# EXHIBIT 6

UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION
- - - - - - - - - - - - - - - - - - - - - - - x
In Re:

    WESTMORELAND COAL COMPANY, et al

           Debtors.
- - - - - - - - - - - - - - - - - - - - - - - x

        Videotaped deposition of MARK
    HOJNACKI, was held at the office of
    SELENDY & GAY 1290 Avenue of the
    Americas, New York, New York, commencing
    December 31, 2018, 7:59 a.m., on the
    above date, before Leslie Fagin, a Court
    Reporter and Notary Public in the State
    of New York.


               - - -




        MAGNA LEGAL SERVICES
   320 West 37th Street, 12th Floor
     New York, New York 10018
       (866) 624-6221



Page 2

1
2    APPEARANCES:
3
     BOIES SCHILLER FLEXNER LLP
4    Attorneys for Mar-Bow Value Partners
               575 Lexington Avenue
5              New York, New York,10022
6    BY:       MICHAEL E. PETRELLA, ESQUIRE
7
8
     DIAMOND McCARTHY, LLP
9    Attorneys for Mar-Bow Value Partners
               Two Houston Center
10             909 Fannin Street
               Houston, Texas 77010
11
     BY:       CHRISTOPHER R. MURRAY, ESQUIRE
12
13
14   SELENDY & GAY PLLC
     Attorneys for the McKinsey RTS and the
15   Witness
               1290 Avenue of the Americas
16             New York, New York 10104
17   BY:       FAITH E. GAY, ESQUIRE
               JOSHUA S. MARGOLIN, ESQUIRE
18             ABBIE PUGH, ESQUIRE
19
20   HOGAN LOVELLS US LLP
     Attorneys for the McKinsey RTS and the
21   Witness
               875 Third Avenue
22             New York, New York
     BY:       PETER A. IVANICK, ESQUIRE
23
24
25



Page 3

```
 1
 2   APPEARANCES, (CONTINUED)
 3   KIRKLAND & ELLIS, LLP
     Attorneys for Westmoreland
 4            609 Main Street
              Houston, Texas 77002
 5
     BY:       ORLA O'CALLAGHAN, ESQUIRE
 6             (Via telephone)
 7
 8   ALSO PRESENT:
 9       RODOLFO DURAN, VIDEOGRAPHER
              MAGNA LEGAL SERVICES
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



Page 4

```
 1
 2          THE VIDEOGRAPHER:  This is the
 3     start of media label No. 1 of the video
 4     recorded deposition of Mark Hojnacki in
 5     the matter In Re Westmoreland Coal
 6     Company, et al., in the United States
 7     Bankruptcy Court for the Southern
 8     District of Texas, Houston Division.
 9     Today is December 31, 2018.  The time is
10     7:59 a.m. and we are located at 1290
11     Avenue of the Americas New York New
12     York.  My name is Rodolfo Duran, I am
13     the legal video specialist.  The court
14     reporter is Leslie Fagin.  We are both
15     in association with Magna Legal
16     Services.  Will counsel please introduce
17     themselves.
18          MR. PETRELLA:  Mike Petrella, Boies
19     Schiller Flexner for Mar-Bow.
20          MR. MURRAY:  Christopher Murray,
21     Diamond Murray for Mar-Bow.
22          MS. GAY:  Good morning, Faith Gay,
23     Selendy & Gay for the deponent Mark
24     Hojnacki and McKinsey RTS.
25          MR. MARGOLIN:  Joshua Margolin,
```



Page 5

```
 1                    Hojnacki
 2        Selendy & gay also for Mr. Hojnacki and
 3        McKinsey RTS.
 4             MS. PUGH:  Abbie Pugh, Selendy &
 5        Gay for the deponent and McKinsey RTS.
 6             MR. IVANICK:  Peter Ivanick, Hogan
 7        Lovells also for Mark Hojnacki and
 8        McKinsey RTS.
 9   M A R K   H O J N A C K I,  called as a
10   witness,  having been duly sworn by a Notary
11   Public, was examined and testified as
12   follows:
13   EXAMINATION BY
14   MR. PETRELLA:
15             MS. GAY:  I want to note for the
16        record Mr. Hojnacki is appearing in part
17        pursuant to the order of U.S. Bankruptcy
18        Judge David R. Jones dated December 20,
19        2018 and the purpose is as follows:  He
20        has to appear by December 31, 2018 for a
21        deposition not to exceed seven hours
22        excluding breaks and the purpose of the
23        deposition is the basis and
24        authorization of his statement set forth
25        at docket numbers 452 and 810 of the
```



```
 1                    Hojnacki
 2        Westmoreland Coal Company Bankruptcy
 3        record and on top of that, the judge has
 4        made clear that in terms of any
 5        statements that Mr. Hojnacki refers to
 6        concerning his two declarations that are
 7        those of a third party, there is no
 8        privilege that applies except for fifth
 9        amendment privilege so we will honor
10        that to the fullest and with regard to
11        David Jones record or his order, we will
12        mark that as, how do you want us to mark
13        the exhibits.
14            MR. PETRELLA:  Let's make it
15        Hojnacki 1.
16            (Hojnacki Exhibit 1 Order marked
17        for identification.)
18        Q.   You are a practice leader at RTS?
19        A.   Yes, sir.
20        Q.   Does that come with a specialty
21   designation or is it just practice leader?
22        A.   Just be a little more specific on
23   specialty designation.
24        Q.   Is there practice leader, this
25   specialty, this division or just practice?
```



Page 7

1                     Hojnacki

2          A.    Just practice.

3          Q.    And how many practice leaders are

4     there at RTS?

5          A.    RTS U.S. probably 15 or so.

6          Q.    You are also a partner at McKinsey

7     & Company Inc., correct?

8          A.    Yes.

9          Q.    Are there any practice leaders at

10    RTS that aren't also partners of McKinsey &

11    Company, Inc.?

12         A.    Can you restate your question.

13         Q.    Of the practice leaders, you said

14    there are about 15 at RTS.  Of those 15 or

15    so, are any of those not also McKinsey &

16    Company, Inc. partners?

17         A.    I'm not aware of any.

18         Q.    Can you just give me your

19    understanding of what Bankruptcy Code Section

20    327 requires of a professional seeking

21    employment in a Chapter 11 case?

22         A.    I'm not an attorney but it's my

23    understanding that 327 is the section of the

24    code that's required -- that allows for

25    retention of professionals by debtors in



 1                    Hojnacki

 2   Chapter 11 cases.

 3        Q.    What quality does the professional

 4   have to have under Section 327?

 5             MS. GAY:  In terms of his

 6        understanding?

 7             MR. PETRELLA:  Yes.

 8        A.    In terms of my understanding, to be

 9   disinterested.

10        Q.    And what is your understanding of

11   what rule 2014A of the bankruptcy rule say

12   about what connections with interested

13   parties the professional has to disclose?

14        A.    Again, I'm not a lawyer but my

15   understanding is that it requires to make

16   appropriate disclosures to demonstrate that

17   you are disinterested.

18        Q.    And what is your understanding of

19   the purposes of rule 2014A?

20             MS. GAY:  Objection to the form.

21        A.    Just repeat your question.

22        Q.    What is your understanding, if any,

23   of the purposes of Bankruptcy Rule 2014A?

24        A.    It's just -- it's designed to help

25   make sure the professional is able to provide



Page 9

1                    Hojnacki

2    unbiased support for its client, the debtors.

3         Q.    And do you have an understanding of

4    what qualifies as a disinterested person

5    under 11 USC 10114?

6         A.    Again, I'm not a lawyer but it's my

7    understanding would be that it requires the

8    professional to demonstrate that it doesn't

9    hold any interest that would cause it to be

10   conflicted in its ability to provide unbiased

11   support for the debtors.

12        Q.    And your declaration that you filed

13   in this case, it is in accordance with

14   Section 327A of Bankruptcy Code as well as

15   Rule 2014A as well as some others, right?

16             MS. GAY:  Mr. Petrella, which

17        declaration are you referring to?

18             MR. PETRELLA:  I'm really referring

19        to both.

20        A.    What was your question, I'm sorry.

21        Q.    I'm just asking those declarations

22   that you submitted in this case, they have

23   been submitted pursuant to Section 327A of

24   the Bankruptcy Code and Rule 2014A of

25   Bankruptcy Rules?



Page 10

1                    Hojnacki

2        A.    I believe that's the case but if

3    you want me to reference the declaration

4    specifically to point to the paragraph, I'm

5    happy to do that.

6        Q.    In connection with the preparation

7    of your declarations in this case, what

8    advice did you receive from legal counsel

9    concerning Rule 327 -- Section 327A of the

10   Bankruptcy Code?

11       A.    So as my declaration states, I did

12   rely on people in the McKinsey general

13   counsel's office as well as others reporting

14   to me in the preparation.  Those people

15   include or those individuals include Peter

16   Ivanick at Hogan Lovells and he advised that

17   the preparation of these declarations was

18   consistent with those sections.

19       Q.    And did he give you any general

20   advice on Section 327A of the code?

21            MS. GAY:  With respect to the

22        declarations?

23            MR. PETRELLA:  In connection with

24        the declarations.

25       A.    I don't recall.



Page 11

1                      Hojnacki

2        Q.    How about Rule 2014A?

3        A.    Just again, as I stated previously,

4    just that the preparations of these

5    declarations was consistent with the

6    requirements under those provisions.

7        Q.    And what is your understanding of a

8    professional's fiduciary obligations in a

9    Chapter 11 case?

10        A.    My understanding of a

11    professional's fiduciary obligations is just

12    that they look out for the best interest of

13    the debtors.

14        Q.    I'm going to show you an exhibit

15    that we will mark as Hojnacki 2.  I ask you

16    to take a look at that document briefly and

17    the first question is, just do you recognize

18    the document.

19            (Hojnacki Exhibit 2 Post petition

20        engagement letters marked for

21        identification.)

22        A.    Yes, I recognize the document.

23        Q.    What is it?

24        A.    It's our post petition engagement

25    letters with the debtors.



Page 12

                          Hojnacki

1

2       Q.    So it's the engagement letter that

3    governs the Westmoreland case with McKinsey

4    RTS, is that fair?

5       A.    Yes.

6       Q.    I would like to direct your

7    attention to section 11, if you would, it's

8    on page 7.

9            MS. GAY:   While Mr. Hojnacki is

10           looking for that, can you slow down just

11           a half hair because it's bouncing a

12           little on the realtime, so I would

13           appreciate that.

14           MR. PETRELLA:   I will try.

15      Q.    Do you have section 11, sir?

16      A.    I do.

17      Q.    About four lines down, do you see a

18   statement that says that RTS -- neither RTS,

19   its affiliates, et cetera shall be acting in

20   a fiduciary capacity?

21      A.    Correct.

22      Q.    And do you see the top, if you look

23   at the top of page 8, it also says that RTS,

24   et cetera will not be deemed a fiduciary?

25      A.    I see that.



 1                    Hojnacki

 2       Q.   Below that by two lines, do you see

 3   where it says that essentially that nothing

 4   will give rise to a fiduciary status on

 5   behalf of RTS?

 6            MS. GAY:  Where exactly are you

 7        reading, Mr. Petrella?

 8            MR. PETRELLA:  Top of page 8, third

 9        line down.

10       A.   Do you mind if I read the whole

11   paragraph instead of the three statements

12   that you cited?

13       Q.   Sure.

14       A.   Thank you.

15       Q.   Got it?

16       A.   Yes, sir.

17       Q.   Doesn't the law provide that RTS is

18   in fact a fiduciary to the debtor in this

19   case?

20            MS. GAY:  Objection to the form.

21        He is not a lawyer.  Do you mean his

22        understanding, Mr. Petrella.

23            MR. PETRELLA:  Sure his

24        understanding.  I believe he testified

25        it's his understanding.



1                      Hojnacki

2           MS. GAY:  I just want to make the

3      record clear.  Thank you.

4      A.    So again, I'm not a lawyer, my

5      understanding is that the declaration that we

6      provided, that I signed was in compliance

7      with the law and the law's requirements.

8      This is specifically stating the actual roles

9      that we would be playing within the

10     assignment to the debtors.

11     Q.    I'm not sure I understand.

12           Section 11 says that McKinsey shall

13     not be deemed a fiduciary, correct, in words

14     or substance?

15     A.    It does have comments about being

16     deemed a fiduciary, yes.

17     Q.    It has three of them, right, saying

18     you are not a fiduciary, right?

19     A.    It does have comments about not

20     being not deemed a fiduciary, yes.

21     Q.    It is your understanding of the law

22     that McKinsey RTS is in fact a fiduciary to

23     the debtor in this case, correct?

24     A.    It's my understanding that we

25     filled out the declarations with the intent



Page 15

```
 1                    Hojnacki
 2   of complying with the law, that is what we
 3   were guided by counsel in preparation of
 4   that.  This is focused on the roles that we
 5   will be playing and performing on behalf of
 6   the debtor and the services that we are
 7   providing, specifically.
 8        Q.   You said a few times now that you
 9   are not a lawyer.  Was there any discussion
10   in the course of leading up to your
11   declarations, was there any discussion of
12   having a lawyer sign these declarations
13   instead of a layman?
14        A.   There was not.
15        Q.   Because I'm asking because in your
16   declaration very early on it lists a bunch of
17   legal provisions that your declaration is
18   pursuant to.  Are you aware that in the A&R
19   case in Richmond Virginia, Judge Hannigan
20   advised McKinsey RTS on the record that it
21   was in fact a fiduciary in these Chapter 11
22   cases?
23             MS. GAY:  Objection.  He is not
24        going to answer questions about A&R.
25             MR. PETRELLA:  He lists A&R in his
```



```
 1                    Hojnacki
 2       declaration as a qualifying basis for
 3       RTS' employment.
 4            MS. GAY:  It's fine if you want to
 5       ask questions about the subject matter
 6       of that bankruptcy in terms of what
 7       industry or something like that but this
 8       is not about the A&R litigation and we
 9       will not go into that today.
10            MR. PETRELLA:  I disagree with
11       that.  I think the judge's order is
12       clear that this is to delve into the
13       basis for his declarations and I think
14       his declaration, in fact, touts the A&R
15       case as one of the qualifications for
16       RTS as a --
17            MS. GAY:  You can put a declaration
18       in front of him and he can answer the
19       questions about the declaration but not
20       about what Judge Hannigan said in A&R,
21       it's well beyond the bounds of the
22       declaration.
23            MR. PETRELLA:  We will disagree on
24       that and I will move on.
25       Q.   The RTS offices are at 55 East 52nd
```



Page 17

```
 1                    Hojnacki
 2   Street, is that right?
 3        A.    Yes, RTS has an office there.
 4        Q.    And are those offices only RTS
 5   offices or is it RTS and other McKinsey
 6   affiliates?
 7        A.    It's a broad based McKinsey office
 8   that includes RTS and others.
 9        Q.    And what other affiliates have
10   offices there that you can think of?
11        A.    I can't state specifically.  I just
12   know there are other McKinsey practitioners
13   that are in that office.
14        Q.    Can you give me an estimate of
15   approximately how many McKinsey professionals
16   are resident in that particular office?
17        A.    In the 55 East --
18        Q.    Yes.
19        A.    No.
20        Q.    Is it more than a hundred, less
21   than a hundred, can you do that?
22             MS. GAY:  Mr. Petrella, slow down
23        it's hard to even hear you from here.
24        A.    It's more than a hundred.
25        Q.    Is it more than 200?
```



Page 18

                        Hojnacki

1

2        A.    I would estimate yes.

3        Q.    How about more than 300?

4        A.    I don't know.

5        Q.    Does RTS have offices anywhere

6    other than 55 East 52nd?

7        A.    I'm not aware of them.

8        Q.    And the number of professional RTS

9    employees at 55 East 52nd, I believe you

10   already testified would be approximately 15,

11   is that fair, excluding support staff and so

12   forth?

13       A.    The 15 that I referenced earlier

14   are resident all around the country.

15       Q.    So how many RTS professionals are

16   actually resident in the 55 East 52nd office?

17       A.    I don't know specifically.

18       Q.    Can you estimate, is it two?

19       A.    I don't know.

20       Q.    Are you the only one?

21       A.    I am in the office in Stamford,

22   Connecticut.

23       Q.    Okay.  Can you just name me any RTS

24   professionals that you know of that are in

25   the 55 East 52nd Street office?



Page 19

```
                             Hojnacki
 1
 2        A.    Not off the top of my head.
 3        Q.    How many other RTS professionals
 4   are there in Stamford with you?
 5        A.    I can recall one.
 6        Q.    Who is that?
 7        A.    Pietro Sorrentino.
 8        Q.    That's all you can think of?
 9        A.    Yes, sir.
10        Q.    Does RTS have its own HR
11   department?
12        A.    Would you ask it one more time.
13        Q.    Does RTS have an HR department
14   dedicated just to RTS?
15        A.    We have a people development
16   function which is a term we refer to which is
17   a function that's designed to manage the
18   people development function, the development
19   of our people within McKinsey RTS
20   specifically.
21        Q.    And who is, that's a function, how
22   about -- who is the person that handles HR
23   for RTS?
24        A.    I don't know.  I know who handles
25   it for me personally.
```



1                    Hojnacki

2          Q.    Who is that?

3          A.    I don't recall her name.

4          Q.    Does that person have a role in

5    McKinsey outside of RTS, to your knowledge?

6          A.    She does.

7          Q.    What is that role?

8          A.    She is the local HR person for the

9    Stamford office.

10         Q.    So she handles everybody in the

11   Stamford office?

12         A.    Correct.

13         Q.    And I believe you already testified

14   but just to confirm, there are other McKinsey

15   professionals in that Stamford office that

16   are not RTS employees or practice leaders, is

17   that fair?

18         A.    Yes.

19         Q.    Does RTS have its own IT

20   department?

21         A.    It does not.

22         Q.    How about its own legal department?

23         A.    To the best of my knowledge it does

24   not.

25         Q.    Does it share its legal department


MAGNA
LEGAL SERVICES

Page 21

```
 1                    Hojnacki
 2  with any other McKinsey entities?
 3       A.   It's my understanding it's part of
 4  McKinsey's broader office of the general
 5  counsel.
 6       Q.   So is it your understanding that
 7  McKinsey has one general counsel's office and
 8  that covers all McKinsey affiliates?
 9       A.   I can't speak to the composition of
10  the entire general counsel's office.
11       Q.   Let's actually mark your first
12  declaration.  We will call that Hojnacki 3.
13            (Hojnacki Exhibit 3 Declaration
14       marked for identification.)
15       Q.   I ask you take a brief look at that
16  and leaf through it and just confirm that
17  that's your first declaration in this matter
18  for Westmoreland?
19       A.   Yes, sir, it appears to be.
20       Q.   If you could look at page 3,
21  paragraph 7, just a little piece at the
22  bottom and it goes over to page 4.
23       A.   Yes, sir.
24       Q.   Then starting there and going
25  through paragraph 10, you talk about two
```



Page 22

```
 1                     Hojnacki

 2   practices.  The EPNG and basic materials

 3   practice.

 4            Do you see that?

 5        A.   Yes.

 6        Q.   Are people from those practices

 7   being used on the Westmoreland engagement?

 8        A.   Generally speaking, yes.

 9        Q.   What does that mean, generally

10   speaking?

11        A.   The practice groups are loose

12   affiliations of people with a specific

13   interest in either topics related to a

14   specific sector, economic sector, in this

15   case EPNG or basic materials or a passion for

16   serving clients in those spaces.  So they

17   affiliate themselves with these practice

18   areas, but ultimately they are assigned to

19   other actual legal affiliates.

20        Q.   But in your declaration here you

21   don't disclose the individuals from these

22   practices that are working on the engagement,

23   correct?

24        A.   Would you ask your question again,

25   please.
```



1                    Hojnacki

2        Q.    In your declaration, you don't

3    identify the individuals from these practice

4    groups that are working on the engagement, is

5    that correct?

6        A.    By name, no.

7        Q.    Approximately how many people,

8    between these two practice groups are working

9    on the engagement?

10            MS. GAY:   On the Westmoreland

11        engagement?

12            MR. PETRELLA:   Correct.

13        A.    I would only be able to estimate

14    because again these are loose affiliations

15    with people, so one individual's choice to

16    associate themselves with that practice would

17    be a personal decision and so it's hard for

18    me to say whether or not they choose to

19    individually assign themselves or associate

20    themselves with these practice areas.

21        Q.    But you are either assigned to it

22    or you are not, you can't float in and out of

23    the assignment, can you?

24        A.    Over time, people do move between

25    practice areas if they are in a longer period



Page 24

1                    Hojnacki

2    of time with McKinsey.

3        Q.   I'm not talking about that.  I'm

4    talking about this engagement.  If I am on

5    the EPNG team and I decide to work on the

6    Westmoreland engagement, am I allowed to just

7    say, you know what, I don't have a passion

8    for this anymore, I'm out of here, I'm going

9    to do something else.  Can they do that?

10            MS. GAY:  Just to clarify whether

11        you can move out of Westmoreland or

12        EPNG?

13        Q.   I'm saying, if you are in the EPNG

14    group, are you allowed to basically decide in

15    the middle of the engagement that you prefer

16    not to be on the engagement anymore?

17        A.   I think you are trying to draw a

18    finer line than there really is.  A person,

19    as part of their career at McKinsey, can

20    associate themselves with these practices and

21    it can be as hard as they want an association

22    or light as an association as they want,

23    depending on what their own individual growth

24    platform and trajectory is.

25            So it's hard for me to say that I



Page 25

```
 1                      Hojnacki
 2    can by name go through the entire
 3    Westmoreland engagement team and say yes or
 4    no.
 5         Q.    Can you just give me a rough
 6    estimate of how many people at McKinsey are
 7    on the Westmoreland engagement team?
 8         A.    Immediately prior to the holidays,
 9    I estimate, it's 19 people.
10         Q.    What about after the holidays?
11         A.    Starting after New Years?
12         Q.    You made a distinction based on the
13    holidays, so it sounded like the number was
14    going to change based on that, so I'm
15    inquiring as to that.
16         A.    I anticipate it to be the same.
17    I'm saying the last factual data is prior to
18    the holidays.
19         Q.    So there are about 19 people on the
20    team.  Are you able to identify any of those
21    people who are at least, in your mind, are on
22    the EPNG team, the practice group?
23         A.    I can tell you that I would
24    affiliate myself with the EPNG group.
25         Q.    Anybody else?
```



MAGNA
LEGAL SERVICES

```
 1                    Hojnacki

 2        A.    By name?

 3        Q.    Yes.

 4        A.    Chris Hagidorn (phonetic).  Any

 5   others, you know, again, I can't say their

 6   own personal preference to be associated with

 7   this group or not.

 8        Q.    So yourself and Chris Hagidorn and

 9   you can't verify anymore beyond that?

10        A.    No.

11        Q.    How about the basic materials

12   group, anyone you can identify that was in

13   that group, is in that group?

14             MS. GAY:  Who is on the

15        Westmoreland engagement team?

16             MR. PETRELLA:  Correct.

17        A.    The two that I would identify would

18   be Eugene Schmitt and Joe Basar (phonetic).

19        Q.    How many RTS professionals are

20   working on the Westmoreland engagement?

21        A.    Again, using the reference of at

22   the time of the holidays here, just a couple

23   of weeks here, seven.

24        Q.    Who are those people?

25        A.    Myself.
```



Case 18-55672 Document 90s-2 Filed in TXSB on 04/01/19 Page 27 of 346

Page 27

```
 1                    Hojnacki
 2        Q.    Right.
 3        A.    Kevin Carmidi, Chris Hagidorn, Rob
 4   Montgomery, Becca Bauman, Raj Roy and Elliot
 5   Neil (phonetic).
 6        Q.    Are those all practice leaders?
 7        A.    No.
 8        Q.    Can you identify, you and Mr.
 9   Carmidi are practice leaders, I assume, is
10   that correct?
11        A.    Correct.
12        Q.    Chris?
13        A.    Chris Hagidorn.
14        Q.    Chris Hagidorn?
15              MS. GAY:   You guys can't talk over
16        each other and slow down.  The court
17        reporter she can't get it down and you
18        will regret it.
19              MR. PETRELLA:   We have the video.
20        Q.    Chris is a male or female?
21        A.    Chris is a male.
22        Q.    Practice leader, is Chris a
23   practice leader?
24        A.    Yes.
25        Q.    Montgomery, is that a practice
```



Page 28

```
 1                    Hojnacki
 2    leader?
 3         A.    No.
 4         Q.    What is their title?
 5         A.    He is a senior vice-president.
 6         Q.    How about Bauman?
 7         A.    She is a vice-president.
 8         Q.    Roy?
 9         A.    He is a senior associate.
10         Q.    Is practice leader the highest
11    designation at RTS?
12         A.    Yes.
13         Q.    My understanding, so far and
14    correct me if I am wrong is the EPNG and
15    basic materials are essentially practice
16    groups within McKinsey, is that fair?
17         A.    As opposed to?
18         Q.    As opposed to legal entities?
19         A.    Yes.
20         Q.    What legal entities are they part
21    of?
22         A.    I can't say specifically.  My
23    assumption is, again, because as I defined
24    it, it's an affiliation of people with the
25    desire to serve clients or build knowledge in
```



Page 29

```
 1                    Hojnacki
 2   a specific area and so it likely crosses
 3   multiple legal entities.
 4        Q.   Do you know what competitors of
 5   Westmoreland people from the EPNG practice
 6   group have served?
 7        A.   Can you be more specific?
 8        Q.   I'm just saying, of the people in
 9   the EPNG practice group, do you know what
10   competitors of Westmoreland those people have
11   provided services to?
12        A.   Of the EPNG group more broadly or
13   those that are members of the service team
14   and the engagement team serving Westmoreland.
15        Q.   Let's start with the latter.  The
16   service team and engagement team?
17        A.   So any party that's on the
18   interested parties list that's served by the
19   services team is disclosed in the
20   declaration.
21        Q.   And how about the broader group of
22   EPNG, have they --
23             MS. GAY:  Objection to the form.
24        Be clear on what your question is if you
25        can, Mr. Petrella.
```



Page 30

1                    Hojnacki

2        Q.    The broader group of EPNG, of those

3    individuals, do you know whether they have

4    served any competitors of Westmoreland?

5        A.    So as it states in the declaration

6    and I'm happy to go through it in detail, we

7    have tried to identify for McKinsey RTS or

8    any affiliate whether or not there is a

9    client that is being served that is in a

10   direct commercial relationship with the

11   debtors.

12       Q.    Did you find any?

13       A.    They are disclosed in the

14   declaration if we did.

15       Q.    Just sitting here right now, you

16   don't know?

17       A.    We can go through the declaration

18   and look.

19       Q.    You submitted two declarations in

20   this case, the second one was December 17,

21   2018, is that correct?

22       A.    I have submitted two.  The specific

23   dates, I would have to check the dates of the

24   filings.

25       Q.    We will look at your supplemental



                         Hojnacki

1          declaration a little later.

2                    How were you selected to be the

3          signatory on these declarations?

4               A.   I am the practice leader that's in

5          charge of the Westmoreland assignment.

6               Q.   So is that essentially the policy

7          that the practice leader of the assignment

8          signs the declaration?

9               A.   I don't know if it's a specific

10         policy but it's the expectation that the

11         partner in charge of -- the practice leader

12         in charge of the assignment for serving the

13         debtors would sign the declarations.

14              Q.   Who is it that decides ultimately

15         at McKinsey what connections get disclosed

16         and which don't?

17              A.   So again, I'm happy to go through

18         the details that we do to identify

19         connections.  Ultimately those, that

20         information that comes through the various

21         sources that we check is reviewed by internal

22         and external counsel to identify the

23         disclosures that are made.

24              Q.   In the course of preparing your two



MAGNA
LEGAL SERVICES

Page 32

```
 1                    H o j n a c k i
 2    declarations, do you recall any disagreements
 3    over what should be disclosed or what kind of
 4    connections ought to be disclosed?
 5         A.    I don't recall any, no.
 6         Q.    And that includes legal counsel?
 7         A.    Between myself and legal counsel or
 8    amongst themselves.
 9         Q.    I'm just asking, any disagreement
10    that you are aware of of any kind with
11    anybody about what disclosures belong in your
12    declarations and what don't?
13         A.    I can't speak to that.
14         Q.    By definition you can.  I'm asking
15    about your awareness.
16         A.    I can't speak to disagreements that
17    happened to people outside of myself.
18         Q.    I understand that.
19               Did you hear about any
20    disagreements about the scope of the
21    connections that had to be disclosed in your
22    declarations?
23               MS. GAY:  Objection to the form.
24         Just make sure the question is clear.
25         A.    Would you ask specifically what
```



MAGNA
LEGAL SERVICES

Page 33

1                        Hojnacki

2    disagreements you are asking if I am aware

3    of.

4         Q.   I'm asking about any disagreement

5    of any kind that you heard about or that you

6    are aware of concerning what connections

7    should or should not be disclosed in your

8    declarations?

9         A.   I'm not aware of any.

10        Q.   Other than Mar-Bow and the trustee,

11   to your knowledge, has anyone outside of

12   McKinsey expressed a view in any way that

13   your disclosures were insufficient in this

14   case, in any way?

15        A.   Would you restate the question.

16        Q.   Can you read it back?  I thought it

17   was pretty clear.

18             (Record read.)

19        A.   So I think the only thing with the

20   question is, I don't think we've disagreed

21   that our disclosures -- McKinsey or McKinsey

22   RTS has disagreed that our disclosures are

23   insufficient.  It's only the U.S. Trustee and

24   Mar-Bow at this point.

25        Q.   You are not aware of anybody else



Page 34

```
 1                    Hojnacki
 2   that expressed that view?
 3        A.    I am not aware of anybody else.
 4        Q.    Either prior to or subsequent to
 5   signing your declarations?
 6        A.    In the Westmoreland case?
 7        Q.    Correct.
 8        A.    No.  Will you state the question
 9   again because you are bringing multiple
10   periods of time into one question.
11        Q.    I'm trying to be as broad as
12   possible.  I'm talking about at any time
13   leading up to your declarations or after your
14   declarations, other than Mar-Bow or the U.S.
15   Trustee, are you aware of anybody anywhere
16   that's expressed any -- has expressed any
17   view that your disclosures in the case are
18   insufficient?
19        A.    Specific to Westmoreland?
20        Q.    Yes.  Your Westmoreland disclosures
21   in this case.
22        A.    So I know that our counsel had
23   discussions with the U.S. Trustee in advance
24   of filing to make sure that the U.S. Trustee
25   was comfortable with the approach that we
```



Page 35

```
 1                    Hojnacki
 2    were using.  I am not aware that Mar-Bow had
 3    any disagreement to our disclosures prior to
 4    the filing of our declaration.
 5         Q.   Are you finished?
 6         A.   Yes.
 7         Q.   I just wanted to know if you were
 8    still thinking or not.
 9              So it sounds like, other than U.S.
10    Trustee, other than Mar-Bow, you are not
11    aware of any view that your disclosures in
12    this case are insufficient?
13              MS. GAY:  That misstates his
14         answer.
15         Q.   Why don't you answer that question
16    then.
17         A.   Would you ask the question again?
18         Q.   The question is, are you aware of
19    anybody who has expressed the view that your
20    disclosures in this case, the Westmoreland
21    case are insufficient other than the U.S.
22    Trustee or Mar-Bow?
23         A.   I am not aware of anybody else.
24         Q.   Who was involved in drafting your
25    declarations?
```



Page 36

```
 1                    Hojnacki
 2       A.    The McKinsey legal department and
 3   external counsel.
 4       Q.    And external counsel?
 5       A.    Yes.
 6       Q.    And who specifically at the
 7   McKinsey legal department?
 8       A.    So I can't state who specifically
 9   was drafting the document.  The person that I
10   interacted with most is Laurie Basch.
11       Q.    Do you know of anyone else at
12   McKinsey legal that worked on your
13   declarations in Westmoreland?
14       A.    Are you asking just within McKinsey
15   legal.
16       Q.    For now, right, yes.
17       A.    Victoria Crane.
18       Q.    Anyone else?
19       A.    I am not aware of anybody else.
20       Q.    How about outside lawyers?
21       A.    Peter Ivanick at Hogan Lovells and
22   another member of his team, I believe the
23   name is Alex.
24       Q.    He is also at Hogan Lovells?
25       A.    Yes, sir.
```



1                    Hojnacki

2       Q.    Anyone else you are aware of from

3   outside counsel?

4       A.    No.

5       Q.    Ms. Gay's firm was not involved?

6       A.    Not in the drafting of the

7   document.  They provided -- they provided

8   comments in support.

9       Q.    Who was primarily responsible for

10   drafting the words in your declaration?

11       A.    Like I said, I didn't sit next to

12   them as they drafted the words but the person

13   that I interacted most with was Laurie Basch.

14       Q.    Is it your understanding that

15   McKinsey legal drafted the words and then

16   maybe Mr. Ivanick had some input on it, is

17   that how it worked?

18       A.    I can't say specifically the

19   distribution of the workload.

20       Q.    Do you know whether Mr. Ivanick's

21   firm did the first draft of your

22   declarations?

23       A.    I don't know specifically, again,

24   the drafting of the document.

25       Q.    But in any event, did you write any



Case 15-10541-BLS    Doc 2417-6    Filed 04/24/19    Page 39 of 347
Case 18-35672    Document 905-2    Filed in TXSB on 04/01/19    Page 38 of 346

Page 38

```
 1                      Hojnacki
 2  of the words in your declarations?
 3        A.    I did not -- I provided comments
 4  and edits to the document at various points
 5  in time, yes.
 6        Q.    How many different drafts of your
 7  declarations did you see?
 8        A.    I can't recall the specific number
 9  but it was several.
10        Q.    It was several, would you say more
11  or less than ten?
12        A.    Probably more.
13        Q.    And you say you made edits to the
14  documents?
15        A.    Edits and provided comments, yes.
16        Q.    Is that true of both your
17  declarations or just your first?
18        A.    Both.
19        Q.    Same thing, more than ten drafts
20  for both?
21        A.    I would estimate, yes.
22        Q.    When you made edits, did you make
23  them by hand with pen or did you make them on
24  the computer?
25        A.    Typically on the computer.
```



```
 1                    Hojnacki
 2       Q.    Did you do it like a red line with
 3  comments or did you just type out a memo or
 4  email and said here are my comments?
 5       A.    Probably a little bit of both.
 6       Q.    Did you retain the different drafts
 7  that you did?
 8       A.    I shared the drafts back with
 9  Laurie and Peter.
10       Q.    So presumably those are still in
11  existence, correct?
12       A.    I can't say.
13       Q.    Do you have any reason to believe
14  they are not still in existence?
15       A.    No.
16       Q.    Did you make any edits by hand?
17       A.    I don't recall any.
18       Q.    How many hours would you say that
19  you worked total on the process leading up to
20  your declarations and editing your
21  declarations?
22       A.    Hours leading up to and editing?
23       Q.    I'm kind of asking for the whole
24  boat here.  From the time you started the
25  process of working on your -- preparing to
```



Case 15-10541-BLS    Doc 2417-6    Filed 04/24/19    Page 41 of 347
Case 18-35672    Document 905-2    Filed in TXSB on 03/01/19    Page 40 of 346

Page 40

```
 1                    Hojnacki

 2   prepare your declaration and sign your

 3   declaration and editing the declaration,

 4   start to finish, what would you say your

 5   total hours were that you spent on that?

 6        A.   I don't recall specifically but it

 7   was many.

 8        Q.   Would you say it's more than a

 9   hundred hours?

10             MS. GAY:  On each declaration?  I

11        want to make this as clear as possible.

12        Q.   Let's break it down.  How about on

13   your first declaration, would you say you

14   spent more than a hundred hours on that?

15        A.   Probably not more than a hundred

16   but more than 40.

17        Q.   Somewhere between 40 and a hundred

18   is fair.

19             How about your second declaration?

20        A.   Likely similar amount of time.

21        Q.   And do you log that time; do you

22   record that time?

23        A.   Not typically.  I don't usually

24   bill that time to the client.

25        Q.   So in the event that there is a fee
```



Page 41

                          Hojnacki
 1
 2    application by McKinsey in this case, those
 3    hours will not be claimed?
 4         A.   Certainly not to the level that I
 5    actually spent in doing it.
 6         Q.   In other words, some hours may be
 7    claimed but not all of them?
 8         A.   Yes, yes.
 9         Q.   So your timesheets will reflect --
10    withdrawn.
11              The timesheets that you submit to
12    the court will reflect some fraction of the
13    hours that you actually spent?
14              MS. GAY:   Let's be clear, on
15         preparing the declarations.
16              MR. PETRELLA:   Working on the
17         declarations, broadly construed.   Go
18         ahead.
19         A.   Any time that's submitted to the
20    court will be a fraction of what I actually
21    spent in preparation of these declarations.
22         Q.   Is there any other work that RTS
23    has done or plans to do that will not be
24    billed in full to the debtor?
25         A.   We don't bill all of our travel



Page 42

```
 1                    Hojnacki
 2   time.  I think it's customary that 50 percent
 3   of the our travel time is actually billed to
 4   the debtor, to the extent it is not actually
 5   productive working on the matter but
 6   generally the rest of our time would be
 7   billed to the debtor.
 8        Q.   So it's only the preparation of the
 9   disclosure declarations where there is kind a
10   haircut on time, is that fair?
11        A.   I wouldn't call it a haircut on
12   time.  I would state that the amount of time
13   that I spent to prepare these is substantial
14   and I take all the necessary time to make
15   sure that it's completed and I don't charge
16   the debtor for all of that time.
17        Q.   Will your timesheets, if you submit
18   them to the court, will they reflect the time
19   you actually spent and then show here is the
20   fraction that we are claiming?
21        A.   I don't understand your question.
22        Q.   In other words, when you put your
23   timesheets in for a fee application, will you
24   list all the time that you actually spent and
25   then say, make some notation and say we are
```



Page 43

1                        Hojnacki

2    not claiming all this time, we only want X

3    hours, will you do anything like that?

4         A.    Show the gross and then the net?

5         Q.    Yes.

6         A.    No, it would show just the fraction

7    that is being charged to the debtors.

8         Q.    And you would decide what fraction

9    that is, right?

10        A.    I would record my time entries and

11   I would choose, yes.

12        Q.    You would choose what fraction to

13   submit?

14        A.    I would choose any sort of time

15   entry that I wanted to charge to the debtor

16   in relation to retention documents.

17        Q.    And you don't need authority or

18   approval or anything to charge the debtor

19   less than the time you actually spent?

20        A.    No.  I think the debtor would

21   actually appreciate charging less time.

22        Q.    I'm just saying internal to

23   McKinsey, do you have the authority to do

24   that?

25        A.    Yes.



Page 44

```
1                    Hojnacki
2        Q.   Was there anything that counsel or
3   anyone at McKinsey wanted you to say in your
4   declaration that you either refused to say or
5   declined to say?
6        A.   I don't recall anything.
7        Q.   Do you recall taking out any
8   language that you didn't like or you didn't
9   want?
10       A.   Again, I provided edits, the
11  specific details of all those edits, I don't
12  recall at this time.
13       Q.   Do you remember any of those edits
14  being particularly controversial, being the
15  subject of extended discussion either
16  internally or with legal counsel?
17            MS. GAY:   Objection to the form.
18       You can answer.
19       A.   We had lengthy conversations about
20  a variety of topics but typically it was
21  around making sure that I as the declarant
22  was extremely comfortable and understood to
23  the best of my ability what was being
24  included.
25       Q.   What was the single most discussed
```



Page 45

```
 1                    Hojnacki
 2   topic to your recollection?
 3           MS. GAY:   Objection to the form.
 4       You can answer.
 5       A.    I don't recall.
 6       Q.    Do you recall any particular topic
 7   of what you would characterize as extended
 8   discussion?
 9       A.    There were topics around -- in
10   which declaration?
11       Q.    Let's start with your first.
12       A.    I don't recall any in the first.
13       Q.    How about the second?  That was
14   just a few weeks ago?
15       A.    Sure.  In the second, there was
16   conversation around the willingness to waive
17   the $96,000 claim in response to the U.S.
18   Trustee's objection to the additional details
19   of the confidential client that still
20   remains.  Those are two.  I'm sure there are
21   many more.
22       Q.    Were there differing views on
23   whether to waive that $96,000 sum?
24       A.    I don't think there was differing
25   views.  I mean certainly we believed that the
```



Page 46

1                    Hojnacki

2    $96,000 is covered by the retainer that is

3    held at the time of filing but we are happy

4    to do it and contribute those funds back to

5    the debtor for the services that were

6    provided.

7        Q.   So to your recollection the

8    discussion was, we should waive the $96,000,

9    everyone agreed and that was it?

10       A.   I don't want to like

11   mischaracterize a long series of

12   conversations with a simple sentence but

13   again, it was trying to understand what the

14   basis was for the U.S. Trustee's objection

15   and then coming to the conclusion that it was

16   the best way to handle it by waiving it.

17       Q.   So was there some sort of extended

18   analysis of whether it was appropriate or

19   required to waive the $96,000?

20       A.   There was multiple conversations

21   had with internal counsel and external

22   counsel about it.

23       Q.   Before Mar-Bow's objection was

24   filed, was there any consideration of waiving

25   that $96,000 sum?


MAGNA
LEGAL SERVICES

Page 47

```
                                     Hojnacki
 1
 2         A.    I don't recall one, no.
 3               I'm sorry, before you proceed, we
 4   had a conversation about the $96,000 that was
 5   due for the one day prior to the last day
 6   that the debtors made payment and the date of
 7   their Chapter 11 filing.  We knew what the
 8   amount was, we articulated the amount and we
 9   knew that there was a retainer in place at
10   the time of filing to cover it.
11         Q.    When was that conversation?
12         A.    In advance of filing the original
13   declaration.
14         Q.    We've talked about Mr. Ivanick's
15   firm, we talked about McKinsey legal.
16               Anyone else that you can recall
17   that was involved in the process of preparing
18   your declarations?
19         A.    McKinsey finance is involved.
20         Q.    And who at McKinsey finance is
21   involved in that?
22         A.    I don't know the direct individual.
23         Q.    Who else; anyone else?
24         A.    That's all I recall.
25         Q.    How about searches for connections
```



Page 48

1                    Hojnacki

2  and so forth, who was involved in that?

3       A.    Those searches are performed on our

4  global client database by McKinsey finance,

5  at the direction of the legal team working at

6  my direction.

7       Q.    So legal is working at your

8  direction and legal is kind of directing

9  finance on these searches, is that fair?

10      A.    That's fair.

11      Q.    How about, you talked about email

12  surveys in your declaration.  Who was

13  involved in that?

14      A.    They're prepared by Laurie Basch

15  and her team.

16      Q.    Again, in terms of the actual

17  individuals that did the database searches,

18  you don't know any names of those?

19      A.    No, sir.

20      Q.    Approximately how many

21  conversations did you have with Ms. Basch

22  about your declarations, the contents of your

23  declarations?

24      A.    Both declarations?

25      Q.    Yes.



Page 49

1                        Hojnacki

2        A.    I couldn't tell you specifically

3    but it was, I would estimate it to be several

4    dozen.

5        Q.    Tell me what you recall about the

6    substance of the discussions you had

7    regarding your first declaration with Ms.

8    Basch?

9        A.    Is there is a specific --

10        Q.    Anything you can remember, as much

11    as can you remember.

12        A.    We discussed a general approach

13    that was being followed for the preparation

14    of the disclosures.  We discussed the various

15    analyses that were included in there in terms

16    of the both, as I mentioned the $96,000 claim

17    as well as the other payments that were made

18    prior to the filing date.  Those were the

19    general matters of topics but again we spent

20    substantial time going through it in detail

21    and providing comments back and forth.

22        Q.    Can you remember anything else

23    about those conversations?

24        A.    Not at the moment.

25        Q.    You said you had discussions about



```
 1                    Hojnacki
 2    the general approach.  Tell me about those
 3    conversations?
 4         A.   It was, again, the approach to
 5    review all the connections for the service
 6    team as defined in the declaration and then
 7    to use the approach of surveying the partners
 8    of McKinsey RTS and its affiliate to identify
 9    any instances where members -- parties on the
10    interested parties list were involved in a
11    direct commercial relationship with the
12    debtor.
13         Q.   Is that an approach you were
14    familiar -- withdrawn.
15              Is that an approach you were
16    familiar with prior to this engagement, the
17    Westmoreland engagement?
18         A.   I understand that it's an approach
19    that's been used before.
20         Q.   But is it one that you were
21    familiar with?
22         A.   It's one that I, based on my
23    conversations with counsel, we have used in
24    situations before.
25         Q.   For example, you were involved in
```



Case 16-35672   Document 905-2   Filed in TXSB on 04/01/19   Page 51 of 346

Page 51

```
 1                    Hojnacki
 2  signing the declarations in the Sun Edison
 3  case, weren't you?
 4      A.   Yes.
 5      Q.   Did the approach in Sun Edison
 6  differ from the approach in the Westmoreland
 7  case?
 8      A.   It's my understanding that the
 9  approach that we used here in Westmoreland is
10  consistent with the approach that we worked
11  with the U.S. Trustee on and the trustee
12  agreed to in the Sun Edison case.
13      Q.   So in other words, you had a
14  conversation with the trustee in Sun Edison,
15  agreed upon an approach and you used that
16  same approach here in Westmoreland?
17      A.   I did not have a conversation
18  directly with the trustee.
19      Q.   Someone did and they related that
20  conversation to you?
21      A.   I can't speak to specific
22  conversations that were had.  It was relayed
23  to me that this is the same approach that we
24  followed in that case, in the Sun Edison
25  case.
```



Case 18-35672   Document 905-2   Filed in TXSB on 04/01/19   Page 52 of 346

Page 52

1                    Hojnacki

2        Q.    So did you know about these

3   conversations with the trustee at the time of

4   the Sun Edison case or is this something you

5   just learned in connection with Westmoreland?

6        A.    I signed the declaration for Sun

7   Edison a long time ago so specifically what I

8   recall from that is -- I don't know.

9        Q.    In connection with the preparation

10   of your declarations in Westmoreland though,

11   do you recall Ms. Basch telling you, look we

12   are using the same approach that we used in

13   Sun Edison which was kind of okayed by the

14   trustee's office?

15       A.    I don't remember if it was Ms.

16   Basch specifically but in conversations in

17   preparation of filing this, whether it was

18   Ms. Basch or Mr. Ivanick, we had the

19   conversations relative to that.

20       Q.    Were you surprised then when the

21   trustee objected to your declarations?

22            MS. GAY:   In Westmoreland?

23       Q.    In Westmoreland.

24       A.    So it's my understanding that prior

25   to the filing of the original declaration,



Page 53

1                    Hojnacki
2  Mr. Ivanick had conversations with the U.S.
3  Trustee about applying the same approach, the
4  approach that was applied in Sun Edison in
5  this case and there was no concern and those
6  were the topics of conversation all the way
7  up until the U.S. Trustee filed their
8  objection in this case.
9        Q.  So you understand from Mr. Ivanick
10  that before you filed your first declaration
11  in Westmoreland, he had a conversation with
12  the U.S. Trustee's office where they agreed
13  with the same approach that had been used in
14  Sun Edison, is that right?
15        A.  I can't speak to the specifics of
16  the conversation because I wasn't a party to
17  it.
18        Q.  I understand.  It's just your
19  understanding --
20        A.  It's my understanding from my
21  conversations with Mr. Ivanick that he had
22  conversations with the U.S. Trustee's office
23  and there was not concerns raised relative to
24  the approach we were employing.
25        Q.  That was before you actually filed



Case 18-35672    Document 905-2    Filed in TXSB on 03/01/19    Page 54 of 346

Page 54

```
 1                    Hojnacki
 2   the declaration itself, right?
 3        A.   I don't recall, I don't recall.
 4        Q.   Do you know whether Mr. Ivanick
 5   provided the trustee's office with a draft of
 6   your first declaration in Westmoreland before
 7   it was filed?
 8        A.   Will you ask the question again?
 9        Q.   Do you know whether before you
10   filed your first declaration in this case, do
11   you know whether Mr. Ivanick provided the
12   trustee's office with a draft of your
13   proposed declaration?
14        A.   I can't state specifically that he
15   did, but I do recall conversations of him
16   discussing the intent to.
17        Q.   In other words, before your first
18   declaration was filed, Mr. Ivanick told you
19   that he planned to provide a draft to the
20   U.S. Trustee's office, is that fair?
21        A.   I don't recall.
22        Q.   You said Ms. Gay's firm had some
23   involvement in the preparation of your
24   declarations.  Can you tell me who you worked
25   with on that?
```



Page 55

1                     Hojnacki

2        A.    It would predominantly have been

3    Mr. Margolin or Ms. Chung.

4        Q.    Tell me as much as you can remember

5    about your conversations with Ms. Chung?

6        A.    I don't recall the substance of

7    those conversations.

8        Q.    Did you speak with Ms. Chung in

9    connection with both your declarations or

10   just the first one?

11       A.    I don't recall.

12       Q.    So you don't remember anything you

13   discussed with Ms. Chung leading up to your

14   declarations?

15       A.    No.

16       Q.    How about Mr. Margolin?

17       A.    Same.

18            MS. GAY:  Margolin.

19            MR. MARGOLIN:  Margolin.

20       Q.    Let's go back to Mr. Ivanick.

21            Tell me anymore conversations you

22   can recall with him leading up to either your

23   first declaration or your second declaration?

24       A.    Again, the specific details of the

25   many conversations we have are going to


MAGNA
LEGAL SERVICES

Case 15-10541-BLS   Doc 2417-6   Filed 04/24/19   Page 57 of 347
Case 18-35672   Document 905-2   Filed in TXSB on 04/01/19   Page 56 of 346

Page 56

```
 1                    Hojnacki
 2  escape me right now.
 3       Q.   You had a couple of specifics so
 4  far, so let's see if you can do better.  Keep
 5  going.
 6            MS. GAY:  Objection to the form.
 7       Maybe if you can tie it to a paragraph
 8       you will get there.
 9            MR. PETRELLA:  I'm not trying to
10       tie it to a paragraph.
11       Q.   You had conversations with Mr.
12  Ivanick, right?
13       A.   Yes.
14       Q.   In connection with your
15  declarations, right?
16       A.   Yes.
17       Q.   About how many?
18       A.   Again, the specific number I don't
19  recall but I would estimate it to be several
20  dozen.
21       Q.   So just any specific conversations
22  that you can recall as you sit here today,
23  just let me know what they were?
24       A.   Again, there were many, but I mean
25  there were specific conversations about the
```


MAGNA
LEGAL SERVICES

Page 57

```
 1                    Hojnacki
 2   payments leading up to the -- the payments
 3   received in the 90 days prior to the filing.
 4   The $96,000 claim for the day immediately
 5   prior to the bankruptcy filing.  The fact
 6   that we were using the template that was
 7   agreed to by the U.S. Trustee in the Sun
 8   Edison case in this matter and again, many
 9   more but those are just specific things that
10   stand out beyond the general preparation of
11   the documents and the comments and the back
12   and forth associated with the preparation of
13   this.
14        Q.   Did you follow all the advice that
15   Mr. Ivanick gave you?
16        A.   Can you be more specific?
17        Q.   Well, I don't want to be too more
18   specific.  All I want to know is, is there
19   any advice that Mr. Ivanick gave you where
20   either you or someone inside McKinsey legal,
21   anyone else said, thanks for the advice, we
22   are not going to go that way?
23        A.   I can't speak for anybody else
24   inside McKinsey.
25        Q.   Just asking to your knowledge.
```



Page 58

1                    Hojnacki

2         A.   Are you asking about myself or to

3    the best of my knowledge?

4         Q.   To the best of your knowledge,

5    whether it was conveyed to you directly or

6    whether you heard about it from someone else?

7         A.   I am not aware.

8         Q.   You are not aware of any instances

9    where Mr. Ivanick gave you advice and you

10   declined to take that advice, is that fair?

11        A.   At this moment I don't recall any.

12        Q.   And you don't recall hearing, you

13   don't recall hearing of any advice that Mr.

14   Ivanick gave to RTS that someone else at RTS

15   or someone else at McKinsey decided not to

16   take?

17             MS. GAY:  Objection to the form.

18        If you can understand it, you can answer

19        it.

20        A.   Can you break it into two

21   questions?

22        Q.   I will rephrase it.

23             MS. GAY:  Thanks.

24        Q.   Are you aware, in any way, of any

25   advice that Mr. Ivanick gave to RTS that



Page 59

```
 1                    Hojnacki
 2  McKinsey, anyone inside McKinsey declined to
 3  accept or declined to take?
 4      A.   I am not aware of any, no.
 5      Q.   In preparing your declarations, did
 6  you discuss with counsel any of the
 7  allegations raised by Mar-Bow in this case or
 8  Jay Alix in any other case?
 9          MS. GAY:  Objection to the form.
10      A.   Would you restate your question or
11  ask again, please?
12      Q.   You are aware that, for example, in
13  the A&R case there is a challenge by Mar-Bow
14  to McKinsey's disclosures, is that fair?
15      A.   I am aware of that, yes.
16      Q.   You are aware of the lawsuit here
17  in the Southern District of New York?
18      A.   Specifically which one?
19      Q.   The RICO action.
20      A.   I am aware of that, yes.
21      Q.   The allegations in A&R and the
22  allegations in the RICO action in the
23  Southern District, did you discuss those with
24  counsel during the preparation of your
25  declarations?
```



Page 60

1                    Hojnacki

2        A.   We discussed the existence of the

3   two lawsuits.

4        Q.   What else did you discuss about

5   them?

6            MS. GAY:   In connection with the

7        preparation of the declarations?

8            MR. PETRELLA:   Yes.   Only in

9        connection with the preparation of the

10       declarations.

11       A.   I mean we discussed the existence

12   of them and certainly there is paragraphs in

13   here that address specific items associated

14   with those litigations that we wanted to

15   include.

16       Q.   Who were those conversations with?

17       A.   Mr. Ivanick and Ms. Basch,

18   primarily.

19       Q.   Anyone else?

20       A.   I don't recall.

21       Q.   As you sit here today, are you

22   aware of any other McKinsey connections

23   related to the Westmoreland case that have

24   not yet been disclosed?

25       A.   I believe with the filing of our



Case 15-10541-BLS   Doc 2417-6   Filed 04/24/19   Page 62 of 347
Case 16-35672   Document 905-2   Filed in TXSB on 04/01/19   Page 61 of 346

Page 61

     1                     Hojnacki

     2    second -- first supplemental declaration,

     3    every connection that we identified pursuant

     4    to the searches that we did have been

     5    disclosed.

     6         Q.   So all the interested parties on

     7    Schedule I and Schedule II to your original

     8    declaration, from your perspective, those are

     9    covered, is that fair?

    10         A.   Do you want to just reference which

    11    schedules you are talking about.

    12         Q.   Sure.   There are two schedules to

    13    your declaration.   Do you recall that?

    14              And they each have sub schedules.

    15    Go ahead and take a look at the back, it

    16    starts on page 71 of 194, if you look in the

    17    upper right-hand corner.   There is a Schedule

    18    I and all the way to the back on page 194 of

    19    194 that's the end of the second schedule.

    20         A.   Is this document that I have here

    21    both the first and second?

    22         Q.   I'm talking about your first right

    23    now.

    24              MS. GAY:   Are you talking about

    25         Exhibit 3?



Page 62

                        Hojnacki

1                       Hojnacki

2              MR. PETRELLA:  Hojnacki 3.

3              MS. GAY:  The question is?

4              MR. PETRELLA:  I will give him a

5       chance to look at Schedule I and

6       Schedule II.

7         Q.   My question is, to your knowledge

8    are RTS's disclosures complete as to all the

9    interested parties on these schedules?

10        A.   So this is just the original

11   declaration?

12        Q.   Correct.

13        A.   You need to include the

14   supplemental declaration and with the filing

15   of the supplemental declaration, all of the

16   connections that we identified through our

17   searches have been identified with that

18   filing.

19        Q.   So just not to put too fine a point

20   on it, as far as you are concerned, you are

21   done in terms of identifying connections, is

22   that fair?

23        A.   As it states in both the original

24   and the supplemental, we reserve the right to

25   continue to file additional supplementals as



Page 63

```
 1                    Hojnacki
 2   additional connections are identified.
 3        Q.   As you sit here now, you are not
 4   aware of any more disclosures that need to be
 5   made?
 6        A.   With the filing of the first
 7   supplemental, the second declaration, we had
 8   made every disclosure that we felt necessary.
 9             MS. GAY:  Just to correct for the
10        record to make sure the record is clear,
11        the first supplemental is the same thing
12        as the second declaration.
13             MR. PETRELLA:  Correct.
14        Q.   The first supplemental is the
15   December 17th declaration, right?
16        A.   Yes, sir.
17        Q.   Which post dates your original
18   declaration which is Hojnacki 3 which you are
19   looking at right now, correct?
20        A.   Yes, sir.
21        Q.   Have there been any efforts to
22   identify additional connections since your
23   first supplemental declaration on December
24   17th?
25        A.   Not that I am aware of.
```



Case 1:18-cv-35672    Document 99S-2    Filed in TXSB on 04/01/19    Page 64 of 346

Page 64

1                     Hojnacki

2      Q.   Has any attorney advised you or

3   anyone else at McKinsey, to your knowledge,

4   that any particular entity should be

5   disclosed by McKinsey in the Westmoreland

6   case but that entity has not yet been

7   disclosed?

8            MS. GAY:   Objection to the form.

9       You can answer if you can understand it.

10      A.   So I can't speak to anybody else at

11  McKinsey.  I have never been advised that

12  there is a name that should have been

13  disclosed that wasn't.

14      Q.   But have you heard that such a

15  thing happened?

16      A.   Heard from whom.

17      Q.   From anyone.  A colleague down the

18  hall say, you know they told us we ought to

19  put in XYZ corp., we haven't done it yet,

20  anything like that?

21      A.   That's a very hypothetical scenario

22  but no I have not heard of that.

23      Q.   Who does Laurie Basch report to?

24      A.   I don't know the full composition

25  of the office of the general counsel but the



Page 65

```
 1                    Hojnacki
 2   general counsel is Jean Molino.
 3        Q.   So ultimately everyone in legal
 4   reports to her?
 5        A.   That's my understanding.
 6        Q.   Do you know whether Ms. Molino
 7   reviewed your declarations in this case?
 8        A.   I don't know specifically.
 9        Q.   You don't know whether she approved
10   them before they were filed?
11        A.   I don't know.
12        Q.   Do you know who is the highest
13   level person in McKinsey legal that approved
14   your declarations?
15             MS. GAY:  Objection to the form.
16        You can answer.
17        A.   I don't know.
18        Q.   Do you know who the highest level
19   official is at McKinsey corporate that
20   reviewed and approved your declarations?
21             MS. GAY:  Objection to the form.
22        You can answer.
23        A.   What do you mean by corporate?
24        Q.   I mean anyone outside of legal from
25   any McKinsey entity.
```



Page 66

                         Hojnacki

1

2       A.   I filed this as the practice

3   leader.  This is my declaration.

4       Q.   So you didn't need to go to anyone

5   else at any McKinsey entity and seek approval

6   before you signed those?

7       A.   No.

8       Q.   At the last hearing in this case

9   there was a Mr. Pincus with you, is that

10  right?

11      A.   Yes, sir.

12      Q.   What's his name again?

13      A.   Gary.

14      Q.   Did he review your first

15  supplemental declaration before it was filed?

16      A.   No, he did not.  To the best of my

17  knowledge, no, he did not.

18      Q.   Let's turn to paragraph 32 of your

19  declaration.

20          MS. GAY:  Is this a good spot for a

21      break.

22          THE VIDEOGRAPHER:  The time is 9:15

23      a.m. and we are going off the record.

24          (Recess.)

25          THE VIDEOGRAPHER:  This is the



```
 1                      Hojnacki
 2        start of media label No. 2.  The time
 3        now is 9:25 a.m. and we are back on the
 4        record.
 5        Q.   Mr. Hojnacki, to your knowledge,
 6   does RTS have any employees that work
 7   exclusively for RTS?
 8        A.   When you say exclusively for RTS,
 9   what do you mean?
10        Q.   Meaning the only entity they work
11   for is RTS, they don't do any work outside of
12   that entity?
13        A.   I don't know.
14        Q.   Let's go to paragraph 32 of your
15   declaration?
16             MS. GAY:  Hojnacki 3?
17             MR. PETRELLA:  Hojnacki 3.
18        A.   Which paragraph.
19        Q.   Thirty-two.
20             In that paragraph you talk about
21   the global client database, right?
22        A.   Yes.
23        Q.   When was that database created?
24        A.   I don't know.
25        Q.   Presumably, you also don't know the
```



Page 68

```
 1                     Hojnacki
 2   purpose it was created for, is that fair?
 3        A.   Not specifically, no.
 4        Q.   How long have you been with
 5   McKinsey?
 6        A.   Five and a half years
 7   approximately.
 8        Q.   Have you been aware of this
 9   database during that entire time?
10        A.   Yes.
11        Q.   Is access to the database
12   restricted in any way within McKinsey?
13        A.   It's highly restricted, meaning
14   that I don't have access to it directly,
15   which is why we rely on McKinsey finance to
16   access it in preparation for this
17   declaration.
18        Q.   So it's not like you can just go to
19   your computer at work and pull up the global
20   client database, is that fair?
21        A.   No, sir.
22        Q.   Do you know what software it's
23   hosted on?
24        A.   I don't.
25        Q.   Do you know whether it's an Excel
```



1                    Hojnacki

2    spreadsheet or whether it's something more or

3    different than that?

4         A.    I don't know specifically what it

5    is.

6         Q.    Have you ever seen a computer

7    monitor with the global client database up on

8    it?

9         A.    No.

10        Q.    To your knowledge, what kind of

11   information is in the global client database?

12        A.    It's a record of all clients that

13   McKinsey and McKinsey RTS or including

14   McKinsey RTS served globally.  It lists the,

15   to the best of my knowledge, the partner

16   who's in charge of that relationship, as well

17   as a very brief description of the type of

18   services that we're providing to that client.

19        Q.    So it's got client names, right?

20        A.    Yes.

21        Q.    And then does it have like an

22   engagement, like engagement names under each

23   client for the different engagements?

24        A.    I don't know specifically, I

25   haven't seen it.



```
 1                    Hojnacki
 2        Q.   But to the best of your knowledge,
 3   does the database also have information on
 4   the various engagements that the firm has for
 5   a particular client?
 6        A.   I don't know.
 7        Q.   And so for each client, it also
 8   gives you the name of the McKinsey partner
 9   that's primarily responsible for the
10   relationship?
11        A.   That's my understanding.
12        Q.   Do you know whether it also gives
13   the name of the partner that's responsible
14   for a particular engagement for that client?
15        A.   I don't know.
16        Q.   Is it typical within McKinsey that
17   a partner that would be responsible for a
18   client would also actually work on all their
19   engagements?
20        A.   Would you ask it again?
21        Q.   Sure.  Like for example, in a law
22   firm, you might have a partner that has a big
23   client and they might -- a new matter might
24   come in and that partner may say, I'm not
25   going to work on this, I'm going to give this
```



1                    Hojnacki

2    to Joe and he is going to work on it and I'm

3    not going to bother with it at all.

4            Is that something, to your

5    knowledge, that happens at McKinsey or if you

6    are the partner responsible for a client, do

7    you always work on their engagements in some

8    capacity?

9        A.    I can't speak to every possible

10   scenario that exists within the firm but

11   typically the partner that's in charge of the

12   client is aware of the activities that are

13   going on at the client.

14       Q.    You said that there is a brief

15   description of the work that's being done for

16   the client, is that fair?

17       A.    That's my understanding.

18       Q.    And so it sounds like there is a

19   description, at least generally, of each

20   engagement that the firm has for a particular

21   client, is that your understanding?

22       A.    I don't want to -- my knowledge of

23   the details of the global client database are

24   fairly vague but I understand there to be a

25   brief description of the overall services to



Case 18-35672   Document 905-2   Filed in TXSB on 03/01/19   Page 72 of 346

Page 72

                              Hojnacki
1
2    the client.
3         Q.    When these searches of the database
4    are done, is there like -- no one comes and
5    hands you a printout of the results or
6    anything like that, right?
7         A.    No.
8         Q.    That all gets filtered through
9    legal?
10        A.    Yes.  In preparation for the
11   declaration, yes.
12        Q.    So in terms of what connections
13   there are, you have to rely almost entirely
14   on legal, is that fair?
15        A.    Yes.
16        Q.    And legal, in turn, has to rely
17   almost entirely on finance, is that fair?
18             MS. GAY:  Objection to the form.
19        A.    When you say rely on.
20        Q.    Finance is doing the searches,
21   right, for the database?
22        A.    I can't speak to the interaction
23   between the two.  I know finance accesses the
24   database.
25        Q.    Do you know if legal accesses the



 1                    Hojnacki

 2    database?

 3         A.    I don't know.

 4         Q.    Do you know anything about the

 5    search functions of the database?

 6         A.    No, sir.

 7         Q.    So you wouldn't know how to do a

 8    search for a -- let's say I give you an

 9    interested party name, you wouldn't know how

10    they go about searching for that?

11         A.    No.

12         Q.    You don't know if they type in the

13    name, hit enter and...

14         A.    I don't know.

15         Q.    Do you know under what

16    circumstances, if any, finance does not

17    report all results from the global client

18    database to legal?

19         A.    No, I don't know.

20         Q.    You don't know if they can search

21    multiple interested parties at once?

22         A.    I don't know how they search.

23         Q.    Do you know if the global client

24    database can tell you anything other than

25    whether an interested party either is or was



Page 74

1                    Hojnacki

2   a McKinsey client?

3         A.    Sorry.  Ask your question again.

4         Q.    Sure.  The database in its most

5   boiled down, it's a list of McKinsey clients,

6   there is other information but at bottom it's

7   a list of McKinsey clients, correct?

8         A.    It's a database of clients that

9   McKinsey and its affiliates, including

10  McKinsey RTS have served, either past or

11  present.

12        Q.    What I'm basically asking is, when

13  they search for an interested party in the

14  global client database, basically, all it can

15  really tell you is, was that interested party

16  a former client or is it a current client, is

17  that your understanding?

18        A.    Along with the partner that's

19  responsible for the services to that client.

20        Q.    Right, but you wouldn't know that

21  until --

22        MS. GAY:  Don't speak over each

23        other.

24        Q.    Finish up.  I'm sorry.

25        A.    Would you ask your question again.



Page 75

1                     Hojnacki

2          Q.    I think you've answered my

3     question.  I know you are saying about the

4     responsible partners there but to have any

5     information about the responsible partner,

6     you would first need to have the fact that

7     they are a client, correct?

8                MS. GAY:  Objection to the form.

9          A.    Again, the search parameters and

10    the approach for search, I am not familiar

11    with.

12         Q.    Do you know, for the Westmoreland

13    case, do you know when the global client

14    database search started?

15         A.    I believe if we reference back to

16    the document, although I don't recall which

17    paragraph, it indicates when we started our

18    retention application but I don't recall the

19    date off the top of my head.

20         Q.    And to your knowledge, when was the

21    last global client database search for the

22    Westmoreland case?

23         A.    I don't know.

24         Q.    Do you know whether it was before

25    or after your first supplemental declaration,



Page 76

1                    Hojnacki

2    meaning your December declaration?

3         A.    I do know that it was searched in

4    preparation of the first supplemental

5    declaration.

6         Q.    So to your knowledge, the last

7    search would have been at sometime before

8    your supplemental declaration, is that fair?

9         A.    We would have accessed the global

10   client database in preparation for filing of

11   the first supplemental declaration.

12        Q.    How often do you recheck the global

13   client database in the course of an

14   engagement?

15        A.    I don't know.

16        Q.    Who would know that, legal?

17        A.    I don't know.

18        Q.    When the interested parties are run

19   through the global client database, does

20   McKinsey then disclose all the results it

21   receives?

22        A.    Would you ask your question again,

23   please.

24        Q.    When the interested party names

25   from the schedules are searched in the global



                         H o j n a c k i
1
2   client database, does McKinsey take those
3   results, the results of the search and then
4   disclose those?
5        A.   So McKinsey RTS, when it performs a
6   search of the global client database and one
7   of the hits on that search is related to a
8   member of the service team, those connections
9   are disclosed, with certain exceptions that
10  are identified within the declaration in a
11  specific paragraph, but I don't recall which
12  paragraph.
13       Q.   I'm sure we will get to it.
14            Can you tell from the global client
15  database whether an engagement is over or
16  not?
17       A.   I am not aware.
18       Q.   Do you know whether it has the
19  dates of the engagements, dates they started?
20       A.   I am not aware.
21       Q.   Do you know whether the results of
22  the global client database search are used
23  for anything other than formulating the email
24  survey that's referenced in your declaration?
25            MS. GAY:   Objection to the form.



Page 78

```
 1                      Hojnacki
 2        A.    Can you be more specific.
 3        Q.    Let me withdraw it.
 4              Are the results of the global
 5   client database search used to perform the
 6   email survey that you discuss in your
 7   declaration?
 8        A.    Can you be more specific to like
 9   what you are asking.
10        Q.    Let me back up for a second.
11              Your declaration talks about a
12   global client database search, right?
13        A.    Yeah.
14        Q.    And then also an email survey,
15   right?
16        A.    Correct.
17        Q.    And maybe one other thing?
18        A.    There are a couple of other things.
19        Q.    What I'm saying is, you do the
20   global client database search, are those
21   results used purely for the purpose of
22   performing the email survey or are they used
23   for something else?
24        A.    There is multiple different
25   surveys.  As it relates to the service team,
```



Page 79

```
 1                 Hojnacki
 2   the service team is asked and provided -- is
 3   provided and asked to review the entire
 4   potential interested parties list,
 5   irregardless of the search done on the global
 6   client database.
 7        Q.    All I'm saying --
 8              MS. GAY:  Can you let him finish.
 9        Q.    Are you done with your answer?
10        A.    The search of the global client
11   database is specific to the survey that's
12   sent out to partners of McKinsey RTS and
13   affiliates for the sake of identifying
14   whether or not any of the hits on that are
15   direct commercial relationships.
16        Q.    So my question is, is any use made
17   of the results of the global client database
18   search other than to formulate one of the
19   email surveys?
20        A.    So the results, again, the results
21   of the search on the global client database
22   are used to identify any instances where the
23   service team has provided consulting services
24   to any company that's on the interested
25   parties list and any of those connections,
```



Page 80

```
 1                    Hojnacki
 2    all of those connections are disclosed with
 3    the exception of certain exceptions that are
 4    noted in the declaration.
 5        Q.   Let's look at paragraph 4 of your
 6    declaration.
 7            MS. GAY:  Again, the first
 8        declaration, just to make the record
 9        pristine.
10            MR. PETRELLA:  Absolutely.
11        Hojnacki 3.  The first declaration.
12        A.   Can you get me to the right page
13    number?
14        Q.   Page 2, real close up front.
15    Paragraph 4.
16        A.   Got it.
17        Q.   You got it?
18        A.   Paragraph 4.
19        Q.   I'm sorry, rather paragraph 3.
20            So in paragraph 3 you define the
21    service team, right?
22        A.   Yes.
23        Q.   And I think you gave me some names
24    of the service team members earlier, right?
25        A.   I gave you a couple in reference to
```



Page 81

1                    Hojnacki
2  a different question.
3        Q.    I think you said there was about 19
4  people on the service team, is that right?
5        A.    No.   The service team is, again,
6  prior to the -- immediately prior to the
7  filing is 79 people.
8        Q.    Oh wow.   Okay.
9             MS. GAY:   If I may, there are two
10       different sets of terms --
11            MR. PETRELLA:   I will get to that
12       and I will figure that out.
13            MS. GAY:   It's fine for me if you
14       want to --
15            MR. PETRELLA:   Let's do it now.
16       Q.    You have a term in your
17  declaration, you have a service team and an
18  engagement team?
19       A.    Yes.
20       Q.    Which one is bigger?
21       A.    The service team.
22       Q.    What's the relationship between the
23  service team and the engagement team?
24       A.    The service team reflects all
25  directors, officers and employees of McKinsey



```
 1                    Hojnacki
 2   RTS U.S., as well as or in addition to any
 3   consultant that's borrowed from an affiliate
 4   for purposes of serving the Westmoreland
 5   debtors.
 6        Q.   You told me before that roughly 15
 7   max are RTS professional employees, right?
 8        A.   I don't believe that's the question
 9   you asked or the response I gave.
10        Q.   I asked you, is that practice
11   leaders that I asked you before?
12        A.   We can check the record.
13        Q.   How many -- let's do it again.
14             How many practice leaders in RTS,
15   to your knowledge?
16        A.   I estimated approximately 15 in
17   McKinsey RTS.
18        Q.   How many total professional
19   employees at RTS, to your knowledge?
20        A.   There are -- I have this answer, I
21   just have to fish it out.  There are
22   approximately 50.
23        Q.   And if you could just give me the
24   titles that fall -- I'm not asking you to
25   name the 50 people but rather, what are the
```



Case 18-35672   Document 905-2   Filed in TXSB on 04/01/19   Page 85 of 346

Page 83

                        Hojnacki

1

2    titles that fall into those 50 people?

3         A.    Sure.   You have senior partners and

4    partners which comprise practice leaders,

5    senior vice presidents, vice presidents,

6    associates and senior associates and then you

7    have certain administrative professionals.

8    Those are the titles of the consulting

9    service staff.   There are other members of

10   McKinsey RTS that aren't in client service

11   functions, so we have, I don't know if this

12   is his title, but a dedicated director of

13   communications.   As I mentioned earlier, a

14   dedicated people development manager, a

15   dedicated practice manager, a dedicated

16   knowledge or learning coordinator.   Those are

17   the ones that I recall at the moment.

18        Q.    So the 50 number, is that inclusive

19   of the 15 or exclusive of the 15?

20        A.    Inclusive.

21        Q.    And between partners, vice

22   presidents and associates of all ranks, how

23   much of that 50 does that comprise?

24        A.    The majority.

25        Q.    Can you estimate any better than



Case 15-10541-BLS   Doc 2417-6   Filed 04/24/19   Page 85 of 347
Case 18-35672   Document 90S-2   Filed in TXSB on 04/01/19   Page 84 of 346

Page 84

1                    Hojnacki

2    that?

3            MS. GAY:  Objection to the form.

4        You can answer.

5        A.   Of the 50, the majority are

6    consulting staff.  The exceptions are

7    predominantly the other titles that I gave

8    you that are dedicated folks to RTS.

9        Q.   The administrators and so forth?

10       A.   Yes, sir.

11       Q.   The administrators and other people

12   that don't have an associate or partner or

13   vice-president rank, would you say those are

14   10 people, 15 people, 5 people?

15       A.   I don't know off the top of my head

16   or I don't recall off the top of my head but

17   it's just that handful of people.

18       Q.   In paragraph 3 you talk about

19   certain consultants borrowed from affiliates

20   of McKinsey RTS.

21            Do you see that?

22       A.   Yes.

23       Q.   Who are those consultants for the

24   Westmoreland case?

25       A.   You would like me to list all of


MAGNA
LEGAL SERVICES

1                    Hojnacki

2    them.

3        Q.    Sure.

4        A.    So as I stated earlier, the service

5    team was, immediately prior to the holidays,

6    right, was 19 people.  Seven of those are RTS

7    people that I believe I had given you their

8    names already.

9        Q.    You did.

10        A.    Off the top of my head the others

11    would be Eugene Schmitt, Curtis Peenes, Tony

12    Tusant, Fannie Trembler, Taru Sharma, Joe

13    Basar, Henry Su, Rob Dunne, Tal Maravich,

14    Gilad Ben Yuda (phonetic) and there is I

15    believe one other that I am not recalling at

16    this moment.

17        Q.    Can you give me the -- all those

18    people just to be clear, they are not RTS

19    employees?

20        A.    That last list of people are

21    borrowed affiliates, consultants borrowed

22    from affiliates.

23        Q.    So Schmitt, can you give me his

24    title and what affiliate he works for?

25        A.    He is a partner, I believe of



Page 86

1                        Hojnacki

2    McKinsey & Company U.S.

3         Q.    Peenes same question?

4         A.    Peenes is an implementation leader

5    and I believe McKinsey & Company U.S.

6         Q.    Tusant?

7         A.    He is an associate, McKinsey and

8    company U.S.

9         Q.    Trembler?

10        A.    She is a business analyst, McKinsey

11   & Company U.S.

12        Q.    Sharma?

13        A.    She is -- I don't know her specific

14   title, she is borrowed from, if we can

15   reference the second declaration, we

16   disclosed the names of the affiliates that

17   are not McKinsey & Company U.S. and she is

18   the one from India.

19        Q.    Basa?

20        A.    Basar.

21        Q.    Basar.

22        A.    He is an implementation leader,

23   McKinsey and company U.S.

24        Q.    Su?

25        A.    He is a business analyst and again



Case 18-35672   Document 905-2   Filed in TXSB on 04/01/19   Page 87 of 346

Page 87

```
 1                    Hojnacki

 2    if we reference the paragraph in the

 3    supplemental declaration, he is borrowed from

 4    the Canadian affiliate and is -- he is

 5    providing services to mines in Canada

 6    currently.

 7         Q.    Dunne?

 8         A.    Rob Dunne, he is an associate,

 9    McKinsey & Company U.S.

10         Q.    Maravich?

11         A.    He is an implementation leader

12    McKinsey & Company U.S.

13         Q.    And Ben Yura?

14         A.    He is a business analyst, McKinsey

15    & Company U.S.

16         Q.    Let's mark your supplemental, first

17    supplemental declaration as Hojnacki 4?

18              (Hojnacki Exhibit 4 First

19              supplemental declaration marked for

20              identification.)

21         Q.    Just leave three there and just

22    confirm that's a copy of your supplemental

23    declaration.

24              Is it?

25         A.    Yes.
```



Case 15-10541-BLS   Doc 2417-6   Filed 04/24/19   Page 89 of 347
Case 18-35672   Document 905-2   Filed in TXSB on 04/01/19   Page 88 of 346

Page 88

```
 1                      Hojnacki
 2        Q.    If you can look at paragraph 4
 3   there.  I just want to take a look at the
 4   affiliates you have been referencing in your
 5   answers to make sure we are talking about the
 6   same thing.
 7        A.    Is there -- what's the question?
 8        Q.    The question is, are those -- those
 9   are the affiliates you were talking about
10   earlier in your answer, correct?
11        A.    When I referred to --
12        Q.    The Canadian --
13        A.    Taru Sharma, she is borrowed from
14   the entity know as McKinsey Knowledge Center
15   India Private Limited and Henry Su is
16   borrowed from the affiliate McKinsey &
17   Company Canada, McKinsey e'Campion Canada.
18        Q.    So are these the only three
19   affiliates from which team members have been
20   borrowed?
21        A.    To the best of my knowledge, yes.
22        Q.    What led to disclosure of the
23   identities of these affiliates in your
24   supplemental declaration?
25        A.    This was in response to a question
```



Page 89

```
 1                    Hojnacki
 2   following the filing of the original
 3   declaration from the U.S. Trustee and this
 4   was intended to address that question that
 5   had come in.
 6            MS. GAY:  We apparently lost our
 7        dial in.  We don't need to do anything,
 8        we just need to pause for a second.
 9            THE VIDEOGRAPHER:  The time is 9:51
10        a.m. and we are going off the record.
11            (Off the record.)
12            THE VIDEOGRAPHER:  This is the
13        start of media label No. 3.  The time
14        now is 9:53 a.m. we are back on the
15        record.
16   Q.   If you can look at paragraph 9 of
17   your supplemental declaration, Hojnacki 4.
18   The first line you say, Five new colleagues
19   were staffed on the service team since the
20   petition date, right?
21   A.   Yes.
22   Q.   And are those five people among the
23   ones you've listed for me already?
24   A.   I believe some of them are.  I
25   recall that the service team includes
```



Page 90

1                 Hojnacki

2    members, officers and directors and employees

3    of McKinsey RTS more broadly, even if they

4    are not serving the debtor, so there were I

5    believe two individuals who joined McKinsey

6    RTS during that time and got added to the

7    service team.

8         Q.   Who are they?

9         A.   I don't recall both.  I know one is

10   an individual named Radika Roy, Radika Ray,

11   excuse me.

12        Q.   You said there is another?

13        A.   Yes.

14        Q.   You don't remember their name?

15        A.   I don't.

16        Q.   The three others are among the list

17   you already gave me, is that fair?

18        A.   Yes.

19        Q.   Ms. Ray, who does she work for?

20        A.   McKinsey RTS U.S.

21        Q.   These five new colleagues, were

22   they added to the team before or after your

23   first declaration, Hojnacki 3?

24        A.   I don't recall the exact timing of

25   when they joined the service team.



1                    Hojnacki

2          Q.    Has RTS disclosed all of RTS's

3    connections to interested parties or only

4    connections of RTS employees working on the

5    Westmoreland team?

6          A.    The service team includes all

7    officers, directors and employees of McKinsey

8    RTS U.S. and between the original declaration

9    and the supplemental declaration, all

10   connections on the interested parties list

11   with the service team have been disclosed,

12   with the exception of certain limitations

13   that are defined in the declaration.

14         Q.    But if you borrow a professional

15   for the service team from an affiliate

16   outside RTS, do you disclose all the

17   connections of that affiliate or just the

18   connects of the individual?

19         A.    The connections of the individual

20   on the service team.

21         Q.    And is it your belief that that

22   complies with Rule 2014A of Bankruptcy Rules?

23         A.    It's my understanding from

24   conversation with counsel that the process

25   that we go through in preparation of these



Case 18-35672   Document 90S-2   Filed in TXSB on 04/01/19   Page 92 of 346

Page 92

```
 1                    Hojnacki
 2  declarations, one was, you know, approved by
 3  the U.S. Trustee in advance of the filing of
 4  their objection and is consistent with the
 5  application of 2014.
 6        Q.   Have you had a conversation with
 7  counsel about the legality of disclosing only
 8  the connections of service team members from
 9  outside RTS as opposed to the connections of
10  the entity they come from, generally?
11        A.   I'm not a lawyer, so I can't opine
12  on the legality of any matters.
13        Q.   I'm just asking if you had a
14  conversation with counsel about that issue.
15        A.   We've had counsels and I'm
16  comfortable that based on their guidance that
17  what we have done here is consistent with the
18  application of 2014.
19        Q.   I'm just saying, have you had a
20  specific conversation with counsel about this
21  issue?
22        A.   About which issue.
23        Q.   The issue of whether it's
24  appropriate to limit disclosures for service
25  team members added from outside of RTS,
```



Page 93

```
 1                    Hojnacki
 2   whether it's appropriate to limit disclosures
 3   just to their connections as opposed to the
 4   connections of the affiliate they come from?
 5             MS. GAY:  Objection to the form.
 6        Misstates what he testified to.
 7        A.   Again, I'm not a lawyer so I can't
 8   speak to the bounds of 2014 and the outer
 9   limits of 2014, but I had conversations that
10   the approach that we followed here was,
11   again, approved by the U.S. Trustee and was
12   consistent with the application of 2014.
13        Q.   And just to be clear, the approach
14   that we are talking about here is if RTS
15   borrows a service team member from outside of
16   RTS, the connections that are going to be
17   disclosed as to that individual are that
18   individual's connections, not that of the
19   affiliate they came from, is that correct?
20        A.   So again we can go through the
21   different paragraphs of how it's described in
22   the approach but any connection of the
23   service team with the party on the interested
24   parties list is disclosed.  We also through
25   various, the survey methods that you are
```



Page 94

1                          Hojnacki

2    referring to previously, we survey partners

3    of McKinsey & Company U.S. and all affiliates

4    globally, even if we don't borrow affiliates

5    consultants from them to identify whether any

6    of their clients have any direct commercial

7    relationship with the debtors.  We also

8    through the client global database identify

9    any clients that are on the interested

10   parties list that have -- that we've

11   previously served, we reach out to the

12   partners that's responsible -- the partners

13   responsible for those relationships and

14   inquire whether or not those relationships

15   have a direct commercial relationship and

16   that's done globally across all affiliates

17   that provide consultants, even if we don't

18   borrow the consultant from them.

19        Q.   If you borrow a consultant from

20   McKinsey & Company U.S., do you disclose all

21   the connections of McKinsey & Company U.S.?

22        A.   Say that again.

23        Q.   If you borrow a team member from

24   McKinsey & Company U.S., do you disclose all

25   the connections to interested parties of



Page 95

```
 1                    Hojnacki
 2  McKinsey & Company U.S.?
 3       A.   If we borrow somebody from McKinsey
 4  & Company U.S., that individual becomes a
 5  member of the service team, we disclose the
 6  connections of that individual.
 7       Q.   Not McKinsey & Company U.S. as a
 8  whole, fair?
 9            MS. GAY:  Misstates his prior
10       testimony.  Tell him again.
11       A.   I think I stated exactly what we
12  do.
13       Q.   State it again.
14       A.   We borrow a consultant from any
15  affiliate, whether McKinsey & Company U.S. or
16  the others or any affiliate globally that
17  provides consulting services and that member
18  becomes part of the service team.
19       Q.   Yes.
20       A.   Any connection of those individuals
21  that are part of the service team are
22  disclosed.
23       Q.   Right.  But not all the connections
24  of the affiliate they come from, is that
25  right?
```



Page 96

```
 1                     Hojnacki
 2        A.   The second set we do is we search,
 3   we do a survey of all partners globally of
 4   any affiliate and identify whether any or not
 5   any of the clients that they are serving have
 6   a direct commercial relationship with the
 7   debtors and those are disclosed.
 8        Q.   Let me ask you one more time.  If
 9   RTS borrows a service team member from
10   McKinsey & Company Inc., U.S. Inc., you
11   disclose the connections of that individual
12   to the interested parties, correct?
13        A.   If we borrow a member from any
14   affiliate and they become a member of the
15   service team, we search and we disclose those
16   connections of the individual.
17        Q.   Assuming that individual came from
18   McKinsey & Company U.S. Inc., you do not
19   further then disclose all the connections of
20   McKinsey & Company U.S. Inc. to the
21   interested parties, correct?
22        A.   Unless there is a direct commercial
23   relationship.  If there is a direct
24   commercial relationship between an entity on
25   the interested parties list that's -- that is
```



Case 15-10541-BLS   Doc 2417-6   Filed 04/24/19   Page 98 of 347
Case 18-35672   Document 905-2   Filed in TXSB on 04/01/19   Page 97 of 346

Page 97

```
 1                     Hojnacki
 2   a client of an affiliate, we do disclose
 3   those.
 4        Q.   Let's look at paragraph 14 of
 5   Hojnacki 3, your original declaration.
 6        A.   Paragraph 14?
 7        Q.   Paragraph 14, correct.
 8             Have any services been provided by
 9   McKinsey beyond those listed in paragraph 14?
10        A.   As it relates to the engagement
11   letter that governs the retention, our
12   retention in these cases.
13        Q.   To the debtor, have you provided
14   any services beyond what's listed in 14?
15        A.   These are the services that are
16   consistent with the scope of services that
17   are in the engagement letter that was signed
18   -- referred to as the engagement letter in
19   this declaration.
20        Q.   Have you done anything else?
21        A.   I think this summarizes the support
22   that we provided.
23        Q.   Has RTS been involved in
24   structuring the sale of Westmoreland's
25   assets?
```



Page 98

1                        Hojnacki

2        A.    No.

3        Q.    Let's look at paragraph 30.

4              MS. GAY:  Paragraph 30 of Exhibit

5        3.

6              MR. PETRELLA:  Correct.  Hojnacki

7        3.

8        Q.    The first line of 30 you talk about

9   RTS U.S. and its consulting affiliates,

10  right?

11             Do you see it?

12       A.    Yes.

13       Q.    Who are the consulting affiliates

14  of RTS U.S.?

15       A.    Is your question who is a

16  consulting affiliate of McKinsey RTS U.S.?

17       Q.    You say McKinsey RTS U.S. and its

18  affiliates.

19             Do you see that?

20       A.    Yes.

21       Q.    I'm focusing on the four words and

22  its consulting affiliates, I want to know who

23  those affiliates are?

24       A.    I can't name every affiliate of --

25  every consulting affiliate of McKinsey RTS



Page 99

1                    Hojnacki

2  U.S.

3        Q.    How many are there?

4        A.    I don't know off the top of my

5  head.

6        Q.    Is it every other McKinsey entity?

7        A.    Those that provide consulting --

8  that are consulting affiliates.

9        Q.    How many McKinsey RTS affiliates

10 are there that do not provide consulting

11 services?

12       A.    I don't know entirely.  I do know

13 we make reference to one specifically in this

14 document.

15       Q.    Which one is that?

16       A.    MIO partners.

17       Q.    As you sit here now, can you think

18 of any other RTS U.S. affiliates that do not

19 provide consulting services other than MIO?

20       A.    Not off the top of my head, no.

21       Q.    Can you estimate for me how many

22 there are?

23       A.    No, I don't know.

24       Q.    Do you think MIO is the only one?

25       A.    I don't know.



Page 100

                              Hojnacki

1

2        Q.    Can you estimate for me how many

3   consulting affiliates there are to RTS U.S.?

4        A.    I don't know how many consulting

5   affiliates there are.

6        Q.    Do you think there are 1000?

7        A.    I couldn't speculate.

8        Q.    You couldn't even narrow it to like

9   100, 200, 300, something like that?

10       A.    No.

11       Q.    And you say in paragraph 30 that

12   RTS and its consulting affiliates serve

13   companies with competing interests, right?

14       A.    We have a policy of serving

15   companies with competing -- serving competing

16   companies.

17       Q.    So that's something that happens

18   all the time, correct?

19       A.    I can't speak to your definition of

20   all the time but we certainly have a policy

21   of doing it.

22       Q.    And that's a policy of

23   longstanding, correct?

24       A.    It's a longstanding policy.

25       Q.    If you go further down in paragraph



Page 101

1                        Hojnacki

2     30 here, you say because of its practice of

3     serving clients with overlapping or competing

4     interests, these consulting affiliates do not

5     have in place any centralized conflicts

6     identification process.  And it goes on.

7                Do you see that?

8          A.   Yes.

9          Q.   What is it about the global client

10    database in your mind that disqualifies it as

11    a centralized conflict identification

12    process?

13         A.   Would you ask your question again.

14         Q.   Let me kind of rephrase it.

15               You have a global client database,

16    right?

17         A.   We have a global -- yes.

18         Q.   In this paragraph, you are saying,

19    we don't have in place or the consulting

20    affiliates do not have in place any

21    centralized conflicts identification process.

22               Do you see that?

23         A.   Yes.

24         Q.   My question is, why isn't that

25    global client database your centralized



Page 102

1                    Hojnacki

2  conflicts identification process?

3       A.   Because it doesn't keep track of

4  inner connections between various parties

5  that are associated with any name that's

6  included in the global clients database.

7       Q.   You also say in paragraph 30 that

8  the global database is primarily for

9  recordkeeping purposes.

10           Do you see that?

11      A.   Yes.

12      Q.   What is the global client database

13 used for other than searching for connections

14 in Chapter 11 cases?

15      A.   I can't speak to all of the uses of

16 the global client database.

17      Q.   Give me one, other than searching

18 for connections, obviously.

19      A.   Maintaining a record of the clients

20 that we serve over time.

21      Q.   That's kind of a description of the

22 database itself.  What else --

23           MS. GAY:  Objection to the form.

24      Q.   How is it -- what other uses does

25 it have?



Page 103

1                     Hojnacki

2         A.     I can't speak to them.

3         Q.     Let's look at paragraph 31, right

4    below it.

5                Actually take a look at Hojnacki 2

6    if you would.  If you turn to the first page,

7    there is a reference to, in the first

8    paragraph of the letter, there is a reference

9    to July 17, 2018.

10               Do you see that?

11        A.     Yes.

12        Q.     What does that date represent?

13        A.     July 17, 2018 is the date that we

14   commenced our services for Westmoreland Coal

15   Company.

16        Q.     And it says here that the agreement

17   that we are looking at supersedes an earlier

18   agreement that's dated July 17, 2018.

19               Do you see that?

20        A.     Yes.

21        Q.     And what entity was that agreement

22   with?

23        A.     The prepetition agreement?

24        Q.     Pardon me.

25        A.     The prepetition agreement?



Page 104

1                    Hojnacki

2        Q.    Correct.

3        A.    Which entity of --

4        Q.    McKinsey.

5        A.    McKinsey RTS U.S.

6        Q.    So that prepetition agreement was

7   also with RTS?

8        A.    Yes.

9        Q.    Was there any prepetition work done

10  prior to July 17th of this year?

11       A.    No.

12       Q.    As of July 17th, is it fair to say

13  McKinsey knew that Westmoreland was likely

14  headed for bankruptcy?

15       A.    We were aware that they were in

16  discussions with their first lien lender

17  group about resolution of the capital

18  structure issue and that Chapter 11 was a

19  potential outcome.

20       Q.    At that point did you start looking

21  for connections to interested parties?

22       A.    I can't speak to the exact date

23  that we began looking for interested parties.

24       Q.    So you don't know?

25       A.    I can't speak to it, no.



1                    Hojnacki

2         Q.   At what point does RTS decide

3    whether it has a disqualifying conflict in

4    the case?

5         A.   Can you state your question again.

6         Q.   Sure at what point in the process;

7    is it prepetition, post petition; at what

8    point does RTS decide whether it has a

9    disqualifying conflict in the case?

10        A.   I don't know if there is a standard

11   point in time in any case.

12        Q.   To your knowledge, has RTS or

13   McKinsey & Company ever determined that it

14   has a disqualifying conflict in the Chapter

15   11 case?

16        A.   Can you ask your question again.

17        Q.   Sure.  To your knowledge, has

18   McKinsey or RTS ever turned down a Chapter 11

19   assignment as a professional because they

20   believed they had a disqualifying conflict?

21        A.   I can't speak to that.

22        Q.   You don't know?

23        A.   I can't speak to it.

24        Q.   Can you -- what do you mean you

25   can't speak to it, you are not allowed to?



Page 106

```
 1                      Hojnacki
 2        A.    I am not aware.
 3        Q.    You don't know, you don't know,
 4   yes?
 5        A.    I'm not aware of any situations
 6   where we turned down a case.
 7        Q.    Can you imagine any scenario in
 8   which RTS or McKinsey might determine that
 9   they have a disqualifying conflict in a case?
10        A.    Can you ask your question again.
11        Q.    Sure.
12              Can you imagine any scenario in
13   which RTS might determine that it has a
14   disqualifying conflict in a case?
15              MS. GAY:  Objection to the form.
16        A.    If we had a conflict that was
17   identified through our search process which
18   we determined would prohibit us from
19   providing the best possible services or the
20   services outlined under the terms of our
21   agreement to the debtors.
22        Q.    What kind of conflict might that
23   be?
24        A.    I can't speculate.
25        Q.    You can't give me a concrete
```



Page 107

1                    Hojnacki

2   example of the type of relationship that

3   might cause McKinsey to say, look we just

4   can't engage in this project?

5        A.   No.

6        Q.   The petition in Westmoreland was

7   filed on October 9, 2018, correct?

8        A.   Yes.

9        Q.   And the application to hire

10  McKinsey was filed on November 8, right?

11       A.   I don't have the date in front of

12  me, but I'm sure the docket would show --

13       Q.   Just to help you out, on Hojnacki 3

14  at the top of the page, you see there a

15  legend there from the filing with the court

16  system.

17       A.   Okay.

18       Q.   Can you see November 8th?

19       A.   Yes.

20       Q.   Your declaration was part of that

21  application, is that right?

22       A.   Yes.

23       Q.   So according to paragraph 31, I

24  believe of your declaration, you got an

25  initial list of interested parties on October



Page 108

                          Hojnacki
1                        Hojnacki
2    16, 2018, correct?
3         A.    Paragraph 31?
4         Q.    Yes.
5              MS. GAY:  Of Exhibit 3.
6              MR. PETRELLA:  Of Exhibit 3.
7         A.    Yes.
8         Q.    And that list is represented in
9    Schedule I to your declaration here, correct,
10   Hojnacki 3?
11        A.    Yes.  I'm just confirming which is
12   one and which was Schedule II.
13        Q.    You got that list about three weeks
14   before your application, fair?
15        A.    We received it on October 16.
16        Q.    Which is a little over three weeks
17   before the application, right?
18        A.    Yes.
19        Q.    Who did you get the list from?
20        A.    We received it from debtors'
21   counsel, Kirkland & Ellis.
22        Q.    So at that point on October 16,
23   2018, how many people were assigned to search
24   for connections to interested parties at that
25   point?



Page 109

1                     Hojnacki

2        A.   I can't say.  I don't do the

3   searches myself.  It was all directed by the

4   McKinsey legal department.

5        Q.   You don't know how many people are

6   assigned on a full-time base to search for

7   those connections?

8        A.   No, I don't.

9        Q.   The people who are engaged in that

10  effort, do they log their hours?

11       A.   No, not that I am aware of.

12       Q.   But certainly RTS understood that

13  this was an important process and they

14  treated it as a priority, is that right?

15       A.   Absolutely.

16       Q.   So later you got another list,

17  right, according to 31?

18       A.   Yes.

19       Q.   And that list is represented in

20  Schedule II to your declaration, fair?

21       A.   Correct.

22       Q.   And you say you also got that from

23  Kirkland & Ellis?

24       A.   Yes, we did.

25       Q.   When did you get that list?



Page 110

1                    Hojnacki

2        A.   I don't recall the specific date

3    but it would have been, it was right after

4    Kirkland & Ellis filed their retention

5    application.

6        Q.   So whatever the date is on Kirkland

7    & Ellis' disclosure declaration, it would

8    have been right around that time?

9        A.   Yes.

10        Q.   And according to paragraph 31, the

11    second list had --

12        A.   Just --

13        Q.   If you want to correct something,

14    go ahead.

15        A.   Just to be clear, it was after, not

16    around that date, it was after the date.

17        Q.   So Kirkland filed their disclosures

18    and then gave you the second list?

19        A.   That's my understanding, yes.

20        Q.   So according to 31, that second

21    list contained about 230 new entities?

22        A.   Correct.

23        Q.   And do you know why there was a lag

24    between the first list and the second list?

25        A.   I don't know.



Page 111

1                          Hojnacki

2        Q.    When did the process of searching

3   for those additional 230 entities start?

4        A.    I don't know.

5        Q.    Do you recall approximately how far

6   after Kirkland filed their disclosure

7   declarations that they provided you with the

8   second list?

9        A.    No, I don't.

10       Q.    You can't remember if it was a

11   week, was it a day, a month?

12       A.    I don't know.

13       Q.    You just don't know, okay.

14             Hojnacki 3, your original

15   declaration, that is complete as to Schedule

16   I, is that fair?

17       A.    Yes.   Declaration one is complete

18   as -- including Schedule I, again with the

19   exceptions noted in a supplemental paragraph

20   here.   It also notes the intention of filing

21   a supplemental declaration in the future.

22       Q.    But it says that the supplemental

23   declaration is going to cover Schedule II,

24   right?

25       A.    It says that the -- yes, the



Page 112

```
 1                    Hojnacki
 2   supplemental declaration will include the
 3   connections of those additional entries to
 4   the extent that they're required.
 5        Q.   So with respect to Schedule I only,
 6   your first declaration, Hojnacki 3 is
 7   complete as to Schedule I, is that fair?
 8        A.   Can you define what you mean by
 9   complete.
10        Q.   All the connections you believe you
11   needed to make as to the people and entities
12   on Schedule I are made in this declaration.
13        A.   We used Schedule I to follow the
14   process that we included in this declaration
15   and made the disclosures based on that.
16        Q.   And in your mind, you had made
17   complete disclosures as to Schedule I as of
18   the filing of this first declaration,
19   correct?
20        A.   Yes, but again, we recognized the
21   fact there was additional names that we still
22   had to search and we were clear about doing
23   that and we also noted certain exceptions to
24   Schedule I in a supplemental paragraph here
25   that weren't included in those disclosures.
```



Page 113

```
 1                    Hojnacki

 2        Q.    What is that supplemental paragraph

 3   that you are referring to?

 4        A.    I believe it's 33.  So we excluded

 5   24 intercompany entities which was consistent

 6   with the approach that Kirkland had used.  We

 7   did not search employees, some individual

 8   employees of the debtors and then there is

 9   some reference to the category of vendors and

10   the level in which we had gone down to at

11   that time, the level of annual spend.

12        Q.    So with the exception of the

13   exceptions you just pointed out in 33, your

14   view is, when you filed your first

15   declaration, your disclosures were complete

16   as to Schedule I only, is that fair?

17        A.    With the exception of the

18   exceptions and the exceptions of the

19   acknowledgment that there were other entities

20   that we had received, it was complete.

21        Q.    Those were on Schedule II.  I'm

22   only asking about Schedule I.

23        A.    Yes.

24        Q.    You are aware that there are

25   connections to interested parties disclosed
```



Case 18-50672    Document 905-2    Filed in TXSB on 01/01/19    Page 114 of 346

Page 114

```
 1                   Hojnacki
 2   for the first time in your supplemental
 3   declaration even though those interested
 4   parties were listed on Schedule I, is that
 5   right?
 6        A.    Yes, that's possible.
 7        Q.    And give me the reasons why that's
 8   possible?
 9        A.    Well as I mentioned, we had new
10   members that were added to the service team
11   with the filing of the supplemental
12   declaration and those people that were added
13   to the service team were required to review
14   both the Schedule I list of interested
15   parties and the Schedule II list of
16   interested parties.  So to the extent we
17   identified a connection with anyone of those
18   service members to somebody on Schedule I, we
19   filed that with the supplemental declaration.
20        Q.    Any other reasons that you are
21   aware of why that might happen?
22        A.    No.
23        Q.    So any instance in which I see a
24   disclosure of a connection in your
25   supplemental declaration that relates to an
```



Page 115

```
 1                    Hojnacki
 2   interested party on Schedule I, that factor
 3   is the explanation of the additional service
 4   team member, is that fair?
 5        A.   As I recall right now, yes.
 6        Q.   I think we already discussed, you
 7   signed the disclosure declarations in Sun
 8   Edison, correct?
 9        A.   Yes.
10        Q.   In that case there was an amended
11   declaration and three supplements as well, do
12   you recall that?
13             MS. GAY:  I will restrict this
14        because at this point, you are getting
15        way far afield on the subject matter of
16        this particular deposition which are
17        these two declarations submitted in the
18        Westmoreland case, so I would not have
19        him answer those.
20             MR. PETRELLA:  Just to be clear, I
21        believe that particularly since No. 1,
22        the Sun Edison case is referenced in his
23        declaration as a qualification.  No. 2,
24        I believe these questions are
25        appropriate as to the basis of his
```



Case 18-85672   Document 905-2   Filed in TXSB on 01/01/19   Page 116 of 346

Page 116

1                    Hojnacki

2          fuller discussion of the different

3          procedures that are used to search but

4          if you are going to instruct him not to

5          answer, that's your prerogative.

6              MS. GAY:   I let him answer some

7          questions about Sun Edison in terms of

8          background to be fair to you, Mr.

9          Petrella.   I will not let him be asked

10         about his submissions in the Sun Edison

11         case when the specific purpose of this

12         deposition are his two submissions in

13         the Westmoreland case.

14             MR. PETRELLA:   In my view, this

15         does relate to the two submissions in

16         the Westmoreland case but I guess we

17         will have to agree to disagree on that.

18         Q.   Let's look at paragraph 32.   You

19    say in this paragraph that the global client

20    database covers RTS and all affiliates that

21    provide consulting services, right?

22         A.   This is Exhibit 3?

23         Q.   Right.   Hojnacki 3.   Correct.

24              Paragraph 32 if you got it.

25         A.   Yes.   Yes to having it.   Can you



Case 16-85672   Document 90-2   Filed in TXSB on 01/01/19   Page 117 of 346

Page 117

```
 1                    Hojnacki
 2   ask your question again.
 3        Q.    There you talk about how the global
 4   client database covers RTS and all affiliates
 5   that provide consulting services, right?
 6        A.    Yes.
 7        Q.    If you look-back at 30, you use
 8   similar language but not quite the same, you
 9   use the language RTS and its consulting
10   affiliates and my question is really, is
11   there any reason for the change in
12   terminology?
13             MS. GAY:  I will object to the
14        form.  You can answer if you understand
15        it.
16        A.    I am not aware.
17        Q.    You don't know whether that change
18   in terminology is significant in any way?
19        A.    I do not know.
20        Q.    The global client database includes
21   all affiliates of RTS that provide consulting
22   services, right?
23        A.    Yes.
24        Q.    And you've already testified that
25   those, the number of those affiliates is too
```



Page 118

```
 1                    Hojnacki
 2   large really to list for me, is that right?
 3        A.   I don't think that's exactly what I
 4   said.  I said I don't know exactly how many
 5   it is.
 6        Q.   Certainly you are not able to list
 7   them all?
 8        A.   No.
 9        Q.   And you are not able to estimate
10   how many there are either, is that fair?
11        A.   I don't know how many there are.
12        Q.   But you know there is a large
13   number of them, right?
14        A.   I know that I don't know them.
15        Q.   The affiliates of RTS U.S. include
16   McKinsey & Company Inc.?
17        A.   Sorry.  Ask the names of the
18   entities again.
19        Q.   Sure.  Do the affiliates of RTS
20   that provide consulting services include
21   McKinsey & Company Inc.?
22        A.   I'm trying to refresh myself on the
23   order of the legal entity chart.  I don't
24   know.
25        Q.   Do the consulting affiliates of
```



1                     Hojnacki

2   McKinsey RTS U.S. include McKinsey & Company

3   Inc. U.S.?

4        A.   The affiliates -- are you

5   referencing a specific paragraph in one of

6   declarations that I can refer to?

7        Q.   32 we were on.

8             Again, it says McKinsey RTS U.S.

9   and all affiliates that provide consulting

10  services.

11            Do you see that?

12       A.   Yes.

13       Q.   You said you don't know whether one

14  of those affiliates is McKinsey & Company

15  Inc.

16            Now I'm asking you, is one of those

17  affiliates McKinsey & Company Inc. U.S.?

18       A.   Yes.  I believe we state in here

19  the entities, I think it's actually on the

20  second declaration, the entities that we

21  borrow from.

22       Q.   That you borrow from.

23            Are you saying the global client

24  database only includes the entities you

25  borrowed from in this particular case?



Page 120

                              Hojnacki

1

2      A.    No.

3      Q.    Let's go back to 32 because maybe

4   we are getting some crossed signals here.

5            You say that you searched the

6   global client database.

7            Do you see that?

8      A.    Uh-huh.

9      Q.    Which covers clients of McKinsey

10  RTS U.S. and all affiliates that provide

11  consulting services, right?

12     A.    Yes.

13     Q.    So what we are talking about is the

14  composition of the global client database

15  here, right?

16     A.    Yes.

17     Q.    So focusing just on that language

18  there and all affiliates that provide

19  consulting services.  My question is, is one

20  of those affiliates McKinsey & Company Inc.

21  U.S.?

22     A.    To the extent McKinsey & Company

23  U.S. provides consulting services.

24     Q.    So your language here in 32, this

25  language, and all affiliates that provide



Case 18-35672   Document 905-2   Filed in TXSB on 01/01/19   Page 121 of 346

Page 121

```
 1                    Hojnacki
 2    consulting services, as you sit here today,
 3    you really don't know what those affiliates
 4    are, fair?
 5         A.    That provide consulting services?
 6         Q.    Yes.
 7         A.    I don't know every entity of
 8    McKinsey that provides consulting services.
 9         Q.    And you don't know whether one of
10    them is McKinsey & Company Inc., right?
11         A.    So I'm trying not to like not
12    answer the question.  I think we were clear
13    in here, the legal entity structure of the
14    different entities and where we borrowed the
15    consultants from.
16         Q.    I'm not talking about where you
17    borrowed consultants from.  I'm asking about
18    who was in that group in 32, the affiliates
19    that provide consulting services, and all I'm
20    asking is one member of that group McKinsey &
21    Company Inc. U.S.?
22         A.    I don't know.
23         Q.    You also don't know whether one
24    member of that group is McKinsey and company
25    Inc., fair?
```



Page 122

                        Hojnacki

1

2       A.    I don't know.

3       Q.    I believe you testified earlier

4   that the only entity that you can think of

5   that is excluded from this group, by this

6   group, I mean all affiliates that provide

7   consulting services is MIO, is that right?

8       A.    Certainly MIO is not an entity that

9   provides consulting services.

10      Q.    In 32, you also say there was a

11  review of the billing records of the service

12  team?

13      A.    Correct.

14      Q.    And who did that?

15      A.    Specifically, I don't know.

16      Q.    Do you know how many people were

17  involved in that process?

18      A.    No.

19      Q.    Do you know how far back they

20  looked at the billing records?

21      A.    No.  I don't know how far they

22  reviewed billing records.  I know for

23  purposes of these declarations, we applied a

24  two-year look-back period.

25      Q.    So is your understanding of the



Case 15-10541-BLS    Doc 2417-6    Filed 04/24/19    Page 124 of 347
Case 18-85672    Document 905-2    Filed in TXSB on 01/01/19    Page 123 of 346

Page 123

                           Hojnacki
 1
 2   process, that they take everybody who is on
 3   the service team and they look at all their
 4   billing records going back two years?
 5        A.    That's my understanding, yes, as
 6   one component of our process.
 7        Q.    And when they're doing this review,
 8   what are they looking for?
 9        A.    Situations where members of the
10   service team served a party that's on the
11   interested parties list.
12        Q.    And another aspect of the process
13   at the very end of 32 is, you compiled and
14   reviewed the list of all clients identified
15   in McKinsey's financial records as clients of
16   McKinsey RTS U.S.
17               Do you see that?
18        A.    Yes.
19        Q.    Do you know who did that?
20        A.    I don't.
21        Q.    What financial records are you
22   referring to there?
23        A.    Just the financial records of the
24   clients that we serve.
25        Q.    Specifically though what financial



Case 18-85672   Document 905-2   Filed in TXSB on 01/01/19   Page 124 of 346

Page 124

```
 1                       Hojnacki
 2   records are you talking about?
 3       A.    I don't know.  I didn't do the
 4   review.
 5       Q.    In what way do those records
 6   identify which are clients of RTS?
 7       A.    McKinsey RTS maintains its own
 8   books and records, so we know which clients
 9   are actually part of the books and records of
10   McKinsey RTS U.S.
11       Q.    Let's look at paragraph 34.  And
12   focusing on, there is kind of four
13   subsections of 34, A through D.
14             Do you see that?
15       A.    Yes.
16       Q.    Let's focus first on subpart A, all
17   right?
18       A.    Uh-huh.
19       Q.    What this says, this deals with an
20   email survey that was done to search for
21   connections, right?
22       A.    Correct.
23       Q.    When did that email survey process
24   begin for Westmoreland?
25       A.    When you say begin?
```



Case 15-10541-BLS    Doc 2417-6    Filed 04/24/19    Page 126 of 347
Case 18-85672    Document 905-2    Filed in TXSB on 01/01/19    Page 125 of 346

Page 125

1                    Hojnacki

2        Q.    When did they start sending out

3    emails?

4        A.    I don't recall off the top of my

5    head.

6        Q.    Who was in charge of this email

7    survey process?

8        A.    The team in the McKinsey legal

9    department that supports the preparation of

10    the declaration.

11        Q.    Is it your understanding that

12    Laurie Basch was primarily responsible for

13    that process for this case?

14        A.    She is certainly involved, yes.

15        Q.    But in terms of anyone she reports

16    to that might have been ultimately

17    responsible other than Ms. Molino, do you

18    know who that might be?

19        A.    No.

20        Q.    Do you know whether Ms. Molino has

21    any involvement in the email survey process?

22        A.    I don't know.

23        Q.    So looking at the four categories,

24    you have A, B, C and D, is there a single

25    form email for all four categories or are



Case 18-85672   Document 90S-2   Filed in TXSB on 01/01/19   Page 126 of 346

Page 126

                         Hojnacki

1

2   there different emails for different

3   categories?

4        A.   There are different emails for

5   different categories.  And one just point of

6   clarification.  The surveying is done via an

7   online surveying tool.  It's distributed to

8   people by email.

9        Q.   So in other words, the relevant

10   people get an email that says please take

11   this survey?

12        A.   Correct.

13        Q.   And they have to click on a link

14   and it takes them to some internal or

15   external website?

16        A.   Yes.

17        Q.   I believe you said somewhere in

18   here or McKinsey said in this case that this

19   survey went to roughly 2000 partners at

20   McKinsey consulting affiliates worldwide,

21   does that sound right?

22        A.   Specifically I believe it's -- let

23   me see if I can quickly reference the letter,

24   one of the surveys sent is to all partners

25   globally which is the roughly 2000 member



Page 127

```
 1                    Hojnacki
 2    that you are making reference to.  All
 3    partners globally, regardless of whether or
 4    not we borrow a consultant from that entity.
 5         Q.   The survey is only sent to
 6    partners, is that fair?
 7         A.   The survey is sent to partners for
 8    -- that specific survey.  There are other
 9    surveys, again, we can go through them in
10    detail if you want to understand the
11    specifics, that don't just survey partners.
12         Q.   Of A, B, C and D, which ones are
13    sent to more than just partners?
14         A.   So A is a survey that is sent to
15    the service team, that includes more than
16    just partners.
17         Q.   Okay.
18         A.   B includes members of the service
19    team which is more than just partners but
20    also partners.  C is just partners and D is
21    all employees of McKinsey RTS and its
22    affiliates globally regardless of whether
23    they are a partner or an administrative staff
24    member.
25         Q.   Are all these survey emails sent
```



Case 18-85672   Document 90S-2   Filed in TXSB on 01/01/19   Page 128 of 346

Page 128

```
 1                    Hojnacki

 2    out by Ms. Basch or is there kind of -- is

 3    there an anonymous sender that sends these?

 4        A.    What do you mean by an anonymous

 5    sender?

 6        Q.    A name that's not a human name,

 7    just a group name or administrator name or

 8    something like that?

 9            MS. GAY:  Objection to the form.

10        You can answer if you know.

11        A.    I don't recall the specific

12    mechanism for sending it.

13        Q.    You received this survey, right?

14        A.    Yes.

15        Q.    Do you remember who sent it to you?

16        A.    I don't recall right now.

17        Q.    Are all the responses to the

18    surveys retained?

19        A.    I don't have a record of them.

20        Q.    But are they retained?

21        A.    I don't know.

22        Q.    Was the response rate of the

23    surveys for categories A through D 100

24    percent?

25        A.    I don't know for every category in
```



Page 129

1                    Hojnacki

2    A through D.  I know for No. 1 that it's a

3    required 100 percent response rate.

4         Q.    It's required, but was it in fact

5    100 percent?

6         A.    I don't know.

7         Q.    Is there a process for making sure

8    that everybody responds to the survey?

9         A.    Everybody in survey A or everybody

10   in every survey?

11        Q.    Everybody in every survey.

12        A.    There is a fairly meticulous

13   follow-up process.

14        Q.    Tell me about that.

15        A.    It involves following up via email

16   to get everybody to respond.

17        Q.    So if employee A gets a survey

18   email and X amount of time passes they will

19   then get another email saying please fill out

20   your survey?

21        A.    Yes.

22        Q.    What if that employee receives

23   multiple follow-up ones and still doesn't

24   fill out the survey?

25        A.    For which?



1                    Hojnacki

2        Q.    Any of them.

3        A.    I don't know.

4        Q.    Does someone from HR or someone

5   else go to that employee directly and say you

6   need to fill this out?

7        A.    I don't know.

8        Q.    Do you know who would know the

9   response rate to these surveys?

10       A.    I don't know.  Ms. Basch I would

11  believe would.

12       Q.    This online survey, how many pages

13  is it?

14       A.    They are all different surveys so I

15  can't speak to each one but there are

16  different questions -- several questions that

17  are asked.

18       Q.    Which of these four categories did

19  you receive?

20       A.    Item A.  I am a member of the

21  service team.

22       Q.    Let me withdraw that question and

23  ask you another one because it might be

24  easier this way.

25             Are there four different surveys



Case 18-85672   Document 905-2   Filed in TXSB on 01/01/19   Page 131 of 346

Page 131

1                          Hojnacki

2    for each category?  Withdrawn.

3                    Is there a different survey for

4    each of the four categories?

5         A.    Different groups of people receive

6    different surveys, but -- receive different

7    questions, so if you are a member of the

8    service team which I am, there was a set of

9    questions associated with survey A and survey

10   B that would have been included in a single

11   survey.

12        Q.    You lost me a little bit on that

13   last answer.  Is there a distinct survey for

14   each of categories A, B, C and D?

15        A.    There is different questions that

16   are asked of different parties based on the

17   information that is being discussed here in

18   each of these.

19        Q.    Does everyone get the same survey

20   except some people are only asked to fill out

21   one part and other people are asked to fill

22   out another part?

23        A.    If one of the questions that's

24   asked doesn't relate to you, you don't get

25   the question.



Case 15-10541-BLS    Doc 2417-6    Filed 04/24/19    Page 133 of 347

Case 18-85672    Document 905-2    Filed in TXSB on 01/01/19    Page 132 of 346

1                    Hojnacki

2        Q.    But everyone gets the same survey?

3        A.    I'm not sure what you mean by

4    survey.

5        Q.    You said there was a link, right,

6    to the survey?

7        A.    Correct.

8        Q.    You click on the link, the survey

9    pops up, right?

10       A.    Yes.

11       Q.    The survey that pops up, is that

12   the the same for every person in categories A

13   through D?

14       A.    No.

15       Q.    So some people's surveys look

16   different than other peoples?

17       A.    Yes, they get different questions.

18       Q.    Does each category get different

19   questions?

20       A.    What do you mean by category?

21       Q.    A, B, C, D.  In other words, is

22   there one survey for B and D and another

23   survey for A and C, or is there one survey

24   for A, one for B, one for C and one for D or

25   something different?



Case 18-85672   Document 905-2   Filed in TXSB on 01/01/19   Page 135 of 346

Page 133

1              Hojnacki

2        A.   Maybe just for my own benefit,

3    should we go through each of these to talk

4    about like the information that's, you know,

5    trying to be identified in each of these

6    surveys.

7        Q.   I don't think we need to do that.

8    I want to know whether the survey is the same

9    or not for any one or more of these

10   categories?

11       A.   I don't know.  Again, I want to

12   make sure I'm understanding the question

13   correctly because you asked me is the survey

14   the same and I believe I answered that there

15   are different questions that are asked of

16   each group that's being surveyed based on

17   what we are trying to get at.

18       Q.   Which of these four groups are you

19   a member?

20       A.   So I am a member of the service

21   team.

22       Q.   That's A?

23       A.   That's A.  B, I'm member of the

24   service team and I'm partner at McKinsey &

25   Company U.S. and its affiliates globally.



Page 134

1                    Hojnacki

2        Q.    Yes.

3        A.    So, C, I don't recall that I was a

4    partner identified through the search of the

5    global client database bearing

6    responsibility, but I was asked about direct

7    commercial relationships to the debtor in B.

8    And then D, I am an employee of McKinsey RTS

9    U.S. and its affiliates globally.

10       Q.    You are in three of those four

11   categories?

12       A.    Yes.

13       Q.    But you got one survey?

14       A.    Yes.

15       Q.    You only had to fill out one?

16       A.    As I recall, yes.

17       Q.    Back to where all this started

18   before we went down the rabbit hole.

19             You click on the survey, it pops

20   up.  How many computer pages is the survey?

21       A.    It's an online survey, I didn't

22   print it.  It's probably four pages.

23       Q.    And what questions does it ask?

24       A.    I don't have -- I don't recall the

25   specific questions off the top of my head.


MAGNA
LEGAL SERVICES

Page 135

1                        Hojnacki

2          Q.    Do you remember generally what any

3    of them were?

4          A.    Not to the specific wording.  The

5    nature is included and described in the

6    results of this declaration though.

7          Q.    Do you know if any partners

8    received the survey and then called either

9    you or someone in legal to talk about whether

10   something needed to be disclosed or not?

11         A.    I'm not aware.

12         Q.    Certainly no one called you and

13   said, hey Mark, I got this survey, I have a

14   question, I have this relationship, does this

15   count, does this not count, did nothing like

16   that happen?

17         A.    Nobody had those conversations with

18   me.  People did comment that they received

19   the survey and my response was, it must be

20   filled out.

21         Q.    How about, are you aware that

22   anyone in legal fielded a phone call like

23   that from a partner that was confused or

24   unsure as to whether something should be

25   disclosed or not?



Page 136

                        Hojnacki

1

2       A.    I mean I wasn't there for any of

3   those phone calls but I understand that there

4   were -- people called and asked questions

5   about the survey.

6       Q.    And do you know how many people

7   called and asked questions?

8       A.    No, I don't.

9       Q.    And who dealt with those phone

10  calls?

11      A.    I don't know everybody, but I would

12  refer Ms. Basch.

13      Q.    Do the -- does the survey specify

14  the look-back date that you used in this

15  case, the October 1, 2016 date?

16      A.    Yes.

17      Q.    When the partners receive or --

18  withdrawn.

19            When the recipients receive this

20  survey, how is it that they go about

21  searching for responsive information?

22      A.    Can you be more specific about what

23  you mean.

24      Q.    Each of these categories is asked

25  for in some form, at least, work they've done



Page 137

```
 1                    Hojnacki
 2   in the past, right?
 3         A.    Yes.
 4         Q.    Are they supposed to derive that
 5   information from memory or is there some sort
 6   of set procedure to search?
 7         A.    There is not directions given to
 8   how to answer the questions.  There is
 9   specificity to the questions and guidance or
10   details in the questions but it doesn't
11   provide them a protocol to follow.
12         Q.    So fair to say as to any individual
13   recipient of the survey, other than yourself
14   you don't know how they went about searching
15   for responsive information?
16         A.    No, I don't.
17         Q.    How often is the service team
18   survey updated?
19         A.    You are asking how often does the
20   service team receive a new survey?
21         Q.    Right -- withdrawn.
22               Is there one survey sent at the
23   beginning of the engagement and that's it or
24   is the survey sent out at the beginning and
25   another survey sent in another six months and
```



Case 16-85672    Document 905-2    Filed in TXSB on 01/01/19    Page 138 of 346

Page 138

                              Hojnacki

1

2    another one in another six months, something

3    like that?

4         A.   So I don't know specific rules but

5    any time we received an updated interested

6    parties list from the debtors or debtors

7    counsel and are preparing for a supplemental

8    declaration which we reserved the right to do

9    at times, we would run an update.

10        Q.   But these are surveys presumably

11   you received for years at McKinsey, is that

12   fair?

13             MS. GAY:   Objection to the form.

14        A.   I received them related to other

15   matters.

16        Q.   And you've received them the entire

17   time you were there, right, on a fairly

18   regular basis?

19        A.   Every time there is a survey sent,

20   because I am a member of RTS and a member of

21   any service team, I receive a survey.

22        Q.   The whole time you have been at

23   McKinsey, from time to time you have received

24   these surveys, right?

25        A.   Yes.



Page 139

1                    Hojnacki

2        Q.    In the course of that experience,

3    have you noticed that you received surveys

4    more than once for the same engagement?

5        A.    Yes.

6        Q.    As an engagement proceeds, work at

7    the firm continues, right, new matters are

8    added, new clients are added, is that right?

9        A.    The firm being?

10        Q.    McKinsey as a whole.

11        A.    Yes, McKinsey has new client

12    matters.

13        Q.    So do they update the survey as the

14    engagement proceeds to catch maybe new

15    clients that have been added in the interim,

16    new engagements that have been added in the

17    interim?

18        A.    Can you be clear on what you are

19    asking.

20        Q.    I think you already testified that,

21    to your knowledge, the only time the survey

22    is updated is when the interested parties

23    list is updated, is that fair?

24        A.    So we have, again, it comments in

25    here, there is steps that are in place to



Case 15-10541-BLS   Document 90S-2   Filed in TXSB on 01/01/19   Page 140 of 346

Page 140

              Hojnacki

1

2    notify the partners that are surveyed and the

3    service team and we would do so again upon

4    being retained to notify us of any change in

5    whether or not a client relationship they

6    have becomes a direct commercial relationship

7    with the debtors or they begin service with

8    the party on the interested parties list to

9    the extent it's a member of the service team.

10        Q.   Let's say I am a partner and I

11   filled out my survey, right?

12        A.   Yes.

13        Q.   For the Westmoreland engagement and

14   let's say --

15        A.   You are a partner of McKinsey &

16   Company or McKinsey RTS?

17        Q.   Any McKinsey entity that receives

18   the survey.  And I fill out my survey and

19   then a month later into the engagement, I am

20   then working on a new matter.  I had

21   forgotten the survey, I'm working on a new

22   matter for a client that is an interested

23   party on the list.

24             Does anyone come to me as a partner

25   and say, hey look, I need you to update your



Page 141

```
 1                    H o j n a c k i
 2   response to this survey based on events that
 3   happened since you filled out your survey?
 4        A.   Are you a member of the service
 5   team?  You have to be more specific about who
 6   you are an what you are doing.
 7        Q.   I am a relevant recipient of the
 8   survey.
 9             MS. GAY:  Objection to the form.
10        A.   Again, there are a couple of
11   different surveys and target audiences that
12   are referred to here so can you just specify
13   which one you are looking to understand.
14             MS. GAY:  Or go through each
15        category so we can do it in a way that
16        is clear for the record.  Up to you.
17        Q.   Is it true of any of these
18   categories?
19             MS. GAY:  Is what true?
20             MR. PETRELLA: The question I asked.
21             MS. GAY:  I will object to the form
22        of the last three questions, I'm sorry
23        to do it but they are incredibly vague,
24        I apologize.
25        Q.   Let's focus on subsection B.  I am
```



Page 142

                        Hojnacki
1
2   a partner at McKinsey RTS U.S. -- I'm a
3   partner of an affiliate of McKinsey RTS U.S..
4           Do you follow me so far?
5       A.   Yes.
6       Q.   And I got a survey at the beginning
7   of the engagement.
8       A.   Yes.
9       Q.   And I filled it out.
10          Are you with me so far?
11      A.   Yes.
12      Q.   And then a month passes and I start
13  working on another engagement for a new
14  client that's on the interested parties list.
15          Are you with me?
16      A.   Yes.
17      Q.   Does anyone come to me and say, hey
18  partner, we need you to update your response
19  to this survey based on things that have
20  happened since you first filled out your
21  survey?
22      A.   So we, like I said, we've notified
23  those partners and we will notify them again
24  upon getting retained that if any client
25  service that they have is for a client, has a



Case 15-10541-BLS   Doc 2417-6   Filed 04/24/19   Page 144 of 347

```
 1                    Hojnacki
 2   direct commercial relationship with the
 3   debtors, that they need to notify the office
 4   of the general counsel.
 5        Q.    Any time a new client comes in, you
 6   send out a notice to all 2000 recipients and
 7   you say, hey this new client is in here, you
 8   need to update the survey if there is a
 9   direct commercial relationship?
10        A.    I don't think that's what I said.
11        Q.    That's how I understood it, so
12   please try it again.
13        A.    I said that all the partners for
14   affiliates globally have been notified and
15   will be notified again upon actual retention
16   to notify the office of the general counsel
17   to the extent that any future client
18   relationships they have have a direct
19   commercial relationship with the debtors.
20             If it's a member of the service
21   team, right, which would include partners of
22   McKinsey RTS U.S., then it wouldn't just be
23   restricted to direct commercial
24   relationships.
25        Q.    Have partners called and after
```



Case 16-85672    Document 90S-2    Filed in TXSB on 01/01/19    Page 144 of 346

Page 144

                                        Hojnacki
1
2    filling out a survey and said I've just been
3    retained by a new client and they are on the
4    interested party list in your case and you
5    need to update it, you need to update your
6    disclosures?
7        A.    If they have, they have been
8    disclosed, I am not aware of any other than
9    what's been disclosed.
10        Q.    Are you aware of that actually
11   happening, though?
12        A.    A partner calling, what
13   specifically?
14        Q.    A partner calling post filling out
15   the survey and saying I just got retained by
16   a new client, they are on your interested
17   parties list, you need to update your
18   disclosures.  Has that ever happened?
19            MS. GAY:  Objection to the form.
20        You can answer.
21        A.    Did the relationship have a direct
22   commercial relationship.
23        Q.    It's irrelevant to the question?
24            MS. GAY:  Then object to the form
25        because it's totally unclear.  You are



Page 145

1               Hojnacki

2       melding categories, Mr. Petrella, all

3       over the place.

4            MR. PETRELLA:  I'm doing it on

5       purpose because it doesn't matter which

6       category.

7            Q.   All that matters is, I got a survey

8    from McKinsey and I got a new client that I'm

9    working on and all I'm asking you, has any

10   recipient of any email survey of the type

11   that you list here in 34, have they ever

12   called up after filling out the survey and

13   say I just got retained by a new client or

14   something different happened, something new

15   happened, I am on a new engagement, anything,

16   and said, you need to know about this, you

17   need to update your disclosures?

18           MS. GAY:  Objection to the form.

19       A.   Am I aware of any phone call that's

20   come in the general counsel's office that

21   relates to --

22       Q.   Any contact to anyone --

23           MS. GAY:  Let him finish the answer

24       please.

25           MR. PETRELLA:  It's not an answer,



Page 146

```
 1                    Hojnacki
 2       but go ahead.
 3             MS. GAY:   What's the question,
 4       there is no pending question, there is
 5       just a speech.
 6             MR. PETRELLA:   That's a question,
 7       it's right there on the screen.
 8       A.    I don't have a screen, I'm sorry.
 9       Q.    Again, has any email -- I will try
10   it again.
11             Has any recipient of one of these
12   email surveys, anybody in any of these
13   categories A through D, have they ever called
14   up or contacted you or anyone on your team,
15   anyone in counsel's office, anyone at
16   McKinsey at all, have they ever contacted
17   them after filling out the survey and said to
18   them, I have just been engaged by a new
19   client, a new matter, something has happened
20   whatever it is, anything, I need to update
21   you on this and you need to update the
22   disclosures.
23             MS. GAY:   Are you asking with
24       respect to Westmoreland, Mr. Petrella.
25             MR. PETRELLA:   I'm asking this as
```



Page 147

```
 1              Hojnacki
 2    to any Chapter 11 case.
 3         MS. GAY:  Then he shouldn't answer.
 4    This is about these two affidavits, so
 5    can you clarify it and pin it to a
 6    question about Westmoreland, these two
 7    affidavits.  It's hypothetical.  It's
 8    way far afield.
 9         MR. PETRELLA:  I won't do that but
10    you can instruct him not to answer it
11    which it sounds like you are doing in
12    which case -- are you in fact
13    instructing him not to answer that.
14         MS. GAY:  I'm asking you to ask a
15    question that relates to these two
16    affidavits.  You said it's a global
17    question about any time, anyplace
18    anywhere, we are here about these two
19    affidavits.
20         MR. PETRELLA:  We are here about
21    these two affidavits which describe a
22    process and the court is interested in
23    the basis for the information that's in
24    these declarations.  And the questions I
25    am asking now is to test the -- how
```



Page 148

```
 1                     Hojnacki
 2       robust that process is.
 3       Q.    And what I'm suggesting to you,
 4  sir, is that once people fill out these
 5  surveys, time goes on, events develop,
 6  matters progress and no one thinks about your
 7  survey anymore, isn't that right?
 8             MS. GAY:  Objection to the form.
 9       A.    I don't think that's right.  I
10  think the partners in McKinsey & Company and
11  McKinsey RTS take this process very seriously
12  and they take their duties very seriously so
13  I trust them to listen to the guidelines and
14  the instructions they're provided.
15       Q.    In fact, they have come to you
16  after the survey and said, there is a new
17  development here, I'm working for a new
18  client, let's update the disclosures, that's
19  happened?
20             MS. GAY:  Again, I'm objecting to
21       the form.  It's not connected to this
22       case but you can answer.
23       A.    You are asking generally in any
24  case that McKinsey has filed since I have
25  been with the firm, am I aware of that?
```



MAGNA

LEGAL SERVICES

Page 149

1                    Hojnacki

2       Q.    Yes.  In Any Chapter 11 case.

3       A.    I can't speak to that.

4       Q.    You can, it would have happened to

5    you, so did it happen or not?

6            MS. GAY:  Objection to the form as

7        argumentative, don't answer.

8        Reformulate your question counsel.

9       Q.    Has it happened or not, sir?

10           MS. GAY:  What is that.

11      Q.    It's the question I put, I asked

12   the question now probably 14 times, 15 times.

13      A.    So in any case -- in any case has

14   any other partner at McKinsey & Company came

15   and said that something has changed in a case

16   that I'm not even involved in.

17      Q.    Or you are.

18      A.    Westmoreland or another case?

19      Q.    Any case, any Chapter 11 case.

20      A.    I can't speak to that.

21      Q.    Why can't you speak to it?

22      A.    Because I wouldn't be -- I'm not

23   the declarant in every case, I am not

24   involved in every case, I would not be the

25   person that is called in every case.



Page 150

1                    Hojnacki

2        Q.    That means it hasn't happened?

3             MS. GAY:  Objection to the form.

4        That's not what he said.

5        Q.    You haven't received any such call

6   or contact?

7             MS. GAY:  Mr. Petrella, I will cut

8        off this line of questioning, if you

9        have questions about these two

10       affidavits which are marked for the

11       record, Hojnacki 3 and 4, ask them,

12       otherwise let us go home.

13            MR. PETRELLA:  I don't think you

14       need to cut it off because it's pretty

15       clear I'm not going to get an answer to

16       that question.  Let's take a quick

17       break.

18            THE VIDEOGRAPHER:  The time is

19       11:02 and we are going off the record.

20            (Recess.)

21            THE VIDEOGRAPHER:  This is the

22       start of media label No. 4.  The time

23       now is 11:18 a.m. and we are back on the

24       record.

25       Q.    So we left off at paragraph 34.



Page 151

1                    Hojnacki

2          MS. GAY:   Of Exhibit 3.

3      Q.   Of Exhibit 3, Hojnacki 3.   Let's

4   focus on sub B, 34 and subsection B there.

5   So in B and in D below that, you say that the

6   email went to partners of RTS and its

7   affiliates globally that provide consulting

8   services.

9          Do you see that?

10     A.   Yes.   It says service team and

11  partners of McKinsey RTS and its affiliates

12  globally, yes.

13     Q.   I'm really focused on the word

14  globally in B and D.

15         Do you see that?

16     A.   Yes.

17     Q.   If you go back to 32, the phrase

18  used in the third line is, this is talking

19  about the -- this is talking about the

20  contents of the global client database, all

21  affiliates that provide consulting services.

22         MS. GAY:   Where are you?

23         MR. PETRELLA:   I'm in 32, I'm

24      contrasting 34B and D have the word

25      globally after affiliates.



Page 152

```
 1                     Hojnacki
 2
 3         Q.    Do you see that?
 4         A.    Sorry was that a question for me.
 5         Q.    I just want to make sure you see
 6   it, it's not so much as a question as trying
 7   to orient you.  In sub B the second line, it
 8   says affiliates globally?
 9         A.    Yes.
10         Q.    And then sub D further down, it
11   says affiliates globally?
12         A.    Yes.
13         Q.    In 32 you just say the affiliates
14   that provide consulting services.
15               My only question is, is there a
16   reason why globally was added in 34 but not
17   in 32?
18         A.    I'm not aware.
19         Q.    Are the affiliate groups in B and D
20   different from the affiliate group whose
21   clients appear in the global client database?
22               MS. GAY:  Again, referring to
23         paragraph 34?
24               MR. PETRELLA:  34 and 32 both.
25         A.    Your question is, is the affiliate
```



Page 153

1              Hojnacki

2  group referred to here as affiliates globally

3  is that different than what's referred to in

4  the paragraph 32 as all affiliates that

5  provide consulting services.

6       Q.   Right.

7       A.   I'm not aware.

8       Q.   So to your knowledge, is the global

9  client database limited to the clients of RTS

10 consulting affiliates that are based in the

11 U.S.?

12      A.   That's not my understanding, no.

13      Q.   Your understanding is that the

14 global client database includes RTS

15 consulting affiliates no matter where they

16 are in the world?

17      A.   Yes.

18      Q.   So back to 34 and specifically sub

19 B.  You talk about a direct commercial

20 relationship or transaction.

21           Do you see that?

22      A.   Yes.

23      Q.   What is a direct commercial

24 relationship or transaction?

25      A.   So in the survey that's sent out



Case 15-10541-BLS   Doc 2417-6   Filed 04/24/19   Page 155 of 347
Case 18-85672   Document 905-2   Filed in TXSB on 01/01/19   Page 154 of 346

```
  1                     Hojnacki
  2    specific to this subsection and I believe --
  3    specific to this subsection and I believe
  4    subsection D which also refers to direct
  5    commercial relationship, there is guidance in
  6    the survey of what constitutes a direct
  7    commercial relationship and the three broad
  8    categories are, there is some direct
  9    commercial relationship between the two
 10    entities, customer vendor type relationship,
 11    that is there is ongoing or pending
 12    litigation between the two parties or that
 13    there is a potential M&A or sales type
 14    transaction between the two parties.
 15         Q.   Who drafts the survey by the way?
 16         A.   I believe the McKinsey legal
 17    department.
 18         Q.   Do you know who specifically at
 19    McKinsey legal drafted the survey for this
 20    case?
 21         A.   I do not.
 22              MS. GAY:  Make sure you guys don't
 23         talk over each other, we want a very
 24         clear record for the court.
 25         Q.   According to the survey, would an
```



1                   Hojnacki

2    indirect relationship be one that fell into

3    none of those three categories?

4            MS. GAY:  Objection to the form.

5        A.   I can't speak to what you may refer

6    to as an indirect relationship but there is

7    specific guidance provided which is intended

8    to define for folks the definition of a

9    direct commercial relationship.

10       Q.   You said there were three broad

11   categories in the survey that define a direct

12   commercial relationship, right?

13       A.   There is three criteria that are

14   provided.

15       Q.   You said that the first is, there

16   is some direct commercial relationship

17   between the two entities, right?

18       A.   Such as a customer vendor type

19   relationship.

20       Q.   Is that the example that's given in

21   the survey?

22       A.   I know it's a commercial

23   relationship.  I'm defining for purposes of

24   this deposition it to be customer vendor but

25   that would be a typical commercial type



Case 18-85672   Document 905-2   Filed in TXSB on 01/01/19   Page 156 of 346

Page 156

```
 1                  Hojnacki
 2    relationship for organizations like
 3    Westmoreland.
 4         Q.   What makes that relationship
 5    direct, what is it about it that's direct?
 6         A.   A customer vendor relationship,
 7    customers and vendors buy and sell from each
 8    other.
 9         Q.   So it's the dealing directly with
10    each other that makes it direct?
11         A.   They deal with each other directly.
12         Q.   That's why it's direct?
13         A.   Yes.
14         Q.   Does the survey provide any
15    examples to the recipients about what
16    constitutes a direct relationship, direct
17    commercial relationship?
18         A.   Beyond the three criteria that I
19    just mentioned in terms of it being
20    commercial relationship between the two,
21    litigation or pending litigation or some sort
22    of sale or M&A type transaction.  Those are
23    the examples that are provided and I think
24    there are some additional specificity that I
25    can't recall to each of those to help clarify
```



```
 1                   Hojnacki
 2    it.
 3        Q.   I was really -- I should have
 4    rephrased the question.
 5             I was really talking about the
 6    first criteria, is the customer vendor
 7    example given in the survey?
 8        A.   I don't have -- I don't recall the
 9    details.
10        Q.   Do you recall whether there is any
11    kind of specific example given for the first
12    criteria, the first of the three?
13        A.   The commercial example?
14        Q.   You said there are three criteria.
15    The first criteria, is there any type of
16    example given with respect to that first
17    criteria?
18        A.   I don't recall.
19        Q.   Can an indirect relationship with
20    the debtor create an interest that's
21    materially adverse to the estate, creditors
22    or the equity security holders?
23             MS. GAY:  Objection to the form.
24        A.   Would you ask it again a little
25    slower for me.
```



Case 16-85672   Document 905-2   Filed in TXSB on 01/01/19   Page 158 of 346

Page 158

```
 1                    Hojnacki
 2       Q.   Can an indirect relationship with
 3  the debtor in a case create an interest
 4  that's materially adverse to either the
 5  estate, the creditors, or the equity security
 6  holders?
 7       A.   Can you define what you mean by
 8  indirect commercial or an indirect
 9  relationship?
10       Q.   Your legal department apparently
11  has laid out the criteria of a direct
12  commercial relationship.  So therefore it
13  must have some idea of what is an indirect
14  commercial relationship, so I would put that
15  question back to you and say, what is your
16  understanding that distinguishes an indirect
17  commercial relationship from a direct
18  commercial relationship?
19       A.   Well, an indirect -- we've defined
20  what a direct commercial relationship is,
21  right, so the -- an indirect relationship
22  could potentially be anything that doesn't
23  involve a direct -- direct commercial
24  relationship as defined or as described with
25  the debtors.
```



Page 159

```
 1                  Hojnacki
 2      Q.   Does the Bankruptcy Code speak to
 3  indirect relationships with the debtor?
 4           MS. GAY:  Objection to the form.
 5      He is not a lawyer.
 6      A.   I am a not a lawyer, I can't speak
 7  to the specifics of the Bankruptcy Code.
 8      Q.   So you don't know?
 9      A.   I can't speak to the specifics of
10  the Bankruptcy Code.
11      Q.   So you don't know?
12      A.   I don't know --
13      Q.   The answer to the question.
14      A.   Can you restate your question.
15      Q.   Your survey only asks for direct
16  commercial relationships, correct?
17      A.   That's -- I think if we are
18  referencing to survey B or survey C, those
19  surveys and the questions that are asked
20  there are intended to identify direct
21  commercial relationships but as it relates to
22  other surveys, specifically the one in A, as
23  it relates to the service team which is the
24  team that actually served -- McKinsey RTS
25  U.S. and the affiliates that are borrowed
```



```
 1                  Hojnacki
 2    that are serving the debtors, that doesn't
 3    just focus on direct commercial
 4    relationships, that focuses on all
 5    relationships.
 6         Q.   Focusing on sub B, that focuses on
 7    work that the service team and partners at
 8    RTS and its affiliates globally that provide
 9    consulting services, that focuses on services
10    that constitute a direct commercial
11    relationship or transaction, correct?
12         A.   The content of the survey discussed
13    here in B is intended to flesh out any direct
14    commercial relationships, but again, as it
15    relates to the service team which is surveyed
16    separately or kind of has additional detail
17    that's included as it relates to all
18    relationships, not just direct commercial
19    relationships.
20         Q.   Focusing on subsection B only, what
21    you are asking for there is direct commercial
22    relationships, right?
23         A.   The specifics of that subsection,
24    yes.
25         Q.   So you are not asking for indirect
```



Page 161

```
 1                    H o j n a c k i
 2     commercial relationships in that subsection,
 3     correct?
 4          A.   No, we are focused on direct
 5     commercial relationships.
 6          Q.   You are excluding indirect
 7     commercial relationships, is that fair?
 8          A.   We are focused on direct commercial
 9     relationships.
10          Q.   You don't know whether under the
11     code a professional can be considered not
12     disinterested as a result of an indirect
13     commercial relationship, is that fair?
14               MS. GAY:  Objection to the form.
15          A.   I'm not a lawyer, so the specifics
16     that are included in the code, I am not aware
17     of.
18          Q.   But the legal department, they are
19     lawyers, right?
20          A.   The McKinsey legal department does
21     have lawyers in it, yes.
22          Q.   They're the ones that assisted you
23     in preparing these declarations, right?
24          A.   They were one party that assisted
25     in addition to outside counsel from Hogan
```



Page 162

                              Hojnacki

1       Lovells, the McKinsey finance department and

2       so I think as I stated before, I relied on

3       them to help identify that this was

4       consistent with what's required under the

5       bankruptcy code.  It was also consistent with

6       the, what had been agreed to or discussed

7       with the U.S. Trustee prior to the filing of

8       their objection.

9            Q.   Who came up with this direct

10      commercial relationship standard?

11           A.   I don't know.

12           Q.   How long has it been in use at RTS?

13           A.    To the best of my knowledge, it was

14      part of the approach of resolving the

15      objection from the U.S. Trustee in the Sun

16      Edison case.

17           Q.   So it's your understanding that the

18      trustee agreed to that standard?

19           A.   It's my understanding that the

20      trustee was comfortable with the approach

21      that was applied, yes.

22           Q.   And have you ever discussed with

23      counsel this issue of direct commercial

24      relationship, what it means and whether it



Page 163

```
 1                    Hojnacki
 2     complies with the law?
 3            MS. GAY:  In the context of the
 4        Westmoreland case?
 5            MR. PETRELLA:  In the context of
 6        any case.
 7            MS. GAY:  In that case, we are not
 8        going to go beyond -- we are already
 9        being extremely generous about
10        conversations with counsel.  The court
11        order directs us to make those
12        conversations available in the four
13        corners of these two affidavits but I
14        don't want to go beyond that.
15            MR. PETRELLA:  These affidavits are
16        based in large part on the concept of a
17        direct commercial relationship.  It's a
18        phrase he used many times in this
19        deposition before I even asked him about
20        it.  I'm pretty sure the judge is going
21        ton want to know what the basis for that
22        standard is and where it came from and
23        whether it's been vetted by counsel.
24            MS. GAY:  I'm giving you as much
25        leeway as I can, I'm just saying,
```



Case 18-85672   Document 905-2   Filed in TXSB on 01/01/19   Page 164 of 346

Page 164

1                    Hojnacki

2       restrain your questions about

3       attorney/client communications to the

4       Westmoreland affidavits, that's all.

5            MR. PETRELLA:  I don't read the

6       court's order to be limited in quite

7       that way.  As long as the question

8       relates to the basis for the

9       declarations in Westmoreland, my

10      understanding of the court's order is

11      that is fair game, it's not my

12      understanding that every question must

13      relate directly to the Westmoreland case

14      in the sense that you are saying but in

15      any event, let's try the question on

16      Westmoreland and see what happens.

17           Q.   In connection with the Westmoreland

18  case, did you have any discussions with

19  counsel, specifically about the issue of what

20  constitutes a direct commercial relationship

21  or whether that standard complies with the

22  law?

23           A.   So I had conversations with counsel

24  that discussed obviously the criteria that

25  was used to define direct commercial



Page 165

                              Hojnacki

1

2    relationship that we discussed in the prior

3    question and we discussed the fact that the

4    approach that we were using was -- that the

5    U.S. Trustee supported it and had accepted it

6    in prior situations and we discussed that the

7    declaration as signed was what was necessary

8    under law.

9         Q.    Who were those conversations with?

10        A.    Ms. Basch and Mr. Ivanick.

11        Q.    And during those conversations,

12   beyond just a general conversation that look,

13   hey the approach we are using here is

14   consistent with what the U.S. Trustee

15   approved, did the words direct commercial

16   relationship pass between you, did those come

17   out of anybody's mouth?

18        A.    In the context of what?

19        Q.    Your conversations with counsel

20   that you just testified to.

21        A.    Yes.

22        Q.    It did?

23        A.    Yes.

24        Q.    Whose mouth did they come out of,

25   yours?



Case 18-85672   Document 90S-2   Filed in TXSB on 01/01/19   Page 166 of 346

Page 166

```
 1                    Hojnacki

 2        A.    No -- well we were having a

 3   conversation.

 4        Q.    What did you say about direct

 5   commercial relationship?

 6        A.    We were having a conversation about

 7   it, so I can't state that I didn't say the

 8   words but we were having a conversation about

 9   the use of direct commercial relationships as

10   part of the -- one of the mechanisms that we

11   searched to make our disclosures.

12        Q.    And what was the substance of that

13   conversation?

14        A.    That it was an approach that was

15   accepted by the U.S. trustees office.

16        Q.    Anything beyond that?

17        A.    I don't recall.

18        Q.    So just to be clear, as far as your

19   recollection goes, you had a conversation

20   with Mr. Ivanick and Ms. Basch.  Was it

21   separate conversations or together?

22        A.    Probably both.

23        Q.    And in that conversation, one of

24   them or both of them said to you, this

25   concept of direct commercial relationship has
```



Case 18-85672   Document 905-2   Filed in TXSB on 01/01/19   Page 167 of 346

Page 167

                         Hojnacki

1

2    been approved by the U.S. Trustee, in words

3    or substance, is that fair?

4        A.   We had discussions and, again, I

5    don't want to characterize it as one

6    discussion because it was many, there were

7    many discussions that went into the

8    preparation of this.  We had a discussion

9    about the use of a direct commercial

10   relationship as an approach that was

11   acceptable by the U.S. Trustee in the

12   preparation of the declaration, yeah.

13       Q.   Is that the only conversation you

14   had specifically about the concept of a

15   direct commercial relationship?

16       A.   Can you give me an example of what

17   other conversations.

18       Q.   No, I can't because I didn't have

19   the conversation, you did.

20           MS. GAY:  Can we clarify the

21           record.  I think he said he had several

22           conversations.  Mr. Petrella, I don't

23           think he is understanding what you are

24           saying.

25           MR. PETRELLA:  He is saying he had



Page 168

1              Hojnacki

2       several conversations on the topic of

3       the approach.

4           MS. GAY:  Correct.

5       Q.   I'm asking about specific

6  conversations about the concept of direct

7  commercial relationship, okay.  If those

8  words weren't used during the conversation,

9  you don't have to tell me about it, okay.  I

10  only want to know about conversations that

11  you had with counsel where the words, direct

12  commercial relationship, passed between you,

13  okay.

14      A.   Right.

15      Q.   You told me about one conversation

16  where you were essentially told that, hey the

17  U.S. attorneys office is -- the U.S.

18  Trustee's office is fine with the direct

19  commercial relationship standard, in words or

20  sub stand stands, right?

21      A.   Right.

22      Q.   Are there anymore conversations

23  about direct commercial relationships

24  specifically those words, that phrase?

25      A.   Right.  But I think you are



Case 18-85672   Document 90s-2   Filed in TXSB on 01/01/19   Page 169 of 346

Page 169

                        Hojnacki

1

2   mischaracterizing what I said.  There were

3   many conversations with counsel and I don't

4   recall exactly which ones or how many but

5   more than one of them related to the concept

6   of direct commercial relationship and the

7   confirmation that it followed an approach

8   that was agreed to by the U.S. Trustee.

9       Q.   So you are saying you basically had

10   the same conversation multiple times, is that

11   right?

12          MS. GAY:  Objection to the form.

13      It's not what he is saying.

14      A.   We discussed the topic multiple

15   times.  I wouldn't characterize it as the

16   same conversation.

17      Q.   You had at least one conversation

18   where your discussion with counsel was, hey

19   the U.S. Trustee's office is okay with the

20   direct commercial relationship standard,

21   right, you had at least one of those, right?

22      A.   Yes.

23      Q.   Did you have any other

24   conversations about a different topic that

25   relates to the concept of direct commercial



Page 170

1                    H o j n a c k i

2   relationship?

3         A.    Not that I recall.

4         Q.    Do you know whether the concept of

5   a direct commercial relationship or

6   transaction was developed by inside counsel

7   or outside counsel?

8         A.    I don't know.

9         Q.    Let's look at -- stay on 34, look

10  at subsection D?

11        A.    D.

12        Q.    D.

13              MS. GAY:   Exhibit 3 for the record.

14        Q.    You identify a group here and you

15  say they were asked about any equity

16  ownership in the debtors, right?

17        A.    Correct.

18        Q.    And why did the survey ask that

19  question?

20        A.    To identify whether or not they

21  were employees of McKinsey RTS U.S. and its

22  affiliates that owned equity ownership in the

23  debtors.

24        Q.    Why does that matter, how is that

25  relevant to your disclosures?



Page 171

1                        Hojnacki

2        A.    To just be as open and transparent

3   as possible.

4        Q.    Were they asked about equity

5   ownership in competitors?

6        A.    Not that I am aware of.

7        Q.    How about customers?

8        A.    You are saying just customers of

9   the debtors in general.

10       Q.    Right.  Were they asked about

11  equity ownership in customers of the debtors?

12       A.    I don't believe so.

13       Q.    Were they asked about equity

14  ownership in suppliers of the debtors?

15       A.    I don't believe so.

16       Q.    Let's look at 42, paragraph 42 of

17  Hojnacki 3.

18             So in this paragraph you say, RTS

19  itself does not hold or represent any

20  interest adverse to the debtors estates or

21  any class of creditors or equity security

22  holders by reason of any direct or indirect

23  relationship to, in connection with or

24  interest in the debtors.

25             Do you see that?



1                    Hojnacki

2        A.    Yes.

3        Q.    Were RTS employees and partners

4   asked whether they hold any such adverse

5   interest?

6        A.    So this paragraph relates to the

7   conclusion that was arrived at based on the

8   thorough searches that are described in the

9   rest of the declaration in terms of

10  identifying where there were connections to

11  the debtors.

12       Q.    Were RTS employees or partners

13  asked whether they -- withdrawn.

14             Were RTS employees or partners

15  asked whether they had any interest adverse

16  to the debtors estates or any class of

17  creditors or equity security holders by

18  reason of any direct or indirect relationship

19  to or connection with or interest in the

20  debtors?

21       A.    Is this again specific to paragraph

22  42?

23       Q.    Yes.   That's where the language I'm

24  reading you comes from.

25       A.    Paragraph 42 is the conclusion that



Case 18-85672   Document 90S-2   Filed in TXSB on 01/01/19   Page 173 of 346

Page 173

```
 1                    Hojnacki
 2   was drawn based on the outputs of all of the
 3   other processes that were gone through to
 4   identify any situations where there was a
 5   connection to the debtor that would cause us
 6   to violate the disinterested person's
 7   definition.
 8       Q.   Look at subparagraph C of 42.  So
 9   it's here you say that RTS does not hold or
10   represent any interest adverse to the debtors
11   estate or any class of creditors or equity
12   security holders by reason of any direct or
13   indirect relationship in connection with or
14   interest in the debtors.
15            Do you see that language?
16       A.   Yes.
17       Q.   My question is, were RTS employees
18   or partners asked whether they hold any such
19   adverse interest?
20            MS. GAY:  Asked and answered.  You
21       can answer it again.
22       A.   So that specific phrase if turned
23   into a question was not directly asked of RTS
24   employees but the process that we describe
25   and we've been discussing that we've gone
```



Case 18-50672    Document 905-2    Filed in TXSB on 01/01/19    Page 174 of 346

Page 174

                              Hojnacki

1    through was intended to identify those

2    situations and allowed us to come to this

3    conclusion that's stated in this paragraph.

4         Q.   Let's look at paragraph 55.  It's a

5    long paragraph but about three quarters of

6    the what down, there is an item, three

7    confidential clients, right?

8         A.   Yes.

9         Q.   You later disclose two of those

10   clients in your supplemental declaration,

11   correct?

12        A.   Yes.

13        Q.   That was after Mar-Bow's objection

14   had been filed, correct?

15        A.   It was also a question that was

16   raised by the U.S. Trustee in conversations

17   with counsel after the filing of the

18   declaration.

19        Q.   So was the disclosure of those two

20   confidential clients in your supplemental

21   declaration, was that prompted by a request

22   from the trustee's office?

23        A.   I believe so.

24        Q.   Why were you willing to disclose



Case 18-50672   Document 90S-2   Filed in TXSB on 01/01/19   Page 185 of 346

Page 175

```
 1                    Hojnacki
 2  two of the clients after talking with the
 3  Trustee's office when you weren't willing to
 4  disclose them in the first place?
 5       A.   I don't know the specifics.  I just
 6  understand that the -- whatever was requiring
 7  the need to keep them confidential at the
 8  time had been removed.
 9       Q.   So is it your testimony that
10  something had changed, that the need for
11  confidentiality was no longer as serious as
12  it was when you first filed your declaration?
13       A.   I wouldn't characterize it that way
14  because I don't know, but I understand based
15  on the preparation of the supplement that
16  whatever the restrictions were or
17  requirements were at that time had changed as
18  far as the disclosure.
19       Q.   It was your understanding there was
20  some sort of changed circumstances that
21  allowed for the disclosure?
22       A.   Yes.
23       Q.   And those circumstances were
24  something other than just a conversation with
25  the U.S. Trustee's office, I assume, is that
```



Case 18-85672   Document 905-2   Filed in TXSB on 01/01/19   Page 176 of 346

Page 176

```
 1                    Hojnacki
 2   right?
 3        A.    I don't know.
 4        Q.    So the circumstance simply might
 5   have been the trustee's office came to
 6   counsel and said we want you to disclose
 7   these clients so you disclosed them?
 8        A.    I don't know.
 9        Q.    Who makes the decision as to
10   whether a client is confidential such that it
11   should not be disclosed in a declaration like
12   the one you prepared?
13        A.    I don't know specifically who makes
14   that decision.
15        Q.    Do you know whether it's someone in
16   legal or someone in corporate?
17        A.    Can you define the difference
18   between legal and corporate?
19        Q.    Legal would be anyone employed by
20   McKinsey's legal department.  Corporate would
21   be anyone else.
22        A.    I don't know.
23        Q.    We talked I think briefly about the
24   two-year or we touched on the two-year
25   look-back that was employed in connection
```



1                    Hojnacki

2      with your search for connections in this

3      case, do you remember that?

4            A.    Yes.

5            Q.    And in your declarations,

6      connections with interested parties that are

7      more than two years old are not disclosed, is

8      that fair?

9            A.    Yes, as part of the application of

10     the two-year look-back period, we looked back

11     two years.

12           Q.    So the exact date that's used for

13     the look-back in your declaration is October

14     1, 2016, is that right?

15           A.    Yes.

16           Q.    Why was that specific date

17     selected?

18           A.    Why was October 1, 2016?

19           Q.    Yes.

20           A.    It's my understanding that two

21     years -- a two-year look-back period is

22     commonplace in these situations.

23           Q.    But when are you looking back from?

24           A.    The petition date.

25           Q.    The petition date was October 9,



Page 178

1                    Hojnacki

2  right?

3        A.   Yes, but let's be clear, right, the

4  two-year look-back period is as of the

5  petition date, goes back to October 1, 2016.

6        Q.   Right.

7        A.   Right.  We are using that date

8  for -- as the look-back period for all

9  subsequent searches that happen even after

10  the petition date.

11        Q.   So as time moves on, the look-back

12  becomes longer than two years, right?

13        A.   Yes.

14        Q.   So when you did your supplemental

15  declaration, you didn't move the look-back

16  date forward in time, you kept it at October

17  1, 2016, right?

18        A.   Can we reference back to the

19  supplemental declaration and see which date

20  it refers to?

21        Q.   Sure.  That's Exhibit 4.

22             I don't know about you but I'm

23  seeing a lot of October 1, 2016s.

24             MS. GAY:  So you will be clear,

25        that was not a question, he was just



Page 179

```
 1                    Hojnacki
 2        being helpful.
 3             MR. PETRELLA:  That is right.
 4        Paragraph 7, paragraph 10.
 5             MS. GAY:  Referring to Exhibit 4,
 6        Mr. Petrella.
 7             MR. PETRELLA:  Correct.  Paragraph
 8        12, paragraph 13.
 9        Q.    Do you see how you are using that
10   date?
11        A.    Yes.
12        Q.    That's consistent with your
13   recollection?
14        A.    Yes.
15        Q.    We looked at the engagement letter
16   before.  McKinsey was first retained in July
17   17, 2018, right?
18        A.    That sounds correct, yes.
19        Q.    And I think you previously
20   testified that, you know, McKinsey at that
21   time or RTS at that time knew it was at least
22   a possibility that Westmoreland may be headed
23   for bankruptcy, right?
24        A.    I stated that we were aware they
25   were in discussions with their first lien
```



Page 180

1              Hojnacki

2   lender steering committee about options to

3   resolve the capital structure issue and that

4   could include a bankruptcy filing.

5        Q.    At that point did RTS owe

6   Westmoreland a fiduciary duty at the time it

7   was retained prepetition?

8        A.    I don't know.

9        Q.    Have you ever had any discussions

10  with counsel about whether it might be

11  appropriate to set the look-back date two

12  years from the date of prepetition retention

13  as opposed to retention for petition and

14  afterwards?

15       A.    No.  We only discussed that a

16  two-year look-back period from the petition

17  date was customary and commonplace in these

18  type of situations.

19       Q.    Who did you discuss that issue

20  with, in terms of legal counsel?

21       A.    Again, Ms. Basch and Mr. Ivanick.

22       Q.    In terms of it being customary,

23  what were you told about that?

24       A.    It's the approach that's applied by

25  many other professionals that are retained in



Case 18-85672    Document 905-2    Filed in TXSB on 01/01/19    Page 181 of 346

Page 181

```
 1                    Hojnacki
 2    Chapter 11 situations, including others that
 3    are retained in this case.
 4         Q.    And for how long has that been the
 5    case?
 6         A.    Has what been the case?
 7         Q.    That that's been customary to use a
 8    two-year look-back period?
 9         A.    I'm not sure.
10         Q.    You don't have any sense of how
11    long this tradition of using a two-year
12    look-back period has been in place?
13         A.    No.
14         Q.    But that look-back period was
15    selected by counsel, correct?
16         A.    We were advised by counsel that it
17    was appropriate to use in these cases, yes.
18         Q.    Was that McKinsey legal, was that
19    Mr. Ivanick or someone else?
20         A.    I don't recall.
21         Q.    Is that the universe of attorneys
22    it might have been those, either Mr. Ivanick
23    or someone from McKinsey legal?
24         A.    Yes.
25         Q.    Are there any formal written
```



```
 1                    Hojnacki
 2   policies on this two-year look-back period of
 3   McKinsey?
 4        A.   The two-year look-back period in
 5   relation to disclosures.
 6        Q.   In relation to disclosure
 7   declarations of the type that you prepared in
 8   this case?
 9        A.   No.
10        Q.   When was the first time that
11   McKinsey RTS used this two-year look-back
12   period?
13             MS. GAY:  That's well beyond the
14        four corners of these two affidavits,
15        Mr. Petrella.
16             MR. PETRELLA:  I don't agree with
17        that at all.
18             MS. GAY:  Why don't you answer the
19        question and we can move on.
20        A.   I don't know.
21        Q.   Is this case the first time you've
22   used a two-year look-back period, you
23   personally?
24        A.   The only other case where I was the
25   declarant was in Sun Edison and I don't
```



MAGNA
LEGAL SERVICES

Page 183

1                     Hojnacki

2   recall what we used in that case.

3        Q.   Do you have a sense of when this

4   two-year look-back policy was established?

5        A.   No.

6        Q.   Are there any exceptions to this

7   two-year look-back policy?

8        A.   I don't know.

9        Q.   Were you shown any legal authority

10  to support this two-year look-back period

11  before you signed your declaration?

12       A.   Can you define what legal authority

13  is.

14       Q.   A case, a statute, a rule?

15       A.   No, it was just discussed in

16  conversation with counsel.

17       Q.   You don't recall who that counsel

18  was that you had that discussion with?

19       A.   It was Ms. Basch and Mr. Ivanick.

20       Q.   Both together?

21       A.   It was in a phone conversation that

22  I recall had both of them on it.

23       Q.   And words or substance, Ms. Basch

24  and Mr. Ivanick said a two-year look-back

25  period was appropriate, is that fair?



Page 184

                              Hojnacki

 1

 2        A.    Yes.

 3        Q.    And is customary?

 4        A.    Yes.

 5        Q.    And it complies with the law?

 6        A.    I'm not a lawyer so I can't state

 7    --

 8        Q.    I'm not asking whether it actually

 9    complies with the law.  I'm asking whether

10    you were told it complies with the law.

11        A.    I don't remember the specific

12    details of everything that was discussed, but

13    it was pointed out that this is -- that a

14    two-year look-back period is customary and

15    commonplace and, in fact, used by other

16    professionals in this case and others.

17        Q.    As part of that conversation, was

18    there any indication that there might be some

19    problems with using a two-year look-back

20    period?

21        A.    Not that I recall.

22        Q.    For a connection to be two years

23    old, it has to end two years earlier, right?

24             MS. GAY:  Objection to the form.

25        You can answer if you understand it.



Page 185

1                         Hojnacki

2         A.    Would you mind asking it again.

3         Q.    Let me go about it a different way.

4               If a connection is ongoing, the

5    two-year look-back period is irrelevant,

6    right?

7         A.    I guess, can you be more specific

8    about what you...

9         Q.    Specifics are irrelevant.  If you

10   have a connection with an interested party.

11              THE VIDEOGRAPHER:  We lost power.

12              (Off the record.)

13              THE VIDEOGRAPHER:  This is the

14         start of media label No. 5.  The time

15         now is 12:07 p.m. and we are back on the

16         record.

17        Q.    So before our little break there.

18   What we were talking about, is in this case

19   you don't disclose connections if they ended

20   greater than two years from the petition

21   date, is that right?

22        A.    If it was a connection outside of

23   the two-year look-back window, it's not

24   disclosed.

25        Q.    So let's say we are talking about a



Page 186

                         Hojnacki
1
2    connection, a client relationship with a
3    competitor of the debtor.  Okay.
4         A.   Okay.
5         Q.   You wouldn't disclose that
6    connection if that relationship ended greater
7    than two years from the petition date, right?
8         A.   If I just state it in my own words,
9    if it wasn't a relationship within the
10   two-year look-back period, we wouldn't
11   disclose it.
12        Q.   How do you determine whether it's
13   within the -- whether the relationship
14   existed within the look-back period?
15        A.   Can you be more specific about what
16   you mean.
17        Q.   Not really.  How do you figure out
18   what's within and without the look-back
19   period, give me -- let's use the example of
20   the client relationship with a competitor.
21   How do you figure it out?
22        A.   If it was a client that we served
23   within the two-year look-back period, that
24   was served by a member of the service team,
25   for instance, we would disclose that



Page 187

                        Hojnacki
1       relationship.
2           Q.    And how do you figure out when you
3       served the client?
4           A.    Again we go through the steps that
5       we used to identify things including the
6       review of the global client database, the
7       review of financial records of RTS, the
8       review of time records of the service team
9       and then the survey that is sent out to both
10      the service team as well as partners of
11      affiliates globally on various topics.  So we
12      use that to identify when there is an ongoing
13      relationship within the two-year look-back
14      period.
15          Q.    So if there is a particular
16      interested party and there is no billing
17      records that show time to that interested
18      party, right, and no one reports that they
19      had done work for that interested party
20      during that two-year period, then you would
21      say, that's outside the two-year period, is
22      that fair?
23          A.    There is also the review of the
24      global client database, right, which tracks



Case 1:18-cv-05672   Document 90S-2   Filed in TXSB on 01/01/19   Page 188 of 346

Page 188

```
 1                    Hojnacki
 2    all of the McKinsey's client relationships
 3    for all of its consulting affiliates
 4    globally.
 5        Q.   Does that tell you when you did
 6    work for the client?
 7        A.   I don't know specifically what's
 8    involved in that but I know it's certainly a
 9    big step in our process.
10        Q.   Right.  But I'm focused on how
11    figure out what is within and without the
12    two-year look-back period.  What I'm saying,
13    the client database, at least as I understand
14    your testimony, doesn't really help you make
15    that determination in and of itself, is that
16    right?
17        A.   I just said, I don't know exactly
18    the details included in that client global
19    database are, so you mischaracterized my
20    words.
21        Q.   I'm not trying to mischaracterize
22    your words.  I'm just saying, as far as you
23    know, it doesn't tell you one way or the
24    other whether you did work for a particular
25    client within the last two years or not?
```



Page 189

```
 1                    Hojnacki
 2        A.    I didn't say that.
 3        Q.    Do you know whether the global
 4   client database tells you whether a
 5   particular client or engagement is active
 6   within the last two years?
 7        A.    I don't know if those details are
 8   included in the global client database.
 9        Q.    With respect to clients for whom
10   services were provided in the past but have
11   not been provided within the two years from
12   the petition date, does McKinsey make efforts
13   to stay in touch with clients and check in
14   with them, see how they're doing, talk to
15   them about potential new engagements, does
16   that happen?
17        A.    So you are saying, if it's a client
18   that we worked with historically outside of
19   the two-year look-back period, do we stay in
20   touch with them.
21        Q.    Yes.
22        A.    I suppose.  I can't speak to every
23   client situation that McKinsey ever had or
24   every situation.
25        Q.    Just in working at McKinsey, it's
```



Page 190

1                         Hojnacki

2    fairly common practice to contact former

3    clients and check in with them, see how

4    they're doing, talk with them about their

5    family, maybe what's going on with their

6    business, things of that nature?

7              MS. GAY:  Is that a question?

8              MR. PETRELLA:  Yes.

9         A.   What's the question.

10        Q.   Isn't that fairly common at

11   McKinsey?

12        A.   To keep in touch with clients even

13   if we are not serving them?

14        Q.   Former clients.

15        A.   Potentially.

16        Q.   So if an engagement, if a past

17   engagement is over, but you are in

18   communication with that client about

19   potential future business, does that extend

20   the two years, does that stop the two years

21   from running?

22              MS. GAY:  Objection to the form.

23        A.   Can you be specific about what time

24   periods you are referencing and what specific

25   conversations you are implying are happening.



Page 191

1                         Hojnacki

2        Q.    I'm talking about a two-year

3   look-back period.  Let's say you have a

4   client where you haven't provided any

5   services to them within the last two years,

6   but within the last two years, okay, you've

7   been in touch with the client about potential

8   future engagements, okay.  Does that get

9   disclosed or not disclosed?

10       A.    If we are not actively serving

11  them, in any capacity then it would not get

12  disclosed.

13       Q.    If a McKinsey partner or partners

14  was actively pitching a former client for a

15  new engagement, that might give them an

16  incentive to favor them potentially, correct?

17       A.    Can you be specific about what --

18       Q.    If I want business from you and I'm

19  talking to you about potentially getting

20  business from you, I have an incentive to

21  help you, don't I?

22            MS. GAY:  Objection to the form.

23       You can answer.

24       A.    Are you the client or am I the

25  client, I want to make sure who is the



Page 192

```
 1                      Hojnacki
 2  client.
 3          Q.    It doesn't matter who the client
 4  is, me and you, let's say me Mike you Mark.
 5          A.    Right.
 6          Q.    I want to sell you something, I
 7  want to do business with you, okay and let's
 8  say I spent a couple of weeks trying to
 9  convince you do business with me.  Under that
10  dynamic, that circumstance, I might have an
11  incentive to do you a favor, to benefit you
12  in some way, is that fair?
13          A.    That doesn't sound at all correct,
14  the way McKinsey works.
15          Q.    I wasn't asking about how McKinsey
16  works, I was asking, you are the one who
17  wanted the specifics, then I gave you the
18  specifics and then you went back to McKinsey.
19              Between me and you, the
20  hypothetical I actually gave you, does it
21  make sense that I might have some incentive
22  to do you a favor, confer some benefit on
23  you?
24          A.    No.  Again you are creating a
25  hypothetical situation that --
```



Page 193

1                        Hojnacki

2          Q.    Yes.

3               MS. GAY:   Let's let each other

4          finish.  Why don't you finish the

5          answer.

6          A.    What type of transaction?  Again,

7    there -- it's so vague of what you are trying

8    to ask me, I'm misunderstanding what scenario

9    you are trying to say that this involves.

10         Q.    Let's say I'm trying to sell you 20

11   cars, okay, I want you to buy my 20 cars.

12               Do you follow that so far?

13         A.    I got that.

14         Q.    I've been talking to you for a

15   month about trying to sell those cars to you.

16   Does it make sense to you that I might

17   because I'm looking for you to do business

18   with me, to buy those cars from me, does it

19   make sense to you that I might have some sort

20   of incentive to favor you in some way?

21         A.    I don't know what your motive would

22   be to sell me the 20 cars.

23         Q.    So in your view, if McKinsey is

24   pitching a past client for additional

25   business, you don't view that as a situation



Page 194

1                      H o j n a c k i

2    where McKinsey might have an incentive to

3    favor that past client?

4         A.   No, I don't think that's how it

5    would work.

6         Q.   If you can turn, Hojnacki 3, if you

7    can turn to Schedule I, specifically 1L.  I

8    will try to get a page for you in a second.

9    Using the page numbers at the top, it's 116

10   of 194.

11             Do you have that?

12        A.   I believe I do, yes.

13        Q.   There is two entities on this list,

14   Aspen Bermuda Limited, Aspen Insurance U.K.

15   Limited.

16             Do you see that?

17        A.   Yes.

18        Q.   Are those entities that McKinsey

19   serves?

20        A.   I don't know, unless it's disclosed

21   in this declaration.

22        Q.   I will represent to you that it's

23   not disclosed in either of your declarations

24   but you are obviously free to check it,

25   preferably on a lunch break and correct me if



Page 195

```
 1                   Hojnacki
 2  I am wrong.
 3              Let me show you, can we mark this
 4  Hojnacki 5?
 5              (Hojnacki Exhibit 5 Article marked
 6         for identification.)
 7         Q.   It's not too long but please read
 8  it over and let me know when you are
 9  finished.
10              Have you read it?
11         A.   I have read it.
12         Q.   This seems to indicate some sort of
13  client relationship between McKinsey and an
14  entity called Aspen.
15              Do you see that?
16         A.   Yes.
17         Q.   Do you know what Aspen entity that
18  is?
19         A.   I do not, you are saying the one
20  referenced in Exhibit 5.
21         Q.   Correct.  In Hojnacki 5.
22         A.   No, I don't.
23         Q.   Are you aware of any work that
24  McKinsey is doing for Aspen?
25         A.   I am not.
```



Page 196

                              Hojnacki

1

2        Q.    Do you know whether McKinsey is in

3    fact doing work for Aspen?

4              MS. GAY:   Any Aspen or the Aspen in

5        Exhibit 5?

6        Q.    For either the entities in Schedule

7    I-L or any of their affiliates?

8        A.    I am not.

9        Q.    You don't know one way or the

10   other?

11       A.    I am not aware that we are doing

12   any work for Aspen one way or the other.

13       Q.    That was really what I wanted to

14   get to.

15             You don't know who the responsible

16   partner is for any relationship that might

17   exist between McKinsey and Aspen?

18       A.    The Aspen referenced in this news

19   article you gave me?

20       Q.    Yes.

21       A.    No, I don't.

22       Q.    We've discussed a couple of times

23   that you signed the disclosure declarations

24   in the Sun Edison case, right?

25       A.    Yes.



Page 197

1                        Hojnacki

2          Q.    And do you recall in that case RTS

3    also applied a two-year look-back as we did

4    in this case, do you remember that?

5          A.    I think I stated earlier I don't

6    recall which look-back period we used in that

7    case.

8          Q.    Do you recall in the three cases

9    prior to that McKinsey used a three-year

10   look-back?

11         A.    I don't recall that.

12         Q.    So you don't know whether in the

13   A&R case, the Standard Registered Case or the

14   NII Holdings case, you don't know whether

15   McKinsey used a three-year look-back in any

16   of those cases?

17         A.    As I sit here now, I don't know.

18              MS. GAY:  We are getting pretty far

19         afield here from the two affidavits that

20         Mr. Hojnacki has signed.

21              MR. PETRELLA:  I don't think we

22         are.  I think we are delving into the

23         basis for the two-year look-back used in

24         those declarations.

25         Q.    During Sun Edison, did you have any



Case 18-50672    Document 90S-2    Filed in TXSB on 01/01/19    Page 198 of 346

Page 198

                              Hojnacki

1

2    conversation with anybody including counsel

3    to the effect that hey look, we are changing

4    from a three-year look-back to a two-year

5    look-back?

6              MS. GAY:  Don't answer that.  We

7         are not going into conversations with

8         counsel in other cases, Mr. Petrella, I

9         already stated that.

10        Q.   Did you have a conversation with

11   anyone other than counsel in the Sun Edison

12   case where it was indicated to you in any way

13   that the firm was switching from a three-year

14   look-back to a two-year look-back?

15        A.   I don't recall any conversations

16   that I had in the preparation of the Sun

17   Edison declarations at this point in time.

18        Q.   But that move from a three-year to

19   a two-year look-back, that was done so that

20   McKinsey would have to disclose less,

21   correct?

22              MS. GAY:  I object to that and also

23        misstates his testimony.  We are also

24        getting way far afield from the two

25        Westmoreland declarations.  The judge's



Page 199

```
 1                    Hojnacki
 2        order says that you may ask questions
 3        about these two declarations.  That is
 4        the only purpose of this deposition,
 5        sir.
 6             MR. PETRELLA:  These two
 7        declarations have a two-year look-back
 8        date throughout them and your colleague
 9        Ms. Chung at the last hearing went on at
10        some length about the two-year look-back
11        and identified it as a very important
12        issue.  So I do think that not only it
13        within the scope of the judge's order,
14        this questioning, I think it's also
15        something Judge Jones is going to be
16        very interested to hear, why and when
17        McKinsey decided that a two-year
18        look-back was customary and appropriate
19        and lawful when just a few years ago, it
20        believed that a three-year look-back was
21        customary and lawful and appropriate.
22             MS. GAY:  Hold on, can you hand me
23        the judge's order in this case.
24             MR. PETRELLA:  Hojnacki 1.
25             MS. GAY:  Thank you.  Hojnacki 1
```



Page 200

```
 1                    Hojnacki
 2        paragraph 2 reads, The subject matter of
 3        Mr. Hojnacki's deposition is limited to
 4        the basis and authorization for the
 5        statements set forth in the declaration
 6        of Mr. Hojnacki filed at docket numbers
 7        452 and 810.  With regard to that, you
 8        may ask him all the questions you want
 9        about the basis and authorization for
10        the statements set forth in his
11        declaration.  The declaration references
12        a specific look-back period.  You may
13        ask him about that, you may not ask him,
14        even though I've given you very generous
15        leeway, anymore questions about other
16        bankruptcies or other affidavits.
17            MR. PETRELLA:  I simply disagree
18        with your analysis.  I think that the
19        declarations talk about a two-year
20        look-back period.
21            MS. GAY:  Ask him about that.
22            MR. PETRELLA:  I'm inquiring into
23        the basis of that.  That being said I
24        will ask my questions.  You instruct him
25        to answer or not.
```



Page 201

1                    Hojnacki

2       Q.    To your knowledge, does Rule 2014,

3  Bankruptcy Rule 2014 have any time limitation

4  on the connections that have to be disclosed?

5       A.    Again, I'm not a lawyer so the

6  strict interpretation of 2014 I can't opine

7  on.

8       Q.    If McKinsey dropped down from a

9  three-year look-back to a two-year look-back,

10  can't it drop down from a two-year look-back

11  to a one-year look-back?

12            MS. GAY:  Objection to the form.

13       You can answer if you know.

14       A.    Are you asking, can we perform

15  searches based on different periods of time

16  or a shorter period of time?

17       Q.    What I'm asking is, if you can

18  change from a three-year look-back to a

19  two-year look-back why not change from a

20  two-year look-back to a one-year look-back or

21  a one-month look-back for that matter?

22            MS. GAY:  Objection to the form.

23       A.    We would rely on the advice of our

24  counsel to help us make the interpretations

25  of the laws and the rules in order to make



Page 202

```
 1                    Hojnacki
 2   sure that we comply.
 3        Q.   Has anyone told you that industry
 4   custom has changed in the last couple of
 5   years such that it used to be three years but
 6   now it's two years?
 7             MS. GAY:  Don't answer.  If you are
 8        asking questions about the Westmoreland
 9        affidavits, I will permit him to answer
10        questions about third parties who had
11        input into those affidavits.  You are
12        going way far afield and infringing on
13        attorney client privilege.  In addition,
14        it's not within the four corners of the
15        subject matter of the deposition.
16             MR. PETRELLA:  Again, we disagree
17        on this issue.
18             MS. GAY:  We do.
19             MR. PETRELLA:  We will move on from
20        here.
21             MS. GAY:  Good.
22        Q.   The two-year look-back approach
23   essentially means that a connection that
24   would be disclosable on day 730 becomes
25   nondisclosable on day 731, is that fair?
```



Page 203

1                         Hojnacki

2              MS. GAY:  You can answer if you

3         understand.

4         A.    I think we talked about it.  If a

5    connection is outside of the look-back

6    period, that goes back to October 1, 2016,

7    it's outside of the look-back period.

8         Q.    So two years roughly 730 days,

9    right, so 730 days goes by, the connection

10   exists, right, the connection exists, on the

11   730th day, you would have to make the

12   disclosure.  The next day 731, you wouldn't

13   make the disclosure, right?

14        A.    I guess that's the interpretation

15   of a look-back period.

16        Q.    And does RTS advise debtors on the

17   timing of its petitions in bankruptcy?

18        A.    Is this specific to Westmoreland?

19        Q.    Sure.  Start with Westmoreland.

20             MS. GAY:  Let's start and leave it

21        with Westmoreland.  You can answer the

22        question.

23        A.    McKinsey RTS did not advise the

24   debtors in this case on the timing of its

25   Chapter 11 filing.



MAGNA

LEGAL SERVICES

Page 204

                              Hojnacki

1

2        Q.    Does it ever advise debtors on the

3   timing of its petitions?

4             MS. GAY:  Don't answer that, this

5        is not within the four corners of these

6        two affidavits.  This is not a general

7        deposition on all of McKinsey's

8        bankruptcy practices.

9             MR. PETRELLA:  Again, I think this

10       is within the scope of the basis for the

11       statements in his declarations.

12            MS. GAY:  I disagree with you.  We

13       can debate it later.

14            MR. PETRELLA:  This is actually

15       probably a good time for lunch if that

16       works for everyone else because I'm

17       about to start something else that I

18       will not want to stop once I get going.

19            MS. GAY:  That sounds ominous.

20       Let's have lunch.

21            THE VIDEOGRAPHER:  The time is

22       12:29 and we are going off the record.

23            (Recess.)

24    A F T E R N O O N   S E S S I O N

25            (Time noted:  1:05 p.m.)



Page 205

```
 1                    Hojnacki
 2    M A R K   H O J N A C K I,    resumed and
 3    testified as follows:
 4    EXAMINATION BY (Cont'd.)
 5    MR. PETRELLA:
 6              THE VIDEOGRAPHER:  This is the
 7         start of media label No. 6.  The time
 8         now is 1:05 p.m. and we are back on the
 9         record.
10         Q.   Going back to Hojnacki 3.  In
11    paragraphs 36 through 41, you talk about the
12    MIO, is that correct?
13         A.   Yes.
14         Q.   So for the partners of McKinsey
15    entities other than MIO, how many of them
16    have a role or a position within the MIO?
17         A.   State specifically your question
18    again for me.
19         Q.   I will try it a different way.
20    Take the MIO out of the picture for a second.
21    Let's focus on any other McKinsey entity
22    other than MIO, you got me?
23         A.   Yes.
24         Q.   Take the partners, just the
25    partners of those entities, are you with me?
```



Page 206

1                    Hojnacki

2         A.    Yes.

3         Q.    Of those partners, how many have

4    some role or position within MIO?

5         A.    I'm not sure the exact number.

6    There is no, there are no employees that are

7    shared between the entities, between the MIO

8    partners and any of the other McKinsey

9    affiliates including RTS with the exception

10   of any members that would serve on the board

11   of directors of MIO.

12        Q.    When you use the term employees,

13   are you including partners?

14        A.    Partners that may serve on the

15   board of directors of MIO, that's the only

16   situation in which and there would be any

17   overlap of employees, partners or otherwise.

18        Q.    So there are no partners of any

19   McKinsey entity that have a role within MIO

20   other than the ones on the board of

21   directors, is that correct?

22        A.    Correct.

23        Q.    How many are there that have that

24   role on the board of directors?

25        A.    I don't know exactly.



Page 207

1                        Hojnacki

2          Q.    Can you just give me a rough, the

3    best you can do, is it 40, 10, 5, you don't

4    know?

5          A.    It's more than one and less than 40

6    is my estimate.

7          Q.    So other than the board of

8    directors, everybody else that works for MIO

9    in any way is limited to MIO, is that right?

10         A.    Everybody else who works for MIO is

11   limited to MIO.

12         Q.    How about -- now, are there any RTS

13   practice leaders on the MIO board?

14         A.    Currently, I believe as it's stated

15   in here, let me just find it, bear with me

16   because I have something in mind that I

17   believe we referenced but I want to point you

18   to -- sorry, I can't find it but would you

19   mind asking your question again just so I can

20   respond to it appropriately.

21         Q.    To your knowledge are there any RTS

22   practice leaders that serve on the MIO board?

23         A.    Not -- I don't believe currently,

24   no.

25         Q.    You have no position or role of any



Page 208

```
 1                        Hojnacki
 2  kind with respect to the MIO?
 3        A.    I have absolutely no involvement in
 4  MIO.
 5        Q.    Including investments?
 6        A.    I have funds that are invested in
 7  the pension, the investment pension plans.
 8        Q.    Do you know who Casey Livskim
 9  (phonetic) is?
10        A.    I only recently became aware of his
11  name, I never met him in person.
12        Q.    Do you know what his title is?
13        A.    Not specifically, no.
14        Q.    Do you know whether he is the
15  general counsel of MIO?
16        A.    Again, I have never met him.  I've
17  recently became aware of him being referenced
18  in that capacity.
19        Q.    Is he also a member of the McKinsey
20  legal department?
21        A.    I don't know.
22        Q.    I just mention it because his
23  LinkedIn page indicates he is both the
24  general counsel of MIO and also an associate
25  counsel of McKinsey.
```



Page 209

```
 1                    Hojnacki
 2              Were you aware of that?
 3      A.     I haven't ever looked at his
 4 LinkedIn page.
 5      Q.     So who are the partners on the MIO
 6 board, if you know?
 7      A.     I don't know specifically or can't
 8 recall them by name.  I think it's made up of
 9 a combination of retired McKinsey partners
10 and potentially some current partners but I
11 can't speak to the make up of the board other
12 than my own detail.  I am not familiar with
13 it.
14      Q.     And of the McKinsey partners that
15 are on the board, do you know what entity
16 they're a partner of, is it McKinsey &
17 Company Inc., McKinsey & Company --
18      A.     I honestly don't know.
19      Q.     In paragraph 36 you say that the
20 MIO invests pension funds and they also make
21 direct investments, right?
22      A.     MIO invests, from my understanding,
23 in two types of programs, the pension funds
24 and then current partners, former partners or
25 their family can choose to invest money into
```



Page 210

```
 1                    Hojnacki
 2   MIO or MIO to direct elsewhere or invest
 3   elsewhere.
 4        Q.   I think you just said you had some
 5   pension funds invested in the MIO, correct?
 6        A.   Part of my compensation that I've
 7   earned over the years is in the form of
 8   retirement contributions and they're invested
 9   in these pension plans.
10        Q.   Of your retirement funds, do you
11   know what percentage roughly is in MIO as
12   opposed to other places?
13        A.   Of my entire?
14        Q.   Retirement funds, not your entire
15   everything you own, just retirement funds.
16        A.   Specific to any retirement funds I
17   have as an individual or those I have that I
18   earned through McKinsey & Company?
19        Q.   Well, is there a difference -- if
20   you earned it through McKinsey, then they're
21   yours, right?
22        A.   That's correct.  But I have been
23   employed at other employers prior to McKinsey
24   and I have retirement funds from those so are
25   you speaking about the collective pool of any
```



Page 211

1                     Hojnacki

2    retirement funds as an individual that I have

3    ever earned.

4         Q.    That's right.  Just as a percentage

5    in the MIO?

6         A.    Again the money I haven't earned in

7    my time at McKinsey & Company.

8         Q.    What I'm saying is you have

9    retirement funds in various different places,

10   is that right?

11        A.    Correct.

12        Q.    Take that whole, what percentage of

13   that whole is in the MIO?

14        A.    Probably about 40 percent.

15        Q.    And do you get regular statements

16   concerning your MIO investments?

17        A.    I'm able to access a website that

18   gives me access to monthly statements that

19   simply shows the allocation of my funds into

20   different investment strategies.  It doesn't

21   show anything about what those funds are

22   actually invested in besides the strategy in

23   which that is used.

24        Q.    No one mails actual statements to

25   your house or anything like that?



Page 212

1                       Hojnacki

2          A.    I don't believe I get that to my

3     house, no.

4          Q.    The statements that you access

5     online, are those monthly statements or is it

6     just like it's constantly updated, so if you

7     go on one day it has the information as of

8     that day and you go on --

9          A.    I believe it's a once a month

10    statement.

11         Q.    So statements, how many pages are

12    they?

13         A.    From what I recall, four or five.

14         Q.    How many different investment

15    strategies are there in the MIO?

16         A.    That the MIO offers?

17         Q.    Yes.

18         A.    I don't know.  I only know the ones

19    I am involved in.

20         Q.    How many are you involved in?

21         A.    Four.

22         Q.    So what other information are on

23    the statements other than what strategies you

24    are in and how much that strategy account is

25    worth?



Case 16-85672    Document 90-2    Filed in TXSB on 01/01/19    Page 213 of 346

Page 213

                        Hojnacki

1

2     A.   So if I recall, it's the allocation

3  of the strategy, four in my instance, you

4  know, the dollar amount of money that I have

5  allocated, my total portfolio across those

6  four strategies, each month there is the

7  performance of that strategy up or down and

8  then kind of the new holding, if you will,

9  it's like a roll forward, beginning balance,

10  change in the month, ending balance.

11     Q.   So when you said new holding, you

12  meant ending balance, is that right or did I

13  misunderstand?

14     A.   I think of it as classic roll

15  forward.  This is what the holding was at the

16  beginning of December, during the month of

17  December it went up or down, end of December

18  it's worth X.

19     Q.   Is it fair to say the statements

20  are essentially limited to the list your four

21  strategies, they tell you what it was worth,

22  what's it's worth now and maybe give a

23  percent up or down, is that fair?

24     A.   Will you repeat the three or four

25  things you just said.



Case 18-85672    Document 90S-2    Filed in TXSB on 01/01/19    Page 214 of 346

Page 214

1                      Hojnacki

2        Q.    Correct me if I'm wrong.  I'm just

3    trying to make sure I understand what you are

4    saying.  The statements basically have your

5    four strategies listed there, they have a

6    beginning balance for the month essentially,

7    an ending balance for the month and maybe

8    some sort of metric of it's up 3 percent,

9    down 4 percent whatever is, is that basically

10   it?

11       A.    I don't specifically recall the

12   percentage, but that's just a mathematical

13   calculation in my mind.

14       Q.    What I'm really asking is, other

15   than that information, is there anything else

16   on these statements?

17       A.    Not that I recall.

18       Q.    That takes up four or five pages to

19   list that?

20       A.    Yeah.  They show you a graph, and

21   show you the listing of the strategies broken

22   down independently so it's kind of a build up

23   from the highest level of, what are you

24   holding to what are you holding here to what

25   are you holding here, so they use three pages



Page 215

1                    Hojnacki

2  to break it down for you.

3        Q.    Were you trying to give me one of

4  those statements yesterday, is that what you

5  were trying to give me?

6        A.    I don't know.

7        Q.    Do you get any newsletters

8  regarding your investments?

9        A.    Occasionally I receive an email

10  from MIO that typically talks about a new

11  investment strategy as I describe them.

12        Q.    What sort of information will they

13  give you about the strategy?

14        A.    Just very high level about what the

15  strategy entails, the type of risk it's

16  pursuing how you might think about it in

17  relation to any other holdings you might

18  have, other strategies you are invested,

19  very, very high level information.

20        Q.    So you don't know -- withdrawn.

21              You have about 40 percent of your

22  retirement funds in MIO and you don't know

23  what that money is actually invested in, is

24  that right?

25        A.    I don't know beyond the four, in my



Page 216

                         Hojnacki
1
2    case, four asset strategies that I choose.
3         Q.   So in those strategies, you don't
4    know what funds are in those strategies,
5    right?
6         A.   No.
7         Q.   And you don't know what the
8    holdings of those funds are, right?
9         A.   I do not.
10        Q.   So I mean, have you ever tried to
11   see if you could find out what the holdings
12   are, I know I would if I had 40 percent of my
13   retirement money in something, I would be
14   looking under every rock to try to figure
15   what my retirement money was in, have you
16   ever tried to do that?
17             MS. GAY:  Objection to the form.
18        You can answer.
19        A.   I have looked at the statement that
20   I can access through this website and I
21   clicked on all the graphs and I clicked on
22   all the bars and I tried to look, there is
23   nothing there.  It's absolutely not available
24   to me and I have not taken any other measures
25   to try to find what those are invested in.



Page 217

1                    Hojnacki

2      Q.    You are just hoping for the best?

3      A.    As we are all with our investment

4    portfolios.

5      Q.    Have you become aware at any point

6    prior to the Westmoreland case that you

7    actually can find out through public means

8    what funds are held by, on the pension side

9    that are held by the MIO?

10     A.    Can you ask your question again,

11   I'm sorry.

12     Q.    It doesn't really matter what you

13   became aware.

14           Are you aware there are publicly

15   filed forms with the Department of Labor,

16   forms 5500 that do, in fact, list the funds

17   that are held by the pension side of the MIO?

18     A.    I've become aware recently again

19   through I believe the discussions about the

20   Mar-Bow litigation that there is information

21   available on websites.  I never accessed it,

22   I never looked at it and I have been told

23   it's extremely historical and outdated.

24     Q.    It's historical by one year, right,

25   it's historical in the sense that a tax



Page 218

1                         Hojnacki

2    return is historical, right?

3             MS. GAY:  Objection to the form.

4         You can answer.

5         A.    I don't know how historical it is,

6    I have never referenced those documents or

7    those sites.

8         Q.    You don't intend to do so?

9         A.    No.

10        Q.    But it's your understanding that

11   somebody who was interested and who did want

12   to do that would be able to do that?

13             MS. GAY:  Objection to the form.

14        Able to do what.

15             MR. PETRELLA:  To go on and access

16        those forms and look at the holdings of

17        the funds.

18             MS. GAY:  Objection to the form.

19        That's not what he said.

20        A.    What's your question, I'm sorry.

21        Q.    You said that you've learned at

22   some point that there are these form 5500s

23   filed with the Department of Labor that are

24   publicly available and list the holdings of

25   the investment strategies for the MIO pension



Page 219

```
 1                        Hojnacki
 2   investments, is that right?
 3        A.    I've been told that there is
 4   something called a form 5500 that has some
 5   information related to the MIO strategies or
 6   MIO partners.  Specifically what it is and
 7   what level of detail I can't speak to.
 8        Q.    Would you agree that once you know
 9   the fund that you are invested in, there are
10   various ways to find out what the holdings of
11   those funds are?
12             MS. GAY:  Objection to the form.  I
13        will give you a little leeway on this.
14        A.    Are you saying in general, do other
15   -- are there ways in which you can get
16   details about what different funds are
17   invested in?
18        Q.    Right.
19             MS. GAY:  As a general matter is
20        what you are asking?
21             MR. PETRELLA:  Sure.
22        A.    As a general matter, yes.
23        Q.    Are you aware that you can go to
24   the form 5500s, find out what funds the MIO
25   is invested in and then use that information
```



Case 18-85672   Document 90S-2   Filed in TXSB on 01/01/19   Page 220 of 346

Page 220

```
 1                    Hojnacki

 2    to find out what those funds hold?

 3         A.   I haven't ever tried to do that

 4    myself.

 5         Q.   Do you believe it's possible to do

 6    that though?

 7              MS. GAY:  Objection to the form.

 8         Asking him to speculate.

 9         A.   I haven't tried it, so I don't know

10    that it is.

11         Q.   You know that Mar-Bow has raised an

12    allegation that the MIO is invested in White

13    Box, correct?

14         A.   Yeah, I mention that in the

15    declaration.

16         Q.   And you are aware that the

17    allegation is that White Box in turn invests

18    in a company called Contura that has an

19    interest in the A&R case, are you aware of

20    those allegations?

21         A.   I heard of them as part of the

22    Mar-Bow litigation.

23         Q.   Are you aware that Mar-Bow found

24    out about White Box's investment in Contura

25    just by searching the internet?
```



Page 221

                         Hojnacki

1

2        A.    I don't know how Mar-Bow became

3    aware of what he found.

4        Q.    Are you familiar with SEC form

5    13Fs?

6        A.    No.

7        Q.    You know John Garcia?

8        A.    I do know John Garcia.

9        Q.    How long have you known him?

10       A.    Since I joined McKinsey.

11       Q.    That was you said I think five

12   years ago?

13       A.    Five and a half.

14       Q.    How many conversations have you had

15   with him?

16             MS. GAY:   In those five years?

17             MR. PETRELLA:   Right.

18       A.    I have no idea.

19       Q.    It's a lot, right?

20       A.    It's certainly more than one but I

21   don't speak to John on a day-to-day basis.

22       Q.    Give me an estimate in the five

23   years -- let me back up.

24             Did you know John Garcia before you

25   joined McKinsey other than through maybe



Page 222

1                    Hojnacki

2   recruiting you over?

3          A.    I only met him in the process of

4   joining McKinsey RTS.

5          Q.    Give me an estimate during those

6   five years how many times did you talk to

7   him, 100 times, 1000 times, 10 times, best

8   you can do?

9          A.    Over a five and a half year period

10  how many times have I spoken to John Garcia,

11  roughly?

12         Q.    Right.

13         A.    Maybe a hundred times.

14         Q.    He is not like a social friend of

15  yours, you don't socialize with him outside

16  of work or anything like that?

17         A.    No.

18         Q.    Mr. Garcia is currently the

19  president of RTS, is that right?

20         A.    That's my understanding, yes.

21         Q.    And he has been the president of

22  RTS since it was founded in 2010, correct?

23         A.    That's my understanding, yes.

24         Q.    For all of those years up until

25  June 2017 he was also a director of the MIO,



Page 223

```
 1                    Hojnacki
 2  correct?
 3      A.    That's what I have been told.
 4      Q.    He was also on the audit committee
 5  and the investment committee of the MIO
 6  board, is that right?
 7      A.    I don't know that.
 8      Q.    Have you reviewed any of the
 9  submissions in the A&R case?
10      A.    Which submissions, which case?
11      Q.    A&R.
12            MR. PETRELLA:  Can you tie this to
13        a provision of either of the affidavits
14        here.
15            MR. PETRELLA:  Paragraphs 36
16        through 41.
17            MS. GAY:  Specifically where?
18            MR. PETRELLA:  The numerous
19        portions and especially 40 where Mr.
20        Hojnacki talks about the separateness of
21        the MIO and the rest of McKinsey.
22            MS. GAY:  It has nothing to do with
23        A&R.
24            MR. PETRELLA:  This case --
25            MS. GAY:  Let me read paragraph 40
```



Page 224

                            Hojnacki

1    for the record, this is Exhibit 3,

2    Hojnacki, this is the first declaration

3    of Mr. Hojnacki, paragraph 40 which you

4    are referring to says, The cause of the

5    separateness of MIO partners from

6    McKinsey RTS U.S. and its consulting

7    affiliates, McKinsey RTS U.S. has not

8    asked MIO partners to search for

9    connections to the potential parties in

10    interest.

11          MR. PETRELLA:  That's what we are

12    talking about the separateness here.

13    Q.   Members of the MIO board can become

14    aware of MIO direct investments as opposed to

15    pension investments, is that right?

16    A.    I don't know what information the

17    MIO board has about MIO specifically.

18    Q.   Do you know what positions Mr.

19    Garcia held on the MIO board when he was on

20    it?

21    A.    No, I don't.

22    Q.   So you don't know whether directors

23    of the MIO approved investments, become aware

24    of investments, become aware of money



Page 225

```
 1                    Hojnacki
 2    managers, that sort of thing?
 3         A.    I don't know what information the
 4    board of MIO partners receives.
 5         Q.    Now, in June of 2016, you said
 6    under oath in the Sun Edison case that the
 7    MIO was a blind trust.
 8              Do you recall saying that?
 9         MS. GAY:   Again, let me note my
10         objection, this is not a deposition
11         concerning Sun Ed so I'm going to direct
12         him not to answer.
13         MR. PETRELLA:   I agree it's not a
14         declaration -- I agree it's not a
15         deposition having to do with Sun Ed
16         except to the extent that Sun Ed has
17         been specifically referenced in the
18         declaration as a qualification for RTS
19         but regardless of the specific case it's
20         about, it is about the basis for the
21         statements in this declaration and the
22         statements in this declaration speak to
23         the purported separateness of MIO from
24         the rest of McKinsey and that is what
25         these questions are directed at.
```



Page 226

                              Hojnacki

1

2        So you are directing him not to

3   answer whether he said in Sun Edison

4   that the MIO is a blind trust.

5        MS. GAY:  Can you point me again to

6   the paragraph you are relating this

7   question to in his Westmoreland

8   affidavit?

9        MR. PETRELLA:  I relate it all to

10   36 to 41.

11        MS. GAY:  Let me stop and read it.

12        MR. PETRELLA:  It's also relevant

13   to the change in terminology from one

14   case to the other, whether there is any

15   significance to that.

16        MS. GAY:  That I do not accept.

17   This is about this affidavit and the

18   prior one, I will let him answer the

19   question and we will see where you go.

20   Q.   Do you remember the question?

21   A.    No, if you don't mind repeating it,

22   please.

23   Q.   Do you recall in June 2016 you said

24   under oath in the Sun Edison case that the

25   MIO is a blind trust or is essentially a



```
 1                     Hojnacki
 2   blind trust in words or substance?
 3            MS. GAY:  Are you quoting.
 4            MR. PETRELLA:  Yes.
 5            MS. GAY:  Do you want to show him
 6       what he said.
 7       Q.    This is Hojnacki 6.
 8            (Hojnacki Exhibit 6 Amended
 9       declaration of Mark Hojnacki marked for
10       identification.)
11            MS. GAY:  Which paragraph, Mr.
12       Petrella?
13            MR. PETRELLA:  Paragraph 67.
14            MS. GAY:  Where are you reading
15       from in paragraph 67.
16            MR. PETRELLA:  The sentence begins,
17       MIO investors make investments.
18       Q.    Do you see that?
19            MS. GAY:  What's your question.
20       Q.    Just if he sees it first.
21       A.    I see the reference to blind trust
22   in roughly the sixth line of that paragraph.
23       Q.    Do you recall making this statement
24   in Sun Edison?
25       A.    I acknowledge this is the
```



Page 228

```
 1                    Hojnacki
 2   declaration that I signed in Sun Edison, yes.
 3        Q.   This line about blind trust, that
 4   was not drafted by you, I assume, is that
 5   right?
 6        A.   No, as in Westmoreland I relied on
 7   the McKinsey legal department and counsel and
 8   others in preparation for this declaration in
 9   Sun Edison.
10        Q.   At the time you made this
11   statement, were you aware that John Garcia
12   was both the president of RTS and a board
13   member at MIO?
14        A.   I think if you continue later in
15   the paragraph 67, it actually indicates that
16   there is certain MIO board of directors are
17   also employees of McKinsey RTS including one
18   director who is also a director.
19        Q.   Right.  But it doesn't name -- it
20   doesn't say John Garcia is the president of
21   RTS, he is also on the board of MIO, right?
22        A.   It does indicate there is a
23   director, a board of directors of MIO that's
24   also an officer, director or officer of
25   McKinsey RTS.
```



Page 229

1                      Hojnacki

2        Q.    But it doesn't say, by the way that

3    person is the president of RTS?

4            MS. GAY:  Why don't you read the

5        paragraph into the record.  One of you

6        to make sure we have a clear record for

7        the record, or I can.

8            MR. PETRELLA:  You want to read the

9        whole paragraph into the record.

10           MS. GAY:  Make sure we are clear,

11       67, Sun Edison says, Two of McKinsey

12       RTS's affiliates, MIO Partners Inc. and

13       MIO Partners do not provide consulting

14       services and were not included in the

15       above inquiries.  MIO serves McKinsey's

16       pension plans, partners and former

17       partners by offering a portfolio of

18       investment products with a variety of

19       structures, risk levels and currencies.

20       The team primarily uses third party fund

21       managers to make investment decisions

22       independently of MIO.  MIO investors

23       make investments with MIO essentially on

24       a blind trust basis with such MIO

25       investors having no access to



Page 230

```
 1                    Hojnacki
 2      information about the underlying
 3      holdings of the third party funds.  MIO
 4      is managed independently and all its
 5      investment activities are separate from
 6      McKinsey's consulting operations.  As
 7      such, MIO does not make any investment
 8      decisions based on the use of McKinsey
 9      RTS and affiliates client information.
10      Certain members MIO board of directors
11      are also employees of McKinsey RTS and
12      its affiliates, including one director
13      who is also director and officer of
14      McKinsey RTS.  MIO's board of directors
15      through the investment committee of that
16      board which generally meets on a
17      quarterly basis is primarily responsible
18      for overseeing, reviewing and approving
19      MIO's overall allocation amongst the
20      various MIO managed investment products.
21           That's the Sun Ed paragraph you are
22      referring to.
23           MR. PETRELLA:  Right.  I hope we
24      don't have to read every paragraph I
25      refer to in the rest of the deposition,
```



Case 18-85672   Document 905-2   Filed in TXSB on 01/01/19   Page 231 of 346

Page 231

```
 1                    Hojnacki
 2       I hope we don't have to read the entire
 3       paragraph.
 4            MS. GAY:  You are talking about a
 5       different affidavit from the subject of
 6       his deposition and I want to make sure
 7       we are clear for the court exactly what
 8       you were doing.
 9            MR. PETRELLA:  I think the court
10       will have the exhibits to the deposition
11       and that the court can read.
12       Q.   Are you aware that the trustees
13   office in the A&R case has concluded that
14   your statements here in paragraph 67 among
15   several others over the years have been
16   misleading?
17            MS. GAY:  Now you have gone too
18       far.  We are talking about the
19       Westmoreland affidavits.  I gave you the
20       benefit of the doubt on Sun Ed, but you
21       misread the paragraph.  We are not going
22       into other bankruptcies, Mr. Petrella.
23       If that's all you are going to ask about
24       we can end right now.  Ask him about the
25       Westmoreland affidavits or we will end
```



MAGNA
LEGAL SERVICES

Page 232

1                    Hojnacki
2        the deposition.
3             MR. PETRELLA:  I am asking about
4        the Westmoreland affidavits in which he
5        --
6             MS. GAY:  Why don't you do that.
7             MR. PETRELLA:  I have been but you
8        are directing him not to answer.
9             MS. GAY:  Let me read the question
10       back for the record then, we will make
11       the record clear.
12            MR. PETRELLA:  The record is clear,
13       it's on the record, you are reading
14       something already on the record and also
15       wasting my time.
16            MS. GAY:  Then don't ask questions
17       not about Westmoreland.
18            MR. PETRELLA:  I am asking
19       questions about Westmoreland.
20            MS. GAY:  Your question was are you
21       aware the trustees office in the A&R
22       case have concluded that your statements
23       here in paragraphs 67 of the Sun Ed case
24       among several others over the years have
25       been misleading.  I will not let him



Case 18-85672   Document 905-2   Filed in TXSB on 01/01/19   Page 233 of 346

Page 233

```
 1                    Hojnacki
 2         answer that.
 3              MR. PETRELLA:  Let me be clear why
 4         I am asking about this.  In Sun Edison
 5         he said it was essentially a blind
 6         trust, the blind trust language doesn't
 7         appear in Westmoreland anymore but the
 8         concept of separateness does still
 9         appear in Westmoreland, which is why I'm
10         asking these questions.  Okay.  And I
11         think it's important for the court to
12         know that over the years McKinsey has
13         made many statements to courts under
14         oath indicating that there is virtual
15         total separation, no way that any one
16         could ever find out what these
17         investments of MIO were, when, in fact,
18         the very president of RTS was a member
19         of the board of MIO, knew all the
20         investments, ratified all the
21         investments, knew everything that was
22         going on and that's not me saying it.
23         That's McKinsey officials saying it
24         under oath in the A&R case, so I think
25         it's very important that Judge Jones
```



Page 234

```
 1                    Hojnacki
 2        understands when he reads this
 3        deposition that whatever McKinsey says
 4        about the MIO is subject to change and
 5        at least by the U.S. Trustee's lights
 6        has determined it to be, to put it
 7        mildly, inaccurate in the past and less
 8        than forthcoming.
 9             MS. GAY:  You made your speech and
10        Judge Jones has indicated lawyers
11        statements are not evidence.  Ask the
12        affiant and the deponent any questions
13        you want about the Westmoreland
14        affidavit.
15             Q.   Does the MIO invest either directly
16   or indirectly in any interested party in the
17   Westmoreland Coal case?
18             A.   I don't know, I don't have access
19   to their investments.
20             Q.   As you say in your declaration,
21   that search was not done, is that fair?
22             A.   Nobody at McKinsey & Company
23   outside of the board of directors which does
24   have members that are partners of McKinsey &
25   Company on it has access to the investments
```



Case 18-85672   Document 905-2   Filed in TXSB on 01/01/19   Page 235 of 346

Page 235

                            Hojnacki

1
2    of MIO.  Can't influence it, can't choose

3    them for them, can't do anything to direct or

4    know of what those investments are.

5        Q.   Except -- that's true as of June

6    2017, right, for seven years before that,

7    that wasn't a true statement, was it?

8            MS. GAY:   That's not what he said.

9        Misstates his testimony.

10       A.   I don't know what you are

11   referencing, specifically.

12       Q.   I wasn't characterizing your

13   testimony.  I was asking you a question.

14           MS. GAY:   What's the question, you

15       just made a speech, what's the question.

16       Q.   The question is, up until June 2017

17   for the seven years prior to that, in fact,

18   RTS did know what was going on at MIO, didn't

19   it?

20           MS. GAY:   Objection to the form.

21       You can answer.

22       A.   I don't think RTS did.  I don't

23   know specifically what you are referencing

24   but RTS didn't know.  The only people that

25   are part of McKinsey & Company or its



Page 236

```
 1                    Hojnacki
 2   affiliates that have access to anything at
 3   MIO are the members of the board of
 4   directors.
 5        Q.   Which was John Garcia for seven
 6   years, correct?
 7        A.   You're conflating John's
 8   responsibility as a board member of RTS or of
 9   MIO and his role as the president of RTS.
10        Q.   So he can compartmentalize in his
11   brain, if he learns something at MIO, that
12   isn't used for any other purposes, is that
13   right?
14             MS. GAY:  Objection to the form.
15        A.   I know he has two different
16   responsibilities.  I know MIO has its own
17   investment professionals that follow their
18   own investment theses and work with their own
19   people to make the investments at MIO.  What
20   role specifically the board or any board
21   member plays in that process, I don't know.
22   I can tell you specific to the work, the team
23   that's focused on Westmoreland, nobody has
24   any access to the investments that's MIO
25   makes.
```



Page 237

                              Hojnacki

1

2      Q.    Unless they look on the internet?

3            MS. GAY:  Objection to the form.

4      Q.    Right?

5            MS. GAY:  That misstates what he

6      said.

7            MR. PETRELLA:  I'm not

8      characterizing what he said.  I'm asking

9      a question.

10           MS. GAY:  Make it a little clearer

11     what your question is.

12     A.    What's your question?

13     Q.    Do you know for a fact that none of

14  your colleagues have searched the internet

15  for the holdings of the MIO?

16     A.    None of my colleagues at McKinsey &

17  Company or...

18     Q.    Yes.  Or RTS or anyone at McKinsey.

19     A.    I am not aware.

20     Q.    Do you know why Mr. Garcia left the

21  MIO board in June of 2017?

22     A.    I do not.

23     Q.    In paragraph 39 you say, there are

24  data protection protocols that segregate --

25     A.    Which exhibit?



Page 238

1                    Hojnacki

2        Q.    Hojnacki 3.

3        A.    Okay.  I have paragraph 39.

4        Q.    You see your reference to data

5    protection protocols that segregate McKinsey

6    client information from MIO employees?

7        A.    I see the statement, yes.

8        Q.    What if someone from RTS wanted to

9    call over to MIO and talk to somebody and

10   say, tell me what's going on with the

11   investments, what am I invested in here, is

12   that prohibited?

13       A.    We have -- there is a specific

14   policy in place that governs the relationship

15   or provides a protocol for communications

16   between MIO and consulting staff and so --

17       Q.    Consulting staff within or without

18   MIO?

19       A.    I'm sorry -- MIO doesn't have

20   consulting staff, MIO does not provide

21   consulting services.

22       Q.    Of any kind?

23       A.    Of any kind.

24       Q.    Doesn't it provide consulting

25   services to its investors?



Page 239

1              Hojnacki

2        A.    I think I would characterize that

3    as investment advice not consulting services

4    in the sense that McKinsey does.

5        Q.    So there are written protocols on

6    the flow of information between MIO and the

7    rest of McKinsey, is that right?

8        A.    Yes.

9        Q.    What do they say?

10       A.    They say that, one specifically to

11   what's here, all information whether it's

12   relative to McKinsey on the consulting side

13   or related to MIO on the MIO partner side is

14   explicitly separate, separate systems,

15   separate email servers, no access between the

16   two of them and one party cannot access that

17   of the other.

18       Q.    So do the protocols say, no one

19   from MIO is allowed to speak with anyone

20   outside of MIO about any investment of the

21   MIO, do they say that in words or substance?

22       A.    In words or substance -- certainly

23   in substance there is direct language in the

24   protocol that says that communications

25   between the two should not be had that would



Page 240

1                    Hojnacki

2    at all jeopardize the independence of either

3    side.

4         Q.    Should not be had or must not be

5    had?

6         A.    I don't recall the specific word

7    that's used but the point is that it is

8    extremely clear that those conversations

9    should not be had.

10        Q.    Ever?

11        A.    As opposed to...

12        Q.    Pardon me?

13        A.    As opposed to?

14        Q.    As opposed to exceptions, as

15    opposed to under certain circumstances, is

16    there a flat clear ban that says, no one from

17    McKinsey -- no one from MIO shall communicate

18    with anyone outside of MIO regarding any of

19    its investments, period, no exceptions.

20               Is that what the protocol says?

21        A.    I'm sure with any policy, they have

22    the ability to get approved exceptions.  What

23    specifically those are, I can't speak to

24    right here as we sit.

25        Q.    You looked at it in preparation for



Page 241

1                         Hojnacki

2      your deposition, right?

3              A.     I have, yes.

4              Q.     Did you look at it yesterday?

5              A.     Yesterday, probably.

6              Q.     What are the exceptions?

7              A.     There is a procedure that you would

8      have to go and request in writing in order to

9      get exceptions, I don't know exactly, I never

10     requested an exception, I never intended to

11     request an exception, I have no intent to do

12     so.  I just know there is a protocol, like

13     any policy, to get exceptions.

14             Q.     The exception we are talking about

15     is an exception to speak -- is this a

16     protocol for someone outside of MIO to speak

17     with someone in MIO or the other way around

18     or both?

19             A.     I don't know.

20             Q.     Who makes the decision on whether

21     to approve an exception?

22             A.     As we sit here right now, I can't

23     recall.

24             Q.     Does the protocol talk about, under

25     what circumstances it is appropriate for MIO



Page 242

 1                          Hojnacki

 2    and individuals at McKinsey outside of MIO to

 3    communicate about MIO investments?

 4          A.    Can you ask your question again

 5    please.

 6          Q.    Sure.  Does the protocol discuss

 7    what type of circumstances under which it

 8    might be appropriate to have communications

 9    between MIO and McKinsey people outside of

10    MIO discuss an investment of the MIO?

11                MS. GAY:  I can't follow that, but

12          if you can answer.

13          A.    I'm not sure I follow the question,

14    I apologize.

15          Q.    We were talking about exceptions,

16    exceptions to the I guess the prohibitions

17    against communications about investments.

18    Does the protocol define what those

19    exceptions are?

20          A.    I don't recall.

21          Q.    Are you aware of any circumstances

22    in which such an exception has been approved?

23          A.    I am not aware of any.

24          Q.    Do the exceptions relate to verbal

25    conversations or do they relate to any kind



Page 243

```
 1                    Hojnacki
 2  of communication?
 3       A.    I'm not sure I understand what you
 4  are asking.
 5       Q.    Withdrawn.
 6             Do the exceptions relate to,
 7  spoken, oral conversations or do they relate
 8  to any kind of communication?
 9       A.    I'm not clear, are you referring to
10  a specific exception or a general exception
11  or are you just implying that a conversation
12  might happen.
13       Q.    What I'm saying is, does the
14  protocol say, employee of McKinsey & Co. Inc.
15  may have a conversation with an employee of
16  MIO partners under the following exceptions?
17       A.    No, it says permission must be
18  granted before an exception is approved.
19       Q.    And permission must be granted to
20  do what, to speak in any way, to communicate
21  in any way, shape or form?
22       A.    Correct.
23       Q.    Let's go back to your supplemental
24  declaration for a second.  That's Hojnacki 4.
25  Specifically paragraph 5.
```


MAGNA
LEGAL SERVICES

Page 244

                         Hojnacki

1

2          Have you read that to yourself?

3     A.    Yes, sir.

4     Q.    This paragraph says that no service

5  team member is on the MIO board or works with

6  board members in that capacity, right?

7     A.    Correct.

8     Q.    Do you know if any service team

9  members worked with MIO investment managers?

10    A.    Will you ask your question again.

11    Q.    Sure.  Do you know if any service

12  team members work with MIO investment

13  managers?

14    A.    I don't believe that the service

15  team knows who the MIO investment managers

16  are.

17    Q.    But in terms of my question, do you

18  know whether they work together?

19    A.    No, I don't know if they -- they

20  wouldn't know they're investment managers of

21  MIO.

22    Q.    It doesn't matter.  I'm just

23  saying, do you know whether they worked

24  together, whether they know it or not?

25    A.    No.



Page 245

1                    Hojnacki

2        Q.    Do you know whether --

3              MS. GAY:  No you don't know or no

4        they not.

5        A.    No, I do not.

6        Q.    Do any service team members work

7    with MIO investment employees?

8        A.    The employees of the service team

9    and the employees of MIO are completely

10   separate and don't work together.

11       Q.    Do you know if any service team

12   members work with MIO board members outside

13   their capacity as MIO board members?

14       A.    Just state again the relationship

15   you are looking to connect.

16       Q.    I'm trying to see whether you know

17   if any of the members of your service team

18   whether they work with people who are MIO

19   board members except their work with those

20   board members doesn't relate to their service

21   on the board?

22             MS. GAY:  Objection to the form.

23       Answer if you can.

24       A.    I don't know.

25       Q.    I believe you also say in this



Page 246

1                    Hojnacki

2     paragraph that McKinsey RTS has uncovered no

3     relationships between members of the service

4     team and members of the board of directors of

5     MIO partners that McKinsey RTS U.S. believes

6     would disqualify it from serving the debtors

7     in this Chapter 11 case.

8                    Do you see that?

9          A.    Yes.

10          Q.    Does that mean there are

11     relationships between members of the service

12     team and the MIO board, it's just that RTS

13     doesn't believe that they're disqualifying?

14          A.    So, as it indicates here, we

15     surveyed -- a survey was sent in addition to

16     those that were surveyed that were described

17     in other paragraphs of the supplemental

18     declaration and others.  We sent surveys to

19     all members of the service team to identify

20     whether or not they have any relationships

21     with the MIO board of directors in their

22     capacity as board of directors to MIO

23     Partners and through that survey we uncovered

24     there is no relationship to those -- that

25     there is no -- let me make sure I get it



Case 18-85672   Document 905-2   Filed in TXSB on 01/01/19   Page 247 of 346

Page 247

Hojnacki

1      Hojnacki

2 correct here as I stated it.  No member of

3 the service team has worked with those board

4 members in their capacity as a board member.

5   Q. So there is working together, it's

6 just that the working together doesn't

7 involve the board members' work as a board

8 member of MIO, is that fair?

9   A. I think you are expanding on a

10 statement that I just said.  We identified

11 that there is not any sort of relationship on

12 their working together in their capacity as

13 board members.

14   Q. Let me try it a different way, the

15 fourth line, right, the second line, based on

16 the survey sent to all members of the service

17 team McKinsey RTS U.S. uncovered no

18 relationships between members of the service

19 team and members of the board of directors of

20 MIO Partners.

21     Do you see that, are you following

22 me that far?

23   A. Yes.

24   Q. Let's put a period right after

25 partners.  My question is --



1                     Hojnacki

2          A.    You are putting a period in the

3    middle of which sentence?

4          Q.    In the middle of where it says

5    board of directors of MIO Partners on the

6    fourth line.

7                Do you see that?

8          A.    Correct.

9          Q.    So let's just say for purposes of

10   this question, let's put a period there.  Why

11   couldn't you just put the period there.  Why

12   did you need the extra language?  Why

13   couldn't you just say there is no

14   relationships period, end of sentence, the

15   end, what's the qualifier for?

16         A.    Because specifically what this

17   declaration is stating is our point of view

18   on being a disinterested party.

19         Q.    So in this paragraph, you made the

20   judgment that the relationships that exist

21   are not disqualifying, fair?

22               MS. GAY:  Objection.  Misstates his

23         testimony.  You can answer.

24         A.    We've reviewed the relationships

25   that exist between any members of the service



Page 249

```
 1                    Hojnacki
 2   team and any members of the MIO board of
 3   directors.  We surveyed to understand what
 4   those relationships involve and come to the
 5   determination that it shouldn't disqualify
 6   McKinsey RTS from serving the debtor in this
 7   case.
 8        Q.    Is that your call to make?
 9        A.    I relied on members -- people
10   working for me to help draft this.
11        Q.    I'm talking about McKinsey.  Is
12   that McKinsey's call to make?
13        A.    I relied on counsel to help prepare
14   this.
15        Q.    Because I mean, doesn't Judge Jones
16   get to decide whether a relationship is
17   disqualifying or not?
18        A.    I think Judge Jones will review the
19   whole body of work in both this supplemental
20   and all the materials related to MIO and all
21   the effort to identify the separateness of
22   MIO both included in the supplemental
23   declaration and paragraphs of the original
24   and can understand exactly how separate they
25   are and how little information the service
```



Page 250

1                    Hojnacki

2    team has about the investments of MIO and

3    certainly can understand that there is no way

4    that anything that the consulting group, the

5    consulting service team is doing can be

6    influenced by MIO and vice-versa, that MIO

7    could not be influenced by the service team.

8         Q.    Unless they go on the internet,

9    right?

10             MS. GAY:  Objection to the form.

11        Argumentative.

12        A.    I didn't say that.

13        Q.    For paragraph 5, Judge Jones

14   basically has to take your word for it that

15   these relationships are not disqualifying,

16   right?

17             MS. GAY:  Objection to the form.

18        Q.    You don't give him any information

19   to help him make that assessment for himself,

20   do you?

21        A.    We've tried to be clear about

22   exactly what we did, the relationships that

23   we evaluated, the question that we asked in

24   terms of what the relationship is and

25   therefore made the statement that we did.



Case 18-50672   Document 905-2   Filed in TXSB on 01/01/19   Page 251 of 346

Page 251

```
 1                    Hojnacki
 2       Q.    Why not at least tell him the
 3  general nature of the relationship so that he
 4  could at least see what kind of relationship
 5  you are talking about here because all you
 6  are saying here is there are relationships,
 7  we looked at them, they don't disqualify
 8  them, go away?
 9            MS. GAY:   Objection to the form.
10       A.    We did state it's specifically they
11  do not work with such board members in their
12  capacity as board members.   We did state that
13  specific piece.
14       Q.    A lot of McKinsey's work for its
15  clients receives media coverage, correct?
16       A.    State your question again.
17       Q.    A lot of the work that McKinsey
18  does for its clients receives coverage in the
19  media, is that right?
20       A.    There is -- we do a lot of work
21  globally so I think a percentage of the work
22  that we do globally for the matters that we
23  do it on, the portions picked up by the media
24  are relatively small, but there are some,
25  yes.
```



Page 252

                                   Hojnacki
1
2        Q.    The work that RTS does in
3   particular, a lot of that is public, right,
4   it's all reflected in public filings and
5   bankruptcy court dockets and there are
6   hundreds and hundreds of documents, is that
7   fair?
8        A.    Certainly any work that we do in
9   the Chapter 11 space is public.
10       Q.    Is MIO allowed to use that kind of
11   public information to make investment
12   decisions?
13       A.    I can't speak to what information
14   MIO uses to make its investment decisions.
15       Q.    Is there any protocol that
16   prohibits that kind of activity?
17       A.    The policy specifically prohibits
18   MIO from accessing any information that is
19   used by the consulting staff or the
20   consulting portion of McKinsey & Company.
21       Q.    But does it prohibit, for example,
22   if someone from MIO is reading the Wall
23   Street Journal and they read something about
24   something McKinsey is doing or something that
25   is going on with a McKinsey client, are they



Page 253

1                    Hojnacki

2   allowed to use that information to make an

3   investment decision?

4        A.   I think as I just stated, I don't

5   know what information MIO is allowed to use.

6        Q.   Does MIO have access to the global

7   client database?

8        A.   I don't know -- actually, I believe

9   not.

10       Q.   What's your basis for that belief?

11       A.   It's just what I believe.

12       Q.   But what's it based on?

13       A.   That there is no information shared

14   between McKinsey's consulting arm and MIO

15   Partners and the global client database is

16   managed and owned and run by the consulting

17   arm.

18       Q.   But you don't know whether MIO has

19   a list of McKinsey clients is that fair?

20       A.   I know that according to the

21   policy, right which I have reviewed in

22   preparation for preparing this declaration

23   and reviewed again as part of preparing for

24   this deposition, that the sharing of

25   information between the two entities is



Page 254

```
 1                    Hojnacki
 2   prohibited.
 3       Q.   Does that protocol specifically
 4   speak about client identities?
 5       A.   It does mention client identities,
 6   yes.
 7       Q.   In that capacity it prohibits MIO
 8   from knowing who McKinsey's clients are,
 9   unless there is an exception, is that right?
10       A.   From what I recall, my review of
11   the policy.
12       Q.   So no one from outside of MIO can
13   tell anyone from MIO who McKinsey's clients
14   are and MIO is not allowed to know, is that
15   fair?
16       A.   Would you state it again?
17       Q.   Sure.  According to this protocol
18   that you reviewed, no one from outside MIO is
19   allowed to tell anyone at MIO who McKinsey's
20   clients are and no one at MIO is allowed to
21   know, is that fair?
22       A.   Correct.
23       Q.   Unless they are a board member,
24   right?
25       A.   Again, I can't speak to what
```



Case 18-85672   Document 905-2   Filed in TXSB on 01/01/19   Page 255 of 346

Page 255

```
 1                    Hojnacki

 2   information the board shares between the

 3   board and MIO partners.

 4        Q.   Well, it's not sharing so much as,

 5   if you are a human being and you know

 6   something, you can't just flush your head of

 7   all knowledge when you act in another

 8   capacity, right?

 9            MS. GAY:  Objection to the form.

10        Q.   If there is a McKinsey partner that

11   does work for McKinsey, right, he knows who

12   his clients are, that doesn't change when he

13   joins the MIO board, does it?

14            MS. GAY:  Objection to the form,

15        again.

16        A.   I guess what's your specific

17   question?

18        Q.   The question I just asked.

19        A.   Sorry, I don't have a screen in

20   front of me.

21        Q.   McKinsey partners, right, they're

22   off working on their consulting assignments,

23   right?

24        A.   Correct.

25        Q.   They have clients and they have
```



Case 18-85672   Document 90S-2   Filed in TXSB on 01/01/19   Page 256 of 346

Page 256

```
                              Hojnacki
 1
 2    engagements and so forth and they are doing
 3    their daily duties, fair?
 4         A.    Serving clients.
 5         Q.    Some of those partners also serve
 6    on the board of MIO, right?
 7         A.    Yes.
 8         Q.    So by definition, they are on the
 9    board of MIO and they know who McKinsey's
10    clients are, right?
11         A.    They would only know who their
12    clients are, again, there is a longstanding
13    policy within McKinsey of serving
14    competitors, right, I stated it in here, I
15    think we talked about it before.  Part of
16    that is maintaining your client confidences
17    including the fact that we serve other
18    clients very close, right, keeping it very
19    close and so a partner of McKinsey doesn't
20    know all of the other clients that McKinsey
21    serves, they only know the ones that they
22    serve.
23         Q.    Let's say I'm partner at McKinsey
24    and I have a friend who is also a partner at
25    McKinsey and we work on different stuff, I am
```



Case 18-85672   Document 90S-2   Filed in TXSB on 01/01/19   Page 257 of 346

Page 257

                            Hojnacki
1

2  not allowed to go and have a beer and talk

3  about what is going on with our different

4  clients?

5          A.   No, you are not supposed to.

6          Q.   Is there a protocol about that too?

7          A.   There is, I will forget the name of

8  the policy, but there is a policy about

9  serving competitors and the way in which we

10  protect those client confidences and how it's

11  one of our most important professional

12  responsibilities and there is additional

13  information about, specific to the sharing of

14  information and that information that's

15  obtained by a service team is intended to be

16  confidential for that service team alone.

17          Q.   And there is a written protocol at

18  McKinsey that you have seen that prohibits

19  partners from telling each other who their

20  clients are?

21          A.   So the practice is that, again when

22  you are in certain roles, right, it becomes

23  necessary to know what another client is,

24  right.  In the context of preparing this

25  declaration, I have become aware of a bunch



Case 18-85672   Document 905-2   Filed in TXSB on 01/01/19   Page 258 of 346

Page 258

                        Hojnacki

1
2   of other clients that are clients of McKinsey
3   that I don't currently serve but I am on a
4   need to know basis for the preparation of
5   this declaration, but they're not clients of
6   mine.  I don't have any information beyond
7   what we've disclosed in these declarations
8   about the service that we provide to those
9   clients.
10      Q.   So you said, part of your answer
11  was that's the practice.  What I'm asking
12  you, is there a formal written policy or
13  protocol that says McKinsey partners cannot
14  share client identities with each other
15  unless there is a business need?
16      A.   So the policy does state that the
17  sharing of information and even the sharing
18  of a client's specific name is confidential.
19      Q.   Are you talking about, is this the
20  MIO protocol you are talking about or is this
21  something different?
22      A.   I believe it's in, I forget the
23  name of the policy, but the policy that
24  governs the fact that we serve competitive
25  clients.



Page 259

1                    Hojnacki

2        Q.    Have you seen that protocol

3    recently or that policy?

4        A.    Yes.

5        Q.    Did you see it yesterday?

6        A.    I saw it in preparation of this

7    declaration.

8        Q.    So are there separate protocols for

9    information flow into and out of MIO, is that

10   a separate protocol or is it all one

11   protocol?

12       A.    They're separate.  There is one

13   that governs any sort of relationship between

14   the consulting staff as I will call it or the

15   consulting arm and MIO and then there is a

16   separate one that governs how we handle the

17   fact that client confidences is one of our

18   most important professional responsibilities

19   and we don't share that information outside

20   of our service teams.

21       Q.    Let's go back to Hojnacki 3,

22   paragraph 41.  This says, RTS performed an

23   independent search related to White Box,

24   right?

25       A.    Paragraph 41 Exhibit 3, yes.  There



Page 260

1                    Hojnacki

2   is a statement here about as the results of

3   an independent search.

4        Q.    Independent of whom?

5        A.    I'm not sure I understand your

6   question.

7        Q.    You used the word independent, you

8   could have just said as a result of a search

9   but you said as a result of an independent

10   search, so what I'm asking you is what do you

11   mean by independent, independent of whom or

12   what was the search conducted?

13        A.    I didn't conduct or wasn't part of

14   the search myself so I can't speak to the

15   specifics of it.  In terms of the specific

16   language here, this is where I relied on

17   others to help me draft this paragraph.

18        Q.    Who did do that search?

19        A.    I don't know.

20        Q.    Do you know whether it was someone

21   from legal?

22        A.    I don't know who conducted the

23   search.

24        Q.    You don't know what the search

25   involved?



Page 261

1                     Hojnacki

2        A.    I'm sorry, I'm just reading the

3   paragraph again as we sit here.

4              Sorry, what was your question.

5        Q.    My last question was do you know

6   what the search involved?  Do you know what

7   was done in connection with the search?

8        A.    Again, I didn't do the search and

9   wasn't involved in the search, so

10  specifically I don't know.

11       Q.    Do you know what the purpose of the

12  search was?

13       A.    What I know is included here in

14  this paragraph 41 in relation to allegations

15  made by Alix in reference to Alpha Natural

16  Resources.

17       Q.    Was the search done for the

18  purposes of preparing this paragraph of your

19  declaration?

20       A.    I don't know what the purpose of

21  the search was.

22       Q.    So someone just put this in your

23  declaration and said basically sign, fair?

24              MS. GAY:  Objection to the form.

25       A.    I went through as I described



Case 15-10541-BLS   Doc 2417-6   Filed 04/24/19   Page 263 of 347

Case 18-85672   Document 905-2   Filed in TXSB on 01/01/19   Page 262 of 346

                                    Hojnacki

 1

 2  before a very careful process and spent a lot

 3  of time in reviewing these.  I did rely on

 4  others in preparation of this.  This

 5  specifically is a paragraph that related to

 6  something that I'm not involved in that I

 7  relied on others for.

 8       Q.   Did you discuss paragraph 41 with

 9  anyone before you signed it?

10       A.   I don't recall a specific

11  discussion of it.

12       Q.   How did you learn that MIO had an

13  investment relationship with White Box?

14       A.   In preparation for this declaration

15  is when I learned about it and in just the

16  news that's been out there in all of the

17  allegations filed by Alix.

18       Q.   Did you learn about it through news

19  or the allegations from Alix or did you first

20  learn about it when you got a draft of your

21  declaration that had paragraph 41 in it?

22       A.   I don't recall the specific timing

23  of when I learned about it.

24       Q.   It says the search was done in

25  April of 2018, is that right?



Page 263

1                    Hojnacki

2        A.   That's what this paragraph states,

3   yes.

4        Q.   And the next line says that it says

5   relating to an April 27, 2008 Wall Street

6   Journal article.

7             Do you see that?

8             MR. MARGOLIN:   2018.

9        Q.   2018.  Do you see that part?

10       A.   Yeah I see the first two lines,

11   that independent search relating to the

12   publication of an article dated April 27,

13   2018 in the Wall Street Journal.

14       Q.   Do you know whether it was the

15   article that prompted the search?

16       A.   I don't know.

17       Q.   There is some reference down here

18   to pleadings in Alpha Natural Resources and

19   the Alix case in the Southern District.

20             Do you see those?

21       A.   In the same paragraph?

22       Q.   Yes.

23       A.   Yes.

24       Q.   Do you know whether those pleadings

25   are what prompted the search you reference



Case 18-85672   Document 905-2   Filed in TXSB on 01/01/19   Page 264 of 346

Page 264

```
 1                    Hojnacki
 2  here?
 3       A.   No.  Like I said, I didn't have any
 4  involvement in the search and don't know
 5  specifically what prompted it.
 6       Q.   I think we discussed earlier that
 7  RTS is a fiduciary to the debtor, correct?
 8       A.   Can you refer me back to the
 9  specific question or document that we
10  referenced.
11       Q.   Rather than dig through.  You agree
12  that RTS is a fiduciary for the debtor in
13  Westmoreland, don't you?
14       A.   Again, just reference me to what
15  document you want me to --
16       Q.   I don't want you to reference a
17  document.  I just want to know, I'm surprised
18  you are having this much trouble answering
19  this.
20            Is RTS a fiduciary to the debtor in
21  the Westmoreland case?
22       A.   We as part of our role in serving
23  the client under some of the provisions
24  listed, have fiduciary obligations to the
25  debtors.
```



MAGNA
LEGAL SERVICES

Page 265

1                    Hojnacki

2        Q.    Why can't you just say yes to that?

3              MS. GAY:  Objection to the form.

4        He is trying to understand what you

5        said.  He is trying to listen to you.

6              MR. PETRELLA:  He is trying to

7        understand a ten word sentence.

8        A.    I'm trying to best answer the

9   questions.

10        Q.    Do you agree it's important for a

11  fiduciary to avoid the appearance of

12  inappropriately?

13        A.    Can you be specific about what you

14  mean.

15        Q.    I mean a situation that potentially

16  looks bad even though it may not actually be

17  bad.  It may be bad, it may not but

18  regardless it looks bad?

19              MS. GAY:  Objection to the form.

20        Q.    Do you understand what I'm talking

21  about?

22        A.    There is a lot of hypotheticals.

23        Q.    It's not a hypothetical.

24        A.    If you explain it to me again, I

25  will do my best.



Page 266

1                     Hojnacki

2          Q.   I'm saying, for example, if -- you

3     don't know whether it's true that MIO

4     actually invests in Contura through White

5     Box, do you?

6          A.   I have no knowledge of specifically

7     what MIO invests in beyond the asset

8     allocations I mentioned in our discussion of

9     MIO earlier.

10         Q.   If it is true, you agree that

11    doesn't look very good to the public?

12              MS. GAY:  Objection to the form.

13         A.   I think they're completely

14    separate, right.  I think that the work being

15    done on behalf of debtors, in this case

16    Westmoreland, is completely separate from any

17    decisions that MIO Partners is making to

18    invest its funds.

19         Q.   Do you have an understanding of the

20    factual allegations regarding Contura and

21    White Box, do you understand what the

22    allegations are?

23         A.   I haven't spent a ton of time

24    reviewing the allegations that have been made

25    outside in other cases, no.



Page 267

```
 1                    Hojnacki

 2      Q.    Let me just go through them briefly

 3   and you tell me whether you formed an

 4   understanding of that prior to today.

 5            Do you understand the allegation is

 6   that the MIO invests in a fund called White

 7   Box?

 8      A.    I understand it based on what I've

 9   disclosed here in this paragraph.

10      Q.    Do you understand also that an

11   allegation has been made that White Box in

12   turn holds an investment in a company called

13   Contura?

14      A.    Okay.  I haven't reviewed

15   documents.  If you have a document you want

16   me to read to review it.

17      Q.    I'm just saying, prior to today,

18   did you have an understanding of that?

19      A.    I know there is many allegations

20   that have been made by Alix and Mar-Bow

21   against McKinsey and McKinsey RTS.

22      Q.    Did you read this Wall Street

23   Journal article here in paragraph 41?

24      A.    There has been many Wall Street

25   Journals, I don't remember if I read the one
```



Case 18-85672  Document 905-2  Filed in TXSB on 01/01/19  Page 268 of 346

Page 268

```
 1                    Hojnacki
 2   dated April 27th.
 3        Q.   But assuming that, I will go back
 4   to my question, assuming that MIO invests in
 5   White Box and assuming that White Box invests
 6   in Contura and Contura benefited
 7   significantly from the A&R, the outcome of
 8   the A&R bankruptcy, do you agree that doesn't
 9   look good to the public?
10            MS. GAY:  Objection to the form.
11        You are getting very far afield from the
12        Westmoreland affidavit but go ahead.
13            MR. PETRELLA:  Except this is
14        expressly addressed in it, but go ahead.
15        A.   Will you please restate your
16   question for me.
17        Q.   I'm saying, if it's true that the
18   MIO invests in White Box and White Box
19   invests in Contura and as a result of the
20   plan in the A&R bankruptcy that McKinsey
21   helped develop, Contura benefited financially
22   significantly, to the tune of approximately
23   $50 million, do you agree that that is not a
24   good look for the bankruptcy process for the
25   public?
```



Page 269

```
 1                    Hojnacki
 2          MS. GAY:  Objection to the form.
 3     A.    So the fact that a team is serving
 4  a debtor that has no knowledge of the
 5  investments that are being made by a
 6  completely separate entity into funds that
 7  may invest in something that's three levels
 8  removed, that they have no knowledge of, I
 9  don't understand how they would even know
10  that's happening.
11     Q.    Well, Jay Alix figured it out,
12  didn't he, using public sources?
13          MS. GAY:  Objection to the form.
14     Q.    That's how?
15     A.    I can't speak to what Mr. Alix did
16  or didn't do.
17     Q.    How do you know one of your
18  colleagues didn't do the same thing?
19          MS. GAY:  Again, objection to the
20          form.  All of this is argumentative and
21          speculative.
22          MR. PETRELLA:  It's a question.
23     Q.    How do you know your colleagues
24  didn't do the same thing?
25          MS. GAY:  What is the same thing.
```



Page 270

1                    Hojnacki

2       Q.   Same thing Jay Alix did, which is

3   go on public sources and figure it out,

4   fairly quickly and easily I might add.

5       A.   I don't know what Mr. Alix did or

6   didn't do to come up with his allegations and

7   so I can tell you that teams like the service

8   team serving Westmoreland don't have any

9   knowledge of the investments or any

10  connection with the MIO Partners and the

11  ability to understand or influence their

12  investment decisions that are being made on a

13  day-to-day basis.

14      Q.   Do you agree that the MIO issue and

15  the allegations that Mr. Alix has raised and

16  Mar-Bow has raised regarding the MIO, do you

17  agree that those issues are essentially

18  irrelevant as long as everyone at McKinsey is

19  playing by the rules?

20           MS. GAY:  Objection to the form.

21      Q.   As long as they are following the

22  protocols you reviewed?

23           MS. GAY:  Again, same objection.

24      A.   Can you -- I think there might be

25  two questions in there or multiple statements



Page 271

1                     Hojnacki

2   buried into a question.  Can you be specific

3   about what you are asking.

4        Q.   Let me rephrase it.

5             Do you agree as long as everyone at

6   McKinsey follows the protocols that you

7   reviewed, it shouldn't matter what MIO was

8   invested in?

9             MS. GAY:  Again, I object to the

10        form.  You can answer if you can

11        decipher it.

12        A.   So I believe that there is and

13   again we have tried to be as fully

14   transparent about the separateness of the two

15   entities, the fact that they don't share

16   servers, they don't share employees, there is

17   policies in place to govern any or prohibit

18   any sort of share of information and so I

19   think it demonstrates the separateness that

20   we characterize through this declaration and

21   the supplemental declaration.

22        Q.   As someone who acts as a fiduciary,

23   does it trouble you at all that MIO might be

24   investing in companies with a financial stake

25   in the bankruptcies that RTS is handling?



Page 272

1                    Hojnacki

2        A.    Again, I think I stated this before

3    but to the extent that I have no idea and no

4    control over what they're doing and the fact

5    that they have no knowledge other than I

6    suppose what's available in public documents

7    to anything being done on the consulting

8    side, it's so separate to me, it doesn't

9    influence what we do on a day-to-day basis on

10   the consulting side and I don't know how it

11   would at all inform what they are trying to

12   do on the investing side.

13           MS. GAY:  Can we clarify, when you

14       are saying they, you are talking about.

15       A.    The employee and the investment

16   professionals of MIO Partners.

17       Q.    In terms of the firm as a whole,

18   you don't know what information anyone other

19   than you might have about what's going on at

20   MIO?

21       A.    So I know what I receive, right, I

22   think we talked about it and I have read the

23   policy and understand what information is

24   prohibited.  I can't speak for every

25   individual of McKinsey RTS or McKinsey &



Page 273

```
 1                 Hojnacki
 2    Company but I'm comfortable that they don't
 3    have any information that I wouldn't have
 4    access to.
 5         Q.   Let's look at paragraph 73 of your
 6    declaration.
 7              MS. GAY:  Can we take a two minute
 8         bathroom break.
 9              THE VIDEOGRAPHER:  The time is 2:25
10         and we are going off the record.
11              (Recess.)
12              THE VIDEOGRAPHER:  This is the
13         start of media label No. 7.  The time
14         now is 2:48 p.m. and we are back on the
15         record.
16         Q.   Let's go back to Hojnacki 3.  And
17    specifically paragraph 73.  Just read through
18    73 for yourself and let me know when you are
19    done.
20         A.   Okay.
21         Q.   So in this paragraph you are
22    talking about RTS and its affiliates
23    provision of analysis and advice to
24    competitors of the debtors, right?
25         A.   So it's specific to providing
```



Page 274

1                    H o j n a c k i

2     analysis and advice to companies in the

3     wholesale power in the North American Coal

4     sectors.

5          Q.    Which include competitors of the

6     debtor in this case, correct?

7          A.    Sure, I think it's a wider view

8     than just competitors of the debtors but

9     there might be some competitors of the

10    debtors in that space.

11         Q.    On page 30, paragraph 73, let's

12    start over on 73, McKinsey RTS and affiliates

13    do from time to time provide overall

14    strategic analysis and advice to companies

15    that operate in the wholesale power

16    generation and North American coal mining

17    sectors in which the debtors operate which

18    analysis and advice could include review and

19    comment on publicly available information and

20    strategic considerations with respect to the

21    debtors as well as other companies.

22              Then you go on to say McKinsey RTS

23    U.S. and affiliates service to other

24    companies in the industry in which the

25    debtors operate may focus on the macro



Page 275

```
 1                    Hojnacki

 2   landscape of the industry but should have no

 3   direct effect on the debtors given the nature

 4   of the market.

 5            Do you see that?

 6       A.   Yes.

 7       Q.   I read that as a fairly big hedge.

 8            Who made this determination?

 9            MS. GAY:  Objection to the form.

10       A.   I guess when you refer to this

11   determination, which determination are you

12   referring to.

13       Q.   The determination that this advice

14   and analysis should have no direct effect on

15   the debtors?

16       A.   So the paragraph is intended to

17   help provide complete transparency to the

18   type of work that McKinsey RTS U.S. and its

19   affiliates state in terms of, just globally,

20   if an affiliate has a client that comes to it

21   and says we would like some information on,

22   you know, the macro landscape or helping us

23   review some publicly available information,

24   et cetera, et cetera, that that type of work

25   if it's performed by some party that's not a
```



Case 18-85672   Document 905-2   Filed in TXSB on 01/01/19   Page 276 of 346

Page 276

                              Hojnacki

1

2   member of the service team or that doesn't

3   have, in which case any relationship would

4   have already been disclosed, or it's not

5   involved in a direct commercial relationship

6   with the debtors which would have also been

7   disclosed, then we do that work but it's kind

8   of unimportant to the debtors.

9        Q.   Right.  So who performed the

10  analysis that determined that this analysis

11  and advice should have no direct effect on

12  the debtors?

13       A.   As I described, the intent of this

14  paragraph and the work we are describing here

15  and what we are trying to describe, I think

16  from my point of view it's clear that it

17  wouldn't have any direct, what does it say,

18  no direct effect on the debtors.

19       Q.   I believe you said this paragraph

20  was designed to give complete transparencies,

21  did I get that right?

22       A.   I don't recall the specific words

23  that I used but it's intended to provide

24  transparency to different types of work.

25       Q.   Saying that the services to the



                         Hojnacki

 1
 2    other companies in the industry may focus on
 3    the macro landscape of the industry but
 4    should have no direct effect on the debtors
 5    given the nature of the market, do you view
 6    that as a completely transparent statement?
 7         A.   I'm comfortable with the language
 8    included in the declaration, yes.
 9         Q.   Did anyone perform a written
10    analysis of the effect that this kind of
11    industry advice and analysis might have on
12    the debtor in this case?
13         A.   Not that I am aware of.
14         Q.   Let's look at paragraph 75, just
15    read that to yourself and let me know when
16    you are done.
17              Do you have it?
18         A.   I'm just reading footnote 10.
19    Okay.
20         Q.   The last sentence of 75 says, In
21    addition to the best of my knowledge, no
22    member of the service team McKinsey RTS U.S.
23    and its consulting affiliates or their family
24    members hold equity securities of the
25    debtors.



Page 278

1                    Hojnacki

2            Do you see that?

3        A.    Yes.

4        Q.    Do you know if that's true of

5    partners of McKinsey & Company Inc.?

6        A.    So this is true with respect as it

7    states to the service team McKinsey RTS U.S.

8    and its consulting affiliates and their

9    family members.

10       Q.    Does that include, leaving the

11   affiliates aside, does it include the

12   individual partners of McKinsey & Company

13   Inc.?

14       A.    You said besides the consulting

15   affiliates.

16       Q.    The partners, as opposed to the

17   affiliates themselves.

18            Were the partners of McKinsey & Co.

19   Inc. asked whether they own equity securities

20   of the debtor?

21       A.    We should reference back to all the

22   surveys that were sent and just --

23       Q.    Okay.  Go ahead.

24       A.    So paragraph 34D, the survey we

25   talked about in reference to that subsection.



Page 279

1                    Hojnacki

2        Q.    Right.

3        A.    All employees of McKinsey RTS U.S.

4   and its affiliates globally that provide

5   consulting services to determine any personal

6   or family relationship with or employment by

7   the debtors, the U.S. Trustee for region 7,

8   attorneys, employees at the office of the

9   U.S. Trustee's office for region 7 and the

10  bankruptcy judges in the Southern District of

11  Texas as well as any equity ownership of the

12  debtors.

13       Q.    So is it your testimony that the

14  affiliates globally there, that would include

15  the partners of McKinsey & Company Inc.?

16       A.    Yes.

17       Q.    How about McKinsey & Company Inc.

18  U.S.?

19       A.    Yes.

20       Q.    Let's go back to your supplemental

21  declaration, Hojnacki 4.  And specifically

22  paragraph 6.  Just let me know when you are

23  done reading it.

24       A.    Okay.

25       Q.    When I read this, it sounded to me



```
 1                    Hojnacki
 2    like what originally appeared to be 5 percent
 3    or more shareholders turned out not to be, is
 4    that a fair characterization of what you are
 5    saying here?
 6         A.   The parties that were listed under
 7    the 5 percent shareholders category were not
 8    indeed 5 percent shareholders.
 9         Q.   Do you have any information or
10    knowledge as to how that happened, why
11    someone thought they were but it turned out
12    they weren't?
13         A.   I don't have any knowledge.  We
14    didn't prepare the interested party list.
15         Q.   Pardon me?
16         A.   McKinsey RTS didn't prepare the
17    interested party list.
18         Q.   You haven't had a conversation with
19    anyone in which they explained to you why the
20    interested parties listed as 5 percent or
21    more shareholders turned out, in fact, not to
22    be 5 percent or more shareholders?
23         A.   I did not, no.
24              MR. IVANICK:  Off the record.
25              (Off the record.)
```



Page 281

1                    Hojnacki

2        Q.    Back to your supplemental

3    declaration, Hojnacki 4, paragraph 7.   Just

4    let me know when you are done reading it.

5        A.    Yes.

6        Q.    In this paragraph you say that

7    there was a search for client services

8    provided to entities on the first

9    supplemental list of potential parties in

10   interest since October 1, 2016.

11              Do you see that?

12       A.    In this paragraph, yes.

13       Q.    Did you check to see if McKinsey

14   and its affiliates owned debt or equity in

15   the interested parties?

16       A.    If employees -- can you ask your

17   question specifically of who you are

18   inquiring about?

19       Q.    I'm asking about McKinsey RTS and

20   its affiliates and whether you did a search

21   to see if any of them owned debt or equity in

22   the interested parties, any of the interested

23   parties?

24       A.    The entities themselves?

25       Q.    The entities or their partners?



Case 18-85672  Document 90S-2  Filed in TXSB on 01/01/19  Page 282 of 346

Page 282

```
 1                    Hojnacki
 2             MS. GAY:  I think it's getting late
 3        and you are dropping your voice a little
 4        bit, Mr. Petrella, it might be the mike
 5        too.
 6        Q.    Did you hear what I said?
 7        A.    For the sake of clarity would you
 8   mind repeating one more time for me, please.
 9        Q.    Sure.  Referring you back to that
10   sentence, where you say you searched the
11   first supplemental list of potential parties
12   et cetera, you saw that?
13        A.    Correct.
14        Q.    What I'm asking is, if McKinsey and
15   its affiliates, did you check to see whether
16   McKinsey, their affiliates or their partners
17   owned any debt or equity in any of the
18   interested parties?
19        A.    So I think that the supplement lays
20   out what we did with respect to the actions
21   taken in filing the supplemental declaration.
22   I think the first declaration lays out the
23   thorough process that we did and I think we
24   just discussed the survey question that was
25   asked to identify whether or not the -- all
```


MAGNA
LEGAL SERVICES

                        Hojnacki

1       employees of McKinsey RTS and its affiliates

2       -- I'm going to read the paragraph again or

3       at least the beginning of it, I have to just

4       find it.

5               Paragraph 34, letter D, about the

6       question in the survey that was provided to

7       the employees of McKinsey RTS U.S. and its

8       affiliates globally and the last section

9       focuses on equity ownership of the debtors.

10          Q.   Let's look at paragraph 22 of the

11      supplement.  There it references a $1.24

12      million payment being wired back to the

13      debtor.

14          A.   Sorry I lost the paragraph number.

15              MS. GAY:  22.

16          Q.   Page 10.

17          A.   Yes, sir.

18          Q.   Does RTS acknowledge that this sum

19      here is a preference?

20          A.   So we acknowledged that the

21      payments received on account of services

22      provided were in excess of the retainer

23      advance payment that we had received from the

24      debtors and we were advised by counsel that



Page 284

```
 1                    Hojnacki
 2    that could be a preference so we have
 3    voluntarily wired the funds back and those
 4    funds have been sent.
 5         Q.   When did you receive that advice
 6    from counsel?
 7         A.   We received that advice from
 8    counsel, I don't recall specifically the
 9    timing of it.
10         Q.   Was it before or after your
11    supplemental declaration?
12         A.   Before or after -- in this
13    supplemental declaration, we've indicated the
14    offer to repay the shortfall and the intent
15    to -- the process of starting the wiring of
16    the funds back.
17         Q.   So it's before?
18         A.   It's before.
19         Q.   Was it before or after your first
20    declaration?
21         A.   I think we acknowledged, let's go
22    back to what is specifically in here.
23         Q.   I'm talking about the advice that
24    it could be a preference and that it should
25    be repaid.
```



Case 18-85672    Document 90s-2    Filed in TXSB on 01/01/19    Page 285 of 346

Page 285

```
 1                    Hojnacki
 2           Did you get that before or after
 3   your first declaration?
 4       A.    What advice are you alluding to?
 5       Q.    The advice you testified to in
 6   which counsel told you that the 1.24 million
 7   could be a preference and should be repaid.
 8       A.    So again, I think the page 12 of
 9   the declaration which includes the analysis.
10       Q.    Hojnacki 3?
11       A.    I'm sorry, yes, Hojnacki 3, we kind
12   of laid out the entire table of all of the
13   activities associated with the payments that
14   we received prior to the filing date and
15   specifically noted the potential preference
16   issue and the fact that we had offered to
17   repay the money to the debtors and we, in
18   fact, followed through with that and
19   disclosed it in the supplemental declaration.
20       Q.    So you got the advice before the
21   first declaration?
22       A.    We were aware of all of the
23   activity that we put into this table at the
24   time of filing this original declaration in
25   Exhibit 3.
```



Page 286

1                     Hojnacki

2          Q.    Why did it take over a month to

3    wire the money back -- withdrawn.

4                Has it actually been wired back

5    yet?

6          A.    The debtors received the money

7    back.

8          Q.    Why did it take over a month to do

9    it?

10         A.    We approved the payment, put in the

11   wire request as fast as possible, it took

12   that long, it's been paid to the debtors.

13         Q.    When did you put the wire request

14   in?

15         A.    I don't remember exactly.

16         Q.    Can you estimate, roughly?

17         A.    I don't have a guess, no.

18         Q.    Let's go back to Hojnacki 4,

19   paragraph 23.  Do you see that?  Read it and

20   let me know when you are done.  I want to

21   make sure you read it.

22         A.    I see paragraph 23, yes.

23         Q.    At the end of paragraph 23, you

24   say, without prejudice or admission, McKinsey

25   RTS U.S. hereby agrees to waive the 96,000



Page 287

```
 1                    H o j n a c k i
 2   prepetition amount.
 3            Do you see that?
 4       A.   The last sentence of paragraph 23,
 5   yes.
 6       Q.   What does that mean, without
 7   prejudice or admission?
 8       A.   At the time of filing, the $96,000
 9   is an account of the one day between the last
10   day that the debtor made payments prior to
11   the filing date and the filing date on
12   October 9th so effectively the October 8th we
13   held a retainer in excess of that amount at
14   that time but we are happy to contribute the
15   $96,000 back and waive any claim against the
16   debtors for that amount of services.
17       Q.   Without prejudice?
18       A.   We are happy to do it.  Contribute
19   those funds back to the debtor.
20       Q.   Without prejudice, right?
21            MS. GAY:  Is that a question?
22       Q.   What is your understanding of what
23   without prejudice means, as you use it here
24   in this paragraph?
25       A.   I am not a lawyer, so I am not
```



Page 288

1                          Hojnacki

2    going to try to define or characterize what

3    without prejudice means in this context, but

4    I can tell you, we are happy to waive the

5    claim and happy to give the money back to the

6    debtors or not be paid on account of the

7    services that were provided to the debtor, we

8    are happy to do it.

9           Q.   Did you ask counsel what this

10   means, without prejudice or admission?

11          A.   I didn't ask counsel specifically

12   what those two words mean.

13          Q.   But you can't reinstate this claim

14   at any point, can you?

15          A.   We have no intent of reinstating

16   this claim.

17          Q.   But can you?

18          A.   I don't know what the context of

19   those words mean or the ability to reinstate

20   this claim.  I can tell you we have no intent

21   of doing so.

22          Q.   Are there any written guidelines or

23   protocols on when it's appropriate to

24   withhold a client's name from a disclosure

25   like this and treat them as a confidential



Case 18-85672   Document 905-2   Filed in TXSB on 01/01/19   Page 289 of 346

Page 289

```
 1                    Hojnacki
 2   client?
 3        A.    Will you ask your question again.
 4        Q.    Sure.  In your original
 5   declaration, we will just stick to that,
 6   initially at least there were three
 7   confidential clients disclosed, they were
 8   called confidential clients but the names
 9   weren't given.
10          Do you remember that?
11        A.    Yes.
12        Q.    What I'm asking, are there any
13   written protocols or guidelines that govern
14   when it's appropriate in a disclosure like
15   this to withhold the client's name and call
16   them a confidential client as opposed to give
17   their actual name?
18        A.    So as we I think discussed earlier,
19   two of those three have been disclosed --
20          MS. GAY:  Let him finish.
21          MR. PETRELLA:  He is not answering
22      the question. Go ahead.
23        Q.    I'm just asking if there are any
24   protocols or guidelines on it?
25        A.    In other instances, it's when the
```



Case 18-85672   Document 905-2   Filed in TXSB on 01/01/19   Page 290 of 346

Page 290

1                    Hojnacki

2    circumstances around the disclosure might

3    prohibit or unduly harm the confidential

4    client.

5         Q.   And again, is that a written policy

6    or protocol or is that just a practice at

7    McKinsey?

8         A.   So I can't speak -- I'm not aware

9    of the written protocol.  I know each is done

10   on a case by case basis to understand the

11   facts and circumstances around what would

12   restrict us from disclosing it.

13        Q.   Are you aware of whether there is a

14   written protocol or not?

15        A.   I'm not aware.

16        Q.   As you sit here now, have you ever

17   been involved in providing services to any of

18   the interested parties in this case, to your

19   knowledge?

20        A.   Ever in the course of my career?

21        Q.   Correct.

22        A.   I didn't use that language when I

23   reviewed the list of interested parties.

24        Q.   You are sitting here right now, can

25   you think of any?  Are there any that jump to



Page 291

1                        Hojnacki

2    mind, I know this is an interested party in

3    this case that I provided services for in my

4    career?

5         A.    In my career at McKinsey or prior

6    to McKinsey?

7         Q.    At any time.

8         A.    Again, I didn't -- I would have to

9    go back and look through -- I didn't apply

10   that lens when I looked at and reviewed --

11        Q.    I'm not asking to go through the

12   schedules and look at them all.  If I ask you

13   the question right here, without looking at

14   anything, is there anything that pops to

15   mind, I know this is an interested party, I

16   did a long project for them, for this company

17   I provided services, any of them?

18        A.    Irrespective of time at McKinsey,

19   this could include time at my prior employer

20   or my prior employer before to that?

21        Q.    Right.

22        A.    I'm happy to --

23        Q.    I'm just saying as you sit here

24   right now as you sit here, does any name come

25   to mind?



Case 18-85672   Document 90S-2   Filed in TXSB on 01/01/19   Page 292 of 346

Page 292

```
 1                   Hojnacki
 2        A.    I know one of the names on here is
 3    AIG, I previously did work for AIG prior to
 4    my time at McKinsey.
 5        Q.    How about any names from your time
 6    at McKinsey, do you know of any of those?
 7        A.    Irrespective of time?
 8        Q.    Yes.
 9        A.    That's not the lens that I used
10    when I reviewed the interested parties list.
11        Q.    I know.
12        A.    I would have to go through --
13        Q.    I'm not asking you to go through.
14    Without looking at the list and whether you
15    used that as a lens or not, just sitting
16    here, are there any that pop into your head,
17    I know at McKinsey I worked on this client, I
18    know they're an interested party in this
19    case?
20        A.    None come to mind sitting here
21    right now.
22        Q.    Let's go back to Hojnacki 3 and
23    specifically paragraph 20.  Give that a read
24    and let me know when you are done.
25        A.    Okay.
```



Case 18-85672   Document 90S-2   Filed in TXSB on 01/01/19   Page 293 of 346

Page 293

1                    Hojnacki

2        Q.    It says in here that RTS follows

3   it's own RTS reimbursement policy.

4              Do you see that?

5        A.    It says it developed its own

6   official reimbursement policy with respect to

7   its professionals' documentation of expenses,

8   the RTS reimbursement policy.

9        Q.    Right.

10       A.    Okay.

11       Q.    Is that the policy that McKinsey is

12  using for this case or RTS is using for this

13  case?

14       A.    Yes.

15       Q.    And does the U.S. Trustee have any

16  guidelines on professional expense

17  reimbursement?

18       A.    I'm not aware of the U.S. Trustee's

19  guidelines but I don't believe they provided

20  any comments on this aspect of our engagement

21  letter or our retention application.

22       Q.    And therefore you don't know

23  whether those guidelines are mandatory or

24  optional?

25              MS. GAY:  Objection to the form.



Case 18-50672   Document 90S-2   Filed in TXSB on 01/01/19   Page 294 of 346

Page 294

                                        Hojnacki

1                            Hojnacki

2          You can answer.

3          A.    Again, I am not aware that we

4    received any comments from the U.S. Trustee

5    with respect to what we've talked about here.

6          Q.    You don't know whether any such

7    guidelines exist and therefore you don't know

8    whether, if they exist, they're mandatory or

9    optional, is that fair?

10         A.    I do not know.

11         Q.    And therefore you also don't know

12   how the RTS reimbursement policies may differ

13   from the U.S. Trustee's guidelines, is that

14   fair?

15              MS. GAY:   Objection to the form.

16         You can answer.

17         A.    I am not familiar with the

18   guidelines so I can't opine how they would

19   apply.

20         Q.    Let's talk about the documents that

21   you reviewed in preparation for your

22   deposition today.

23              Can you tell me what those were?

24         A.    I reviewed in detail my Exhibit 3,

25   my first declaration.  Exhibit 4 my second



Page 295

                    Hojnacki
1
2    declaration and a handful of policies, some
3    of which we've discussed during this
4    deposition, in preparation for this
5    deposition.
6        Q.    Did those policies have any
7    particular numbers, were they numbered?
8        A.    No.
9        Q.    They just kind of have a heading at
10   the top, is that fair?
11       A.    That's how I recall them, sitting
12   here right now.
13       Q.    Tell me the policies you reviewed
14   that we haven't discussed today?
15       A.    The one I recall is the personal
16   investments policy.
17       Q.    What does that say?
18       A.    It's a policy that governs any
19   employee of McKinsey, their personal
20   investment abilities, the fact that it's
21   prohibited from trading on any material
22   nonpublic information that we receive about
23   clients.
24       Q.    Any others that you remember,
25   policies that you reviewed?



Page 296

                        Hojnacki

1

2        A.    I think I've mentioned the others

3    in the context of this discussion.

4        Q.    And are those policies available on

5    a McKinsey website or anything like that?

6        A.    I'm not aware.

7        Q.    Do you know whether those have ever

8    been filed anywhere publicly?

9        A.    I am not aware.

10        Q.    Okay, so you reviewed your

11    declarations there and you reviewed these

12    policies, did you review anything else in

13    preparation?

14        A.    I reviewed my MIO statements or the

15    most recent month statement.  I reviewed a

16    handful of MIO newsletters that we discussed.

17        Q.    Anything else you can remember?

18        A.    Those are the items that I remember

19    as we sit here right now.

20            MR. PETRELLA:  Why don't we take a

21        break and see what we can do to wrap it

22        up.

23            THE VIDEOGRAPHER:  The time is 3:23

24        and we are off the record.

25            (Recess.)



Page 297

1                    Hojnacki

2              THE VIDEOGRAPHER:  This is the

3         start of media label number 8.  The time

4         now is 3:37 p.m. and we are back on the

5         record.

6         Q.   Who actually signed your paycheck,

7    is it McKinsey & Company Inc. or is it RTS?

8         A.   I get a direct deposit so I'm not

9    sure I have actually seen a paycheck to know

10   who the signatory is.

11        Q.   But you get like a statement,

12   right, that shows taxes that have been taken

13   out, things of that nature?

14        A.   I can have access to them on an

15   online site.

16        Q.   Have you ever looked at them and

17   see where the money is coming from, whether

18   McKinsey & Company or RTS Inc.?

19        A.   I don't know off the top of my

20   head.

21        Q.   Do you have an understanding one

22   way or the other of who pays you?

23        A.   As we sit here right now, I don't

24   know the entity that pays my paycheck.

25        Q.   Do you hold an equity or debt



Page 298

```
 1                    Hojnacki
 2  interest of any kind in the debtors?
 3        A.    Not that I am aware of.
 4        Q.    How about in the debtors creditors?
 5        A.    Not directly.  I have investments
 6  through various funds through MIO and others
 7  that we spoke about that I don't know the
 8  holdings of all those assets.
 9        Q.    Does McKinsey RTS have any offices
10  that are dedicated solely to RTS?
11        A.    Not that I know of.
12        Q.    What is the shareholders council?
13        A.    It's, to the best of my knowledge,
14  a group of senior partners that function as
15  the board of directors, if you will, of
16  McKinsey & Company.
17             MS. GAY:  Was this relevant to the
18        two affidavits.
19             MR. PETRELLA:  I think that --
20        Q.    Let me ask you this.  Mr. Pincus,
21  he was with you at the hearing?
22        A.    Yes.
23        Q.    Before Judge Jones?
24        A.    Yes.
25        Q.    Did he have anything to do with
```



Case 18-85672   Document 90S-2   Filed in TXSB on 01/01/19   Page 299 of 346

Page 299

```
 1                    Hojnacki
 2   your disclosures?
 3        A.   He wasn't involved in the
 4   preparation of them, no.
 5        Q.   Was he involved in them in any way,
 6   shape or form?
 7        A.   He is a partner of McKinsey &
 8   Company and so he would have received some of
 9   the surveys that we referenced through the
10   discussion that were sent to partners in
11   McKinsey & Company.
12        Q.   But beyond that he had no role in
13   the preparation of your declaration?
14        A.   Correct.
15        Q.   And who is the other gentleman who
16   was with you at the hearing, was his name
17   Raj?
18        A.   Rok Kana (phonetic).
19        Q.   Did he have anything to do with
20   your disclosures?
21        A.   Again, he is a partner of McKinsey
22   & Company so he would have received the
23   survey that we discussed before and some of
24   the declarations, but beyond that, not that I
25   know of.
```



Page 300

1                         Hojnacki

2         Q.    And in the course of preparing your

3    declarations, did you have any conversations

4    about your declarations with McKinsey

5    management?

6         A.    When you say management, who do you

7    mean.

8         Q.    I mean officers, directors of

9    McKinsey & Co. Inc.?

10        A.    McKinsey & Co.?

11        Q.    Yes.

12        A.    Or McKinsey RTS?

13        Q.    McKinsey & Co. Inc.

14        A.    Not that I know of.

15        Q.    Did you have any conversations

16   about your declarations with other managers

17   at RTS beyond the ones that you've identified

18   already today?

19        A.    Before I answer that.  Can I

20   clarify, I don't know all the officers and

21   directors of McKinsey & Company Inc. to be

22   able to state specifically without exception

23   to the question I think you are asking me.

24             Did you ask me a follow-up question

25   or second question I skipped before I



Page 301

                              Hojnacki

1

2    answered that.

3         Q.   I understand you don't know who

4    they are, but the ones that you do know, did

5    you have any conversations with them about

6    your declaration?

7         A.   No.

8              MS. GAY:  Then you skipped a

9         question, I think.

10        A.   I interrupted you.

11             MS. GAY:  You asked whether he had

12        conversations with any one else at

13        McKinsey RTS that he hasn't previously

14        mentioned in connection with his

15        declaration and he didn't answer.

16        Q.   So answer that one.

17        A.   So any other discussions with

18   people at McKinsey RTS?

19        Q.   Right.

20        A.   Ms. Molino who is part of McKinsey

21   RTS, part of the service team.  I had

22   discussions with her.  That's who I recall in

23   preparation of the declarations, yes.

24        Q.   What were your conversations with

25   Ms. Molino?



Page 302

                              Hojnacki

1

2        A.   I think we discussed many

3   conversations over many, many hours, both in

4   the preparation of the original declaration

5   and then the supplemental, both in terms of

6   some of the disclosures that I relied upon

7   her and her team for, as well as just the

8   general preparation of them.

9             Sorry, I completely misspeaking,

10  Ms. Basch.

11       Q.   I thought you had said --

12       A.   I misused the name, Ms. Basch.

13       Q.   So the record is clear, Ms. Molino,

14  did you have any conversations with her at

15  all about your declarations?

16       A.   No, sir.

17       Q.   Did you have any communications

18  with the managing partner of McKinsey about

19  this case?

20       A.   About this case?

21       Q.   About the Westmoreland case

22  generally.

23       A.   No I received a text message from

24  Mr. Sneider (phonetic) prior to the holidays

25  wishing me a happy holiday and recognizing



Page 303

                         Hojnacki
1
2    that there was going to be a significant
3    amount of work done over the holidays in
4    preparation for this deposition but nothing
5    substantive.
6         Q.    Nothing substantive about the case?
7         A.    No.
8         Q.    And Mr. Sneider had no role in the
9    preparation of your declarations, is that
10   right?
11        A.    No, sir.
12        Q.    Who are the officers and directors
13   of RTS, if you know?
14        A.    I don't know all of them off the
15   top of my head.
16        Q.    Name as many as you can?
17        A.    Mr. Garcia, Ms. Basch.
18        Q.    What's her title?
19        A.    I don't recall.  I just recall
20   seeing it in reference to an officer role.
21        Q.    Go ahead.
22        A.    Mr. Yakola are the three that I
23   recall as we sit here right now.
24        Q.    Are you saying Yakola?
25        A.    Yakola with a Y.



Page 304

1                    Hojnacki

2        Q.    What's his title?

3        A.    He is a senior partner in McKinsey

4    & Company and a practice leader of RTS.

5        Q.    Is he involved in this engagement?

6        A.    He is not part of the engagement

7    team but he is part of the service team.

8        Q.    But everybody is part of the

9    service team right, isn't that what you said?

10        A.    The service team includes all

11    officers, directors, employees of McKinsey

12    RTS.

13        Q.    Can you be on the service team and

14    do no work with respect to an engagement?

15        A.    Yes.

16        Q.    Do you know when McKinsey plans on

17    filing its first fee application in this

18    case?

19        A.    It would be after our retention is

20    approved but specifically the date I don't

21    know, but hopefully -- I don't know

22    specifically.

23        Q.    I want to talk just a little bit

24    more about, I know you said you did a lot of

25    work in preparation for your -- in



1                    Hojnacki

2    preparation for your declarations and on your

3    declarations and you mentioned that you

4    edited your declarations, can you give me a

5    better sense of what exactly it was that you

6    did leading up to your declarations in terms

7    of the work that you did?

8         A.    So I would characterize it in a

9    couple of buckets.  One is reviewing drafts

10   of the declaration as it was prepared and

11   providing comments to those drafts back to

12   Ms. Basch and Mr. Ivanick.  Having phone

13   conversations with typically one or often

14   both of them to discuss the comments, to make

15   sure they were clear and that I was getting

16   responses to the comments and then asking

17   additional verbal questions.

18              Those were the main items that I

19   did in preparation of filing these.

20        Q.    Do you know how far back the

21   information in the global client database

22   goes?

23        A.    I do not.

24        Q.    Do you know whether information

25   drops out of it automatically once it becomes



Page 306

```
 1                    Hojnacki
 2    a certain age?
 3         A.    I do not.
 4         Q.    We talked a lot about the phrase,
 5    direct commercial relationship or
 6    transaction.
 7               Do you remember that?
 8         A.    Direct commercial relationship?
 9         Q.    Or transaction I think was the
10    phrase.  Do you want to look at it, go back
11    to Hojnacki 3 and look at, I think it was 34
12    so under sub B there, do you see where it
13    says direct commercial relationship or
14    transaction?
15               MS. GAY:  33 or 34.
16         Q.    34B.
17         A.    Yes.
18         Q.    I assume that direct modifies both
19    commercial relationship and transaction, is
20    that right?
21         A.    Yes.  Direct commercial, I think
22    modifies both of those.
23               MR. PETRELLA:  No further
24      questions.
25               MS. GAY:  We reserve our questions
```



Case 18-50672    Document 90S-2    Filed in TXSB on 01/01/19    Page 307 of 346

Page 307

1                      Hojnacki

2          for trial.  We appreciate you coming

3          over on New Years Eve.

4                THE VIDEOGRAPHER:  The time is 3:48

5          p.m. and we are going off the record.

6                (Time Noted:  3:48 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 308

1

2                         - - -

3                      I N D E X

4                         - - -

5

6   MARK HOJNACKI                              PAGE

7       By Mr. Petrella                        5

8

9                         - - -

10                 E X H I B I T S

11                        - - -

12  HOJNACKI EXHIBIT                           PAGE

13  Exhibit 1          Order                   6

14  Exhibit 2          Post Petition engagement

15                     Letters                 11

16  Exhibit 3          Declaration             21

17  Exhibit 4          Supplemental declaration 87

18  Exhibit 5          Article                 195

19  Exhibit 6          Amended declaration     227

20

21

22

23

24

25



```
 1
 2                        - - -
 3              DEPOSITION SUPPORT INDEX
 4                        - - -
 5   Direction to Witness Not to Answer
     Page   Line          Page   Line      Page   Line
 6   None
                          - - -
 7
     Request for Production of Documents
 8   Page   Line          Page   Line      Page   Line
     None
 9
                          - - -
10
     Stipulations
11   Page   Line          Page   Line      Page   Line
     None
12                        - - -
13   Questions Marked
     Page   Line          Page   Line      Page   Line
14   None
                          - - -
15
     To Be Filled In
16   Page   Line          Page   Line      Page   Line
     None
17                        - - -
18
19
20
21
22
23
24
25
```



Page 310

1

2                          CERTIFICATE

3

            I HEREBY CERTIFY that the witness,
4    MARK HOJNACKI, was duly sworn by me and that
     the deposition is a true record the
5    testimony given by the witness.

6    _____
            Leslie Fagin,
7            Registered Professional Reporter
            Dated: December 31, 2018

8

9

10

            (The foregoing certification of
11   this transcript does not apply to any
     reproduction of the same by any means, unless
12   under the direct control and/or supervision
     of the certifying reporter.)

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 311

1
2              ACKNOWLEDGMENT OF DEPONENT
3              I,                          , do hereby
   certify that I have read the foregoing pages,
4  and that the same is a correct transcription
   of the answers given by me to the questions
5  therein propounded, except for the
   corrections or changes in form or substance,
6  if any, noted in the attached Errata Sheet.
7
8
   MARK HOJNACK                     DATE
9
10
   Subscribed and sworn
11 to before me this
            day of                    , 2018.
12
   My commission expires:
13
14 Notary Public
15
16
17
18
19
20
21
22
23
24
25



 1

 2                        - - - - - -

                         E  R  R  A  T  A

 3                        - - - - - -

     PAGE   LINE   CHANGE

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Case 15-10541-BLS   Doc 2417-6   Filed 04/24/19   Page 314 of 347
Case 18-35672   Document 905-2   Filed in TXSB on 01/01/19   Page 314 of 346

Page 1

**A**

**Abbie** 2:18 5:4
**abilities** 295:20
**ability** 9:10 44:23
    240:22 270:11
    288:19
**able** 8:25 23:13
    25:20 118:6,9
    211:17 218:12,14
    300:22
**absolutely** 80:10
    109:15 208:3
    216:23
**accept** 59:3 226:16
**acceptable** 167:11
**accepted** 165:5
    166:15
**access** 68:11,14,16
    211:17,18 212:4
    216:20 218:15
    229:25 234:18,25
    236:2,24 239:15
    239:16 253:6
    273:4 297:14
**accessed** 76:9
    217:21
**accesses** 72:23,25
**accessing** 252:18
**account** 212:24
    283:22 287:9
    288:6
**acknowledge**
    227:25 283:19
**acknowledged**
    283:21 284:21
**acknowledgment**
    113:19 311:2
**act** 255:7
**acting** 12:19
**action** 59:19,22
**actions** 282:20
**active** 189:5
**actively** 191:10,14
**activities** 71:12
    230:5 285:13

**activity** 252:16
    285:23
**acts** 271:22
**actual** 14:8 22:19
    48:16 143:15
    211:24 289:17
**add** 270:4
**added** 90:6,22
    92:25 114:10,12
    139:8,8,15,16
    152:16
**addition** 82:2
    161:25 202:13
    246:15 277:21
**additional** 45:18
    62:25 63:2,22
    111:3 112:3,21
    115:3 156:24
    160:16 193:24
    257:12 305:17
**address** 60:13 89:4
**addressed** 268:14
**administrative**
    83:7 127:23
**administrator**
    128:7
**administrators**
    84:9,11
**admission** 286:24
    287:7 288:10
**advance** 34:23
    47:12 92:3 283:24
**adverse** 157:21
    158:4 171:20
    172:4,15 173:10
    173:19
**advice** 10:8,20
    57:14,19,21 58:9
    58:10,13,25
    201:23 239:3
    273:23 274:2,14
    274:18 275:13
    276:11 277:11
    284:5,7,23 285:4
    285:5,20
**advise** 203:16,23

    204:2
**advised** 10:16
    15:20 64:2,11
    181:16 283:25
**affiant** 234:12
**affidavit** 226:8,17
    231:5 234:14
    268:12
**affidavits** 147:4,7
    147:16,19,21
    150:10 163:13,15
    164:4 182:14
    197:19 200:16
    202:9,11 204:6
    223:13 231:19,25
    232:4 298:18
**affiliate** 22:17
    25:24 30:8 50:8
    82:3 85:24 87:4
    88:16 91:15,17
    93:4,19 95:15,16
    95:24 96:4,14
    97:2 98:16,24,25
    142:3 152:19,20
    152:25 275:20
**affiliates** 12:19
    17:6,9 21:8 22:19
    74:9 79:13 84:19
    85:21,22 86:16
    88:4,9,19,23 94:3
    94:4,16 98:9,13
    98:18,22,23 99:8
    99:9,18 100:3,5
    100:12 101:4,20
    116:20 117:4,10
    117:21,25 118:15
    118:19,25 119:4,9
    119:14,17 120:10
    120:18,20,25
    121:3,18 122:6
    126:20 127:22
    133:25 134:9
    143:14 151:7,11
    151:21,25 152:8
    152:11,13 153:2,4
    153:10,15 159:25

    160:8 170:22
    187:12 188:3
    196:7 206:9 224:8
    229:12 230:9,12
    236:2 273:22
    274:12,23 275:19
    277:23 278:8,11
    278:15,17 279:4
    279:14 281:14,20
    282:15,16 283:2,9
**affiliation** 28:24
**affiliations** 22:12
    23:14
**afield** 115:15 147:8
    197:19 198:24
    202:12 268:11
**age** 306:2
**ago** 45:14 52:7
    199:19 221:12
**agree** 116:17
    182:16 219:8
    225:13,14 264:11
    265:10 266:10
    268:8,23 270:14
    270:17 271:5
**agreed** 46:9 51:12
    51:15 53:12 57:7
    162:7,19 169:8
**agreement** 103:16
    103:18,21,23,25
    104:6 106:21
**agrees** 286:25
**ahead** 41:18 61:15
    110:14 146:2
    268:12,14 278:23
    289:22 303:21
**AIG** 292:3,3
**al** 1:6 4:6
**Alex** 36:23
**Alix** 59:8 261:15
    262:17,19 263:19
    267:20 269:11,15
    270:2,5,15
**allegation** 220:12
    220:17 267:5,11
**allegations** 59:7,21

    59:22 220:20
    261:14 262:17,19
    266:20,22,24
    267:19 270:6,15
**allocated** 213:5
**allocation** 211:19
    213:2 230:19
**allocations** 266:8
**allowed** 24:6,14
    105:25 174:3
    175:21 239:19
    252:10 253:2,5
    254:14,19,20
    257:2
**allows** 7:24
**alluding** 285:4
**Alpha** 261:15
    263:18
**amended** 115:10
    227:8 308:19
**amendment** 6:9
**American** 274:3,16
**Americas** 1:11 2:15
    4:11
**amount** 40:20
    42:12 47:8,8
    129:18 213:4
    287:2,13,16 303:3
**analyses** 49:15
**analysis** 46:18
    200:18 273:23
    274:2,14,18
    275:14 276:10,10
    277:10,11 285:9
**analyst** 86:10,25
    87:14
**and/or** 310:12
**annual** 113:11
**anonymous** 128:3,4
**answer** 15:24 16:18
    35:14,15 44:18
    45:4 58:18 64:9
    65:16,22 79:9
    82:20 84:4 88:10
    115:19 116:5,6
    117:14 121:12



Case 1:17-10541-BLS    Doc 2417-6    Filed 04/24/19    Page 315 of 347
Case 18-50672   Document 905-2   Filed in TXSB on 01/01/19   Page 314 of 346

Page 2

128:10 131:13
137:8 144:20
145:23,25 147:3
147:10,13 148:22
149:7 150:15
159:13 173:21
182:18 184:25
191:23 193:5
198:6 200:25
201:13 202:7,9
203:2,21 204:4
216:18 218:4
225:12 226:3,18
232:8 233:2
235:21 242:12
245:23 248:23
258:10 265:8
271:10 294:2,16
300:19 301:15,16
309:5
**answered** 75:2
133:14 173:20
301:2
**answering** 264:18
289:21
**answers** 88:5 311:4
**anticipate** 25:16
**anybody** 25:25
32:11 33:25 34:3
34:15 35:19,23
36:19 57:23 64:10
146:12 198:2
**anybody's** 165:17
**anymore** 24:8,16
26:9 55:21 148:7
168:22 200:15
233:7
**anyplace** 147:17
**apologize** 141:24
242:14
**apparently** 89:6
158:10
**appear** 5:20 152:21
233:7,9
**appearance** 265:11
**APPEARANCES**

2:2 3:2
**appeared** 280:2
**appearing** 5:16
**appears** 21:19
**application** 41:2
42:23 75:18 92:5
92:18 93:12 107:9
107:21 108:14,17
110:5 177:9
293:21 304:17
**applied** 53:4
122:23 162:22
180:24 197:3
**applies** 6:8
**apply** 291:9 294:19
310:11
**applying** 53:3
**appreciate** 12:13
43:21 307:2
**approach** 34:25
49:12 50:2,4,7,13
50:15,18 51:5,6,9
51:10,15,16,23
52:12 53:3,4,13
53:24 75:10 93:10
93:13,22 113:6
162:15,21 165:4
165:13 166:14
167:10 168:3
169:7 180:24
202:22
**appropriate** 8:16
46:18 92:24 93:2
115:25 180:11
181:17 183:25
199:18,21 241:25
242:8 288:23
289:14
**appropriately**
207:20
**approval** 43:18
66:5
**approve** 241:21
**approved** 65:9,13
65:20 92:3 93:11
165:15 167:2

224:24 240:22
242:22 243:18
286:10 304:20
**approving** 230:18
**approximately**
17:15 18:10 23:7
48:20 68:7 82:16
82:22 111:5
268:22
**April** 262:25 263:5
263:12 268:2
**area** 29:2
**areas** 22:18 23:20
23:25
**argumentative**
149:7 250:11
269:20
**arm** 253:14,17
259:15
**arrived** 172:7
**article** 195:5
196:19 263:6,12
263:15 267:23
308:18
**articulated** 47:8
**aside** 278:11
**asked** 79:2,3 82:9
82:10,11 116:9
130:17 131:16,20
131:21,24 133:13
133:15 134:6
136:4,7,24 141:20
149:11 159:19
163:19 170:15
171:4,10,13 172:4
172:13,15 173:18
173:20,23 224:9
250:23 255:18
278:19 282:25
301:11
**asking** 9:21 15:15
32:9,14 33:2,4
36:14 39:23 57:25
58:2 74:12 78:9
82:24 92:13
113:22 119:16

121:17,20 137:19
139:19 145:9
146:23,25 147:14
147:25 148:23
160:21,25 168:5
184:8,9 185:2
192:15,16 201:14
201:17 202:8
207:19 214:14
219:20 220:8
232:3,18 233:4,10
235:13 237:8
243:4 258:11
260:10 271:3
281:19 282:14
289:12,23 291:11
292:13 300:23
305:16
**asks** 159:15
**aspect** 123:12
293:20
**Aspen** 194:14,14
195:14,17,24
196:3,4,4,12,17
196:18
**assessment** 250:19
**asset** 216:2 266:7
**assets** 97:25 298:8
**assign** 23:19
**assigned** 22:18
23:21 108:23
109:6
**assignment** 14:10
23:23 31:6,8,13
105:19
**assignments** 255:22
**assisted** 161:22,24
**associate** 23:16,19
24:20 28:9 84:12
86:7 87:8 208:24
**associated** 26:6
57:12 60:13 102:5
131:9 285:13
**associates** 83:6,6,22
**association** 4:15
24:21,22

**assume** 27:9 175:25
228:4 306:18
**assuming** 96:17
268:3,4,5
**assumption** 28:23
**attached** 311:6
**attention** 12:7
**attorney** 7:22 64:2
202:13
**attorneys** 2:4,9,14
2:20 3:3 168:17
181:21 279:8
**attorney/client**
164:3
**audiences** 141:11
**audit** 223:4
**authority** 43:17,23
183:9,12
**authorization** 5:24
200:4,9
**automatically**
305:25
**available** 163:12
216:23 217:21
218:24 272:6
274:19 275:23
296:4
**Avenue** 1:11 2:4,15
2:21 4:11
**avoid** 265:11
**aware** 7:17 15:18
18:7 32:10 33:2,6
33:9,25 34:3,15
35:2,11,18,23
36:19 37:2 58:7,8
58:24 59:4,12,15
59:16,20 60:22
63:4,25 68:8
71:12 77:17,20
104:15 106:2,5
109:11 113:24
114:21 117:16
135:11,21 144:8
144:10 145:19
148:25 152:18
153:7 161:16



Case 1:17-10541-BLS Doc 2417-6 Filed 04/24/19 Page 316 of 347
Case 18-35672 Document 905-2 Filed in TXSB on 05/01/19 Page 315 of 346

Page 3

171:6 179:24
195:23 196:11
208:10,17 209:2
217:5,13,14,18
219:23 220:16,19
220:23 221:3
224:15,24,25
228:11 231:12
232:21 237:19
242:21,23 257:25
277:13 285:22
290:8,13,15
293:18 294:3
296:6,9 298:3
**awareness** 32:15
**A&R** 15:18,24,25
16:8,14,20 59:13
59:21 197:13
220:19 223:9,11
223:23 231:13
232:21 233:24
268:7,8,20
**a.m** 1:12 4:10 66:23
67:3 89:10,14
150:23

**B**

**B** 125:24 127:12,18
131:10,14 132:21
132:22,24 133:23
134:7 141:25
151:4,4,5,14
152:7,19 153:19
159:18 160:6,13
160:20 306:12
308:10
**back** 33:16 39:8
46:4 49:21 55:20
57:11 61:15,18
67:3 75:15 78:10
89:14 120:3
122:19 123:4
134:17 150:23
151:17 153:18
158:15 177:10,23
178:5,18 185:15

192:18 203:6
205:8,10 221:23
232:10 243:23
259:21 264:8
268:3 273:14,16
278:21 279:20
281:2 282:9
283:13 284:3,16
284:22 286:3,4,7
286:18 287:15,19
288:5 291:9
292:22 297:4
305:11,20 306:10
**background** 116:8
**bad** 265:16,17,17
265:18
**balance** 213:9,10
213:12 214:6,7
**ban** 240:16
**bankruptcies**
200:16 231:22
271:25
**bankruptcy** 1:2 4:7
5:17 6:2 7:19 8:11
8:23 9:14,24,25
10:10 16:6 57:5
91:22 104:14
159:2,7,10 162:6
179:23 180:4
201:3 203:17
204:8 252:5 268:8
268:20,24 279:10
**bars** 216:22
**Basa** 86:19
**Basar** 26:18 85:13
86:20,21
**Basch** 36:10 37:13
48:14,21 49:8
52:11,16,18 60:17
64:23 125:12
128:2 130:10
136:12 165:10
166:20 180:21
183:19,23 302:10
302:12 303:17
305:12

**base** 109:6
**based** 17:7 25:12
25:14 50:22 92:16
112:15 131:16
133:16 141:2
142:19 153:10
163:16 172:7
173:2 175:14
201:15 230:8
247:15 253:12
267:8
**basic** 22:2,15 26:11
28:15
**basically** 24:14
74:12,14 169:9
214:4,9 250:14
261:23
**basis** 5:23 16:2,13
46:14 115:25
138:18 147:23
163:21 164:8
197:23 200:4,9,23
204:10 221:21
225:20 229:24
230:17 253:10
258:4 270:13
272:9 290:10
**bathroom** 273:8
**Bauman** 27:4 28:6
**bear** 207:15
**bearing** 134:5
**Becca** 27:4
**beer** 257:2
**began** 104:23
**beginning** 137:23
137:24 142:6
213:9,16 214:6
283:4
**begins** 227:16
**behalf** 13:5 15:5
266:15
**belief** 91:21 253:10
**believe** 10:2 13:24
18:9 20:13 36:22
39:13 60:25 75:15
82:8 85:7,15,25

86:5 89:24 90:5
107:24 112:10
113:4 115:21,24
119:18 122:3
126:17,22 130:11
133:14 154:2,3,16
171:12,15 174:24
194:12 207:14,17
207:23 212:2,9
217:19 220:5
244:14 245:25
246:13 253:8,11
258:22 271:12
276:19 293:19
**believed** 45:25
105:20 199:20
**believes** 246:5
**belong** 32:11
**Ben** 85:14 87:13
**benefit** 133:2
192:11,22 231:20
**benefited** 268:6,21
**Bermuda** 194:14
**best** 11:12 20:23
44:23 46:16 58:3
58:4 66:16 69:15
70:2 88:21 106:19
162:14 207:3
217:2 222:7 265:8
265:25 277:21
298:13
**better** 56:4 83:25
305:5
**beyond** 16:21 26:9
57:10 97:9,14
156:18 163:8,14
165:12 166:16
182:13 215:25
258:6 266:7
299:12,24 300:17
**big** 70:22 188:9
275:7
**bigger** 81:20
**bill** 40:24 41:25
**billed** 41:24 42:3,7
**billing** 122:11,20

122:22 123:4
187:17
**bit** 39:5 131:12
282:4 304:23
**blind** 225:7 226:4
226:25 227:2,21
228:3 229:24
233:5,6
**board** 206:10,15,20
206:24 207:7,13
207:22 209:6,11
209:15 223:6
224:14,18,20
225:4 228:12,16
228:21,23 230:10
230:14,16 233:19
234:23 236:3,8,20
236:20 237:21
244:5,6 245:12,13
245:19,20,21
246:4,12,21,22
247:3,4,7,7,13,19
248:5 249:2
251:11,12 254:23
255:2,3,13 256:6
256:9 298:15
**boat** 39:24
**body** 249:19
**Boies** 2:3 4:18
**boiled** 74:5
**books** 124:8,9
**borrow** 91:14 94:4
94:18,19,23 95:3
95:14 96:13
119:21,22 127:4
**borrowed** 82:3
84:19 85:21,21
86:14 87:3 88:13
88:16,20 119:25
121:14,17 159:25
**borrows** 93:15 96:9
**bother** 71:3
**bottom** 21:22 74:6
**bouncing** 12:11
**bounds** 16:21 93:8
**Box** 220:13,17



Case 15-10541-BLS  Doc 2417-6  Filed 04/24/19  Page 317 of 347
Case 18-85672  Document 905-2  Filed in TXSB on 01/01/19  Page 316 of 346

Page  4

259:23 262:13
266:5,21 267:7,11
268:5,5,18,18
**Box's** 220:24
**brain** 236:11
**break** 40:12 58:20
66:21 150:17
185:17 194:25
215:2 273:8
296:21
**breaks** 5:22
**brief** 21:15 69:17
71:14,25
**briefly** 11:16
176:23 267:2
**bringing** 34:9
**broad** 17:7 34:11
154:7 155:10
**broader** 21:4 29:21
30:2
**broadly** 29:12
41:17 90:3
**broken** 214:21
**buckets** 305:9
**build** 28:25 214:22
**bunch** 15:16
257:25
**buried** 271:2
**business** 86:10,25
87:14 190:6,19
191:18,20 192:7,9
193:17,25 258:15
**buy** 156:7 193:11
193:18

**C**

**C** 5:9 125:24
127:12,20 131:14
132:21,23,24
134:3 159:18
173:8 205:2
**calculation** 214:13
**call** 21:12 42:11
135:22 145:19
150:5 238:9 249:8
249:12 259:14

289:15
**called** 5:9 135:8,12
136:4,7 143:25
145:12 146:13
149:25 195:14
219:4 220:18
267:6,12 289:8
**calling** 144:12,14
**calls** 136:3,10
**Canada** 87:5 88:17
88:17
**Canadian** 87:4
88:12
**capacity** 12:20 71:8
191:11 208:18
244:6 245:13
246:22 247:4,12
251:12 254:7
255:8
**capital** 104:17
180:3
**career** 24:19
290:20 291:4,5
**careful** 262:2
**Carmidi** 27:3,9
**cars** 193:11,11,15
193:18,22
**case** 7:21 9:13,22
10:2,7 11:9 12:3
13:19 14:23 15:19
16:15 22:15 30:20
33:14 34:6,17,21
35:12,20,21 41:2
51:3,7,12,24,25
52:4 53:5,8 54:10
57:8 59:7,8,13
60:23 64:6 65:7
66:8 75:13,22
84:24 105:4,9,11
105:15 106:6,9,14
115:10,18,22
116:11,13,16
119:25 125:13
126:18 136:15
144:4 147:2,12
148:22,24 149:2

149:13,13,15,18
149:19,19,23,24
149:25 154:20
158:3 162:17
163:4,6,7 164:13
164:18 177:3
181:3,5,6 182:8
182:21,24 183:2
183:14 184:16
185:18 196:24
197:2,4,7,13,13
197:14 198:12
199:23 203:24
216:2 217:6
220:19 223:9,10
223:24 225:6,19
226:14,24 231:13
232:22,23 233:24
234:17 246:7
249:7 263:19
264:21 266:15
274:6 276:3
277:12 290:10,10
290:18 291:3
292:19 293:12,13
302:19,20,21
303:6 304:18
**cases** 8:2 15:22
97:12 102:14
181:17 197:8,16
198:8 266:25
**Casey** 208:8
**catch** 139:14
**categories** 125:23
125:25 126:3,5
128:23 130:18
131:4,14 132:12
133:10 134:11
136:24 141:18
145:2 146:13
154:8 155:3,11
**category** 113:9
128:25 131:2
132:18,20 141:15
145:6 280:7
**cause** 9:9 107:3

173:5 224:5
**Center** 2:9 88:14
**centralized** 101:5
101:11,21,25
**certain** 77:9 80:3
83:7 84:19 91:12
112:23 228:16
230:10 240:15
257:22 306:2
**certainly** 41:4
45:25 60:12
100:20 109:12
118:6 122:8
125:14 135:12
188:8 221:20
239:22 250:3
252:8
**CERTIFICATE**
310:2
**certification** 310:10
**certify** 310:3 311:3
**certifying** 310:12
**cetera** 12:19,24
275:24,24 282:12
**challenge** 59:13
**chance** 62:5
**change** 25:14
117:11,17 140:4
201:18,19 213:10
226:13 234:4
255:12 312:3
**changed** 149:15
175:10,17,20
202:4
**changes** 311:5
**changing** 198:3
**Chapter** 7:21 8:2
11:9 15:21 47:7
102:14 104:18
105:14,18 147:2
149:2,19 181:2
203:25 246:7
252:9
**characterization**
280:4
**characterize** 45:7

167:5 169:15
175:13 239:2
271:20 288:2
305:8
**characterizing**
235:12 237:8
**charge** 31:6,12,13
42:15 43:15,18
69:16 71:11 125:6
**charged** 43:7
**charging** 43:21
**chart** 118:23
**check** 30:23 31:22
82:12 189:13
190:3 194:24
281:13 282:15
**choice** 23:15
**choose** 23:18 43:11
43:12,14 209:25
216:2 235:2
**Chris** 26:4,8 27:3
27:12,13,14,20,21
27:22
**Christopher** 2:11
4:20
**Chung** 55:3,5,8,13
199:9
**circumstance** 176:4
192:10
**circumstances**
73:16 175:20,23
240:15 241:25
242:7,21 290:2,11
**cited** 13:12
**claim** 45:17 49:16
57:4 287:15 288:5
288:13,16,20
**claimed** 41:3,7
**claiming** 42:20
43:2
**clarification** 126:6
**clarify** 24:10 147:5
156:25 167:20
272:13 300:20
**clarity** 282:7
**class** 171:21 172:16



Case 15-10541-BLS  Doc 2417-6  Filed 04/24/19  Page 318 of 347
Case 18-85672  Document 90S-2  Filed in TXSB on 01/01/19  Page 317 of 346

Page 5

173:11
**classic** 213:14
**clear** 6:4 14:3 16:12
29:24 32:24 33:17
40:11 41:14 63:10
85:18 93:13
110:15 112:22
115:20 121:12
139:18 141:16
150:15 154:24
166:18 178:3,24
229:6,10 231:7
232:11,12 233:3
240:8,16 243:9
250:21 276:16
302:13 305:15
**clearer** 237:10
**click** 126:13 132:8
134:19
**clicked** 216:21,21
**client** 9:2 30:9
40:24 45:19 48:4
67:21 68:20 69:7
69:11,18,19,23
70:5,7,14,18,23
71:6,12,13,16,21
71:23 72:2 73:17
73:23 74:2,14,16
74:16,19 75:7,13
75:21 76:10,13,19
77:2,6,14,22 78:5
78:12,20 79:6,10
79:17,21 83:10
94:8 97:2 101:9
101:15,25 102:12
102:16 116:19
117:4,20 119:23
120:6,14 134:5
139:11 140:5,22
142:14,24,25
143:5,7,17 144:3
144:16 145:8,13
146:19 148:18
151:20 152:21
153:9,14 176:10
186:2,20,22 187:4

187:7,25 188:2,6
188:13,18,25
189:4,5,8,17,23
190:18 191:4,7,14
191:24,25 192:2,3
193:24 194:3
195:13 202:13
230:9 238:6
252:25 253:7,15
254:4,5 256:16
257:10,23 258:14
259:17 264:23
275:20 281:7
289:2,16 290:4
292:17 305:21
**clients** 22:16 28:25
69:12 74:5,7,8
94:6,9 96:5 101:3
102:6,19 120:9
123:14,15,24
124:6,8 139:8,15
152:21 153:9
174:8,11,21 175:2
176:7 189:9,13
190:3,12,14
251:15,18 253:19
254:8,13,20
255:12,25 256:4
256:10,12,18,20
257:4,20 258:2,2
258:5,9,25 289:7
289:8 295:23
**client's** 258:18
288:24 289:15
**close** 80:14 256:18
256:19
**coal** 1:6 4:5 6:2
103:14 234:17
274:3,16
**code** 7:19,24 9:14
9:24 10:10,20
159:2,7,10 161:11
161:16 162:6
**colleague** 64:17
199:8
**colleagues** 89:18

90:21 237:14,16
269:18,23
**collective** 210:25
**combination** 209:9
**come** 6:20 70:24
89:5 92:10 93:4
95:24 140:24
142:17 145:20
148:15 165:16,24
174:3 249:4 270:6
291:24 292:20
**comes** 31:21 72:4
143:5 172:24
275:20
**comfortable** 34:25
44:22 92:16
162:21 273:2
277:7
**coming** 46:15
297:17 307:2
**commenced** 103:14
**commencing** 1:11
**comment** 135:18
274:19
**comments** 14:15,19
37:8 38:3,15 39:3
39:4 49:21 57:11
139:24 293:20
294:4 305:11,14
305:16
**commercial** 30:10
50:11 79:15 94:6
94:15 96:6,22,24
134:7 140:6 143:2
143:9,19,23
144:22 153:19,23
154:5,7,9 155:9
155:12,16,22,25
156:17,20 157:13
158:8,12,14,17,18
158:20,23 159:16
159:21 160:3,10
160:14,18,21
161:2,5,7,8,13
162:11,24 163:17
164:20,25 165:15

166:5,9,25 167:9
167:15 168:7,12
168:19,23 169:6
169:20,25 170:5
276:5 306:5,8,13
306:19,21
**commission** 311:12
**committee** 180:2
223:4,5 230:15
**common** 190:2,10
**commonplace**
177:22 180:17
184:15
**communicate**
240:17 242:3
243:20
**communication**
190:18 243:2,8
**communications**
83:13 164:3
238:15 239:24
242:8,17 302:17
**companies** 100:13
100:15,16 271:24
274:2,14,21,24
277:2
**company** 1:6 4:6
6:2 7:7,11,16
79:24 86:2,5,8,11
86:17,23 87:9,12
87:15 88:17 94:3
94:20,21,24 95:2
95:4,7,15 96:10
96:18,20 103:15
105:13 118:16,21
119:2,14,17
120:20,22 121:10
121:21,24 133:25
140:16 148:10
149:14 209:17,17
210:18 211:7
220:18 234:22,25
235:25 237:17
252:20 267:12
273:2 278:5,12
279:15,17 291:16

297:7,18 298:16
299:8,11,22
300:21 304:4
**compartmentalize**
236:10
**compensation**
210:6
**competing** 100:13
100:15,15 101:3
**competitive** 258:24
**competitor** 186:3
186:20
**competitors** 29:4
29:10 30:4 171:5
256:14 257:9
273:24 274:5,8,9
**compiled** 123:13
**complete** 62:8
111:15,17 112:7,9
112:17 113:15,20
275:17 276:20
**completed** 42:15
**completely** 245:9
266:13,16 269:6
277:6 302:9
**compliance** 14:6
**complies** 91:22
163:2 164:21
184:5,9,10
**comply** 202:2
**complying** 15:2
**component** 123:6
**composition** 21:9
64:24 120:14
**comprise** 83:4,23
**computer** 38:24,25
68:19 69:6 134:20
**concept** 163:16
166:25 167:14
168:6 169:5,25
170:4 233:8
**concern** 53:5
**concerned** 62:20
**concerning** 6:6
10:9 33:6 211:16
225:11



Case 15-10541-BLS    Doc 2417-6    Filed 04/24/19    Page 319 of 347
Case 18-85672   Document 905-2   Filed in TXSB on 01/01/19   Page 318 of 346

Page 6

**concerns** 53:23
**concluded** 231:13
    232:22
**conclusion** 46:15
    172:7,25 174:4
**concrete** 106:25
**conduct** 260:13
**conducted** 260:12
    260:22
**confer** 192:22
**confidences** 256:16
    257:10 259:17
**confidential** 45:19
    174:8,21 175:7
    176:10 257:16
    258:18 288:25
    289:7,8,16 290:3
**confidentiality**
    175:11
**confirm** 20:14
    21:16 87:22
**confirmation** 169:7
**confirming** 108:11
**conflating** 236:7
**conflict** 101:11
    105:3,9,14,20
    106:9,14,16,22
**conflicted** 9:10
**conflicts** 101:5,21
    102:2
**confused** 135:23
**connect** 245:15
**connected** 148:21
**Connecticut** 18:22
**connection** 10:6,23
    52:5,9 55:9 56:14
    60:6,9 61:3 93:22
    95:20 114:17,24
    164:17 171:23
    172:19 173:5,13
    176:25 184:22
    185:4,10,22 186:2
    186:6 202:23
    203:5,9,10 261:7
    270:10 301:14
**connections** 8:12

31:16,20 32:4,21
33:6 47:25 50:5
60:22 62:16,21
63:2,22 72:12
77:8 79:25 80:2
91:3,4,10,17,19
92:8,9 93:3,4,16
93:18 94:21,25
95:6,23 96:11,16
96:19 102:4,13,18
104:21 108:24
109:7 112:3,10
113:25 124:21
172:10 177:2,6
185:19 201:4
224:10
**connects** 91:18
**consideration**
    46:24
**considerations**
    274:20
**considered** 161:11
**consistent** 10:18
    11:5 51:10 92:4
    92:17 93:12 97:16
    113:5 162:5,6
    165:14 179:12
**constantly** 212:6
**constitute** 160:10
**constitutes** 154:6
    156:16 164:20
**construed** 41:17
**consultant** 82:3
    94:18,19 95:14
    127:4
**consultants** 84:19
    84:23 85:21 94:5
    94:17 121:15,17
**consulting** 79:23
    83:8 84:6 95:17
    98:9,13,16,22,25
    99:7,8,10,19
    100:3,4,12 101:4
    101:19 116:21
    117:5,9,21 118:20
    118:25 119:9

120:11,19,23
121:2,5,8,19
122:7,9 126:20
151:7,21 152:14
153:5,10,15 160:9
188:3 224:7
229:13 230:6
238:16,17,20,21
238:24 239:3,12
250:4,5 252:19,20
253:14,16 255:22
259:14,15 272:7
272:10 277:23
278:8,14 279:5
**contact** 145:22
    150:6 190:2
**contacted** 146:14
    146:16
**contained** 110:21
**content** 160:12
**contents** 48:22
    151:20
**context** 163:3,5
    165:18 257:24
    288:3,18 296:3
**continue** 62:25
    228:14
**CONTINUED** 3:2
**continues** 139:7
**contrasting** 151:24
**contribute** 46:4
    287:14,18
**contributions**
    210:8
**control** 272:4
    310:12
**controversial** 44:14
**Contura** 220:18,24
    266:4,20 267:13
    268:6,6,19,21
**Cont'd** 205:4
**conversation** 45:16
    47:4,11 51:14,17
    51:20 53:6,15,16
    91:24 92:6,14,20
    165:12 166:3,6,8

166:13,19,23
167:13,19 168:8
168:15 169:10,16
169:17 175:24
183:16,21 184:17
198:2,10 243:11
243:15 280:18
**conversations**
    44:19 46:12,20
    48:21 49:23 50:3
    50:23 51:22 52:3
    52:16,19 53:2,21
    53:22 54:15 55:5
    55:7,21,25 56:11
    56:21,25 60:16
    93:9 135:17
    163:10,12 164:23
    165:9,11,19
    166:21 167:17,22
    168:2,6,10,22
    169:3,24 174:17
    190:25 198:7,15
    221:14 240:8
    242:25 243:7
    300:3,15 301:5,12
    301:24 302:3,14
    305:13
**conveyed** 58:5
**convince** 192:9
**coordinator** 83:16
**copy** 87:22
**corner** 61:17
**corners** 163:13
    182:14 202:14
    204:5
**corp** 64:19
**corporate** 65:19,23
    176:16,18,20
**correct** 7:7 12:21
    14:13,23 20:12
    22:23 23:5,12
    26:16 27:10,11
    28:14 30:21 34:7
    39:11 62:12 63:9
    63:13,19 74:7
    75:7 78:16 88:10

93:19 96:12,21
97:7 98:6 100:18
100:23 104:2
107:7 108:2,9
109:21 110:13,22
112:19 115:8
116:23 122:13
124:22 126:12
132:7 159:16
160:11 161:3
168:4 170:17
174:12,15 179:7
179:18 181:15
191:16 192:13
194:25 195:21
198:21 205:12
206:21,22 210:5
210:22 211:11
214:2 220:13
222:22 223:2
236:6 243:22
244:7 247:2 248:8
251:15 254:22
255:24 264:7
274:6 282:13
290:21 299:14
311:4
**corrections** 311:5
**correctly** 133:13
**council** 298:12
**counsel** 4:16 10:8
    15:3 21:5 31:23
    32:6,7 34:22 36:3
    36:4 37:3 44:2,16
    46:21,22 50:23
    59:6,24 64:25
    65:2 91:24 92:7
    92:14,20 108:21
    138:7 143:4,16
    149:8 161:25
    162:24 163:10,23
    164:19,23 165:19
    168:11 169:3,18
    170:6,7 174:18
    176:6 180:10,20
    181:15,16 183:16



Case 15-10541-BLS    Doc 2417-6    Filed 04/24/19    Page 320 of 347
Case 18-85672    Document 905-2    Filed in TXSB on 01/01/19    Page 319 of 346

Page  7

183:17 198:2,8,11
201:24 208:15,24
208:25 228:7
249:13 283:25
284:6,8 285:6
288:9,11
**counsels** 92:15
**counsel's** 10:13
21:7,10 145:20
146:15
**count** 135:15,15
**country** 18:14
**couple** 26:22 56:3
78:18 80:25
141:10 192:8
196:22 202:4
305:9
**course** 15:10 31:25
76:13 139:2
290:20 300:2
**court** 1:2,12 4:7,13
27:16 41:12,20
42:18 107:15
147:22 154:24
163:10 231:7,9,11
233:11 252:5
**courts** 233:13
**court's** 164:6,10
**cover** 47:10 111:23
**coverage** 251:15,18
**covered** 46:2 61:9
**covers** 21:8 116:20
117:4 120:9
**Crane** 36:17
**create** 157:20 158:3
**created** 67:23 68:2
**creating** 192:24
**creditors** 157:21
158:5 171:21
172:17 173:11
298:4
**criteria** 155:13
156:18 157:6,12
157:14,15,17
158:11 164:24
**crossed** 120:4

**crosses** 29:2
**currencies** 229:19
**current** 74:16
209:10,24
**currently** 87:6
207:14,23 222:18
258:3
**Curtis** 85:11
**custom** 202:4
**customary** 42:2
180:17,22 181:7
184:3,14 199:18
199:21
**customer** 154:10
155:18,24 156:6
157:6
**customers** 156:7
171:7,8,11
**cut** 150:7,14

**D**
**D** 124:13 125:24
127:12,20 128:23
129:2 131:14
132:13,21,22,24
134:8 146:13
151:5,14,24
152:10,19 154:4
170:10,11,12
283:6 308:3
**daily** 256:3
**data** 25:17 237:24
238:4
**database** 48:4,17
67:21,23 68:9,11
68:20 69:7,11
70:3 71:23 72:3
72:21,24 73:2,5
73:18,24 74:4,8
74:14 75:14,21
76:10,13,19 77:2
77:6,15,22 78:5
78:12,20 79:6,11
79:17,21 94:8
101:10,15,25
102:6,8,12,16,22

116:20 117:4,20
119:24 120:6,14
134:5 151:20
152:21 153:9,14
187:7,25 188:13
188:19 189:4,8
253:7,15 305:21
**date** 1:12 47:6
49:18 75:19 89:20
103:12,13 104:22
107:11 110:2,6,16
110:16 136:14,15
177:12,16,24,25
178:5,7,10,16,19
179:10 180:11,12
180:17 185:21
186:7 189:12
199:8 285:14
287:11,11 304:20
311:8
**dated** 5:18 103:18
263:12 268:2
310:7
**dates** 30:23,23
63:17 77:19,19
**David** 5:18 6:11
**day** 47:5,5 57:4
111:11 202:24,25
203:11,12 212:7,8
287:9,10 311:11
**days** 57:3 203:8,9
**day-to-day** 221:21
270:13 272:9
**deal** 156:11
**dealing** 156:9
**deals** 124:19
**dealt** 136:9
**debate** 204:13
**debt** 281:14,21
282:17 297:25
**debtor** 13:18 14:23
15:6 41:24 42:4,7
42:16 43:15,18,20
46:5 50:12 90:4
97:13 134:7
157:20 158:3

159:3 173:5 186:3
249:6 264:7,12,20
269:4 274:6
277:12 278:20
283:14 287:10,19
288:7
**debtors** 1:7 7:25
9:2,11 11:13,25
14:10 30:11 31:14
43:7 47:6 82:5
94:7 96:7 106:21
108:20 113:8
138:6,6 140:7
143:3,19 158:25
160:2 170:16,23
171:9,11,14,20,24
172:11,16,20
173:10,14 203:16
203:24 204:2
246:6 264:25
266:15 273:24
274:8,10,17,21,25
275:3,15 276:6,8
276:12,18 277:4
277:25 279:7,12
283:10,25 285:17
286:6,12 287:16
288:6 298:2,4
**December** 1:12 4:9
5:18,20 30:20
63:15,23 76:2
213:16,17,17
310:7
**decide** 24:5,14 43:8
105:2,8 249:16
**decided** 58:15
199:17
**decides** 31:15
**decipher** 271:11
**decision** 23:17
176:9,14 241:20
253:3
**decisions** 229:21
230:8 252:12,14
266:17 270:12
**declarant** 44:21

149:23 182:25
**declaration** 9:12,17
10:3,11 14:5
15:16,17 16:2,14
16:17,19,22 21:12
21:13,17 22:20
23:2 29:20 30:5
30:14,17 31:2,9
35:4 37:10 40:2,3
40:3,10,13,19
44:4 45:10 47:13
48:12 49:7 50:6
52:6,25 53:10
54:2,6,10,13,18
55:23,23 61:2,8
61:13 62:11,14,15
63:7,12,15,18,23
66:3,15,19 67:15
68:17 72:11 75:25
76:2,5,8,11 77:10
77:24 78:7,11
80:4,6,8,11 81:17
86:15 87:3,17,19
87:23 88:24 89:3
89:17 90:23 91:8
91:9,13 97:5,19
107:20,24 108:9
109:20 110:7
111:15,17,21,23
112:2,6,12,14,18
113:15 114:3,12
114:19,25 115:11
115:23 119:20
125:10 135:6
138:8 165:7
167:12 172:9
174:11,19,22
175:12 176:11
177:13 178:15,19
183:11 194:21
200:5,11,11
220:15 224:3
225:14,18,21,22
227:9 228:2,8
234:20 243:24
246:18 248:17



Case 15-10541-BLS    Doc 2417-6    Filed 04/24/19    Page 321 of 347
Case 18-85672    Document 905-2    Filed in TXSB on 01/01/19    Page 320 of 346

Page 8

249:23 253:22
257:25 258:5
259:7 261:19,23
262:14,21 271:20
271:21 273:6
277:8 279:21
281:3 282:21,22
284:11,13,20
285:3,9,19,21,24
289:5 294:25
295:2 299:13
301:6,15 302:4
305:10 308:16,17
308:19
**declarations** 6:6
9:21 10:7,17,22
10:24 11:5 14:25
15:11,12 16:13
30:19 31:4,14
32:2,12,22 33:8
34:5,13,14 35:25
36:13 37:22 38:2
38:7,17 39:20,21
41:15,17,21 42:9
47:18 48:22,23,24
51:2 52:10,21
54:24 55:9,14
56:15 59:5,25
60:7,10 65:7,14
65:20 92:2 111:7
115:7,17 119:6
122:23 147:24
161:23 164:9
177:5 182:7
194:23 196:23
197:24 198:17,25
199:3,7 200:19
204:11 258:7
296:11 299:24
300:3,4,16 301:23
302:15 303:9
305:2,3,4,6
**declined** 44:5 58:10
59:2,3
**dedicated** 19:14
83:12,14,15,15

84:8 298:10
**deemed** 12:24
14:13,16,20
**define** 80:20 112:8
155:8,11 158:7
164:25 176:17
183:12 242:18
288:2
**defined** 28:23 50:6
91:13 158:19,24
**defining** 155:23
**definition** 32:14
100:19 155:8
173:7 256:8
**delve** 16:12
**delving** 197:22
**demonstrate** 8:16
9:8
**demonstrates**
271:19
**department** 19:11
19:13 20:20,22,25
36:2,7 109:4
125:9 154:17
158:10 161:18,20
162:2 176:20
208:20 217:15
218:23 228:7
**depending** 24:23
**deponent** 4:23 5:5
234:12 311:2
**deposit** 297:8
**deposition** 1:10 4:4
5:21,23 115:16
116:12 155:24
163:19 199:4
200:3 202:15
204:7 225:10,15
230:25 231:6,10
232:2 234:3 241:2
253:24 294:22
295:4,5 303:4
309:3 310:4
**derive** 137:4
**describe** 147:21
173:24 215:11

276:15
**described** 93:21
135:5 158:24
172:8 246:16
261:25 276:13
**describing** 276:14
**description** 69:17
71:15,19,25
102:21
**designation** 6:21,23
28:11
**designed** 8:24
19:17 276:20
**desire** 28:25
**detail** 30:6 49:20
127:10 160:16
209:12 219:7
294:24
**details** 31:19 44:11
45:18 55:24 71:23
137:10 157:9
184:12 188:18
189:7 219:16
**determination**
188:15 249:5
275:8,11,11,13
**determine** 106:8,13
186:12 279:5
**determined** 105:13
106:18 234:6
276:10
**develop** 148:5
268:21
**developed** 170:6
293:5
**development** 19:15
19:18,18 83:14
148:17
**dial** 89:7
**Diamond** 2:8 4:21
**differ** 51:6 294:12
**difference** 176:17
210:19
**different** 38:6 39:6
69:3,23 78:24
81:2,10 93:21

116:2 121:14
126:2,2,4,5
130:14,16,25
131:3,5,6,6,15,16
132:16,17,18,25
133:15 141:11
145:14 152:20
153:3 169:24
185:3 201:15
205:19 211:9,20
212:14 219:16
231:5 236:15
247:14 256:25
257:3 258:21
276:24
**differing** 45:22,24
**dig** 264:11
**direct** 12:6 30:10
47:22 50:11 79:15
94:6,15 96:6,22
96:23 134:6 140:6
143:2,9,18,23
144:21 153:19,23
154:4,6,8 155:9
155:11,16 156:5,5
156:10,12,16,16
158:11,17,20,23
158:23 159:15,20
160:3,10,13,18,21
161:4,8 162:10,24
163:17 164:20,25
165:15 166:4,9,25
167:9,15 168:6,11
168:18,23 169:6
169:20,25 170:5
171:22 172:18
173:12 209:21
210:2 224:15
225:11 235:3
239:23 275:3,14
276:5,11,17,18
277:4 297:8 306:5
306:8,13,18,21
310:12
**directed** 109:3
225:25

**directing** 48:8
226:2 232:8
**direction** 48:5,6,8
309:5
**directions** 137:7
**directly** 51:18 58:5
68:14 130:5 156:9
156:11 164:13
173:23 234:15
298:5
**director** 83:12
222:25 228:18,18
228:23,24 230:12
230:13
**directors** 81:25
90:2 91:7 206:11
206:15,21,24
207:8 224:23
228:16,23 230:10
230:14 234:23
236:4 246:4,21,22
247:19 248:5
249:3 298:15
300:8,21 303:12
304:11
**directs** 163:11
**disagree** 16:10,23
116:17 200:17
202:16 204:12
**disagreed** 33:20,22
**disagreement** 32:9
33:4 35:3
**disagreements** 32:2
32:16,20 33:2
**disclosable** 202:24
**disclose** 8:13 22:21
76:20 77:4 91:16
94:20,24 95:5
96:11,15,19 97:2
174:10,25 175:4
176:6 185:19
186:5,11,25
198:20
**disclosed** 29:19
30:13 31:16 32:3
32:4,21 33:7



Case 15-10541-BLS    Doc 2417-6    Filed 04/24/19    Page 322 of 347
Case 16-35672    Document 905-2    Filed in TXSB on 01/01/19    Page 324 of 346

Page  9

60:24 61:5 64:5,7
64:13 77:9 80:2
86:16 91:2,11
93:17,24 95:22
96:7 113:25
135:10,25 144:8,9
176:7,11 177:7
185:24 191:9,9,12
194:20,23 201:4
258:7 267:9 276:4
276:7 285:19
289:7,19
**disclosing** 92:7
290:12
**disclosure** 42:9
63:8 88:22 110:7
111:6 114:24
115:7 174:20
175:18,21 182:6
196:23 203:12,13
288:24 289:14
290:2
**disclosures** 8:16
31:24 32:11 33:13
33:21,22 34:17,20
35:3,11,20 49:14
59:14 62:8 63:4
92:24 93:2 110:17
112:15,17,25
113:15 144:6,18
145:17 146:22
148:18 166:11
170:25 182:5
299:2,20 302:6
**discuss** 59:6,23
60:4 78:6 180:19
242:6,10 262:8
305:14
**discussed** 44:25
49:12,14 55:13
60:2,11 115:6
131:17 160:12
162:7,23 164:24
165:2,3,6 169:14
180:15 183:15
184:12 196:22

264:6 282:24
289:18 295:3,14
296:16 299:23
302:2
**discussing** 54:16
173:25
**discussion** 15:9,11
44:15 45:8 46:8
116:2 167:6,8
169:18 183:18
262:11 266:8
296:3 299:10
**discussions** 34:23
49:6,25 104:16
164:18 167:4,7
179:25 180:9
217:19 301:17,22
**disinterested** 8:9
8:17 9:4 161:12
173:6 248:18
**disqualifies** 101:10
**disqualify** 246:6
249:5 251:7
**disqualifying** 105:3
105:9,14,20 106:9
106:14 246:13
248:21 249:17
250:15
**distinct** 131:13
**distinction** 25:12
**distinguishes**
158:16
**distributed** 126:7
**distribution** 37:19
**District** 1:3 4:8
59:17,23 263:19
279:10
**division** 1:4 4:8
6:25
**docket** 5:25 107:12
200:6
**dockets** 252:5
**document** 11:16,18
11:22 36:9 37:7
37:24 38:4 61:20
75:16 99:14 264:9

264:15,17 267:15
**documentation**
293:7
**documents** 38:14
43:16 57:11 218:6
252:6 267:15
272:6 294:20
309:7
**doing** 41:5 72:20
100:21 112:22
123:7 141:6 145:4
147:11 189:14
190:4 195:24
196:3,11 231:8
250:5 252:24
256:2 272:4
288:21
**dollar** 213:4
**doubt** 231:20
**dozen** 49:4 56:20
**draft** 37:21 54:5,12
54:19 249:10
260:17 262:20
**drafted** 37:12,15
154:19 228:4
**drafting** 35:24 36:9
37:6,10,24
**drafts** 38:6,19 39:6
39:8 154:15 305:9
305:11
**draw** 24:17
**drawn** 173:2
**drop** 201:10
**dropped** 201:8
**dropping** 282:3
**drops** 305:25
**due** 47:5
**duly** 5:10 310:4
**Dunne** 85:13 87:7,8
**Duran** 3:9 4:12
**duties** 148:12 256:3
**duty** 180:6
**dynamic** 192:10

---
**E**
---
E 2:6,17 204:24,24

308:3,10 312:2
**earlier** 18:13 80:24
83:13 85:4 88:10
103:17 122:3
184:23 197:5
264:6 266:9
289:18
**early** 15:16
**earned** 210:7,18,20
211:3,6
**easier** 130:24
**easily** 270:4
**East** 16:25 17:17
18:6,9,16,25
**economic** 22:14
**Ed** 225:11,15,16
230:21 231:20
232:23
**Edison** 51:2,5,12
51:14,24 52:4,7
52:13 53:4,14
57:8 115:8,22
116:7,10 162:17
182:25 196:24
197:25 198:11,17
225:6 226:3,24
227:24 228:2,9
229:11 233:4
**edited** 305:4
**editing** 39:20,22
40:3
**edits** 38:4,13,15,22
39:16 44:10,11,13
**effect** 198:3 275:3
275:14 276:11,18
277:4,10
**effectively** 287:12
**effort** 109:10
249:21
**efforts** 63:21
189:12
**either** 22:13 23:21
34:4 44:4,15
55:22 57:20 73:25
74:10 118:10
135:8 158:4

181:22 194:23
196:6 223:13
234:15 240:2
**Elliot** 27:4
**Ellis** 3:3 108:21
109:23 110:4,7
**email** 39:4 48:11
77:23 78:6,14,22
79:19 124:20,23
125:6,21,25 126:8
126:10 129:15,18
129:19 145:10
146:9,12 151:6
215:9 239:15
**emails** 125:3 126:2
126:4 127:25
**employed** 176:19
176:25 210:23
**employee** 129:17
129:22 130:5
134:8 243:14,15
272:15 295:19
**employees** 18:9
20:16 67:6 81:25
82:7,19 85:19
90:2 91:4,7 113:7
113:8 127:21
170:21 172:3,12
172:14 173:17,24
206:6,12,17
228:17 230:11
238:6 245:7,8,9
271:16 279:3,8
281:16 283:2,8
304:11
**employer** 291:19
291:20
**employers** 210:23
**employing** 53:24
**employment** 7:21
16:3 279:6
**ended** 185:19 186:6
**engage** 107:4
**engaged** 109:9
146:18
**engagement** 11:20



MAGNA ▶
LEGAL SERVICES

Case 15-10541-BLS   Doc 2417-6   Filed 04/24/19   Page 323 of 347
Case 18-35672   Document 905-2   Filed in TXSB on 01/01/19   Page 324 of 346

Page 10

11:24 12:2 22:7
22:22 23:4,9,11
24:4,6,15,16 25:3
25:7 26:15,20
29:14,16 50:16,17
69:22,22 70:14
71:20 76:14 77:15
81:18,23 97:10,17
97:18 137:23
139:4,6,14 140:13
140:19 142:7,13
145:15 179:15
189:5 190:16,17
191:15 293:20
304:5,6,14 308:14
**engagements** 69:23
70:4,19 71:7
77:19 139:16
189:15 191:8
256:2
**entails** 215:15
**enter** 73:13
**entire** 21:10 25:2
68:9 79:13 38:16
210:13,14 231:2
285:12
**entirely** 72:13,17
99:12
**entities** 21:2 28:18
28:20 29:3 110:21
111:3 112:11
113:5,19 118:18
119:19,20,24
121:14 154:10
155:17 194:13,18
196:6 205:15,25
206:7 253:25
271:15 281:8,24
281:25
**entity** 64:4,6 65:25
66:5 67:10,12
88:14 92:10 96:24
99:6 103:21 104:3
118:23 121:7,13
122:4,8 127:4
140:17 195:14,17

205:21 206:19
209:15 269:6
297:24
**entries** 43:10 112:3
**entry** 43:15
**EPNG** 22:2,15 24:5
24:12,13 25:22,24
28:14 29:5,9,12
29:22 30:2
**equity** 157:22
158:5 170:15,22
171:4,11,13,21
172:17 173:11
277:24 278:19
279:11 281:14,21
282:17 283:10
297:25
**Errata** 311:6
**escape** 56:2
**especially** 223:19
**ESQUIRE** 2:6,11
2:17,17,18,22 3:5
**essentially** 13:3
28:15 31:7 168:16
202:23 213:20
214:6 226:25
229:23 233:5
270:17
**established** 183:4
**estate** 157:21 158:5
173:11
**estates** 171:20
172:16
**estimate** 17:14 18:2
18:18 23:13 25:6
25:9 38:21 49:3
56:19 83:25 99:21
100:2 118:9 207:6
221:22 222:5
286:16
**estimated** 82:16
**et** 1:6 4:6 12:19,24
275:24,24 282:12
**Eugene** 26:18
85:11
**evaluated** 250:23

**Eve** 307:3
**event** 37:25 40:25
164:15
**events** 141:2 148:5
**everybody** 20:10
123:2 129:8,9,9
129:11,16 136:11
207:8,10 304:8
**evidence** 234:11
**exact** 90:24 104:22
177:12 206:5
**exactly** 13:6 95:11
118:3,4 169:4
188:17 206:25
231:7 241:9
249:24 250:22
286:15 305:5
**EXAMINATION**
5:13 205:4
**examined** 5:11
**example** 50:25
59:12 70:21 107:2
155:20 157:7,11
157:13,16 167:16
186:19 252:21
266:2
**examples** 156:15
156:23
**exceed** 5:21
**Excel** 68:25
**exception** 80:3
91:12 113:12,17
206:9 241:10,11
241:14,15,21
242:22 243:10,10
243:18 254:9
300:22
**exceptions** 77:9
80:3 84:6 111:19
112:23 113:13,18
113:18 183:6
240:14,19,22
241:6,9,13 242:15
242:16,19,24
243:6,16
**excess** 283:23

287:13
**excluded** 113:4
122:5
**excluding** 5:22
18:11 161:6
**exclusive** 83:19
**exclusively** 67:7,8
**excuse** 90:11
**exhibit** 6:16 11:14
11:19 21:13 61:25
87:18 98:4 108:5
108:6 116:22
151:2,3 170:13
178:21 179:5
195:5,20 196:5
224:2 227:8
237:25 259:25
285:25 294:24,25
308:12,13,14,16
308:17,18,19
**exhibits** 6:13
231:10
**exist** 196:17 248:20
248:25 294:7,8
**existed** 186:14
**existence** 39:11,14
60:2,11
**exists** 71:10 203:10
203:10
**expanding** 247:9
**expectation** 31:11
**expense** 293:16
**expenses** 293:7
**experience** 139:2
**expires** 311:12
**explain** 265:24
**explained** 280:19
**explanation** 115:3
**explicitly** 239:14
**expressed** 33:12
34:2,16,16 35:19
**expressly** 268:14
**extend** 190:19
**extended** 44:15
45:7 46:17
**extent** 42:4 112:4

114:16 120:22
140:9 143:17
225:16 272:3
**external** 31:23 36:3
36:4 46:21 126:15
**extra** 248:12
**extremely** 44:22
163:9 217:23
240:8
**e'Campion** 88:17

### F

**F** 204:24
**fact** 13:18 14:22
15:21 16:14 57:5
75:6 112:21 129:4
147:12 148:15
165:3 184:15
196:3 217:16
233:17 235:17
237:13 256:17
258:24 259:17
269:3 271:15
272:4 280:21
285:16,18 295:20
**factor** 115:2
**facts** 290:11
**factual** 25:17
266:20
**Fagin** 1:12 4:14
310:6
**fair** 12:4 18:11
20:17 28:16 40:18
42:10 48:9,10
54:20 58:10 59:14
61:9 62:22 68:2
68:20 71:16 72:14
72:17 76:8 90:17
95:8 104:12
108:14 109:20
111:16 112:7
113:16 115:4
116:8 118:10
121:4,25 127:6
137:12 138:12
139:23 161:7,13



Case 15-10541-BLS   Doc 2417-6   Filed 04/24/19   Page 324 of 347
Case 18-50872   Document 905-2   Filed in TXSB on 01/01/19   Page 324 of 346

Page 11

164:11 167:3
177:8 183:25
187:23 192:12
202:25 213:19,23
234:21 247:8
248:21 252:7
253:19 254:15,21
256:3 261:23
280:4 294:9,14
295:10
**fairly** 71:24 129:12
138:17 190:2,10
270:4 275:7
**Faith** 2:17 4:22
**fall** 82:24 83:2
**familiar** 50:14,16
50:21 75:10
209:12 221:4
294:17
**family** 190:5
209:25 277:23
278:9 279:6
**Fannie** 85:12
**Fannin** 2:10
**far** 28:13 56:4
62:20 111:5
115:15 122:19,21
142:4,10 147:8
166:18 175:18
188:22 193:12
197:18 198:24
202:12 231:18
247:22 268:11
305:20
**fast** 286:11
**favor** 191:16
192:11,22 193:20
194:3
**fee** 40:25 42:23
304:17
**fell** 155:2
**felt** 63:8
**female** 27:20
**fiduciary** 11:8,11
12:20,24 13:4,18
14:13,16,18,20,22

15:21 180:6 264:7
264:12,20,24
265:11 271:22
**fielded** 135:22
**fifth** 6:8
**figure** 81:12 186:17
186:21 187:3
188:11 216:14
270:3
**figured** 269:11
**file** 62:25
**filed** 9:12 46:24
53:7,10,25 54:7
54:10,18 65:10
66:2,15 107:7,10
110:4,17 111:6
113:14 114:19
148:24 174:15
175:12 200:6
217:15 218:23
262:17 296:8
**filing** 34:24 35:4
46:3 47:7,10,12
49:18 52:17,25
57:3,5 60:25
62:14,18 63:6
76:10 81:7 89:2
92:3 107:15
111:20 112:18
114:11 162:8
174:18 180:4
203:25 282:21
285:14,24 287:8
287:11,11 304:17
305:19
**filings** 30:24 252:4
**fill** 129:19,24 130:6
131:20,21 134:15
140:18 148:4
**filled** 14:25 135:20
140:11 141:3
142:9,20 309:15
**filling** 144:2,14
145:12 146:17
**filtered** 72:8
**finance** 47:19,20

48:4,9 68:15
72:17,20,23 73:16
162:2
**financial** 123:15,21
123:23,25 187:8
271:24
**financially** 268:21
**find** 30:12 207:15
207:18 216:11,25
217:7 219:10,24
220:2 233:16
283:5
**fine** 16:4 62:19
81:13 168:18
**finer** 24:18
**finish** 40:4 74:24
79:8 145:23 193:4
193:4 289:20
**finished** 35:5 195:9
**firm** 37:5,21 47:15
54:22 70:4,22
71:10,20 139:7,9
148:25 198:13
272:17
**first** 11:17 21:11,17
37:21 38:17 40:13
45:11,12 49:7
53:10 54:6,10,17
55:10,23 61:2,21
61:22 63:6,11,14
63:23 66:14 75:6
75:25 76:4,11
80:7,11 87:16,18
89:18 90:23 98:8
103:6,7 104:16
110:24 112:6,18
113:14 114:2
124:16 142:20
155:15 157:6,11
157:12,15,16
175:4,12 179:16
179:25 182:10,21
224:3 227:20
262:19 263:10
281:8 282:11,22
284:19 285:3,21

294:25 304:17
**fish** 82:21
**five** 68:6 89:18,22
90:21 212:13
214:18 221:11,13
221:16,22 222:6,9
**flat** 240:16
**flesh** 160:13
**Flexner** 2:3 4:19
**float** 23:22
**Floor** 1:19
**flow** 239:6 259:9
**flush** 255:6
**focus** 124:16
141:25 151:4
160:3 205:21
274:25 277:2
**focused** 15:4
151:13 161:4,8
188:10 236:23
**focuses** 160:4,6,9
283:10
**focusing** 98:21
120:17 124:12
160:6,20
**folks** 84:8 155:8
**follow** 57:14 112:13
137:11 142:4
193:12 236:17
242:11,13
**followed** 49:13
51:24 93:10 169:7
285:18
**following** 89:2
129:15 243:16
247:21 270:21
**follows** 5:12,19
205:3 271:6 293:2
**follow-up** 129:13
129:23 300:24
**footnote** 277:18
**foregoing** 310:10
311:3
**forget** 257:7 258:22
**forgotten** 140:21
**form** 8:20 13:20

29:23 32:23 44:17
45:3 56:6 58:17
59:9 64:8 65:15
65:21 72:18 75:8
77:25 84:3 93:5
102:23 106:15
117:14 125:25
128:9 136:25
138:13 141:9,21
144:19,24 145:18
148:8,21 149:6
150:3 155:4
157:23 159:4
161:14 169:12
184:24 190:22
191:22 201:12,22
210:7 216:17
218:3,13,18,22
219:4,12,24 220:7
221:4 235:20
236:14 237:3
243:21 245:22
250:10,17 251:9
255:9,14 261:24
265:3,19 266:12
268:10 269:2,13
269:20 270:20
271:10 275:9
293:25 294:15
299:6 311:5
**formal** 181:25
258:12
**formed** 267:3
**former** 74:16 190:2
190:14 191:14
209:24 229:16
**forms** 217:15,16
218:16
**formulate** 79:18
**formulating** 77:23
**forth** 5:24 18:12
48:2 49:21 57:12
84:9 200:5,10
256:2
**forthcoming** 234:8
**forward** 178:16



Case 15-10541-BLS   Doc 2417-6   Filed 04/24/19   Page 325 of 347
Case 18-35672   Document 905-2   Filed in TXSB on 01/01/19   Page 324 of 346

Page 12

213:9,15
**found** 220:23 221:3
**founded** 222:22
**four** 12:17 98:21
  124:12 125:23,25
  130:18,25 131:4
  133:18 134:10,22
  163:12 182:14
  202:14 204:5
  212:13,21 213:3,6
  213:20,24 214:5
  214:18 215:25
  216:2
**fourth** 247:15
  248:6
**fraction** 41:12,20
  42:20 43:6,8,12
**free** 194:24
**friend** 222:14
  256:24
**front** 16:18 80:14
  107:11 255:20
**full** 41:24 64:24
**fuller** 116:2
**fullest** 6:10
**fully** 271:13
**full-time** 109:6
**function** 19:16,17
  19:18,21 298:14
**functions** 73:5
  83:11
**fund** 219:9 229:20
  267:6
**funds** 46:4 208:6
  209:20,23 210:5
  210:10,14,15,16
  210:24 211:2,9,19
  211:21 215:22
  216:4,8 217:8,16
  218:17 219:11,16
  219:24 220:2
  230:3 266:18
  269:6 284:3,4,16
  287:19 298:6
**further** 96:19
  100:25 152:10

306:23
**future** 111:21
  143:17 190:19
  191:8

## G

**game** 164:11
**Garcia** 221:7,8,24
  222:10,18 224:20
  228:11,20 236:5
  237:20 303:17
**Gary** 66:13
**gay** 1:11 2:14,17
  4:22,22,23 5:2,5
  5:15 8:5,20 9:16
  10:21 12:9 13:6
  13:20 14:2 15:23
  16:4,17 17:22
  23:10 24:10 26:14
  27:15 29:23 32:23
  35:13 40:10 41:14
  44:17 45:3 52:22
  55:18 56:6 58:17
  58:23 59:9 60:6
  61:24 62:3 63:9
  64:8 65:15,21
  66:20 67:16 72:18
  74:22 75:8 77:25
  79:8 80:7 81:9,13
  84:3 89:6 93:5
  95:9 98:4 102:23
  106:15 108:5
  115:13 116:6
  117:13 128:9
  138:13 141:9,14
  141:19,21 144:19
  144:24 145:18,23
  146:3,23 147:3,14
  148:8,20 149:6,10
  150:3,7 151:2,22
  152:22 154:22
  155:4 157:23
  159:4 161:14
  163:3,7,24 167:20
  168:4 169:12
  170:13 173:20

178:24 179:5
  182:13,18 184:24
  190:7,22 191:22
  193:3 196:4
  197:18 198:6,22
  199:22,25 200:21
  201:12,22 202:7
  202:18,21 203:2
  203:20 204:4,12
  204:19 216:17
  218:3,13,18
  219:12,19 220:7
  221:16 223:17,22
  223:25 225:9
  226:5,11,16 227:3
  227:5,11,14,19
  229:4,10 231:4,17
  232:6,9,16,20
  234:9 235:8,14,20
  236:14 237:3,5,10
  242:11 245:3,22
  248:22 250:10,17
  251:9 255:9,14
  261:24 265:3,19
  266:12 268:10
  269:2,13,19,25
  270:20,23 271:9
  272:13 273:7
  275:9 282:2
  283:16 287:21
  289:20 293:25
  294:15 298:17
  301:8,11 306:15
  306:25
**Gay's** 37:5 54:22
**general** 10:12,19
  21:4,7,10 49:12
  49:19 50:2 57:10
  64:25 65:2 143:4
  143:16 145:20
  165:12 171:9
  204:6 208:15,24
  219:14,19,22
  243:10 251:3
  302:8
**generally** 22:8,9

42:6 71:19 92:10
  135:2 148:23
  230:16 302:22
**generation** 274:16
**generous** 163:9
  200:14
**gentleman** 299:15
**getting** 115:14
  120:4 142:24
  191:19 197:18
  198:24 268:11
  282:2 305:15
**Gilad** 85:14
**give** 7:18 10:19
  13:4 17:14 25:5
  62:4 70:25 73:8
  82:23 85:17,23
  102:17 106:25
  114:7 167:16
  186:19 191:15
  207:2 213:22
  215:3,5,13 219:13
  221:22 222:5
  250:18 276:20
  288:5 289:16
  292:23 305:4
**given** 85:7 137:7
  155:20 157:7,11
  157:16 200:14
  275:3 277:5 289:9
  310:5 311:4
**gives** 70:8,12
  211:18
**giving** 163:24
**global** 48:4 67:21
  68:19 69:7,11
  71:23 73:17,23
  74:14 75:13,21
  76:9,12,19,25
  77:6,14,22 78:4
  78:12,20 79:5,10
  79:17,21 94:8
  101:9,15,17,25
  102:6,8,12,16
  116:19 117:3,20
  119:23 120:6,14

134:5 147:16
  151:20 152:21
  153:8,14 187:7,25
  188:18 189:3,8
  253:6,15 305:21
**globally** 69:14 94:4
  94:16 95:16 96:3
  126:25 127:3,22
  133:25 134:9
  143:14 151:7,12
  151:14,25 152:8
  152:11,16 153:2
  160:8 187:12
  188:4 251:21,22
  275:19 279:4,14
  283:9
**go** 16:9 25:2 30:6
  30:17 31:18 41:17
  55:20 57:22 61:15
  66:4 67:14 68:18
  73:10 91:25 93:20
  100:25 110:14
  120:3 127:9 130:5
  133:3 136:20
  141:14 146:2
  150:12 151:17
  163:8,14 185:3
  187:5 212:7,8
  218:15 219:23
  226:19 241:8
  243:23 250:8
  251:8 257:2
  259:21 267:2
  268:3,12,14 270:3
  273:16 274:22
  278:23 279:20
  284:21 286:18
  289:22 291:9,11
  292:12,13,22
  303:21 306:10
**goes** 21:22 101:6
  148:5 166:19
  178:5 203:6,9
  305:22
**going** 11:14 15:24
  21:24 24:8 25:14



Case 15-10541-BLS Doc 2417-6 Filed 04/24/19 Page 326 of 347
Case 18-85672 Document 905-2 Filed in TXSB on 03/01/19 Page 325 of 346

Page 13

49:20 55:25 56:5
57:22 66:23 70:25
70:25 71:2,3,13
89:10 93:16
111:23 116:4
123:4 150:15,19
163:8,20 190:5
198:7 199:15
202:12 204:18,22
205:10 225:11
231:21,23 233:22
235:18 238:10
252:25 257:3
272:19 273:10
283:3 288:2 303:2
307:5
**good** 4:22 66:20
202:21 204:15
266:11 268:9,24
**govern** 271:17
289:13
**governs** 12:3 97:11
238:14 258:24
259:13,16 295:18
**granted** 243:18,19
**graph** 214:20
**graphs** 216:21
**greater** 185:20
186:6
**gross** 43:4
**group** 24:14 25:22
25:24 26:7,12,13
26:13 29:6,9,12
29:21 30:2 104:17
121:18,20,24
122:5,6 128:7
133:16 152:20
153:2 170:14
250:4 298:14
**groups** 22:11 23:4
23:8 28:16 131:5
133:18 152:19
**growth** 24:23
**guess** 116:16 185:7
203:14 242:16
255:16 275:10

286:17
**guidance** 92:16
137:9 154:5 155:7
**guided** 15:3
**guidelines** 148:13
288:22 289:13,24
293:16,19,23
294:7,13,18
**guys** 27:15 154:22

---

**H**

**H** 5:9 205:2 308:10
**Hagidorn** 26:4,8
27:3,13,14
**hair** 12:11
**haircut** 42:10,11
**half** 12:11 68:6
221:13 222:9
**hall** 64:18
**hand** 38:23 39:16
199:22
**handful** 84:17
295:2 296:16
**handle** 46:16
259:16
**handles** 19:22,24
20:10
**handling** 271:25
**hands** 72:5
**Hannigan** 15:19
16:20
**happen** 114:21
135:16 149:5
178:9 189:16
243:12
**happened** 32:17
64:15 141:3
142:20 144:18
145:14,15 146:19
148:19 149:4,9
150:2 280:10
**happening** 144:11
190:25 269:10
**happens** 71:5
100:17 164:16
**happy** 10:5 30:6

31:18 46:3 287:14
287:18 288:4,5,8
291:22 302:25
**hard** 17:23 23:17
24:21,25
**harm** 290:3
**head** 19:2 75:19
84:15,16 85:10
99:5,20 125:5
134:25 255:6
292:16 297:20
303:15
**headed** 104:14
179:22
**heading** 295:9
**hear** 17:23 32:19
199:16 282:6
**heard** 33:5 58:6
64:14,16,22
220:21
**hearing** 58:12,13
66:8 199:9 298:21
299:16
**hedge** 275:7
**held** 1:10 46:3
217:8,9,17 224:20
287:13
**help** 8:24 107:13
156:25 162:4
188:14 191:21
201:24 249:10,13
250:19 260:17
275:17
**helped** 268:21
**helpful** 179:2
**helping** 275:22
**Henry** 85:13 88:15
**hey** 135:13 140:25
142:17 143:7
165:13 168:16
169:18 198:3
**high** 215:14,19
**highest** 28:10 65:12
65:18 214:23
**highly** 68:13
**hire** 107:9

**historical** 217:23
217:24,25 218:2,5
**historically** 189:18
**hit** 73:13
**hits** 77:7 79:14
**Hogan** 2:20 5:6
10:16 36:21,24
161:25
**HOJNACK** 311:8
**Hojnacki** 1:10 4:4
4:24 5:1,2,7,16
6:1,5,15,16 7:1
8:1 9:1 10:1 11:1
11:15,19 12:1,9
13:1 14:1 15:1
16:1 17:1 18:1
19:1 20:1 21:1,12
21:13 22:1 23:1
24:1 25:1 26:1
27:1 28:1 29:1
30:1 31:1 32:1
33:1 34:1 35:1
36:1 37:1 38:1
39:1 40:1 41:1
42:1 43:1 44:1
45:1 46:1 47:1
48:1 49:1 50:1
51:1 52:1 53:1
54:1 55:1 56:1
57:1 58:1 59:1
60:1 61:1 62:1,2
63:1,18 64:1 65:1
66:1 67:1,5,16,17
68:1 69:1 70:1
71:1 72:1 73:1
74:1 75:1 76:1
77:1 78:1 79:1
80:1,11 81:1 82:1
83:1 84:1 85:1
86:1 87:1,17,18
88:1 89:1,17 90:1
90:23 91:1 92:1
93:1 94:1 95:1
96:1 97:1,5 98:1,6
99:1 100:1 101:1
102:1 103:1,5

104:1 105:1 106:1
107:1,13 108:1,10
109:1 110:1 111:1
111:14 112:1,6
113:1 114:1 115:1
116:1,23 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1
148:1 149:1 150:1
150:11 151:1,3
152:1 153:1 154:1
155:1 156:1 157:1
158:1 159:1 160:1
161:1 162:1 163:1
164:1 165:1 166:1
167:1 168:1 169:1
170:1 171:1,17
172:1 173:1 174:1
175:1 176:1 177:1
178:1 179:1 180:1
181:1 182:1 183:1
184:1 185:1 186:1
187:1 188:1 189:1
190:1 191:1 192:1
193:1 194:1,6
195:1,4,5,21
196:1 197:1,20
198:1 199:1,24,25
200:1,6 201:1
202:1 203:1 204:1
205:1,10 206:1
207:1 208:1 209:1
210:1 211:1 212:1
213:1 214:1 215:1
216:1 217:1 218:1
219:1 220:1 221:1
222:1 223:1,20
224:1,3,4 225:1



Case 1:17-cv-10541-BLS Document 90-2 Filed 04/24/19 Page 327 of 347
Case 1:18-cv-05712 Document 90-2 Filed in TXSD on 01/01/19 Page 327 of 346

Page 14

226:1 227:1,7,8,9
228:1 229:1 230:1
231:1 232:1 233:1
234:1 235:1 236:1
237:1 238:1,2
239:1 240:1 241:1
242:1 243:1,24
244:1 245:1 246:1
247:1 248:1 249:1
250:1 251:1 252:1
253:1 254:1 255:1
256:1 257:1 258:1
259:1,21 260:1
261:1 262:1 263:1
264:1 265:1 266:1
267:1 268:1 269:1
270:1 271:1 272:1
273:1,16 274:1
275:1 276:1 277:1
278:1 279:1,21
280:1 281:1,3
282:1 283:1 284:1
285:1,10,11 286:1
286:18 287:1
288:1 289:1 290:1
291:1 292:1,22
293:1 294:1 295:1
296:1 297:1 298:1
299:1 300:1 301:1
302:1 303:1 304:1
305:1 306:1,11
307:1 308:6,12
310:4
**Hojnacki's** 200:3
**hold** 9:9 171:19
172:4 173:9,18
199:22 220:2
277:24 297:25
**holders** 157:22
158:6 171:22
172:17 173:12
**holding** 213:8,11
213:15 214:24,24
214:25
**holdings** 197:14
215:17 216:8,11

218:16,24 219:10
230:3 237:15
298:8
**holds** 267:12
**hole** 134:18
**holiday** 302:25
**holidays** 25:8,10,13
25:18 26:22 85:5
302:24 303:3
**home** 150:12
**honestly** 209:18
**honor** 6:9
**hope** 230:23 231:2
**hopefully** 304:21
**hoping** 217:2
**hosted** 68:23
**hours** 5:21 39:18
39:22 40:5,9,14
41:3,6,13 43:3
109:10 302:3
**house** 211:25 212:3
**Houston** 1:4 2:9,10
3:4 4:8
**HR** 19:10,13,22
20:8 130:4
**human** 128:6 255:5
**hundred** 17:20,21
17:24 40:9,14,15
40:17 222:13
**hundreds** 252:6,6
**hypothetical** 64:21
147:7 192:20,25
265:23
**hypotheticals**
265:22

———————
**I**
**idea** 158:13 221:18
272:3
**identification** 6:17
11:21 21:14 87:20
101:6,11,21 102:2
195:6 227:10
**identified** 61:3
62:16,17 63:2
77:10 106:17

114:17 123:14
133:5 134:4
199:11 247:10
300:17
**identify** 23:3 25:20
26:12,17 27:8
30:7 31:19,23
50:8 63:22 79:22
94:5,8 96:4 124:6
159:20 162:4
170:14,20 173:4
174:2 187:6,13
246:19 249:21
282:25
**identifying** 62:21
79:13 172:10
**identities** 88:23
254:4,5 258:14
**II** 61:7 62:6 108:12
109:20 111:23
113:21 114:15
**imagine** 106:7,12
**immediately** 25:8
57:4 81:6 85:5
**implementation**
86:4,22 87:11
**implying** 190:25
243:11
**important** 109:13
199:11 233:11,25
257:11 259:18
265:10
**inaccurate** 234:7
**inappropriately**
265:12
**incentive** 191:16,20
192:11,21 193:20
194:2
**include** 10:15,15
60:15 62:13 112:2
118:15,20 119:2
143:21 180:4
274:5,18 278:10
278:11 279:14
291:19
**included** 44:24

49:15 102:6
112:14,25 131:10
135:5 160:17
161:16 188:18
189:8 229:14
249:22 261:13
277:8
**includes** 17:8 32:6
89:25 91:6 117:20
119:24 127:15,18
153:14 285:9
304:10
**including** 69:13
74:9 111:18 181:2
187:6 198:2 206:9
206:13 208:5
228:17 230:12
256:17
**inclusive** 83:18,20
**incredibly** 141:23
**independence**
240:2
**independent**
259:23 260:3,4,7
260:9,11,11
263:11
**independently**
214:22 229:22
230:4
**INDEX** 309:3
**India** 86:18 88:15
**indicate** 195:12
228:22
**indicated** 198:12
234:10 284:13
**indicates** 75:17
208:23 228:15
246:14
**indicating** 233:14
**indication** 184:18
**indirect** 155:2,6
157:19 158:2,8,8
158:13,16,19,21
159:3 160:25
161:6,12 171:22
172:18 173:13

**indirectly** 234:16
**individual** 24:23
47:22 90:10 91:18
91:19 93:17 95:4
95:6 96:11,16,17
113:7 137:12
210:17 211:2
272:25 278:12
**individually** 23:19
**individuals** 10:15
22:21 23:3 30:3
48:17 90:5 95:20
242:2
**individual's** 23:15
93:18
**industry** 16:7 202:3
274:24 275:2
277:2,3,11
**influence** 235:2
270:11 272:9
**influenced** 250:6,7
**inform** 272:11
**information** 31:21
69:11 70:3 74:6
75:5 131:17 133:4
136:21 137:5,15
147:23 212:7,22
214:15 215:12,19
217:20 219:5,25
224:17 225:3
230:2,9 238:6
239:6,11 249:25
250:18 252:11,13
252:18 253:2,5,13
253:25 255:2
257:13,14,14
258:6,17 259:9,19
271:18 272:18,23
273:3 274:19
275:21,23 280:9
295:22 305:21,24
**infringing** 202:12
**initial** 107:25
**initially** 289:6
**inner** 102:4
**input** 37:16 202:11



Case 15-10541-BLS   Doc 2417-6   Filed 04/24/19   Page 328 of 347
Case 18-85672   Document 905-2   Filed in TXSB on 01/01/19   Page 327 of 346

Page 15

**inquire** 94:14
**inquiries** 229:15
**inquiring** 25:15
200:22 281:18
**inside** 57:20,24
59:2 170:6
**instance** 114:23
186:25 213:3
**instances** 50:9 58:8
79:22 289:25
**instruct** 116:4
147:10 200:24
**instructing** 147:13
**instructions** 148:14
**insufficient** 33:13
33:23 34:18 35:12
35:21
**Insurance** 194:14
**intend** 218:8
**intended** 89:4
155:7 159:20
160:13 174:2
241:10 257:15
275:16 276:23
**intent** 14:25 54:16
241:11 276:13
284:14 288:15,20
**intention** 111:20
**interacted** 36:10
37:13
**interaction** 72:22
**intercompany**
113:5
**interest** 9:9 11:12
22:13 157:20
158:3 171:20,24
172:5,15,19
173:10,14,19
220:19 224:11
281:10 298:2
**interested** 8:12
29:18 50:10 61:6
62:9 73:9,21,25
74:13,15 76:18,24
79:4,24 91:3,10
93:23 94:9,25

96:12,21,25
104:21,23 107:25
108:24 113:25
114:3,14,16 115:2
123:11 138:5
139:22 140:8,22
142:14 144:4,16
147:22 177:6
185:10 187:17,18
187:20 199:16
218:11 234:16
280:14,17,20
281:15,22,22
282:18 290:18,23
291:2,15 292:10
292:18
**interests** 100:13
101:4
**interim** 139:15,17
**internal** 31:22
43:22 46:21
126:14
**internally** 44:16
**internet** 220:25
237:2,14 250:8
**interpretation**
201:6 203:14
**interpretations**
201:24
**interrupted** 301:10
**introduce** 4:16
**invest** 209:25 210:2
234:15 266:18
269:7
**invested** 208:6
210:5,8 211:22
215:18,23 216:25
219:9,17,25
220:12 238:11
271:8
**investing** 271:24
272:12
**investment** 208:7
211:20 212:14
215:11 217:3
218:25 220:24

223:5 229:18,21
230:5,7,15,20
236:17,18 239:3
239:20 242:10
244:9,12,15,20
245:7 252:11,14
253:3 262:13
267:12 270:12
272:15 295:20
**investments** 208:5
209:21 211:16
215:8 219:2
224:15,16,24,25
227:17 229:23
233:17,20,21
234:19,25 235:4
236:19,24 238:11
240:19 242:3,17
250:2 269:5 270:9
295:16 298:5
**investors** 227:17
229:22,25 238:25
**invests** 209:20,22
220:17 266:4,7
267:6 268:4,5,18
268:19
**involve** 158:23
247:7 249:4
**involved** 35:24 37:5
47:17,19,21 48:2
48:13 50:10,25
97:23 122:17
125:14 149:16,24
188:8 212:19,20
260:25 261:6,9
262:6 276:5
290:17 299:3,5
304:5
**involvement** 54:23
125:21 208:3
264:4
**involves** 129:15
193:9
**irregardless** 79:5
**irrelevant** 144:23
185:5,9 270:18

**Irrespective** 291:18
292:7
**issue** 92:14,21,22
92:23 104:18
162:24 164:19
180:3,19 199:12
202:17 270:14
285:16
**issues** 270:17
**item** 130:20 174:7
**items** 60:13 296:18
305:18
**Ivanick** 2:22 5:6,6
10:16 36:21 37:16
52:18 53:2,9,21
54:4,11,18 55:20
56:12 57:15,19
58:9,14,25 60:17
165:10 166:20
180:21 181:19,22
183:19,24 280:24
305:12
**Ivanick's** 37:20
47:14
**I-L** 196:7

**J**
**J** 5:9 205:2
**Jay** 59:8 269:11
270:2
**Jean** 65:2
**jeopardize** 240:2
**Joe** 26:18 71:2
85:12
**John** 221:7,8,21,24
222:10 228:11,20
236:5
**John's** 236:7
**joined** 90:5,25
221:10,25
**joining** 222:4
**joins** 255:13
**Jones** 5:18 6:11
199:15 233:25
234:10 249:15,18
250:13 298:23

**Joshua** 2:17 4:25
**Journal** 252:23
263:6,13 267:23
**Journals** 267:25
**judge** 5:18 6:3
15:19 16:20
163:20 199:15
233:25 234:10
249:15,18 250:13
298:23
**judges** 279:10
**judge's** 16:11
198:25 199:13,23
**judgment** 248:20
**July** 103:9,13,18
104:10,12 179:16
**jump** 290:25
**June** 222:25 225:5
226:23 235:5,16
237:21

**K**
**K** 5:9,9 205:2,2
**Kana** 299:18
**keep** 56:4 102:3
175:7 190:12
**keeping** 256:18
**kept** 178:16
**Kevin** 27:3
**kind** 32:3,10 33:5
39:23 42:9 48:8
52:13 69:10
101:14 102:21
106:22 124:12
128:2 157:11
160:16 208:2
213:8 214:22
238:22,23 242:25
243:8 251:4
252:10,16 276:7
277:10 285:11
295:9 298:2
**Kirkland** 3:3
108:21 109:23
110:4,6,17 111:6
113:6



Case 15-10541-BLS    Doc 2417-6    Filed 04/24/19    Page 329 of 347
Case 18-35672    Document 905-2    Filed in TXSB on 01/01/19    Page 328 of 346

Page 16

**knew** 47:7,9 104:13
179:21 233:19,21
**know** 17:12 18:4,17
18:19,24 19:24,24
24:7 26:5 29:4,9
30:3,16 31:10
34:22 35:7 36:11
37:20,23 47:22
48:18 52:2,8 54:4
54:9,11 56:23
57:18 64:18,24
65:6,8,9,11,12,17
65:18 67:13,24,25
68:22,25 69:4,24
70:6,12,15 72:23
72:25 73:3,4,7,9
73:12,14,15,19,20
73:22,23 74:20
75:3,12,13,23,24
76:3,15,16,17
77:18,21 83:11
84:15 86:13 88:14
90:9 92:2 98:22
99:4,12,12,23,25
100:4 104:24
105:10,22 106:3,3
109:5 110:23,25
111:4,12,13
117:17,19 118:4
118:11,12,14,14
118:24 119:13
121:3,7,9,22,23
122:2,15,16,19,21
122:22 123:19
124:3,8 125:18,20
125:22 128:10,21
128:25 129:2,6
130:3,7,8,8,10
133:4,8,11 135:7
136:6,11 137:14
138:4 145:16
154:18 155:22
159:8,11,12
161:10 162:12
163:21 168:10
170:4,8 175:5,14

176:3,8,13,15,22
178:22 179:20
180:8 182:20
183:8 188:7,8,17
188:23 189:3,7
193:21 194:20
195:8,17 196:2,9
196:15 197:12,14
197:17 201:13
206:25 207:4
208:8,12,14,21
209:6,7,15,18
210:11 212:18,18
213:4 215:6,20,22
215:25 216:4,7,12
218:5 219:8 220:9
220:11 221:2,7,8
221:24 223:7
224:17,19,23
225:3 233:12
234:18 235:4,10
235:18,23,24
236:15,16,21
237:13,20 241:9
241:12,19 244:8
244:11,18,19,20
244:23,24 245:2,3
245:11,16,24
253:5,8,18,20
254:14,21 255:5
256:9,11,20,21
257:23 258:4
260:19,20,22,24
261:5,6,10,11,13
261:20 263:14,16
263:24 264:4,17
266:3 267:19
269:9,17,23 270:5
272:10,18,21
273:18 275:22
277:15 278:4
279:22 281:4
286:20 288:18
290:9 291:2,15
292:2,6,11,17,18
292:24 293:22

294:6,7,10,11
296:7 297:9,19,24
298:7,11 299:25
300:14,20 301:3,4
303:13,14 304:16
304:21,21,24
305:20,24
**knowing** 254:8
**knowledge** 20:5,23
28:25 33:11 57:25
58:3,4 62:7 64:3
66:17 67:5 69:10
69:15 70:2 71:5
71:22 75:20 76:6
82:15,19 83:16
88:14,21 105:12
105:17 139:21
153:8 162:14
201:2 207:21
255:7 266:6 269:4
269:8 270:9 272:5
277:21 280:10,13
290:19 298:13
**known** 221:9
**knows** 244:15
255:11

---

## L

**label** 4:3 67:2 89:13
150:22 185:14
205:7 273:13
297:3
**Labor** 217:15
218:23
**lag** 110:23
**laid** 158:11 285:12
**landscape** 275:2,22
277:3
**language** 44:8
117:8,9 120:17,24
120:25 172:23
173:15 233:6
239:23 248:12
260:16 277:7
290:22
**large** 118:2,12

163:16
**late** 282:2
**Laurie** 36:10 37:13
39:9 48:14 64:23
125:12
**law** 13:17 14:7,21
15:2 70:21 163:2
164:22 165:8
184:5,9,10
**lawful** 199:19,21
**laws** 201:25
**lawsuit** 59:16
**lawsuits** 60:3
**lawyer** 8:14 9:6
13:21 14:4 15:9
15:12 92:11 93:7
159:5,6 161:15
184:6 201:5
287:25
**lawyers** 36:20
161:19,21 234:10
**law's** 14:7
**layman** 15:13
**lays** 282:19,22
**leader** 6:18,21,24
27:22,23 28:2,10
31:5,8,12 66:3
86:4,22 87:11
304:4
**leaders** 7:3,9,13
20:16 27:6,9
82:11,14 83:4
207:13,22
**leading** 15:10 34:13
39:19,22 55:13,22
57:2 305:6
**leaf** 21:16
**learn** 262:12,18,20
**learned** 52:5
218:21 262:15,23
**learning** 83:16
**learns** 236:11
**leave** 87:21 203:20
**leaving** 278:10
**led** 88:22
**leeway** 163:25

200:15 219:13
**left** 150:25 237:20
**legal** 1:18 3:9 4:13
4:15 10:8 15:17
20:22,25 22:19
28:18,20 29:3
32:6,7 36:2,7,12
36:15 37:15 44:16
47:15 48:5,7,8
57:20 65:3,13,24
72:9,14,16,25
73:18 76:16 109:4
118:23 121:13
125:8 135:9,22
154:16,19 158:10
161:18,20 176:16
176:18,19,20
180:20 181:18,23
183:9,12 208:20
228:7 260:21
**legality** 92:7,12
**legend** 107:15
**lender** 104:16
180:2
**length** 199:10
**lengthy** 44:19
**lens** 291:10 292:9
292:15
**Leslie** 1:12 4:14
310:6
**letter** 12:2 97:11,17
97:18 103:8
126:23 179:15
283:6 293:21
**letters** 11:20,25
308:15
**let's** 6:14 21:11
29:15 40:12 41:14
45:11 55:20 56:4
66:18 67:14 73:8
80:5 81:15 82:13
87:16 97:4 98:3
103:3 116:18
120:3 124:11,16
140:10,14 141:25
148:18 150:16



Case 15-10541-BLS    Doc 2417-6    Filed 04/24/19    Page 330 of 347
Case 18-35672    Document 905-2    Filed in TXSB on 01/01/19    Page 329 of 346

Page 17

151:3 164:15
170:9 171:16
174:5 178:3
185:25 186:19
191:3 192:4,7
193:3,10 203:20
204:20 205:21
243:23 247:24
248:9,10 256:23
259:21 273:5,16
274:11 277:14
279:20 283:11
284:21 286:18
292:22 294:20
**level** 41:4 65:13,18
113:10,11 214:23
215:14,19 219:7
**levels** 229:19 269:7
**Lexington** 2:4
**lien** 104:16 179:25
**light** 24:22
**lights** 234:5
**limit** 92:24 93:2
**limitation** 201:3
**limitations** 91:12
**limited** 88:15 153:9
164:6 194:14,15
200:3 207:9,11
213:20
**limits** 93:9
**line** 13:9 24:18 39:2
89:18 98:8 150:8
151:18 152:7
227:22 228:3
247:15,15 248:6
263:4 309:5,5,5,8
309:8,8,11,11,11
309:13,13,13,16
309:16,16 312:3
**lines** 12:17 13:2
263:10
**link** 126:13 132:5,8
**LinkedIn** 208:23
209:4
**list** 29:18 42:24
50:10 74:5,7 79:4

79:25 84:25 85:20
90:16 91:10 93:24
94:10 96:25
107:25 108:8,13
108:19 109:16,19
109:25 110:11,18
110:21,24,24
111:8 114:14,15
118:2,6 123:11,14
138:6 139:23
140:8,23 142:14
144:4,17 145:11
194:13 213:20
214:19 217:16
218:24 253:19
280:14,17 281:9
282:11 290:23
292:10,14
**listed** 89:23 97:9,14
114:4 214:5
264:24 280:6,20
**listen** 148:13 265:5
**listing** 214:21
**lists** 15:16,25 69:14
**litigation** 16:8
154:12 156:21,21
217:20 220:22
**litigations** 60:14
**little** 6:22 12:12
21:21 31:2 39:5
108:16 131:12
157:24 185:17
219:13 237:10
249:25 282:3
304:23
**Livskim** 208:8
**LLP** 2:3,8,20 3:3
**local** 20:8
**located** 4:10
**log** 40:21 109:10
**long** 46:11 52:7
68:4 162:13 164:7
174:6 181:4,11
195:7 221:9
270:18,21 271:5
286:12 291:16

**longer** 23:25
175:11 178:12
**longstanding**
100:23,24 256:12
**look** 11:12,16 12:22
21:15,20 30:18,25
52:11 61:15,16
62:5 80:5 88:2,3
89:16 97:4 98:3
103:3,5 107:3
116:18 123:3
124:11 132:15
140:25 165:12
170:9,9 171:16
173:8 174:5 198:3
216:22 218:16
237:2 241:4
266:11 268:9,24
273:5 277:14
283:11 291:9,12
306:10,11
**looked** 122:20
177:10 179:15
209:3 216:19
217:22 240:25
251:7 291:10
297:16
**looking** 12:10
63:19 103:17
104:20,23 123:8
125:23 141:13
177:23 193:17
216:14 245:15
291:13 292:14
**looks** 265:16,18
**look-back** 117:7
122:24 136:14
176:25 177:10,13
177:21 178:4,8,11
178:15 180:11,16
181:8,12,14 182:2
182:4,11,22 183:4
183:7,10,24
184:14,19 185:5
185:23 186:10,14
186:18,23 187:14

188:12 189:19
191:3 197:3,6,10
197:15,23 198:4,5
198:14,14,19
199:7,10,18,20
200:12,20 201:9,9
201:10,11,18,19
201:20,20,21
202:22 203:5,7,15
**loose** 22:11 23:14
**lost** 89:6 131:12
185:11 283:15
**lot** 178:23 221:19
251:14,17,20
252:3 262:2
265:22 304:24
306:4
**Lovells** 2:20 5:7
10:16 36:21,24
162:2
**lunch** 194:25
204:15,20

———————————
**M**
**M** 5:9 205:2
**macro** 274:25
275:22 277:3
**Magna** 1:18 3:9
4:15
**mails** 211:24
**main** 3:4 305:18
**maintaining** 102:19
256:16
**maintains** 124:7
**majority** 83:24
84:5
**making** 44:21
127:2 129:7
227:23 266:17
**male** 27:20,21
**manage** 19:17
**managed** 230:4,20
253:16
**management** 300:5
300:6
**manager** 83:14,15

**managers** 225:2
229:21 244:9,13
244:15,20 300:16
**managing** 302:18
**mandatory** 293:23
294:8
**Maravich** 85:13
87:10
**Margolin** 2:17 4:25
4:25 55:3,16,18
55:19,19 263:8
**mark** 1:10 4:4,23
5:7 6:12,12 11:15
21:11 87:16
135:13 192:4
195:3 227:9 308:6
310:4 311:8
**marked** 6:16 11:20
21:14 87:19
150:10 195:5
227:9 309:13
**market** 275:4 277:5
**Mar-Bow** 2:4,9
4:19,21 33:10,24
34:14 35:2,10,22
59:7,13 217:20
220:11,22,23
221:2 267:20
270:16
**Mar-Bow's** 46:23
174:14
**material** 295:21
**materially** 157:21
158:4
**materials** 22:2,15
26:11 28:15
249:20
**mathematical**
214:12
**matter** 4:5 16:5
21:17 42:5 57:8
70:23 115:15
140:20,22 145:5
146:19 153:15
170:24 192:3
200:2 201:21



Case 15-10541-BLS   Doc 2417-6   Filed 04/24/19   Page 331 of 347
Case 18-05672   Document 90-2   Filed in TXSB on 01/01/19   Page 330 of 346

Page 18

202:15 217:12
219:19,22 244:22
271:7
**matters** 49:19
92:12 138:15
139:7,12 145:7
148:6 251:22
**max** 82:7
**McCARTHY** 2:8
**McKinsey** 2:14,20
4:24 5:3,5,8 7:6
7:10,15 10:12
12:3 14:12,22
15:20 17:5,7,12
17:15 19:19 20:5
20:14 21:2,7,8
24:2,19 25:6
28:16 30:7 31:16
33:12,21,21 36:2
36:7,12,14 37:15
41:2 43:23 44:3
47:15,19,20 48:4
50:8 57:20,24
58:15 59:2,2
60:22 64:3,5,11
65:13,19,25 66:5
68:5,12,15 69:13
69:13,14 70:8,16
71:5 74:2,5,7,9,10
76:20 77:2,5
79:12 81:25 82:17
83:10 84:20 86:2
86:5,7,10,17,23
87:9,12,14 88:14
88:16,17 90:3,5
90:20 91:7 94:3
94:20,21,24 95:2
95:3,7,15 96:10
96:18,20 97:9
98:16,17,25 99:6
99:9 104:4,5,13
105:13,18 106:8
107:3,10 109:4
118:16,21 119:2,2
119:8,14,17 120:9
120:20,22 121:8

121:10,20,24
123:16 124:7,10
125:8 126:18,20
127:21 133:24
134:8 138:11,23
139:10,11 140:15
140:16,17 142:2,3
143:22 145:8
146:16 148:10,11
148:24 149:14
151:11 154:16,19
159:24 161:20
162:2 170:21
179:16,20 181:18
181:23 182:3,11
189:12,23,25
190:11 191:13
192:14,15,18
193:23 194:2,18
195:13,24 196:2
196:17 197:9,15
198:20 199:17
201:8 203:23
205:14,21 206:8
206:19 208:19,25
209:9,14,16,17
210:18,20,23
211:7 221:10,25
222:4 223:21
224:7,8 225:24
228:7,17,25
229:11 230:8,11
230:14 233:12,23
234:3,22,24
235:25 237:16,18
238:5 239:4,7,12
240:17 242:2,9
243:14 246:2,5
247:17 249:6,11
251:17 252:20,24
252:25 253:19
255:10,11,21
256:13,19,20,23
256:25 257:18
258:2,13 267:21
267:21 268:20

270:18 271:6
272:25,25 274:12
274:22 275:18
277:22 278:5,7,12
278:18 279:3,15
279:17 280:16
281:13,19 282:14
282:16 283:2,8
286:24 290:7
291:5,6,18 292:4
292:6,17 293:11
295:19 296:5
297:7,18 298:9,16
299:7,11,21 300:4
300:9,10,12,13,21
301:13,18,20
302:18 304:3,11
304:16
**McKinsey's** 21:4
59:14 123:15
176:20 188:2
204:7 229:15
230:6 249:12
251:14 253:14
254:8,13,19 256:9
**mean** 13:21 22:9
45:25 56:24 60:11
65:23,24 67:9
105:24 112:8
122:6 128:4 132:3
132:20 136:2,23
158:7 186:16
216:10 246:10
249:15 260:11
265:14,15 287:6
288:12,19 300:7,8
**meaning** 67:10
68:13 76:2
**means** 150:2
162:25 202:23
217:7 287:23
288:3,10 310:11
**meant** 213:12
**measures** 216:24
**mechanism** 128:12
**mechanisms**

166:10
**media** 4:3 67:2
89:13 150:22
185:14 205:7
251:15,19,23
273:13 297:3
**meets** 230:16
**melding** 145:2
**member** 36:22 77:8
93:15 94:23 95:5
95:17 96:9,13,14
115:4 121:20,24
126:25 127:24
130:20 131:7
133:19,20,23
138:20,20 140:9
141:4 143:20
186:24 208:19
228:13 233:18
236:8,21 244:5
247:2,4,8 254:23
276:2 277:22
**members** 29:13
50:9 80:24 83:9
88:19 90:2 92:8
92:25 114:10,18
123:9 127:18
206:10 224:14
230:10 234:24
236:3 244:6,9,12
245:6,12,12,13,17
245:19,20 246:3,4
246:11,19 247:4,7
247:13,16,18,19
248:25 249:2,9
251:11,12 277:24
278:9
**memo** 39:3
**memory** 137:5
**mention** 208:22
220:14 254:5
**mentioned** 49:16
83:13 114:9
156:19 266:8
296:2 301:14
305:3

**message** 302:23
**met** 208:11,16
222:3
**methods** 93:25
**meticulous** 129:12
**metric** 214:8
**MICHAEL** 2:6
**middle** 24:15 248:3
248:4
**mike** 4:18 192:4
282:4
**mildly** 234:7
**million** 268:23
283:13 285:6
**mind** 13:10 25:21
101:10 112:16
185:2 207:16,19
214:13 226:21
282:8 291:2,15,25
292:20
**mine** 258:6
**mines** 87:5
**mining** 274:16
**minute** 273:7
**MIO** 99:16,19,24
122:7,8 205:12,15
205:16,20,22
206:4,7,11,15,19
207:8,9,10,11,13
207:22 208:2,4,15
208:24 209:5,20
209:22 210:2,2,5
210:11 211:5,13
211:16 212:15,16
215:10,22 217:9
217:17 218:25
219:5,6,24 220:12
222:25 223:5,21
224:6,9,14,15,18
224:18,20,24
225:4,7,23 226:4
226:25 227:17
228:13,16,21,23
229:12,13,15,22
229:22,23,24
230:3,7,10,20



Case 15-10541-BLS Doc 2417-6 Filed 04/24/19 Page 332 of 347
Case 18-55672 Document 90S-2 Filed in TXSB on 01/01/19 Page 334 of 346

Page 19

233:17,19 234:4
234:15 235:2,18
236:3,9,11,16,19
236:24 237:15,21
238:6,9,16,18,19
238:20 239:6,13
239:13,19,20,21
240:17,18 241:16
241:17,25 242:2,3
242:9,10,10
243:16 244:5,9,12
244:15,21 245:7,9
245:12,13,18
246:5,12,21,22
247:8,20 248:5
249:2,20,22 250:2
250:6,6 252:10,14
252:18,22 253:5,6
253:14,18 254:7
254:12,13,14,18
254:19,20 255:3
255:13 256:6,9
258:20 259:9,15
262:12 266:3,7,9
266:17 267:6
268:4,18 270:10
270:14,16 271:7
271:23 272:16,20
296:14,16 298:6
**MIO's** 230:14,19
**mischaracterize**
46:11 188:21
**mischaracterized**
188:19
**mischaracterizing**
169:2
**misleading** 231:16
232:25
**misread** 231:21
**misspeaking** 302:9
**misstates** 35:13
93:6 95:9 198:23
235:9 237:5
248:22
**misunderstand**
213:13

**misunderstanding**
193:8
**misused** 302:12
**modifies** 306:18,22
**Molino** 65:2,6
125:17,20 301:20
301:25 302:13
**moment** 49:24
58:11 83:17 85:16
**money** 209:25
211:6 213:4
215:23 216:13,15
224:25 285:17
286:3,6 288:5
297:17
**monitor** 69:7
**Montgomery** 27:4
27:25
**month** 111:11
140:19 142:12
193:15 212:9
213:6,10,16 214:6
214:7 286:2,8
296:15
**monthly** 211:18
212:5
**months** 137:25
138:2
**morning** 4:22
**motive** 193:21
**mouth** 165:17,24
**move** 16:24 23:24
24:11 178:15
182:19 198:18
202:19
**moves** 178:11
**multiple** 29:3 34:9
46:20 73:21 78:24
129:23 169:10,14
270:25
**Murray** 2:11 4:20
4:20,21
**M&A** 154:13
156:22

**N**

N 5:9 204:24,24,24
205:2 308:3
**name** 4:12 18:23
20:3 23:6 25:2
26:2 36:23 64:12
66:12 70:8,13
73:9,13 82:25
90:14 98:24 102:5
128:6,6,7,7
208:11 209:8
228:19 257:7
258:18,23 288:24
289:15,17 291:24
299:16 302:12
303:16
**named** 90:10
**names** 48:18 69:19
69:22 76:24 80:23
85:8 86:16 112:21
118:17 289:8
292:2,5
**narrow** 100:8
**Natural** 261:15
263:18
**nature** 135:5 190:6
251:3 275:3 277:5
297:13
**necessary** 42:14
63:8 165:7 257:23
**need** 43:17 62:13
63:4 66:4 75:6
89:7,8 130:6
133:7 140:25
142:18 143:3,8
144:5,5,17 145:16
145:17 146:20,21
150:14 175:7,10
248:12 258:4,15
**needed** 112:11
135:10
**Neil** 27:5
**neither** 12:18
**net** 43:4
**never** 64:11 208:11
208:16 217:21,22
218:6 241:9,10

**new** 1:11,11,13,19
1:19 2:5,5,16,16
2:22,22 4:11,11
25:11 59:17 70:23
89:18 90:21
110:21 114:9
137:20 139:7,8,11
139:14,16 140:20
140:21 142:13
143:5,7 144:3,16
145:8,13,14,15
146:18,19 148:16
148:17 189:15
191:15 213:8,11
215:10 307:3
**news** 196:18 262:16
262:18
**newsletters** 215:7
296:16
**NII** 197:14
**nondisclosable**
202:25
**nonpublic** 295:22
**North** 274:3,16
**Notary** 1:13 5:10
311:14
**notation** 42:25
**note** 5:15 225:9
**noted** 80:4 111:19
112:23 204:25
285:15 307:6
311:6
**notes** 111:20
**notice** 143:6
**noticed** 139:3
**notified** 142:22
143:14,15
**notify** 140:2,4
142:23 143:3,16
**November** 107:10
107:18
**number** 18:8 25:13
38:8 56:18 80:13
83:18 117:25
118:13 206:5
283:15 297:3

**numbered** 295:7
**numbers** 5:25
194:9 200:6 295:7
**numerous** 223:18

**O**

O 5:9 204:24,24,24
205:2
**oath** 225:6 226:24
233:14,24
**object** 117:13
141:21 144:24
198:22 271:9
**objected** 52:21
**objecting** 148:20
**objection** 8:20
13:20 15:23 29:23
32:23 44:17 45:3
45:18 46:14,23
53:8 56:6 58:17
59:9 64:8 65:15
65:21 72:18 75:8
77:25 84:3 92:4
93:5 102:23
106:15 128:9
138:13 141:9
144:19 145:18
148:8 149:6 150:3
155:4 157:23
159:4 161:14
162:9,16 169:12
174:14 184:24
190:22 191:22
201:12,22 216:17
218:3,13,18
219:12 220:7
225:10 235:20
236:14 237:3
245:22 248:22
250:10,17 251:9
255:9,14 261:24
265:3,19 266:12
268:10 269:2,13
269:19 270:20,23
275:9 293:25
294:15



Case 15-10541-BLS Doc 2417 Filed 04/24/19 Page 333 of 347
Case 18-50671 Document 905-2 Filed in TXSB on 01/01/19 Page 334 of 346

Page 20

obligations 11:8,11
264:24
obtained 257:15
obviously 102:18
164:24 194:24
Occasionally 215:9
October 107:7,25
108:15,22 136:15
177:13,18,25
178:5,16,23 203:6
281:10 287:12,12
offer 284:14
offered 285:16
offering 229:17
offers 212:16
office 1:10 10:13
17:3,7,13,16
18:16,21,25 20:9
20:11,15 21:4,7
21:10 52:14 53:12
53:22 54:5,12,20
64:25 143:3,16
145:20 146:15
166:15 168:17,18
169:19 174:23
175:3,25 176:5
231:13 232:21
279:8,9
officer 228:24,24
230:13 303:20
officers 81:25 90:2
91:7 300:8,20
303:12 304:11
offices 16:25 17:4,5
17:10 18:5 298:9
official 65:19 293:6
officials 233:23
Oh 81:8
okay 18:23 81:8
107:17 111:13
127:17 168:7,9,13
169:19 186:3,4
191:6,8 192:7
193:11 233:10
238:3 267:14
273:20 277:19

278:23 279:24
292:25 293:10
296:10
okayed 52:13
old 177:7 184:23
ominous 204:19
once 73:21 139:4
148:4 204:18
212:9 219:8
305:25
ones 83:17 89:23
127:12 129:23
161:22 169:4
206:20 212:18
256:21 300:17
301:4
one-month 201:21
one-year 201:11,20
ongoing 154:11
185:4 187:13
online 126:7 130:12
134:21 212:5
297:15
open 171:2
operate 274:15,17
274:25
operations 230:6
opine 92:11 201:6
294:18
opposed 28:17,18
92:9 93:3 180:13
210:12 224:15
240:11,13,14,15
278:16 289:16
optional 293:24
294:9
options 180:2
oral 243:7
order 5:17 6:11,16
16:11 118:23
163:11 164:6,10
199:2,13,23
201:25 241:8
308:13
organizations
156:2

orient 152:7
original 47:12
52:25 61:7 62:10
62:23 63:17 89:2
91:8 97:5 111:14
249:23 285:24
289:4 302:4
originally 280:2
ORLA 3:5
ought 32:4 64:18
outcome 104:19
268:7
outdated 217:23
outer 93:8
outlined 106:20
outputs 173:2
outside 20:5 32:17
33:11 36:20 37:3
65:24 67:11 91:16
92:9,25 93:15
161:25 170:7
185:22 187:22
189:18 203:5,7
222:15 234:23
239:20 240:18
241:16 242:2,9
245:12 254:12,18
259:19 266:25
overall 71:25
230:19 274:13
overlap 206:17
overlapping 101:3
overseeing 230:18
owe 180:5
owned 170:22
253:16 281:14,21
282:17
ownership 170:16
170:22 171:5,11
171:14 279:11
283:10
O'CALLAGHAN
3:5

_____
P
_____
page 12:8,23 13:8

21:20,22 61:16,18
80:12,14 103:6
107:14 194:8,9
208:23 209:4
274:11 283:17
285:8 308:6,12
309:5,5,5,8,8,8,11
309:11,11,13,13
309:13,16,16,16
312:3
pages 130:12
134:20,22 212:11
214:18,25 311:3
paid 286:12 288:6
paragraph 10:4
13:11 21:21,25
56:7,10 66:18
67:14,18,20 75:17
77:11,12 80:5,15
80:18,19,20 84:18
87:2 88:2 89:16
97:4,6,7,9 98:3,4
100:11,25 101:18
102:7 103:3,8
107:23 108:3
110:10 111:19
112:24 113:2
116:18,19,24
119:5 124:11
150:25 152:23
153:4 171:16,18
172:6,21,25 174:4
174:5,6 179:4,4,7
179:8 200:2
209:19 223:25
224:4 226:6
227:11,13,15,22
228:15 229:5,9
230:21,24 231:3
231:14,21 237:23
238:3 243:25
244:4 246:2
248:19 250:13
259:22,25 260:17
261:3,14,18 262:5
262:8,21 263:2,21

267:9,23 273:5,17
273:21 274:11
275:16 276:14,19
277:14 278:24
279:22 281:3,6,12
283:3,6,11,15
286:19,22,23
287:4,24 292:23
paragraphs 60:12
93:21 205:11
223:15 232:23
246:17 249:23
parameters 75:9
Pardon 103:24
240:12 280:15
part 5:16 21:3
24:19 28:20 95:18
95:21 107:20
124:9 131:21,22
162:15 163:16
166:10 177:9
184:17 210:6
220:21 235:25
253:23 256:15
258:10 260:13
263:9 264:22
301:20,21 304:6,7
304:8
particular 17:16
45:6 64:4 70:5,14
71:20 115:16
119:25 187:16
188:24 189:5
252:3 295:7
particularly 44:14
115:21
parties 8:13 29:18
50:9,10 61:6 62:9
73:21 76:18 79:4
79:25 91:3,10
93:24 94:10,25
96:12,21,25 102:4
104:21,23 107:25
108:24 113:25
114:4,15,16
123:11 131:16



138:6 139:22
140:8 142:14
144:17 154:12,14
177:6 202:10
224:10 280:6,20
281:9,15,22,23
282:11,18 290:18
290:23 292:10
**partner** 7:6 31:12
69:15 70:8,13,17
70:22,24 71:6,11
74:18 75:5 84:12
85:25 127:23
133:24 134:4
135:23 140:10,15
140:24 142:2,3,18
144:12,14 149:14
191:13 196:16
209:16 239:13
255:10 256:19,23
256:24 299:7,21
302:18 304:3
**partners** 2:4,9 7:10
7:16 50:7 75:4
79:12 83:3,4,21
94:2,12,12 96:3
99:16 126:19,24
127:3,6,7,11,13
127:16,19,20,20
135:7 136:17
140:2 142:23
143:13,21,25
148:10 151:6,11
160:7 172:3,12,14
173:18 187:11
191:13 205:14,24
205:25 206:3,8,13
206:14,17,18
209:5,9,10,14,24
209:24 219:6
224:6,9 225:4
229:12,13,16,17
234:24 243:16
246:5,23 247:20
247:25 248:5
253:15 255:3,21

256:5 257:19
258:13 266:17
270:10 272:16
278:5,12,16,18
279:15 281:25
282:16 298:14
299:10
**party** 6:7 29:17
53:16 73:9,25
74:13,15 76:24
93:23 115:2
123:10 140:8,23
144:4 161:24
185:10 187:17,19
187:20 229:20
230:3 234:16
239:16 248:18
275:25 280:14,17
291:2,15 292:18
**pass** 165:16
**passed** 168:12
**passes** 129:18
142:12
**passion** 22:15 24:7
**pause** 89:8
**paycheck** 297:6,9
297:24
**payment** 47:6
283:13,24 286:10
**payments** 49:17
57:2,2 283:22
285:13 287:10
**pays** 297:22,24
**Peenes** 85:11 86:3,4
**pen** 38:23
**pending** 146:4
154:11 156:21
**pension** 208:7,7
209:20,23 210:5,9
217:8,17 218:25
224:16 229:16
**people** 10:12,14
19:15,18,19 22:6
22:12 23:7,15,24
25:6,9,19,21
26:24 28:24 29:5

29:8,10 32:17
81:4,7 82:25 83:2
83:14 84:11,14,14
84:14,17 85:6,7
85:18,20 89:22
108:23 109:5,9
112:11 114:12
122:16 126:8,10
131:5,20,21
135:18 136:4,6
148:4 235:24
236:19 242:9
245:18 249:9
301:18
**peoples** 132:16
**people's** 132:15
**percent** 42:2
128:24 129:3,5
211:14 213:23
214:8,9 215:21
216:12 280:2,7,8
280:20,22
**percentage** 210:11
211:4,12 214:12
251:21
**perform** 78:5
201:14 277:9
**performance** 213:7
**performed** 48:3
259:22 275:25
276:9
**performing** 15:5
78:22
**performs** 77:5
**period** 23:25
122:24 177:10,21
178:4,8 180:16
181:8,12,14 182:2
182:4,12,22
183:10,25 184:14
184:20 185:5
186:10,14,19,23
187:15,21,22
188:12 189:19
191:3 197:6
200:12,20 201:16

203:6,7,15 222:9
240:19 247:24
248:2,10,11,14
**periods** 34:10
190:24 201:15
**permission** 243:17
243:19
**permit** 202:9
**person** 9:4 19:22
20:4,8 24:18 36:9
37:12 65:13
132:12 149:25
208:11 229:3
**personal** 23:17
26:6 279:5 295:15
295:19
**personally** 19:25
182:23
**person's** 173:6
**perspective** 61:8
**Peter** 2:22 5:6
10:15 36:21 39:9
**petition** 11:19,24
89:20 105:7 107:6
177:24,25 178:5
178:10 180:13,16
185:20 186:7
189:12 308:14
**petitions** 203:17
204:3
**Petrella** 2:6 4:18,18
5:14 6:14 8:7 9:16
9:18 10:23 12:14
13:7,8,22,23
15:25 16:10,23
17:22 23:12 26:16
27:19 29:25 41:16
56:9 60:8 62:2,4
63:13 67:17 80:10
81:11,15 98:6
108:6 115:20
116:9,14 141:20
145:2,4,25 146:6
146:24,25 147:9
147:20 150:7,13
151:23 152:24

163:5,15 164:5
167:22,25 179:3,6
179:7 182:15,16
190:8 197:21
198:8 199:6,24
200:17,22 202:16
202:19 204:9,14
205:5 218:15
219:21 221:17
223:12,15,18,24
224:12 225:13
226:9,12 227:4,12
227:13,16 229:8
230:23 231:9,22
232:3,7,12,18
233:3 237:7 265:6
268:13 269:22
282:4 289:21
296:20 298:19
306:23 308:7
**phone** 135:22 136:3
136:9 145:19
183:21 305:12
**phonetic** 26:4,18
27:5 85:14 208:9
299:18 302:24
**phrase** 151:17
163:18 168:24
173:22 306:4,10
**picked** 251:23
**picture** 205:20
**piece** 21:21 251:13
**Pietro** 19:7
**pin** 147:5
**Pincus** 66:9 298:20
**pitching** 191:14
193:24
**place** 47:9 101:5,19
101:20 139:25
145:3 175:4
181:12 238:14
271:17
**places** 210:12 211:9
**plan** 268:20
**planned** 54:19
**plans** 41:23 208:7



Case 15-10541-BLS   Doc 2417-6   Filed 04/24/19   Page 335 of 347
Case 18-85672   Document 905-2   Filed in TXSB on 01/01/19   Page 334 of 346

Page 22

210:9 229:16
304:16
**platform** 24:24
**playing** 14:9 15:5
270:19
**plays** 236:21
**pleadings** 263:18
263:24
**please** 4:16 22:25
59:11 76:23
126:10 129:19
143:12 145:24
195:7 226:22
242:5 268:15
282:8
**PLLC** 2:14
**point** 10:4 33:24
62:19 104:20
105:2,6,8,11
108:22,25 115:14
126:5 180:5
198:17 207:17
217:5 218:22
226:5 240:7
248:17 276:16
288:14
**pointed** 113:13
184:13
**points** 38:4
**policies** 182:2
271:17 294:12
295:2,6,13,25
296:4,12
**policy** 31:7,11
100:14,20,22,24
183:4,7 238:14
240:21 241:13
252:17 253:21
254:11 256:13
257:8,8 258:12,16
258:23,23 259:3
272:23 290:5
293:3,6,8,11
295:16,18
**pool** 210:25
**pop** 292:16

**pops** 132:9,11
134:19 291:14
**portfolio** 213:5
229:17
**portfolios** 217:4
**portion** 252:20
**portions** 223:19
251:23
**position** 205:16
206:4 207:25
**positions** 224:19
**possibility** 179:22
**possible** 34:12
40:11 71:9 106:19
114:6,8 171:3
220:5 286:11
**post** 11:19,24 63:17
105:7 144:14
308:14
**potential** 79:4
104:19 154:13
189:15 190:19
191:7 224:10
281:9 282:11
285:15
**potentially** 158:22
190:15 191:16,19
209:10 265:15
**power** 185:11
274:3,15
**practice** 6:18,21,24
6:25 7:2,3,9,13
20:16 22:3,11,17
23:3,8,16,20,25
25:22 27:6,9,22
27:23,25 28:10,15
29:5,9 31:5,8,12
66:2 82:10,14
83:4,15 101:2
190:2 207:13,22
257:21 258:11
290:6 304:4
**practices** 22:2,6,22
24:20 204:8
**practitioners** 17:12
**predominantly**

55:2 84:7
**prefer** 24:15
**preferably** 194:25
**preference** 26:6
283:20 284:2,24
285:7,15
**prejudice** 286:24
287:7,17,20,23
288:3,10
**preparation** 10:6
10:14,17 15:3
41:21 42:8 49:13
52:9,17 54:23
57:10,12 59:24
60:7,9 68:16
72:10 76:4,10
91:25 125:9 167:8
167:12 175:15
198:16 228:8
240:25 253:22
258:4 259:6 262:4
262:14 294:21
295:4 296:13
299:4,13 301:23
302:4,8 303:4,9
304:25 305:2,19
**preparations** 11:4
**prepare** 40:2 42:13
249:13 280:14,16
**prepared** 48:14
176:12 182:7
305:10
**preparing** 31:25
39:25 41:15 47:17
59:5 138:7 161:23
253:22,23 257:24
261:18 300:2
**prepetition** 103:23
103:25 104:6,9
105:7 180:7,12
287:2
**prerogative** 116:5
**present** 3:8 74:11
**president** 222:19
222:21 228:12,20
229:3 233:18

236:9
**presidents** 83:5,5
83:22
**presumably** 39:10
67:25 138:10
**pretty** 33:17 150:14
163:20 197:18
**previously** 11:3
94:2,11 179:19
292:3 301:13
**primarily** 37:9
60:18 70:9 102:8
125:12 229:20
230:17
**print** 134:22
**printout** 72:5
**prior** 25:8,17 34:4
35:3 47:5 49:18
50:16 52:24 57:3
57:5 81:6,6 85:5
95:9 104:10 162:8
165:2,6 197:9
210:23 217:6
226:18 235:17
267:4,17 285:14
287:10 291:5,19
291:20 292:3
302:24
**priority** 109:14
**pristine** 80:9
**Private** 88:15
**privilege** 6:8,9
202:13
**probably** 7:5 38:12
39:5 40:15 134:22
149:12 166:22
204:15 211:14
241:5
**problems** 184:19
**procedure** 137:6
241:7
**procedures** 116:3
**proceed** 47:3
**proceeds** 139:6,14
**process** 39:19,25
47:17 91:24 101:6

101:12,21 102:2
105:6 106:17
109:13 111:2
112:14 122:17
123:2,6,12 124:23
125:7,13,21 129:7
129:13 147:22
148:2,11 173:24
188:9 222:3
236:21 262:2
268:24 282:23
284:15
**processes** 173:3
**Production** 309:7
**productive** 42:5
**products** 229:18
230:20
**professional** 7:20
8:3,13,25 9:8 18:8
82:7,18 91:14
105:19 161:11
257:11 259:18
293:16 310:7
**professionals** 7:25
17:15 18:15,24
19:3 20:15 26:19
83:7 180:25
184:16 236:17
272:16 293:7
**professional's** 11:8
11:11
**programs** 209:23
**progress** 148:6
**prohibit** 106:18
252:21 271:17
290:3
**prohibited** 238:12
254:2 272:24
295:21
**prohibitions**
242:16
**prohibits** 252:16,17
254:7 257:18
**project** 107:4
291:16
**prompted** 174:22



Case 15-10541-BLS   Doc 2417-6   Filed 04/24/19   Page 336 of 347
Case 18-85672   Document 90S-2   Filed in TXSB on 01/01/19   Page 335 of 346

Page 23

263:15,25 264:5
**proposed** 54:13
**propounded** 311:5
**protect** 257:10
**protection** 237:24
238:5
**protocol** 137:11
238:15 239:24
240:20 241:12,16
241:24 242:6,18
243:14 252:15
254:3,17 257:6,17
258:13,20 259:2
259:10,11 290:6,9
290:14
**protocols** 237:24
238:5 239:5,18
259:8 270:22
271:6 288:23
289:13,24
**provide** 8:25 9:10
13:17 54:19 94:17
99:7,10,19 116:21
117:5,21 118:20
119:9 120:10,18
120:25 121:5,19
122:6 137:11
151:7,21 152:14
153:5 156:14
160:8 229:13
238:20,24 258:8
274:13 275:17
276:23 279:4
**provided** 14:6
29:11 37:7,7 38:3
38:15 44:10 46:6
54:5,11 79:2,3,23
97:8,13,22 111:7
148:14 155:7,14
156:23 189:10,15
191:4 281:8 283:7
283:23 288:7
291:3,17 293:19
**provides** 95:17
120:23 121:8
122:9 238:15

**providing** 15:7
49:21 69:18 87:5
106:19 273:25
290:17 305:11
**provision** 223:13
273:23
**provisions** 11:6
15:17 264:23
**public** 1:13 5:11
217:7 252:3,4,9
252:11 266:11
268:9,25 269:12
270:3 272:6
311:14
**publication** 263:12
**publicly** 217:14
218:24 274:19
275:23 296:8
**Pugh** 2:18 5:4,4
**pull** 68:19
**purely** 78:21
**purported** 225:23
**purpose** 5:19,22
68:2 78:21 116:11
145:5 199:4
261:11,20
**purposes** 8:19,23
82:4 102:9 122:23
155:23 236:12
248:9 261:18
**pursuant** 5:17 9:23
15:18 61:3
**pursuing** 215:16
**put** 16:17 42:22
62:19 64:19
149:11 158:14
234:6 247:24
248:10,11 261:22
285:23 286:10,13
**putting** 248:2
**p.m** 185:15 204:25
205:8 273:14
297:4 307:5,6

**Q**
**qualification**

115:23 225:18
**qualifications**
16:15
**qualifier** 248:15
**qualifies** 9:4
**qualifying** 16:2
**quality** 8:3
**quarterly** 230:17
**quarters** 174:6
**question** 7:12 8:21
9:20 11:17 22:24
29:24 32:24 33:15
33:20 34:8,10
35:15,17,18 42:21
54:8 59:10 62:3,7
74:3,25 75:3
76:22 79:16 81:2
82:8 86:3 88:7,8
88:25 89:4 98:15
101:13,24 105:5
105:16 106:10
117:2,10 120:19
121:12 130:22
131:25 133:12
135:14 141:20
144:23 146:3,4,6
147:6,15,17 149:8
149:11,12 150:16
152:4,6,15,25
157:4 158:15
159:13,14 164:7
164:12,15 165:3
170:19 173:17,23
174:16 178:25
182:19 190:7,9
203:22 205:17
207:19 217:10
218:20 226:7,19
226:20 227:19
232:9,20 235:13
235:14,15,16
237:9,11,12 242:4
242:13 244:10,17
247:25 248:10
250:23 251:16
255:17,18 260:6

261:4,5 264:9
268:4,16 269:22
271:2 281:17
282:24 283:7
287:21 289:3,22
291:13 300:23,24
300:25 301:9
**questioning** 150:8
199:14
**questions** 15:24
16:5,19 58:21
115:24 116:7
130:16,16 131:7,9
131:15,23 132:17
132:19 133:15
134:23,25 136:4,7
137:8,9,10 141:22
147:24 150:9
159:19 164:2
199:2 200:8,15,24
202:8,10 225:25
232:16,19 233:10
234:12 265:9
270:25 305:17
306:24,25 309:13
311:4
**quick** 150:16
**quickly** 126:23
270:4
**quite** 117:8 164:6
**quoting** 227:3

**R**
**R** 2:11 5:9,18
204:24 205:2
312:2,2
**rabbit** 134:18
**Radika** 90:10,10
**raised** 53:23 59:7
174:17 220:11
270:15,16
**Raj** 27:4 299:17
**rank** 84:13
**ranks** 83:22
**rate** 128:22 129:3
130:9

**ratified** 233:20
**Ray** 90:10,19
**reach** 94:11
**read** 13:10 33:16
33:18 164:5 195:7
195:10,11 223:25
226:11 229:4,8
230:24 231:2,11
232:9 244:2
252:23 267:16,22
267:25 272:22
273:17 275:7
277:15 279:25
283:3 286:19,21
292:23 311:3
**reading** 13:7
172:24 227:14
232:13 252:22
261:2 277:18
279:23 281:4
**reads** 200:2 234:2
**real** 80:14
**really** 9:18 24:18
74:15 117:10
118:2 121:3
151:13 157:3,5
186:17 188:14
196:13 214:14
217:12
**realtime** 12:12
**reason** 39:13
117:11 152:16
171:22 172:18
173:12
**reasons** 114:7,20
**recall** 10:25 19:5
20:3 32:2,5 38:8
39:17 40:6 44:6,7
44:12 45:5,6,12
47:2,16,24 49:5
52:8,11 54:3,3,15
54:21 55:6,11,22
56:19,22 58:11,12
58:13 60:20 61:13
75:16,18 77:11
83:17 84:16 89:25



Case 15-10541-BLS   Doc 2417-6   Filed 04/24/19   Page 337 of 347
Case 18-50572   Document 905-2   Filed in TXSB on 01/01/19   Page 336 of 346

Page 24

90:9,24 110:2
111:5 115:5,12
125:4 128:11,16
134:3,16,24
156:25 157:8,10
157:18 166:17
169:4 170:3
181:20 183:2,17
183:22 184:21
197:2,6,8,11
198:15 209:8
212:13 213:2
214:11,17 225:8
226:23 227:23
240:6 241:23
242:20 254:10
262:10,22 276:22
284:8 295:11,15
301:22 303:19,19
303:23
**recalling** 85:15
**receive** 10:8 130:19
131:5,6 136:17,19
137:20 138:21
215:9 272:21
284:5 295:22
**received** 57:3
108:15,20 113:20
128:13 135:8,18
138:5,11,14,16,23
139:3 150:5
283:22,24 284:7
285:14 286:6
294:4 299:8,22
302:23
**receives** 76:21
129:22 140:17
225:4 251:15,18
**Recess** 66:24
150:20 204:23
273:11 296:25
**recheck** 76:12
**recipient** 137:13
141:7 145:10
146:11
**recipients** 136:19

143:6 156:15
**recognize** 11:17,22
**recognized** 112:20
**recognizing** 302:25
**recollection** 45:2
46:7 166:19
179:13
**record** 5:16 6:3,11
14:3 15:20 33:18
40:22 43:10 63:10
63:10 66:23 67:4
69:12 80:8 82:12
89:10,11,15
102:19 128:19
141:16 150:11,19
150:24 154:24
167:21 170:13
185:12,16 204:22
205:9 224:2 229:5
229:6,7,9 232:10
232:11,12,13,14
273:10,15 280:24
280:25 296:24
297:5 302:13
307:5 310:4
**recorded** 4:4
**recordkeeping**
102:9
**records** 122:11,20
122:22 123:4,15
123:21,23 124:2,5
124:8,9 187:8,9
187:18
**recruiting** 222:2
**red** 39:2
**refer** 19:16 119:6
136:12 155:5
230:25 264:8
275:10
**reference** 10:3
26:21 61:10 75:15
80:25 86:15 87:2
99:13 103:7,8
113:9 126:23
127:2 178:18
227:21 238:4

261:15 263:17,25
264:14,16 278:21
278:25 303:20
**referenced** 18:13
77:24 115:22
195:20 196:18
207:17 208:17
218:6 225:17
264:10 299:9
**references** 200:11
283:12
**referencing** 88:4
119:5 159:18
190:24 235:11,23
**referred** 88:11
97:18 141:12
153:2,3
**referring** 9:17,18
94:2 113:3 123:22
152:22 179:5
224:5 230:22
243:9 275:12
282:9
**refers** 6:5 154:4
178:20
**reflect** 41:9,12
42:18
**reflected** 252:4
**reflects** 81:24
**Reformulate** 149:8
**refresh** 118:22
**refused** 44:4
**regard** 6:10 200:7
**regarding** 49:7
215:8 240:18
266:20 270:16
**regardless** 127:3,22
225:19 265:18
**region** 279:7,9
**Registered** 197:13
310:7
**regret** 27:18
**regular** 138:18
211:15
**reimbursement**
293:3,6,8,17

294:12
**reinstate** 288:13,19
**reinstating** 288:15
**relate** 116:15
131:24 164:13
226:9 242:24,25
243:6,7 245:20
**related** 22:13 51:19
60:23 77:7 138:14
169:5 219:5
239:13 249:20
259:23 262:5
**relates** 78:25 97:10
114:25 145:21
147:15 159:21,23
160:15,17 164:8
169:25 172:6
**relating** 226:6
263:5,11
**relation** 43:16
182:5,6 215:17
261:14
**relationship** 30:10
50:11 69:16 70:10
81:22 94:7,15
96:6,23,24 107:2
135:14 140:5,6
143:2,9,19 144:21
144:22 153:20,24
154:5,7,9,10
155:2,6,9,12,16
155:19,23 156:2,4
156:6,16,17,20
157:19 158:2,9,12
158:14,17,18,20
158:21,24 160:11
161:13 162:11,25
163:17 164:20
165:2,16 166:5,25
167:10,15 168:7
168:12,19 169:6
169:20 170:2,5
171:23 172:18
173:13 186:2,6,9
186:13,20 187:2
187:14 195:13

196:16 238:14
245:14 246:24
247:11 249:16
250:24 251:3,4
259:13 262:13
276:3,5 279:6
306:5,8,13,19
**relationships** 79:15
94:13,14 134:7
143:18,24 159:3
159:16,21 160:4,5
160:14,18,19,22
161:2,5,7,9 166:9
168:23 188:2
246:3,11,20
247:18 248:14,20
248:24 249:4
250:15,22 251:6
**relative** 52:19
53:23 239:12
**relatively** 251:24
**relayed** 51:22
**relevant** 126:9
141:7 170:25
226:12 298:17
**relied** 162:3 228:6
249:9,13 260:16
262:7 302:6
**rely** 10:12 68:15
72:13,16,19
201:23 262:3
**remains** 45:20
**remember** 44:13
49:10,11,22 52:15
55:4,12 90:14
111:10 128:15
135:2 177:3
184:11 197:4
226:20 267:25
286:15 289:10
295:24 296:17,18
306:7
**removed** 175:8
269:8
**repaid** 284:25
285:7



repay 284:14 285:17
repeat 8:21 213:24
repeating 226:21 282:8
rephrase 58:22 101:14 271:4
rephrased 157:4
report 64:23 73:17
reporter 1:13 4:14 27:17 310:7,12
reporting 10:13
reports 65:4 125:15 187:19
represent 103:12 171:19 173:10 194:22
represented 108:8 109:19
reproduction 310:11
request 174:22 241:8,11 286:11 286:13 309:7
requested 241:10
required 7:24 46:19 112:4 114:13 129:3,4 162:5
requirements 11:6 14:7 175:17
requires 7:20 8:15 9:7
requiring 175:6
reserve 62:24 306:25
reserved 138:8
resident 17:16 18:14,16
resolution 104:17
resolve 180:3
resolving 162:15
Resources 261:16 263:18
respect 10:21 112:5 146:24 157:16

189:9 208:2 274:20 278:6 282:20 293:6 294:5 304:14
respond 129:16 207:20
responds 129:8
response 45:17 82:9 88:25 128:22 129:3 130:9 135:19 141:2 142:18
responses 128:17 305:16
responsibilities 236:16 257:12 259:18
responsibility 134:6 236:8
responsible 37:9 70:9,13,17 71:6 74:19 75:4,5 94:12,13 125:12 125:17 196:15 230:17
responsive 136:21 137:15
rest 42:6 172:9 223:21 225:24 230:25 239:7
restate 7:12 33:15 59:10 159:14 268:15
restrain 164:2
restrict 115:13 290:12
restricted 68:12,13 143:23
restrictions 175:16
result 161:12 260:8 260:9 268:19
results 72:5 73:17 76:20 77:3,3,21 78:4,21 79:17,20 79:20 135:6 260:2
resumed 205:2

retain 39:6
retained 128:18,20 140:4 142:24 144:3,15 145:13 179:16 180:7,25 181:3
retainer 46:2 47:9 283:23 287:13
retention 7:25 43:16 75:18 97:11 97:12 110:4 143:15 180:12,13 293:21 304:19
retired 209:9
retirement 210:8 210:10,14,15,16 210:24 211:2,9 215:22 216:13,15
return 218:2
review 50:5 66:14 79:3 114:13 122:11 123:7 124:4 187:7,8,9 187:24 249:18 254:10 267:16 274:18 275:23 296:12
reviewed 31:22 65:7,20 122:22 123:14 223:8 248:24 253:21,23 254:18 267:14 270:22 271:7 290:23 291:10 292:10 294:21,24 295:13,25 296:10 296:11,14,15
reviewing 230:18 262:3 266:24 305:9
Richmond 15:19
RICO 59:19,22
right 9:15 14:17,18 17:2 27:2 30:15 36:16 43:9 53:14 54:2 56:2,12,15

61:22 62:24 63:15 63:19 66:10 67:21 69:19 72:6,21 74:20 78:12,15 80:12,21,24 81:4 82:7 85:6 89:20 95:23,25 98:10 100:13 101:16 103:3 107:10,21 108:17 109:14,17 110:3,8 111:24 114:5 115:5 116:21,23 117:5 117:22 118:2,13 120:11,15 121:10 122:7 124:17,21 126:21 128:13,16 132:5,9 137:2,21 138:8,17,24 139:7 139:8 140:11 143:21 146:7 148:7,9 153:6 155:12,17 158:21 160:22 161:19,23 168:14,20,21,25 169:11,21,21 170:16 171:10 174:8 176:2 177:14 178:2,3,6 178:7,12,17 179:3 179:17,23 184:23 185:6,21 186:7 187:19,25 188:10 188:16 192:5 196:24 203:9,10 203:13 207:9 209:21 210:21 211:4,10 213:12 215:24 216:5,8 217:24 218:2 219:2,18 221:17 221:19 222:12,19 223:6 224:16 228:5,19,21 230:23 231:24 235:6 236:13

237:4 239:7 240:24 241:2,22 244:6 247:15,24 250:9,16 251:19 252:3 253:21 254:9,24 255:8,11 255:21,23 256:6 256:10,14,18 257:22,24 259:24 262:25 266:14 272:21 273:24 276:9,21 279:2 287:20 290:24 291:13,21,24 292:21 293:9 295:12 296:19 297:12,23 301:19 303:10,23 304:9 306:20
right-hand 61:17
rise 13:4
risk 215:15 229:19
Rob 27:3 85:13 87:8
robust 148:2
rock 216:14
Rodolfo 3:9 4:12
Rok 299:18
role 20:4,7 205:16 206:4,19,24 207:25 236:9,20 264:22 299:12 303:8,20
roles 14:8 15:4 257:22
roll 213:9,14
rough 25:5 207:2
roughly 82:6 126:19,25 203:8 210:11 222:11 227:22 286:16
Roy 27:4 28:8 90:10
RTS 2:14,20 4:24 5:3,5,8 6:18 7:4,5 7:10,14 12:4,18



Case 15-10541-BLS   Doc 2417-6   Filed 04/24/19   Page 339 of 347
Case 16-55672   Document 905-2   Filed in TXSB on 01/01/19   Page 338 of 346

Page 26

12:18,23 13:5,17
14:22 15:20 16:3
16:16,25 17:3,4,5
17:8 18:5,8,15,23
19:3,10,13,14,19
19:23 20:5,16,19
26:19 28:11 30:7
33:22 41:22 50:8
58:14,14,25 67:6
67:7,8,11 69:13
69:14 74:10 77:5
79:12 82:2,7,14
82:17,19 83:10
84:8,20 85:6,18
90:3,6,20 91:2,4,8
91:16 92:9,25
93:14,16 96:9
97:23 98:9,14,16
98:17,25 99:9,18
100:3,12 104:5,7
105:2,8,12,18
106:8,13 109:12
116:20 117:4,9,21
118:15,19 119:2,8
120:10 123:16
124:6,7,10 127:21
134:8 138:20
140:16 142:2,3
143:22 148:11
151:6,11 153:9,14
159:24 160:8
162:13 170:21
171:18 172:3,12
172:14 173:9,17
173:23 179:21
180:5 182:11
187:8 197:2
203:16,23 206:9
207:12,21 222:4
222:19,22 224:7,8
225:18 228:12,17
228:21,25 229:3
230:9,11,14
233:18 235:18,22
235:24 236:8,9
237:18 238:8

246:2,5,12 247:17
249:6 252:2
259:22 264:7,12
264:20 267:21
271:25 272:25
273:22 274:12,22
275:18 277:22
278:7 279:3
280:16 281:19
283:2,8,19 286:25
293:2,3,8,12
294:12 297:7,18
298:9,10 300:12
300:17 301:13,18
301:21 303:13
304:4,12
**RTS's** 62:8 91:2
229:12
**rule** 8:11,11,19,23
9:15,24 10:9 11:2
91:22 183:14
201:2,3
**rules** 9:25 91:22
138:4 201:25
270:19
**run** 76:18 138:9
253:16
**running** 190:21

**S**

**S** 2:17 204:24,24,24
308:10
**sake** 79:13 282:7
**sale** 97:24 156:22
**sales** 154:13
**saw** 259:6 282:12
**saying** 14:17 24:13
25:17 29:8 43:22
75:3 78:19 79:7
92:19 101:18
119:23 129:19
144:15 163:25
164:14 167:24,25
169:9,13 171:8
188:12,22 189:17
195:19 211:8

214:4 219:14
225:8 233:22,23
243:13 244:23
251:6 266:2
267:17 268:17
272:14 276:25
280:5 291:23
303:24
**says** 12:18,23 13:3
14:12 103:16
111:22,25 119:8
124:19 126:10
151:10 152:8,11
199:2 224:5
229:11 234:3
239:24 240:16,20
243:17 244:4
248:4 258:13
259:22 262:24
263:4,4 275:21
277:20 293:2,5
306:13
**scenario** 64:21
71:10 106:7,12
193:8
**schedule** 61:7,7,17
61:19 62:5,6
108:9,12 109:20
111:15,18,23
112:5,7,12,13,17
112:24 113:16,21
113:22 114:4,14
114:15,18 115:2
194:7 196:6
**schedules** 61:11,12
61:14 62:9 76:25
291:12
**Schiller** 2:3 4:19
**Schmitt** 26:18
85:11,23
**scope** 32:20 97:16
199:13 204:10
**screen** 146:7,8
255:19
**search** 73:5,8,20,22
74:13 75:9,10,14

75:21 76:7 77:3,6
77:7,22 78:5,12
78:20 79:5,10,18
79:21 96:2,15
106:17 108:23
109:6 112:22
113:7 116:3
124:20 134:4
137:6 177:2 224:9
234:21 259:23
260:3,8,10,12,14
260:18,23,24
261:6,7,8,9,12,17
261:21 262:24
263:11,15,25
264:4 281:7,20
**searched** 76:3,25
120:5 166:11
237:14 282:10
**searches** 47:25 48:3
48:9,17 61:4
62:17 72:3,20
109:3 172:8 178:9
201:15
**searching** 73:10
102:13,17 111:2
136:21 137:14
220:25
**SEC** 221:4
**second** 30:20 40:19
45:13,15 55:23
61:2,19,21 63:7
63:12 78:10 86:15
89:8 96:2 110:11
110:18,20,24
111:8 119:20
152:7 194:8
205:20 243:24
247:15 294:25
300:25
**section** 7:19,23 8:4
9:14,23 10:9,20
12:7,15 14:12
283:9
**sections** 10:18
**sector** 22:14,14

**sectors** 274:4,17
**securities** 277:24
278:19
**security** 157:22
158:5 171:21
172:17 173:12
**see** 12:17,22,25
13:2 22:4 38:7
56:4 84:21 98:11
98:19 101:7,22
102:10 103:10,19
107:14,18 114:23
119:11 120:7
123:17 124:14
126:23 151:9,15
152:3,5 153:21
164:16 171:25
173:15 178:19
179:9 189:14
190:3 194:16
195:15 216:11
226:19 227:18,21
238:4,7 245:16
246:8 247:21
248:7 251:4 259:5
263:7,9,10,20
275:5 278:2
281:11,13,21
282:15 286:19,22
287:3 293:4
296:21 297:17
306:12
**seeing** 178:23
303:20
**seek** 66:5
**seeking** 7:20
**seen** 69:6,25 257:18
259:2 297:9
**sees** 227:20
**segregate** 237:24
238:5
**selected** 31:3
177:17 181:15
**Selendy** 1:11 2:14
4:23 5:2,4
**sell** 156:7 192:6



Case 15-10541-BLS   Doc 2417-6   Filed 04/24/19   Page 340 of 347
Case 18-50672   Document 90-2   Filed in TXSB on 01/01/19   Page 339 of 346

Page 27

193:10,15,22
**send** 143:6
**sender** 128:3,5
**sending** 125:2
  128:12
**sends** 128:3
**senior** 28:5,9 83:3,5
  83:6 298:14 304:3
**sense** 164:14
  181:10 183:3
  192:21 193:16,19
  217:25 239:4
  305:5
**sent** 79:12 126:24
  127:5,7,13,14,25
  128:15 137:22,24
  137:25 138:19
  153:25 187:10
  246:15,18 247:16
  278:22 284:4
  299:10
**sentence** 46:12
  227:16 248:3,14
  265:7 277:20
  282:10 287:4
**separate** 166:21
  230:5 239:14,14
  239:15 245:10
  249:24 259:8,10
  259:12,16 266:14
  266:16 269:6
  272:8
**separately** 160:16
**separateness**
  223:20 224:6,13
  225:23 233:8
  249:21 271:14,19
**separation** 233:15
**series** 46:11
**serious** 175:11
**seriously** 148:11,12
**serve** 28:25 100:12
  102:20 123:24
  206:10,14 207:22
  256:5,17,22 258:3
  258:24

**served** 29:6,18 30:4
  30:9 69:14 74:10
  94:11 123:10
  159:24 186:22,24
  187:4
**servers** 239:15
  271:16
**serves** 194:19
  229:15 256:21
**service** 29:13,16
  50:5 77:8 78:25
  79:2,23 80:21,24
  81:4,5,17,21,23
  81:24 83:9,10
  85:4 89:19,25
  90:7,25 91:6,11
  91:15,20 92:8,24
  93:15,23 95:5,18
  95:21 96:9,15
  114:10,13,18
  115:3 122:11
  123:3,10 127:15
  127:18 130:21
  131:8 133:20,24
  137:17,20 138:21
  140:3,7,9 141:4
  142:25 143:20
  151:10 159:23
  160:7,15 186:24
  187:9,11 244:4,8
  244:11,14 245:6,8
  245:11,17,20
  246:3,11,19 247:3
  247:16,18 248:25
  249:25 250:5,7
  257:15,16 258:8
  259:20 270:7
  274:23 276:2
  277:22 278:7
  301:21 304:7,9,10
  304:13
**services** 1:18 3:9
  4:16 15:6 29:11
  29:19 46:5 69:18
  71:25 74:19 79:23
  87:5 95:17 97:8

97:14,15,16 99:11
  99:19 103:14
  106:19,20 116:21
  117:5,22 118:20
  119:10 120:11,19
  120:23 121:2,5,8
  121:19 122:7,9
  151:8,21 152:14
  153:5 160:9,9
  189:10 191:5
  229:14 238:21,25
  239:3 276:25
  279:5 281:7
  283:22 287:16
  288:7 290:17
  291:3,17
**serving** 22:16 29:14
  31:13 82:4 90:4
  96:5 100:14,15
  101:3 160:2
  190:13 191:10
  246:6 249:6 256:4
  256:13 257:9
  264:22 269:3
  270:8
**set** 5:24 96:2 131:8
  137:6 180:11
  200:5,10
**sets** 81:10
**seven** 5:21 26:23
  85:6 235:6,17
  236:5
**shape** 243:21 299:6
**share** 20:25 258:14
  259:19 271:15,16
  271:18
**shared** 39:8 206:7
  253:13
**shareholders** 280:3
  280:7,8,21,22
  298:12
**shares** 255:2
**sharing** 253:24
  255:4 257:13
  258:17,17
**Sharma** 85:12

86:12 88:13
**Sheet** 311:6
**shorter** 201:16
**shortfall** 284:14
**show** 11:14 42:19
  43:4,6 107:12
  187:18 195:3
  211:21 214:20,21
  227:5
**shown** 183:9
**shows** 211:19
  297:12
**side** 217:8,17
  239:12,13 240:3
  272:8,10,12
**sign** 15:12 31:14
  40:2 261:23
**signals** 120:4
**signatory** 31:4
  297:10
**signed** 14:6 52:6
  66:6 97:17 115:7
  165:7 183:11
  196:23 197:20
  228:2 262:9 297:6
**significance** 226:15
**significant** 117:18
  303:2
**significantly** 268:7
  268:22
**signing** 34:5 51:2
**signs** 31:9
**similar** 40:20 117:8
**simple** 46:12
**simply** 176:4
  200:17 211:19
**single** 44:25 125:24
  131:10
**sir** 6:19 12:15 13:16
  19:9 21:19,23
  36:25 48:19 63:16
  63:20 66:11 68:21
  73:6 84:10 148:4
  149:9 199:5 244:3
  283:18 302:16
  303:11

**sit** 37:11 56:22
  60:21 63:3 99:17
  121:2 197:17
  240:24 241:22
  261:3 290:16
  291:23,24 296:19
  297:23 303:23
**site** 297:15
**sites** 218:7
**sitting** 30:15
  290:24 292:15,20
  295:11
**situation** 189:23,24
  192:25 193:25
  206:16 265:15
**situations** 50:24
  106:5 123:9 165:6
  173:4 174:3
  177:22 180:18
  181:2
**six** 137:25 138:2
**sixth** 227:22
**skipped** 300:25
  301:8
**slow** 12:10 17:22
  27:16
**slower** 157:25
**small** 251:24
**Sneider** 302:24
  303:8
**social** 222:14
**socialize** 222:15
**software** 68:22
**solely** 298:10
**somebody** 95:3
  114:18 218:11
  238:9
**Sorrentino** 19:7
**sorry** 9:20 47:3
  74:3,24 80:19
  118:17 141:22
  146:8 152:4
  207:18 217:11
  218:20 238:19
  255:19 261:2,4
  283:15 285:11



MAGNA ▶
LEGAL SERVICES

Case 15-10541-BLS Doc 2417-6 Filed 04/24/19 Page 341 of 347
Case 18-85672 Document 90S-2 Filed in TXSB on 01/01/19 Page 341 of 346

Page 28

302:9
sort 43:14 46:17
  137:5 156:21
  175:20 193:19
  195:12 214:8
  215:12 225:2
  247:11 259:13
  271:18
sound 126:21
  192:13
sounded 25:13
  279:25
sounds 35:9 71:18
  147:11 179:18
  204:19
sources 31:22
  269:12 270:3
Southern 1:3 4:7
  59:17,23 263:19
  279:10
space 252:9 274:10
spaces 22:16
speak 21:9 32:13
  32:16 51:21 53:15
  55:8 57:23 64:10
  71:9 72:22 74:22
  93:8 100:19
  102:15 103:2
  104:22,25 105:21
  105:23,25 130:15
  149:3,20,21 155:5
  159:2,6,9 189:22
  209:11 219:7
  221:21 225:22
  239:19 240:23
  241:15,16 243:20
  252:13 254:4,25
  260:14 269:15
  272:24 290:8
speaking 22:8,10
  210:25
specialist 4:13
specialty 6:20,23
  6:25
specific 6:22 22:12
  22:14 29:2,7

30:22 31:10 34:19
  38:8 44:11 49:9
  51:21 55:24 56:18
  56:21,25 57:9,16
  57:18 60:13 77:11
  78:2,8 79:11
  86:13 92:20 110:2
  116:11 119:5
  127:8 128:11
  134:25 135:4
  136:22 138:4
  141:5 154:2,3
  155:7 157:11
  168:5 172:21
  173:22 177:16
  184:11 185:7
  186:15 190:23,24
  191:17 200:12
  203:18 210:16
  225:19 236:22
  238:13 240:6
  243:10 251:13
  255:16 257:13
  258:18 260:15
  262:10,22 264:9
  265:13 271:2
  273:25 276:22
specifically 10:4
  14:8 15:7 17:11
  18:17 19:20 28:22
  32:25 36:6,8
  37:18,23 40:6
  49:2 52:7,16
  54:14 59:18 65:8
  68:3 69:4,24
  99:13 122:15
  123:25 126:22
  144:13 153:18
  154:18 159:22
  164:19 167:14
  168:24 176:13
  188:7 194:7
  205:17 208:13
  209:7 214:11
  219:6 223:17
  224:18 225:17

235:11,23 236:20
  239:10 240:23
  243:25 248:16
  251:10 252:17
  254:3 261:10
  262:5 264:5 266:6
  273:17 279:21
  281:17 284:8,22
  285:15 288:11
  292:23 300:22
  304:20,22
specificity 137:9
  156:24
specifics 53:15 56:3
  127:11 159:7,9
  160:23 161:15
  175:5 185:9
  192:17,18 260:15
specify 136:13
  141:12
speculate 100:7
  106:24 220:8
speculative 269:21
speech 146:5 234:9
  235:15
spend 113:11
spent 40:5,14 41:5
  41:13,21 42:13,19
  42:24 43:19 49:19
  192:8 262:2
  266:23
spoke 298:7
spoken 222:10
  243:7
spot 66:20
spreadsheet 69:2
staff 18:11 83:9
  84:6 127:23
  238:16,17,20
  252:19 259:14
staffed 89:19
stake 271:24
Stamford 18:21
  19:4 20:9,11,15
stand 57:10 168:20
standard 105:10

162:11,19 163:22
  164:21 168:19
  169:20 197:13
stands 168:20
start 4:3 29:15 40:4
  45:11 67:2 89:13
  104:20 111:3
  125:2 142:12
  150:22 185:14
  203:19,20 204:17
  205:7 273:13
  274:12 297:3
started 39:24 75:14
  75:17 77:19
  134:17
starting 21:24
  25:11 284:15
starts 61:16
state 1:13 17:11
  34:8 36:8 42:12
  54:14 95:13 105:5
  119:18 166:7
  184:6 186:8
  205:17 245:14
  251:10,12,16
  254:16 258:16
  275:19 300:22
stated 11:3 85:4
  95:11 162:3 174:4
  179:24 197:5
  198:9 207:14
  247:2 253:4
  256:14 272:2
statement 5:24
  12:18 212:10
  216:19 227:23
  228:11 235:7
  238:7 247:10
  250:25 260:2
  277:6 296:15
  297:11
statements 6:5
  13:11 200:5,10
  204:11 211:15,18
  211:24 212:4,5,11
  212:23 213:19

214:4,16 215:4
  225:21,22 231:14
  232:22 233:13
  234:11 270:25
  296:14
states 1:2 4:6 10:11
  30:5 62:23 263:2
  278:7
stating 14:8 248:17
status 13:4
statute 183:14
stay 170:9 189:13
  189:19
steering 180:2
step 188:9
steps 139:25 187:5
stick 289:5
Stipulations 309:10
stop 190:20 204:18
  226:11
strategic 274:14,20
strategies 211:20
  212:15,23 213:6
  213:21 214:5,21
  215:18 216:2,3,4
  218:25 219:5
strategy 211:22
  212:24 213:3,7
  215:11,13,15
Street 1:19 2:10 3:4
  17:2 18:25 252:23
  263:5,13 267:22
  267:24
strict 201:6
structure 104:18
  121:13 180:3
structures 229:19
structuring 97:24
stuff 256:25
Su 85:13 86:24
  88:15
sub 61:14 151:4
  152:7,10 153:18
  160:6 168:20
  306:12
subject 16:5 44:15



MAGNA ▶
LEGAL SERVICES

Case 15-10541-BLS   Doc 2417-6   Filed 04/24/19   Page 342 of 347
Case 18-35672   Document 905-2   Filed in TXSB on 01/01/19   Page 341 of 346

Page 29

115:15 200:2
202:15 231:5
234:4
**submissions** 116:10
116:12,15 223:9
223:10
**submit** 41:11 42:17
43:13
**submitted** 9:22,23
30:19,22 41:19
115:17
**subparagraph**
173:8
**subpart** 124:16
**Subscribed** 311:10
**subsection** 141:25
151:4 154:2,3,4
160:20,23 161:2
170:10 278:25
**subsections** 124:13
**subsequent** 34:4
178:9
**substance** 14:14
49:6 55:6 166:12
167:3 183:23
227:2 239:21,22
239:23 311:5
**substantial** 42:13
49:20
**substantive** 303:5,6
**suggesting** 148:3
**sum** 45:23 46:25
283:19
**summarizes** 97:21
**Sun** 51:2,5,12,14,24
52:4,6,13 53:4,14
57:7 115:7,22
116:7,10 162:16
182:25 196:24
197:25 198:11,16
225:6,11,15,16
226:3,24 227:24
228:2,9 229:11
230:21 231:20
232:23 233:4
**supersedes** 103:17

**supervision** 310:12
**supplement** 175:15
282:19 283:12
**supplemental**
30:25 61:2 62:14
62:15,24 63:7,11
63:14,23 66:15
75:25 76:4,8,11
87:3,16,17,19,22
88:24 89:17 91:9
111:19,21,22
112:2,24 113:2
114:2,11,19,25
138:7 174:11,21
178:14,19 243:23
246:17 249:19,22
271:21 279:20
281:2,9 282:11,21
284:11,13 285:19
302:5 308:17
**supplementals**
62:25
**supplements**
115:11
**suppliers** 171:14
**support** 9:2,11
18:11 37:8 97:21
183:10 309:3
**supported** 165:5
**supports** 125:9
**suppose** 189:22
272:6
**supposed** 137:4
257:5
**sure** 8:25 13:13,23
14:11 32:24 34:24
42:15 44:21 45:15
45:20 61:12 63:10
70:21 74:4 77:13
83:3 85:3 88:5
105:6,17 106:11
107:12 118:19
129:7 132:3
133:12 152:5
154:22 163:20
178:21 181:9

191:25 202:2
203:19 206:5
214:3 219:21
229:6,10 231:6
240:21 242:6,13
243:3 244:11
246:25 254:17
260:5 274:7 282:9
286:21 289:4
297:9 305:15
**surprised** 52:20
264:17
**survey** 77:24 78:6
78:14,22 79:11
93:25 94:2 96:3
124:20,23 125:7
125:21 126:11,19
127:5,7,8,11,14
127:25 128:13
129:8,9,10,11,17
129:20,24 130:12
131:3,9,9,11,13
131:19 132:2,4,6
132:8,11,22,23,23
133:8,13 134:13
134:19,20,21
135:8,13,19 136:5
136:13,20 137:13
137:18,20,22,24
137:25 138:19,21
139:13,21 140:11
140:18,18,21
141:2,3,8 142:6
142:19,21 143:8
144:2,15 145:7,10
145:12 146:17
148:7,16 153:25
154:6,15,19,25
155:11,21 156:14
157:7 159:15,18
159:18 160:12
170:18 187:10
246:15,23 247:16
278:24 282:24
283:7 299:23
**surveyed** 133:16

140:2 160:15
246:15,16 249:3
**surveying** 50:7
126:6,7
**surveys** 48:12
78:25 79:19
126:24 127:9
128:18,23 130:9
130:14,25 131:6
132:15 133:6
138:10,24 139:3
141:11 146:12
148:5 159:19,22
246:18 278:22
299:9
**switching** 198:13
**sworn** 5:10 310:4
311:10
**system** 107:16
**systems** 239:14

---
**T**

**T** 204:24 308:10
312:2
**table** 285:12,23
**take** 11:16 21:15
42:14 58:10,16
59:3 61:15 77:2
88:3 103:5 123:2
126:10 148:11,12
150:16 205:20,24
211:12 250:14
273:7 286:2,8
296:20
**taken** 216:24
282:21 297:12
**takes** 126:14
214:18
**Tal** 85:13
**talk** 21:25 27:15
67:20 84:18 98:8
117:3 133:3 135:9
153:19 154:23
189:14 190:4
200:19 205:11
222:6 238:9

241:24 257:2
294:20 304:23
**talked** 47:14,15
48:11 176:23
203:4 256:15
272:22 278:25
294:5 306:4
**talking** 24:3,4
34:12 61:11,22,24
88:5,9 93:14
120:13 121:16
124:2 151:18,19
157:5 175:2
185:18,25 191:2
191:19 193:14
224:13 231:4,18
241:14 242:15
249:11 251:5
258:19,20 265:20
272:14 273:22
284:23
**talks** 78:11 215:10
223:20
**target** 141:11
**Taru** 85:12 88:13
**tax** 217:25
**taxes** 297:12
**team** 24:5 25:3,7,20
25:22 26:15 29:13
29:14,16,16,19
36:22 48:5,15
50:6 77:8 78:25
79:2,23 80:21,24
81:4,5,17,18,21
81:23,23,24 85:5
88:19 89:19,25
90:7,22,25 91:5,6
91:11,15,20 92:8
92:25 93:15,23
94:23 95:5,18,21
96:9,15 114:10,13
115:4 122:12
123:3,10 125:8
127:15,19 130:21
131:8 133:21,24
137:17,20 138:21



Case 15-10541-BLS Doc 2417 Filed 04/24/19 Page 343 of 347
Case 18-85672 Document 90S-2 Filed in TXSB on 01/01/18 Page 343 of 346

Page 30

140:3,9 141:5
143:21 146:14
151:10 159:23,24
160:7,15 186:24
187:9,11 229:20
236:22 244:5,8,12
244:15 245:6,8,11
245:17 246:4,12
246:19 247:3,17
247:19 249:2
250:2,5,7 257:15
257:16 269:3
270:8 276:2
277:22 278:7
301:21 302:7
304:7,7,9,10,13
**teams** 259:20 270:7
**telephone** 3:6
**tell** 25:23 49:2,5
50:2 54:24 55:4
55:21 73:24 74:15
77:14 95:10
129:14 168:9
188:5,23 213:21
236:22 238:10
251:2 254:13,19
267:3 270:7 288:4
288:20 294:23
295:13
**telling** 52:11
257:19
**tells** 189:4
**template** 57:6
**ten** 38:11,19 265:7
**term** 19:16 81:16
206:12
**terminology** 117:12
117:18 226:13
**terms** 6:4 8:5,8
16:6 48:16 49:15
62:21 72:12 81:10
106:20 116:7
125:15 156:19
172:9 180:20,22
244:17 250:24
260:15 272:17

275:19 302:5
305:6
**test** 147:25
**testified** 5:11 13:24
18:10 20:13 93:6
117:24 122:3
139:20 165:20
179:20 205:3
285:5
**testimony** 95:10
175:9 188:14
198:23 235:9,13
248:23 279:13
310:5
**Texas** 1:3 2:10 3:4
4:8 279:11
**text** 302:23
**Thank** 13:14 14:3
199:25
**thanks** 57:21 58:23
**theses** 236:18
**thing** 33:19 38:19
63:11 64:15 78:17
88:6 225:2 269:18
269:24,25 270:2
**things** 57:9 78:18
142:19 187:6
190:6 213:25
297:13
**think** 16:11,13
17:10 19:8 24:17
33:19,20 42:2
43:20 45:24 75:2
80:23 81:3 95:11
97:21 99:17,24
100:6 115:6 118:3
119:19 121:12
122:4 133:7
139:20 143:10
148:9,10 150:13
156:23 159:17
162:3 167:21,23
168:25 176:23
179:19 194:4
197:5,21,22
199:12,14 200:18

203:4 204:9 209:8
210:4 213:14
215:16 221:11
228:14 231:9
233:11,24 235:22
239:2 247:9
249:18 251:21
253:4 256:15
264:6 266:13,14
270:24 271:19
272:2,22 274:7
276:15 282:2,19
282:22,23 284:21
285:8 289:18
290:25 296:2
298:19 300:23
301:9 302:2 306:9
306:11,21
**thinking** 35:8
**thinks** 148:6
**third** 2:21 6:7 13:8
151:18 202:10
229:20 230:3
**Thirty-two** 67:19
**thorough** 172:8
282:23
**thought** 33:16
280:11 302:11
**three** 13:11 14:17
87:21 88:18 90:16
108:13,16 115:11
134:10 141:22
154:7 155:3,10,13
156:18 157:12,14
174:6,7 197:8
202:5 213:24
214:25 269:7
289:6,19 303:22
**three-year** 197:9
197:15 198:4,13
198:18 199:20
201:9,18
**tie** 56:7,10 223:12
**time** 4:9 19:12
23:24 24:2 26:22
34:10,12 38:5

39:24 40:20,21,22
40:24 41:19 42:2
42:3,6,10,12,12
42:14,16,18,24
43:2,10,14,19,21
44:12 46:3 47:10
49:20 52:3,7
66:22 67:2 68:9
89:9,13 90:6 96:8
100:18,20 102:20
105:11 110:8
113:11 114:2
129:18 138:5,17
138:19,22,23,23
139:21 143:5
147:17 148:5
150:18,22 175:8
175:17 178:11,16
179:21,21 180:6
182:10,21 185:14
187:9,18 190:23
198:17 201:3,15
201:16 204:15,21
204:25 205:7
211:7 228:10
232:15 262:3
266:23 273:9,13
274:13,13 282:8
285:24 287:8,14
291:7,18,19 292:4
292:5,7 296:23
297:3 307:4,6
**times** 15:8 138:9
149:12,12 163:18
169:10,15 196:22
222:6,7,7,7,10,13
**timesheets** 41:9,11
42:17,23
**timing** 90:24
203:17,24 204:3
262:22 284:9
**title** 28:4 83:12
85:24 86:14
208:12 303:18
304:2
**titles** 82:24 83:2,8

84:7
**today** 4:9 16:9
56:22 60:21 121:2
267:4,17 294:22
295:14 300:18
**told** 54:18 64:18
82:6 168:15,16
180:23 184:10
202:3 217:22
219:3 223:3 285:6
**ton** 163:21 266:23
**Tony** 85:11
**tool** 126:7
**top** 6:3 12:22,23
13:8 19:2 75:19
84:15,16 85:10
99:4,20 107:14
125:4 134:25
194:9 295:10
297:19 303:15
**topic** 45:2,6 168:2
169:14,24
**topics** 22:13 44:20
45:9 49:19 53:6
187:12
**total** 39:19 40:5
82:18 213:5
233:15
**totally** 144:25
**touch** 189:13,20
190:12 191:7
**touched** 176:24
**touts** 16:14
**track** 102:3
**tracks** 187:25
**trading** 295:21
**tradition** 181:11
**trajectory** 24:24
**transaction** 153:20
153:24 154:14
156:22 160:11
170:6 193:6 306:6
306:9,14,19
**transcript** 310:11
**transcription** 311:4
**transparencies**



Case 15-10541-BLS   Doc 2417-6   Filed 04/24/19   Page 344 of 347
Case 18-85671   Document 905-2   Filed in TXSB on 01/01/19   Page 343 of 346

Page 31

276:20
**transparency**
275:17 276:24
**transparent** 171:2
271:14 277:6
**travel** 41:25 42:3
**treat** 288:25
**treated** 109:14
**Trembler** 85:12
86:9
**trial** 307:2
**tried** 30:7 216:10
216:16,22 220:3,9
250:21 271:13
**trouble** 264:18
271:23
**true** 38:16 141:17
141:19 235:5,7
266:3,10 268:17
278:4,6 310:4
**trust** 148:13 225:7
226:4,25 227:2,21
228:3 229:24
233:6,6
**trustee** 33:10,23
34:15,23,24 35:10
35:22 51:11,11,14
51:18 52:3,21
53:3,7 57:7 89:3
92:3 93:11 162:8
162:16,19,21
165:5,14 167:2,11
169:8 174:17
279:7 293:15
294:4
**trustees** 166:15
231:12 232:21
**trustee's** 45:18
46:14 52:14 53:12
53:22 54:5,12,20
168:18 169:19
174:23 175:3,25
176:5 234:5 279:9
293:18 294:13
**try** 12:14 143:12
146:9 164:15

194:8 205:19
216:14,25 247:14
288:2
**trying** 24:17 34:11
46:13 56:9 118:22
121:11 133:5,17
152:6 188:21
192:8 193:7,9,10
193:15 214:3
215:3,5 245:16
265:4,5,6,8
272:11 276:15
**tune** 268:22
**turn** 66:18 72:16
103:6 194:6,7
220:17 267:12
**turned** 105:18
106:6 173:22
280:3,11,21
**Tusant** 85:12 86:6
**two** 2:9 6:6 13:2
18:18 21:25 23:8
26:17 30:19,22
31:25 45:20 58:20
60:3 61:12 72:23
81:9 90:5 115:17
116:12,15 123:4
147:4,6,15,18,21
150:9 154:9,12,14
155:17 156:20
163:13 174:10,20
175:2 177:7,11,20
178:12 180:11
182:14 184:22,23
185:20 186:7
188:25 189:6,11
190:20,20 191:5,6
194:13 197:19
198:24 199:3,6
202:6 203:8 204:6
209:23 229:11
236:15 239:16,25
253:25 263:10
270:25 271:14
273:7 288:12
289:19 298:18

**two-year** 122:24
176:24,24 177:10
177:21 178:4
180:16 181:8,11
182:2,4,11,22
183:4,7,10,24
184:14,19 185:5
185:23 186:10,23
187:14,21,22
188:12 189:19
191:2 197:3,23
198:4,14,19 199:7
199:10,17 200:19
201:9,10,19,20
202:22
**type** 39:3 69:17
73:12 107:2
145:10 154:10,13
155:18,25 156:22
157:15 180:18
182:7 193:6
215:15 242:7
275:18,24
**types** 209:23
276:24
**typical** 70:16
155:25
**typically** 38:25
40:23 44:20 71:11
215:10 305:13

———————
**U**
**Uh-huh** 120:8
124:18
**ultimately** 22:18
31:15,20 65:3
125:16
**unbiased** 9:2,10
**unclear** 144:25
**uncovered** 246:2
246:23 247:17
**underlying** 230:2
**understand** 14:11
32:18 42:21 46:13
50:18 53:9,18
58:18 64:9 71:24

117:14 127:10
136:3 141:13
175:6,14 184:25
188:13 203:3
214:3 243:3 249:3
249:24 250:3
260:5 265:4,7,20
266:21 267:5,8,10
269:9 270:11
272:23 290:10
301:3
**understanding**
7:19,23 8:6,8,10
8:15,18,22 9:3,7
11:7,10 13:22,24
13:25 14:5,21,24
21:3,6 28:13
37:14 51:8 52:24
53:19,20 65:5
70:11 71:17,21
74:17 91:23
110:19 122:25
123:5 125:11
133:12 153:12,13
158:16 162:18,20
164:10,12 167:23
175:19 177:20
209:22 218:10
222:20,23 266:19
267:4,18 287:22
297:21
**understands** 234:2
**understood** 44:22
109:12 143:11
**unduly** 290:3
**unimportant** 276:8
**United** 1:2 4:6
**universe** 181:21
**unsure** 135:24
**update** 138:9
139:13 140:25
142:18 143:8
144:5,5,17 145:17
146:20,21 148:18
**updated** 137:18
138:5 139:22,23

212:6
**upper** 61:17
**USC** 9:5
**use** 50:7 79:16
117:7,9 162:13
166:9 167:9 181:7
181:17 186:19
187:13 206:12
214:25 219:25
230:8 252:10
253:2,5 287:23
290:22
**uses** 102:15,24
229:20 252:14
**usually** 40:23
**U.K** 194:14
**U.S** 5:17 7:5 33:23
34:14,23,24 35:9
35:21 45:17 46:14
51:11 53:2,7,12
53:22 54:20 57:7
82:2 86:2,5,8,11
86:17,23 87:9,12
87:15 89:3 90:20
91:8 92:3 93:11
94:3,20,21,24
95:2,4,7,15 96:10
96:18,20 98:9,14
98:16,17 99:2,18
100:3 104:5
118:15 119:2,3,8
119:17 120:10,21
120:23 121:21
123:16 124:10
133:25 134:9
142:2,3 143:22
153:11 159:25
162:8,16 165:5,14
166:15 167:2,11
168:17,17 169:8
169:19 170:21
174:17 175:25
224:7,8 234:5
246:5 247:17
274:23 275:18
277:22 278:7



283:8 286:25
293:15,18 294:4
294:13

**V**

**vague** 71:24 141:23
193:7
**Value** 2:4,9
**variety** 44:20
229:18
**various** 31:21 38:4
49:14 70:4 93:25
102:4 187:12
211:9 219:10
230:20 298:6
**vendor** 154:10
155:18,24 156:6
157:6
**vendors** 113:9
156:7
**verbal** 242:24
305:17
**verify** 26:9
**vetted** 163:23
**vice** 83:5,5,21
**vice-president** 28:5
28:7 84:13
**vice-versa** 250:6
**Victoria** 36:17
**video** 4:3,13 27:19
**VIDEOGRAPH...**
3:9 4:2 66:22,25
89:9,12 150:18,21
185:11,13 204:21
205:6 273:9,12
296:23 297:2
307:4
**Videotaped** 1:10
**view** 33:12 34:2,17
35:11,19 113:14
116:14 193:23,25
248:17 274:7
276:16 277:5
**views** 45:22,25
**violate** 173:6
**Virginia** 15:19

**W**

**waive** 45:16,23
46:8,19 286:25
287:15 288:4
**waiving** 46:16,24
**Wall** 252:22 263:5
263:13 267:22,24
**want** 5:15 6:12 10:3
14:2 16:4 24:21
24:22 40:11 43:2
44:9 46:10 57:17
57:18 61:10 71:22
81:14 88:3 98:22
110:13 127:10
133:8,11 152:5
154:23 163:14,21
167:5 168:10
176:6 191:18,25
192:6,7 193:11
200:8 204:18
207:17 218:11
227:5 229:8 231:6
234:13 264:15,16
264:17 267:15
286:20 304:23
306:10
**wanted** 35:7 43:15
44:3 60:14 192:17
196:13 238:8
**wasn't** 53:16 64:13
136:2 186:9
192:15 235:7,12
260:13 261:9
299:3
**wasting** 232:15
**way** 33:12,14 46:16
53:6 57:22 58:24
61:18 68:12
115:15 117:18
124:5 130:24
141:15 147:8
154:15 164:7

175:13 185:3
188:23 192:12,14
193:20 196:9,12
198:12,24 202:12
205:19 207:9
229:2 233:15
241:17 243:20,21
247:14 250:3
257:9 297:22
299:5
**ways** 219:10,15
**website** 126:15
211:17 216:20
296:5
**websites** 217:21
**week** 111:11
**weeks** 26:23 45:14
108:13,16 192:8
**went** 126:19 134:18
137:14 151:6
167:7 192:18
199:9 213:17
261:25
**weren't** 51:3
112:25 168:8
175:3 280:12
289:9
**West** 1:19
**Westmoreland** 1:6
3:3 4:5 6:2 12:3
21:18 22:7 23:10
24:6,11 25:3,7
26:15,20 29:5,10
29:14 30:4 31:6
34:6,19,20 35:20
36:13 50:17 51:6
51:9,16 52:5,10
52:22,23 53:11
54:6 60:23 64:5
75:12,22 82:4
84:24 91:5 103:14
104:13 107:6
115:18 116:13,16
124:24 140:13
146:24 147:6
149:18 156:3

163:4 164:4,9,13
164:16,17 179:22
180:6 198:25
202:8 203:18,19
203:21 217:6
226:7 228:6
231:19,25 232:4
232:17,19 233:7,9
234:13,17 236:23
264:13,21 266:16
268:12 270:8
302:21
**Westmoreland's**
97:24
**we're** 69:18
**we've** 33:20 47:14
92:15 94:10
142:22 158:19
173:25,25 196:22
248:24 250:21
258:7 284:13
294:5 295:3
**White** 220:12,17,24
259:23 262:13
266:4,21 267:6,11
268:5,5,18,18
**wholesale** 274:3,15
**wider** 274:7
**willing** 174:25
175:3
**willingness** 45:16
**window** 185:23
**wire** 286:3,11,13
**wired** 283:13 284:3
286:4
**wiring** 284:15
**wishing** 302:25
**withdraw** 78:3
130:22
**withdrawn** 41:10
50:14 131:2
136:18 137:21
172:13 215:20
243:5 286:3
**withhold** 288:24
289:15

**witness** 2:15,21
5:10 309:5 310:3
310:5
**word** 151:13,24
240:6 250:14
260:7 265:7
**wording** 135:4
**words** 14:13 37:10
37:12,15 38:2
41:6 42:22 51:13
54:17 98:21 126:9
132:21 165:15
166:8 167:2 168:8
168:11,19,24
183:23 186:8
188:20,22 227:2
239:21,22 276:22
288:12,19
**work** 24:5 41:22
67:6,10,11 68:19
70:18,25 71:2,7
71:15 90:19 104:9
136:25 139:6
160:7 187:20
188:6,24 194:5
195:23 196:3,12
222:16 236:18,22
244:12,18 245:6
245:10,12,18,19
247:7 249:19
251:11,14,17,20
251:21 252:2,8
255:11 256:25
266:14 275:18,24
276:7,14,24 292:3
303:3 304:14,25
305:7
**worked** 36:12
37:17 39:19 51:10
54:24 189:18
244:9,23 247:3
292:17
**working** 22:22 23:4
23:8 26:20 39:25
41:16 42:5 48:5,7
91:4 140:20,21



142:13 145:9
148:17 189:25
247:5,6,12 249:10
255:22
**workload** 37:19
**works** 85:24 192:14
192:16 204:16
207:8,10 244:5
**world** 153:16
**worldwide** 126:20
**worth** 212:25
213:18,21,22
**wouldn't** 42:11
73:7,9 74:20
143:22 149:22
169:15 175:13
186:5,10 203:12
244:20 273:3
276:17
**wow** 81:8
**wrap** 296:21
**write** 37:25
**writing** 241:8
**written** 181:25
239:5 257:17
258:12 277:9
288:22 289:13
290:5,9,14
**wrong** 28:14 195:2
214:2

---
**X**

**x** 1:5,8 43:2 129:18
213:18 308:3,10
**XYZ** 64:19

---
**Y**

**Y** 303:25
**Yakola** 303:22,24
303:25
**yeah** 78:13 167:12
214:20 220:14
263:10
**year** 104:10 217:24
222:9
**years** 25:11 68:6

123:4 138:11
177:7,11,21
178:12 180:12
184:22,23 185:20
186:7 188:25
189:6,11 190:20
190:20 191:5,6
199:19 202:5,5,6
203:8 210:7
221:12,16,23
222:6,24 231:15
232:24 233:12
235:6,17 236:6
307:3
**yesterday** 215:4
241:4,5 259:5
**York** 1:11,11,13,19
1:19 2:5,16,16,22
2:22 4:11,12
59:17
**York,10022** 2:5
**Yuda** 85:14
**Yura** 87:13

---
**$**

**$1.24** 283:12
**$50** 268:23
**$96,000** 45:17,23
46:2,8,19,25 47:4
49:16 57:4 287:8
287:15

---
**1**

**1** 4:3 6:15,16
115:21 129:2
136:15 177:14,18
178:5,17,23
199:24,25 203:6
281:10 308:13
**1L** 194:7
**1.24** 285:6
**1:05** 204:25 205:8
**10** 21:25 84:14
179:4 207:3 222:7
277:18 283:17
**100** 100:9 128:23

129:3,5 222:7
**1000** 100:6 222:7
**10018** 1:19
**10104** 2:16
**10114** 9:5
**11** 7:21 8:2 9:5 11:9
12:7,15 14:12
15:21 47:7 102:14
104:18 105:15,18
147:2 149:2,19
181:2 203:25
246:7 252:9
308:15
**11:02** 150:19
**11:18** 150:23
**116** 194:9
**12** 179:8 285:8
**12th** 1:19
**12:07** 185:15
**12:29** 204:22
**1290** 1:11 2:15 4:10
**13** 179:8
**13Fs** 221:5
**14** 97:4,6,7,9,14
149:12
**15** 7:5,14,14 18:10
18:13 82:6,16
83:19,19 84:14
149:12
**16** 108:2,15,22
**17** 30:20 103:9,13
103:18 179:17
**17th** 63:15,24
104:10,12
**19** 25:9,19 81:3
85:6
**194** 61:16,18,19
194:10
**195** 308:18

---
**2**

**2** 11:15,19 67:2
80:14 103:5
115:23 200:2
308:14
**2:25** 273:9

**2:48** 273:14
**20** 5:18 193:10,11
193:22 292:23
**200** 17:25 100:9
**2000** 126:19,25
143:6
**2008** 263:5
**2010** 222:22
**2014** 92:5,18 93:8,9
93:12 201:2,3,6
**2014A** 8:11,19,23
9:15,24 11:2
91:22
**2016** 136:15 177:14
177:18 178:5,17
203:6 225:5
226:23 281:10
**2016s** 178:23
**2017** 222:25 235:6
235:16 237:21
**2018** 1:12 4:9 5:19
5:20 30:21 103:9
103:13,18 107:7
108:2,23 179:17
262:25 263:8,9,13
310:7 311:11
**21** 308:16
**22** 283:11,16
**227** 308:19
**23** 286:19,22,23
287:4
**230** 110:21 111:3
**24** 113:5
**27** 263:5,12
**27th** 268:2

---
**3**

**3** 21:12,13,20 61:25
62:2 63:18 67:16
67:17 80:11,19,20
84:18 89:13 90:23
97:5 98:5,7
107:13 108:5,6,10
111:14 112:6
116:22,23 150:11
151:2,3,3 170:13

171:17 194:6
205:10 214:8
224:2 238:2
259:21,25 273:16
285:10,11,25
292:22 294:24
306:11 308:16
**3:23** 296:23
**3:37** 297:4
**3:48** 307:4,6
**30** 98:3,4,8 100:11
101:2 102:7 117:7
274:11
**300** 18:3 100:9
**31** 1:12 4:9 5:20
103:3 107:23
108:3 109:17
110:10,20 310:7
**32** 66:18 67:14
116:18,24 119:7
120:3,24 121:18
122:10 123:13
151:17,23 152:13
152:17,24 153:4
**320** 1:19
**327** 7:20,23 8:4
10:9
**327A** 9:14,23 10:9
10:20
**33** 113:4,13 306:15
**34** 124:11,13
145:11 150:25
151:4 152:16,23
152:24 153:18
170:9 283:6
306:11,15
**34B** 151:24 306:16
**34D** 278:24
**36** 205:11 209:19
223:15 226:10
**37th** 1:19
**39** 237:23 238:3

---
**4**

**4** 21:22 80:5,15,18
87:17,18 88:2



Case 15-10541-BLS    Doc 2417-6    Filed 04/24/19    Page 347 of 347
Case 18-85671    Document 90-2    Filed in TXSB on 01/01/19    Page 346 of 346

Page 34

89:17 150:11,22
178:21 179:5
214:9 243:24
279:21 281:3
286:18 294:25
308:17
**40** 40:16,17 207:3,5
211:14 215:21
216:12 223:19,25
224:4
**41** 205:11 223:16
226:10 259:22,25
261:14 262:8,21
267:23
**42** 171:16,16
172:22,25 173:8
**452** 5:25 200:7

---

**5**

**5** 84:14 185:14
195:4,5,20,21
196:5 207:3
243:25 250:13
280:2,7,8,20,22
308:7,18
**50** 42:2 82:22,25
83:2,18,23 84:5
**52nd** 16:25 18:6,9
18:16,25
**55** 16:25 17:17 18:6
18:9,16,25 174:5
**5500** 217:16 219:4
**5500s** 218:22
219:24
**575** 2:4

---

**6**

**6** 205:7 227:7,8
279:22 308:13,19
**609** 3:4
**624-6221** 1:20
**67** 227:13,15
228:15 229:11
231:14 232:23

---

**7**

**7** 12:8 21:21 179:4
273:13 279:7,9
281:3
**7:59** 1:12 4:10
**71** 61:16
**73** 273:5,17,18
274:11,12
**730** 202:24 203:8,9
**730th** 203:11
**731** 202:25 203:12
**75** 277:14,20
**77002** 3:4
**77010** 2:10
**79** 81:7

---

**8**

**8** 12:23 13:8 107:10
297:3
**8th** 107:18 287:12
**810** 5:25 200:7
**866** 1:20
**87** 308:17
**875** 2:21

---

**9**

**9** 89:16 107:7
177:25
**9th** 287:12
**9:15** 66:22
**9:25** 67:3
**9:51** 89:9
**9:53** 89:14
**90** 57:3
**909** 2:10
**96,000** 286:25

