# EXHIBIT 13

| | |
|---|---|
| JONES DAY<br>North Point<br>901 Lakeside Avenue<br>Cleveland, Ohio 44114<br>Telephone: (216) 586-3939<br>Facsimile: (216) 579-0212<br>David G. Heiman (admitted *pro hac vice*)<br>Carl E. Black (admitted *pro hac vice*)<br>Thomas A. Wilson (admitted *pro hac vice*) | HUNTON & WILLIAMS LLP<br>Riverfront Plaza, East Tower<br>951 East Byrd Street<br>Richmond, Virginia 23219<br>Telephone: (804) 788-8200<br>Facsimile: (804) 788-8218<br>Tyler P. Brown (VSB No. 28072)<br>J.R. Smith (VSB No. 41913)<br>Henry P. (Toby) Long, III (VSB No. 75134)<br>Justin F. Paget (VSB No. 77949) |

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| In re:<br><br>Alpha Natural Resources, Inc., et al.,<br><br>Debtors. | Chapter 11<br><br>Case No. 15-33896 (KRH)<br><br>(Jointly Administered) |

**DECLARATION OF KEVIN CARMODY IN SUPPORT
OF APPLICATION OF THE DEBTORS, PURSUANT TO
SECTIONS 327(a), 328(a) AND 1107(b) OF THE BANKRUPTCY CODE,
BANKRUPTCY RULE 2014(a) AND LOCAL BANKRUPTCY RULE 2014-1, FOR
AN ORDER AUTHORIZING THEM TO RETAIN AND EMPLOY MCKINSEY
RECOVERY & TRANSFORMATION SERVICES U.S., LLC AS TURNAROUND
ADVISOR FOR THE DEBTORS, EFFECTIVE AS OF THE PETITION DATE**

I, Kevin Carmody, under penalty of perjury, declare as follows:

1. I am a Practice Leader in the professional services firm of McKinsey Recovery & Transformation Services U.S., LLC ("McKinsey RTS")[1] with an office at 55 East 52nd Street, New York, NY 10055. I am duly authorized to make this Declaration on behalf of McKinsey RTS in support of the *Application of the Debtors, Pursuant to Sections 327(a), 328(a)*

---

[1] "Members" of McKinsey RTS, as such term is used in this Declaration, include colleagues in McKinsey RTS who provide recovery and transformation services worldwide.

*and 1107(b) of the Bankruptcy Code, Bankruptcy Rule 2014(a) and Local Bankruptcy Rule
2014-1, for an Order Authorizing Them to Retain and Employ McKinsey Recovery &
Transformation Services U.S., LLC as Turnaround Advisor for the Debtors, Effective as of the
Petition Date* (the "<u>Application</u>"),[2] filed by the above-captioned debtors and debtors in
possession (collectively, the "<u>Debtors</u>"), under the terms and conditions set forth in the
Engagement Letter, attached to the Application as Exhibit A.  Except as otherwise noted, the
statements set forth herein are as a result of my employment position and diligence undertaken
by me or by professionals working under my direction and, if called and sworn as a witness, I
would testify competently thereto.

## Qualifications of McKinsey RTS

2.    McKinsey RTS is highly qualified to serve as the Debtors' turnaround
advisor in these chapter 11 cases.  Certain employees of McKinsey RTS, along with certain
consultants borrowed from affiliates of McKinsey RTS, are together serving the Debtors and
shall be referred to as the "<u>McKinsey RTS Team</u>" for purposes of this Declaration.  McKinsey
RTS is a global, full service restructuring advisory and crisis management firm that draws on
unmatched industry and functional expertise to support companies through all aspects of
recovery and transformation.  Its members have extensive experience in improving the
operational performance of financially troubled companies.  McKinsey RTS is deeply
experienced in providing chapter 11 advisory services, which include contingency planning,
interim management, cash flow and liquidity assessment, forecasting and management, analysis
and development of business and strategic plans, development and implementation of creditor

---

[2]    All capitalized terms used but not defined herein shall have the meanings set forth in the Application or the
Engagement Letter, as appropriate.

-2-

and supplier strategies and development and implementation of operational and financial improvement and turnaround plans. McKinsey RTS has been or is currently involved in numerous large and complex restructurings, including In re Standard Register Company, Inc., No. 15-10541 (Bankr. D. Del. Mar. 12, 2015); In re NII Holdings, Inc., No. 14-12611 (Bankr. S.D.N.Y. Sept. 15, 2014); In re Edison Mission Energy, No. 12-49219 (Bankr. N.D. Ill. Dec. 17, 2012); In re AMF Bowling Worldwide, Inc., No. 12-36495 (Bankr. E.D. Va. Nov. 12, 2012); In re AMR Corp., No. 11-15463 (Bankr. S.D.N.Y. Nov. 29, 2011); and In re Harry & David Holdings, Inc., No. 11-10844 (Bankr. D. Del. Mar. 28, 2011).

3.  In particular, McKinsey RTS and its affiliates have considerable experience in the metals and mining industries, as well as experience in the related oil, electric power, and natural gas industries. Specifically, McKinsey RTS utilizes the expertise of its affiliates' global Metals & Mining Practice (the "Metals & Mining Practice"), which has been engaged by clients on over 1,000 studies in the mining industry over the last five years and which serves the majority of the world's top major diversified mining companies and many of the leading specialist mining companies (including many of the top coal producers). This experience has given McKinsey RTS and its affiliates a unique understanding of industry trends and of key strategic operational success factors for the Debtors' business.

4.  The Metals & Mining Practice includes over 500 practice consultants and experts, including numerous mine engineers, metallurgists, geologists, and business managers, each with deep operational experience in mining. The practice is backed by an extensive program of proprietary research, high-impact management tools, and information experts who (a) provide insight into industry structure and dynamics (including supply, demand, trade flows, and future prospects for all major mining commodities) and (b) ensure that consulting teams

-3-

have access to the latest thinking, approaches and analyses on financial, market, operational, organizational and strategic matters.  The Metals & Mining Practice has also implemented several knowledge development initiatives, including multi-year research projects addressing the most urgent client topics (e.g., a "Cost-Curve Initiative" looking at mining cost-economics of numerous commodities; the Metals & Mining Practice's "Value Pools" research undertaken to help clients compare prospects for commodities), and several proprietary benchmarks (e.g., a benchmark that allows mine operators to assess performance against a broad set of peers; the "McKinsey Mining Productivity Index," which tracks and compares the productivity of worldwide mining operations).  These initiatives, projects and benchmarks ensure that the Metals and Mining Practice remains at the forefront of industry information and trends.  Accordingly, the combination of McKinsey RTS's and the Metals & Mining Practice's experience offer an extensive knowledge and expert base which will benefit the Debtors in these chapter 11 cases.

    5.  McKinsey RTS began assisting the Debtors' senior management with their development of the Business Plan immediately upon the execution of the Prepetition Agreement.  As a result of this prepetition work performed on behalf of the Debtors, McKinsey RTS is familiar with the Debtors and their business, including the Debtors' financial affairs, debt structure, operations, employee groups, cost structures and related matters.  Since McKinsey RTS's engagement began, McKinsey RTS personnel have worked closely with the Debtors' management and other professionals in the development of the Business Plan.  In addition, McKinsey RTS (a) supported management in preparing supplemental analyses related to the Business Plan and a potential restructuring and (b) helped management prepare for diligence discussions with various financial advisors to certain of the Debtors' significant creditor constituencies.  Consequently, McKinsey RTS has developed significant relevant experience and

-4-

expertise regarding the Debtors and the circumstances of these cases and has the skills, qualifications and expertise necessary to assist the Debtors with respect to the Business Plan in an effective and cost-efficient manner.

### Terms and Scope of Engagement

6. The parties have entered into the Engagement Letter – which amends and restates the Prepetition Agreement – with the expectation that the terms of the Engagement Letter will govern the Debtors' retention of McKinsey RTS during these bankruptcy cases. The Engagement Letter was negotiated between the Debtors and McKinsey RTS at arm's length and in good faith, and reflects the parties' mutual agreement as to the substantial efforts that will be required in this engagement.

7. McKinsey RTS will provide a range of necessary services related to the Business Plan. Such services include the following:[3]

- *Market Outlook* – Create a domestic (including basin perspective) and seaborne metallurgical and thermal coal market analysis including demand, supply and price scenarios (and North America coal basin perspective). Perform an assessment of the Debtors' competitive position (position in cost curves).

- *Business Plan* – Develop/validate a fully integrated business plan for the current and future operating portfolio of the Debtors, including the estimated impact of performance improvement initiatives. It is anticipated that the business plan will include an outlook for key performance indicators, including production and sales tonnage, net realized price per ton, direct and indirect operating expenses, selling, general and administrative expenses, working capital, capital budget and debt capacity.

- *Value Creation Plan* – Develop a top-down value creation and performance improvement plan for the Debtors' current operating portfolio utilizing McKinsey RTS's industry and market expertise, proprietary operations databases and comprehensive benchmarking tools.

---

[3] Any references to, or descriptions of, the Engagement Letter herein are qualified by the express terms of the Engagement Letter, which shall govern if there is any conflict between the Engagement Letter and the descriptions provided herein.

-5-

- *Operations Footprint Assessment* – Prepare a rapid footprint optimization assessment for the Debtors considering product demand and market outlook, cost positions and cost improvement potential, likely evolution of product quality, transport logistics and legacy costs.

- *Pennsylvania Land Resources Holding Company, LLC ("PLR") Business Plan* – Develop, along with the Debtors' management, a strategic assessment and business plan for PLR. Provide an assessment of PLR's configuration and development plans, prepare a strategic review of forecast operating costs and field performance and support evaluation of potential commercial and asset strategies.

- *Constituent Management* – Assist in development of supporting diligence materials and presentations for use in various stakeholder meetings, attend diligence sessions and working meetings with various stakeholders and constituents, and provide *ad hoc* support to the management team, including the development and preparation of analytics to be used in restructuring discussions.

- *Other Restructuring Services* - As appropriate, assist the Debtors with other restructuring matters as may be requested by the Debtors and that are mutually agreed upon between McKinsey RTS and the Debtors.

8. The services that McKinsey RTS will provide to the Debtors are necessary to enable the Debtors to maximize the value of their estates. Specifically, the Business Plan prepared with the assistance of McKinsey RTS, and the further development and analysis thereof over the course of these chapter 11 cases, will form the foundation for the restructuring of the Debtors' operations and capital structure.

9. McKinsey RTS's services will complement, and not duplicate, the services rendered by other professionals retained in these chapter 11 cases. The Debtors and McKinsey RTS will use reasonable efforts to ensure that there is no duplication of services that McKinsey RTS is being retained to perform. To the extent that the Debtors request services other than those detailed in the Engagement Letter, the Debtors will seek further approval from the Court of a supplement to McKinsey RTS's retention and any related modifications to the Engagement

-6-

Letter, and such application shall set forth, in addition to the additional services to be performed, the additional fees sought to be paid.

### Fee and Expense Structure

10. Subject to Court approval, and in compliance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, any fee and expense guidelines of this Court and such other procedures as may be fixed by order of the Court, the Debtors will compensate McKinsey RTS in accordance with the terms and conditions of the Engagement Letter, which provides for the following compensation structure (the "Fee and Expense Structure"):

11. Hourly rates. McKinsey RTS's fees are to be based on the hours worked by McKinsey RTS's personnel at the following hourly rates:

| | |
|---|---|
| Practice Leader: | $875-$1,050 |
| Senior Vice President: | $675-$810 |
| Vice President: | $525-$675 |
| Senior Associate | $435-$525 |
| Associate: | $375-$435 |
| Analyst: | $250-$350 |
| Paraprofessional: | $200-$225 |

McKinsey RTS periodically reviews and revises its billing rates indicated above. Such rates and ranges shall be subject to adjustment at such time as McKinsey RTS adjusts its rates periodically.

12. Expenses. McKinsey RTS will be reimbursed for the reasonable out-of-pocket expenses of McKinsey RTS professionals incurred in connection with this assignment, such as travel, lodging, case administrators, third party duplications, working meals, messenger and telephone charges. All fees and expenses due to McKinsey RTS will be billed in

-7-

accordance with any interim compensation orders entered by this Court, and the relevant sections of the Bankruptcy Code, Bankruptcy Rules and Local Bankruptcy Rules.

13. The Debtors will reimburse McKinsey RTS for all reasonable out-of-pocket expenses incurred in connection with its engagement, including but not limited to travel, lodging, case administrators, and working meals following McKinsey RTS's standard expense reporting. As McKinsey RTS clients frequently request that McKinsey RTS personnel travel to their offices and work there for extended periods of time, McKinsey RTS has developed its own official reimbursement policy with respect to its professionals' documentation of expenses (the "RTS Reimbursement Policy"). More specifically, McKinsey RTS professionals serving the Debtors will seek reimbursement for expenses over $35.00 that (a) have been charged on a McKinsey RTS-provided corporate credit card or have a receipt and (b) have a receipt for lodging. For amounts under $35.00, McKinsey RTS will seek reimbursement when exact amounts are submitted in lieu of a receipt. Therefore, the Debtors request that McKinsey RTS be authorized to maintain detailed documentation of its professionals' actual and necessary costs and expenses in accordance with the RTS Reimbursement Policy.

14. Retainer. Pursuant to the Prepetition Agreement, on June 29, 2015, the Debtors paid McKinsey RTS a $500,000 retainer (the "Retainer") in connection with services to be performed by McKinsey RTS on or after such date. On account of such services (and related expenses), McKinsey RTS (a) issued invoices to the Debtors reflecting applications against the Retainer and (b) received funds from the Debtors in replenishment of the Retainer. As of the Petition Date, the Retainer balance was $500,000. The Retainer shall remain in place until work under the Engagement Letter is concluded, or the Engagement Letter is amended in writing. All Retainer balances shall be credited against any outstanding amounts due upon termination of the

-8-

engagement, with the remainder to be returned to the Debtors upon satisfaction of all payment obligations due under the Engagement Letter.

15. Consistent with the scope of services to be provided by McKinsey RTS under the Prepetition Agreement (as amended by the Engagement Letter), the Debtors and McKinsey RTS negotiated and agreed upon the Fee and Expense Structure described above. The Fee and Expense Structure is comparable to compensation generally charged by other firms of similar stature to McKinsey RTS for comparable engagements, both in and out of bankruptcy. The Debtors believe that the Fee and Expense Structure is both reasonable and market-based and consistent with McKinsey RTS's normal and customary billing levels for comparably sized and complex cases, both in and out of court, involving the services to be provided in these chapter 11 cases.

## Timekeeping and Fee Applications

16. McKinsey RTS intends to file interim and final fee applications for the allowance of compensation for services rendered and reimbursement of expenses incurred in accordance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, any fee and expense guidelines of this Court and such other procedures as may be fixed by order of the Court. Such applications will include time records setting forth, in reasonable detail, a description of the services rendered by each professional and the amount of time spent on each date by each such individual in rendering services on behalf of the Debtors. McKinsey RTS will maintain and file contemporaneous time records in half-hour increments. McKinsey RTS also will maintain detailed records of any actual and necessary costs and expenses incurred in connection with the services as discussed above. McKinsey RTS's applications for compensation and expenses will be paid by the Debtors pursuant to the terms of

-9-

the Engagement Letter, in accordance with Local Bankruptcy Rule 2016-1 and any procedures established by the Court.

### Indemnification Provisions

17.     As part of the overall compensation payable to McKinsey RTS under the terms of the Engagement Letter, the Debtors have agreed to certain indemnification and contribution provisions described in the Engagement Letter (the "Indemnification Provisions"). The Indemnification Provisions provide, among other things, that the Debtors will indemnify, hold harmless and defend McKinsey RTS, including its past, present and future affiliates, and each of their directors, officers, managers, shareholders, partners, members, employees, agents, representatives, advisors and controlling persons (each, an "Indemnified Party") against liabilities arising out of or in connection with the Engagement Letter and/or McKinsey RTS's retention by the Debtors in these chapter 11 cases, except for any liabilities judicially determined by a court of competent jurisdiction to have resulted from the willful misconduct or gross negligence of any of McKinsey RTS or the other Indemnified Parties in connection with McKinsey RTS's services provided under the Engagement Letter.  In addition, if indemnification or reimbursement obligations are held to be unavailable by any court (other than circumstances where a court determines that liability resulted from the willful misconduct or gross negligence of the Indemnified Party), the Engagement Letter allocates contribution obligations based on the relative benefits and faults of McKinsey RTS and the Debtors.  The Engagement Letter further sets forth that McKinsey RTS's aggregate liability shall be no more than the amount of its fees actually received under the Engagement Letter.

### Disclosure Regarding McKinsey RTS's Disinterestedness

18.     To the best of my knowledge, information and belief, other than as may be set forth herein, McKinsey RTS (a) is a "disinterested person" within the meaning of

-10-

section 101(14) of the Bankruptcy Code, (b) does not hold or represent any interest adverse to the Debtors' estates and (c) has no connection to the Debtors, their creditors or their related parties that would negatively impact McKinsey RTS's disinterestedness.  McKinsey RTS holds no prepetition claim against the Debtors for services provided or expenses incurred.

    19.  In anticipation of its proposed retention, McKinsey RTS:  (a) emailed members of McKinsey RTS and the McKinsey RTS Team and searched its global client database to determine the existence of any client services provided by such employees within the last three years to parties in interest (the "<u>Interested Parties</u>") identified on the interested parties list attached hereto as <u>Schedule 1</u> (the "<u>Interested Parties List</u>"),[4] (b) emailed members of McKinsey RTS, the McKinsey RTS Team and partners at affiliates that provide consulting services to determine the existence of client services provided by employees within the last three years to any client that focused on a direct commercial relationship or transaction with the Debtors and (c) emailed all employees of McKinsey RTS and its affiliates to request information on any relationships with the Debtors, the United States Trustee and the Bankruptcy Court, as well as equity ownership in the Debtors.

    20.  Based upon the research described above, McKinsey RTS has ascertained that members of McKinsey RTS and its affiliates have served and/or currently serve various parties on the Interested Parties List, but on matters unrelated to the Debtors and their chapter 11 cases.  More specifically, to the best of my knowledge and belief:

    (a)  Members of the McKinsey RTS Team serve or have served in the last three years one Major Customer but on matters unrelated to the Debtors and these chapter 11 cases.

---

[4] The identities of the Interested Parties were provided to McKinsey RTS by the Debtors or the Debtors' other professional advisors.

-11-

(b)     Members of the McKinsey RTS Team serve or have served in the last three years two Major Competitors but in each case such support did not relate to coal and was unrelated to the Debtors and these chapter 11 cases.

(c)     A member of the McKinsey RTS Team attended a proposal meeting and submitted a proposal to a Major Competitor that was not accepted.

(d)     Certain members of the McKinsey RTS Team serve as "Senior Experts" or "Knowledge Specialists" and in connection with such services, in the past three years, provided market data to two Major Competitors one Major Unsecured Noteholder, one Lender Under A/R Facility, three Major Customers, one Revolving Facility Lender, one Other Major Supplier of Goods and Services, one Party to Material Unexpired Leases, and one Party to Joint Ventures. No members received any confidential information specific to any of such parties except as noted in paragraph "g" herein and in each case such services were unrelated to the Debtors and these chapter 11 cases.

(e)     One member of the McKinsey RTS Team, through past employment by an affiliate of one of the Debtors' Professionals, Consultants and Service Providers in the past three years published daily market reports that were transmitted to various parties on the Interested Parties List. Such reports involved market information and evaluations pertaining to the market, and no information specific to any of such parties except as noted in paragraph "g" herein.

(f)     One member of the McKinsey RTS Team was previously employed, in the past three years, by an affiliate of one of the Debtors' Parties to Material Unexpired Leases, Major Customers and Major Competitors, but on matters unrelated to the Debtors and these chapter 11 cases.

(g)     Members of the McKinsey RTS Team currently serve or in the past three years have served one Beneficiary of Letters of Credit, one Depository and Disbursement Bank, one Insurer, Insurance Broker and Third-Party Administrator, one Lender Under A/R Facility, one Major Competitor, three Major Customers, one Major Unsecured Noteholder, one Other Major Supplier of Goods and Services, two Parties to Joint Ventures, one Party to Material Unexpired Leases, two Revolving Facility Lenders, and one Significant Utility Provider or affiliates thereof, but in each case on matters unrelated to the Debtors and these chapter 11 cases.

-12-

(h) Members of McKinsey RTS, in the past three years, have served one Major Customer of the Debtors on procurement in the coal sector generally but with no specific focus on the Debtors or these chapter 11 cases.

(i) Members of McKinsey RTS serve or in the past three years have served one Major Competitor on matters related to coal but such matters are unrelated to the Debtors and these chapter 11 cases.

(j) Ten members of McKinsey RTS were previously employed, in the past three years, by three of the Debtors' Professionals, Consultants and Service Providers, but in each case on matters unrelated to the Debtors and these chapter 11 cases.

(k) Members of McKinsey RTS, in the past three years, served a company in chapter 11 where the Debtors were among the interested parties in that case as a top 50 creditor and over 100K vendor. Such members of McKinsey RTS provided general analytical support to the client's procurement efforts in, among others, the coal sector, but such service was unrelated to the Debtors and these chapter 11 cases.

(l) Members of McKinsey RTS currently serve or in the past three years have served one Beneficiary of Letters of Credit; two Largest Unsecured Creditors (Excluding Noteholders); five Professionals, Consultants and Service Providers; five Depository and Disbursement Banks; three Insurers, Insurance Brokers and Third-Party Administrators; one Lender Under A/R Facility; three Major Competitors; three Major Customers; four Major Equity Holders; four Major Unsecured Noteholders; one Material Surety; one Other Major Supplier of Goods and Services; one Party to Joint Ventures; one Party to Material Contracts; four Parties to Material Unexpired Leases; eight Revolving Facility Lenders; one Second Lien Noteholder; nine Secured Term Loan Lenders; and one Significant Utility Provider or affiliates thereof, but in each case on matters unrelated to the Debtors and these chapter 11 cases.

(m) Members of an affiliate of McKinsey RTS, in the past three years, have served one Major Customer of the Debtors on procurement in the coal sector generally but with no specific focus on the Debtors or these chapter 11 cases.

(n) An affiliate of McKinsey RTS is providing the Debtors with a proprietary knowledge benchmarking tool which includes confidential operational data and information of members of the mining sector who participate in the benchmarking model ("Benchmarking Confidential Information"). Such McKinsey

-13-

      affiliate keeps the Benchmarking Confidential Information strictly confidential and discloses it only to its employees and agents who have a need to know and who are bound to keep it confidential in connection with performing the benchmarking services.
The Benchmarking Confidential Information is used to provide participants with information comparing its data to the aggregated or disguised data of other participants in the benchmarking study. Participants' data is kept secure, confidential, and is only used to create aggregated and blinded results that do not allow any individual mine or participant to be identified.

    21.  In addition, McKinsey RTS and its affiliates serve clients across a broad range of industries, functions, and geographies, and, within industries, serve competitors and do so in a manner that protects the confidentiality of each client's information (including the confidentiality of the engagement itself). Thus, McKinsey RTS and certain of its affiliates may have in the past provided services for, may presently be providing services for, and may in the future provide services for entities that are determined to be creditors, lenders, shareholders, insurers, customers, competitors, vendors, or contract counterparties of the Debtors or of Interested Parties named on the Interested Parties List. However, to the best of my current knowledge, subject to the disclosures set forth herein, such services do not focus on direct commercial relationships or transactions between such companies and the Debtors.

    22.  McKinsey RTS and its affiliates do, however, from time to time provide overall strategic analysis and advice to companies that operate in the industries in which the Debtors operate, which analysis and advice could include review and comment on publicly available information and strategic considerations with respect to the Debtors, as well as other companies. Similarly, certain members of McKinsey RTS and its affiliates may have business associations with certain of the Debtors' creditors, professionals, service providers or other Interested Parties, or interests adverse to such creditors, professionals, service providers or

-14-

Interested Parties, which associations, to the best of my knowledge and information, have no connection with these proceedings.

23. As noted, McKinsey RTS and its affiliates have a long-standing policy of serving competing companies, and they do so in a manner that protects the confidentiality of each client's information. In fact, McKinsey RTS's expertise which the Debtors desire to utilize for the purposes described herein, derives from McKinsey RTS's and its affiliates' broad-based service in many different aspects of the industry and business sectors in which the Debtors operate. Because of its practice of serving clients with overlapping or competing interests, these affiliates do not have in place any centralized conflicts identification process and only have a central database of clients and engagements performed for those clients, which is kept principally for record keeping purposes, but does not contain detailed descriptions of the client support.

24. However, McKinsey RTS completed the following steps in order to make the representations contained herein:

(a) McKinsey RTS made inquiry to all partners or their equivalents at its affiliates worldwide that provide consulting services about whether they currently provide consulting services to entities that focus on a direct commercial relationship or transaction with the Debtors.

(b) McKinsey RTS made inquiry to the partners or their equivalents at its affiliates worldwide that provide consulting services, who are responsible for those clients appearing on the Interested Parties List, as to whether any services McKinsey RTS or its affiliates provided over the past three years or are currently providing to such Interested Parties focused or focus on a direct commercial relationship or transaction with the Debtors.

(c) McKinsey RTS made inquiry of all employees at all of its affiliates worldwide, as to whether such employee or a member of his or her immediate family is related to or employed by the Debtors, the United States Trustee or the Bankruptcy Court.

-15-

  (d)  McKinsey RTS made inquiry of all employees at all of its affiliates worldwide as to whether such employee or a member of his or her immediate family owns equity securities of the Debtors.

  (e)  McKinsey RTS requested that, for the duration of McKinsey RTS's retention by the Debtors, partners of McKinsey RTS and its affiliates worldwide that provide consulting services immediately inform the office of McKinsey RTS's General Counsel if proposed support for any of their clients would focus on a direct commercial relationship with the Debtors.

  25.  Based upon the responses to these inquiries, McKinsey RTS and its affiliates serve or have served in the last three years various parties included on the Interested Parties List, but other than as may be described herein, such client service has not focused on a direct commercial relationship or transaction with the Debtors.

  26.  Furthermore, based upon responses received to the inquiry of over 18,000 colleagues of McKinsey RTS and its affiliates, no employees of the McKinsey RTS Team or McKinsey RTS have immediate family members that are related to or employed by the Debtors. In addition, to the best of my knowledge and belief, no employees of the McKinsey RTS Team or McKinsey RTS or their family members hold equity securities of the Debtors.[5]

  27.  To the best of my knowledge and belief, no client of McKinsey RTS and its affiliates who is identified on the Interested Parties List accounts for more than one percent of McKinsey RTS's and its affiliates' gross annual revenue on a consolidated basis as of its fiscal year 2014.

---

[5]  In reviewing its records and the relationships of its professionals, McKinsey RTS did not seek information as to whether any employee of McKinsey RTS or its affiliates or member of his or her immediate family: (a) indirectly owns, through a public mutual fund or through partnerships in which certain employees have invested but as to which such professionals have no control over or knowledge of investment decisions, securities of the Debtors; or (b) has engaged in any ordinary course consumer transaction with any party in interest. If any such relationship does exist, I do not believe it would impact McKinsey RTS's disinterestedness or otherwise give rise to a finding that McKinsey RTS holds or represents an interest adverse to the Debtors' estates.

28. McKinsey RTS has adopted procedures to identify any potential support by McKinsey RTS that focuses on a direct commercial relationship or transaction with the Debtors so that McKinsey RTS may either make disclosure of such potential engagement to the Bankruptcy Court or take other appropriate steps. If and when retained, McKinsey RTS will again communicate to all partners in McKinsey RTS and its affiliates to notify the office of the General Counsel of any such proposed client engagements.

29. Finally, as part of its diverse practice, McKinsey RTS and its affiliates are involved in numerous matters and transactions involving many different professionals, including attorneys, accountants and financial consultants, some of which may represent the Debtors or claimants and Interested Parties in the Debtors' chapter 11 cases. For instance, McKinsey RTS and its affiliates may have in the past been represented by, may currently be represented by, and may in the future be represented by attorneys, law firms or financial advisors who are involved in these proceedings, including law firms and financial advisors representing the Debtors. Further, McKinsey RTS and its affiliates may in the past have served, may currently serve, and may in the future serve professionals in these cases on matters unrelated to the Debtors' chapter 11 cases. In addition, McKinsey RTS and its affiliates may in the past have worked with, may currently work with, and likely will in the future work with professionals in these cases on matters unrelated to these cases. Lastly, McKinsey RTS and its affiliates may have in the past contracted with, may currently contract with, and may in the future contract with certain service providers listed on the Interested Parties List for necessary business services. Based upon my current knowledge of the professionals involved, to the best of my knowledge, none of these business relations constitute interests materially adverse to the Debtors herein in matters upon which McKinsey RTS is to be employed, and none are in connection with these cases.

30. In the 90 days immediately preceding the Petition Date, McKinsey RTS received payments totaling $1,825,000.00 in the aggregate for services rendered and expenses incurred on behalf of the Debtors. McKinsey RTS received no other payments from the Debtors during the 90 days immediately preceding the Petition Date. As of the Petition Date, the Debtors did not owe McKinsey RTS for any fees or expenses incurred prior to the Petition Date.

31. McKinsey RTS has not shared or agreed to share any of its compensation from the Debtors with any other person, other than as permitted by section 504 of the Bankruptcy Code.

32. McKinsey RTS will conduct an ongoing review of its files during the pendency of these chapter 11 cases to ensure that no conflicts or other disqualifying circumstances exist or arise. In this regard, if McKinsey RTS discovers additional information that requires disclosure, McKinsey RTS will file supplemental disclosures with the Court.

33. Based upon the foregoing, I believe that McKinsey RTS does not hold an adverse interest to the Debtors' estates and that McKinsey RTS is a "disinterested person" as that term is defined in section 101(14) of the Bankruptcy Code.

34. McKinsey RTS reserves the right to supplement this Declaration in the event it becomes aware of any relationship or other information that requires disclosure.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: August 24, 2015
       Chicago, Illinois

/s/ Kevin Carmody
Kevin Carmody
Practice Leader