# EXHIBIT 36

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: <br><br> NEW STREAM SECURED CAPITAL, INC., <br> a Delaware corporation, <br><br> Debtor. | Chapter 11 |
| In re: <br><br> NEW STREAM INSURANCE, LLC, <br> a Delaware limited liability company, <br><br> Debtor. | Chapter 11 |
| In re: <br><br> NEW STREAM CAPITAL LLC, <br> a Delaware limited liability company, <br><br> Debtor. | Chapter 11 |
| In re: <br><br> NEW STREAM SECURED CAPITAL L.P., <br> a Delaware limited partnership, <br><br> Debtor. | Chapter 11 |

## DISCLOSURE STATEMENT IN CONNECTION WITH THE PREPETITION SOLICITATION OF VOTES IN RESPECT OF THE JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

NO CASES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE HAVE YET BEEN COMMENCED. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY ANY U.S. BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE.

REED SMITH LLP
599 LEXINGTON AVENUE
22ND FLOOR
NEW YORK, NY 10022
Telephone: (212) 521 5400
Facsimile:  (212) 521 5450

REED SMITH LLP
1201 MARKET STREET
SUITE 1500
WILMINGTON, DE  19801
Telephone: (302) 778 7512
Facsimile:  (302) 778 7575

*Proposed Counsel for the Debtors*

US_ACTIVE-104461708.35

Classes B, E, H, K, L, N and O of the Bermuda Fund and appointed McKenna as the Receiver

over Class F.

On September 13, 2010, the Bermuda Fund Receivers petitioned the Bermuda Court for

the winding up of the Bermuda Fund and by ex parte summons for their appointment as joint

provisional liquidators of the Bermuda Fund.  They were appointed the joint provisional

liquidators that same day.  On October 7, 2010, the Bermuda Court ordered that the Bermuda

Fund be wound up under the provisions of the Companies Act and confirmed the appointment of

the joint provisional liquidators.

In December 2009, an Internet blog reported that United States law enforcement

authorities had initiated an investigation of Debtors.  Although no regulatory authorities had

contacted the Debtors, the Debtors proactively communicated with the U.S. Attorney's Office

for the District of Connecticut to offer their assistance in any investigation and voluntarily

supplied information and documents.  In July 2010, the Debtors were contacted by the U.S.

Securities and Exchange Commission ("SEC"), which initially sought copies of the materials

provided to the U.S. Attorney's Office.  The Debtors, again, voluntarily supplied information and

documents.  Just recently, in mid-December 2010, in connection with its investigation, the SEC

has sought additional materials from the Debtors and the Debtors have been voluntarily

complying with that request.  The SEC's investigation is ongoing.  No proceeding has been

initiated by any law enforcement authority.  The Debtors intend to fully cooperate with any

regulatory or enforcement activity.

**E.**      Negotiations with the Bermuda Fund Receivers

Since the appointments of the Bermuda Fund Receivers, the Debtors have been in

negotiations with them, as the court-appointed representatives of the Bermuda Fund Segregated

Account Classes, concerning an orderly liquidation of the Debtors.  During these discussions,

US_ACTIVE-104461708.35

there was disagreement concerning the use of cash generated from NSSC's portfolio to pay premiums on the NSI Life Settlement Portfolio. Without the use of this cash, NSI was unable to pay premiums and faced the potential loss of value from cancellation of policies for non-payment of premiums.

The Debtors, with encouragement and assent of the Bermuda Receivers, marketed the NSI Insurance Portfolio. That marketing effort culminated in the acceptance of an offer made by the Purchaser, which was the highest and best offer received for the Portfolio, for a cash price of $127.5 million plus a "price-neutral" premium financing in the amount extended under the Pre-Petition Secured Note to fund premium payments until the sale could be closed. (*See,* Article V.C.5 for a more detailed discussion on the sale process and terms of the purchase).

**F.**     The Plan Support Agreements

The Debtors anticipate that consummation of the Insurance Portfolio Sale would serve as the foundation for a reorganization. On November 9, 2010, the Debtors entered into the Initial Plan Support Agreement with, *inter alia*, the Receivers and MIO, which outlines the terms for the Plan. A true and correct copy of the Initial Plan Support Agreement is attached as Exhibit 2.

The Initial Plan Support Agreement contemplated a second Plan Support Agreement that would include copies of the Plan and Disclosure Statement. Accordingly on January 21, 2011, the Debtors entered into the Plan Support Agreement with, *inter alia*, the Receivers and MIO, which attaches copies of the Plan and this Disclosure Statement. The Debtors may continue to seek to have the Plan Support Agreement executed by additional Creditors. A true and correct copy of the Plan Support Agreement is attached as Exhibit 3. In connection with the solicitation the Debtors have requested that the US/Cayman Creditors execute a copy of the Plan Support Agreement. All Creditors have the ability to enter into and be bound by the terms of the Plan Support Agreement at any time.

US_ACTIVE-104461708.35

The Plan, if confirmed, would settle and resolve issues related to the rights of Creditors, the relative priorities and potential claims and causes of action that each them may have against the other.  The Plan is intended to achieve a global resolution of all such issues and for that reason the Plan contains broad provisions relating to the distribution of assets, the method of liquidation, the release of claims and the compromise of rights and claims that the Debtors' Creditors may have.  If the Plan is confirmed by the Bankruptcy Court, it will be binding on all Creditors, regardless of whether they voted to accept or reject the Plan.

## V.      The Debtors and Their Business

The businesses of each of the Debtors, and their respective organization and operations, are summarized in this section of this Disclosure Statement.  However, a brief overview of the organizational structure, which is based on the "master-feeder fund" structure commonly used by investment managers, will simplify the explanation.

## A.      The Master Fund and Three Feeder Funds

The master-feeder fund structure is commonly utilized by investment managers to accumulate funds raised from both U.S. and foreign investors and pool them into a single master fund.  In this way, the investment manager can achieve a critical mass of investments, realize economies of scale, enhance operating efficiencies and thereby reduce costs.

In this parlance, NSSC is the "master fund."  The capital that it invests is obtained from the three feeder funds, one of which is a domestic entity that aggregates investments from U.S. investors.  The other two feeder funds are foreign entities that aggregate investments from non-resident investors who are not subject to taxation in the United States.

The US Fund, New Stream Secured Capital (U.S.), LLC, is a Delaware limited liability company and the entity through which U.S. residents have invested in NSSC.  Each domestic

US_ACTIVE-104461708.35

5.    Sale of the Life Insurance Portfolio

        a.    The Marketing and Auction Process.

On May 3, 2010 NSI engaged Guggenheim Securities, L.L.C. ("Guggenheim"), an

independent investment bank with extensive experience in the life settlement market, to help the

Debtors explore financing opportunities for the NSI Insurance Portfolio.  In late May, 2010,

Guggenheim was prepared to go to the market to obtain a five year $200 million credit facility.

However, as a result of the Bermuda Judgment that was issued in June 2010, Guggenheim

advised NSSC that it would suspend solicitation for the offering until such time as it became

clear that any prospective lender would be able to obtain a first priority security interest in the

NSI Insurance Portfolio.[12]

Following the Bermuda Judgment and the appointment of the Receivers, the Debtors

entered into negotiations with the Receivers.  While these discussions were ongoing, there was

disagreement concerning the use of the cash proceeds from NSSC's investment portfolio to pay

premiums on the NSI Insurance Portfolio.  Specifically, the Joint NSSC Receivers on behalf of

the NSSC Bermuda Lenders objected to the payment of insurance premiums necessary to

preserve the value of the NSI Insurance Portfolio on which the NSI Secured Lender had a

structurally superior position.  As noted above (*see,* Article IV.B.2), the Bermuda Judgment

made it impossible for the Debtors to obtain financing from a commercial lender for the

insurance premiums on commercially reasonable terms.  The inability to utilize the cash

proceeds resulted in the Debtors' inability to pay current premiums in full and as a result they

---

[12]  All of the Debtors credit documents in effect at such time permitted the Debtors to obtain "Senior Indebtedness" from a "commercial lender."  Hence, financing from a source other than from a "commercial lender" was not permitted under the Debtors' credit documents.

US_ACTIVE-104461708.35

made only *de minimis* payments causing the policies in the portfolio to fall into the "grace period" prior to which the policies would lapse for non-payment of premiums.

During this time the Debtors were also engaged in discussions with the Bermuda Receivers about the possibility of financing the NSI Insurance Portfolio.  Over the course of the month of June and into July numerous attempts were made at obtaining approval from Bermuda C, F and I to permit Guggenheim to proceed with the offering, but no agreement could be reached.  On July 20th, a meeting was held with the Bermuda Receivers and representatives of the Bermuda Investors, whereby a decision was reached to cease any activities around financing and instead to pursue an outright sale of the portfolio.  Finally, MIO, on behalf of the Purchaser, submitted an offer to purchase the NSI Insurance Portfolio and the Debtors were instructed to move ahead on that offer.

In late July, 2010, the Debtors, with encouragement and assent of the Bermuda Receivers, began to seek means to prevent the termination of the life insurance policies through a sale of the NSI Insurance Portfolio.  Thereafter, the Debtors and Guggenheim began negotiating with MIO, on behalf of the Purchaser, for a purchase of the NSI Insurance Portfolio.  At the behest of a Bermuda Investor, an additional competitive bid was received.  Subsequently, Guggenheim and the Debtors elected to seek out additional competitive bids, as there appeared to be a greater interest in the NSI Insurance Portfolio from legitimate buyers than had previously been thought.  Guggenheim ultimately received expressions of interest from five potential purchasers.

Guggenheim continued to engage the potential purchasers in negotiations and it became clear that three of the five potential purchasers were serious and were in a position to make binding offers to purchase the NSI Insurance Portfolio.  In fact, the three interested parties began

US_ACTIVE-104461708.35

making uncommitted offers and continued to negotiate the purchase price with Guggenheim and the Debtors. Given the looming deadline and lack of liquidity, the Debtors and Guggenheim decided the only way they could timely sell the portfolio would be to require that all interested parties submit their final and best offers. Between July 23, 2010 and July 28, 2010, Guggenheim was working with several parties who had expressed interest in or made written offers for the portfolio. Because there were substantial differences in the bids, Guggenheim and the Debtors were working to create a standard set of terms. This culminated in a written form term sheet that was sent to all bidders on July 27, 2010, and a deadline was set for final bids 3:00 PM ET on July 28, 2010 for bidders to introduce, refine or improve offers. The notice made clear that the Debtors would welcome offers on any terms, but that it would ideally like to see certain features in any offer, including bridge financing and a commitment to close by July 30, 2010. The three interested parties each delivered bids to Guggenheim which were evaluated based on (a) an assessment of the certainty of closing the transaction, (b) total economics on the table including the size of the cash component of any offer and (c) any other features proposed.

> b. The Winning Bid.

On July 29, 2010, that process concluded with Guggenheim reviewing and recommending an offer made by MIO, on behalf of the Purchaser, to purchase the entire portfolio for a cash payment of $127.5 million.[13] The Debtors agreed that the offer was the highest and best offer and NSI and MIO, on behalf of the Purchaser, entered into a binding term sheet agreement ("MIO Purchaser Term Sheet") on July 29, 2010 setting forth the terms and

---

[13]  The Purchaser has advised the Debtors that it has recently entered into an agreement with an unrelated entity that was a participant at the auction for the NSI Insurance Portfolio. The agreement grants the unrelated entity an option, effective after the closing of the sale to the Purchaser, to acquire up to 50% of the equity interests of the Purchaser for a pro rata share of the purchase price (including amounts under the Pre-Petition Secured Note, DIP Facility, fees and costs).

US_ACTIVE-104461708.35

conditions of the sale.  MIO intends to assign its rights under the MIO Purchaser Term Sheet to
Purchaser.  As of the date of the MIO Purchaser Term Sheet, the terms of the Insurance Portfolio
Sale provided for:

     (i)      A purchase price of $127,500,000 in cash;

     (ii)      No additional due diligence required (this was the only bid that did not require
additional due diligence);

     (iii)      Interim financing of up to $25,000,000, the proceeds of which were to be used to
pay the premiums of the NSI Insurance Portfolio;

     (iv)      Any interim financing would be "purchase price neutral"; i.e., repayment would
be forgiven and the amount outstanding added to the purchase price so long as MIO or its
nominee (*i.e.*, the Purchaser) was the ultimate purchaser;

     (v)      As soon as possible after the execution of the MIO Purchaser Term Sheet, the
parties would enter into definitive documentation with a closing to occur no later than September
30, 2010;

     (vi)      The sale must be approved by either 100% of the investors or a bankruptcy court
and the assets must be sold free and clear of all Claims and Interests through a bankruptcy
process;

     (vii)      If the NSI Insurance Portfolio is sold to an alternative bidder, MIO or its nominee
(*i.e.*, the Purchaser) would be entitled to a break-up fee equal to 3% of the purchase price and
expense reimbursement of up to $500,000; and

     (viii)    MIO or its nominee (*i.e.,* the Purchaser) would offer additional incentives to the
US/Cayman investors in order to induce them to support the sale.[14]

---

[14]  This term culminated in the Purchaser Contribution.

US_ACTIVE-104461708.35

Subsequent to the execution of the MIO Purchaser Term Sheet the parties diligently began negotiating and drafting the definitive documentation relating to the Insurance Portfolio Sale.  The final agreed upon terms of the Sale to the Purchaser are now set forth in the Asset Purchase Agreement, substantially in the form attached as Exhibit A to the Plan.   Pursuant to the MIO Purchaser Term Sheet, the parties anticipated a closing on or prior to September 30, 2010.  Since the parties were unable to close before such date, the Purchaser and the Note Lenders agreed (i) to extend such date, (ii) to amend the principal amount of "price neutral" interim financing extended under the Pre-Petition Secured Note to $39,480,268.58 and (iii) to offer financing under a "price neutral" DIP Facility, provided, however, that all interest, fees and expenses under the DIP Facility would not be "price neutral" and would be fully payable in Cash upon termination of the DIP Facility.   In return for the significant consideration extended by the Note Lenders and the Purchaser, the Debtors agreed that any death benefits received by the Debtors on or after October 1, 2010 would be held in escrow for the benefit of the Purchaser upon the closing of the sale (the "Escrowed Benefits").  These terms are now reflected in the Asset Purchase Agreement and the Pre-Petition Secured Note.  Although the Debtors are in default under the Pre-Petition Secured Note, the Note Lenders and the Purchaser continue to cooperate with the Plan process, while reserving all rights to enforce their Claims.

In the event the Plan is accepted by Classes 1, 2, 3 and 4(c), the Debtors will proceed to consummate the Insurance Portfolio Sale simultaneously with the Effective Date under the Plan.  If, however, the Plan will require a cramdown on Class 3 or any other non-accepting impaired Class of Claims eligible to vote on the Plan, then the Debtors will, immediately after filing the Chapter 11 cases, seek approval to sell the Insurance Portfolio to the Purchaser or its designee under Section 363 of the Bankruptcy Code.  In the event the closing of the Insurance Portfolio

US_ACTIVE-104461708.35

Sale occurs prior to the Confirmation, the proceeds from the Insurance Portfolio Sale will be deposited into the Bermuda Liquidation Account and distributed pursuant to the terms of the Plan as if the closing occurred on the Effective Date.

It is important to highlight the critical value of the financing the Note Lenders and the DIP Lenders have, or will, provide to the Debtors. The Note Lenders will have loaned the Debtors approximately $40,000,000 prior to the Petition Date and the DIP Lenders will commit to fund up to an additional $15,000,000 during the pendency of the Chapter 11 Cases. So long as the NSI Insurance Portfolio is sold to the Purchaser, this $55,000,000 of financing will effectively be added to purchase price and will not need to be repaid by the Debtors (except for interest and fees relating to the DIP Facility, which will need to be repaid in cash). On the other hand, a sale to any party other than the Purchaser will require the Debtors to repay the $55,000,000. Additionally, the Purchaser would be entitled to a break-up fee equal to $3,825,000 (3% of the purchase price) plus up to $500,000 for expense reimbursement. Hence in order for a sale to any party other than the Purchaser to be of greater value to the Debtors' estates, it would require a purchase price in excess of approximately $181,500,000.

      c.      Pre-Petition Secured Financing

As previously described, following NSI's acceptance of the MIO Purchaser Term Sheet, NSI and the Note Lenders entered into the Pre-Petition Secured Note, which is currently in default, and related loan documents.

      d.      Fees Relating to the Sale Transaction.

In addition to the Debtors', Note Lenders, DIP Lenders and the Purchaser's ordinary professional advisory fees for legal and financial consulting, NSI agreed to pay Guggenheim a fee in the amount of 2.5% of the gross proceeds from the NSI Sale for its investment banking

US_ACTIVE-104461708.35

and placement services.  Based on the $127,500,000 cash purchase price the Purchaser has

agreed to pay, the fee would equal $3,187,500.  Guggenheim agreed as a condition precedent to

its agreement with NSI that it would enter into an agreement with SSS, a subsidiary of NSC,

with respect to the sharing of certain fees Guggenheim may receive so as to compensate SSS for

its assistance in the services Guggenheim was to perform.  Accordingly, Guggenheim and SSS

entered into an agreement whereby Guggenheim agreed to pay SSS fees equal to 10% of the total

fees earned by Guggenheim.  SSS therefore will be paid $318,750 of the fee paid to

Guggenheim.  It is anticipated that such fees will be used by the Reorganized Debtors in the

ordinary course for their on going operations.  For the avoidance of doubt, none of the principals,

members, employees or insiders of the Debtors directly or indirectly received any fee as a result

of or from the sale to the Purchaser.

6.    Debtor-in-Possession Financing

In order to enable the Debtors to pay premiums and other costs and expenses relating to

the NSI Insurance Portfolio during the pendency of the Chapter 11 Cases, the Debtors obtained a

commitment for financing from the DIP Lenders.  The DIP Facility is subject to Bankruptcy

Court approval, which the Debtors will seek immediately upon the filing of the Chapter 11

Cases.  The proceeds of the loans under the DIP Facility are to be used by the Debtors for the

limited purpose of paying the actual amounts necessary to fund the premium payments of the

insurance policies in the NSI Insurance Portfolio, and the reasonable fees and costs associated

therewith (including servicing fees) in accordance with a budget.  The terms of the DIP Facility

are set forth in the term sheet attached as Exhibit 5 hereto.

Similar to the Pre-Petition Secured Note, the DIP Facility is structured to be "price

neutral", which means that outstanding amounts will not be deducted from the sale price at

closing, but are effectively added to the purchase price for the Insurance Portfolio; *provided*,

US_ACTIVE-104461708.35

NSI Secured Lender: Each of Segregated Account Classes C, F and I of New Stream Capital Fund Ltd. (each a "NSI Secured Lender" and collectively, the "NSI Secured Lenders").

NSI Receiver: McKenna, in his capacity as the receiver for Segregated Account Classes C, F and I of New Stream Capital Fund Ltd. appointed by Orders of the Bermuda Court in the Bermuda Proceedings on June 18, 2010 and July 16, 2010.

NSSC: New Stream Secured Capital L.P., a Delaware limited partnership, formerly known as Porter Secured Capital Partners, L.P.

NSSC Bermuda Lenders: Segregated Account Classes B, E, H, K, L, N and O of the Bermuda Fund.

NSSC Collateral Agency Agreement: The Second Amended and Restated Collateral Agency Agreement by and among NSSC (as defined herein), the Lenders, as identified therein, the Subordinated Lenders as identified therein, and Wilmington Trust, as Collateral Agent (as amended, restated, amended and restated, supplemented or otherwise modified from time to time).

Other Priority Claim: Any Claim of a Creditor, other than an Administrative Claim, to the extent such Claim is entitled to priority pursuant to Section 507(a) of the Bankruptcy Code.

Percentage Share:  For purposes of Sections 5.3 and 12.7 of the Plan, the ratio —expressed as a percentage— of each US-Cayman Investor's investment to the aggregate of all US-Cayman Investors' investment as reflected on Schedule 1 annexed to the Plan.

Person:  A "person" as defined in Section 101(41) of the Bankruptcy Code.

Petition Date: The date on which the Debtors' voluntary petitions commencing their respective Chapter 11 Cases are filed with the Bankruptcy Court.

Plan:  This Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code, and all exhibits annexed hereto or referenced herein, as it may be amended, modified or supplemented from time to time in accordance with the provisions of the Plan or the Bankruptcy Code and Bankruptcy Rules.

Plan Administrator:  FTI Consulting, or any successor Entity selected by the Post-Confirmation Debtors with the consent of the Joint NSSC Receivers.

Plan Supplement: The compilation of documents, forms of documents, schedules, and exhibits to the Plan to be Filed by the Debtors no later than five (5) days prior to the Confirmation Hearing or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, and additional documents filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement, comprised of, among other documents, the following: (a) the organizational documents for the Bermuda Wind Down Asset Structure that have been implemented by the Debtors; (b) the Wind Down Budget; (c) schedules of executory contracts and/or unexpired leases to be assumed; and, (d) the form of the Asset Management Agreement to be entered into as of the Effective Date. Any reference to the Plan Supplement in the Plan shall include each of the documents identified above as (a) through (d). The Debtors shall have the right to amend the documents contained in the Plan Supplement with the prior consent of the Joint NSSC Receivers, and add additional documents to the Plan Supplement, through and including the Effective Date, provided, however, that the written consent of the Purchaser shall be

US_ACTIVE-104461708.35

required for any amendment or addition that affects the Insurance Portfolio Sale and the written consent of the DIP Lenders shall be required for any amendment or addition that affects the DIP Facility, the Plan terms or the "Milestones" set forth in each of the Plan Support Agreements.

Plan Support Agreement: The Plan Support Agreement entered into as of January 21, 2011, by and among the Debtors and certain of the Debtors' Creditors and equity Holders, including, but not limited to each of the entities set forth on Schedules 1-3 thereto, as amended or supplemented from time to time.

Plan Support Agreements: Collectively the Initial Plan Support Agreement and the Plan Support Agreement, each as amended or supplemented from time to time.

Post-Confirmation Debtors: The Debtors, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

Pre-Petition Secured Note:  That certain Secured Promissory Note, dated as of August 4, 2010, as amended, made by NSI, as borrower, in favor of the Note Lenders in the original principal amount of Twenty-Five Million and No/100 Dollars (USD $25,000,000.00), as amended by the Amended and Restated Secured Promissory Note, dated as of November 8, 2010, in the amended principal amount of Thirty-Nine Million Four Hundred Eighty Thousand Two Hundred Sixty Eight and 58/100 Dollars (USD $39,480,268.58), made by NSI, as borrower, in favor of the Note Lenders.

Professional:  A Person (a) employed in the Chapter 11 Cases pursuant to a Final Order in accordance with Sections 327, 328 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to Sections 327, 328, 329, 330, 331 and 363 of the Bankruptcy Code or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to Section 503(b)(4) of the Bankruptcy Code.

Professional Claim:  A Claim of a Professional (a) retained in the Chapter 11 Cases pursuant to a Final Order in accordance with Sections 327, 328 and 1103 of the Bankruptcy Code or otherwise, for compensation or reimbursement of actual and necessary costs and expenses relating to services incurred after the Petition Date and prior to and including the Effective Date or (b) for compensation and reimbursement that has been allowed by the Bankruptcy Court pursuant to Section 503(b)(4) of the Bankruptcy Code.

Pro Rata Portion: For purposes of Section 5.6 of the Plan, the ratio that the Allowed Amount of each Claim in Class 4(c) bears to the aggregate of all Allowed Claims in Class 4(c).

Purchaser: An entity that is controlled or managed by MIO, which shall be the purchaser under the Asset Purchase Agreement.

Purchaser Contribution:  The sum of $5,000,000 to be paid by the Purchaser or by the Note Lenders, into the Global Settlement Fund, solely in the event that the Plan is confirmed by the Consensual Process, which payment shall be separate, distinct and in addition to the amounts payable by the Purchaser as the purchaser under the Asset Purchase Agreement and the amounts advanced under the DIP Facility.

Receivers: Collectively, the NSI Receiver and the Joint NSSC Receivers.

US_ACTIVE-104461708.35

Released Parties: Each of: (a) the Bermuda Liquidators, in their capacity as such; (b) the Joint NSSC Receivers, in their capacity as such; (c) the NSI Receiver, in his capacity as such; (d) the Collateral Agent, in its capacity as such; (e) the DIP Lenders, in its capacity as such; (f) the Note Lenders, in their capacity as such; (g) the Purchaser, in its capacity as purchaser under the Asset Purchase Agreement; (h) MIO, both in its individual capacity and in its capacity as manager, managing member, general partner, investment manager, adviser or authorized signatory, as the case may be, for the Purchaser, the DIP Lenders and the Note Lenders; (i) the US-Cayman Investors that are affiliates of or controlled by MIO, (j) the Debtors and the Post-Confirmation Debtors; and (k) with respect to each of the foregoing entities in clauses (a) through (j), such person's current and former officers, directors, principals, members, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, in each case in their capacity as such.

Sale Order:  A Final Order of the Bankruptcy Court, which is entered prior to Confirmation of the Plan, approving the Insurance Portfolio Sale on the terms set forth in the Asset Purchase Agreement and authorizing the Debtors to consummate the Insurance Portfolio Sale on the terms set forth in the Asset Purchase Agreement.

Scheduled:  Information that is set forth on the Schedules.

Schedules:  The Schedules of Assets and Liabilities Filed by the Debtors in accordance with Section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as the same may be amended from time to time in accordance with Bankruptcy Rule 1009.

Secured Claim: A Claim that is (a) secured by a Lien on Collateral in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to Section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estate's interest in such Collateral or to the extent of the amount subject to setoff, as applicable, as determined pursuant to Section 506(a) of the Bankruptcy Code; or (b) Allowed as such pursuant to the Plan.

Segregated Account:  A Segregated Account of the Bermuda Fund.

Segregated Account Class C: Segregated Account Class C of the Bermuda Fund.

Segregated Account Class F: Segregated Account Class F of the Bermuda Fund.

Segregated Account Class I:  Segregated Account Class I of the Bermuda Fund.

Taxes:  All income, gaming, franchise, excise, sales, use, employment, withholding, property, payroll or other taxes, assessments, or governmental charges, together with any interest, penalties, additions to tax, fines, and similar amounts relating thereto, imposed or collected by any federal, state, local or foreign governmental authority on or from any of the Debtors.

Unimpaired:  Any Claim, Interest, or Class of Creditors or Interests, that is not Impaired.

United States Trustee:  The United States Trustee appointed under Section 581(a)(3) of title 28 of the United States Code to serve in the District of Delaware.

US_ACTIVE-104461708.35

each of the entities set forth on Schedules 1-3 thereto, as amended or supplemented from time to time.

**1.117  Plan Support Agreements**: Collectively the Initial Plan Support Agreement and the Plan Support Agreement, each as amended or supplemented from time to time.

**1.118  Post-Confirmation Debtors**: The Debtors, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

**1.119  Pre-Petition Secured Note**:  That certain Secured Promissory Note, dated as of August 4, 2010, as amended, made by NSI, as borrower, in favor of the Note Lenders in the original principal amount of Twenty-Five Million and No/100 Dollars (USD $25,000,000.00), as amended by the Amended and Restated Secured Promissory Note, dated as of November 8, 2010, in the amended principal amount of Thirty-Nine Million Four Hundred Eighty Thousand Two Hundred Sixty Eight and 58/100 Dollars (USD $39,480,268.58), made by NSI, as borrower, in favor of the Note Lenders.

**1.120  Professional**: A Person (a) employed in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327, 328 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to sections 327, 328, 329, 330, 331 and 363 of the Bankruptcy Code or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

**1.121  Professional Claim**: A Claim of a Professional (a) retained in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327, 328 and 1103 of the Bankruptcy Code or otherwise, for compensation or reimbursement of actual and necessary costs

and expenses relating to services incurred after the Petition Date and prior to and including the Effective Date or (b) for compensation and reimbursement that has been allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

**1.122  Pro Rata Portion**: For purposes of section 5.6 of the Plan, the ratio that the Allowed Amount of each Claim in Class 4(c) bears to the aggregate of all Allowed Claims in Class 4(c).

**1.123  Purchaser**: An entity that is controlled or managed by MIO, which shall be the purchaser under the Asset Purchase Agreement.

**1.124  Purchaser Contribution**:  The sum of $5,000,000 to be paid by Purchaser or by the Note Lenders, into the Global Settlement Fund, solely in the event that the Plan is confirmed by the Consensual Process, which payment shall be separate, distinct and in addition to the amounts payable by Purchaser, as the purchaser under the Asset Purchase Agreement, and the amounts advanced under the DIP Facility.

**1.125  Receivers**: Collectively, the NSI Receiver and the Joint NSSC Receivers.

**1.126  Released Parties**: Each of: (a) the Bermuda Liquidators, in their capacity as such; (b) the Joint NSSC Receivers, in their capacity as such; (c) the NSI Receiver, in his capacity as such; (d) the Collateral Agent, in its capacity as such; (e) the DIP Lenders, in its capacity as such; (f) the Note Lenders, in their capacity as such; (g) Purchaser, in its capacity as purchaser under the Asset Purchase Agreement; (h) MIO, both in its individual capacity and in its capacity as manager, managing member, general partner, investment manager, adviser or authorized signatory, as the case may be, for Purchaser, the DIP Lenders and the Note Lenders; (i) the US-Cayman Investors that are affiliates of or controlled by MIO, (j) the Debtors and the Post-Confirmation Debtors; and (k) with respect to each of the foregoing entities in clauses (a)

through (j), such person's current and former officers, directors, principals, members, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, in each case in their capacity as such.

      **1.127  Sale Order**:  A Final Order of the Bankruptcy Court, which is entered prior to Confirmation of the Plan, approving the Insurance Portfolio Sale on the terms set forth in the Asset Purchase Agreement and authorizing the Debtors to consummate the Insurance Portfolio Sale on the terms set forth in the Asset Purchase Agreement.

      **1.128  Scheduled**: Information that is set forth on the Schedules.

      **1.129  Schedules**:  The Schedules of Assets and Liabilities Filed by the Debtors in accordance with section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as the same may be amended from time to time in accordance with Bankruptcy Rule 1009.

      **1.130  Secured Claim**: A Claim that is (a) secured by a Lien on Collateral in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estate's interest in such Collateral or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed as such pursuant to the Plan.

      **1.131  Segregated Account**:  A Segregated Account of the Bermuda Fund.

      **1.132  Segregated Account Class C**: Segregated Account Class C of the Bermuda Fund.

      **1.133  Segregated Account Class F**: Segregated Account Class F of the Bermuda Fund.

# EXHIBIT C

DEBTOR-IN-POSSESSION CREDIT FACILTY
FOR
NEW STREAM INSURANCE, LLC

NON-BINDING SUMMARY OF PROPOSED TERMS AND CONDITIONS

February __, 2011

This term sheet outlines the terms and conditions for a proposed debtor-in-possession credit facility to be provided by (i) a newly-formed entity ("Newco"), as administrative agent and [a] lender, (ii) SSALT Fund Limited, by and through its nominee; (iii) Compass Special Situations Fund LLC, by and through its nominee; (iv) Compass COSS Master Limited, by and through its nominee; and (v) Special Situations Fund LP, as lenders, for New Stream Insurance, LLC, as borrower, in connection with a "pre-packaged" Chapter 11 bankruptcy plan process or sale of assets pursuant to section 363 of the Bankruptcy Code.  This term sheet is for discussion purposes only, is non-binding and is subject to, among other conditions set forth herein, definitive documentation.

| | |
|---|---|
| Borrower: | New Stream Insurance, LLC, a Delaware limited liability company (the "Borrower"), as debtor and debtor-in-possession in a Chapter 11 case (the "Chapter 11 Case") to be commenced in the United State Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on February [28], 2011 (the "Petition Date"). |
| Administrative Agent: | Newco (the "Administrative Agent"). |
| Lenders: | (i) Newco ; (ii) SSALT Fund Limited, by and through its nominee; (iii) Compass Special Situations Fund LLC, by and through its nominee; (iv) Compass COSS Master Limited, by and through its nominee; and (v) Special Situations Fund LP (collectively, the "Lenders"). |
| DIP Facility: | A first priority, senior secured multiple draw term loan credit facility (the "DIP Credit Facility") on the terms and conditions set forth in the Pre-Petition Secured Note (as defined below), as ratified and amended by the Ratification and Amendment Agreement (as defined below) (as ratified and amended, the "DIP Credit Agreement"), in the aggregate principal amount of not more than $54,480,268.58 (the "Total Commitment"), which shall be comprised of (i) all outstanding principal, and all accrued but unpaid interest, fees, costs and others expenses, incurred or accrued prior to the Petition Date under the Pre-Petition Secured Note (collectively, the "Pre-Petition Obligations"), and (ii) and an additional commitment in the amount of up to $15,000,000 (the "Additional Commitment"). |

| Repayment: | Upon the occurrence and continuation of an Event of Default (as defined below), the entire amount of all outstanding principal, and all accrued but unpaid interest, Fees and Expenses (as defined below), including, but not limited to, all Pre-Petition Obligations, under the DIP Credit Facility (collectively, the "<u>Obligations</u>"), shall be due and payable in full, in cash. |
|---|---|
| | Upon the occurrence of the DIP Expiration Date (as defined below), other than as a result of the occurrence and continuation of an Event of Default, the sum of all (i) Pre-Petition Obligations and (ii) Loans borrowed after the Petition Date under the Additional Commitment then outstanding, shall be deemed satisfied as additional purchase price for the insurance policies and assets set forth on <u>Schedule A</u> hereto (the "<u>NSI Life Portfolio</u>") as set forth in the APA; <u>provided</u>, that that all Fees and Expenses shall be payable in full, in cash on the DIP Expiration Date. |
| Ratification and Amendment Agreement: | The Borrower and Lenders shall enter into an agreement pursuant to which (i) the Borrower shall reaffirm its obligations under the Pre-Petition Secured Note and (ii) the terms and conditions of the Pre-Petition Secured Note shall be amended to reflect the terms and conditions set forth in this term sheet (the "<u>Ratification and Amendment Agreement</u>"). |
| Availability: | Upon entry by the Bankruptcy Court of an interim order approving the DIP Loan Documents (as defined below) and the DIP Credit Facility (the "<u>Interim Order</u>"), and until entry by the Bankruptcy Court of a final order approving the DIP Loan Documents and DIP Credit Facility (the "<u>Final Order</u>"), the Borrower shall be permitted to borrow up to the maximum aggregate amount of $5,000,000, in accordance with the Budget (as defined below) to fund (a) the actual amounts necessary to fund the premium payments of the insurance policies included in the NSI Life Portfolio plus (b) the reasonable and documented fees and costs associated therewith (including servicing fees). |
| | Upon entry by the Bankruptcy Court of the Final Order, and until the DIP Expiration Date, the Borrower will be permitted to borrow (a) the actual amounts necessary to fund the premium payments of the insurance policies in the NSI Life Portfolio, and (b) the reasonable fees and costs associated therewith (including servicing fees), up to the maximum amount of the Total Commitment, in accordance with the Budget. |
| Use of Proceeds: | The proceeds of the loans (the "<u>Loans</u>") under the DIP Credit Facility shall be used by the Borrower for the limited purpose of |