# EXHIBIT 64

# EXHIBIT A

**Engagement Letter**

# AMENDED AND RESTATED AGREEMENT

Philip J. Cavatoni
Executive Vice President & Chief Financial and Strategy Officer
Alpha Natural Resources, Inc.
One Alpha Place
P.O. Box 16429
Bristol, VA 24209

Dear Philip:

      This amended and restated letter (the "Agreement"), dated August 3, 2015 (the "Effective Date"), is between McKinsey Recovery & Transformation Services U.S., LLC ("McKinsey RTS") and Alpha Natural Resources, Inc. (the "Client"), and amends and restates that certain agreement dated June 29, 2015 between McKinsey RTS and Client (the "Prepetition Agreement") and sets forth the terms of McKinsey RTS's engagement to provide consulting services to the Client as expressly contemplated by this Agreement (the "Engagement"). McKinsey RTS and the Client are collectively referred to in this Agreement as the "Parties," and each a "Party".

    1.    SERVICES.

      (a)    Client hereby agrees to retain McKinsey RTS to provide the services (the "Services") described in this Section 1.

      (b)    To fulfill its responsibilities on a timely basis McKinsey RTS will rely on the Client's timely cooperation regarding the Engagement, including the Client's making available to McKinsey RTS relevant data, information and personnel, performing any tasks or responsibilities assigned to the Client and notifying McKinsey RTS of any issues or concerns the Client may have relating to the Services. The Client understands and acknowledges that McKinsey RTS's delivery of the Services and the Fees (as defined below) charged hereunder are dependent upon timely decisions and approvals by the Client and its management.

The general responsibilities of McKinsey RTS will be as follows:

- *Market Outlook* – Create a domestic (including basin perspective) and seaborne metallurgical and thermal coal market analysis including demand, supply and price scenarios (and North America coal basin perspective). Perform an assessment of Client's competitive position (position in cost curves).

- *Business Plan* – Develop/validate a fully integrated business plan for the current and future operating portfolio of the Client, including the estimated impact of performance improvement initiatives. It is anticipated that the business plan will include an outlook for key performance indicators, including production and sales tonnage, net realized price per ton, direct and indirect operating expenses, SG&A, working capital, capital budget and debt capacity.

- ***Value Creation Plan*** – Develop a top-down value creation and performance improvement plan for the current operating portfolio utilizing our industry and market expertise, proprietary operations databases and comprehensive benchmarking tools.

- ***Operations Footprint Assessment*** – Prepare a rapid footprint optimization assessment for the Client considering product demand and market outlook, cost positions and cost improvement potential, likely evolution of product quality, transport logistics and legacy costs.

- ***Pennsylvania Land Resources Holding Company, LLC ("PLR") Business Plan*** – Develop, along with Client management, a strategic assessment and business plan for PLR. Provide an assessment of PLR's configuration and development plans, prepare a strategic review of forecast operating costs and field performance and support evaluation of potential commercial and asset strategies.

- ***Constituent Management*** – Assist in development of supporting diligence materials and presentations for use in various stakeholder meetings, attend diligence sessions and working meetings with various stakeholders and constituents and provide ad hoc support to the management team, including the development and preparation of analytics to be used in restructuring discussions.

- ***Other Restructuring Services*** - As appropriate, assisting the Client with other restructuring matters as may be requested by Client and that are mutually agreed upon between McKinsey RTS and the Client. Such assistance may include providing advice and assistance to Client and its counsel, Jones Day, in connection with possible restructuring and/or preparing for or conducting litigation and other potential judicial and/or non-judicial proceedings by providing information, and thus to assist Jones Day in rendering legal advice to Client. Such work of McKinsey RTS, including but not limited to written and oral work product, communications and conclusions may also include and/or reflect the theories, conclusions, opinions or legal theories of Jones Day or otherwise be subject to protection as privileged. Therefore, in the course of such work, McKinsey RTS will take such reasonable steps as directed by Client or Jones Day as may be necessary to protect and maintain such work product, communications and conclusions as privileged.

(c) During the term of the Engagement, priorities may shift or unexpected events may occur which will necessitate changes to the Services. In this event, McKinsey RTS and the Client will jointly discuss the anticipated impact on the Services and agree on any appropriate adjustments, including to the scope of work, timeframe, budget and fees.

(d) In connection with the Client's chapter 11 proceeding commenced on August 3, 2015 under title 11 of the United States Code (the "Bankruptcy Proceeding"), McKinsey RTS will participate, as necessary, in any proceedings before the bankruptcy court (the "Bankruptcy Court") implicating the Services or this Engagement (which participation may include witness testimony).

2.  COMPENSATION. The Client shall compensate McKinsey RTS for its professional fees and expenses in connection with the Services (collectively, the "Fees") and hereby agrees to pay McKinsey RTS during the term of this Agreement in accordance with the

terms set forth in Schedule 1 attached hereto. In connection with the $500,000.00 retainer (the "Retainer") provided by the Client to McKinsey RTS pursuant to the Prepetition Agreement, McKinsey RTS and the Client agree that this Agreement shall govern, among other things, the application of the Retainer in the Bankruptcy Proceeding. McKinsey RTS shall bill the Client on a monthly basis and shall be paid in accordance with any interim compensation orders entered by the Bankruptcy Court. The Retainer shall remain in place until work under this Agreement is concluded, or this Agreement is amended in writing. All Retainer balances shall be credited against any outstanding amounts due upon termination of the Engagement, with the remainder to be returned to the Client upon satisfaction of all payment obligations due under this Agreement.

3. CONFIDENTIALITY.

McKinsey RTS will keep confidential any information furnished by the Company to McKinsey RTS in connection with the Services ("Confidential Information"). McKinsey RTS will disclose Confidential Information only to its employees and agents who have a need to know and are bound to keep it confidential and will use Confidential Information only for purposes of performing the Services and, where the agreed upon Services include benchmarking services, to benchmark and report on sanitized, aggregate trends and metrics without disclosing the Client's Confidential Information and without attribution to the Client. Confidential Information shall not include information that is or becomes publicly available, is already known to McKinsey RTS through means not involving a breach by any party of an obligation to keep such information confidential, is independently acquired by McKinsey RTS or is legally required to be disclosed. In performing the Services, McKinsey RTS will use and rely primarily on the Confidential Information and on information available from public sources without having independently verified any of such information. McKinsey RTS will reasonably cooperate with the Client, at its expense, in responding to any legally required disclosure. In performing the Services, McKinsey RTS will use and rely primarily on the Confidential Information and on information available from public sources without having independently verified any of such information.

4. USE OF McKINSEY RTS NAME AND DELIVERABLES. In connection with the Engagement, McKinsey RTS may furnish the Client with information, advice, reports, analyses, presentations or other such materials (the "Deliverables"). The Client understands and agrees that any such Deliverables are furnished or presented solely for the Client's internal use and benefit (limited to management and the Board) and may not be furnished or conveyed in whole or in part to any person or entity other than as described in this Section 4 without McKinsey RTS's prior written consent or as required by law. The Client may furnish and convey Deliverables to its management and directors, its legal counsel and other restructuring professionals retained by the Client, and, in the event the Client and/or any of its affiliates commence cases under title 11 of the United States Code ("Chapter 11 Cases"), other parties involved in the administration of such chapter 11 cases (collectively, the "Permitted Recipients"), in each case only if such persons (i) are informed of the confidential nature of the Deliverables and (ii) agree to comply with the restrictions stated in this Section 4. Without limitation of the foregoing, Deliverables branded as "McKinsey RTS" may not be furnished, conveyed or presented to any person or entity other than the Permitted Recipients unless (A) the Client has received McKinsey RTS's oral or written consent to furnish or convey such information, which consent shall not be unreasonably withheld; and (B) such third parties are informed of the

confidential nature of the information and, prior to Client's disclosure, each such person or entity to whom it seeks to disclose such information executes and delivers to McKinsey RTS a letter agreement in a form reasonably acceptable to McKinsey RTS. The Client further agrees that, without McKinsey RTS's prior written consent, it shall not refer to McKinsey RTS or attribute any information to McKinsey RTS in any document or communication external, or reasonably likely to be disseminated externally, to the Client for any purpose, including in press releases and web sites, unless required by law or as reasonably necessary in connection with the Client's Chapter 11 Cases. The Client also agrees that it shall not, and shall not permit its advisors to, refer to McKinsey RTS or attribute any information to McKinsey RTS, either generically or by name, without McKinsey RTS's prior written approval except as required by law or in connection with the Client's Chapter 11 Cases. McKinsey RTS shall not issue any press release which references this Agreement or Client without Client's prior written consent.

5.  INTELLECTUAL PROPERTY. Upon payment in full of McKinsey RTS's fees, the Client will own all Deliverables furnished by McKinsey RTS to the Client in connection with the Services, save that McKinsey RTS retains ownership of all concepts, analyses, know-how, tools, frameworks, models and industry perspectives used and/or developed by McKinsey RTS in connection with the Services (the "McKinsey Tools"), it being understood that none of the McKinsey Tools will contain the Client's Confidential Information. To the extent the Deliverables include any McKinsey Tools, McKinsey RTS hereby grants the Client a non-exclusive, non-transferable, non-sublicenseable, worldwide, royalty-free license to use and copy the McKinsey Tools solely as part of the Deliverables and subject to the above limitations on the use of McKinsey RTS name and Deliverables.

    5A    Benchmarking Database

(a)  As part of the Services, McKinsey RTS will utilize distinctive, proprietary benchmarking database(s), and related reports, analyses and other materials (the "Materials"). Client acknowledges that McKinsey RTS and its affiliates retain sole ownership, including all intellectual property rights, in the benchmarking databases and related solutions and the associated Materials and that these are deemed to be "McKinsey Tools" and that these are provided "as is", without any express or implied warranty. In no event will McKinsey RTS be liable to Client for any damages or losses relating to or arising out of the provision of such database solutions and related Materials to Client, including without limitation indirect, consequential, incidental or special damages (including without limitation lost profits).

(b)  McKinsey RTS and its affiliates will use the data that Client provides in connection with the benchmarking databases to provide Client with information comparing the Client's data to the aggregated or disguised data of other relevant participants. In particular, McKinsey RTS and its affiliates will use Client's data to develop and provide Client with the agreed Materials, to publish reports outlining general conclusions from the databases and to develop, distribute and use aggregated or disguised analyses and results in databases and in our client work. McKinsey RTS may also disclose the names of participants in the applicable benchmark solely to the other existing and prospective participants.

(c)  McKinsey RTS's work for Client is confidential and intended for Client's internal use only. Client agrees that it will not use McKinsey RTS name, marks, materials or information

4

with, or disclose the Materials or refer to McKinsey RTS's work to any external entity other than with McKinsey RTS's prior written consent or as required by law. Notwithstanding the foregoing sentence, Client may share the Materials with Permitted Recipients (defined in Section 4 above) in the manner, and subject to the specific restrictions, described in Section 4 above. This does not prohibit Client from publishing its own conclusions based on the Materials provided that such conclusions do not disclose any data (other than data originally provided by Client) contained in or generated by the Materials and does not make any reference or attribution to McKinsey RTS, except as required by law.

(d) Materials and related results and recommendations are dependent upon the accuracy of the data, information and other material processed by McKinsey RTS (including the data, information and materials Client provides), as well as upon Client's proper use of the Materials and interpretation of results, and Client agrees that it is duly authorized to provide all such data, information and materials for use as described herein and that Client will remain solely responsible for your decisions, actions and use of all such Materials.

6. INDEMNIFICATION

(a) In order to induce McKinsey RTS to provide the Services to the Client, the Client and its affiliates hereby agree (i) to indemnify, hold harmless and defend McKinsey RTS, and its past, present and future affiliates, and each of their respective directors, officers, managers, shareholders, partners, members, employees, agents, representatives, advisors and controlling persons (collectively, the "Indemnified Parties" and each individually, an "Indemnified Party"), to the fullest extent lawful, from and against any and all losses, claims, penalties, damages or liabilities (or actions in respect thereof), joint or several, caused by, relating to, based upon or arising out of (directly or indirectly) this Agreement or the Engagement, or any actions taken or omitted to be taken by an Indemnified Party or the Client and its affiliates in connection with this Agreement or the Engagement (including, without limitation, any acts taken or omitted to be taken by an Indemnified Party as a representative, agent, fiduciary or in any other capacity of, or in connection with any services provided to or termination of, any employee benefit plan (including any defined contribution plan)); and (ii) to reimburse each Indemnified Party for the reasonable, actual and documented expenses (including, without limitation, the reasonable, actual and documented fees and expenses of counsel and the reasonable, actual and documented costs of McKinsey RTS's professional time) as and when they are incurred in connection with investigating, preparing, pursuing, defending, settling or compromising any action, suit, dispute, inquiry, investigation or proceeding, pending or threatened, brought by or against any person or entity (whether or not such Indemnified Party is a formal party to any such action, suit, dispute, inquiry, investigation or proceeding), caused by, relating to, based upon or arising out of (directly or indirectly) this Agreement or the Engagement, or any actions taken or omitted to be taken by an Indemnified Party or the Client and its affiliates in connection with this Agreement or the Engagement (including, without limitation, any acts taken or omitted to be taken by an Indemnified Party as a representative, agent, fiduciary or in any other capacity of, or in connection with any services provided to or termination of, any employee benefit plan (including any defined contribution plan)) and in enforcing this Agreement. Notwithstanding the foregoing, neither the Client nor any of its affiliates shall be liable under the foregoing indemnity and reimbursement provisions for any loss, claim, damage, penalty, liability, cost, fee or expense which is finally judicially determined by a court of competent jurisdiction on the merits to have

resulted from the willful misconduct or gross negligence of such Indemnified Party, but pending any such judicial determination, the Client and its affiliates shall continue to be obligated on, and shall continue to perform, its indemnification and reimbursement obligations.

(b)   If for any reason the foregoing indemnification or reimbursement is held by a court of competent jurisdiction to be unavailable to any Indemnified Party or insufficient fully to indemnify or reimburse any such Indemnified Party or to hold it harmless in respect of any losses, claims, damages, penalties, liabilities or expenses referred to in such indemnification or reimbursement provisions, then the Client and its affiliates shall contribute to the amount paid or payable by such Indemnified Party as a result of such losses, claims, damages, penalties, liabilities or expenses in such proportion as is appropriate to reflect the relative benefits received (or anticipated to be received) by the Client and its affiliates, on the one hand, and McKinsey RTS, on the other hand, in connection with the matters contemplated by this Agreement. If, however, the allocation provided by the immediately preceding sentence is not permitted by applicable law, then the Client and its affiliates shall contribute to such amount paid or payable by any Indemnified Party in such proportion as is appropriate to reflect not only such relative benefits, but also the relative fault of the Client and its affiliates, on the one hand, and such Indemnified Party, on the other hand, in connection therewith, as well as any other relevant equitable considerations. The Client, its affiliates and McKinsey RTS agree that it would not be just and equitable if contribution pursuant to this Section 6(b) were determined by pro rata allocation or by any other method of allocation which does not take account of the equitable considerations referred to above in this Section 6(b). Notwithstanding the foregoing, in no event shall the Indemnified Parties be required to contribute an aggregate amount in excess of the amount of Fees (but not expenses) actually received by McKinsey RTS from the Client and its affiliates pursuant to this Agreement.

(c)   The Client and its affiliates shall not, without the prior written consent of McKinsey RTS, settle, compromise or consent to the entry of any judgment in or otherwise seek to terminate any pending or threatened action, suit, dispute, inquiry, investigation or proceeding in respect of which indemnification, reimbursement of expenses or contribution may be sought hereunder (whether or not an Indemnified Party is an actual or potential party thereto).

(d)   The Client and its affiliates agree that neither McKinsey RTS nor any other Indemnified Party shall have any liability (whether direct or indirect and regardless of the legal theory advanced) to the Client, its affiliates or any person or entity asserting claims on behalf of or in right of the Client and its affiliates caused by, relating to, based upon or arising out of (directly or indirectly) this Agreement or the Engagement, or any actions taken or omitted to be taken by an Indemnified Party or the Client and its affiliates in connection with this Agreement or the Engagement (including, without limitation, any acts taken or omitted to be taken by an Indemnified Party as a representative, agent, fiduciary or in any other capacity of, or in connection with any services provided to or termination of, any employee benefit plan (including any defined contribution plan)), except for losses, claims, damages, penalties or liabilities incurred by the Client and its affiliates which are finally judicially determined by a court of competent jurisdiction on the merits to have resulted from the willful misconduct or gross negligence of McKinsey RTS or any other Indemnified Party. In no event, however, shall McKinsey RTS's or any other Indemnified Party's liability to the Client or its respective

affiliates, successors, or any person claiming on behalf of or in right of the Client, including Client's owners, parents, affiliates, directors, officers, employees, agents, security holders, or creditors, exceed, when taken together with all losses for which McKinsey RTS or such other Indemnified Party is liable in connection with this Agreement or the Engagement, the amount of Fees actually received by McKinsey RTS in connection with the Engagement.

(e) The indemnity, reimbursement, and other obligations and agreements of the Client and its affiliates set forth in this Section 6: (i) shall apply to any Services provided by McKinsey RTS in connection with the Engagement (whether provided prior to, on or after the Effective Date) and to any modifications of this Agreement, (ii) shall be in addition to any obligation or liability which the Client and its affiliates may otherwise have to any Indemnified Party, (iii) shall remain operative and in full force and effect regardless of any investigation made by or on behalf of the Client, its affiliates or any Indemnified Party, or any other person or entity, (iv) shall survive the completion of the Services described in, and any expiration or termination of the relationship established by, this Agreement and (v) shall be binding on any successor or assign of the Client and its affiliates. In no event shall any Indemnified Party be responsible for any loss profits or special, punitive, exemplary, indirect or consequential damages.

7.     CLIENT ACKNOWLEDGMENT. It is McKinsey RTS's long-standing policy to serve competing clients and clients with potentially conflicting interests as well as counter-parties in merger, acquisition and alliance opportunities, and to do so without compromising McKinsey RTS's professional responsibility to maintain the confidentiality of client information. Consistent with such practice and McKinsey RTS's confidentiality obligations to its other clients, McKinsey RTS is not able to advise or consult with the Client about McKinsey RTS's serving the Client's competitors or other parties. To avoid situations of potential conflict, McKinsey RTS will not assign consultants, who are providing the Services and who receive Confidential Information, to a competitively sensitive project for a significant period of time (typically two years) following an assignment for the Client.

8.     TERM AND TERMINATION. The Engagement will commence as of the Effective Date and shall continue until the earlier of: (a) the completion of the Services hereunder or (b) the termination of this Agreement by either Party by giving 30 days' written notice to the other Party. In the event of any termination, the Client will pay McKinsey RTS's Fees and expenses up to the effective date of termination.

9.     RELATIONSHIP OF THE PARTIES. The Parties intend that an independent contractor relationship will be created by this Agreement. Nothing in this Agreement is intended to create, nor shall be deemed or construed to create, a fiduciary or agency relationship between McKinsey RTS and the Client, or its Board of Directors. More specifically, for purposes of this Agreement, neither McKinsey RTS, its affiliates, nor any individual consultant providing services to the Client shall be acting as an officer, director, manager, trustee, or in any other agency or fiduciary capacity. Notwithstanding McKinsey RTS's provision of the Services described in Section 1, none of McKinsey RTS, its affiliates, nor any individual consultant providing services to the Client shall be (i) deemed a fiduciary; or (ii) be required to perform any tasks, actions or functions, and shall not be required to assume any roles, assignments or capacities, that (in any such case) could give rise to fiduciary status to McKinsey RTS, its affiliates or any Indemnified Party with respect of the Client.

7

10. **BANKRUPTCY FILING.** In connection with the filing of the Bankruptcy Proceeding, the Client will apply to the Bankruptcy Court as soon as practicable to obtain approval of McKinsey RTS's retention and Retainer, *nunc pro tunc* to the date of filing. It is understood that in the Bankruptcy Proceeding, the terms and conditions of this Agreement, particularly the compensation provisions, are subject to (a) prior approval of the Bankruptcy Court to be treated as administrative expenses of the bankruptcy case; and (b) may be subject to a standard of reasonableness. McKinsey RTS shall file applications for approval of its fees and expenses in accordance with the terms of any interim compensation orders or other orders approved by the Bankruptcy Court.

11. **MISCELLANEOUS.** This Agreement and any schedules hereto constitute the entire agreement between the parties, and there are no prior or contemporaneous oral or written representations, understandings or agreements relating to this subject matter that are not fully expressed herein or therein. This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to conflicts of law principles and shall inure to the benefit of and be binding on the successors and assigns of the Client and McKinsey. The following Sections shall survive the completion or any termination of the Services: 3 (Confidentiality), 4 (Use of McKinsey RTS Name and Deliverables), 5 (Intellectual Property), 6 (Indemnification), 7 (Client Acknowledgement), 8 (Term and Termination) and 9 (Relationship of the Parties), 10 (Bankruptcy Filing) and 11 (Miscellaneous) and any other provision which by law or by its nature should survive. Neither party may assign its rights or obligations under this agreement to any person or entity without the written consent of the other party, which consent, in the case of a proposed assignment to a Party's affiliate, shall not be unreasonably withheld. Assignment shall not relieve either party of its obligations hereunder.

*[Remainder of Page Intentionally Left Blank]*

McKinsey Recovery & Transformation Services U.S., LLC

By: _____

Name:   Kevin M. Carmody
Title:   Practice Leader


ACCEPTED AND AGREED TO

Alpha Natural Resources, Inc.

By: _____
Name:   Philip Cavatoni
Title:   EVP Chief Financial + Strategy Officer

Schedule 1

Fees for Services

In exchange for its services, Company will compensate McKinsey RTS in accordance with the terms of this Agreement, which provides for payment of Fees as follows:

(a) Retainer- $500,000 as described in Section 2 of the Agreement

(b) Hourly rates: Effective as of January 1, 2015: McKinsey RTS's fees are to be based on the hours worked by McKinsey RTS's personnel at the following hourly rates:

| i.    | Practice Leader:       | $875-$1,050 |
|-------|------------------------|-------------|
| ii.   | Senior Vice President: | $675-$810   |
| iii.  | Vice President:        | $525-$675   |
| iv.   | Senior Associate       | $435-$525   |
| v.    | Associate:             | $375-$435   |
| vi.   | Analyst:               | $250-$350   |
| vii.  | Paraprofessional:      | $200-$225   |

McKinsey RTS periodically reviews and revises its billing rates indicated above.

(c) Expenses: The Company will reimburse McKinsey RTS for all reasonable out-of-pocket expenses incurred in connection with the Engagement, including but not limited to travel, lodging, case administrators, and working meals.

10