# EXHIBIT 65

IN THE UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA (RICHMOND)

In re                              )  Case No. 15-33896-KRH
                                   )  Richmond, Virginia
ALPHA NATURAL RESOURCES, INC.,     )
et al.,                            )
                                   )  June 28, 2016
                        Debtors.   )  10:05 AM
_____     )

TRANSCRIPT OF HEARING ON:

MOTION OF THE DEBTORS FOR AN ORDER AUTHORIZING THE REJECTION
OF OPERATIONS AGREEMENT WITH VEOLIA WATER NORTH AMERICA
OPERATING SERVICES, LLC [DOCKET NO. 1883];

DEBTORS' MOTION TO APPROVE THE STIPULATION AND AGREED ORDER
BETWEEN DEBTORS AND SAP AMERICA, INC. CONCERNING THE
ASSUMPTION OF A CERTAIN SOFTWARE AGREEMENT [DOCKET NO. 2612];

DEBTORS' MOTION FOR AN ORDER AUTHORIZING THE REJECTION OF A
CERTAIN SERVICES AGREEMENT WITH CINTAS, EFFECTIVE AS OF
JUNE 10, 2016 [DOCKET NO. 2641];

MOTION FOR ENTRY OF A CONSENT ORDER MODIFYING THE AUTOMATIC
STAY PURSUANT TO SECTION 362 OF THE BANKRUPTCY CODE [FILED BY
THE VIRGINIA DEPARTMENT OF TRANSPORTATION; DOCKET NO. 2633];

MOTION OF DEBTORS AND DEBTORS IN POSSESSION FOR ENTRY OF AN
ORDER, PURSUANT TO SECTIONS 105, 365 AND 1123 OF THE
BANKRUPTCY CODE, (I) ESTABLISHING PROCEDURES WITH RESPECT TO
THE PROPOSED ASSUMPTION, ASSUMPTION AND ASSIGNMENT, AND
REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND THE
TREATMENT OF OTHER AGREEMENTS PURSUANT TO THE DEBTORS' SECOND
AMENDED JOINT PLAN OF REORGANIZATION AND APPLICABLE LAW AND
(II) APPROVING THE FORM AND MANNER OF NOTICE THEREOF
[DOCKET NO. 2673];

SURETIES' MOTION FOR ESTIMATION AND ALLOWANCE OF CLAIMS
PURSUANT TO 11 U.S.C. SECTION 502(C) [DOCKET NO. 2614];

ARGO'S JOINDER MOTION TO SURETIES' MOTION FOR ESTIMATION AND
ALLOWANCE OF CLAIMS PURSUANT TO 11 U.S.C. SECTION 502(C)
[DOCKET NO. 2695];

(Cont'd. on next page)

2

1  ALLOWANCE OF CLAIMS FOR VOTING PURPOSES UNDER FEDERAL RULE OF
   BANKRUPTCY PROCEDURE 3018, (II) MODIFIED CLASSIFICATION OF
2  CLAIMS FOR VOTING PURPOSES AND (III) JOINDER TO SURETIES'
   MOTION FOR ESTIMATION AND ALLOWANCE OF CLAIMS
3            [DOCKET NO. 2717];

4     DEBTORS' COMBINED MOTION FOR ENTRY OF (A) AN ORDER
   ESTABLISHING BIDDING AND SALE PROCEDURES FOR THE POTENTIAL
5   SALE OF CERTAIN MINING PROPERTIES AND RELATED ASSETS AND
   GRANTING RELATED RELIEF AND (B) ONE OR MORE ORDERS APPROVING
6      THE SALE OF SUCH PROPERTIES [DOCKET NO. 707];

7     MOTION TO RECONSIDER ORDER (A) APPROVING TERMINATION OF
   SUPPLEMENTAL BENEFIT PLANS, (B) DIRECTING RETURN OF TRUST
8   FUNDS TO THE ESTATES, (C) REJECTING TRUST AGREEMENTS AND
   (D) GRANTING CERTAIN RELATED RELIEF [FILED BY FRANK MATRAS,
9            ET AL.; DOCKET NO. 2629];

10    MOTION OF CREDITOR MAR-BOW VALUE PARTNERS, LLC TO COMPEL
   MCKINSEY RECOVERY & TRANSFORMATION SERVICES U.S., LLC,
11  TURNAROUND ADVISOR FOR THE DEBTORS, TO COMPLY WITH THE
   REQUIREMENTS OF BANKRUPTCY RULE 2014 [DOCKET NO. 2603]

12
              BEFORE KEVIN R. HUENNEKENS,
13            UNITED STATES BANKRUPTCY JUDGE

14 APPEARANCES:
   For the Debtors:        CARL E. BLACK, ESQ.
15                         JONES DAY
                           901 Lakeside Avenue
16                         Cleveland, OH 44114

17                         JEFFREY B. ELLMAN, ESQ.
                           JONES DAY
18                         1420 Peachtree Street N.E.
                           Suite 800
19                         Atlanta, GA 30309

20                         HENRY P. (TOBY) LONG, III, ESQ.
                           JUSTIN F. PAGET, ESQ.
21                         HUNTON & WILLIAMS LLP
                           951 East Byrd Street
22                         Richmond, VA 23219

23 For the United States   ROBERT B. VAN ARSDALE, AUST
   Trustee:                UNITED STATES DEPARTMENT OF JUSTICE
24                         OFFICE OF THE UNITED STATES TRUSTEE
                           701 East Broad Street, Suite 4304
25                         Richmond, VA 23219

```
 1    APPEARANCES (cont'd.):
      For Veolia Water          JED K. DONALDSON, ESQ.
 2    North America             SPOTTS FAIN PC
      Operating Services,       411 East Franklin Street
 3    LLC:                      Suite 600
                                Richmond, VA 23219
 4
      For the Virginia          MICHAEL A. CONDYLES, ESQ.
 5    Department of             KUTAK ROCK LLP
      Transportation:           1111 East Main Street
 6                              Suite 800
                                Richmond, VA 23219
 7
      For Pocahontas Land       AUGUSTUS C. EPPS, JR., ESQ.
 8    Corporation and           CHRISTIAN & BARTON LLP
      Norfolk Southern          909 East Main Street
 9    Railway Company:          Suite 1200
                                Richmond, VA 23219
10
      For The David J.          PETER M. PEARL, ESQ.
11    Pierce Trust U/A          SPILMAN THOMAS & BATTLE, PLLC
      dated February 23,        310 First Street
12    2011:                     Suite 1100
                                Roanoke, VA 24011
13
      For Commonwealth of       MARK K. AMES, ESQ.
14    Virginia Department       TAXING AUTHORITY CONSULTING SERVICES
      of Taxation:                PC
15                              P.O. Box 31800
                                Henrico, VA 23294
16
      For Movants Vaughn        KEVIN J. FUNK, ESQ.
17    Groves, Frank Matras,     DURRETTECRUMP PLC
      and Greg Blankenship:     1111 East Main Street
18                              16th Floor
                                Richmond, VA 23219
19
      For Mar-Bow Value         DAVID R. RUBY, ESQ.
20    Partners, LLC:            THOMPSONMCMULLAN, P.C.
                                100 Shockoe Slip
21                              Richmond, VA 23219

22                              HON. (RET.) STEVEN RHODES

23    For McKinsey Recovery     CHRISTOPHER L. PERKINS, ESQ.
      & Transformation          LECLAIRRYAN
24    Services U.S., LLC:       919 East Main Street
                                24th Floor
25                              Richmond, VA 23219
```

```
 1    APPEARANCES (cont'd.):
      For McKinsey Recovery    MARTIN J. BIENENSTOCK, ESQ.
 2    & Transformation         PROSKAUER ROSE LLP
      Services U.S., LLC:      767 5th Avenue
 3                             Suite 10
                               New York, NY 10153
 4
      For the Official         ERIC C. HOWLETT, ESQ.
 5    Committee of             SANDS ANDERSON PC
      Unsecured Creditors:     1111 E. Main Street
 6                             Suite 2400
                               Richmond, VA 23219
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21
      Transcription Services:                    eScribers
22                                               700 West 192nd Street
                                                 Suite #607
23                                               New York, NY 10040
                                                 (973) 406-2250
24
      PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.
25    TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.
```

Colloquy

1          THE COURT OFFICER:  The United States Bankruptcy

2    Court for the Eastern District of Virginia is now in session,

3    the Honorable Kevin R. Huennekens presiding.  Please be

4    seated, come to order.

5          THE CLERK:  Alpha Natural Resources, Incorporated,

6    items 1 through 16 on amended agenda.

7          MR. BLACK:  Good morning, Your Honor.  Carl Black of

8    Jones Day, on behalf of the debtors.

9          THE COURT:  Good morning, Mr. Black.

10         MR. BLACK:  If it please the Court.  We can hopefully

11   move through the agenda relatively quickly.  Items 1 through 4

12   are all adjourned, so, not really anything to say about those.

13   The first uncontested matter is item 5; it's the motion of the

14   debtors for an order authorizing the rejection of an

15   operations agreement with Veolia Water North America Operating

16   Services, LLC.  This is basically a services agreement that

17   the debtors determined they no longer needed.

18         By agreement of the parties, we extended the

19   deadline.  We do have an amended order that reflects an

20   agreement.  May I --

21         THE COURT:  You may.

22         MR. BLACK:  May I approach?

23         Your Honor, the only change to the order is really in

24   paragraph 2, which just establishes the effective date of the

25   rejection.

Colloquy

1          THE COURT:  Oh, okay.  Very good.

2          MR. BLACK:  And I think there's someone -- there's

3    counsel here, on behalf of Veolia, that wanted to just make a

4    quick statement.

5          THE COURT:  All right, thank you very much,

6    Mr. Black.

7          MR. DONALDSON:  Good morning, Your Honor.

8          THE COURT:  Good morning.

9          MR. DONALDSON:  Jed Donaldson on behalf of Veolia.

10   Mr. Black's representations are accurate; we're in agreement

11   on the rejection and the order.

12         THE COURT:  All right, very good.

13         MR. DONALDSON:  Thank you, Your Honor.

14         THE COURT:  All right, thank you.

15         So that motion'll be granted.

16         MR. BLACK:  Thank you, Your Honor.  Next item on the

17   agenda is a stipulation and agreed order between Debtors and

18   SAP America, related to the assumption of a software

19   agreement.  There's been no objections.  We have a stipulation

20   and agreed order we submitted with the motion.  We would ask

21   the Court to enter it.  I'm happy to answer any questions the

22   Court may have about the agreement.

23         THE COURT:  Does any party wish to be heard in

24   connection with the motion?

25         That motion'll be granted.

Colloquy

1          MR. BLACK:  The next item on the agenda, Your Honor,

2   is the motion for an order authorizing rejection of a services

3   agreement with Cintas.  Again, this -- related to uniforms

4   that the debtors use in their operations but no longer need;

5   they've had a replacement supplier.  There've been no

6   objections.  We would ask the Court to enter the order.

7          THE COURT:  Does any party wish to be heard in

8   connection with the motion?

9          That'll be granted.

10          MR. BLACK:  Thank you, Your Honor.  The next item on

11   the agenda is a motion from the Virginia Department of

12   Transportation.  I believe Mr. Condyles is here to --

13          THE COURT:  All right.

14          MR. BLACK:  -- present.

15          THE COURT:  Good morning, Mr. Condyles.

16          MR. CONDYLES:  Thank you, Your Honor.  Michael

17   Condyles on behalf of the Virginia Department of

18   Transportation.

19          Your Honor, this matter involves an agreement between

20   VDOT and one of the debtors, involving the design,

21   construction and maintenance of about a fifty-mile stretch of

22   a four-lane highway in Western Virginia, known as the

23   Coalfield (sic) Expressway.  The parties have been cooperating

24   throughout the case, on various matters.  There was a previous

25   motion before the Court on approval of a second amendment.  As

8

Colloquy

1   part of that second amendment, there was an agreement to

2   cooperate with regard to the condemnation of certain property

3   that's known as the Looney (ph.) property.  It --

4           THE COURT:  Okay.

5           MR. CONDYLES:  It is indeed, as particular -- you

6   know some more of the history there.  But in any event, the

7   parties are looking to proceed with the condemnation.  The

8   debtor has agreed to cooperate in that regard, and the motion

9   for relief from stay simply seeks authority to allow the

10  condemnation to proceed.  There've been no objections.  We'd

11  ask that it be allowed to go forward.

12          THE COURT:  All right, thank you, sir.

13          Any party wish to be heard in connection with the

14  motion?

15          All right, that'll be granted.

16          MR. CONDYLES:  Thank you, Your Honor.

17          MR. ELLMAN:  Good morning, Your Honor.

18          THE COURT:  Good morning.

19          MR. ELLMAN:  Jeffrey Ellman from Jones Day, on behalf

20  of the debtors.  And I'm going to cover the next few items on

21  the agenda, including the next one, which is item 9, and this

22  is the debtors' motion for a contract-procedures order; it's

23  docket 2673; it's a motion under Sections 105, 365 and 1123.

24  And this is in support of the debtors' plan of reorganization

25  set to be considered by the Court next week.  And if you look

9

Colloquy

1    at Section 2(g), which is a variety of provisions about

2    contracts that are in the plan, it does contemplate that there

3    will be a contract-procedures order, which is what we're

4    asking the Court to approve here today.  The contracts-

5    procedures order is defined in the plan, in Section 1(a)(64),

6    and it is an order that is to be entered before confirmation.

7    So this is timely in that way.

8          And the plan, as the Court is well aware, describes

9    in some detail the treatment of contracts and it does provide

10   that parties whose contracts are dealt with in the plan will

11   get notice, which is obviously required.  What the plan does

12   not address is how that notice will be given and the details

13   about timing and objection deadlines and things like that.  We

14   didn't burden the plan with all those details; we put those

15   instead into this motion, which we're asking the Court to

16   approve today.  So, effectively, the motion provides all the

17   details about the form and nature of notice, the timing of

18   notice, objection deadlines, and all that.

19         We had no objections to the form of -- to the motion

20   or anything about the motion, as far as we're aware.  And I

21   was not going to go through the procedures at all, except to

22   maybe highlight a few things very quickly and then answer any

23   questions the Court might have.

24         We did file the contract exhibits last week, as they

25   were due on the 22nd, under solicitation procedures, and that

Colloquy

1    was an assumption exhibit, an assignment-only exhibit, and a

2    rejection exhibit.  And we at this point are prepared to send

3    out individualized notices to the parties on those exhibits.

4    The procedures that we're proposing indicate we'll do that

5    within two business days of the order being entered.  We would

6    like to do that quickly so that we can get notices out and

7    identify any issues in advance of closing on the effective

8    date, especially with respect to assumed and assigned

9    contracts.  So the timing is important to us.

10        The notices themselves, I think, are relatively

11   straightforward, as are the procedures giving information

12   about the nature of the contract:  a little bit of identifying

13   information for rejected contracts; a bar date for assumed

14   contracts; the cure; if there's an assignment, details about

15   assignment.  So I don't think there's anything terribly

16   controversial about any of this.

17        The one thing I did want to mention briefly:  we did

18   have two other contract procedures in this case, as the Court

19   may be aware or recall.  We did a sale motion last year, which

20   we're going to talk about a little bit later because we have

21   another related matter to that.  But that was in October.  And

22   the Court approved, in November, sale procedures with a

23   contract procedure attached to it.  And then we had another

24   contract procedure, after the first of the year, that the

25   Court approved in March, and we had a contract procedure with

Colloquy

1    that.

2         So a number of these parties have received -- who are

3    counterparties to the contracts, have received notices of

4    cure; they have received notices, in many cases, of the

5    possible assignment to NewCo, which is the buyer under the

6    plan.  So that's all gone out.  And I just wanted to make

7    clear for the record, which is in our motion as well, that we

8    were not intending in this motion to revisit the deadlines the

9    Court previously established, or to give people another

10   opportunity to object to things where they had an opportunity

11   already.  Likewise, we're not requiring people to refile the

12   same objections again if they've already filed a cure

13   objection.  It's already on the docket; they don't need to do

14   that again.  So we're trying to make these new procedures kind

15   of fit within the construct of what the Court has already

16   done.

17        And with that, Your Honor, I do have a blackline of

18   the order, if I could hand that up.

19        THE COURT:  You may.

20        MR. ELLMAN:  And they're really just very minor

21   edits, almost not worth spending much time going through.  But

22   I will point out just a couple things, for the record, that we

23   did modify.  Obviously there are a number of cleanup edits, as

24   there always are, including changing the notion that we're

25   going to file the plan exhibits to the past tense, since we've

Colloquy

1    already done it, which you see, for example, on page 2, and it
2    comes up a couple places.
3             In 4(j), which is on page --
4             THE COURT:  I'm there.
5             MR. ELLMAN:  I'm trying to find it myself.  But we
6    did change the deadline for replies to assignment objections,
7    to eight days instead of seven, just to match what the timing
8    was for assumption.  That was, I think, just a mistake that we
9    made.  And then in 4(m) is some additional clarification on
10   the point I just made about matching these up with the other
11   contract procedures to ensure that it's clear that contract
12   counterparties are not being asked again to object to things
13   they've already been given notice of and had an opportunity to
14   object to.
15            And then the last thing is just paragraph 7, which
16   makes it clear that we can revise the various forms of notice,
17   which we didn't attach to the order again.  They're attached
18   to the motion and there'll be maybe a few cleanup changes, and
19   that just authorizes the debtors to make those revisions.
20            And with that we'd ask for the Court to approve the
21   procedures.
22            THE COURT:  All right.
23            Does any party wish to be heard in connection with
24   the debtors' motion to establish the contract procedures?
25            All right, there being no comment or objection, the

Colloquy

1    Court will approve this.  I've been through your proposals

2    and, as you suggest, they look fairly routine to me.

3            MR. ELLMAN:  Thank you very much, Your Honor.

4            Next, I'm going to cover the next three items

5    together, which -- they're items 10, 11 and 12, which are

6    three motions by sureties to estimate and allow claims.  There

7    was an original motion by one group of sureties and a couple

8    of others, or joinder-type motions, that joined in the relief.

9    All three of these are settled.  And although these are not

10   the debtors' motions, I believe I'm authorized to present the

11   settlement.  I don't know if anyone from the sureties would

12   prefer to speak first, but they are not my motions but I

13   believe I'm authorized to present the settlements, which I'm

14   prepared to do.

15           THE COURT:  Why don't you go ahead and present them

16   and then I'll give anybody an opportunity, who wishes to, to

17   comment or correct the record --

18           MR. ELLMAN:  Okay.

19           THE COURT:  -- if necessary.

20           MR. ELLMAN:  Thank you very much, Your Honor.  And

21   the settlements between these three different groups of

22   parties are basically identical.  The motions that were filed

23   were primarily related to Section 502(c) and they were

24   intended to establish the amount of claims for these sureties,

25   based on indemnification and other theories, and to set them

Colloquy

1  at a specific amount for distribution for all purposes,

2  effectively, in the case, not just voting but -- including

3  voting but also including distribution and other purposes.

4       We had separately, on the debtors' side, filed

5  objections to all these various claims, both on the grounds

6  that a number of claims were duplicative, and also using

7  502(e) -- Section 502(e) to disallow claims that were

8  contingent claims for reimbursement or indemnification.  As a

9  result of those filings of the objections, effectively these

10  claims, for voting purposes, are reduced based on the relief

11  sought in those objections.  So you have basically the

12  sureties asking for the claims to be allowed in full, for all

13  purposes, and we sought to effectively disallow them, which

14  would limit the voting.

15       For purposes of resolution, the parties have agreed

16  to grant the sureties' claims that are temporarily allowed for

17  voting purposes only.  These motions that are on the docket,

18  by the sureties, will be withdrawn.  Each surety will get a

19  claim, for voting, that is liquidated, in an amount that's

20  effectively equal to the penal amount of their various bonds,

21  less the collateral.  So that'll be the math.  And those will

22  be claims in Class 6A under the plan; they'll be able to vote

23  in that class.  The stipulations make clear that the sureties

24  remain parties-in-interest who can object to the plan if they

25  desire to do so.  And they also make clear, which I think goes

Colloquy

1    without saying, that the parties reserve all the rights as to

2    the ultimate treatment of the claims.  This is strictly for

3    voting purposes.  It's not an allowance for any other purpose.

4    Nothing in here is going to be an evidentiary basis to bind

5    anyone to anything in the future.  So, anything about

6    allowance, reduction, disallowance, estimation, in the future,

7    of these claims will be fully and totally reserved.

8           And I can hand up two forms of stipulation and order.

9           We worked out an agreement with the sureties that are

10   in item 10 on the agenda, with the Stites & Harbison firm, and

11   that has one stipulation and order.  And then the other two

12   parties, we did a pretty much identical stipulation and agreed

13   order with them.

14          The one thing I'll point about the -- point out about

15   these orders, I've really set on the record the primary terms.

16   But if you look at Exhibit A to each of those orders, you'll

17   see the voting amounts.  And I can read them into the record,

18   but I think they're just -- they're there, so you can see

19   them.  And each claim is effectively reduced from what was

20   filed in the proof of claim, to an amount that reflects the

21   penal amount less the security.

22          THE COURT:  And that's for voting purposes only

23   and --

24          MR. ELLMAN:  For voting purposes only.

25          THE COURT:  -- without prejudice to any party?

Colloquy

1          MR. ELLMAN:  Absolutely.

2          THE COURT:  All right.

3          MR. ELLMAN:  For any other purpose, those claims are

4     subject to further adjudication of the Court, or resolution of

5     the parties.

6          THE COURT:  All right, very good.

7          MR. ELLMAN:  And with that we'd ask for those to be

8     approved; and I'll let the sureties speak if they would like

9     to.

10          THE COURT:  All right.  Now, let's take them one at a

11     time.

12          MR. ELLMAN:  Sure.

13          THE COURT:  So we'll take item number 10 on the

14     docket, which is the Argo motion and the Liberty Mutual

15     motion.

16          Does any party wish to be heard with regard to that

17     matter?

18          All right, very good.  Let's go on to number 11 on

19     the Court's -- on the proposed agenda, which is the matter

20     relating to -- well, that's the motion to expedite

21     consideration, so that obviously'll be granted.

22          And then the Liberty Mutual, item number 12, does any

23     party wish to be heard in connection with that proposal?

24          All right, it seems like you've done a very good job

25     making everybody happy this morning, Mr. Ellman, so --

Colloquy

1          MR. ELLMAN:  I guess so.  I think the one that maybe

2    you didn't call was the -- item 10, I think, is a group that

3    includes Aspen, Fidelity, Indemnity National, Travelers, and

4    Zurich.  I don't know if they want to speak or not, but --

5          THE COURT:  Okay.

6          MR. ELLMAN:  -- I think that was one that -- I didn't

7    hear you mention their names.

8          THE COURT:  I did not.

9          Okay, does Aspen, Travelers, or Zurich wish to be

10   heard?

11         All right.  Any other party?

12         All right.  I'm still hearing silence.

13         MR. ELLMAN:  Okay.

14         THE COURT:  So they'll be approved.

15         MR. ELLMAN:  Thank you very much, Your Honor.

16         THE COURT:  All right.

17         MR. ELLMAN:  That concludes that.  I think Mr. Long

18   is next on the agenda --

19         THE COURT:  Okay, very good.

20         MR. ELLMAN:  -- to present the next item.

21         THE COURT:  Thank you.

22         MR. LONG:  Good morning, Your Honor.

23         THE COURT:  Good morning.

24         MR. LONG:  Toby Long from Hunton & Williams, on

25   behalf of the debtors.

Colloquy

1        My colleague Justin Paget and I are going to tag-team
2   item number 13.
3        THE COURT:  All right.
4        MR. LONG:  This is the third omnibus motion to assume
5   or reject leases.  And I say we're going to tag-team.
6   Yesterday we filed a reply to two of the contested objections:
7   that's the objection of Mary Amstutz -- and forgive me if I
8   mispronounce that -- and The David J. Pierce Trust.
9        THE COURT:  I was relying on you.
10       MR. LONG:  Mr. Paget's done the laboring oars on
11  that, and we'll take up that argument shortly.  My part should
12  be much easier, as most of the items I'm going to address as
13  of now are either continued or resolved.  I think the two can
14  be handled separately.  For Mr. Paget's issue, it's a matter
15  of whether or not we can reject the lease; if we can, it'll be
16  added to the order that I'll propose to Your Honor; if not,
17  then it will not be.
18       For the items I'm addressing, items N through V are
19  all continued, and at this point they're continued to the
20  confirmation hearing.  The resolved objections on the agenda
21  are reflected in W through AA.  For the record, this is the
22  objection filed by Appalachian Power, Dominion Transmission,
23  and West Penn Power Company; that's docket number 1910; the
24  objection filed by Pardee Minerals, docket number 1912; the
25  objection filed by John D. Moore Trust, docket number 1943;

Colloquy

1    the objection filed by PBM Holdings, docket number 1946.  And

2    to be clear with respect to PBM Holdings, this is resolved

3    because we have decided to reject the lease.  It was a cure

4    objection, so, obviously it's moot.  And the last one that's

5    resolved -- listed as resolved objection is Consol Energy,

6    docket number 2118.  Also pleased to report, Your Honor, with

7    respect to contested objections, we have resolved the

8    objection filed by the Williams heirs; it's docket number

9    1926.

10           And the last one that we believe is resolved is the

11   objection filed by the heirs of William J. Neace; that's

12   docket number 1898.  And I qualify -- we believe that's

13   resolved.  This was filed by a pro se on behalf of a number of

14   heirs.  We have advised these theirs that we have agreed to

15   increase the cure amount to 16,000 dollars.  And we have been

16   told -- we believe that resolves their objection.  We also

17   told them, while we're going forward today, to ask Your Honor

18   to approve assumption of this lease where the cure was 16,000

19   dollars.  And I don't believe any are here, although I welcome

20   them to tell me if I'm incorrect.

21           THE COURT:  Okay.  Very good.

22           MR. LONG:  We -- I'm sorry, Your Honor?

23           THE COURT:  Do you want me to solicit that

24   information now?

25           MR. LONG:  Yes, sir.  Please.

Colloquy

1          THE COURT:  All right.  Is anybody here on behalf of

2     the objection filed by William Neace at docket number 1898?

3          All right, it doesn't appear that anyone is here, so

4     you must have resolved that.

5          MR. LONG:  Thank you, Your Honor.  With that, if I

6     may, I have a blackline with two slight changes from the order

7     we submitted in the past.

8          THE COURT:  You may.

9          MR. LONG:  If you turn, Your Honor, first to

10    paragraph 8.  This is with respect to the objection filed by

11    the utilities:  by Appalachian Power, Dominion Transmission,

12    and West Penn Power Company.  We agreed to insert language in

13    the order.  The objection concerned whether or not the

14    agreements were easements and could be assumed.  We reviewed

15    the agreements; we agree that they are easements and we agree

16    that they are not leases that can be assumed or assigned under

17    365.  And that is what is in paragraph 8.

18          THE COURT:  All right.

19          MR. LONG:  Paragraph 7 is a unique situation.  This

20    addresses an objection I didn't discuss.  This was an informal

21    objection filed by Gary Crutchfield very early on when we

22    first presented this motion.  While reviewing this objection,

23    we determined that the lease had expired and therefore could

24    not be assumed.  We subsequently realized it was inadvertently

25    included on one of the orders.  And so this provision, which

Colloquy

1   Mr. Crutchfield's counsel agreed to, merely makes clear that
2   it was inadvertently included and is expired and cannot be
3   assumed or assigned.

4          I did -- Mr. Crutchfield's counsel did ask me to
5   advise Your Honor that he may be seeking to file a motion to
6   file a late claim, and we of course reserve our rights with
7   respect to that.

8          With that, Your Honor, we would submit that the
9   assumption or rejection of the leases, subject to the
10  aforementioned resolved objections at this time, is
11  appropriate and is in the best interest of the estates and
12  creditors.  And unless Your Honor has any questions -- and of
13  course Mr. Paget's going to address his issue shortly.  But
14  with respect to these resolved objections, we would ask Your
15  Honor to approve our motion.

16         THE COURT:  All right very good.

17         Mr. Epps, you wanted to be heard on this part?

18         MR. EPPS:  Yes, sir, if I may.  Your Honor, with
19  regard to matter number Y, which is the objection of
20  Huntington National Bank, Trustee, I want to affirm for the
21  record that that has been properly resolved and we are in
22  agreement with that resolved.  It's on page --

23         THE COURT:  That's docket number 1943?

24         MR. EPPS:  It is docket 1943, yes, sir.

25         THE COURT:  Okay, so that's resolved as well.  All

22

Colloquy

1   right, and that's going to be part of the same order that

2   Mr. --

3        MR. LONG:  Yes.  That's the John D. Moore Trust.

4        THE COURT:  Okay.  Excellent.

5        MR. EPPS:  Thank you, Your Honor.

6        THE COURT:  Okay, thank you very much --

7        MR. LONG:  Thank you.

8        THE COURT:  -- for that clarification.

9        Is anybody here on behalf of Mr. Crutchfield?

10       All right.  All right, I'll take your

11   representations, and they may be filing a late -- a motion for

12   leave to file late claim and that the debtor reserves its

13   rights with regard to any such request.

14       And then with that, the other matters'd be resolved

15   and the Court will enter the order authorizing the rejection

16   and assumption --

17       MR. EPPS:  Thank you, Your Honor.  With that I will

18   cede the podium to Mr. Paget.

19       THE COURT:  All right, thank you, sir.

20       MR. PAGET:  Good morning, Your Honor.

21       THE COURT:  Good morning.

22       MR. PAGET:  Justin Paget with Hunton & Williams, on

23   behalf of the debtors.

24       Your Honor, I know, as Mr. Long has mentioned on

25   previous occasions, we have a number of leases that we've been

## Colloquy

1    working to resolve cure issues and related issues to

2    assumption and rejection.  For the most part, we've been able

3    to resolve a significant number of those, and we hope to be

4    able to continue to do that.  Unfortunately, and --

5         THE COURT:  I've been duly impressed; I mean, the

6    time limits that Congress has given you to work through all

7    these.  It's been amazing that you've been able achieve what

8    you've been able to do.

9         MR. PAGET:  And it's certainly a great part (sic) to

10   the employees at the debtors, Your Honor; they've done an

11   exceptional job of working through these issues with us.

12        Unfortunately, today we have a situation where I

13   think the parties are so diametrically opposed on a strictly

14   legal issue, that we've not been able to reach a resolution.

15   So this matter, it concerns, as Mr. Long mentioned, the

16   debtors' motion to reject an agreement that the debtors have

17   determined no longer benefits the estate.  Now, this is an old

18   agreement, and the heirs to the original counterparty have

19   objected to the rejection; they've objected to the rejection

20   of the agreement on the grounds that they believe it is

21   integrated with certain Wyoming -- two Wyoming coal leases,

22   under which one of the debtors is the lessee.

23        Now, we think that it's clear from the language, in

24   the four corners of the agreement, that the obligations are,

25   first, contractual in nature and, second, that they are in

24

Colloquy

1    fact separate and independent from the underlying mineral

2    leases.  Therefore, we believe that the debtors are entitled,

3    under Section 365, to exercise their business judgment and

4    elect to reject the agreement.

5            Now, Your Honor, when I cede the podium to Mr. Epps,

6    I think the Court is likely to hear about concepts such as

7    overriding royalties, nonparticipating royalties, net-profits

8    interest, production payments, and unleased mineral interests,

9    among other concepts.  The Court may hear about working

10   interests and resulting trusts and how payments received from

11   the sale of coal under this agreement are allegedly not

12   property of the estate.

13           THE COURT:  Well, these are federal leases, though,

14   aren't they?

15           MR. PAGET:  They are, sir.

16           THE COURT:  Okay.

17           MR. PAGET:  Most of the concepts that I just

18   mentioned, we think, are very specific to situations in the

19   oil and gas industry.  Some of the concepts, such as

20   overriding royalties, do also apply to the coal industry.  But

21   we believe that many of these concepts that were mentioned in

22   the briefs filed by the objecting parties are simply

23   inapplicable (a) to the coal industry and specifically to this

24   case and, more particularly, the interpretation of this

25   agreement.

Colloquy

1          Nearly all the cases also cited by the objecting
2   parties concern entirely different situations; they concern
3   royalties that were granted by the owner of a fee interest in
4   the real property.  That's not what we have here.  As Your
5   Honor just indicated, what we have here are leases and the
6   status of counterparties of the lease being a lessee under
7   those leases.

8          So we think this matter's resolved much more simply
9   without necessarily wading too deeply into Wyoming mineral law
10  or forcibly trying to fit a square peg into a round hole.  We
11  don't have any witnesses today, Your Honor, because we believe
12  this is a summary proceeding.  We stipulated to the documents
13  that we believe are sufficient for the Court to adjudicate the
14  matter.

15          I have one reservation to one of the documents, which
16  I'll describe in a moment.  But what we have here, we have a
17  letter agreement -- it's between an entity called Ayrshire,
18  which is a predecessor-in-interest to the Debtor Alpha
19  Wyoming; we have a memorandum of agreement; and we have the
20  two federal leases that Your Honor mentioned.  These were
21  filed on the docket.  I have copies here, if it'd be helpful
22  to hand them up.

23          THE COURT:  I've got copies in front of me, unless
24  you want to specifically mark those as exhibits to this
25  proceeding.

Colloquy

1        MR. PAGET:  It's not necessary, sir.  They're

2   stipulated.  We can do that if you'd like, but I don't think

3   there's any issue with stipulating to the documents.

4        MR. EPPS:  Your Honor, they're attached to the filing

5   we made yesterday that Mr. Paget is satisfied with.  Those are

6   copies of the same documents; you already have them.  We could

7   just introduce those.

8        THE COURT:  All right.

9        MR. EPPS:  We don't need to do it again, as far as

10  I'm concerned.

11       THE COURT:  All right, very good.  I've got them

12  right in front of me.

13       MR. PAGET:  Excellent.  The one reservation that I

14  mentioned that I would make, Your Honor, is with respect to

15  the memorandum of agreement.  The memorandum was apparently

16  recorded.  And I've agreed with Mr. Epps not to object to

17  that, based on lack of having a certified copy or not having

18  any foundation for the document.  But my reservation is with

19  respect to the authority to record that document.  If you look

20  within the four corners of the settlement letter, there's

21  nothing in there that authorizes the Organs to have recorded

22  that document.  It's not -- the memorandum is not signed by

23  any predecessor-in-interest to Alpha Wyoming.  And there's

24  nothing in there that says to us -- I also mentioned it was

25  recorded five years after the settlement agreement was entered

Colloquy

1    into.  So there's nothing that tells us that it was -- that

2    the Organs had authority to record that document.  So that's

3    the reservation I would make.

4         So if I may, I'd like to just proceed with legal

5    argument, since we have stipulated to the documents, Your

6    Honor.  And unless the Court would indicate to me otherwise,

7    I'm going to assume that Your Honor has read the briefs.

8         THE COURT:  Oh, I've read your briefs, yes.

9         MR. PAGET:  Excellent.  So just to frame the issue

10   for the Court briefly, the agreement that's sought to be

11   rejected here is a settlement letter; it was entered into more

12   than forty-five years ago, as I mentioned, between a party

13   called Ayrshire, and the Organs.  The settlement letter was

14   entered into, ostensibly, for the purpose of resolving certain

15   disputes.  The issue we have is, because of how long ago this

16   agreement was executed, we don't have anyone at the company

17   still with personal knowledge about the nature of the

18   disputes.  But we believe, from the language in the settlement

19   letter, that Mr. Organ was engaged in mineral exploration or

20   prospecting.

21        As consideration for resolving these disputes,

22   Ayrshire, the original counterparty, agreed to make a stream

23   of payments to the Organs.  The amount of these payments were

24   calculated based on a percentage of what's defined in the

25   agreement to be net realization, and that's derived from coal

Colloquy

1    sales made within an area that's called North and South

2    Gillette, in Wyoming.

3          Also in the agreement is consideration; Ayrshire

4    agreed to cancel an existing note made by Mr. Organ and, in

5    exchange, the Organs agreed to waive all claims against

6    Ayrshire.  And Mr. Organ agreed to continue providing certain

7    services to Ayrshire and its successors-in-interest, on terms

8    to be decided.

9          Mr. Organ is now deceased and the debtors have

10   determined that there's no current benefit, to the estates, of

11   continuing the agreement.  And we believe that the ongoing

12   obligations are a burden and, therefore, the debtors, in

13   exercising their business judgment, have elected to reject it.

14         I'd also add, Your Honor, that under the term (sic)

15   of the agreement, it actually expires in 2019, so there's only

16   about three years left.

17         Now, the objecting parties, Your Honor, have said

18   that the settlement letter and the leases, as I mentioned, are

19   integrated.

20         THE COURT:  And then what happens at the end of the

21   term when it expires?

22         MR. PAGET:  I believe the obligations to pay the

23   royalties would simply terminate.  I don't believe there's

24   anything else that happens.

25         So if I may, Your Honor, I'd like to dispel the

Colloquy

1   notion that these agreements and leases are integrated; and if

2   they're not integrated, I believe that the debtors would be

3   free to elect, under Section 365, to treat the leases and the

4   settlement agreement distinctly.

5           So, state law supplies the legal standard.  Here the

6   state law is Wyoming.  And like most states, Wyoming looked to

7   the parties' intent.  We've discussed the issue in our brief,

8   Your Honor, but I think it's worth drawing a contrasting

9   example.  So this is not a situation where you have a royalty,

10  as I mentioned, reserved by a landlord, by the owner of the

11  fee interest, where you may have a separate agreement where a

12  lease is entered into and then a royalty agreement as well.

13  But it's clear that the royalty in favor of the landowner is

14  being paid as consideration for entering into the lease.

15  That's not the issue we have here.  Here, the consideration

16  for the two agreements is wholly distinct.  The payments to

17  the Organs were promised in exchange for the settlement of

18  claims.  And there's nothing to suggest, within the four

19  corners of the document, that the claims of the Organs at all

20  related to the leased property.

21          More importantly, Your Honor, I think I would note

22  that there is not even a reference, in the settlement letter,

23  to the leases.  I simply don't see how you could grant an

24  interest in real property or the leases, which the objecting

25  parties are claiming, without even referencing the leases in

Colloquy

1    the agreement.

2          Finally, Your Honor, there's the fact that the

3    obligations under the settlement letter and the leases are

4    completely unrelated.  In one of the cases that were cited by

5    the objecting parties -- and it's Bronco Hazelton out of -- I

6    believe it's the Southern District of Indiana -- the court

7    there held that the royalty agreement and the lease was

8    integrated because the beneficiary of the royalty had the

9    right to verify payment under the lease, to make advanced

10   payments under the lease, to require permitting and mining

11   under the lease.  So there were interrelated obligations.  But

12   none of those features appear here in the settlement letter.

13   As I mentioned before, and I think it's worth repeating, the

14   settlement letter does not even reference the leases or the

15   fact -- or tie the obligations to Ayrshire's or its

16   successors' role as lessee.

17          The other point I want to make, Your Honor, is that

18   we believe this obligation is contractual rather than grounded

19   in any real-property interest, as the objecting parties argue.

20   Now, the Wyoming Supreme Court has specifically recognized

21   that royalties can be contractual personal obligations; that

22   was recognized in the case of Ferguson v. Coronado Oil at

23   884 P.2d 971; it's a Wyoming Supreme Court case from 1994.

24   There the Wyoming Supreme Court said, what you do is you look

25   to intent, you look within the four corners of the document,

Colloquy

1    determine the nature of the right.

2          So, in looking at this agreement, I asked myself,

3    Your Honor, if I was to draft a contractual royalty, what

4    would I do differently than what's contained in the settlement

5    letter?  The only thing that I could come up with is that I

6    would probably explicitly state this agreement is not intended

7    to grant an interest in property.  Now, it doesn't say that

8    but, unfortunately, contracts don't spend a lot of time

9    talking about what they're not.

10         Everything else that's in the settlement agreement I

11   would probably put into an agreement that created a

12   contractual obligation.  There's no conveyance language.

13   There's no reference to the lease, as I mentioned.  And it

14   creates a broad personal obligation to pay royalties, without

15   regard to whether the debtor is a lessee, sublessee, operator,

16   or the actual mineral-owner.  And again, that's what we have

17   here.  There's simply no connection to the lease such that we

18   could say that these agreements are integrated.

19         The other argument made by the objecting parties,

20   Your Honor, is that there is a conveyance of a real-property

21   interest.  Now, I think that can be swiftly dispatched.

22   First, as I mentioned before, there's no conveyance language

23   in the document.  While there is a property description,

24   Ayrshire, the original counterparty, as I mentioned, was not

25   the owner of a fee interest in the minerals.  These are

Colloquy

1    federal leases.  It's the United States, or the Bureau of Land

2    Management, which is the fee-owner.  The only property

3    interest that I think Ayrshire could have conveyed would have

4    been an interest in the lease.  And yet, as I repeat again,

5    there's no description or reference, in the document, to a

6    lease.

7         You also have issues with the recording of the

8    memorandum.  The settlement letter itself was not recorded.

9    There's nothing in the settlement letter that contemplates

10   that it would be recorded or, as I mentioned earlier,

11   authorizes it to be recorded.  All we have is the memorandum

12   that it was executed and authenticated only by the Organs more

13   than five years after the settlement letter was entered into.

14        Then if you turn to the memorandum, the memorandum

15   itself has issues:  it's not authenticated by Ayrshire or any

16   other predecessor-in-interest to the Debtor Alpha Wyoming.

17   And there's a requirement in Wyoming that in order to transfer

18   an interest in property, the document has to be authenticated.

19        I would also point out that the memorandum lacks

20   essential information that I think would be necessary to

21   provide constructive notice to someone who was searching the

22   land records.  The lessor is not mentioned in the memorandum.

23   The lease, again, is not mentioned in the memorandum.  This

24   kind of information, for example, in Virginia would be

25   statutorily required for the memorandum to be in recordable

Colloquy

1    form.   Now, Wyoming doesn't have a similar statute, but we

2    don't believe that the memorandum contains sufficient

3    information to put, for example, a future assignee of the

4    lease on constructive notice, had there been an intent to

5    transfer an interest in the lease.

6             So in conclusion, Your Honor, we don't think that

7    there's any evidence here, within the four corners of the

8    documents, that the settlement letter and the federal leases

9    were intended to be integrated.   We don't believe there's any

10   evidence of an intent to assign an interest in the lease.   We

11   don't believe there's any evidence of an intent to convey a

12   real-property interest or for the document to be recorded.

13   For these reasons, we think the debtors should be permitted to

14   exercise their business judgment and reject this agreement,

15   without regard to how they'd like to treat the federal leases.

16            THE COURT:  All right, thank you very much.

17            MR. PAGET:  Thank you.

18            THE COURT:  Mr. Epps?

19            MR. EPPS:  Good morning, Your Honor.  A. C. Epps,

20   Jr., on behalf of the objectors.  There's Nancy Gettinger,

21   who's in the courtroom with me today; also Mary Ellen Amstutz

22   and all the other objectors except for David Pierce, who's

23   represented by Mr. Pearl, who's also at counsel table.

24            Your Honor, I'm going to go out of order -- out of

25   the order that I set for myself, to --

Colloquy

1          THE COURT:  Well, then I wouldn't know, so you go in

2    any order you --

3          MR. EPPS:  No, you would know -- you would know.

4    I've been wanting to say it before; I forget it, frankly.

5    So --

6          THE COURT:  All right.

7          MR. EPPS:  -- I'm going to do it now.

8          Your Honor, I'm perfectly aware, as is Mr. Paget

9    since we both took the Virginia bar and practice law in

10   Virginia, what the requirements are for indexing grantors and

11   grantees in the state of Virginia.  But that is in fact not

12   correct in Wyoming.  In Wyoming, things are indexed twice:

13   once is by map and tax parcel, and also by grantors and

14   grantees.  And if the Court will look at the documents

15   involved, that information is clearly thereon.

16          So I believe that is a complete red herring based on

17   the ingrained thought process we have about Virginia law,

18   which of course does not apply to this situation --

19          THE COURT:  Okay, so --

20          MR. EPPS:  -- Your Honor.

21          THE COURT:  -- what is the point you're making there,

22   then?

23          MR. EPPS:  The point is that --

24          THE COURT:  Help me --

25          MR. EPPS:  -- that Mr. Paget has said that it's not

Colloquy

1    properly recorded and you could not find them in the chain of

2    title.  That is in fact not correct, because of the

3    reference -- the Court will see --

4           THE COURT:  Well, let's back up so I know what we're

5    talking about.

6           MR. EPPS:  Sure.

7           THE COURT:  As far as the letter agreement dated

8    January 18, 1969, is there any dispute that that was not

9    recorded?

10          MR. EPPS:  No, sir, not at all.

11          THE COURT:  So, no dispute there.

12          MR. EPPS:  No, sir.

13          THE COURT:  The only thing that was recorded,

14   apparently, was this memorandum of agreement?

15          MR. EPPS:  That is correct, Your Honor.

16          THE COURT:  And you're saying that what was incorrect

17   or what you're correcting is that somebody in Wyoming that

18   would search the title would find this memorandum of

19   agreement --

20          MR. EPPS:  They would, Your --

21          THE COURT:  -- in the chain of title?

22          MR. EPPS:  They would, Your Honor.

23          THE COURT:  Okay.  Very good.

24          MR. EPPS:  And you'll find it in paragraph 1 on page

25   1 of the memorandum, where it talks about Section 1621, the

Colloquy

1   south half of Section 1622, et cetera -- Section 1622, the

2   south half of -23, et cetera, et cetera.

3           THE COURT:  Right.

4           MR. EPPS:  In Wyoming, that is part of the indexing

5   system.  The only state that I've ever dealt with like this,

6   other than Wyoming, is Florida, which also will do the same

7   sort of thing.  But I don't want to leave untouched the idea

8   that somehow this is not traceable in the chain of title,

9   because it is.

10          THE COURT:  All right.

11          MR. EPPS:  Thank you, Your Honor.

12          First of all -- or second of all, I guess, I want to

13  apologize for filing another pleading yesterday morning; I had

14  hoped to have it ready Friday but it just was not -- I don't

15  feel quite as guilty, since we're all equally guilty of

16  that --

17          THE COURT:  Well, obviously --

18          MR. EPPS:  -- at this --

19          THE COURT:  -- I don't have a life and I just read

20  all of this stuff as you guys file it, so it's fine.

21          MR. EPPS:  Well, we appreciate the dedication of the

22  judiciary and our Court, Your Honor.

23          Your Honor, it's really -- there are two questions

24  here, and this case has developed, in my mind, as we've gone

25  on.  And I have better and better focus of it so that maybe

Colloquy

1    finally I have focus of it.  But there are two essential

2    issues here.  The first is whether this is a mineral royalty

3    interest.  And I think we discussed it fairly accurately and

4    fairly completely in our documents.

5         I think that the -- that Wyoming law, I would like to

6    say, it's perfectly clear, but actually as I said yesterday,

7    it's a little bit cloudy, because for many years, Wyoming,

8    like any other state, particularly in the Midwest and the

9    Great Basin and so forth, has said that royalty -- overriding

10   royalty interests, working -- nonparticipating working

11   interests, et cetera, are real property; and they're a real

12   property interest, and they transfer with the real property,

13   to the extent that they're properly recorded, and so forth.

14        Somewhat late in the game, the Wyoming Supreme Court

15   decided in the Coronado Oil case, which is interestingly cited

16   by both of us -- but what they said, which I think makes

17   perfectly good sense to me and I hope to someone else is that

18   it is a burden on the land and travels with the land, but you

19   can't do anything with it until it comes out, at which

20   point -- if you're entitled to a share of the profits, if

21   you're entitled to X dollars for each ton of coal that comes

22   out or a percentage of the sale price, that at the moment the

23   coal comes out and the coal is sold, then you have a personal

24   property interest in those proceeds, because that's what your

25   royalty is.

Colloquy

1          And it makes actual sense to me what the Coronado Oil

2    case says; but you have to follow along with that, that the

3    fact that this is a proper mineral royalty override means it

4    is not property of the estate.

5          Now, Judge Mitchell in Alabama, I think, frankly

6    missed that one in the Walter case, and I'm going to come back

7    to the Walter case in a minute. But if you are properly

8    recorded and if you are properly indexed, and if you have an

9    override, and if you obtained your interest from the person or

10   entity that has that interest, then you have a valid mineral

11   override.

12         I personally think, and I think very strongly, that

13   the distinction that counsel for the debtors attempts to draw

14   here, that it can only come out of the lease, is not correct.

15   I think that --

16         THE COURT:  Where does it come from, then?

17         MR. EPPS:  Well, it comes from the lessee. The

18   lessee, once the -- the lessee, as the owner of a leasehold

19   interest in the property, can do with it as he or she sees

20   fit. And in this case, the lessee granted the Organ family

21   the override. It can't bind the lessor. That wouldn't be

22   true in Virginia for any kind of minerals or other things.

23   And it can't be true here. But they can bind the lessee,

24   because they are the lessee.

25         And I don't think that's even a really very hard

Colloquy

1    concept.  To the extent that I'm mistaken and the Court thinks

2    it is a hard concept, I would ask the Court to look at the

3    Bronco Hazelton case.  In the Bronco -- which is attached to

4    our memorandum of yesterday as Exhibit C.  The Bronco Hazelton

5    case, two of the claimants to mineral overrides were

6    individuals --

7              THE COURT:  This is the Southern District of Indiana

8    case?

9              MR. EPPS:  It is.  It's by Judge Lorch in the

10   Southern District of Indiana.

11             THE COURT:  Okay.  And is Indiana law similar to

12   Wyoming law?

13             MR. EPPS:  I think in this respect it is.  Obviously

14   Indiana is most of a century earlier than Wyoming and its law

15   history is somewhat different.  But in this respect, I believe

16   it is, Your Honor.

17             THE COURT:  All right.

18             MR. EPPS:  If the Court looks to --

19             THE COURT:  This was Judge Lorch's case?

20             MR. EPPS:  This is Judge Lorch's case.

21             THE COURT:  All right.

22             MR. EPPS:  Look on page 5 -- beginning on page 5 of

23   his opinion -- and as I said, it's Exhibit C to my filing of

24   yesterday -- there were two individuals who claimed royalty

25   interests in the proceeds of the mineral extraction in this

Colloquy

1   case.  Nash received his from an employment agreement

2   executed, curiously enough, five years after the lease.

3   That's a familiar number, the same number we have; five years

4   later.  Mr. Paget is worried about that five years, but

5   apparently Judge Lorch wasn't worried about that five years.

6          But not only was this an employment agreement, it had

7   nothing to do with the property or the minerals or anything,

8   but as Judge Lorch found in paragraph 21:  "Nash did not make

9   any filings related to the Nash Employment Agreement in the

10  Gibson County Indiana Real Property Records."

11         Likewise, Mr. Kerr, sometime in 2005, entered into a

12  royalty agreement for services previously provided.  This is

13  many more years than five after the lease.  Kerr made no

14  filings related to the Kerr Agreement in the Gibson County

15  Indiana Real Property Records.

16         Nonetheless, the court found that all of the

17  claimants had a royalty interest that could not be rejected as

18  an executory contract.

19         Now, Mr. Paget has discussed, to a certain extent,

20  all the indicia of the main claimant in this case --

21         THE COURT:  I know.  But the problem, though, I want

22  you to focus on -- help me with here is that under Wyoming

23  law, if I'm looking at the Coronado case correctly, they're

24  saying that royalty payments can be a personal interest as

25  opposed to an interest in real property; in other words, they

Colloquy

1   say it can be both.  Is Indiana -- is that what Judge Lorch --

2   it seemed to me that he was finding that there was a property

3   interest here.

4        MR. EPPS:  Well, I think that -- I think he did find

5   that, and I think that there is one.  And I would like -- may

6   I come back to that in just a second?

7        THE COURT:  Oh, sure.  I'm sorry.  I didn't mean to

8   jump ahead.

9        MR. EPPS:  No, I understand --

10       THE COURT:  I just wanted to tell you what's

11  bothering me.

12       MR. EPPS:  No, I understand.  And as I tried to

13  impart to the Court before, I've had a hard time wrestling

14  with the Coronado Oil case.  But I think what the Coronado

15  Oil --

16       THE COURT:  Well, that's because it's a little

17  problematic.

18       MR. EPPS:  Well, I think it's problematic for all

19  sides, because I'm not really sure what it says.  But it has

20  a -- I think what the Wyoming law is at the Coronado Oil and

21  its subsequent cases is, you have -- if you have a right to a

22  mineral override, a percentage of whatever comes out of the

23  land, and you don't have the right to go and take it yourself

24  from the land, that at the moment -- it is a real property

25  impediment in the sense that you can transfer the property,

Colloquy

1    but you can't get rid of it.  But once the property comes out,

2    it is your property, because all you're entitled to is the

3    proceeds.  But it is not property of the estate, because it's

4    yours.  You can't pull it out yourself.  It's a

5    nonparticipating royalty interest.

6         Have I lost the Court on that?  I hope not.

7         THE COURT:  Well, how does that help me with whether

8    or not this is something that is personal as opposed to a real

9    property interest?  That's -- I guess that -- all right.

10   Well, continue with your argument.

11        MR. EPPS:  All right.

12        THE COURT:  I'll come back to you at the end.  Maybe

13   you'll --

14        MR. EPPS:  Sure.

15        THE COURT:  -- connect the dots for me.

16        MR. EPPS:  All right, I'll try.  Your Honor, when the

17   minerals come out of the ground is the only time that whoever

18   has a royalty interest that is not a participating interest --

19   in other words, that you can go mine it yourself -- that's the

20   only time that it becomes absolutely yours.  And I think

21   whether it is a real property interest or it isn't, it's still

22   yours.  It's not anyone else's.  And it's not the debtors' in

23   this case.  That is -- let me find the cases in here that have

24   said that.  Bear with me for a second, Your Honor.

25        Your Honor, let me come back to that.  I don't want

Colloquy

1    to hold up the Court.  I will find --

2           THE COURT:  Okay.

3           MR. EPPS:  -- what I'm looking for.  But moving on

4    for the moment, and we'll come back to that, I am disturbed by

5    the reference and heavy reliance of the debtors on the Walter

6    case.  And the reason that I'm concerned about it, that the

7    Walter case is being cited for why this is an executory

8    contract and consequently can be dismissed.

9           And examination of the Walter case indicates that it

10   is governed by, as it should be, Eleventh Circuit law.  But

11   the Eleventh Circuit law on executory contracts is not only

12   bizarre, but it's directly in contravention to the Fourth

13   Circuit law, particularly because Judge Mitchell in that case

14   determined that the Vern Countryman definition of an executory

15   contract did not apply to this circumstance in the Eleventh

16   Circuit because the power of the debtor to reject a contract

17   of part of its reorganization efforts is consistent with the

18   fresh start and rehabilitative purposes of the Bankruptcy

19   Code, and thus the Eleventh Circuit has declined to limit the

20   definition of executory contracts to the more restrictive

21   Countryman definition, which requires unperformed mutual

22   obligations on both sides, which of course it does.

23          Instead, when determining whether a contract is

24   executory for purposes of rejection under Section 365 of the

25   Bankruptcy Code, the Eleventh Circuit is more inclined to

Colloquy

1  embrace the functional approach.  Under the functional

2  approach, even if only one of the parties to the contract has

3  material performance obligations remaining, the contract may

4  nevertheless be deemed executory if the assumption or

5  rejection would ultimately benefit the estate and its

6  creditors.

7          I don't know what that means except if the debtor

8  needs it, just --

9          THE COURT:  Well, that's the Westbrook view of

10 executory contracts, right?

11         MR. EPPS:  I suppose.  It's certainly not ours.  The

12 Fourth Circuit has -- in Lubrizol and Sunterra and since

13 Sunterra --

14         THE COURT:  I'm aware that the Fourth Circuit does

15 not --

16         MR. EPPS:  -- has had --

17         THE COURT:  -- the Countryman test.

18         MR. EPPS:  -- the Countryman test is the test.

19 And --

20         THE COURT:  But what difference does that have to

21 make with regard to the letter agreement?  Because --

22         MR. EPPS:  Well --

23         THE COURT:  -- there were things that were going to

24 be done by both sides under the letter agreement.  And

25 wouldn't this fall within the Countryman definition?  One

Colloquy

1   party was going to cancel a note; one party was going to

2   assist with the development of the coal mining, and the other

3   party was going to pay monies based on a percentage that was

4   taken out of the ground.

5           MR. EPPS:  Well, Your Honor, I think it -- we have to

6   look -- take the Countryman test and look at the agreement.

7           THE COURT:  Okay, well, let's do that then.

8           MR. EPPS:  Well, let's do --

9           THE COURT:  Are you saying this does not fall within

10  the Countryman?

11          MR. EPPS:  No, sir, it does not.

12          THE COURT:  Okay, well, let's --

13          MR. EPPS:  There's nothing left to be done.

14          THE COURT:  Now -- now, but --

15          MR. EPPS:  On our side.  On our side.

16          THE COURT:  But back when it was executed, it was

17  certainly.

18          MR. EPPS:  Well, a contract isn't executory forever

19  if it started being executory.  If one side's finished, it's

20  done.  It's no longer executory.

21          THE COURT:  So you're saying I have to look and see

22  whether or not it continues to be executory today, even

23  though --

24          MR. EPPS:  As to the Gettinger side of the case,

25  yeah.  Yes, sir, Your Honor.  There's nothing left for us to

Colloquy

1    do.  Nothing at all.  How can it be executory under the

2    Countryman test?

3            THE COURT:  Well, maybe it's just a debt that you're

4    owed, then?

5            MR. EPPS:  Well, I think if the Court wanted to --

6            THE COURT:  I mean it's got to be one thing.  It's

7    got to be either a property interest, a debt, or a contract,

8    right?

9            MR. EPPS:  It does.  It --

10            THE COURT:  Okay.

11            MR. EPPS:  -- does.

12            THE COURT:  And we would define the world that way.

13    It's pretty easy.

14            MR. EPPS:  All right.

15            THE COURT:  So what is it?

16            MR. EPPS:  It's a property interest, Your Honor.

17            THE COURT:  Okay.

18            MR. EPPS:  And it belongs to the Gettingers.

19            THE COURT:  All right.

20            MR. EPPS:  And to rule contrary to that in spite of

21    all the distinctions that Mr. Paget has raised, is to turn the

22    Wyoming law on overriding royalty interests on its ear.  This

23    is the --

24            THE COURT:  Okay.  Well, and I want to walk through

25    that.

Colloquy

1          MR. EPPS:  Sure.

2          THE COURT:  Because I'm having a little bit -- what

3   Mr. Paget is saying is that all this does is it measures the

4   amount that's supposed to be paid based on the amount that's

5   taken out of the ground as opposed to granting a property

6   interest.  So where is the grant language in this letter

7   agreement?

8          MR. EPPS:  All right.  Well, on page 1 of the

9   agreement, which is the document dated 1969 -- this document

10  is obviously written by Mr. Organ.

11         THE COURT:  Well, how do I know that?

12         MR. EPPS:  Well, he's -- I can't bring him back from

13  the --

14         THE COURT:  This is a 1969 document.

15         MR. EPPS:  Well, I can't bring him back from the

16  dead.  But he says, to resolve disputes respecting certain

17  coal interests and to effect an amicable compromise of these

18  differences, Mrs. Organ and I will accept the interests set

19  forth hereinafter as full settlement of our claims.

20         Now, as I said, I can't bring him back --

21         THE COURT:  Okay.

22         MR. EPPS:  -- but it certainly sounds to me like he's

23  writing it.

24         THE COURT:  All right, very good.

25         MR. EPPS:  All right.  Now, the areas involved and

Colloquy

```
1    the royalties to be paid and the description of the properties

2    and expiration dates regarding Ayrshire's obligations are; and

3    A is not related to our case today; B is not related to our

4    case today.  C is our case today.  And with regard to the

5    Gillette property, the earned royalty to be paid by Ayrshire

6    to us or our successors or assigns is the rate of one-half of

7    one percent of the net realization.  The obligation of

8    Ayrshire in respect to the payment of royalties as herein

9    provided for each of the North and South Gillette areas, shall

10   continue until the end of December 31st, 2019, at which time

11   Ayrshire's obligation shall cease.

12          THE COURT:  And that was the question I was asking

13   Mr. Paget, on what happens --

14          MR. EPPS:  Yeah.

15          THE COURT:  -- at the end.

16          MR. EPPS:  Nothing.

17          THE COURT:  Right, right.  Then --

18          MR. EPPS:  And there has to be a true-up of the last

19   month, and that's it.

20          THE COURT:  Right.

21          MR. EPPS:  So we're almost done.  We've gone through

22   forty-six-and-a-half years of this --

23          THE COURT:  All right.

24          MR. EPPS:  -- of this interest.

25          Now, on the next page were the provisions that Mr.
```

Colloquy

1   Paget was referring to about the note, et cetera.  And then it

2   concludes by saying that the provisions hereof shall be

3   binding upon and inure to the benefit of the successor and

4   assigns --

5           THE COURT:  Wait a second --

6           MR. EPPS:  -- of the parties --

7           THE COURT:  -- where are you reading?

8           MR. EPPS:  At the end of page 3.  Excuse me.

9           THE COURT:  Oh, 3.  I was on page 2.

10          MR. EPPS:  I'm sorry, that's my fault.  The end of

11  page 3.

12          THE COURT:  Okay, I'm there.

13          MR. EPPS:  All right.  Successors and assigns

14  language, which was --

15          THE COURT:  Okay.

16          MR. EPPS:  -- an issue that was raised in one of the

17  debtors' pleadings.  But that is, in fact, there.

18          And then it is executed by all parties.

19          THE COURT:  But where does the debtor grant an

20  interest in property?

21          MR. EPPS:  Well, it certainly grants --

22          THE COURT:  That's what I'm trying to find.

23          MR. EPPS:  I don't understand very well why the

24  granting of the mineral override isn't the grant of an

25  interest in property.  I don't know really how better to

Colloquy

1 │ answer the question.  That's my failing if I can't answer it
2 │ better, but it's clear that he has granted the -- excuse me --
3 │ he -- Ayrshire has granted him --
4 │       THE COURT:  Well, there was clearly an agreement to
5 │ pay, and the agreement to pay was defined by the amount of
6 │ coal that was taken out of the ground, which was one-half of
7 │ one percent of the net realization.  Okay, so we've got that.
8 │       MR. EPPS:  We do.
9 │       THE COURT:  And what Mr. Paget is arguing is that
10 │ that was a personal interest, okay, which is a contract right.
11 │ And you're saying it was a conveyance of real property?
12 │       MR. EPPS:  It's an impediment --
13 │       THE COURT:  And where am I seeing a conveyance?
14 │       MR. EPPS:  It's an impediment to the real property.
15 │ Any royalty interest is an impediment to the real property.
16 │ It isn't necessarily a transfer of real property, because
17 │ that's not what a royalty is.
18 │       THE COURT:  Well, but Coronado Oil said that
19 │ royalties could be personal.
20 │       MR. EPPS:  Well, they have to be something when they
21 │ come out of the ground.
22 │       THE COURT:  Well, it would be -- okay.
23 │       MR. EPPS:  I'm frustrated with myself that I can't
24 │ convince the Court of what I'm saying.  But it comes out of
25 │ the ground.  It's an interest in the real property until the

Colloquy

1    moment it lands as in terms of proceeds, at which point the

2    proceeds are the property of the royalty holder, whoever that

3    may be.

4          THE COURT:  Okay.  So you're saying because they use

5    the word "royalty" that that necessarily then is an impediment

6    to the real property interest, which in this case, was a

7    federal lease.

8          MR. EPPS:  The lessee's interest in a federal lease,

9    yes.

10         THE COURT:  Okay.

11         MR. EPPS:  Not the lessor's interest.

12         THE COURT:  All right.  Let's assume that you're

13   right.  Okay?  Doesn't the conveyance document need to be

14   recorded?

15         MR. EPPS:  No, sir, Your Honor.

16         THE COURT:  Okay, now tell me why not?

17         MR. EPPS:  Because it's common practice in Wyoming

18   and a lot of western states, including this one, that a

19   memorandum can suffice for that purpose.  For the purpose of

20   noting --

21         THE COURT:  A memorandum --

22         MR. EPPS:  -- noting is --

23         THE COURT:  -- memorandum.  So in --

24         MR. EPPS:  The memorandum was recorded.

25         THE COURT:  -- Wyoming, I can claim that you gave me

Colloquy

1   the right to pitch a tent on your property and record that

2   independent of anything that you do, and now --

3           MR. EPPS:  You can.  It's --

4           THE COURT:   -- you're bound by that?

5           MR. EPPS:  Well, you're not bound by that, but you're

6   bound by that after ten years.  And that's Exhibit D to our

7   pleading, which is the reformation statute in Wyoming.  This

8   is -- as the Court may recall, fifteen or twenty years ago,

9   there was a group of individual liberties types in the State

10  of Montana called the Freemen, and they spent time running

11  around and putting liens on people's properties, and they were

12  all recorded on their end, and it caused a tremendous amount

13  of difficulty, because the owner of the property then had to

14  get it off.

15          But as to whether it was recordable with a simple

16  signature of one party, the memorandum is clearly recordable,

17  and this was clearly recorded.  And it's even -- to the extent

18  that the Court has a problem with the formalities, the ten-

19  year statute in Wyoming has already run.

20          THE COURT:  So in Wyoming, you have to constantly be

21  looking at the land records to make sure that no one's

22  recorded a memorandum against your property?

23          MR. EPPS:  That's true.  In Montana too, which is the

24  case that I was referring to that was widely in the news

25  about --

Colloquy

1          THE COURT:  Well, I'm not worrying about Montana

2    right now.

3          MR. EPPS:  No, but it's --

4          THE COURT:  I'm worrying about --

5          MR. EPPS:  -- not the only state that has this

6    situation, is what I meant.  But that's correct.

7          THE COURT:  Okay.

8          MR. EPPS:  It's akin to, in some tangential way, sort

9    of a mechanics' lien memorandum, where only one party -- it's

10   very different, but it's a single signature.

11         Now, it's true that in Virginia we have a statute

12   that a memorandum and leases --

13         THE COURT:  Normally, you have to give notice.

14         MR. EPPS:  Well, you do have to give notice in a

15   mechanics' lien statute -- filing.  There's no question about

16   that.  But it doesn't have to be signed by but one party.

17         I just don't think this is unusual.  I know it's not

18   unusual in Wyoming, because the --

19         THE COURT:  You don't think this unusual.

20         MR. EPPS:  I don't think it's unusual in Wyoming.

21         THE COURT:  Okay.

22         MR. EPPS:  Memoranda are commonly signed by only one

23   party.  And I don't have my Wyoming consulting counsel with me

24   to tell you that, but I can only tell you that I've asked this

25   question several times and been given the same answer every

Colloquy

1    time.  This happens commonly in Wyoming, particularly with
2    interests such as this.
3            Furthermore, on that subject, before I surrender the
4    podium to Mr. Pearl, not that it's evidence, but it certainly
5    is common sense to think of the fact that we are now in year
6    forty-seven of a fifty-year -- what I would suggest to you is
7    a royalty agreement, but it's clearly some kind of override
8    agreement which has been honored by all parties, including
9    several successors on both sides.  There's nobody but the
10   current debtors' counsel who thinks that this is not the way
11   it works under Wyoming law, because it is the way it works
12   under Wyoming law.
13           And I just don't see why the distinctions that
14   counsel has brought up should jettison this family deal after
15   all these years that everyone has known what the deal is and
16   that it was a royalty interest.
17           Now, rather than keep the podium any longer, unless
18   the Court would like me to answer any further questions, I'd
19   like to let Mr. Pearl have a shot at the podium.
20           THE COURT:  Okay, very good.
21           MR. EPPS:  Or I'll allow you a shot at Mr. Pearl,
22   depending on which way you want to put it.
23           THE COURT:  All right, Mr. Pearl?
24           MR. PEARL:  Thank you, Your Honor.  Good morning.
25   Pete Pearl, Spilman Thomas & Battle, here on behalf of The

Colloquy

1   David J. Pierce Trust.  The trust, Your Honor, has a twenty
2   percent interest in this royalty stream.

3        Maybe the first thing I would like to do, Your Honor,
4   is address a couple of questions that the Court had with
5   respect to the Coronado case.  In looking at that case, the
6   court went into a fairly in-depth discussion of prior
7   holdings, finding that an overriding royalty interest is an
8   interest in real property.  And the court appears to
9   distinguish those cases to this decision by saying that the
10  dispute over the ownership of the proceeds from the minerals
11  were in the ground, and that's why they were considered part
12  of the real property; they'd not yet been extracted from the
13  ground, which is when they become personal property, similar
14  to, under the UCC, as extracted coal becoming treated more
15  like inventory as opposed to part of the real property.

16       Your Honor, the coal at issue here is in the ground.
17  It's not been taken out of the ground as of yet.  So that's
18  one of the reasons that we believe this is a real property
19  interest.

20       Certainly the prior cases in Wyoming -- and I cite
21  the Court to the Connaghan v. Eighty-Eight Oil Company, which
22  is at 750 P.2d 1321.  There the court said -- citing a number
23  of different decisions -- "We have long held an overriding
24  royalty to be an interest in real property."

25       So if you take that as our starting point, the

Colloquy

1    question then becomes well, is this an overriding royalty

2    interest?  The debtor has said in their reply -- and I think

3    and in their oral argument -- that under Wyoming law, the

4    intention of the parties control.  That's in paragraph 20.

5    And you look to two things.  You look to the four corners of

6    the agreement and you look to the conduct of the parties.

7            Now, I understand the Court's questions with respect

8    to the agreement.  This does appear to have been drafted by

9    Mr. Organ many, many years ago.  The debtor has couched this

10   as a simple settlement agreement and nothing more, but

11   settlement agreements that I've drafted typically will say I

12   will pay you X in exchange for Y.  That's not what this says.

13   This --

14           THE COURT:  Isn't it exactly what it says?  They're

15   going to cancel the --

16           MR. PEARL:  I don't believe it does, Your Honor.

17           THE COURT:  -- note in exchange for these payments?

18           MR. PEARL:  It says I will accept the interests.  It

19   doesn't say I will accept payment.  It says I will accept the

20   interests.  I think the logical conclusion from that statement

21   is that's an interest in this land and in this royalty.  I

22   think that language was very intentional, Your Honor, and that

23   is what it says.

24           The debtor has spent some time talking about this not

25   being an agreement that was executed at the time that the

Colloquy

1    lease was executed.  There's no authority that says an

2    overriding royalty interest can only come at the time the

3    lease is executed.  There's nothing -- as Mr. Epps has said --

4    nothing to prevent the lessee from entering into such an

5    agreement at any point during the term of the lease, which is

6    essentially what's happened here.

7         THE COURT:  But don't you think that -- I mean, this

8    goes back to Mr. Paget's argument.  And I promised Mr. Epps I

9    was going to get back to him on this, and then I didn't -- but

10   if you're going through and you're searching the record

11   because you want to convey the lease, you want to make sure

12   that the assignment of the lease outside of bankruptcy, you're

13   actually getting a valid assignment, and there's no reference

14   to the lease anywhere in here, how in the world would you know

15   that your lease was encumbered?  Because it's not -- I mean,

16   the integration argument seems to me to be a pretty strong

17   one.

18        MR. PEARL:  Well, what's interesting, Your Honor, is

19   I guess you have to almost look to step 2, which is how the

20   parties treated this from the get-go.

21        THE COURT:  Well, I'm talking about a third party.

22        MR. PEARL:  I understand that.  Okay.  But this has

23   been through four or five different companies since Ayrshire

24   entered into this agreement, finally ending up with Alpha.  In

25   each instance, parties have paid the royalties pursuant to

Colloquy

1    this agreement.  They have treated it as a part of the entire

2    obligation due and owing under the lease.

3        Again, I think the second part of the test, how the

4    parties acted, how they treated it, they've treated it as an

5    interest in real property.  I don't think there's any question

6    about that.

7        And then, when you look to the debtors' own

8    pleadings, the schedules, their notice of redesignation,

9    everything calls this an overriding royalty agreement.  So if

10   you start with a proposition that an overriding royalty

11   agreement is a real property interest in Wyoming, and you

12   accept the language here drafted by Mr. Organ that the

13   acceptance of an interest -- it's not just an agreement for

14   payment for a settlement -- and you look to how the parties

15   have treated this since the agreement was entered into, I

16   think the only logical conclusion is that yes, it's an

17   overriding royalty agreement, and as a result of that, it

18   creates an interest in real property under Wyoming law.

19       THE COURT:  Okay.  Just so I could -- because I may

20   have missed something.  Maybe you can help me with that.  But

21   where does Mr. Organ use the word "overriding royalty" in --

22       MR. PEARL:  He does not -- he doesn't use -- he uses

23   the word "earned royalty".

24       THE COURT:  I know.  Which didn't make any sense to

25   me.

## Colloquy

1          MR. PEARL: Well, just a term of art back in 1969, as

2     I understand it. But if you look at what he's being granted

3     here, it can only be an overriding royalty, because the lessee

4     is agreeing to pay this particular percentage of a royalty

5     from coal that's mined pursuant to that particular lease. And

6     that's what an overriding royalty is.

7          THE COURT: All right.

8          MR. PEARL: So again, Your Honor, I think when you

9     take those two things together, I think if you take the

10    language as drafted by Mr. Organ back in 1969, which does not

11    talk about payment of a certain dollar amount in settlement of

12    claims, it talks about an acceptance of a particular interest,

13    and he says respecting certain coal interests as well, all in

14    the first paragraph of that letter; and then you look at how

15    the parties have treated it -- and we're talking about

16    multiple parties over the years -- I think the only conclusion

17    that you can draw, at the end of the day, is that yes, it's an

18    overriding royalty agreement, and under Wyoming law, it

19    creates an interest in real property.

20         I'm happy to entertain any questions the Court may

21    have.

22         THE COURT: All right. Thank you very much.

23         MR. PEARL: Thank you, Your Honor.

24         THE COURT: All right, Mr. --

25         MR. EPPS: Your Honor, may I impose upon the Court to

Colloquy

1    say one thing because I turn the podium back to Mr. Paget.

2              THE COURT:  Okay, one thing.

3              MR. EPPS:  One thing.

4              THE COURT:  One thing.

5              MR. EPPS:  Your Honor, I want to make sure that the

6    Court understands that we are not here seeking money from the

7    debtor.  We are seeking not to have the recorded override

8    agreement stricken.  This is not a damage claim.  So the

9    question of are we asking them for money now; the answer is

10   no.  I want to make sure the Court understands that.  We're

11   all current.

12             THE COURT:  Yeah, I understand.

13             MR. EPPS:  Okay.

14             THE COURT:  But they want to reject the --

15             MR. EPPS:  That's correct.

16             THE COURT:  -- agreement.

17             MR. EPPS:  But it's on a future basis only.

18             THE COURT:  Right.

19             MR. EPPS:  Yeah.

20             THE COURT:  And then you would be entitled to file a

21   lease rejection or a damage claim.

22             Are we done?

23             MR. EPPS:  I'm done, thank you.

24             THE COURT:  Okay, good.

25             Mr. Paget?

Colloquy

1          MR. PAGET:  Thank you, Your Honor.  Justin Paget on

2     behalf of the debtors.  I'll try and be brief, Your Honor, in

3     my reply, and just hit the high points.

4          One thing that Mr. Epps talked about was his

5     understanding of indexing in Wyoming.  And I have to admit,

6     I'm certainly not an expert on indexing and recording

7     documents in Wyoming, but I still don't understand it.  Here,

8     again, we're not talking about a burden on the real estate.

9     The original counterparty was a lessee.  The only interest

10    that could be granted, conceivably, would be an interest in

11    the lease.

12         So how, without mentioning it in the recording

13    document the lessee or the identity of the lease, anyone who

14    went and searched through the land records would know that the

15    lease is burdened?  I don't understand how you'd be able to

16    make that connection.  For instance, if this lease -- if the

17    federal lease had been given back, abandoned, and then a new

18    lease was entered into, how would anyone going to search the

19    land records know whether or not this recording burdened that

20    new lease?  You wouldn't know.

21         THE COURT:  Well, was Ayrshire Collieries Corporation

22    the lessee?

23         MR. PAGET:  Yes.

24         THE COURT:  Well, can't it burden its lease?

25         MR. PAGET:  I think, conceivably it could.

Colloquy

1            THE COURT:  Okay.

2            MR. PAGET:  But if Ayrshire had relinquished the

3    lease and a new party had entered into a different lease, a

4    new lease, with the United States government, and went to

5    search the land records to see if there was any sort of

6    burden, it would have no idea whether or not its lease -- and

7    particularly a future assignee of that new lease who was

8    searching the land records, would have no idea whether this

9    purported burden benefited an older lease or the newer lease.

10   You simply wouldn't know, because there's no reference to the

11   lease.

12           THE COURT:  Well, Mr. Epps said you don't need to

13   have a reference to the lease, all you have to do is file a

14   memorandum of agreement, apparently in the land records, and

15   then it attaches to the interest.

16           MR. PAGET:  I could see that attaching to the real

17   property, because you have a description of the property.  But

18   I think the key missing ingredient is that you don't have any

19   reference to the lease, so someone searching and looking for

20   this document would not be able to make any connection between

21   any purported interest under this document and the lease that

22   it purports to burden.

23           THE COURT:  All right.  Is this an override

24   agreement?

25           MR. PAGET:  I don't think it is, Your Honor.  The

Colloquy

1    term "overriding royalty" pre-dates this agreement.  There are
2    cases from the 1940s that mention the term.  And there's no
3    use of that term here.  And every case I've looked at where
4    the court says this is an overriding royalty, you have a
5    specific granting clause, a conveyance of an interest in a
6    lease.  The lease is referenced.  Typically it's identified by
7    lessor and by description.

8         But here you don't have that.  So that brings me to
9    the Coronado Oil case, which --

10        THE COURT:  Well, that's sort of what bothers me
11   here, is that there is no granting clause, and that -- I was
12   asking Mr. Epps that question, because if I read this letter
13   agreement, it does look like a settlement agreement and where
14   you have one party says I will accept the interest in exchange
15   for this.  And then you would expect, then, there would be
16   some sort of a closing, where you would actually do the things
17   that were here, where you would convey the interest, and you
18   would cancel the note or do whatever was going to happen.  Did
19   that ever occur in this case?

20        MR. PAGET:  Not to our knowledge, Your Honor.

21        THE COURT:  So this is the only thing we've got?

22        MR. PAGET:  I believe that's right.

23        THE COURT:  Okay.

24        MR. PAGET:  In every other case I've looked at, there
25   is that granting language, and it's clear that there is a

Colloquy

1   conveyance of an interest in the lease.  It's not what you

2   have here.

3         In Coronado Oil, now, this is an oil and gas case.

4   So there was specific language, again, referencing a lease,

5   and it used key terms called "net profits and the proceeds of

6   oil and gas saved and sold."  Now, I think that's significant

7   to the oil and gas industry, and I think that's why Coronado

8   Oil said well, this is a personal property right, it attaches

9   to the oil when it comes out of the ground, instead of a

10  personal contract.  Because that's the two options that the

11  Wyoming Supreme Court was down to in the discussion in

12  Coronado Oil, and that's the one it picked.

13        Importantly -- and I'll read you a quote from

14  Coronado Oil, they say:  "Nothing in this agreement purports

15  or can be read to give Coronado title to the minerals while

16  they are in situs or the right to bonus and delay rentals, the

17  traditional indicia of a mineral interest."

18        So what they're saying in Coronado is this is not an

19  interest in real property.  And certainly with the language

20  they had in Coronado Oil, with our language, I don't think you

21  get there.

22        The court in Coronado Oil distinguishes other cases

23  by the Wyoming Supreme Court where they involved quiet title

24  actions, which concerned real property interests, the

25  royalties that were granted by fee owners.  Again, that's why

## Colloquy

1   I think those cases are distinguishable, because here we have
2   a lessee, and I do not believe the Organs have any claim to
3   the real property.

4          So I think either -- first of all, I think if these
5   facts were before the Wyoming Supreme Court and they were
6   applying Coronado Oil, they'd say this is a personal contract.
7   But even if they were to say, in line with Coronado Oil, that
8   it's a personal property right, then I think the Walter Energy
9   case is helpful, because in that case the court said, okay,
10  under Alabama law, this royalty override -- and again, I don't
11  think we have a royalty override here -- but they said this
12  royalty override is a personal property right, and we think
13  that it can be rejected without regard to what happens in the
14  underlying lease.

15         Mr. Epps discussed the Bronco Hazelton case,
16  specifically two agreements, one of which was an employment
17  agreement that were entered into after the assignment of the
18  lease that was the subject of much discussion in that case.  I
19  don't think that there's much takeaway from that discussion,
20  for the following reasons.

21         It was an employment agreement.  There was no
22  analysis whatsoever -- we don't have any language from that
23  agreement.  The thrust of the analysis in Bronco Hazelton was
24  about the lease assignment, where there was clearly a grant of
25  a royalty override, unlike here.  It was not a case where the

Colloquy

1    debtors moved to reject.  So that issue is not before the
2    Court.

3           The employment agreement that Mr. Epps mentioned was
4    simply lumped in among the very specific analysis the Court
5    gave about royalty overrides in connection with the assignment
6    of the lease.

7           So and in addition, that case was not about, as I
8    said, moving to reject.  It was about whether they had an
9    admin claim.  So there's nothing in that case that tells us
10   whether or not the employment continued or whether there some
11   other reason that they were lumped together and given an admin
12   claim.  It was not -- the court did not look specifically at
13   those agreements in analyzing whether they could be rejected.

14          The other point I want to touch on, Your Honor, is
15   about whether or not this is an executory contract.  And I
16   think it doesn't -- at the end of the day, it doesn't matter.
17   We've treated it as such out of an abundance of caution.  I
18   think you can look at it and say that perhaps there were some
19   ongoing obligations on behalf of Mr. Organ.  But if it is
20   fully executed, then we think it is a wholly pre-petition
21   agreement, and any damages arising from breach would simply be
22   treated as pre-petition damages.  So we think that's not
23   really pertinent to the issue about whether the federal leases
24   in the settlement agreement are integrated.

25          Finally, Your Honor, there's been a lot of discussion

Colloquy

1    about how the parties treated this agreement over the years.

2    I don't think that that should be a part of the analysis.  I

3    think the Court should focus its analysis on the four corners.

4    There have been a lot of agreements that are as old or older

5    than this one that the company is reviewing and has determined

6    to reject it.  There's not been a bankruptcy before.  There's

7    not been an opportunity to go and do a thorough review of the

8    contracts and leases.  So I don't think the treatment of the

9    contract over the years is at all pertinent to the rejection

10   analysis under the Bankruptcy Code.

11            Unless, Your Honor has any questions?

12            THE COURT:  Thank you very much.

13            MR. PAGET:  Thank you.

14            MR. EPPS:  Your Honor, may I --

15            THE COURT:  I thought you already had your one thing?

16            MR. EPPS:  Well, I did until Mr. Paget raised an

17   issue.

18            THE COURT:  All right.

19            MR. EPPS:  Two quick things, Your Honor.  One with

20   regard to the Bronco Hazelton case.  I'm not sure that

21   Mr. Paget isn't slicing the ham too thin with regard to how he

22   shrugs off the two agreement which are a part of the Bronco

23   Hazelton case.

24            If you look at paragraphs 21 through 23 of the

25   opinion, appearing on pages 5 and 6, not only was there no

Colloquy

1    recorded document regarding the overrides granted to Nash and

2    Kerr, but one was for an employment agreement five years

3    later; the other was for past services fifteen years later.

4         Judge Lorch didn't have any problem with that.  And

5    to say that that was an afterthought of the main case, which

6    is what I understood Mr. Paget just to say, is clearly not

7    correct, because they may have not have had as much of a claim

8    in terms of dollars, but they got the same -- they raised the

9    same issue and they got the same treatment.  So I think that's

10   really an unfair statement of what happened in Bronco

11   Hazelton.

12        And the second thing is that when Mr. Paget says that

13   the conduct of the parties is of no relevance, I'd like to

14   quote him and you from yesterday's pleading by the debtors in

15   paragraph 20, in which they say, "The parties' intent is

16   determined by considering elements such as the subject matter

17   of the contract, a reasonable interpretation of the contract's

18   terms, and the conduct of the parties."

19        So I think Mr. Paget has contradicted himself on

20   that.  And I think the conduct of the parties over the forty-

21   six years is of relevance to the Court.  Thank you.

22        THE COURT:  All right, thank you very much.  All

23   right, this Court's going to take this matter under

24   advisement, and I'll issue a decision shortly.  Let's move on

25   to the next matter.

Colloquy

1      MR. PEARL:  Thank you, Your Honor.

2      THE COURT:  Thank you very much, Mr. Pearl.

3      MR. ELLMAN:  Your Honor, Jeffrey Ellman from Jones

4  Day, again, on behalf of the debtors.  I think the next matter

5  is on me again.  That's item 14, which is our motion to sell

6  the Knox Creek assets.  And although it's listed as contested

7  in the contested part of the agenda, I think that we have

8  resolved all of the known objections.

9      This is a request for relief under Sections 105(a),

10  363 and 365 to sell assets free and clear.  This request

11  actually goes back to October 22nd.  This is that very

12  original sale process motion I mentioned earlier, for the

13  inactive and noncore assets.  At the time there were no

14  stalking-horse buyers and we put the assets out for sale based

15  on the approved procedures and spent some time trying to

16  market the assets and implement the procedures.

17      They were fully marketed and with diligence and all

18  that.  But until today, we had not sold any assets under those

19  procedures.

20      The Knox Creek asset sale -- these were one of the

21  few sets of assets that at the time drew some interest that we

22  thought we could turn into a qualified bid.  At the time, in

23  the timeline that the Court established, we did not have a bid

24  for these assets that we could call "qualified", but we did

25  continue to work on creating a qualified bid by working with

Colloquy

1   the potential buyer, Ramaco, who is the buyer of the assets.

2          At the time we had an auction scheduled for January

3   27th, and we had, in accordance with the bidding procedures,

4   adjourned the auction and the potential hearing on a sale,

5   which we were permitted to do, to work on this.  And we had

6   hoped at the time -- I think I was here in January saying I

7   think we'll be back next month to get the sale approved, and

8   obviously it took a lot longer than that.  But we now have

9   something that's been finalized that we feel comfortable is an

10  appropriate sale.

11         So the Knox Creek assets are comprised of underground

12  metallurgical coal mining complex.  It's in Buchanan,

13  Tazewell, and Russell Counties in Virginia.  It's an inactive

14  mine.  That was why it was part of the inactive sale process.

15  It's not generating revenue.  There are holding costs.  And of

16  course it was in active mining at one point, so there are the

17  environmental and other liabilities that go along with the

18  assets.

19         The asset's not critical to the debtors' business

20  now.  It's not part of -- not expected to be part of our

21  business going forward under the plan.  Really, at the end of

22  the day, it's really just a burden on the estate.

23         So in the last few weeks, we were able to finalize a

24  revised purchase agreement with Ramaco Resources Land

25  Holdings, LLC.  We were able to qualify that revised purchase

Colloquy

1   agreement as a qualified bid under the bidding procedures.

2   That was done after consultation with the consultation

3   parties.  And in the absence of other qualified bids, we filed

4   a notice of successful bid.  And that was done more than five

5   business days before today's hearing, which again, that was

6   the rule under the procedures approved by the Court.  So we've

7   done that.

8           And we filed that with the black-lines of the

9   purchase agreement and the sale order compared to the forms we

10   filed back in January, and effectively sent people the notice

11   of the sale.  We sent out the adequate assurance documents

12   required by the procedures.  And we're moving forward on that

13   basis.

14          As far as the assets, we're talking about basically

15   owned property.  Leases and contracts and the permits are the

16   main assets here for this mining complex, free and clear under

17   Section 363(f).

18          The sale consideration here is a small amount of

19   cash, 100,000 dollars; and primarily the assumption of the

20   liabilities and reimbursement of the debtors of certain cure

21   amounts.  The major benefit, of course, Your Honor, being to

22   eliminate this nonproductive asset from the estate and save

23   the costs related to it and, of course, saving the cost of the

24   assigned contracts.

25          We believe that it is in the best interests of the

Colloquy

1  debtors' estates and creditors and that the debtors' judgment

2  supports that conclusion.

3         I guess also in support of that conclusion, yesterday

4  we filed a declaration in support of the sale, docket 2781.

5  And that was filed by the debtors, signed by Gideon Volschenk,

6  a director from Rothschild. Mr. Volschenk is here today, I

7  think, in the second row back there. And I was prepared to

8  summarize briefly his declaration, and that would be our

9  support for the findings and the relief today, if that please

10 the Court?

11        THE COURT: That'd be fine.

12        MR. ELLMAN: And this will be very brief, Your Honor.

13 Basically, the declaration describes the assets and the fact

14 that they are not needed for the restructuring, as I've

15 already mentioned, and they're a burden on the estates. It

16 describes the marketing process which was, in fact, extensive.

17 It describes briefly the limited interest in the market in

18 these assets and the effort to negotiate with the buyer on a

19 final contract. It supports the fairness of the overall

20 process, the compliance with the bidding procedures, including

21 consultation with the consultation parties.

22        It supports the conclusion that Ramaco's successful

23 bid was the highest and best bid and the only qualified bid.

24 The declaration describes the benefits of the sale, in

25 particular the assumption of liabilities, I've mentioned a

Colloquy

1    couple times now.  It provides that the total consideration is
2    fair and in the best interests of the debtors' estates.  It
3    supports good faith, arm's length.  It supports the conclusion
4    that there is no collusion.
5            Because, again, much of the value is in the
6    contracts, it supports the notion that the contracts are
7    critical to this sale and are not needed by the estate.  And
8    it finally supports the notion that the buyer has the
9    financial wherewithal to perform and ultimately the business
10   judgment of the debtors to proceed.
11           So again, Mr. Volschenk is here and would testify to
12   those things and the other things in his declaration.  And
13   with that, we'd move the declaration into evidence.  He's
14   obviously available for cross-examination, if there are
15   parties interested.
16           THE COURT:  Does any party wish to cross-examine the
17   proffered witness?
18           All right, the proffer is accepted.  The declaration
19   is admitted.
20   (Declaration of Gideon Volschenk in support of sale of Knox
21   Creek Mining Complex was hereby received into evidence as a
22   Debtors' exhibit, as of this date.)
23           MR. ELLMAN:  Thank you very much, Your Honor.  And so
24   with that, I would like to talk briefly about the objections
25   and how those were resolved.  And this does go back to the

Colloquy

1   original objection deadline in January.  And there were a

2   number of objections filed to the sale process at that time.

3   And we've done our best to go through and figure out which

4   ones might still apply to this sale, and we've talked to a

5   number of the objecting parties.  And we feel like we've

6   addressed all of the ones that could be relevant.

7           There was a supplemental objection deadline on June

8   24th.  Based on the filing of the notice on June 20th, we

9   again addressed all of those.  And we believe that there

10  should be no objections.

11          So I think the best way to talk about how we've

12  resolved these is probably to hand up a black-line of the

13  order.

14          THE COURT:  You may.

15          MR. ELLMAN:  If I could do that?

16          And so Your Honor, there's the normal updates, as

17  we've talked about, for all these kinds of orders, and

18  corrections.  And again, this is a black-line of just what we

19  filed on June 20th.  The June 20th filing has the black-line

20  showing all the changes to the form order.  But this is just

21  what's been done since then to resolve objections.

22          And really all the changes, I think, are pretty much

23  starting on page 16 with paragraph 24.  You'll see we have

24  basically four paragraphs that are there that are new.  And

25  this is where the objections are resolved.

Colloquy

1          So paragraph 24 addresses the objection of Coal

2    Mountain Mining Company and related lessors under a joint

3    lease.   And this paragraph's a long paragraph, but it

4    effectively addresses the cure obligations to the lessors and

5    the amounts payable by the debtors, and where applicable, some

6    of those amounts are reimbursable by the buyer.   And at the

7    end it addresses the debtors' responsibility to pay amounts

8    pending the closing.   And that's really all this paragraph

9    does is address cures.

10          THE COURT:  Oh, okay.  Very good.

11          MR. ELLMAN:  It's a lot of words to do that, but

12    that's all it does.

13          And paragraph 25 is the paragraph that deals with

14    resolving the objection of American Electric Power, AEP.  And

15    this relates to the treatment of a certain easement.  And this

16    short sentence really just makes clear that a certain right-

17    of-way agreement is an easement, it runs with the land, and it

18    survives the sale.  And that resolves the AEP objection.

19          The next paragraph, 26, is another cure issue.  This

20    establishes the cure amount for Norfolk Southern Railway

21    Company with respect to its contract.  Again, payable within

22    ten days of closing.

23          And then paragraph 27 is the last additional new

24    paragraph.  This one addresses objections of certain taxing

25    authorities and establishes -- these are taxing authorities

Colloquy

1    that have secured claims for personal property taxes and real

2    property taxes.  And effectively, this paragraph says we will

3    pay to each county the principal amount of the tax owed plus

4    agreed interest within ten business days of closing.

5          The parties were trying to but did not quite get to

6    the point where they finalized a calculation of interest, so

7    that's why it says an amount plus agreed interest.  We will

8    work with the counties to determine those amounts.  I assume

9    if there's some dispute, we might be back.  But I don't

10   imagine that will be a problem.  And so that, we believe,

11   should resolve the issues raised by Tazewell County and

12   Buchanan County.

13         And the last thing which is not in this document, but

14   for the record, we are going to amend Schedule 2.5 to the

15   purchase agreement.  And that is to deal with another cure

16   issue, a very small dollar.  It's lease BCL-243.  The

17   counterparty is Natural Resource Partners.  And we will modify

18   the schedule to reflect a cure of 159 dollars, roughly.  I

19   think it's just short of 159 dollars.  So it's a small dollar

20   issue, but for the record, we're going to do that.

21         THE COURT:  Excellent.

22         MR. ELLMAN:  And so with that, we would ask for this

23   motion to be approved.  I will say that we do hope to close

24   the sale this week, so if the Court is inclined to approve our

25   motion, we would ask that the order be signed promptly so we

Colloquy

1    could close within the next couple of days.

2         THE COURT:  Certainly.

3         MR. ELLMAN:  And with that, that's all I have, Your

4    Honor, unless you have questions.

5         THE COURT:  I don't have any questions for you.

6         Does any party wish to be heard in connection with

7    the order authorizing the sale of the debtors' assets relating

8    to the Knox Creek mining complex?  Mr. Epps?

9         MR. EPPS:  Your Honor, I'm co-counsel to Norfolk

10   Southern Pocahontas Land Corporation in this matter.  And I'm

11   authorized to say that the representations by Mr. Ellman are

12   correct.

13        THE COURT:  Excellent.

14        MR. EPPS:  Thank you.

15        THE COURT:  Thank you, sir.

16        MR. AMES:  Good morning, Your Honor.  Mark Ames

17   representing, in this case, Buchanan and Tazewell County

18   Treasurers.  And what Mr. Ellman has represented is correct.

19   We've reached a resolution, and just wasn't able to tease out

20   the penalties from the interest and the figures I was getting

21   from the Treasurers.  So we'll be able to get that done.  And

22   I guess those penalties end up --

23        THE COURT:  I'm sure that's just a matter of math.

24   And if you have a dispute --

25        MR. AMES:  Simple math.

Colloquy

1        THE COURT:  -- I'll be happy to try to work the math,
2    but --
3        MR. AMES:  Yeah.
4        THE COURT:  -- I'm confident you'll be able to work
5    it out.
6        MR. AMES:  I think we can get through that, Your
7    Honor.
8        THE COURT:  Excellent.  All right.  Thank you.
9        Any other party?  All right.  With those comments,
10   then, the motion is granted, and the Court will enter that
11   order.
12       MR. ELLMAN:  Thank you very much, Your Honor.
13       Your Honor, the next item on the agenda, it's not the
14   debtors' motion.  It's a motion for reconsideration of a prior
15   order of the Court.
16       THE COURT:  I always love these.
17       MR. FUNK:  Good morning, Your Honor.
18       THE COURT:  Good morning, Mr. Funk.
19       MR. FUNK:  Kevin Funk with the law firm of
20   DurretteCrump on behalf of Vaughn Groves, Frank Matras, and
21   Greg Blankenship.
22       If the Court will recall, we were here on May 31st on
23   the debtors' motion to terminate certain retiree programs.  At
24   the conclusion of that hearing -- and we had objected to that.
25   And --

Colloquy

1          THE COURT:  I recall.

2          MR. FUNK:  And at the conclusion of the hearing, we

3   asked that the Court either deny the motion, allow us to

4   conduct discovery on the motion, or possibly convert it to an

5   adversary proceeding.

6          At the time I failed to point out to the Court that

7   the relief that the debtor was requesting must be handled in

8   the context of an adversary proceeding.  They requested this

9   relief under 542.  Rule 7001 defines an adversary proceeding

10  to include actions for turnover of property from other than

11  the debtor.  And so clearly, it really crystalized in my head

12  after I read the order the following day, entered on June 1,

13  that this needed to be brought as an adversary proceeding.

14         I think we raised the substance of that at the May

15  31st hearing, but I wanted to clarify in a motion to

16  reconsider that Rule 7001 required this to be brought as an

17  adversary proceeding.

18         THE COURT:  It was a motion to terminate a

19  supplemental benefit plan.

20         MR. FUNK:  Yes.

21         THE COURT:  Okay.

22         MR. FUNK:  And we would have -- the defendants would

23  have had to include Bank of America and the participants in

24  that plan.  And so they would have had to name the plan

25  participants as defendants in the adversary proceeding.  So

Colloquy

1   that's why we were deprived of the due process requirements.

2         And the Congress --

3         THE COURT:  You were here and argued it.  How could

4   you be deprived of due process?

5         MR. FUNK:  Because we'd had no opportunity for

6   discovery.

7         THE COURT:  Well -- okay, Mr. Funk, what was there to

8   discover?  The debtor had a right to terminate the contract.

9         MR. FUNK:  The debtor had a right to terminate it

10  if -- and again, I realize the Court had a different

11  position -- took a different ruling -- but it is our position

12  that if we could prove that they had not qualified as a top --

13  it was not a top-hat plan at all -- that they would not have

14  had the right to terminate it.  And that's --

15        THE COURT:  But didn't I find the elements that it

16  was not a top-hat plan?  I mean, it seemed to be --

17        MR. FUNK:  Yes.

18        THE COURT:  -- a relatively easy question.

19        MR. FUNK:  Well, we don't think so.  Because we think

20  that if we had been allowed to conduct discovery, what we

21  would have wanted to know in discovery was what was the role

22  of the sixty-some participants in this plan and their role

23  in -- and their job duties and their abilities to craft their

24  own compensation within Alpha Natural Resources.

25        THE COURT:  Sixty out of over 3,000.

Colloquy

1       MR. FUNK:  That goes to the quantitative aspect of a
2   top-hat plan.  It doesn't go to the qualitative aspect of a
3   top-hat plan.  Because the Court has said not only does it
4   have to be a small group, not only do they have to be highly
5   compensated, which I think is an issue as well, but they also
6   have to be in a position of significance within the company to
7   craft their own compensation plan.

8       So let's say that you had a mining engineer who was
9   highly compensated.  The question is, is he in a position
10  within the company that he can craft his own compensation
11  plan?  Can he go to the head of HR and say you know what,
12  here's how I'd like to handle my compensation?  And we don't
13  know that with respect to all sixty of those employees.

14      What we also know with respect to the compensation
15  aspect, is that the mean -- this is in the declaration that
16  was filed the day before the hearing -- the mean income was
17  250,000 dollars.  We know that there were members in that
18  class of sixty-some participants that earned over two million
19  dollars.  So that suggests that there have to be people well
20  below the 250,000 mean in that group of sixty.

21      I don't know how far down the income went.  I don't
22  know what those people -- those sixty people, all of them,
23  did.  And so that's what we wanted to know in discovery.

24      The motion was filed eighteen days before the
25  hearing.  Now, I know they said in the response to my motion

Colloquy

1    to reconsider that, well, we could have done discovery.  A

2    request for production of documents and interrogatory allows

3    thirty days to respond.

4         THE COURT:  Not if you file a motion asking for

5    authority to shorten the time.

6         MR. FUNK:  Well, yes, we could have done that.  But

7    we also -- if Rule 7001 is to be given effect, then we had a

8    right to a summons and a notice and an -- it would have been

9    set down for a pre-trial conference.  A scheduling order would

10   have been entered.  And in one of the cases -- it was

11   interesting.  In one of the cases that the debtor cites in its

12   response -- and I think that's the E-Z Convenience Stores

13   case -- I can't find it right now -- that one, the court said

14   that due process requires not just notice, but the degree of

15   notice that the rules entitle you to.

16        So 7001 says this has to be an adversary proceeding.

17   Okay.  It's an adversary proceeding; I was entitled to -- my

18   clients were entitled to thirty days' notice prior to

19   answering.  The fact that we got eighteen days' notice does

20   not satisfy the due process notice requirements because the

21   federal judiciary said we get thirty days if it has to be an

22   adversary proceeding.  And this had to be an adversary

23   proceeding, because the defendants, my clients -- I'm sorry;

24   my clients would have been defendants in there, and the reason

25   is that Congress gave participants in a pension plan, not just

Colloquy

1    beneficiaries, standing to protect their rights.  And that's

2    in 29 U.S.C. 1132.  And it refers to participants or

3    beneficiaries have standing.

4          So the fact that we made -- the participants, the

5    people like my client may not have had a beneficial

6    interest -- they clearly didn't have the legal interest --

7    even if they don't have the beneficial interest, they're

8    participants, and Congress gave them the right to protect

9    their interests in Section 1132.

10         Now, Congress admittedly exempted top hat plans from

11   certain requirements of ERISA, but that -- they exempted them

12   from the vesting and the fiduciary protections in ERISA.  And

13   every court that I have found that's taken up the issue says

14   that the enforcement provisions of ERISA, which is 1132, apply

15   to top hat plans.  And there are case -- there's a case from

16   the Third Circuit, and the Seventh Circuit that specifically

17   say that the enforcement provisions of ERISA are subject to --

18   or top hat plans are subject to the enforcement provisions of

19   ERISA.

20         So my clients, as participants, have a right, a legal

21   standing, to assert their interest, and if they were going to

22   be defendants in that proceeding, then they had -- then it has

23   to be handled in the context of a Rule 7001 adversary

24   proceeding.

25         I'm happy to answer any questions, Your Honor.

Colloquy

1    THE COURT: All right. Thank you. Does the debtor
2  wish to reply?

3    MR. BLACK: Very briefly, Your Honor.

4    The prior motion, when we were asking for authority
5  out of abundance of caution to terminate the plans, the
6  company possessed that authority under those documents.

7    The hook to counsel's relying upon is the return of
8  the money from the Rabbi trust. We had negotiated with the
9  trustee before we ever filed the motion to have those monies
10  returned in accordance with the terms of the agreement. The
11  agreement, and the motion, was simply the mechanism to get
12  that accomplished and to make the trustee comfortable that it
13  was done appropriately. It was not -- 542 is really a
14  provision that says if someone else has the estate's money,
15  they need to give it back. The trustee was willing to give
16  that money back, but wanted some sort of --

17    THE COURT: Comfort order.

18    MR. BLACK: -- comfort order.

19    I have nothing further, Your Honor.

20    THE COURT: Thank you very much.

21    All right, Mr. Funk, the court has already considered
22  this in great detail, and I'm not going to revisit it now. I
23  really think that the turnover matter is a red herring. I'm
24  not going to grant your motion. It will be denied.

25    All right. Mr. Black, will you please submit an

Colloquy

1   order?

2          MR. FUNK:  Thank you, Your Honor.

3          THE COURT:  Thank you.

4          MR. BLACK:  Your Honor, the next item on the agenda

5   is a matter -- a motion by the creditor Mar-Bow Value

6   Partners.

7          THE COURT:  All right.  Why don't we take a brief

8   five-minute recess, and then we'll come back and hear that

9   matter?

10         THE CLERK:  All rise.

11      (Recess from 11:49 a.m. until 11:57 a.m.)

12         THE CLERK:  All rise.  Court is now in session.

13   Please be seated and come to order.

14         THE COURT OFFICER:  Item 16, motion of creditor Mar-

15   Bow Value Partners to compel McKinsey Recovery and

16   Transformation Services.

17         MR. VAN ARSDALE:  Your Honor, the partners has

18   graciously allowed me to take less than a minute at the start

19   of this hearing.

20         It appears that Jay Alix wants the United States

21   Trustee to object to every retention application McKinsey ever

22   files.  And now, it appears that McKinsey wants the United

23   States Trustee to do the same with respect to Jay Alix.

24         Instead, the United States --

25         THE COURT:  Does that resolve it?

86

Colloquy

1        MR. VAN ARSDALE:  I'm sorry?

2        THE COURT:  Does that resolve it?

3        MR. VAN ARSDALE:  I think it may resolve it as far as

4   our participation in this -- further in this hearing.  And

5   instead, the United States Trustee would continue to bring

6   reasons, objections, to the Court, and we think that a

7   professional applicant has not made disclosures necessary to

8   satisfy the rule requirements.

9        We will continue to do our duty as an independent

10   watchdog, and faithfully apply the law to the particular facts

11   presented in the case.  And when someone brings a matter to

12   our attention where there might be a problem, the United

13   States Trustee will make an independent inquiry into the

14   matter and act or not act according to the results of that

15   inquiry, and the requirements of the Code and the Rules.

16   That's what we do.  That's what we will continue to do.  Thank

17   you.

18        THE COURT:  All right.  Is that helpful?

19        MR. VAN ARSDALE:  It was to us.

20        THE COURT:  I know.  I understand.  I understand.

21   All right.  Very good.  Mr. Ruby?

22        MR. RUBY:  Good morning, Your Honor.  David Ruby on

23   behalf of Mar-Bow Value Partners LLC.  Your Honor, if it

24   please the Court, we have a number of pro hac vice motions

25   that are pending before the Court, and I'd like --

Colloquy

1          THE COURT:  I believe I've already entered those this

2    morning, early.  They may not have hit the docket yet, but

3    I've entered the orders.

4          MR. RUBY:  Thank you, Your Honor.  I'd like to

5    introduce those people, and the people at counsel table.

6    Steven Rhodes, Your Honor.

7          THE COURT:  I don't know that you need to introduce

8    them.  I think I know who they are.

9          MR. RUBY:  Okay.  Your Honor, Steven Rhodes will be

10   appearing, Judith Fitzgerald, and Steven Biskupic and also,

11   Your Honor, Jay Alix on behalf of Mar-Bow.

12          Your Honor, Mr. Rhodes will be making the

13   presentation for Mar-Bow Partners.

14          THE COURT:  All right.  Thank you.

15          MR. RUBY:  Thank you, Your Honor.

16          THE COURT:  Welcome to Virginia.

17          MR. RHODES:  Thank you.

18          Good morning.  May it please the Court.  Steven

19   Rhodes on behalf of Mar-Bow Value Partners LLC.

20          I'd like to begin by setting the legal stage for our

21   motion here this morning.  As we all know, Section 327 allows

22   the employment of a professional by the estate only if the

23   professional is disinterested and does not hold, or represent,

24   an interest that is adverse to the estate.

25          Rule 2014 provides that an application for the

## Colloquy

1    approval of employment shall be accompanied by a verified

2    statement of the person to be employed setting forth the

3    person's connections with the debtor, creditors, any other

4    party-in-interest, their respective attorneys and accountants,

5    United States Trustee, or any person employed by the Office of

6    the United States Trustee.

7         As this Court succinctly stated in Lewis Road,

8    Section 327 is implemented by Rule 2014 of the Federal Rules

9    of Bankruptcy Procedure.

10        Bankruptcy Judge Walrath in Delaware stated this in

11   the In re eToys, Inc. case in 2005, "The duty to disclose

12   under Bankruptcy Rule 2014 is considered sacrosanct, because

13   the complete and candid disclosure by an attorney seeking

14   employment is indispensable to the court's discharge of its

15   duty to assure the attorneys' eligibility for employment under

16   Section 327(a), and to make an informed decision about whether

17   the engagement is in the best interest in the estate."

18        And similarly, the First Circuit in 1994 in the Rome

19   v. Braunstein case said, "These statutory provisions

20   prohibiting conflicting interest in bankruptcy serve the

21   important policy of ensuring that all professionals appointed

22   pursuant to Section 327(a) tender undivided loyalty, and

23   provide untainted advice and assistance."

24        And we have two cases from the Seventh Circuit;

25   Gellene and Crivello.

Colloquy

1       In Gellene, in 1999, the court stated, "This

2   procedure is designed to ensure that a disinterested person is

3   chosen to represent the debtor.  The requirement goes to the

4   heart of the integrity of the administration of the bankruptcy

5   estate.  The Code reflects Congress' concern that any person

6   who might possess, or assert an interest, or have a

7   predisposition that would reduce the value of the estate, or

8   delay its administration ought not have a professional

9   relationship with the estate."

10      In Crivello, in 1998, the Seventh Circuit said,

11  "Despite the seriousness of this responsibility" referring to

12  the responsibility to ensure the integrity of the

13  administration of the bankruptcy estate, the court pointed

14  out, "bankruptcy courts must rely on self-reporting from

15  debtors' professionals, and the information obtained in

16  objections from the United States Trustee's office, or other

17  interested parties."

18      It said, "Bankruptcy courts have neither the

19  resources nor the time to investigate the veracity of the

20  information submitted, and to root out the existence of

21  undisclosed conflicts of interest."

22      So there, the court points out that creditors like

23  Mar-Bow have not just standing, but an invitation, perhaps,

24  even a responsibility to report these matters to the court.

25  So what is it that must be disclosed?

## Colloquy

1       Again, this Court in Lewis Roads (sic) said it quite
2   cogently, "Disclosures made pursuant to Rule 2014 'must be
3   explicit enough for the court and other parties to gauge
4   whether the person to be employed is not disinterested or
5   holds an adverse interest'".  And continuing, the court said,
6   "Debtors-in-possession and their attorneys must be meticulous
7   in disclosing 'all connections' with the debtor and other
8   parties-in-interest, and the failure to do so justifies a
9   court in taking significant, punitive, or corrective action."
10  And of course, it is exactly that corrective action that we
11  seek here.

12      And let's take a slightly deeper dive into Lewis --
13  the Lewis Road case.  In that case, the debtors' employment
14  application for the attorney disclosed, "Proposed counsel has
15  connections with a creditor."  Exactly the kinds of
16  disclosures that we had in this case, and this Court rejected
17  that.  It said, "Counsel did not disclose with whom it held
18  connections, nor did it describe what those connections were
19  in its application."

20      And then later, "The purported disclosure that was
21  made was woefully inadequate, and not in compliance with the
22  requirement that the disclosure be explicit enough for the
23  Court and other parties to gauge whether the person to be
24  employed is not disinterested or holds an adverse interest."
25  And it is exactly those findings that are appropriate in this

Colloquy

1    case, and that we ask the Court to make.

2        Similarly, in the First Circuit BAP opinion in In re

3    San Juan Hotel (sic) in 1999 the court stated, "The

4    disclosures must be explicit and complete.  Coy or incomplete

5    disclosures which leave the Court to ferret out pertinent

6    information from other sources are not sufficient."

7        And the Fifth Circuit in 2012 in the American

8    International Refinery case said that, "The disclosure

9    requirements of Rule 2014 are broader than the rules governing

10   disqualification and an applicant must disclose all

11   connections, regardless of whether they are sufficient to rise

12   to the level of a disqualifying interest under Section

13   327(a)."

14       And quoting again from the Rome case that I mentioned

15   earlier, "The decision should not be left to counsel whose

16   judgment may be clouded by the benefits of the potential

17   employment."

18       And that same court said, "The professional cannot

19   usurp the Court's function by choosing ipse dixit which

20   connections impact disinterestedness and which do not.  The

21   existence of an arguable conflict must be disclosed if only to

22   be explained away."

23       And in what may be the most similar case, In re

24   Leslie Fay Companies, Judge Brozman from the Southern District

25   of New York in 1994, dealt with a declaration that included

Colloquy

1    what she called, "boilerplate language to the effect that Weil
2    Gotshal may have, in the past, represented, currently
3    represents, and may, in the future, represent entities which
4    are claimants of the debtor."

5         Again, very familiar sounding language comparing it
6    to what McKinsey has disclosed here.  And in response, Judge
7    Brozman said, "This was insufficient to alert the Court to
8    Weil Gotshal's representation of a creditor which was high on
9    the list of the debtors' twenty largest creditors, from which
10   list a creditors' committee is normally selected.

11        "The boilerplate is reasonable to cover inadvertent
12   failures to disclose insignificant connections.  It is not an
13   adequate substitute for a disclosure of representation of
14   known and significant creditors.  To rule any other way would
15   be to eviscerate the disclosure requirements of Rule 2014(a)."

16        And as the Third Circuit noted in 2002 in the
17   Pillowtex case, "When a professional conceals the identities
18   of its connections, it is impossible for the court to
19   determine whether 'it is likely that a professional will be
20   placed in a position permitting it to favor one interest over
21   an impermissibly conflicting interest so that a conflict of
22   interest is considered actual and hence, per se
23   disqualifying."

24        So does McKinsey comply with Rule 2014?  Well, before
25   we dive into that, let's talk about who McKinsey is.

Colloquy

1          It is the largest consulting firm in the world.  It

2    has 108 offices in over 60 countries around the world.  It

3    reportedly had 8.3 billion dollars in revenues in 2014, with

4    20,500 employees.  It reportedly serves 147 of the world's

5    largest -- the world's 200 largest corporations, and it serves

6    80 of the top 120 financial services and banking firms; two-

7    thirds.  It has 30,000 alumni.

8          If it were a law firm, Your Honor, it would be five

9    times the size of Jones Day.  It would also be what we in the

10   bankruptcy world call a "creditor firm."

11         On its Web site it proclaims, however, "Our firm is

12   designed to operate as one.  We are a single global

13   partnership."

14         Now, among the affiliates of McKinsey is the McKinsey

15   Investment Office which invests pension and investment funds

16   for McKinsey's employees and its partners.  It invests in

17   securities, hedge funds, venture capital firms, et cetera,

18   around the world.  And we know from the disclosures here that

19   McKinsey RTS employees are on the board of the MIO.

20         We've seen reports that the assets of MIO total

21   anywhere between nine billion and twenty-three billion

22   dollars.

23         What else do we know about McKinsey?  It holds out

24   that it maintains a strict policy of confidentiality regarding

25   its clients.  Its Web site proclaims, "We guard client

Colloquy

1    confidences." And then again, "We don't publicize our work

2    for our clients."

3          Now, the McKinsey we know today came about as the

4    result of the work of Marvin Bower. Now, Mr. Bower was not

5    the founder of McKinsey. That was James McKinsey, but he was

6    the one that set it on the path to grow into the dominant

7    business consulting firm that it has become around the world.

8          When he came in, it was a small engineering and

9    accounting firm, but he turned it into a very successful

10   business consulting firm, the first of its kind in the world,

11   and now, as we know, the largest. He was a graduate of the

12   Harvard Law School, and of the Harvard Business School, and

13   also, coincidentally, an alum of Jones Day.

14         The code of ethics that he promoted included this

15   commitment to confidentiality, and as a result, McKinsey never

16   talks about its clients. Its clients can talk about McKinsey,

17   and some of them have but McKinsey never talks about its

18   clients. He was the visionary business leader that created

19   the McKinsey of today.

20         Does McKinsey comply with Rule 2014? It does not.

21   It does not. It admits that it doesn't comply.

22         Its opposition to our motion, if you read it

23   carefully, never claims that it complies with Rule 2014. It

24   never says we comply. In fact, Your Honor, in the ten Chapter

25   11 cases that it has been involved in spanning fifteen years,

Colloquy

1    including the first ten months into this case, until it filed

2    its third supplemental declaration in this case, just thirty-

3    nine days ago, McKinsey had never disclosed the identity of a

4    single connection in any case, never.

5         Finally, thirty-nine days ago, it disclosed the

6    identities of seventeen of its clients who gave permission.

7    Seventeen out of at least 138, and we think many, many more.

8    It still has not complied with Rule 2014.

9         If it has 138 connections, which we think is a very

10   low number, but if it has that number and it's only disclosed

11   17, that means 88 percent of its admitted connections in the

12   case remain undisclosed; 88 percent, but there are other

13   connections, including as our reply brief pointed out, a

14   connection with the United States Department of Justice.  We

15   have no information whatsoever about McKinsey's connections

16   through the MIO, the McKinsey Investment Office, with its

17   billions of dollars in assets.

18        Does the MIO invest in the coal industry?  Does it

19   invest in any creditors of the debtor?  Does it invest in any

20   asset purchasers of the debtors' various assets?  Does it

21   invest in any of ANR's competitors?  We don't know any of this

22   one way or the other.

23        What are McKinsey's relationships with the attorneys

24   in this case, or other professionals?  Again, totally

25   undisclosed.

Colloquy

1          We do know one connection there, though, Your Honor,

2    and the reason we know is because that professional disclosed

3    their connection with McKinsey, not because McKinsey disclosed

4    the connection; that was Jones Day.  Jones Day disclosed that

5    it is a client of McKinsey, and that McKinsey is a client of

6    Jones Day.

7          Most distressing is we know that one of McKinsey's

8    creditor connections pays McKinsey in excess of eighty-million

9    dollars a year for its services.  We know that because

10   McKinsey disclosed that this creditor is over one percent, and

11   one percent of eight billion is eighty million.  But we

12   suspect there are many more connections that even McKinsey has

13   not been able to gather because its search processes are so

14   inadequate.  Regardless, this level of nondisclosure that even

15   McKinsey admits is unprecedented in the history of modern

16   bankruptcy.  So let's just talk very briefly about the

17   inadequacy of McKinsey search processes.  I don't want to dive

18   into the weeds of this because we'll get bogged down really

19   fast.

20         McKinsey has some kind of a global database, but it

21   admits that that global database is not sufficient for its

22   compliance with Rule 2014, and that's why it uses the e-mail

23   system that it uses, and that it finally described for us in

24   detail in its response to our motion.  But we know the global

25   database is insufficient, because they admit that, but the

Colloquy

1   e-mail system is inadequate to plug the holes in it, because

2   the e-mail system relies on a series of assumptions which we

3   laid out in our initial motion and again, in our reply.  And

4   those assumptions are just not reasonable assumptions.

5           So for example, it assumes that everyone who gets the

6   e-mail responds to it, 20,500.  What we're never told, by the

7   way, is what the response rate is to that e-mail survey.  We

8   don't know whether it's five percent, ten percent, or anything

9   approaching a hundred percent.

10          And the law here is clear, Your Honor.  Judge Teel in

11  the Ellipso case in Washington in 2011, and Judge Adler in the

12  Thrifty Oil Company case in the Southern District of

13  California in 1997 both said that disclosure is based on

14  inadequate searching do not comply with the requirements of

15  2014.

16          And frankly, Your Honor, this is incomprehensible to

17  us.  We don't understand this because there is a McKinsey

18  affiliate called McKinsey Digital, and if you go on McKinsey

19  Digital's Web site, you see that it markets itself based on

20  its ability to provide technological and computer-based

21  solutions for operational issues.

22          McKinsey's process for providing the Court with

23  supplemental disclosures, it has a continuing obligation; its

24  supplemental disclosure process is equally inadequate for the

25  same reason that its e-mail and computer-based systems are

Colloquy

1   inadequate.

2          So why do disclosures, or the lack of disclosures in

3   this case matter?  The absence of disclosure raises questions.

4   Are any of the banks that are secured creditors in this case

5   McKinsey clients?  We know that 80 of the biggest 120 banks

6   are.  Which of them are secured creditors in this case?  Are

7   any McKinsey clients purchasing core assets in this case in

8   transactions that McKinsey is negotiating on behalf of the

9   debtor?  We don't know that.

10         We know that the plan calls for the banks that are

11  secured creditors to purchase the assets, but we don't know

12  McKinsey's connection with those banks.  And as I said

13  earlier, we don't know whether MIO, the investment office,

14  owns any stock or debt of creditors, competitors, or asset

15  purchasers.  So what are the consequences of not acting in

16  this case?

17         The last thing this Court, or anyone here, would want

18  is for the transactions that this Court approves in this case

19  to become tainted, or even to be called into question because

20  of some undisclosed McKinsey connection that gets disclosed

21  later.  Your Honor, that's exactly what happened in the Lewis

22  Road case, and we want to avoid that.

23         Your Honor, McKinsey is a fiduciary.  A fiduciary is

24  someone who has undertaken an act for another in circumstances

25  which give rise to a relationship of trust, and of confidence.

Colloquy

1          A fiduciary duty is the highest standard of care in
2     law and in equity.

3          A fiduciary has an obligation of loyalty to place the
4     interest of another ahead of self-interest.

5          For a fiduciary, the ethics of the ordinary
6     marketplace don't apply.  The responsibilities created under
7     ordinary contract law, or tort law, are not the
8     responsibilities of a fiduciary.

9          In our society, a fiduciary is an honored position
10    because it means that others have determined to have trust and
11    confidence in the fiduciary's judgment and conduct.

12         And I want to say, Your Honor, that Marvin Bower
13    recognized this.  The New York Times said of him when he
14    passed away in 2003, "Mr. Bower stressed integrity.
15    Consultants, he maintained, must always put the interest of a
16    client ahead of McKinsey's own revenue."

17         And here are a couple of my favorite quotes from him.
18    "There is no such thing as business ethics," he said, "there
19    is only one kind.  You have to adhere" -- "you have to
20    adhere," he said, "to the highest standards."

21         And then he said, "If you are not willing to take
22    pain, to live by your principles, there's no point in having
23    principles."

24         And so I ask what would Marvin Bower think of what
25    the present day McKinsey, and McKinsey RTS, have done with

Colloquy

1    their fiduciary obligations in this Chapter 11 case?  Would he

2    tolerate it?

3         Marvin Bower would recognize that his beloved firm

4    has only two choices here.  As a lawyer himself, an alum of

5    Jones Day, he would say there's no higher principle than the

6    law, especially no higher principle than the law that imposes

7    a fiduciary obligation on my firm.  McKinsey will live by that

8    principle, and McKinsey will take the pain for it.  If the

9    bankruptcy law requires disclosure of our clients, then we

10   will take the pain that results from complying with the law,

11   and in making the required disclosures of our clients.

12        On the other hand, he has another choice.  As a

13   business consultant and graduate of the Harvard Business

14   School, and as a true American business leader who was

15   ethically committed to the confidentiality of his clients, he

16   would say fulfilling McKinsey's commitments to our existing

17   consulting clients is our highest principle.

18        McKinsey will live by that principle, and McKinsey

19   will take the pain that results from it.  If the bankruptcy

20   law requires disclosure of our clients, we will take the pain

21   that results from keeping our client's confidences, and if

22   that means -- if that means forgoing bankruptcy business, so

23   be it.  But Your Honor, what he would never say is this.

24   Let's see what we can get away with.  If anyone complains,

25   we'll deal with it later.  Let's see what minimal disclosure

Colloquy

1   we can get away with.  Let's see what few clients' names we

2   can give them.  Let's see what a tax we might make stick if

3   someone raises the question.  After all, there's a lot of

4   money at stake for us here.  Never.  Never would he have said

5   that.  Nor, Your Honor, would he blame Jay Alix for having to

6   make this choice.

7          He would recognize that it is the law, and McKinsey's

8   own principles that require that choice.  Which of the two

9   choices would he make?  I don't know that, of course, but I do

10  know this, either is fine.

11         In our country, McKinsey is perfectly free to compete

12  in the marketplace for professional bankruptcy services on a

13  level playing field and with a commitment to the rule of law

14  just like all other bankruptcy professionals.

15         We have asked the Court to compel this fiduciary,

16  McKinsey, to disclose its connections so that everyone in the

17  case, including Mar-Bow, can have confidence in its loyalty,

18  and in the integrity of the Court's process.

19         We also ask this relief so that the Court can fulfill

20  its ongoing responsibility in this regard.

21         So what response do we get?  What response do we get

22  from this fiduciary that has put 1,708 -- 17,800 hours into

23  the case?  This fiduciary that is deeply involved in

24  negotiating with creditors who will testify in this court in

25  support of the debtors' plan, and whose loyalty to creditors

Colloquy

1   are supposed to trust.  What is that response?  Here's what we

2   got, Your Honor.

3         The motion is not timely.  Waiver.  Laches.  Rule

4   2019.  The Alix protocol.  Lack of standing.  Law of the case.

5   Anticompetitive.  No expert testimony.  McKinsey's role is too

6   small to have any conflicts.  Let's change Rule 2014.  And the

7   motion identifies no conflicts of interest.  For the record,

8   none of these have the slightest merit, but I'm going to rely

9   on my reply brief to respond to them.

10        But much more important than those is this question.

11  Are those the defenses that we expect of a fiduciary?  A

12  fiduciary who first -- whose first, and only obligation is to

13  protect the beneficiaries of this bankruptcy estate, and to

14  assist this bankruptcy court and not to protect itself.

15        How about this one sentence response instead?  Your

16  Honor, we recognize that McKinsey is a fiduciary in this

17  estate that its stake holders have to be able to trust, so of

18  course we will fully comply with Bankruptcy Rule 2014, and

19  with the Court's permission, we'll do so by X date.

20        McKinsey's defenses here, Your Honor, are all

21  irrelevant distractions.  They are distractions because the

22  only real issue is this; has McKinsey complied with Rule 2014?

23  They are irrelevant.  None of them matter.  None of them

24  matter.  Why?  Because regardless of all of those defenses,

25  three points will remain.  Rule 2014 requires the full

Colloquy

1  disclosure of all connections, and it is mandatory, it is not
2  discretionary.
3         Number two, McKinsey has not complied with Rule 2014
4  as it has admitted.
5         And number three, this Court has an independent and
6  ongoing responsibility to enforce Rule 2014 because it has an
7  independent and ongoing responsibility to protect the
8  integrity of its process.
9         None of McKinsey's defenses matter, Your Honor.
10  Would any of them have mattered to this Court in the Lewis
11  Road case?  I don't think so.  We urge the Court to ignore
12  McKinsey's irrelevant distractions.
13         And let me make this observation.  If McKinsey were a
14  law firm -- let's create this hypothetical world for a moment;
15  it's instructive -- if McKinsey were a law firm that
16  represented two-thirds of the world's largest 120 banks, would
17  this Court allow it to represent the ANR estate while
18  disclosing only 12 percent of its creditor connections?  Of
19  course not.  It matters not to Section 327, or Rule 2014, that
20  instead, McKinsey is a turnaround advisor.
21         The rules are the same for all estate professionals,
22  and let me extend the observation.  Would this Court let
23  McKinsey -- the law firm, McKinsey, form a separate subsidiary
24  to do its debtor work in order to shield it from the
25  requirement to disclose its much more significant bank

Colloquy

1  representation?  Of course not.  Why?  Because as McKinsey's
2  Web site says, "Our firm is designed to operate as one.  We
3  are a single global partnership."

4        In conclusion, Your Honor, let me say this; it's past
5  time for McKinsey to act like the fiduciary that it is.  It's
6  past time for McKinsey to act with full loyalty to this
7  bankruptcy estate putting the interest of the beneficiaries of
8  this estate ahead of its own and to do that by complying with
9  Rule 2014 and to disclose its connections, and it's past time
10 for McKinsey to act with a generous and cooperative, and
11 professional spirit in assisting this Court to fulfill its
12 fundamental and ongoing responsibility to maintain the
13 integrity of its process.

14        Is there anything more important for this Court to do
15 in any case?  Is there anything more important for McKinsey to
16 do in this case?

17        Now, I predict, Your Honor, that counsel for McKinsey
18 will not want to talk about McKinsey.  He'll want to talk
19 about Jay Alix.  Jay Alix this, Jay Alix that, Jay Alix
20 something else.  We urge the Court not to let that happen.

21        We challenge McKinsey's lawyers here to talk about
22 McKinsey's obligations here, and to talk about McKinsey's
23 conduct here.  McKinsey is accountable to this Court for its
24 conduct.  It is accountable to this Court for its conduct at
25 all times, and in all circumstances, and no matter who raises

1   a question about it.  So let's ask McKinsey to talk about

2   McKinsey.

3           McKinsey ought to be able to do that, Your Honor.  It

4   has had almost two years to think about what it's going to say

5   today.  To think about what it's going to say now that it has

6   been finally called to account, because in September of 2014,

7   Dominic Barton, the CEO of McKinsey, was advised that someday,

8   a day of accounting on this very issue would come.  Today is

9   that day.  So let's ask McKinsey to talk about McKinsey.

10          And so it is, Your Honor, we ask for this relief.  We

11  ask the Court or order McKinsey to disclose its connections,

12  to comply with the Bankruptcy Rule.  We leave, of course, to

13  the Court's discretion whatever deadline the Court thinks is

14  appropriate.

15          We also think that it is appropriate in the

16  circumstances to suspend any consideration of McKinsey's fees,

17  and any consideration of giving an exculpation in this case,

18  whether through the plan or otherwise, until the Court is

19  satisfied that McKinsey has fully disclosed its connections.

20  Thank you, Your Honor.

21          THE COURT:  Thank you, Mr. Rhodes.

22          MR. PERKINS:  Afternoon, Your Honor.

23          THE COURT:  Hello, Mr. Perkins.

24          MR. PERKINS:  Chris Perkins for McKinsey Recovery &

25  Transformation Services (U.S.), LLC.  My cocounsel, Mr.

Colloquy

1    Bienenstock has been admitted pro hac vice and will address

2    the motion.

3              THE COURT:  All right.  Very good.  Mr. Bienenstock?

4              MR. BIENENSTOCK:  Thank you, Your Honor.  Good

5    morning.  My name is Martin Bienenstock of Proskauer Rose LLP.

6    We represent McKinsey RTS in this case.

7              Your Honor, the relief we request is the denial of

8    the Mar-Bow motion filed June 6, 2016.  We have a few points

9    of agreement with Mar-Bow.

10             All professionals retained by the court order are

11   subject to the same rules, and there's no special treatment

12   for McKinsey RTS, Alvarez, Rothschild and Protiviti, Jeffries,

13   or anyone else.

14             The McKinsey RTS response provides procedural and

15   substantive grounds to deny the Mar-Bow motion.  So as not to

16   repeat our brief unnecessarily, I'll try to restrict my

17   argument to explaining why Mar-Bow's reply brief and its

18   arguments this morning are not meritorious in the least.

19             We raised Mar-Bow's lack of prudential standing.  I

20   want to mention that in their reply brief, rather than engage

21   our argument, which was based on Circuit Judge Posner's

22   decision in James Wilson in the Seventh Circuit where he said,

23   "Section 1109(b) is not independently sufficient to provide

24   standing."  Mar-Bow totally ignores that and says look at

25   1109(b).

Colloquy

1          Now, I realize the Seventh Circuit rulings are not

2     binding on this Court, but we all know being in this field

3     that bankruptcy courts and district courts and circuit courts

4     regard other circuit court decisions as at least worth

5     considering, if not more.  And apparently, Mar-Bow had no

6     answer.

7          The facts here are very clear.  While Mar-Bow bought

8     a claim after the fact for a small amount, it has not acted in

9     this case as a creditor, and it filed its motion which admits

10    in its words that Jay Alix is acting personally as an advocate

11    for all those who are interested in compliance with the law.

12         THE COURT:  What difference does it make?  I mean,

13    isn't the bankruptcy process supposed to work that way?  Isn't

14    the bankruptcy process supposed to be one that -- Chapter 11

15    specifically, a self-policing process where the creditors

16    police the debtor who is the fiduciary debtor-in-possession?

17    I mean, because is it -- the answer is if we had a trustee who

18    was a different fiduciary, it might be different.  But in the

19    world of debtor-in-possession, in the world of Chapter 11,

20    that's the role the creditors are supposed to play and bring

21    it to the Court because the Court has got millions, I mean,

22    what are we up to now, over 3,000 pleadings have been filed in

23    this case.  I think the number was, as of this morning, 2,783,

24    and this is how I'm able to do it.

25         I don't read all 2,783.  I expect everybody thinks I

Colloquy

1   do, but I don't.  What I do read is what has been presented

2   before me to decide on, and that's what's very, very

3   important, and that's why it has to be a creditor or a party-

4   in-interest.  And if you are not, well, then, I won't allow

5   you to have standing and proceed in the case, and we've had

6   that occur, actually, in this case.  But in -- I'm just not

7   impressed with the prudential standing issue.  I think that's

8   exactly the role that creditors are supposed to play in a

9   case.

10         And of course, creditors look out for their self-

11  interest.  If I have a creditor that is a competitor, and it

12  brought a bid, we can do certain things there.  I've done that

13  in the past, but I don't see that here.

14         MR. BIENENSTOCK:  Your Honor, I'll simply say that we

15  raised that issue because Mar-Bow is not that type of

16  creditor.  We have creditors here.  We have a creditors'

17  committee.  We have secured creditors.

18         THE COURT:  And I am concerned about that, and I'm

19  going to get to that, and I'm going to invite Mr. Rhodes to

20  come back because I didn't ask him that question which is the

21  practical question, the question that I've got in this case

22  which is that I've got many constituencies, because he asked

23  the question in a hypothetical matter, but I wanted to get to

24  this issue about what do you do when you're a week away from

25  confirmation and this issue is presented, but that's a

Colloquy

1    different issue.

2          But as far as prudential standing is concerned, I

3    really don't have an issue with that.

4          MR. BIENENSTOCK:  Okay.  In terms of the orderly

5    process of the judicial system, I hope the Court is

6    considering our other procedural objections concerning time

7    limits.  We have an issue here that initially resulted in the

8    granting of the debtors' retention order of McKinsey RTS.  We

9    then had the U.S. Trustee come in and move for further

10   compliance with 2014, and that was resolved, with notice to

11   all creditors, the Court, et cetera.

12         THE COURT:  It was withdrawn.  I didn't rule on

13   anything.

14         MR. BIENENSTOCK:  It was withdrawn based on a

15   stipulation of what McKinsey RTS was adding to its disclosure.

16   And the fact that it happened, it was noticed to all creditors

17   in this case, secured and unsecured.  And the U.S. Trustee was

18   satisfied has to have some meaning.  I'm going to get to the

19   merits, trust me, please, but --

20         THE COURT:  Okay.  I'm hoping that you will --

21         MR. BIENENSTOCK:  -- but --

22         THE COURT:  -- because the procedural arguments, I'm

23   just not that, you know, impressed with.  I mean, I think

24   there is a continuing obligation to disclose.  I don't think

25   it's time-barred.  I don't think waiver of estoppel will

Colloquy

1    apply.  We can go through all of those things.  I just don't

2    think that that is there.

3         What I would really like to get to is whether or not:

4    number one, McKinsey's complied with Rule 2014, and second,

5    you know, if not, then what do we need to do to address it?

6         MR. BIENENSTOCK:  Your Honor, let me turn now to what

7    has happened in this case and the law of the case, which Mar-

8    Bow also contends that there is no law of the case because

9    this issue hasn't come up.  But it has come up more than Mar-

10   Bow has acknowledged.  And I think it's impossible to consider

11   this without realizing what the law of this case, right here,

12   is at present.

13        Your Honor, McKinsey's response will show that

14   substantively, we have complied, in fact, more than most

15   professionals.  By taking a look at Rule 2014 and its repeated

16   enforcement in this case, it becomes very clear that law of

17   the case does exist and McKinsey, if anything, has overshot

18   it.

19        As the Supreme Court repeatedly remarks -- let's

20   start with the words of the statute, as it said in Connecticut

21   National Bank v. Germain 503 US 249, pages 453-4.  Rule 2014,

22   Your Honor, provides that the applicant -- which was ANR --

23   must disclose to persons -- that's McKinsey RTS --

24   connections.  And it further provides that the person being

25   retained, McKinsey RTS must provide a verified statement of

Colloquy

1   those connections.  To start with, there is absolutely nothing

2   in Section 2014 requiring the disclosure, in any form or

3   manner, of the information that the Mar-Bow motion demands and

4   requests at its functional equivalent of a wherefore clause on

5   pages 42 and 43 of its motion.  It wants a lot of

6   competitively sensitive and valuable information, but it is

7   nowhere to be found in Rule 2014.

8        Rule 2014, as explained by some of the authorities

9   Mr. Rhodes cited, is geared towards disclosing connections and

10  then the U.S. Trustee and others can ask questions to see if

11  any of them are actual conflicts that should cause the Court

12  not to approve the retention.

13       THE COURT:  Okay.  We're making progress; that's

14  good.  All right.

15       MR. BIENENSTOCK:  So first, I think it's telling that

16  in Mar-Bow's reply, they don't argue anymore for their

17  additional information.  I don't want to be presumptuous to

18  say they've given it up.  In fact, I think Mr. Rhodes might

19  have reasserted some of that, but as a practical matter, it's

20  not in Rule 2014 and there's absolutely no basis in law to

21  require it, let alone order it.

22       In the Leslie Fay case that Mar-Bow relies on -- at

23  175 B.R. 525, at page 536 -- that court acknowledges that

24  connections in one case may not be connections in another.

25  The facts in that case, for instance, were that the debtors'

Colloquy

1    attorney did not disclose that two of the debtors' directors
2    who were on the audit committee, were also senior officers at
3    clients that the debtors' attorney represented in unrelated
4    matters.  And the law firm, Weil Gotshal, said, well, those
5    aren't connections within the meaning of 2014.  And Judge
6    Brosman said, generally, you may well be right, but in this
7    case, where the focus of the accounting scandal was on those
8    two directors, they were certainly connections for purposes of
9    that case.

10       The principle we ask the Court to infer from that and
11   from common sense, is facts matter when determining what
12   connections are.  In this case -- let's look at the facts.
13   The debtor has five law firms -- two general ones, Jones Day
14   and Hunton & Williams, three high-powered special counsel,
15   three of the big four accounting firms, two financial
16   advisors, Rothschild and Alvarez, and it has McKinsey as a
17   turnaround advisor.  Now, Mr. Rhodes -- among the things I'll
18   disagree with him, which I'll point out, he made at least one
19   factual error.  He said McKinsey is negotiating sales with
20   people; we need to know if McKinsey represents those people.

21       Your Honor, the role of McKinsey in this case was not
22   to negotiate with anybody.  McKinsey didn't run the sale
23   process.  You can look at its engagement letter, what it was
24   retained to do, and its fee applications.  Its role was to
25   help the debtor figure out how to make its operations more

Colloquy

1   profitable, and more cash flow, and that's why it can testify

2   at confirmation as to the cash flow that the reorganized

3   debtor can expect and the liquidation value of the company.

4   Its role was not to run the sale process; its role was not to

5   negotiate the Chapter 11 plan.  It did not run the sale

6   process; it did not negotiate with creditors, under the plan.

7   That matters, because if it had, the Court would be very

8   concerned with what Mr. Rhodes said.  You shouldn't negotiate

9   with someone you're representing or at least people should

10  know it so they'll make sure someone else can do it or

11  whatever the solution is.  But that wasn't McKinsey's role in

12  this case.  It was to help the debtor make its operations more

13  profitable and that's what it's done.

14          THE COURT:  Well let me ask you this, has it

15  disclosed to the debtor these connections, if it hasn't

16  disclosed it to the Court or to anybody else?

17          MR. BIENENSTOCK:  I think what -- I'll get to the

18  disclosures it's made.  Let me cover that now.  When the U.S.

19  Trustee made its motion to compel further compliance with

20  2014, the resolution between --

21          THE COURT:  That's one of the thirteen connections

22  that were identified?

23          MR. BIENENSTOCK:  Right.  And they basically ask for,

24  what are the names of the clients that are among the secured

25  lender group and that are among the bidders.  And McKinsey

Colloquy

1   provided that.  McKinsey also acknowledged that it represented

2   some competitors.  That's what Mr. Rhodes is saying with the

3   one percent of its revenues.

4        And -- so McKinsey was completely candid in saying to

5   the U.S. Trustee, and to everyone -- because it disclosed it

6   in its declarations -- yes, it represents some competitors.

7   Which one?  The U.S. Trustee was satisfied that it really

8   didn't matter; you've acknowledged you represent some

9   competitors.  If there had been more time, possibly McKinsey

10  could provide more names, no question I'm sure, going forward.

11  But given McKinsey's role and the fact that there were other

12  professionals dealing with the creditors and the sale

13  processes, it was not a disqualifying feature that McKinsey

14  rendered services to significant creditors or insignificant

15  creditors.  It just had --

16       THE COURT:  Well, what was --

17       MR. BIENENSTOCK:  -- nothing to do with its work.

18       THE COURT:  Okay.  Well, let's just -- okay.  Answer

19  this question then, if you would, please.  I mean, there are

20  121 clients, as I understand it, that McKinsey has said, yes,

21  we know that these are on the interested parties list, okay?

22  And they've identified those 121 by category, but they've not

23  identified those 121.

24       MR. BIENENSTOCK:  Right.

25       THE COURT:  Now, don't they have a duty to

Colloquy

1    disclose -- or though the connection has -- I mean, they're

2    known entities.  We're not getting into the part where they

3    may not know or anything.  But they actually know that.  Why

4    aren't they required to disclose that?

5         MR. BIENENSTOCK:  Okay.  Your Honor, ever since

6    Leslie Fay, which, in the view of the bankruptcy community,

7    expanded the universe of potential connections, what has

8    happened -- and I'm sure Your Honor has seen it -- is that

9    professionals attach to their declarations what we call

10   telephone books.

11        THE COURT:  I'm aware of that.

12        MR. BIENENSTOCK:  In the response --

13        THE COURT:  I used to prepare my own 2014 disclosures

14   back --

15        MR. BIENENSTOCK:  So --

16        THE COURT:  -- in the day.  I know how difficult it

17   is.

18        MR. BIENENSTOCK:  Right.  So now the question is, is

19   there a substantive difference between saying, I represent

20   everyone on your list in unrelated matters, or I represent the

21   following by name, except for these three or four.  There is

22   no substantive difference.

23        THE COURT:  So they've only identified 121, though,

24   not everybody on the list.

25        MR. BIENENSTOCK:  Well, okay.  But they -- let's say

## Colloquy

1  they had said everybody.  We provide services in unrelated

2  matters for everybody.  It would still make no difference and

3  carving out a few makes no difference.  That's why I

4  suspect -- and I can't speak for the U.S. Trustee's office,

5  obviously, but that's why I suspect the U.S. Trustee's office

6  has been fine with these retentions.  Because their role is

7  what their role is and if they say, yes, in unrelated matters,

8  we provide services to most of your parties in interest and

9  it's less than one percent, in virtually all cases, of our

10 revenues, life goes on because it has absolutely no bearing on

11 how they will function in this case or in any case they've

12 been retained in.

13         THE COURT:  So you're advocating an amendment of the

14 rule then?

15         MR. BIENENSTOCK:  No.  The rule says, provide your

16 connections.  If they say, assume we have connections with

17 everyone, why isn't that a satisfactory response?

18         THE COURT:  Well, they didn't.  They said that they

19 had disclosed that they had a connection with -- they 121

20 clients, not connections with interested parties.

21         MR. BIENENSTOCK:  Well, say there were 121 matches to

22 their global database and --

23         THE COURT:  Well, is that --

24         MR. BIENENSTOCK:  -- the parties in interest.

25         THE COURT:  Maybe I'm confused, because what I

## Colloquy

1   understood from the declarations that were filed is they said
2   that they actually have 121 clients that are on the interested
3   parties list.

4          MR. BIENENSTOCK:  Right, right.

5          THE COURT:  Do I have that wrong?

6          MR. BIENENSTOCK:  No.

7          THE COURT:  Okay.  So -- I mean, there might be other
8   connections but that's why I just wanted to focus -- they know
9   who those clients are and those are actual clients.  And, yes,
10  the disinterested part, and the fact that it's unrelated, and
11  all of that is one thing, but disclosing that is what Rule
12  2014 requires.

13         MR. BIENENSTOCK:  And what I'm saying, when they
14  spoke to the U.S. Trustee, they said, well, give us -- we have
15  a lot of interested parties, but most of them are not
16  significant in terms of the work of the professionals in this
17  case.  So give us your matches, by name, to the secured
18  lenders, and the bidders, and the stalking horses.  And that's
19  what they did.

20         And what I'm saying, Your Honor, is instead of naming
21  the others by name, they basically can say, assume it's
22  everyone on your list, in unrelated matters; assume it's
23  everyone.  Would that disqualify us?  If it would not, then
24  what's the difference whether they give the other names by
25  name or not?  It's simply -- they've carried out the purpose

## Colloquy

1  of 2014, which say, okay, we have connections; we do unrelated
2  work, for less than one percent of our revenues, with all
3  these people; do you not want to retain us?

4         The answer has been, no, we do want to retain you
5  because none of that matters.  And Mar-Bow has not given Your
6  Honor one single reason why that's not sufficient under 2014.
7  What they did was they made up a fact that's incorrect, that
8  we were negotiating deals with either sellers, or creditors,
9  or whatever, which is -- it's a critical mistake for them to
10 make because that's not what we were doing.  If we were, we
11 would obviously have to say whether we represent the person
12 we're negotiating with.  That's the problem Your Honor had in
13 Lewis Roads, where father and son in the same law firm were
14 representing debtor and creditor.  That's not this case by a
15 mile, and they know that.

16        Let me go on about how 2014 works generally and in
17 this case, Your Honor.  Section 28 U.S.C. 586 (a)(3)(1)
18 provides the U.S. Trustee may monitor Section 327 applications
19 and file comments with respect to their approval.  And that's
20 basically the statute that gets the U.S. Trustee involved.
21 And when it gets the declarations from professionals, it sits
22 with them and answers questions.  Now, some professionals --
23 few, but some -- volunteer in their declarations most of the
24 information the U.S. Trustee will ask about, but sometimes
25 that's injurious to clients.

Colloquy

 1          Even Mar-Bow, in its reply, said that, sure, there

 2     are some that you don't want -- you don't name.  And there are

 3     obvious reasons why you don't name them.  You can kill them by

 4     naming them.  When there's an article in the Wall Street

 5     Journal that AlixPartners or Alvarez & Marsal and, to pick a

 6     name, Lazard have been retained by so-and-so, that's a signal

 7     that a Chapter 11 has at least a fifty percent, if not higher,

 8     probability of occurring.

 9          So this disclosure is not to be taken lightly.  And a

10     lot of people will disclose in chambers to the judge, ask for

11     a seal, or tell the U.S. Trustee.  We had lots of meetings

12     with the U.S. Trustee to work this out, obviously to the U.S.

13     Trustee's satisfaction.  Otherwise, they wouldn't have

14     withdrawn their motion.  So the enforcement of 2014 has, in

15     this case and in all cases, accommodated the fact that you

16     don't want to hurt the people whose names you're disclosing,

17     especially when they're insignificant in the context of this

18     case.

19          THE COURT:  So you're saying that if the Office of

20     the U.S. Trustee doesn't object, the Court shouldn't look into

21     the matter further?

22          MR. BIENENSTOCK:  No, I'm not saying that, Your

23     Honor.  I'm saying the Court may.  The Court absolutely may,

24     but --

25          THE COURT:  Because the Court's got a duty to do

Colloquy

1    that, doesn't it?

2            MR. BIENENSTOCK:  Well, I think the Court probably is

3    well within its rights to rely on the U.S. Trustee's office;

4    that's why it was there.  But if --

5            THE COURT:  I agree and I'm going to have another

6    colloquy with Mr. Van Arsdale, but --

7            MR. BIENENSTOCK:  And the Court also has the power to

8    ask its own questions, to tell an applicant, I need to know

9    about this, otherwise, I don't want to approve your retention.

10   Absolutely, the Court can do that.  But as I said, it can also

11   rely on the U.S. Trustee.

12           Now, I'd like to go through the enforcement of Rule

13   2015 in this case.  I'm going to go through about four

14   different retentions, Your Honor.

15           THE COURT:  Why is that relevant?

16           MR. BIENENSTOCK:  Because Your Honor's going to see

17   that -- I hope -- that McKinsey RTS has, if anything, overshot

18   compliance with Rule 2014 in this case.

19           First, there's the application for retention of

20   Alvarez & Marsal, which was docket number 0215.  The retention

21   was approved by the Court's order September 17, 2015, docket

22   number 0477.  That declaration showed that Alvarez keeps a

23   database of current and recent clients.  It "generally

24   includes" the name of each client of the firm and each party

25   who was known to be adverse.  And it was followed up -- that

## Colloquy

1   matching of the database and the interested parties was
2   followed up by e-mails.  And based on that, A&M declared
3   itself disinterested.  And it also said it represents a
4   competitor, supplies some restructuring officers to a
5   competitor, Patriot Coal.  And the retention was approved.

6        Now more interesting, Your Honor, the application of
7   Rothschild as financial advisor and investment advisor.  That
8   application is docket number 0211 in this case and the order
9   approving the retention was 0469, entered on September 17,
10  2015.  Rothschild's declaration provides upfront, in paragraph
11  21(d), that it's an indirect subsidiary of a French holding
12  company; it has affiliate relationships that it calls the
13  affiliated entities; and it is not searching the clients of
14  the affiliated entities.  It is only searching the advisory
15  entity that was being retained in this case.

16        Your Honor, Rothschild, like McKinsey, is an
17  integrated enterprise.  Any company in a field like this has
18  to operate as an integrated enterprise, seamless from the
19  point of view of the client.  But they didn't check clients of
20  the affiliated entities.  McKinsey, on the other hand, checked
21  its entire global database.  So Rothschild's acknowledgement
22  of connections was basically a short list.  That was fine
23  because the U.S. Trustee must have concluded, as it has in
24  many other cases with Rothschild, that checking just the
25  advisory entity, in the U.S., that's being retained here, as

Colloquy

1   opposed to all the other Rothschild entities, is sufficient.

2   It also doesn't provide, in the declaration, any of the

3   additional information that the Mar-Bow motion requests.

4        Now let's look at the retention of Protiviti by the

5   statutory creditors' committee in this case.  That application

6   was docket number 0511.  It was approved by order, dated

7   October 16, 2015, docket number 0677.  They have a client

8   database that just has clients and they outputted the list of

9   names, none of the additional information that Mar-Bow

10   requests.

11        And let's look at Jefferies.  The application to

12   retain Jefferies by the creditors' committee was docket number

13   0512.  And the application to retain it was granted by order

14   dated October 16, 2015, docket number 0678.  They had a

15   database solely of client names.  There's no mention of

16   follow-up with e-mail, as there was no mention in Protiviti of

17   a follow-up with e-mail.  They spit out a list of names and

18   their application was approved, basically saying they were

19   representing everyone in unrelated matters.

20        Now, let's compare Protiviti, Rothschild, Jefferies

21   with McKinsey.  Unlike Rothschild, McKinsey checked all of the

22   clients of all its affiliated entities around the world.

23   Unlike Protiviti, unlike Rothschild, unlike Jefferies,

24   McKinsey followed up the matching of the global database with

25   the parties of interest with e-mails.  And Mr. Kevin Carmody's

Colloquy

1    affidavit, Your Honor, explains, step-by-step, how thorough

2    these e-mails were in how they were drop-down windows that

3    each McKinsey employee could easily deploy with the click of a

4    mouse to answer all the questions and to be on alert of the

5    need not to take other retentions in the industry without

6    first checking, et cetera.

7         So bottom line, Your Honor, McKinsey used a global

8    database; not all the other professionals in this case did.

9    McKinsey followed up with e-mails; not all the other the

10   professionals did.  And McKinsey, obviously, answered all the

11   questions of the U.S. Trustee, as I assume all the other

12   professionals did. We contend that the U.S. Trustee was

13   correct.

14        In each of these retention applications, it applied

15   the facts of the case, what the professional was doing, to

16   what it needed to determine whether the professional was

17   disinterested or not.  As I've just shown, McKinsey did more

18   than most.  Now Mar-Bow goes to great lengths -- sort of a

19   reverse psychology -- to say we shouldn't take its motion as

20   anti-competitive as between Alix and McKinsey.

21        THE COURT:  Before we move on, let's go back.  You

22   know, when I look at the Protiviti application --

23        MR. BIENENSTOCK:  Yup.

24        THE COURT:  -- or disclosure, you know, they list

25   twenty-nine former clients --

Colloquy

1        MR. BIENENSTOCK:  Right.

2        THE COURT:   -- and over sixty-one current clients by

3   name, identified, on the list, which was what I asked you a

4   little while ago.  You know, McKinsey has identified 121;

5   here, we've got them disclosed.  Why shouldn't McKinsey be

6   required to disclose to them?

7        MR. BIENENSTOCK:  And my answer --

8        THE COURT:  Well, you're saying that Protiviti didn't

9   do as much as McKinsey, but it looks like they have.

10        MR. BIENENSTOCK:  No, what I'm say -- it's an

11   important distinction, Your Honor.  I want to acknowledge Your

12   Honor's point that Protiviti disclosed all the names; McKinsey

13   has not.  Protiviti says nothing about following up on its

14   computer matching with e-mails to see if there's something

15   going on in any of these situations that would create a

16   disqualification or a concern.  McKinsey did follow up to see

17   if there's any situation that, for whatever reason, would

18   create a concern.

19        So, yes, Protiviti disclosed more names; McKinsey did

20   a more thorough checking of whether there's cause for concern.

21   And the answer to Your Honor's question of shouldn't McKinsey

22   give the rest of the names, my answer is this.  Only if it

23   would be unsatisfactory or insufficient for some reason if

24   McKinsey said, assume we represent all of them in unrelated

25   matters.  If representing all of them in unrelated matters

Colloquy

1  would not be a disqualifying factor, why should it matter if

2  we pick out a bunch?  That common sense applied here, and it's

3  applied not only in this case, Your Honor.

4         I want to mention where else it's applied.  As Your

5  Honor knows, on the Mar-Bow legal team, Mr. Steven Rhodes and

6  Ms. Judith Fitzpatrick (sic) were former bankruptcy judges.  I

7  am happy to say they were highly distinguished; they were

8  hardworking; and they were highly respected as bankruptcy

9  judges.  And the --

10        THE COURT:  I know who they are.

11        MR. BIENENSTOCK:  -- the industry is better for their

12  having been on the bench.  And for that reason, I think it's

13  particularly instructive to look at retentions they approved,

14  and I'm only going to mention two.  In the Detroit case,

15  Chapter 9, case number 13-53846 in the bankruptcy court for

16  the Eastern District of Michigan, Southern Division, docket

17  number 1476 was the application to retain Lazard Freres as

18  financial advisor for the retirees' committee.  The order

19  approving that was docket number 2250.  The order was dated

20  December 19, 2013.  Lazard said, "we have researched" -- in

21  paragraph 9 of its declaration -- "We have researched only the

22  electronic client files and records of Lazard, not all of its

23  affiliates, to determine relationships with any potential

24  parties in interest."  It doesn't indicate any e-mail follow-

25  up.

Colloquy

1          Now let's look at the retention of Blackstone --

2          THE COURT:  Before we move on from that, let's drill

3     down on that just a little bit --

4          MR. BIENENSTOCK:  Sure.

5          THE COURT:  -- okay?  Was that a litigated issue?

6     Was there a memorandum opinion that was published in

7     connection --

8          MR. BIENENSTOCK:  No, it was just an order.

9          THE COURT:  -- with the issuance of that order?  It

10    was just an order that was entered on a normal application?

11         MR. BIENENSTOCK:  Yes.

12         THE COURT:  Okay.  So it would be like one of these

13    other 2,783 pleadings filed in this case.  You know, I was on

14    a panel with Judge Lawrath (ph.) a few years ago and she said,

15    never cite to me an order where there wasn't a memorandum

16    opinion because I know who drafted the order and, you know,

17    it's not the conclusion, or actual finding, or the holding of

18    this Court.  And you can't just do that -- pick it out and

19    say, well, because -- you know, in one of these things -- I

20    mean, my goodness, in the Detroit case, I'm sure there were

21    all kinds of applications for employment and I am absolutely

22    confident that then-Judge Rhodes didn't read every single one

23    of them.

24         MR. BIENENSTOCK:  No.  Actually, Your Honor, that was

25    not the case because of the Tenth Amendment, there were

Colloquy

1    actually very few.  There were just --

2           THE COURT:  Well, whatever.  The point being, you

3    know, unless it's actually litigated, then, you know, it's

4    just not something that's going to be front and center that

5    you're going to be deciding.  And that's the point I was, I

6    guess --

7           MR. BIENENSTOCK:  Well --

8           THE COURT:  -- inarticulately, trying to get across a

9    few minutes ago about why it is so important that parties in

10   interest bring these kinds of matters to the attention of the

11   Court so the Court can deal with them.  And just because we've

12   got a great watering-down of Rule 2014 because nobody is,

13   apparently, complying with the rule, doesn't mean that the

14   rule shouldn't be enforced.  It should be enforced.

15          And so it's not really helpful for me to have you

16   say, well, it wasn't done here, it wasn't done there; and so

17   therefore we're going to buy a Fiat -- you know, amend the

18   rule by not enforcing it.  That doesn't make any sense to me.

19          MR. BIENENSTOCK:  No, you're --

20          THE COURT:  It seems to me what we need to look at

21   is, okay, are there connections that have not been disclosed;

22   if there are, what do we do about that; and how do we fix

23   where we are?

24          MR. BIENENSTOCK:  Well, Your Honor, I beg to differ

25   just a bit, if I may.

Colloquy

1          THE COURT:  Okay.

2          MR. BIENENSTOCK:  I'm sorry to belabor it.

3          THE COURT:  No, please.  I asked the question.  I

4   want you to answer.

5          MR. BIENENSTOCK:  The purpose of the connections is

6   so that the U.S. Trustee, the Court, ultimately, can determine

7   if there's a disqualifying factor and the professional should

8   not be retained.

9          Let's take a simple case where there are ten parties

10  in interest and the professional has represented nine of them

11  in unrelated manners, all less than one percent of their

12  revenues.  Does it really matter which of the ten they did not

13  represent?  That's the point that I think is being lost here.

14  And if you have a situation where it doesn't matter if you

15  represent all of them, then why does it matter if the names

16  are given?  You know, once the professional steps forward and

17  says, I'm happy to have you consider my application as if I

18  represent everyone in the case in unrelated matters, for less

19  than one percent of my revenues, why are the names -- why do

20  they have any importance or relevance at that point?

21         And that's why -- I think where the U.S. Trustee -- I

22  mean, Your Honor's attention, Judge Rhodes' attention when he

23  was a judge, might not have gone to these applications, but

24  the U.S. Trustee's attention clearly did.  And the U.S.

25  Trustee's office generally knows what it's doing.  And if they

1   are satisfied that whether you represented some of the parties
2   in interest or all of them, it wouldn't make a difference,
3   that's, in my view, Your Honor -- or in McKinsey RTS' view, we
4   assert that is not the failure to carry out 2014.  The purpose
5   of --

6          THE COURT:  Who gets to make that decision though?
7   Who gets to decide?  Is it the entity that's applying for
8   employment that decides?  Is it the Office of the U.S. Trustee
9   that decides?  Is it this Court that decides?  Is it the right
10  of every other constituency in the case to look at it and
11  decide?

12          MR. BIENENSTOCK:  Well --

13          THE COURT:  How do we do that?

14          MR. BIENENSTOCK:  That's an easy question --

15          THE COURT:  Good.

16          MR. BIENENSTOCK:  -- because only Your Honor can
17  decide.  So the step one is, the U.S. Trustee asks its
18  questions when it's confronted with the application of the
19  declaration.  If it gets satisfactory answers, presumably
20  comes before the Court and the U.S. Trustee says, no
21  objection.  If it doesn't get satisfactory answers, it
22  objects.  When it becomes before the Court, if Your Honor
23  is -- for whatever reason, wants to second-guess the U.S.
24  Trustee, the Court obviously has the last word.

25          But my point is I don't think there's any basis,

## Colloquy

1    certainly in this record, to believe that the U.S. Trustee
2    hasn't been doing its job and that if the Court makes further
3    inquiry, it will reach a different decision.  And I've teed it
4    up, basically, the way it is.  If a professional can say,
5    assume I represent all of them in unrelated matters, what
6    difference does it make which number, less than all, they
7    actually represent?

8         And I did appreciate Your Honor's comments about an
9    order without an opinion not necessarily carrying -- well,
10   doesn't carry the weight of an opinion.  But, Your Honor, I
11   also don't think, for this matter, in this case right now,
12   that it should be given no weight because it shows what 2014
13   is interpreted to mean.  Unless we're going to assume that the
14   U.S. Trustee is just not doing its job anywhere.

15        And so I just want to mention one more.  Then-judge
16   Fitzpatrick, in the Specialty Products case, docket number
17   388, order entered September 17, 2010, approved the
18   application of Blackstone Advisory Partners LP to be retained
19   as financial advisor and investment banker.  Blackstone
20   announced, in its declaration, it did not check its
21   affiliates' clients.  It only checked the advisory clients,
22   just like Rothschild here, in this case.  McKinsey has done
23   more than that.

24        So the question comes back, Your Honor, to -- I have
25   a feeling Your Honor is saying the word "connection" in 2014

Colloquy

1   only has one meaning.  And that is, give me every name that's

2   a hit between the database and the parties in interest.  And

3   what --

4          THE COURT:  I will grant you that the word

5   "connection" is not as good a word as I might have used.

6          MR. BIENENSTOCK:  But -- and what I'm saying, then is

7   that because it's not and because there's no statutory or rule

8   definition, context matters.  And what the U.S. Trustee

9   concludes are connections for purposes of Rule 2014 has

10  meaning.  It's not a scientific test that you'll come to the

11  same result in every case.

12         And, again, I cite Leslie Fay, where Judge Brosman

13  acknowledged that generally, those two directors -- the fact

14  that they worked for other clients, Weil Gotshal -- would not

15  be connections.  But in that case, they were connections.

16  Context matters.  And that's why this is not a matter of 2014

17  not being enforced, Your Honor.  It's a matter of deciding

18  what are the real connections that have to be disclosed.

19         Now, the Mar-Bow motion asks the Court to send a

20  "strong statement" and "powerful message" to McKinsey.

21  Contrary to what the U.S. Trustee said earlier, I have no

22  knowledge -- and my client is here -- about our asking the

23  U.S. Trustee's office to do anything vis-a-vis AlixPartners.

24  That's not the way McKinsey does business.  It is obviously

25  the way AlixPartners and Mar-Bow do business, as they admit in

Colloquy

1   their motion, where they said they went to the U.S. Trustee,

2   and now they're unsatisfied, and they're back.

3        But every time in the past, Your Honor, that I've

4   heard a judge be asked to send a message, the judge has said,

5   I don't send messages; I decide what's in front of me.

6        THE COURT:  Yeah.  And I have no problem with that.

7   You don't need to dwell on that.

8        Let's focus on a couple of the things, though, that

9   are bothering me.  You know, I've talked about 121 known

10  clients that have not been named, and we can come back to that

11  in a minute.  And I've got your explanation; I understand

12  that.  What about McKinsey Investments and the fact that there

13  may be investments in competitors or in other entities that

14  may be involved in the case?

15       MR. BIENENSTOCK:  Your Honor, I'd have to ask my

16  client if that even exists.

17       THE COURT:  Well -- I mean, if it exists though, do

18  you think that it should be disclosed or not disclosed?

19       MR. BIENENSTOCK:  We would disclose it if we -- yeah.

20       THE COURT:  Excellent.  We're making progress.  All

21  right.  And the other issue that was raised was with regard to

22  the e-mail -- the e-mail became relevant because of some of

23  the concerns that were raised over what was included in the

24  database that was searched by McKinsey.

25       And so this was an attempt to plug that hole.  For

Colloquy

1   instance, the fact that if there was an adverse interest,

2   adverse parties and such were not included in the global

3   database, as I understood it.  And that's what the e-mail was

4   designed to do.  What about being able to provide information

5   regarding the survey response and the results to the e-mail

6   inquiry?

7           MR. BIENENSTOCK:  Well, Your Honor --

8           THE COURT:  Is that something that you think should

9   be disclosed?

10          MR. BIENENSTOCK:  If the responses show a concern, a

11  conflict, yes.

12          THE COURT:  Well, what if there was absolutely no

13  response to the survey request?  I mean, what if this e-mail

14  went out and the answer was not a single one of the 20,000

15  employees responded?  I mean, that would be significant.  You

16  would agree with that, right?

17          MR. BIENENSTOCK:  I would check the pulse of 20,000

18  employees.

19          THE COURT:  I would agree too.  Okay, so somewhere

20  between 0 and 20,000, there is a number that becomes relevant.

21  And that's -- I think what was being suggested is that the

22  survey response -- the response rate becomes relevant at some

23  point, don't you think?

24          MR. BIENENSTOCK:  Well, yeah.  And I think you have

25  to trust the professional, if the response rate seems

Colloquy

1    abnormally low, to do something about it.

2            THE COURT:  Okay.

3            MR. BIENENSTOCK:  But that's not a disclosure to Mar-

4    Bow; that's we have to make sure people are listening and

5    responding, so we can give the U.S. Trustee the proper --

6            THE COURT:  We can deal with your issues about Mar-

7    Bow, and about competitors, and all of that.  There's ways we

8    can do that.  If there's information, you know, that needs to

9    be discrete or needs to be confidential, we can deal with.

10   All of that is dealable (sic), okay?  What we need to worry

11   about is whether or not there's been sufficient disclosure,

12   okay?

13           And it seems to me that it comes down to about three

14   different categories of things.  One is these 121 actual known

15   clients that have not been identified.  Second is the

16   investments of McKinsey Investment in other entities that you

17   say that if it does exist, should be disclosed, and I tend to

18   agree with you.  And if doesn't exist, then that's an easy

19   one; say none, zero, and we're done.  And third is, you know,

20   what were the results to the survey?  What were the actual

21   results, as well as the --

22           MR. BIENENSTOCK:  Well --

23           THE COURT:  -- survey response?

24           MR. BIENENSTOCK:  Your Honor, let me -- it may be

25   that I'm not understanding the comment, but I want to be

Colloquy

1    clear.  Your Honor was, first, completely correct that our

2    global database lists the client names.  And one of the

3    reasons -- not the only reason, but one of the reasons -- for

4    our email follow-up is to get the other adverse parties and

5    things of that nature.  As Your Honor may recall from the

6    other applications in this case, that I went through several

7    minutes ago, a lot of the professionals used a client database

8    and no e-mail follow-up.  We did an e-mail follow-up.

9        Now, the e-mail follow-up is our effort to get the

10   information so we can tell the U.S. Trustee, and we do that.

11   I --

12       THE COURT:  So the U.S. Trustee has this response --

13   the survey response, as well as the actual results?

14       MR. BIENENSTOCK:  Oh, no.  We don't give survey

15   responses.

16       THE COURT:  Oh.

17       MR. BIENENSTOCK:  If the survey response turns up a

18   conflict, we'll disclose it.  But if it doesn't turn up a

19   conflict, we won't disclose it.  But that's our internal

20   efforts to make sure that we're complying and that we don't

21   have conflicts.

22

23       THE COURT:  All right, well --

24       MR. BIENENSTOCK:  I don't --

25       THE COURT:  -- apparently we're talking past each

Colloquy

1    other.

2           MR. BIENENSTOCK:  In other words, if Your Honor was

3    suggesting that we have to give -- make public e-mail survey

4    results, as a general matter, I would say no.  To the extent

5    they actually show connections we hadn't known of or

6    conflicts, yes.

7           THE COURT:  Well, there was obviously something that

8    came up afterward because we're into the third disclosure at

9    this point.  And each one, the list has been growing, so

10   there's obvious -- there's been effort on McKinsey's part to

11   identify either clients or other connections that it's seen.

12   And it's coming up some way or another.  I assume, whether

13   it's through this e-mail response or something else, but

14   obviously, the initial one didn't capture everything, and

15   we're continuing to capture, which is what we're supposed to

16   do, right?

17          MR. BIENENSTOCK:  Yes, but I want to reiterate that

18   if we took the accepted position that some other professionals

19   take and have been accepted here, that we're only going to run

20   McKinsey RTS and not our affiliated entities, instead of 121,

21   you might have 10 or 0 or 5 or who knows what.  I mean, we

22   start with trying to overkill.

23          THE COURT:  I understand but that's the way McKinsey

24   operates its business too.  I mean, we've seen the

25   application.  They talked about its metal division, how it was

Colloquy

1  a unified enterprise, and why it would be able to get

2  expertise from the other parts of the business, and so I mean,

3  it makes sense, doesn't it?

4  MR. BIENENSTOCK:  But ever -- yes, but every firm is

5  global and operates seamlessly from the point of view of the

6  client.  You wouldn't dare say, if you're dealing with me in

7  Paris, I can't help you, and we don't coordinate with the

8  Netherlands or Greece.  I mean, everyone is going to say

9  they're seamless and one enterprise.  But we won the data

10  around the world.  Not everyone does.  I mean, we can get the

11  121 number down, but we'd rather find out everything --

12  everything that's possibly a problem.

13  THE COURT:  Okay.  And I don't have a quarrel with

14  that.  I think that's a good thing.  Okay?

15  MR. BIENENSTOCK:  Yeah.

16  THE COURT:  All right.

17  MR. BIENENSTOCK:  And so once we find out everything

18  that's possibly a problem, and we say to the U.S. Trustee,

19  okay, we found 121 names, we do unrelated work for all of

20  them, less than one percent of revenues.  Is there anything

21  more you need to know?  I mean, the logical response is it

22  doesn't matter what their names are.  I know everything I need

23  to know.  It's not going to affect anything happening in this

24  case.

25  I know I've said it several times, and Your Honor

Colloquy

1   gets it, but I'm a little hung up with the notion that there's

2   only one way to comply with 2014, which is to give a list of

3   names, if you can give the functional equivalence and do a

4   very comprehensive check, as we do.  And the --

5           THE COURT:  Well, let me go back to a question I

6   asked you about ten minutes ago.  Maybe it was longer than

7   that, but it is something that has bothered me.  Did McKinsey

8   disclose the 120 names to the debtor?

9           MR. BIENENSTOCK:  To the debtor -- may I just ask my

10  client, Your Honor?

11          THE COURT:  Sure.

12      (Pause)

13          MR. BIENENSTOCK:  Your Honor, the answer is that we

14  told them there were 121.  We didn't give them a list of

15  names.

16          THE COURT:  All right, very good.  All right,

17  anything further?

18          MR. BIENENSTOCK:  Yes, Your Honor.  I'd just like to

19  respond to some points made by Mr. Rhodes.  Probably too up in

20  the air in global, but citations to cases like Gellene in the

21  Seventh Circuit, that was a case where the lawyer for the

22  debtor knew he represented the dominant creditor in many other

23  matters and swore that he didn't.  And he went to prison for

24  it.  This case has nothing to do with that.

25          They claim we have an undisclosed connection to the

## Colloquy

1    U.S. Trustee's Office -- totally false.  McKinsey has a
2    contract having something to do with federal prisons.  That is
3    not the United States Trustee's Office, far from it.  I doubt
4    they want to have anything to do with federal prisons.  We
5    don't know where they got that information, but it's just
6    totally false.

7         As I mentioned earlier, their parade of horribles is
8    what if McKinsey is negotiating with a creditor for the
9    purchase of a core assets (sic), and on behalf of someone it
10   represents?  Well, as I said, we don't negotiate with
11   creditors in this case.  That's not our role.  They had to go
12   to a parade of horribles that don't exist to suggest that
13   there's something wrong here.

14        To sum up, Your Honor, I would simply say as I think
15   we've demonstrated this morning, we've gone above and beyond
16   certainly the average standard to identify issues, to be
17   candid with the U.S. Trustee's Office about what we do for
18   others.  I understand the issue is giving a name, but Your
19   Honor knows why we believe that once you say you've provided
20   unrelated services, whether the name is one insignificant
21   creditor or another makes no difference whatsoever.

22        We have done more than most professionals in this
23   case, and other cases.  I think that's evidence that the
24   meeting of 2014, and the word "connections" within it, has
25   been satisfied.  Mar-Bow has an implicit assumption that when

Colloquy

 1   you match the parties-in-interest list to the global database,
 2   every match is automatically a connection for purposes of rule
 3   2014.

 4        As I explained before with Leslie Fay, that's just
 5   not the case.  And the U.S. Trustee's Office is pretty good at
 6   asking the questions to find out which matches are meaningful,
 7   and which are not, and what you're doing.  Especially given
 8   the role that McKinsey has here, which is simply to make the
 9   debtors' operations more profitable.

10        If we were an attorney, and we represented a creditor
11   in an unrelated matter, that would be very relevant, because
12   even though it's an unrelated matter, under the Rules of
13   Professional Responsibility, we can't sue that creditor
14   without consent.  And that's something the U.S. Trustee and
15   the Court would want to know.  And whether that would be
16   satisfactory, because you'd get conflict of counsel, or
17   whether it would not be satisfactory if it were a dominant
18   creditor in the case, that's why the Court would want to know
19   it.  And the U.S. Trustee would want to know it.

20        We're not an attorney.  We are giving advice on how
21   to improve the business.  If the debtor hires someone to make
22   a machine more efficient, you probably wouldn't dream of
23   having an application like this.  Well, we were hired to make
24   business operations more efficient and profitable.

25        It's not a whole lot different.  Based on what we're

## Colloquy

1   doing in this case, we submit we overshot 2014, and Your Honor

2   is just hearing a competitor try to take advantage.

3          I know Your Honor asked what difference does the

4   motive make, but it's really hard to believe that in this

5   case, with all of the sophisticated people -- the advisors for

6   the creditors' committee, the creditors themselves, these

7   aren't mas and pas, orphans and retirees.  These are

8   sophisticated hedge fund creditors, banks, et cetera.

9          And all of the professionals doing the jobs that run

10  the sales and did the negotiations, it's really hard to

11  believe that Mar-Bow is concerned about McKinsey for any

12  purpose other than creating a business advantage.

13         And the proof, Your Honor, is the two professionals

14  who represent the committee that does represent the Mar-Bow

15  claim, those two professionals, they did less than we did

16  defining conflicts.  No e-mail follow up, no global database

17  in the case of Rothschild -- or in the case of Jeffries.  And

18  yet, they're not complaining about the people representing

19  their claim.

20         They're complaining about us, who had nothing to do

21  with their claim.  We just make things more profitable.  I ask

22  Your Honor to consider that in the balance in how this should

23  be resolved.  We think their motion should simply be

24  dismissed.

25         THE COURT:  All right, thank you.

Colloquy

1          MR. BIENENSTOCK:  Thanks.

2          THE COURT:  All right, this is -- Mr. Black, does

3    anybody from the debtor wish to be heard in connection with

4    this matter?

5          MR. BLACK:  No, Your Honor.

6          THE COURT:  All right, does an --

7          MR. BIENENSTOCK:  Your Honor, I'm sorry, but may I

8    correct one thing I said?

9          THE COURT:  Of course you may.

10         MR. BIENENSTOCK:  The investment arm or entity is

11   walled off.  We cannot search it.  We know nothing about it.

12   There's no way we can find out about their investments, and we

13   don't know about their investments.  And I think maybe that's

14   why other professionals don't even search their global

15   databases.  They just search the advisory part, but the MIO

16   entity that makes investments, we have no ability to get their

17   information.

18         THE COURT:  We being who?

19         MR. BIENENSTOCK:  McKinsey RTS.

20         THE COURT:  All right, thank you.

21         MR. BIENENSTOCK:  I'm sorry to interrupt Your Honor.

22         THE COURT:  No, thank you for that clarification.

23         All right, does anyone from the creditors' committee

24   wish to be heard in connection with this matter?

25         MR. HOWLETT:  Eric Howlett on behalf of the

Colloquy

1    creditors' committee, Your Honor.

2            THE COURT:  All right.

3            Mr. Van Arsdale, you don't get to say no.  I'd like

4    to -- okay, notwithstanding the disclaimer that you put on the

5    record at the beginning of this, the Office of the U.S.

6    Trustee does serve an important role with regard to review of

7    applications, not only for employment, but also for

8    compensation.

9            And I am interested in the withdrawal of your motion

10   that was originally before the Court.  As you know, that was

11   not heard, and I didn't address it and such.  But is it the

12   view of the Office of the U.S. Trustee that the disclosures in

13   this case are adequate?

14           MR. VAN ARSDALE:  Your Honor, if I could give the

15   Court pretty much a synopsis of what came about, and how it

16   ended up being withdrawn at the end.

17           McKinsey originally identified a number of parties on

18   the interested party list for whom it had provided services in

19   matters unrelated to the debtor or their Chapter 11 cases.

20   But, as we have well established today, McKinsey did not name

21   the names of any of these connections.

22           Indeterminate statements, such as, "connections with

23   a creditor," do not satisfy Rule 2014.  Disclosing the

24   existence of a connection without disclosing the identity of

25   the connection is almost always insufficient.  Naming names in

Colloquy

1   Rule 2014 declarations is generally required, and certainly

2   preferred and makes it easier to police connections and

3   conflicts.

4       But in the event a truly confidential client, it

5   sometimes may be appropriate for a professional applicant to

6   withhold the connection's identity if the applicant provides

7   other information about the nature and the scope of the

8   connection sufficiently explicit, sufficient for the Court and

9   the parties to determine if there is a disqualifying conflict

10  or a lack of disinterestedness.

11      The professional, however, must provide real evidence

12  of a confidentiality restriction grounded not in rote contract

13  or standard business model and compatible with bankruptcy

14  practice, but dictated by the unique circumstances of an

15  engagement.  In that case, the U.S. Trustee might not object,

16  as long as other contextual information about the scope and

17  the nature of their work confirms that the confidential work

18  did not give rise to a disqualifying conflict.

19      After the United States Trustee filed the motion to

20  compel disclosures in compliance with Rule 2014, McKinsey

21  apparently reevaluated its routine confidentiality practice

22  that made its Rule 2014 compliance difficult.  It then sought

23  client permission to disclose client identities and filed the

24  third supplemental declaration that the Court spoke of

25  earlier, naming seventeen of the twenty confidential clients

Colloquy

1    who had given their permission.

2           McKinsey also reaffirmed that none of the twenty

3    representations related to the debtors or their Chapter 11

4    cases and gave some additional information about the scope of

5    a confidential engagement.

6           The U.S. Trustee's motion to compel and McKinsey's

7    supplemental disclosures were filed in the context of a

8    critical case juncture.  The case was fast approaching a

9    hearing to approve the disclosure statement, followed by plan

10   confirmation.

11          Once the U.S. Trustee was satisfied that McKinsey

12   possessed no conflicts and had greatly improved the public

13   record of its connections, the U.S. Trustee's objection was

14   satisfied.  That's how we ended up where we are today.

15          THE COURT:  My question to you was do you think that

16   the failure to disclose the 121 clients in this case satisfies

17   Rule 2014?

18          MR. VAN ARSDALE:  Your Honor, in terms of asking me

19   that question, everything that was --

20          THE COURT:  I don't know who else to ask.  You're at

21   the podium.

22          MR. VAN ARSDALE:  I am.  I am, but everything that

23   has happened concerning McKinsey has happened on a very high

24   level in the Office of the U.S. Trustee.  If it were left up

25   to me, I think my solution to this problem would be for them

Colloquy

1   to make the list available and file it and ask that it be

2   filed under seal.

3           That is the same kind of thing that this Court does

4   all the time.  That would protect whatever it is they think

5   needs to be protected, yet provide whatever the list is that's

6   going be of the people who get to see the sealed documents,

7   provide them with the information.

8           THE COURT:  All right, thank you.

9           MR. VAN ARSDALE:  Yes, sir.

10          THE COURT:  All right, you get the last word, I

11  guess.

12          MR. RHODES:  Thank you, Your Honor.  I'd just like

13  the opportunity to rebut a few points that Mr. Bienenstock

14  made, and one point that Mr. Van Arsdale made.

15          We made no mistake at all in asserting that McKinsey

16  negotiates with creditors here.  We didn't make that up.  We

17  got it from McKinsey's own fee applications.  That's where we

18  got it from.  And in fact, we were so concerned that they

19  would deny this that we actually created a little bit of an

20  exhibit.  And I'd like to share this with Your Honor.  We've

21  called it Exhibit 1.

22          So what you'll see here is we took a sample of their

23  fee applications from November 13 -- of their fee statements

24  from November 13 to December 18.  And this is from McKinsey's

25  second application for compensation, docket 1781, and we

### Colloquy

1    looked for the following words:  Calling lenders, meeting with
2    lenders, preparing for meetings with lenders, preparing plans
3    for lenders, responding to lenders, preparing materials for
4    lenders.

5            And we got a hit in each one of these specific
6    instances, with each one of these specific employees of
7    McKinsey, on each one of those specific dates.  That's why I
8    asserted to this Court that McKinsey deals with lenders and
9    deals with the debtor's plan.  Of course it does.

10           Now, I want to follow to a logical conclusion what I
11   think I heard Mr. Bienenstock arguing here.  In his view, if I
12   understood it correctly, a declaration which says we have
13   looked at every client -- at every name -- at every name on
14   the interested parties list, and while we have connections
15   with some or even all of them, none of them are on matters
16   related to the debtor.  Signed, sealed, and delivered --
17   that's adequate.

18           That's the logical extension of where he goes here.
19   And the problem with that, Your Honor, is that's not the rule.
20   It may be what they want the rule to be.  Maybe it's even what
21   the rule should be.  I don't know, but that's not what the
22   rule is.

23           And in fact, there was a recent effort, which we
24   referred to at the end of our reply brief, to get the rule to
25   say something like that.  It failed.  The advisory committee

Colloquy

1   for bankruptcy rules rejected that change, and I refer Your

2   Honor to their report rejecting that change, which is the last

3   footnote in our reply.

4           So what they said there was very interesting.  They

5   acknowledged this euphemism, the phonebook euphemism.  They

6   said we think the phonebook is helpful.  They said that.

7           I haven't looked at the Alvarez disclosure,

8   Rothschild, Protiviti, Jefferies, I cannot speak to them.  I

9   can only say this to Your Honor, that if the extent of

10  nondisclosure for those declarations is as bad as it is for

11  McKinsey, the problem is five times bigger than just McKinsey.

12  I don't know how to tell you to solve that problem.  I'm here

13  to get McKinsey to comply with the rule.  I refuse to speak to

14  the Detroit case, and I think Your Honor will understand why.

15          THE COURT:  I'm not going to ask you.

16          MR. RHODES:  Thank you.  McKinsey says it's happy to

17  rely on what the U.S. Trustee found.  Well, the U.S. Trustee

18  made one very significant finding that I'm not so sure it's

19  happy to rely on.  And it's a finding on page 13 of its

20  motion.  I'll quote it to Your Honor.  It says:

21          "McKinsey RTS, to the U.S. Trustee's knowledge, is

22  the only professional firm claiming contractual

23  confidentiality is a blanket shield from, and superior to the

24  disclosure requirements applicable to every bankruptcy

25  professional under the Bankruptcy Code and rules."

## Colloquy

1          It was very disheartening to hear that McKinsey RTS
2    doesn't have access to the information it needs to comply with
3    Bankruptcy Rule 2014 with respect to the McKinsey Investment
4    office.   There are employees and/or partners of McKinsey RTS
5    who are on the board of MIO, and presumably helped to make
6    investment decisions.  We've got to know about that.  We've
7    got to know about that.

8          Finally, what I thought I heard Mr. Van Arsdale say
9    is that the U.S. Trustee's Office was satisfied not to require
10   McKinsey to disclose either to it -- let alone the Court, or
11   let alone publicly its 121 undisclosed connections -- admitted
12   undisclosed connections because of McKinsey's policy of
13   confidentiality or confidentiality agreements with these
14   clients -- coupled with, of course, McKinsey's rote assurance
15   that they are unrelated -- that these connections are on
16   unrelated matters.

17         The problem there is, Your Honor, that if we're going
18   to tolerate an exception to Rule 2014 to protect
19   confidentiality, it has to be done on a very limited and very
20   carefully constrained basis.  It can't be wholesale because
21   not only is it the purpose of Rule 2014 to give this Court the
22   information it needs to ensure the integrity of its process,
23   the other purpose of it is to give all of the beneficiaries of
24   the estate confidence and trust that the process has
25   integrity.  And by concealing eighty-eight percent of the

Colloquy

1    connections, even if those eighty-eight percent are disclosed

2    to the Court and the U.S. Trustee, it's going to be hard for

3    the beneficiaries of the estate to have that confidence.

4              THE COURT:  Well, let's back --

5              MR. RHODES:  If there is a specific --

6              THE COURT:  -- let's go back to Mr. Bienenstock's

7    argument, though.  Let's say that the answer is every one of

8    the parties on the interested party list is --

9              MR. RHODES:  Right.

10             THE COURT:  -- is a client, but they're in unrelated

11   matters.

12             MR. RHODES:  Right.

13             THE COURT:  And we just list every one of them.  Does

14   that provide any additional information?

15             MR. RHODES:  Well, Your Honor answered that question,

16   and you answered it in the Lewis Road case, because there you

17   said -- and remember, their counsel disclosed that it

18   represented a creditor.  It not only didn't disclose who the

19   creditor was, it didn't disclose what work it was doing for

20   that creditor.  And it turned out to be work relating to the

21   case.

22             So you said -- the Court said, "Counsel did not

23   disclose with whom it held the connection," in other words,

24   the identity, "nor did it describe what those connections were

25   in its application."  That's the problem with that response,

Colloquy

1   Your Honor.

2          Rule 2014 says it's not for the applicant nor the

3   declarant to simply say there's no conflict here.  That's not

4   Rule 2014.  They've got to give you and the U.S. Trustee's

5   Office enough information to make an independent judgment.

6          THE COURT:  All right, thank you very much.

7          MR. BIENENSTOCK:  Your Honor, may I respond --

8          THE COURT:  Oh, now, wait --

9          MR. BIENENSTOCK:  -- to Exhibit 1?

10         THE COURT:  -- Mr. -- no, I'd like Mr. Rhodes to come

11  back to this podium.  There's one other question I wanted to

12  ask --

13         MR. RHODES:  Yes, sir.

14         THE COURT:  -- before we got done.  And that is

15  notwithstanding the -- what I said to Mr. Bienenstock at the

16  beginning of when he was talking about the standing issues and

17  such, but in this case, as you well know, there are many

18  constituencies.  We have thousands of creditors.

19         MR. RHODES:  Right.

20         THE COURT:  I mean you know the magnitude --

21         MR. RHODES:  Right.

22         THE COURT:  -- we're dealing with.  I don't need to

23  tell you that.

24         MR. RHODES:  Right.

25         THE COURT:  And here we are a week before

Colloquy

1    confirmation.

2         MR. RHODES:  Right.

3         THE COURT:  And what do I need -- how do I put in

4    context everybody else's concerns and such, because you had

5    asked, and you did it sort of hypothetically and rhetorically

6    at the end of your presentation is what could be of more

7    concern to the Court.  Well, the concern to the Court

8    obviously is making sure that there is a -- the case works

9    properly --

10        MR. RHODES:  Right.

11        THE COURT:  -- in this case.  And we're right at the

12   end of the case.

13        MR. RHODES:  Right.

14        THE COURT:  And what good does it do to derail it

15   now, if that's what happens here?

16        MR. RHODES:  Right.  This is a matter of grave

17   concern.  We get that.

18        THE COURT:  That's why I'm asking.

19        MR. RHODES:  Yeah, obviously.  You've got two

20   competing, really important considerations.  On the one hand,

21   there is the underlying purpose of Rule 2014, which is to

22   ensure the integrity of the process.  And on the other hand,

23   you've got the concern that we need to constantly be moving

24   big cases like this towards a conclusion, a prompt conclusion,

25   a fair conclusion.  And one that preserves value for the

Colloquy

1   estate.  That's what Chapter 11 is all about.

2           And so Your Honor has to see not which one prevails,

3   because I'm not going to stand here and tell you one is more

4   important than the other.  But to see if there is a way to

5   meet both concerns.

6           And here I have to beg off a little bit, because we

7   have not been involved in the day-in and day-out of processing

8   this case towards plan confirmation, we don't really know what

9   the consequences would be, if, for example, you put a two-week

10  hold on confirmation to give McKinsey an opportunity to either

11  make the disclosures of the 121 and all the others it's

12  required to make, or some kind of an expedited process to

13  identify an isolate a few of them that they want to disclose

14  in camera, but disclose all the rest in public.

15          I've got to leave that to Your Honor.  You've got

16  your finger on the pulse of the pace of this case.  I wish I

17  could be more help, but I don't know how to -- I don't know

18  how to be more help.

19          THE COURT:  All right, thank you very much.

20          MR. BIENENSTOCK:  Your Honor --

21          THE COURT:  Yes, you may --

22          MR. BIENENSTOCK:  -- may I respond briefly?

23          THE COURT:  You may respond briefly.

24          MR. BIENENSTOCK:  Thank you.  Your Honor, in Mr.

25  Rhodes' opening argument, he posited that McKinsey could be

Colloquy

1    negotiating the sale or purchase of a core asset with a client

2    that McKinsey represents.  I said that's a total incorrect

3    statement.  McKinsey did not negotiate sales of any assets or

4    the treatment of any creditor.

5         He then came back and proffered his Exhibit 1, which

6    says nothing more than that there were meetings with lenders

7    and providing information with lenders.  That was McKinsey's

8    role, to make things more profitable, and it showed the

9    creditors how much more profitable.  That doesn't mean they

10   were negotiating treatment or sales.  They were wrong.  They

11   created a false fact, and Exhibit 1 doesn't refute that at

12   all.

13        Second, Mr. Rhodes did not answer your question.

14   What about when you asked -- what about what I had said

15   previously, that when McKinsey says assume we represent

16   everyone in unrelated matters.

17        His answer was well, but some of them may be related.

18   Well, no, if McKinsey represents that its representations are

19   all unrelated, whether it gives names or not, that's its

20   representation.  These are two different issues.  So

21   basically, Mar-Bow does not have an answer to that, and I just

22   wanted to point that out.  And I appreciate you're giving me

23   the opportunity.

24        THE COURT:  Now I've got one question for you though.

25        MR. BIENENSTOCK:  Okay.

Colloquy

1          THE COURT:  And that is are there, in fact, McKinsey

2    RTS employees on the board of McKinsey Investment?

3          MR. BIENENSTOCK:  May I find out, Your Honor?

4          THE COURT:  You may.

5          MR. BIENENSTOCK:  Thank you for the indulgence.

6          THE COURT:  You're welcome.

7          MR. BIENENSTOCK:  The answer is that there's one

8    McKinsey RTS person not on the ANR case who is on the board of

9    the investment entity.

10          THE COURT:  All right, very good.  Anything further?

11          MR. BIENENSTOCK:  No, Your Honor.

12          THE COURT:  All right.

13          MR. BLACK:  Your Honor --

14          THE COURT:  Mr. Black, now you wish to be heard.

15          MR. BLACK:  Just a moment, Your Honor.  I'd like to

16    respond to Mr. Rhodes' suggestion of a couple-week delay and

17    how this would impact on the plan.

18          THE COURT:  He said he didn't know whether a two-week

19    delay would impact the plan.

20          MR. BLACK:  I just wanted to set that one to rest,

21    Your Honor.  The debtors do believe that a two-week delay or

22    anything like that would be problematic for this case.

23          THE COURT:  I know where we are in the case.  Believe

24    me, that's why I --

25          MR. BLACK:  All right.

Colloquy

1          THE COURT:  -- asked the question that I asked.

2          MR. BLACK:  And just a last point, Your Honor, is

3   that my client's view, certainly, is that as far as they're

4   concerned, there is not a conflict here that would disqualify

5   McKinsey.  And they just wanted me to make that statement on

6   the record.

7          THE COURT:  Okay.  I understand you didn't get the

8   names of the 121 clients.

9          MR. BLACK:  We did not, Your Honor, but I think the

10  answer, at least from a broad perspective, is the

11  representations that McKinsey makes regarding the conflicts,

12  whether there's an interest, whether that party is related to

13  this case, you're fundamentally relying upon the

14  representation of McKinsey for all of those facts.  And my

15  client is comfortable, given the role McKinsey in this case,

16  that the not having those 120 names is not giving them

17  heartburn.

18         THE COURT:  All right, thank you.

19         All right, the Court has before it the unfortunate

20  motion to compel the compliance with Rule 2014.  But of course

21  what Rule 2014 says, that the application has to be

22  accompanied by a verified statement from the person employed,

23  setting forth all of the person's connections with the various

24  interested parties.  And it doesn't limit it.

25         And while there has to be some sort of limitation on

Colloquy

1   the word "connection," it certainly doesn't go to known or

2   significant parties, which are the parties on the interested

3   parties list in this case, but something that would be

4   relatively insignificant.

5        So the Court is going to require McKinsey to disclose

6   the 121 clients.  Now, when I say that, I'm going to require

7   that that list be provided to the Court in camera.  There's

8   going to have to be some sort of a mechanism if it needs to be

9   protected, if it's somehow confidential.  We can work that out

10  through confidentiality agreements or whatever.

11       And I will allow McKinsey to negotiate those with the

12  debtor, with the committee, with the Office of the U.S.

13  Trustee, and the moving party, and so that we can have the

14  proper confidentiality provisions before anything is

15  disclosed.  But they are going to be disclosed, in the

16  meantime, to the Court in camera, so the Court can see the 121

17  clients.

18       The Court is going to require, since we have an

19  employee on the board of McKinsey Investments, that

20  investments in any of the interested parties be disclosed.

21  Again in camera, to the Court, and that can be handled

22  separately.

23       Maybe there's a separate disclosure there, but

24  certainly, the debtor's going to have to be aware of that;

25  certainly, the committee's going to have to be aware of that

Colloquy

1   and the Office of the U.S. Trustee.  We can again be having

2   that done on a confidential basis, and such.

3           The purpose here is not to destroy McKinsey's

4   business model.  It's certainly not to give a competitive

5   advantage to a competitor.  The Court's going to be completely

6   respectful of all of that, but I am not going to do anything

7   to impair the integrity of Rule 2014.  And just because other

8   parties are doing it doesn't mean that it's right.  And it's

9   not a different standard for lawyers than it is for other

10  parties.

11          Section 327 talks about professionals.  McKinsey's a

12  professional.  Mr. Rhodes is exactly right.  They're a

13  fiduciary.  They're employed by the fiduciary.  They're held

14  to the same standard.  Outside of the bankruptcy arena, it's

15  different, but inside bankruptcy it's not, and so it's going

16  to have to be disclosed.

17          The third thing that the Court's going to want is the

18  survey response, the response rate to the e-mail survey that

19  went out, so the Court has that as well.  That's again --

20  somewhere between 2,000-whatever and 0 is obviously going to

21  be a sufficient response, but I think the Court needs to have

22  that in order to make the disclosures that have been provided

23  in this case meaningful.

24          The Court is going to want the list provided to it by

25  Monday.  We've got confirmation coming up next week.  I'd have

Colloquy

1    to see that beforehand.  We can deal with the other

2    confidentiality things afterward.  I'm not going to hold up

3    confirmation in this case, but that said; I am going to want

4    to see that prior to going forward with the confirmation,

5    because obviously, I'm going to need to rely on McKinsey's

6    testimony in order to confirm a plan, and so I want to see it.

7         Are there any questions regarding what the Court has

8    just required?  Mr. Rhodes?

9         MR. RHODES:  Is the deadline of Monday for both the

10   121 known undisclosed connections and MIO connections?

11        THE COURT:  Yes.  Thank you.

12        Mr. Bienenstock.

13        MR. BIENENSTOCK:  So the deadline Monday for

14   everything?

15        THE COURT:  In camera, to me only, because you're

16   going to --

17        MR. BIENENSTOCK:  Right.

18        THE COURT:  -- want to negotiate your confidentiality

19   agreements to make sure that they're tight, and that we're not

20   going to do anything to disrupt McKinsey's business model or

21   anything else.  I respect that, and that may take some more

22   time, but providing the information in camera to me shouldn't.

23        MR. BIENENSTOCK:  But Your Honor mentioned the moving

24   party as one of the negotiators.  Can I --

25        THE COURT:  To the confidentiality agreement.

Colloquy

1              MR. BIENENSTOCK:  But --

2              THE COURT:  There may be different things that would

3     be disclosed to the moving party that would be less than what

4     you had disclosed to the Office of the U.S. Trustee and to the

5     debtor, whatever.  I'm going to let the parties negotiate

6     that.  If you can't come up with a confidentiality agreement,

7     I will provide one.  I am confident I can.  Okay?

8              MR. BIENENSTOCK:  No, but Your Honor mentioned --

9              THE COURT:  This isn't rocket science.

10             MR. BIENENSTOCK:  -- Your Honor mentioned that this

11    was not to hurt McKinsey competitively, so --

12             THE COURT:  Exactly.

13             MR. BIENENSTOCK:  -- giving information to

14    AlixPartners is obviously --

15             THE COURT:  You're not going to give anything to

16    AlixPartners.  AlixPartners is not before the Court.

17             MR. BIENENSTOCK:  Okay, and well --

18             THE COURT:  And we will make sure of that.

19             MR. BIENENSTOCK:  -- Mar-Bow is the same.  Jay Alix

20    is a director of AlixPartners.

21             THE COURT:  Well, you can deal with that.  If you

22    can't get comfortable with that, then you come back to me, and

23    I'll get comfortable with it.  Okay?

24             MR. BIENENSTOCK:  Yes.

25             THE COURT:  Because I can make sure that that doesn't

Colloquy

1    happen.  There are ways to protect that.  Okay?  And I will

2    make sure that McKinsey's protected.

3         MR. RHODES:  All right, just one more deadline

4    question.  The survey responses by Monday as well?

5         THE COURT:  Yes, all -- I want all three to me --

6         MR. RHODES:  All three.

7         THE COURT:  -- by Monday.  That shouldn't be a

8    problem.

9         Is that a problem, Mr. Bienenstock?

10        MR. BIENENSTOCK:  Well, Your Honor, I don't know if

11   McKinsey even kept survey responses.  I'll find out.

12        THE COURT:  Okay.  Well, then you can reveal that to

13   me, whatever.  I want your response by Monday.

14        MR. BIENENSTOCK:  Okay.

15        THE COURT:  And obviously, if we don't have

16   information, or the information I'm getting back from McKinsey

17   is not going to be adequate, then we're going to have some

18   further proceedings, but we can deal with that.

19        What I would like to do is try to see if we can't

20   ferret it out so we can put this to rest completely.  That's

21   what I'd like to do, and if we can't do it, then you're going

22   to need to tell me.  But I don't -- you've got that

23   information.

24        MR. BIENENSTOCK:  Well, okay.  We --

25        THE COURT:  I'm not going to tell you to do something

Colloquy

1    that you can't do.

2           MR. BIENENSTOCK:  Okay.  Obviously, we understand the

3    timing and the reason for the Court's deadline.  We probably

4    have to go to other parties, which will take a lot of work,

5    and all I can say is we will do the best we can.

6           THE COURT:  All right.

7           MR. BIENENSTOCK:  And tell Your Honor the results.

8           THE COURT:  All right.  Thank you very much.

9           All right, any other questions?

10          MR. RHODES:  Your Honor, Monday is the 4th of July.

11   Tuesday, Your Honor?

12          THE COURT:  I'm the only one that doesn't have a

13   life.  I started the hearings off that way.

14          MR. RHODES:  Apparently, we didn't realize this

15   either.

16          THE COURT:  What day is our confirmation hearing?

17          UNIDENTIFIED SPEAKER:  7th, Your Honor.

18          THE COURT:  On the 7th?  Okay, so if we get it by

19   noon on the 6th, that would give me an opportunity to review

20   it.

21          Is that putting an undue burden on you,

22   Mr. Bienenstock, given the holiday?

23          MR. BIENENSTOCK:  I'm not concerned with the holiday.

24   I'm just concerned, assuming no holiday, it's going to be hard

25   but we'll do our best.

Colloquy

1          THE COURT:  That's what I'm asking you to do.

2          MR. BIENENSTOCK:  Right.

3          THE COURT:  Okay.  Thank you very much.

4          All right, any other questions regarding the Court's

5    ruling?  Mr. Ruby?

6          MR. RUBY:  Your Honor, do you want Mar-Bow to prepare

7    an order?

8          THE COURT:  Yes, I would like an order.  I probably

9    am going to doctor it some, but please submit it.  If you can

10   get that to me just as quickly as you can.

11         MR. RUBY:  Thank you, Your Honor.

12         THE COURT:  All right.

13         MR. RHODES:  We'll have Mr. Bienenstock review it.

14         THE COURT:  Yes, obviously, I would like that too.

15   That would be the appropriate protocol in this Court.

16         MR. RHODES:  Right.

17         THE COURT:  And that's the way that that would work.

18         All right, any other questions regarding the Court's

19   ruling?  All right, thank you all very much.

20         MR. RHODES:  Thank you.

21         THE CLERK:  All rise.  Court is now adjourned.

22      (Whereupon these proceedings were concluded at 2:06 PM)

23

24

25

1
2                        I N D E X
3   EXHIBITS:    DESCRIPTION                    I.D.      EVID
4   For the Debtors:
5   —              Declaration of Gideon                   73
6                  Volschenk in support of sale
7                  of Knox Creek Mining Complex
8
9   RULINGS:                                    PAGE      LINE
10  Debtors' motion for order authorizing        6         15
11  rejection of operations agreement with
12  Veolia Water North America Operating
13  Services, LLC, granted.
14  Debtors' motion to approve stipulation       6         25
15  and agreed order between Debtors and
16  SAP America, Inc. concerning the assumption
17  of a certain software agreement, granted.
18  Debtors' motion for order authorizing the    7         9
19  rejection of a certain services agreement
20  with Cintas, effective as of June 10, 2016,
21  granted.
22  VDOT's motion for entry of a consent order   8         15
23  modifying the automatic stay, granted.
24  Debtors' motion for order as to contract     13        1
25  procedures, granted.

| | RULINGS (cont'd.): | PAGE | LINE |
|---|---|---|---|
| 1 | | | |
| 2 | | | |
| 3 | Argo's motion to expedite consideration, | 16 | 21 |
| 4 | granted. | | |
| 5 | The Liberty Mutual motion, granted. | 17 | 14 |
| 6 | Sureties' motion for estimation and | 17 | 14 |
| 7 | allowance of claims, granted. | | |
| 8 | Debtors' third omnibus motion to assume | 22 | 15 |
| 9 | or reject leases, granted. | | |
| 10 | Debtors' combined motion for entry of | 78 | 10 |
| 11 | (A) order establishing bidding and sale | | |
| 12 | procedures for the potential sale of | | |
| 13 | certain mining properties and related | | |
| 14 | assets and granting related relief and | | |
| 15 | (B) one or more orders approving the sale | | |
| 16 | of such properties, granted. | | |
| 17 | Motion to reconsider motion to terminate | 84 | 24 |
| 18 | certain supplemental benefit plans, | | |
| 19 | denied. | | |
| 20 | McKinsey ordered to disclose 121 | 157 | 5 |
| 21 | clients. | | |
| 22 | McKinsey ordered to disclose investments | 157 | 18 |
| 23 | of any interested parties. | | |
| 24 | Survey response rate to e-mail survey to | 158 | 17 |
| 25 | be disclosed to the Court. | | |

1

2                    C E R T I F I C A T I O N

3

4          I, Clara Rubin, the court approved transcriber, do

5   hereby certify the foregoing is a true and correct transcript

6   from the official electronic sound recording of the

7   proceedings in the above-entitled matter.

8

9

10

11

12                                              June 29, 2016

13   _____        _____

14   CLARA RUBIN                      DATE

15

16   eScribers, LLC

17   700 West 192nd Street, Suite #607

18   New York, NY 10040

19   (973)406-2250

20   operations@escribers.net

21

22

23

24

25