# EXHIBIT 66

**EXHIBIT C**

**Engagement Letter**

**AGREEMENT**

Mr. John S. Dubel
Chief Restructuring Officer
SunEdison, Inc.
600 Clipper Drive
Belmont, CA 94002

Dear John:

     This letter (the "Agreement"), dated as of April 21, 2016 (the "Effective Date"), is between McKinsey Recovery & Transformation Services U.S., LLC ("McKinsey RTS") and SunEdison, Inc. (the "Company") and sets forth the terms of McKinsey RTS's engagement to provide certain consulting services to the Company as expressly contemplated by this Agreement (the "Engagement"). McKinsey RTS and the Company are collectively referred to in this Agreement as the "Parties," and each a "Party".

    1.    SERVICES.

    (a)    Company hereby agrees to retain McKinsey RTS to provide the services (the "Services") described in this Section 1. McKinsey RTS has been providing Services since the Effective Date.

    (b)    To fulfill its responsibilities on a timely basis McKinsey RTS will rely on the Company's timely cooperation regarding the Engagement, including the Company's making available to McKinsey RTS relevant data, information and personnel, performing any tasks or responsibilities assigned to the Company and notifying McKinsey RTS of any issues or concerns the Company may have relating to the Services. The Company understands and acknowledges that McKinsey RTS's delivery of the Services and the Fees (as defined below) charged hereunder are dependent upon timely decisions and approvals by the Company and its management. The Company shall be responsible for any delays, additional costs or other deficiencies caused by not completing its responsibilities.

    The general responsibilities of McKinsey RTS shall be as follows:

- Support the development of a strategic business plan with the Company's Chief Restructuring Officer and other key functional leaders that can be used to facilitate discussions with the Company's lenders and certain other stakeholders;

- Assist the Company's Chief Restructuring Officer and Chief Financial Officer with matters related to financial planning and analysis, as requested;

- Assist in developing a short-term cash flow forecasting process and implementing cash management strategies, tactics and processes and work with the Company's

1

treasury department and other professionals and coordinate the activities of the representatives of other constituencies in the cash management process;

- Assist with the Company's financial and treasury functions as they respond to the analytical requests and other requests for information that are placed upon the Company;

- Along with management, develop and establish a weekly financial reporting package that provides additional transparency into the Company's near term cash position, including a forecast to actual variance analysis;

- Provide strategic advice to support the overall restructuring process;

- In cooperation with the Company's officers, investment bankers and other engaged professionals and counsel, develop and prepare a chapter 11 plan of reorganization;

- Assist the Company in managing its bankruptcy process including managing outside stakeholders and their professionals;

- Assist with the evaluation of certain near term operational cost reduction and value enhancement opportunities (e.g., SG&A, fixed costs and procurement);

- Plan and execute the Company's business support functions re-organization and cost reduction goals;

- Work with the Company's counsel ("Counsel") on supporting data in order for Counsel to prepare first day motions, the petitions for relief and other documents and evidence needed to implement any Chapter 11 bankruptcy case filed by the Company;

- Assist the Company with developing a detailed communications plan;

- Provide local support with development of various strategic and restructuring alternatives for international operations;

- Provide testimony and other litigation support as requested by Counsel in connection with matters upon which McKinsey RTS is providing Services; and

- Assist with all such other restructuring matters as may be requested by Counsel and/or the Board that fall within McKinsey RTS's expertise and that are mutually agreed upon between the Parties.

(c)    During the term of the Engagement, priorities may shift or unexpected events may occur which will necessitate changes to the Services. In this event, McKinsey RTS and the Company will jointly discuss the anticipated impact on the Services and agree on any appropriate adjustments, including to the scope of work, timeframe, budget and fees.

2

2.      COMPENSATION. The Company shall compensate McKinsey RTS for its professional fees and expenses, including payment of a retainer, in connection with the Services for the Engagement based on the hourly rates set forth in Schedule 1 attached hereto (the "Fees"). Prior to commencing work under this Agreement and for this Engagement, McKinsey RTS was paid a total retainer in the amount of $2,000,000. McKinsey RTS shall bill Company on a monthly basis. All invoiced amounts shall be applied against the retainer. McKinsey RTS shall issue periodic statements for replenishing the retainer. These statements, which shall be due upon receipt by the Company, shall be submitted with sufficient frequency that a retainer balance shall always be maintained. The retainer shall remain in place until work under this Agreement is concluded, or this Agreement is amended in writing. All retainer balances shall be credited against any outstanding amounts due upon termination of the Engagement, with the remainder to be returned to the Company upon satisfaction of all payment obligations due under this Agreement.

3.      CONFIDENTIALITY.   McKinsey RTS will keep confidential any confidential information furnished by the Company to McKinsey RTS in connection with the Services ("Confidential Information").   McKinsey RTS will disclose Confidential Information only to its employees and agents who have a need to know and are bound to keep it confidential and will use Confidential Information only for purposes of performing the Services and, where the agreed upon Services include benchmarking services, to benchmark and report on sanitized, aggregate trends and metrics without disclosing the Company's Confidential Information and without attribution to the Company. Confidential Information shall not include information that is or becomes publicly available, already known to McKinsey RTS, independently acquired or developed by McKinsey RTS or legally required to be disclosed.   McKinsey RTS will reasonably cooperate with the Company, at its expense, in responding to any legally required disclosure. In performing the Services, McKinsey RTS will use and rely primarily on the Confidential Information and on information available from public sources without independently verifying any of such information.

4.      USE OF McKINSEY RTS NAME AND DELIVERABLES. In connection with the Engagement, McKinsey RTS may furnish the Company with information, advice, reports, analyses, presentations or other such materials (the "Deliverables"). The Company understands and agrees that any such Deliverables are furnished or presented solely for the Company's internal use and benefit (limited to management and the Board, the Company's financial advisors and legal counsel) and may not be furnished or conveyed in whole or in part to any person or entity other than as described in this Section 4 without McKinsey RTS's prior written consent or as required by law. The Company may furnish and convey Deliverables to its management, directors, lenders and other stakeholders  (and to their respective financial advisors or legal counsel), in each case only if such persons (i) need to know the information set forth, or embodied in, such Deliverables and (ii) are informed of the confidential nature of the Deliverables and (iii) agree to comply with the restrictions stated in this Section 4.; Provided, however, that Deliverables may not be furnished, conveyed or presented to any person or entity other than management and the Board, the

Company's financial advisors and legal counsel unless (A) Company has received McKinsey RTS's oral or written consent to furnish or convey such information; and (B) such third parties are informed of the confidential nature of the information and, prior to Company's disclosure, each such third party to whom it seeks to disclose such information executes and delivers to McKinsey RTS a letter agreement in a form reasonably acceptable to McKinsey RTS. The Company further agrees that, without McKinsey RTS's prior written consent, it shall not refer to McKinsey RTS or attribute any information to McKinsey RTS in any document or communication external, or reasonably likely to be disseminated externally, to the Company for any purpose, including in press releases and web sites. The Company also agrees that it shall not, and shall not permit its advisors to, refer to McKinsey RTS or attribute any information to McKinsey RTS, either generically or by name, without McKinsey RTS's prior written approval except as required by law. McKinsey RTS shall not issue any press release which references this Agreement or Company without Company's prior written consent.

5.    INTELLECTUAL PROPERTY. Upon payment in full of McKinsey RTS's Fees, the Company will own all Deliverables furnished by McKinsey RTS to the Company in connection with the Services, save that McKinsey RTS retains ownership of all concepts, analyses, know-how, tools, frameworks, models and industry perspectives used and/or developed by McKinsey RTS in connection with the Services (the "McKinsey RTS Tools"), it being understood that none of the McKinsey RTS Tools will contain the Company's Confidential Information. To the extent the Deliverables include any McKinsey RTS Tools, McKinsey RTS hereby grants the Company a non-exclusive, non-transferable, non-sublicenseable, worldwide, royalty-free license to use and copy the McKinsey RTS Tools solely as part of the Deliverables and subject to the above limitations on the use of McKinsey RTS name and Deliverables.

6.    INDEMNIFICATION

(a)    In order to induce McKinsey RTS to provide the Services to Company, the Company and its affiliates hereby agree (i) to indemnify, hold harmless and defend McKinsey RTS, and its past, present and future affiliates, and each of their respective directors, officers, managers, shareholders, partners, members, employees, agents, representatives, advisors and controlling persons (collectively, the "Indemnified Parties" and each individually, an "Indemnified Party"), to the fullest extent lawful, from and against any and all losses, claims, penalties, damages or liabilities (or actions in respect thereof), joint or several, caused by, relating to, based upon or arising out of (directly or indirectly) this Agreement or the Engagement, or any actions taken or omitted to be taken by an Indemnified Party or the Company and its affiliates in connection with this Agreement or the Engagement (including, without limitation, any acts taken or omitted to be taken by an Indemnified Party as a representative, agent, fiduciary or in any other capacity of, or in connection with any services provided to or termination of, any employee benefit plan (including any defined contribution plan)); and (ii) to reimburse each Indemnified Party for all reasonable expenses (including, without limitation, the reasonable fees and reasonable expenses of counsel and the reasonable costs of McKinsey RTS's

4

professional time) as and when they are incurred in connection with investigating, preparing, pursuing, defending, settling or compromising any action, suit, dispute, inquiry, investigation or proceeding, pending or threatened, brought by or against any person or entity (whether or not such Indemnified Party is a formal party to any such action, suit, dispute, inquiry, investigation or proceeding), caused by, relating to, based upon or arising out of (directly or indirectly) this Agreement or the Engagement, or any actions taken or omitted to be taken by an Indemnified Party or the Company and its affiliates in connection with this Agreement or the Engagement (including, without limitation, any acts taken or omitted to be taken by an Indemnified Party as a representative, agent, fiduciary or in any other capacity of, or in connection with any services provided to or termination of, any employee benefit plan (including any defined contribution plan)), and in enforcing this Agreement. However, the Company and its affiliates shall not be liable under the foregoing indemnity and reimbursement provisions for any loss, claim, damage, penalty or liability which is finally judicially determined by a court of competent jurisdiction on the merits to have resulted primarily and directly from the willful misconduct or gross negligence of such Indemnified Party toward the Company and its affiliates, but pending any such judicial determination, the Company and its affiliates shall continue to be obligated on, and shall continue to perform, its indemnification and reimbursement obligations.

(b)    If for any reason the foregoing indemnification or reimbursement is held by a court of competent jurisdiction to be unavailable to any Indemnified Party or insufficient fully to indemnify or reimburse any such Indemnified Party or to hold it harmless in respect of any losses, claims, damages, penalties, liabilities or expenses referred to in such indemnification or reimbursement provisions, then the Company and its affiliates shall contribute to the amount paid or payable by such Indemnified Party as a result of such losses, claims, damages, penalties, liabilities or expenses in such proportion as is appropriate to reflect the relative benefits received (or anticipated to be received) by the Company and its affiliates, on the one hand, and McKinsey RTS, on the other hand, in connection with the matters contemplated by this Agreement. If, however, the allocation provided by the immediately preceding sentence is not permitted by applicable law, then the Company and its affiliates shall contribute to such amount paid or payable by any Indemnified Party in such proportion as is appropriate to reflect not only such relative benefits, but also the relative fault of the Company and its affiliates, on the one hand, and such Indemnified Party, on the other hand, in connection therewith, as well as any other relevant equitable considerations. The Company, its affiliates and McKinsey RTS agree that it would not be just and equitable if contribution pursuant to this Section 6(b) were determined by pro rata allocation or by any other method of allocation which does not take account of the equitable considerations referred to above in this Section 6(b). Notwithstanding the foregoing, in no event shall the Indemnified Parties be required to contribute an aggregate amount in excess of the amount of Fees (but not expenses) actually received by McKinsey RTS from the Company and its affiliates pursuant to this Agreement.

(c)    The Company and its affiliates shall not, without the prior written consent of McKinsey RTS which shall not be unreasonably delayed or withheld, settle, compromise

5

or consent to the entry of any judgment in or otherwise seek to terminate any pending or threatened action, suit, dispute, inquiry, investigation or proceeding in respect of which indemnification, reimbursement of expenses or contribution may be sought hereunder (whether or not an Indemnified Party is an actual or potential party thereto).

(d) The Company and its affiliates agree that neither McKinsey RTS nor any other Indemnified Party shall have any liability (whether direct or indirect and regardless of the legal theory advanced) to the Company, its affiliates or any person or entity asserting claims on behalf of or in right of the Company and its affiliates caused by, relating to, based upon or arising out of (directly or indirectly) this Agreement or the Engagement, or any actions taken or omitted to be taken by an Indemnified Party or the Company and its affiliates in connection with this Agreement or the Engagement (including, without limitation, any acts taken or omitted to be taken by an Indemnified Party as a representative, agent, fiduciary or in any other capacity of, or in connection with any services provided to or termination of, any employee benefit plan (including any defined contribution plan)), except for losses, claims, damages, penalties or liabilities incurred by the Company and its affiliates which are finally judicially determined by a court of competent jurisdiction on the merits to have resulted primarily and directly from the willful misconduct or gross negligence of McKinsey RTS or any other Indemnified Party. In no event, however, shall McKinsey RTS's or any other Indemnified Party's liability to the Company or its respective affiliates, successors, or any person claiming on behalf of or in right of the Company, including Company's owners, parents, affiliates, directors, officers, employees, agents, security holders, or creditors, exceed, when taken together with all losses for which McKinsey RTS or such other Indemnified Party is liable in connection with this Agreement or the Engagement, the amount of Fees actually received by McKinsey RTS in connection with the Engagement.

(e) The indemnity, reimbursement, and other obligations and agreements of the Company and its affiliates set forth in this Section 6: (i) shall apply to any Services provided by McKinsey RTS in connection with the Engagement (whether provided prior to, on or after the Effective Date) and to any modifications of this Agreement, (ii) shall be in addition to any obligation or liability which the Company and its affiliates may otherwise have to any Indemnified Party, (iii) shall remain operative and in full force and effect regardless of any investigation made by or on behalf of the Company, its affiliates or any Indemnified Party, or any other person or entity, (iv) shall survive the completion of the Services described in, and any expiration or termination of the relationship established by, this Agreement and (v) shall be binding on any successor or assign of the Company and its affiliates. In no event shall any Indemnified Party be responsible for any loss profits or special, punitive, exemplary, indirect or consequential damages.

7. COMPANY ACKNOWLEDGMENT. It is McKinsey RTS's long-standing policy to serve competing clients and clients with potentially conflicting interests as well as counter-parties in merger, acquisition and alliance opportunities, and to do so without compromising McKinsey RTS's professional responsibility to maintain the confidentiality of client information. Consistent with such practice and McKinsey RTS's confidentiality

6

obligations to its other clients, McKinsey RTS is not able to advise or consult with the Company about McKinsey RTS's serving the Company's competitors or other parties. To avoid situations of potential conflict, McKinsey RTS will not assign consultants, who are providing the Services and who receive Confidential Information, to a competitively sensitive project for a period of two years following an assignment for the Company.

8.       NON-SOLICITATION OF EMPLOYEES

(a)      Without the Company's prior written consent, none of McKinsey RTS's directors, officers or employees who have worked with the Company on this engagement will, for a period of two (2) years subsequent to the termination of this engagement, directly or indirectly solicit, recruit, hire or otherwise engage for services any employee of the Company or any of its affiliates who have worked with McKinsey RTS's employees or representatives on this engagement while employed by the Company (a) for employment by McKinsey RTS or by any of its affiliates or (b) to provide consulting or other services to or on behalf of McKinsey RTS or any of its affiliates.

(b)      McKinsey RTS acknowledges and agrees that money damages alone may not be an adequate remedy for a breach of this Section 8, and the both parties agree that the other shall have the right to seek a restraining order and/or an injunction for any breach of this non-solicitation provision, without the need for posting a bond. If any provision of this Section 8 is found to be invalid or unenforceable, then it shall be deemed modified or restricted to the extent and in the manner necessary to render the same valid and enforceable.

9.       TERM AND TERMINATION. The Engagement will commence as of the Effective Date and shall continue until the earlier of:  (a) the completion of the Services hereunder or (b) the termination of this Agreement by either Party by giving five (5) days' written notice to the other Party. In the event of any termination, the Company will pay McKinsey RTS's Fees and expenses up to the effective date of termination.

10.      RELATIONSHIP OF THE PARTIES. The Parties intend that an independent contractor relationship will be created by this Agreement. Nothing in this Agreement is intended to create, nor shall be deemed or construed to create, a fiduciary or agency relationship between McKinsey RTS and the Company, or its Board of Directors. More specifically, for purposes of this Agreement, neither McKinsey RTS, its affiliates, nor any individual consultant providing services to the Company shall be acting as an officer, director, manager, trustee, or in any other agency or fiduciary capacity. Notwithstanding McKinsey RTS's provision of the Services described in Section 1, none of McKinsey RTS, its affiliates, nor any individual consultant providing services to the Company shall be (i) deemed a fiduciary; or (ii) be required to perform any tasks, actions or functions, and shall not be required to assume any roles, assignments or capacities, that (in any such case) could give rise to fiduciary status to McKinsey RTS, its affiliates or any Indemnified Party with respect of the Company.

7

11.    BANKRUPTCY FILING.  In the event that the Company commences or has commenced a case under chapter 11 of title 11 of the United States Code, the Company will apply to the Bankruptcy Court, on the date of filing or as soon thereafter as practicable, to obtain approval of McKinsey RTS's retention and Retainer, *nunc pro tunc* to the date of filing.  It is understood that in the case of a Chapter 11 bankruptcy, the terms and conditions of this Agreement, particularly the compensation provisions, are subject to (a) prior approval of the Bankruptcy Court to be treated as administrative expenses of the bankruptcy case; and (b) may be subject to a standard of reasonableness.  McKinsey RTS shall file applications for approval of its fees and expenses in accordance with the terms of any interim compensation orders or other orders approved by the Bankruptcy Court.

12.    MISCELLANEOUS.  This Agreement and any schedules hereto constitute the entire agreement between the parties, and there are no prior or contemporaneous oral or written representations, understandings or agreements relating to this subject matter that are not fully expressed herein or therein.  This agreement and the Proposals shall be governed by and construed in accordance with the laws of the State of New York without regard to conflicts of law principles and shall inure to the benefit of and be binding on the successors and assigns of the Company and McKinsey RTS.  The following Sections shall survive the completion or any termination of the Services:  3 (Confidentiality), 4 (Use of McKinsey RTS Name and Deliverables), 5 (Intellectual Property), 6 (Indemnification), 7 (Company Acknowledgement), 8 (Non-Solicitation of Employees), 9 (Term and Termination), 10 (Relationship of the Parties), 11 (Bankruptcy Filing) and 12 (Miscellaneous) and any other provision which by law or by its nature should survive. Neither party may assign its rights or obligations under this agreement to any person or entity without the written consent of the other party, not to be unreasonably withheld, provided, however, that either party may assign its rights and obligations under this agreement to its affiliates upon reasonable written notice to the other party but without the written consent of the other party.  Assignment shall not relieve either party of its obligations hereunder.

[Remainder of Page Intentionally Left Blank]

8

McKinsey Recovery & Transformation Services U.S., LLC


By:

Name:    Mark W. Hojnacki

Title:    Practice Leader


ACCEPTED AND AGREED TO

SunEdison, Inc.


By:

Name:    John S. Dubel

Title:    Chief Restructuring Officer

9

## Schedule 1

## Fees for Services

In exchange for its services, Company will compensate McKinsey RTS in accordance with the terms of this Agreement, which provides for payment of Fees as follows:

(a) Retainer- A retainer of $2,000,000 was received prior to this Engagement.

(b) Hourly rates: Following a bankruptcy filing, McKinsey RTS's fees are to be based on the hours worked by McKinsey RTS's personnel at the following hourly rates:

| | | |
|---|---|---|
| i. | Practice Leader: | $950-$1,075 |
| ii. | Senior Vice President: | $700-$875 |
| iii. | Vice President: | $600-$700 |
| iv. | Senior Associate | $500-$575 |
| v. | Associate: | $400-$475 |
| vi. | Analyst: | $250-$350 |
| vii. | Paraprofessional: | $225-$250 |

McKinsey RTS reviews and revises its billing rates on or about January 1 of each year.

(c) Expenses: The Company will reimburse McKinsey RTS for all reasonable out-of-pocket expenses incurred in connection with the Engagement, such as travel, lodging, case administrators, and working meals.

10