# EXHIBIT 68

**Exhibit 1**

**Engagement Letter**

# AGREEMENT

Mr. Michael G. Hutchinson
Chief Executive Officer
Westmoreland Coal Company
9540 South Maroon Circle, Suite 300
Englewood, CO 80112

Dear Michael:

This letter (the "Agreement"), dated as of October 9, 2018 (the "Effective Date"), is between McKinsey Recovery & Transformation Services U.S., LLC ("McKinsey RTS") and Westmoreland Coal Company (the "Client") and supersedes the agreement dated July 17, 2018 between McKinsey RTS and the Client (the "Prepetition Agreement") as of the Effective Date. This Agreement sets forth the terms of McKinsey RTS's engagement to provide consulting services to the Client as expressly contemplated by this Agreement (the "Engagement"). McKinsey RTS and the Client are collectively referred to in this Agreement as the "Parties," and each a "Party."

1. SERVICES.

(a) Client hereby agrees to retain McKinsey RTS to provide the services (the "Services") described in this Section 1.

(b) To fulfill its responsibilities on a timely basis, McKinsey RTS will rely on the Client's timely cooperation regarding the Engagement, including the Client's making available to McKinsey RTS relevant data, information and personnel, performing any tasks or responsibilities assigned to the Client and notifying McKinsey RTS of any issues or concerns the Client may have relating to the Services. The Client understands and acknowledges that McKinsey RTS's delivery of the Services and the Fees (as defined below) charged hereunder are dependent upon timely decisions and approvals by the Client and its management. The Client shall be responsible for any delays, additional costs or other deficiencies caused by not completing their respective responsibilities.

The general responsibilities of McKinsey RTS will be as follows:

- Operational improvement planning – Assist the Client with identifying and planning detailed initiatives to support improvements in operating performance in mining operations, corporate functions and commercial agreements.

- Operational Support – Provide the Client with hands-on support to implement the detailed initiatives to support operational improvements.

- Business Plan – Support the Client and the Client's Restructuring Advisor, Alvarez and Marsal North America, LLC ("A&M"), with incorporating the operational improvement plans into the Client's business plan, disclosure statement and plans of reorganization.

- Constituent Management – Assist in development of supporting diligence materials and presentations for use in various stakeholder meetings, attend diligence sessions and working meetings with various stakeholders and constituents and provide related ad hoc support to the management team on matters related to the operational improvement plans.

- Other Operational Services - As appropriate, assist the Client with other matters as may be requested by Client and that are mutually agreed upon between McKinsey RTS and the Client.

(c) During the term of the Engagement, priorities may shift or unexpected events may occur which will necessitate changes to the Services. In this event, McKinsey RTS and the Client will jointly discuss the anticipated impact on the Services and agree on any appropriate adjustments, including to the scope of work, timeframe, budget and fees.

(d) In connection with the Client's chapter 11 proceeding commenced on October 9, 2018 under title 11 of the United States Code (the "Bankruptcy Proceeding"), McKinsey RTS will participate, as necessary, in any proceedings before the bankruptcy court (the "Bankruptcy Court") implicating the Services or this Engagement (which participation may include witness testimony).

2. COMPENSATION. The Client shall compensate McKinsey RTS for its professional fees and expenses in connection with the Services (the "Fees") for the Engagement and hereby agrees to pay McKinsey RTS during the term of this Agreement in accordance with the terms set forth in Schedule 1. As of the Effective Date, McKinsey RTS holds a credit balance of $1.5 million from the retainer (the "Retainer") provided by the Client to McKinsey RTS pursuant to the Prepetition Agreement. McKinsey RTS and the Client agree that this Agreement shall continue to govern the application of the Retainer in the Bankruptcy Proceeding. McKinsey shall bill the Client on a monthly basis and shall be paid in accordance with the interim compensation orders entered by the Bankruptcy Court. McKinsey intends to hold the Retainer until the end of the Bankruptcy Proceeding and then apply it to its final application to the Bankruptcy Court for payment in the Bankruptcy Proceeding.

3. NO DUPLICATION OF SERVICES. McKinsey RTS acknowledges that the Client has separately engaged Centerview Partners LLC ("Centerview") to serve as the Client's financial advisor and A&M to serve as the Client's restructuring advisor. As set forth herein, McKinsey RTS will carry out unique functions that are not duplicative of the work performed by Centerview or A&M, and McKinsey RTS will coordinate with the Client's other retained professionals to avoid the unnecessary duplication of services as reasonably possible. Furthermore, all of the services that each retained professional provides to the Client will be appropriately directed by the Client so as to avoid unnecessary duplicative efforts among such professionals.

2

4. CONFIDENTIALITY.

McKinsey RTS will keep confidential any confidential information, including any personal data (as defined below), furnished by the Client to McKinsey RTS in connection with the Services ("Confidential Information"). McKinsey RTS will disclose Confidential Information only to its employees and agents who have a need to know and are bound to keep it confidential, will use Confidential Information only for purposes of performing the Services, including preparing Proposals and evaluating potential services, or as otherwise requested or authorized by the Client, and will protect Confidential Information in accordance with the McKinsey Data Protection Protocols available at https://solutions.mckinsey.com/msd/data-protocols.pdf (the "Protocols"). Subject to its confidentiality obligations, where the agreed upon Services include benchmarking services, McKinsey RTS may also incorporate Confidential Information into its benchmarking databases for use in reporting on sanitized or aggregate trends and metrics without attribution to the Client. To bring the best of McKinsey RTS's global resources to serve the Client, the Client agrees that McKinsey RTS may transfer Confidential Information to geographies other than those in which it was collected or received, including to McKinsey RTS affiliates and sub-processors that comprise or support McKinsey RTS's infrastructure and maintenance functions as set forth in the Protocols, to facilitate any activities authorized by the Client, provided that at all times Confidential Information will be treated as confidential and protected in accordance with this Agreement. Confidential Information shall not include information that is or becomes publicly available, already known to McKinsey RTS without an obligation of confidentiality, or independently acquired or developed by McKinsey RTS or legally required to be disclosed. In performing the Services, McKinsey RTS will use and rely primarily on the Confidential Information and on information available from public sources and Client acknowledges that it is authorized to provide McKinsey RTS with such Confidential Information for its use in connection with agreed Services and that McKinsey RTS will have no obligation to independently verify such information. At the Client's election and notification to McKinsey RTS, McKinsey RTS shall promptly return or destroy any Confidential Information, including any personal data, in its possession or control when the same is no longer necessary for the provision of the Services, provided that McKinsey RTS may retain such Confidential Information only as required by applicable law, regulation or documented professional archival policy or as otherwise authorized or instructed by the Client. Any Confidential Information so retained shall at all times remain subject to the terms and conditions of this Agreement, including with respect to confidentiality, security and non-disclosure.

5. DATA SECURITY. Without limiting the foregoing, if McKinsey RTS processes data as part of the Services and on behalf of the Client which relates to an identified or identifiable person ("personal data"), McKinsey RTS shall (i) only process such personal data, including with respect to McKinsey RTS's use of subcontractors or sub-processors, as set forth in this Agreement and the Protocols, as otherwise authorized in writing by the Client, or as required by applicable law, (ii) implement appropriate technical and organizational measures to protect such personal data as set forth in the Protocols, (iii) promptly notify the Client of any incident in which the confidentiality, integrity or security of the personal data has been compromised, and (iv) collaborate with the Client as required by applicable law or the Client's request to document the personal data, data subjects and processing activities related to the Services, including as part of an applicable Proposal. In the event that the Client transfers personal data that is subject to the General Data Protection Regulation (2016/679) to McKinsey RTS outside of the European

3

Economic Area, or where otherwise agreed by the Parties or required by applicable law, the parties agree that the standard contractual clauses for the transfer of personal data to processors established in third countries under Directive 95/46/EC of the European Parliament and of the Council (or any successor thereto), as applicable to McKinsey RTS's Services and available at https://solutions.mckinsey.com/msd/sccs.pdf shall be deemed automatically incorporated into this Agreement and binding upon the parties hereto, including their affiliates, unless an alternate data transfer arrangement authorized by applicable law is agreed by the parties. McKinsey RTS will comply with the Client's reasonable requests to furnish information regarding McKinsey RTS's processing activities as is reasonably necessary to enable the Client to verify that McKinsey RTS is complying with its obligations under this Agreement, including by making its Director of IT Security or person of comparable knowledge and position available to provide information about the Protocols and McKinsey RTS's processing in connection with the Services, and the foregoing shall apply in full satisfaction of any Client audit or inspection rights of McKinsey RTS, but shall not limit or restrict the ability of any legal or regulatory authority to conduct such audit or inspection pursuant to applicable law.

6. <u>USE OF McKINSEY RTS NAME AND DELIVERABLES</u>. In connection with the Engagement, McKinsey RTS may furnish the Client with information, advice, reports, analyses, presentations or other such materials (the "<u>Deliverables</u>"). The Client understands and agrees that any such Deliverables are furnished or presented solely for the Client's internal use and benefit (limited to management and the Board) and may not be furnished or conveyed in whole or in part to any person or entity other than as described in this Section 6 without McKinsey RTS's prior written consent or as required by law. The Client may furnish and convey Deliverables to its management and directors (and to its legal counsel, Kirkland & Ellis LLP ("<u>Counsel</u>")), in each case only if such persons (i) need to know the information set forth, or embodied in, such Deliverables, (ii) are informed of the confidential nature of the Deliverables and (iii) agree to comply with the restrictions stated in this Section 6. The Deliverables may not be furnished, conveyed or presented to any person or entity other than as described in this Section 6 unless (A) Client has received McKinsey RTS's oral or written consent to furnish or convey such information; and (B) such third parties (x) are informed of the confidential nature of the information and (y) prior to Client's disclosure, each third party to whom it seeks to disclose such information executes and delivers to McKinsey RTS a letter agreement in a form reasonably acceptable to McKinsey RTS. Further, notwithstanding anything to the contrary contained herein, Counsel or the Client may furnish and convey the Deliverables (a) to Centerview, in its capacity as financial advisor to the Client, and A&M, in its capacity as restructuring advisor to the Client; *provided* that Centerview and A&M have agreed to comply with the confidentially requirements of this Section 6 and (b) if required by law in connection with any legal process or court proceeding; *provided that*, prior to making any such disclosure, Counsel or the Client shall provide prompt written notice thereof, and to the extent legally permissible, to McKinsey RTS, and Counsel or the Client, as applicable, may, without liability hereunder, disclose only that portion of the Deliverables which the Client or Counsel, as applicable, in consultation with McKinsey RTS, reasonably believe it is required to disclose. For the avoidance of doubt, nothing herein is intended to restrict the Client from implementing and using the advice and recommendations provided by McKinsey RTS to the Client hereunder or including such advice or recommendations in information or reports that the Client publishes in its own name and shares with third parties, provided that all references and attribution to McKinsey RTS and all McKinsey RTS proprietary information is removed prior to

4

sharing any such information or reports with any third parties. The Client further agrees that, without McKinsey RTS's prior written consent, it shall not refer to McKinsey RTS or attribute any information to McKinsey RTS, or use McKinsey RTS's trademark, in any document or communication external, or reasonably likely to be disseminated externally, to the Client for any purpose, including in press releases and web sites. The Client also agrees that it shall not, and shall not permit its advisors to, refer to McKinsey RTS or attribute any information to McKinsey RTS, either generically or by name, or use McKinsey RTS's trademark, without McKinsey RTS's prior written approval except as required by law. McKinsey RTS shall not issue any press release which references this Agreement or Client without Client's prior written consent.

7. <u>INTELLECTUAL PROPERTY</u>. Upon payment in full of McKinsey RTS's fees, the Client will own all Deliverables prepared for and furnished by McKinsey RTS to the Client in connection with the Services, save that McKinsey RTS retains ownership of all concepts, analyses, know-how, tools, questionnaires and assessments, modules, courses, frameworks, software, algorithms, databases, content, models and industry perspectives developed or enhanced outside of or in connection with the Services (the "<u>McKinsey Tools</u>"), it being understood that none of the McKinsey Tools will contain the Client's Confidential Information. To the extent the Deliverables include any embedded McKinsey Tools, McKinsey RTS hereby grants the Client a non-exclusive, non-transferable, non-sublicenseable, worldwide, royalty-free license to use and copy the McKinsey Tools solely as part of the Deliverables and subject to the above limitations herein on the use of McKinsey RTS's name and Deliverables. The Client agrees that, without McKinsey RTS's prior written permission, it will not, or permit any third party to (a) access, copy or reverse engineer any McKinsey Tool or Deliverables, or (b) remove or circumvent security or technological safeguards, including notices, digital protection mechanisms, metadata, watermarks, or disclaimers provided with any McKinsey Tool or Deliverable.

8. <u>INDEMNIFICATION</u>

(a) In order to induce McKinsey RTS to provide the Services to the Client, the Client hereby agree (i) to indemnify, hold harmless and defend McKinsey RTS, and its past, present and future affiliates, and each of their respective directors, officers, managers, shareholders, partners, members, employees, agents, representatives, advisors and controlling persons (collectively, the "<u>Indemnified Parties</u>" and each individually, an "<u>Indemnified Party</u>"), to the fullest extent lawful, from and against any and all losses, claims, penalties, damages or liabilities (or actions in respect thereof), joint or several, caused by, relating to, based upon or arising out of (directly or indirectly) this Agreement or the Engagement, or any actions taken or omitted to be taken by an Indemnified Party or the Client in connection with this Agreement or the Engagement (including, without limitation, any acts taken or omitted to be taken by an Indemnified Party as a representative, agent, fiduciary or in any other capacity of, or in connection with any Services provided to or termination of, any employee benefit plan (including any defined contribution plan)); and (ii) to reimburse each Indemnified Party for all reasonable and documented expenses (including, without limitation, the reasonable and documented fees and expenses of counsel and the costs of McKinsey RTS's professional time) as and when they are incurred in connection with investigating, preparing, pursuing, defending, settling or compromising any action, suit, dispute, inquiry, investigation or proceeding, pending or threatened, brought by or against any person or entity (whether or not such Indemnified Party is a formal party to any such action, suit, dispute, inquiry, investigation or proceeding), caused by, relating to, based upon or arising out of (directly or indirectly) this

5

Agreement or the Engagement, or any actions taken or omitted to be taken by an Indemnified Party or the Client in connection with this Agreement or the Engagement (including, without limitation, any acts taken or omitted to be taken by an Indemnified Party as a representative, agent, fiduciary or in any other capacity of, or in connection with any Services provided to or termination of, any employee benefit plan (including any defined contribution plan)), and in enforcing this Agreement. However, the Client shall not be liable under the foregoing indemnity and reimbursement provisions for any loss, claim, damage, penalty or liability which is finally judicially determined by a court of competent jurisdiction to have resulted primarily and directly from the bad faith, willful misconduct, or gross negligence of such Indemnified Party toward the Client, but pending any such judicial determination, the Client shall continue to be obligated on, and shall continue to perform, its indemnification and reimbursement obligations.

(b) If for any reason the foregoing indemnification or reimbursement is held by a court of competent jurisdiction to be unavailable to any Indemnified Party or insufficient fully to indemnify or reimburse any such Indemnified Party or to hold it harmless in respect of any losses, claims, damages, penalties, liabilities or expenses referred to in such indemnification or reimbursement provisions, then the Client shall contribute to the amount paid or payable by such Indemnified Party as a result of such losses, claims, damages, penalties, liabilities or expenses in such proportion as is appropriate to reflect the relative benefits received (or anticipated to be received) by the Client, on the one hand, and McKinsey RTS, on the other hand, in connection with the matters contemplated by this Agreement. If, however, the allocation provided by the immediately preceding sentence is not permitted by applicable law, then the Client shall contribute to such amount paid or payable by any Indemnified Party in such proportion as is appropriate to reflect not only such relative benefits, but also the relative fault of the Client, on the one hand, and such Indemnified Party, on the other hand, in connection therewith, as well as any other relevant equitable considerations. The Client and McKinsey RTS agree that it would not be just and equitable if contribution pursuant to this Section 8(b) were determined by pro rata allocation or by any other method of allocation which does not take account of the equitable considerations referred to above in this Section 8(b). Notwithstanding the foregoing, in no event shall the Indemnified Parties be required to contribute an aggregate amount in excess of the amount of Fees (but not expenses) actually received by McKinsey RTS from the Client pursuant to this Agreement.

(c) The Client and its affiliates shall not, without the prior written consent of McKinsey RTS, settle, compromise or consent to the entry of any judgment in or otherwise seek to terminate any pending or threatened action, suit, dispute, inquiry, investigation or proceeding in respect of which indemnification, reimbursement of expenses or contribution may be sought hereunder (whether or not an Indemnified Party is an actual or potential party thereto).

(d) The Client agree that neither McKinsey RTS nor any other Indemnified Party shall have any liability (whether direct or indirect and regardless of the legal theory advanced) to the Client or any person or entity asserting claims on behalf of or in right of the Client caused by, relating to, based upon or arising out of (directly or indirectly) this Agreement or the Engagement, or any actions taken or omitted to be taken by an Indemnified Party or the Client in connection with this Agreement or the Engagement (including, without limitation, any acts taken or omitted to be taken by an Indemnified Party as a representative, agent, fiduciary or in any other capacity of, or in connection with any services provided to or termination of, any employee benefit plan

6

(including any defined contribution plan)), except for losses, claims, damages, penalties or liabilities incurred by the Client which are finally judicially determined by a court of competent jurisdiction to have resulted primarily and directly from the willful misconduct or gross negligence of McKinsey RTS or any other Indemnified Party. In no event, however, shall McKinsey RTS's or any other Indemnified Party's liability to the Client or its respective affiliates, successors, or any person claiming on behalf of or in right of the Client, including Client's owners, parents, affiliates, directors, officers, employees, agents, security holders, or creditors, exceed, when taken together with all losses for which McKinsey RTS or such other Indemnified Party is liable in connection with this Agreement or the Engagement, the amount of Fees actually received by McKinsey RTS in connection with the Engagement.

(e) The indemnity, reimbursement, and other obligations and agreements of the Client set forth in this Section 8: (i) shall apply to any Services provided by McKinsey RTS in connection with the Engagement (whether provided prior to, on or after the Effective Date) and to any modifications of this Agreement, (ii) shall be in addition to any obligation or liability which the Client may otherwise have to any Indemnified Party, (iii) shall remain operative and in full force and effect regardless of any investigation made by or on behalf of the Client or any Indemnified Party, or any other person or entity, (iv) shall survive the completion of the Services described in, and any expiration or termination of the relationship established by, this Agreement and (v) shall be binding on any successor or assign of the Client. In no event shall any Indemnified Party be responsible for any loss profits or special, punitive, exemplary, indirect or consequential damages.

9. <u>CLIENT ACKNOWLEDGMENT</u>. It is McKinsey RTS's long-standing policy to serve competing clients and clients with potentially conflicting interests as well as counter-parties in merger, acquisition and alliance opportunities, and to do so without compromising McKinsey RTS's professional responsibility to maintain the confidentiality of client information. Consistent with such practice and McKinsey RTS's confidentiality obligations to its other clients, McKinsey RTS is not able to advise or consult with the Client about McKinsey RTS's serving the Client's competitors or other parties. To avoid situations of potential conflict, McKinsey RTS will not assign consultants, who are providing the Services and who receive Confidential Information, to a competitively sensitive project for a significant period of time (typically two years) following an assignment for the Client.

10. <u>TERM AND TERMINATION</u>. The Engagement will commence as of the Effective Date and shall continue until the earlier of: (a) the completion of the Services hereunder and (b) the termination of this Agreement by either Party by giving five (5) days' written notice to the other Party. In the event of any termination, the Client will pay McKinsey RTS's Fees and expenses up to the effective date of termination.

11. <u>RELATIONSHIP OF THE PARTIES</u>. The Parties intend that an independent contractor relationship will be created by this Agreement. Nothing in this Agreement is intended to create, nor shall be deemed or construed to create, a fiduciary or agency relationship between McKinsey RTS and the Client, or its Board of Directors. More specifically, for purposes of this Agreement, neither McKinsey RTS, its affiliates, nor any individual consultant providing services to the Client shall be acting as an officer, director, manager, trustee, or in any other agency or fiduciary capacity. Notwithstanding McKinsey RTS's provision of the Services described in Section 1, none of McKinsey RTS, its affiliates, nor any individual consultant providing services

7

to the Client shall be (i) deemed a fiduciary; or (ii) be required to perform any tasks, actions or functions, and shall not be required to assume any roles, assignments or capacities, that (in any such case) could give rise to fiduciary status to McKinsey RTS, its affiliates or any Indemnified Party with respect of the Client.

12. BANKRUPTCY FILING. In connection with the filing of the Bankruptcy Proceeding, the Client will apply to the Bankruptcy Court, on the date of filing or as soon thereafter as practicable, to obtain approval of McKinsey RTS's retention and retainer, *nunc pro tunc* to the date of filing. It is understood that in the Bankruptcy Proceeding, the terms and conditions of this Agreement, particularly the compensation provisions, are subject to (a) prior approval of the Bankruptcy Court to be treated as administrative expenses of the bankruptcy case; and (b) may be subject to a standard of reasonableness. McKinsey RTS shall file applications for approval of its Fees and expenses in accordance with the terms of any interim compensation orders or other orders approved by the Bankruptcy Court.

13. MISCELLANEOUS. This Agreement and any schedules and Exhibits hereto constitute the entire agreement between the parties, and there are no prior or contemporaneous oral or written representations, understandings or agreements relating to this subject matter that are not fully expressed herein or therein. This Agreement and the Proposals shall be governed by and construed in accordance with the laws of the State of New York without regard to conflicts of law principles and shall inure to the benefit of and be binding on the successors and assigns of the Client and McKinsey RTS. The following Sections shall survive the completion or any termination of the Services: 4 (Confidentiality), 5 (Data Security), 6 (Use of McKinsey RTS Name and Deliverables), 7 (Intellectual Property), 8 (Indemnification), 9 (Client Acknowledgement), 10 (Term and Termination) and 11 (Relationship of the Parties), 12 (Bankruptcy Filing) and 13 (Miscellaneous) and any other provision which by law or by its nature should survive. Neither party may assign its rights or obligations under this Agreement to any person or entity without the written consent of the other party, not to be unreasonably withheld, provided, however, that either party may assign its rights and obligations under this Agreement to its affiliates upon reasonable written notice to the other party but without the written consent of the other party. Assignment shall not relieve either party of its obligations hereunder.

*[Remainder of Page Intentionally Left Blank]*

8

McKinsey Recovery & Transformation Services U.S., LLC

By: _____
Name: Mark W. Hojnacki
Title: Partner

ACCEPTED AND AGREED TO

Westmoreland Coal Company

By: _____
Name: JENNIFER GRAFTON
Title: CLO AND SECRETARY

Schedule 1

Fees for Services

In exchange for its services, Client will compensate McKinsey RTS in accordance with the terms of this Agreement, which provides for payment of Fees as follows:

(a) Retainer: $1,500,000 as described in Section 2 of the Agreement

(b) Hourly rates: Following a bankruptcy filing, McKinsey RTS's fees are to be based on the hours worked by McKinsey RTS US's personnel at the following hourly rates:

| | | |
|---|---|---|
| i. | Practice Leader: | $995 - $1,150 |
| ii. | Senior Vice President: | $735 - $925 |
| iii. | Vice President: | $640 - $735 |
| iv. | Senior Associate | $530 - $615 |
| v. | Associate: | $425 - $515 |
| vi. | Analyst: | $300 - $425 |
| vii. | Paraprofessional: | $250 - $275 |

McKinsey RTS reviews and revises its billing rates on or about January 1 of each year.

(c) Expenses: The Client will reimburse McKinsey RTS for all reasonable out-of-pocket expenses incurred in connection with the Engagement, such as travel, lodging, case administrators, and working meals.

10