# EXHIBIT 69

# The New York Times

# As McKinsey Sells Advice, Its Hedge Fund May Have a Stake in the Outcome

By **Michael Forsythe,** **Walt Bogdanich** and Bridget Hickey

Feb. 19, 2019

The sins of Valeant Pharmaceuticals are well known. Instead of spending to develop new drugs, Valeant bought out other drugmakers, then increased prices of lifesaving medicines by as much as 5,785 percent. Patients had no choice but to pay.

Valeant's chief executive, J. Michael Pearson, was hauled into a 2016 Senate hearing and verbally thrashed by lawmakers. "It's using patients as hostages. It's immoral," said Claire McCaskill, then the Democratic senator from Missouri. One executive went to prison for fraud. The company's share price collapsed.

It hadn't always been that way. Before Valeant's fall, its stock was a Wall Street darling, attracting high-profile investors who tirelessly promoted the company on financial news channels. But one investor especially avoided the spotlight — a secretive hedge fund owned by McKinsey & Company, the world's most prestigious consulting firm. McKinsey, in fact, had deep ties to the drugmaker: Four top Valeant officials, including Mr. Pearson, were McKinsey veterans, and the firm was advising Valeant on drug prices and acquisitions.



J. Michael Pearson, left, testifying on Capitol Hill in 2016 after the pharmaceutical company he led, Valeant, raised the prices of lifesaving medicines. McKinsey had both advised and invested in Valeant. Drew Angerer for The New York Times

That web of relationships underscores the unusual nature of McKinsey's hedge fund, and the potential for undisclosed conflicts of interest between the fund's investments and the advice the firm sells to clients.

McKinsey is alone among the leading consulting firms in operating the hedge fund, which invests for about 30,000 current and former McKinsey partners and other employees. The fund — McKinsey Investment Office, or MIO Partners — is as opaque as its parent.

You have 3 free articles remaining.
Subscribe to The Times

McKinsey does not disclose the identity of its clients — the chief executives, prime ministers and princes who seek its counsel on management best practices. And even as the firm is privy to market-moving corporate maneuvers and confidential government information, its hedge fund's investments are often secret, with a large part of its approximately $12.3 billion in holdings concealed behind a tangle of shell companies in an island tax haven in the English Channel.

As a result, any intersections between McKinsey's consulting work and the fund's investments are largely hidden.

MIO has over $12 billion in holdings, according to a filing with the Securities and Exchange Commission.

McKinsey says the way the fund is structured and operated ensures that its employee investors do not stand to benefit from the firm's inside knowledge and consulting advice. Hedge fund managers do not coordinate with McKinsey consultants, the firm says, and about 90 percent of MIO's capital, including the Valeant investment, is managed by outside funds.

"MIO and McKinsey employ separate staffs. MIO staff have no nonpublic knowledge of McKinsey clients," the company said in a statement. "For the vast majority of assets under management, decisions about specific investments are made by third-party managers."

But those assurances of church-state separation are increasingly, and very publicly, being challenged, in Congress and in lawsuits alleging that McKinsey failed to fully disclose conflicts of interest in its work advising companies going through bankruptcy.

In one of them, a federal judge in Virginia last month reopened a coal-company bankruptcy case after learning that McKinsey had not disclosed, as required by law, that it was also among the company's secured creditors, through MIO. The secured creditors recovered the most money. "These are some of the most serious allegations that I have ever seen," said the judge, Kevin R. Huennekens.

Among the revelations in that lawsuit was that the head of McKinsey's bankruptcy practice was also a member of the hedge fund's board. Indeed, nine of the 11 people identified as MIO directors are current or former McKinsey consultants.

[McKinsey has agreed to pay $15 million to resolve a Justice Department investigation of its disclosures.]

In Puerto Rico, where McKinsey is advising a board that seeks to reduce the island's crippling debt, The New York Times reported last year that the hedge fund was invested in bonds that gave it a stake in the outcome. Afterward, a bipartisan group of House members introduced a bill to compel advisers like McKinsey to disclose potential conflicts of interest. And Representative Nydia M. Velázquez, a New York Democrat, and Senator Elizabeth Warren, the Massachusetts Democrat now running for president, wrote to McKinsey, assailing its conflict-of-interest disclosure as "opaque or nonexistent." McKinsey responded that there was no relationship between its work in Puerto Rico and the fund's bond investments.

A bankruptcy claim listing Puerto Rican bonds held by a fund owned by McKinsey. Two columns, highlighted for this photograph, show their face value, left, and the claim amounts.

An investigation requested by the oversight board found that MIO had five direct and indirect investments in Puerto Rico's debt while McKinsey advised the island, according to a report released Monday. The investigation found no evidence that McKinsey violated any laws or that its consultants knew about MIO's investments, though the report noted that any consultant could have learned about them by "reviewing publicly available (albeit usually dated and incomplete) information." MIO's holdings of Puerto Rico debt "could create the appearance of a potential conflict," said the report, which recommended more thorough disclosure.

Much of what the fund invests in remains concealed. But The Times uncovered some investments through interviews with former fund officials and shareholders and a review of thousands of pages of documents, including court filings, prospectuses and leaked offshore records. Those investments range from Valeant to a Nepalese casino and a stake in a fund that lent money to the man who became China's most notorious fugitive.

And while outside managers direct most of the firm's holdings, its own traders have directly invested more than $1 billion in assets like commodities, foreign currencies and government bonds. With McKinsey increasingly advising governments around the world, those direct investments, highly sensitive to government policies, create the potential for conflicts of interest.

"The mistake people make is to say, 'Well, conflicts of interest aren't so dangerous, because well-meaning professionals can navigate them objectively,'" said Daylian Cain, who teaches business ethics at the Yale School of Management. "But the research is out on this: No, they can't."

# Gaining Ground in a Talent War

McKinsey sells itself as a partnership of the best and the brightest, marshaled to confront the toughest problems. But that defining claim was threatened in the early 1990s as soaring Wall Street salaries dimmed the allure of consulting careers. One McKinsey consultant called it a "war for talent."

MIO was set up in part to attract and retain that talent, offering an in-house hedge fund that gave financial advice and had a portfolio of high-quality, low-fee funds, according to a former MIO executive.

It was a novel idea. Management consultants were not known for managing money. It also represented a broad philosophical shift at McKinsey. Tom Peters, the management guru and co-author of "In Search of Excellence," said that during his time as a McKinsey partner in the late

1970s, managers rejected the notion of having financial stakes in their clients.

"You can't be advising people and have a fiduciary interest in the people you're advising," Mr. Peters said in an interview.

Today, on the 13th floor of an aging office building five blocks from McKinsey's home office in Midtown Manhattan, MIO oversees vast sums of money — with what appears to be considerable success.

Internal documents examined by The Times show that from 2000 to 2010, MIO's flagship fund, the Compass Special Situations Fund, had an average annual return above 9 percent, compared with a 1.6 percent loss in the S&P 500 Index. In 2008, when the broader United States stock market fell more than 36 percent, the Special Situations Fund lost about half that amount.

McKinsey's main competitors, Bain & Company and Boston Consulting Group, have nothing like MIO. Regulatory filings show that an outside manager, Vanguard, manages their employees' 401(k) retirement accounts.

But investments for McKinsey's 401(k) plan, which must be disclosed to the Department of Labor, make up only about half of MIO's assets. The rest, about $6 billion, is the private wealth of McKinsey's current and former partners, according to a disclosure to the Securities and Exchange Commission.

Those partners have access to a trove of inside knowledge about their clients.

According to its website, McKinsey counts as clients 90 of the world's 100 biggest companies. It advises two-thirds of the top mining companies, more than half of the top 25 airlines and 60 percent of the 100 largest banks.

At the same time, the current or former McKinsey consultants who dominate MIO's board include the leaders of the firm's wealth and asset management and energy practices, according to an S.E.C. filing.

That board structure has come under scrutiny by the Justice Department amid the lawsuits alleging that McKinsey engaged in fraud by failing to fully disclose conflicts of interest in its bankruptcy work. The three suits were brought by Jay Alix, a retired bankruptcy adviser who retains a minority interest in a consulting company he founded.

In Virginia, the judge ordered a reopening of the bankruptcy case of Alpha Natural Resources after an official with the Justice Department's Office of the United States Trustee argued that the hedge fund was not a "blind trust," as claimed. The Justice Department pointed out that the head of McKinsey's bankruptcy practice, Jon Garcia, sat on the fund's board. Until he stepped down in 2017, Mr. Garcia received regular reports on the fund's investment decisions and ratified them, the official said.

In another case, the trustee's office, which oversees the bankruptcy system, said in a December court filing that McKinsey had "pervasive disclosure deficiencies" in its bankruptcy work with a Colorado coal-mining company. McKinsey, the trustee argued, should be removed from the bankruptcy case and stripped of its fees.

On Tuesday, the trustee's office announced that it had reached a $15 million settlement with McKinsey over the firm's inadequate disclosures in the three bankruptcy cases. Mr. Alix's lawsuits continue.

In a statement, McKinsey noted that the settlement did not "constitute an admission of liability or misconduct," adding that the firm had agreed to the settlement "to move forward and focus on serving its clients."

Until the flurry of attention from the bankruptcies and the Puerto Rico controversy, the very existence of McKinsey's hedge fund had largely escaped public notice. McKinsey declined to make Todd Tibbetts, the fund's longtime chief investment officer, or any other officials available for interviews for this article.

For someone who manages such a large and successful portfolio, there is surprisingly little public information about Mr. Tibbetts. So secretive is the fund under Mr. Tibbetts that its managers were discouraged from attending industry events and, even when they did, from talking to participants, one former fund executive said.

One reason for the secrecy, another former executive said, is that McKinsey does not want people connecting any dots between what its consultants do and where its hedge fund invests. (The former fund officials requested anonymity because they were not authorized to speak to the press.)

MIO's secrecy is also manifest in the location it chose to house so much of its money — at least $4 billion, according to S.E.C. filings: the tiny English Channel island of Guernsey.

# An Island of Buried Treasure

Trafalgar Court is a grand name gracing a forgettable modern office building wildly out of place in the postcard-perfect town of St. Peter Port. Inside, hundreds of deskbound office workers do the work that is Guernsey's lifeblood: hiding billions of dollars from the outside world.

The Guernsey offices of Northern Trust, an asset manager that offers clients secrecy through the use of shell companies.

This is the Guernsey headquarters of Northern Trust, a Chicago-based asset manager. For a price, it offers exceptional secrecy through Barfield Nominees, an obscure company it controls.

At the Guernsey Registry, there is little information on Barfield Nominees other than that it has three directors, all Northern Trust executives who work at Trafalgar Court. Douglas A. Holt, a Northern Trust spokesman, said Barfield acted as a custodian, holding assets for its clients. These assets are identified only by a number.

A document from the Guernsey registry providing information on one of MIO's funds.

"The identity of Northern Trust clients and their beneficial ownership is confidential," he said.

Very few documents link Barfield Nominees to McKinsey's hedge fund, but when they do, MIO money can be traced to unusual places like a casino in Kathmandu, Nepal, called the Millionaire's Club.

Then there were MIO's investments — through three Barfield Nominees numbered entities — in a Hong Kong-based asset manager called PAG, formerly Pacific Alliance Group.

The McKinsey fund took stakes in two China-focused PAG funds. In a 2010 London exchange filing, PAG disclosed that MIO had a stake of more than 10 percent in one fund, worth about $20 million. At the end of 2015, MIO also owned more than a quarter of another China-focused PAG fund.

In 2008, Pacific Alliance had made a big bet on a real estate mogul who owned a colossal office and luxury apartment complex next to the site of that year's Summer Olympics in Beijing. Court records show that it lent $30 million to a company controlled by the mogul, who had deep ties to China's intelligence community and was already notorious for allegedly orchestrating the downfall of a Beijing vice mayor with a sex tape.

PAG says it was never repaid its loan. The mogul has fled China for New York. In China, he faces corruption and rape charges, which he says are false. PAG sued him in a New York court in 2017, saying he owed it about $88 million, court records show.

His name is Guo Wengui, though he also goes by Miles Kwok. He is China's highest-profile fugitive, and for years McKinsey was, through PAG, one of his creditors, a fact hidden through Barfield Nominees. There is no evidence that McKinsey knew its investment would find its way to Mr. Guo, with whom the firm said it had no direct dealings.

4/18/2019 McKinsey Sells Advice. But a Hedge Fund May Have a Stake in the Outcome. - The New York Times

Case 15-10541-BLS Doc 2417-60 Filed 04/24/19 Page 11 of 14

Guo Wengui, a Chinese mogul and fugitive, at his home in Manhattan.
Sasha Rudensky for The New York Times

In its statement, McKinsey said the decision to use an offshore company was driven not by its hedge fund but "by our custodian and the type of investment" — in funds rather than traded securities. McKinsey's hedge fund, the statement added, is "hardly the only investment or pension fund" to use such an arrangement.

But John Christensen, a founder of the Tax Justice Network, a group based in Britain that seeks to bring more transparency to tax havens, said there was a disconnect between McKinsey's mission of spreading corporate best practices and its use of tax havens like Guernsey.

# Tracing McKinsey Hedge Fund Money to China's Most Prominent Fugitive

| | | | | |
|---|---|---|---|---|
| | | **OWNS** | | **McKinsey & Co.** is a management consulting firm. **MIO Partners**, with about $12.3 billion in net assets, manages the pension and investment funds for McKinsey's partners and employees. |
| | | **MIO Partners** | | |
| | | MANAGES | | |
| McKINSEY FUNDS: | Compass Offshore Special Situations PCC Limited | Compass Special Situations Fund | SSALT Fund Limited | The **McKinsey funds** hold assets at **Barfield Nominees**, a company owned by the Chicago-based Northern Trust. Barfield is located on the English Channel island of Guernsey, which has become a haven for offshore financial activities. |
| | OWNS | OWNS | OWNS | |
| BARFIELD NOMINEES ACCOUNTS: | ACC. NO. **CSC01** | ACC. NO. **CSJ01** | ACC. NO. **SLI01** | |
| OWNERSHIP STAKES: April 2010 | 3.3% | 1.6% | 5.6% | Through the **Barfield accounts**, McKinsey invested in a hedge fund called the **Pacific Alliance Asia Opportunity Fund**. |
| | | **Pacific Alliance Asia Opportunity Fund** | | |
| | | MADE BAD LOANS TO: | | In 2008, **Pacific Alliance** lent $30 million to a company controlled by the Chinese billionaire **Guo Wengui**. The loans, which it has sought unsuccessfully to recover, have now grown to $88 million. Mr. Guo fled China about four years ago and now lives in New York. |
| | | **Guo Wengui** | | |

By The New York Times

"I can't think of any legitimate, genuinely economic reason for using a place like that," Mr. Christensen said.

He should know: For 11 years, Mr. Christensen was the economic adviser to Jersey, a neighboring tax haven.

# The 'Pharmaceutical Enron'

The Senate hearings on Valeant Pharmaceuticals examined how the company, under Mr. Pearson's leadership, raised the price of Isuprel and Nitropress, decades-old heart medications commonly found on emergency-room crash carts.

Mr. Pearson relied on an idea he had honed as head of McKinsey's pharmaceutical practice: focusing on acquisitions of existing drugmakers instead of spending heavily to discover the next blockbuster drug.

Before buying Isuprel and Nitropress from a competitor, Valeant consulted McKinsey, which reported that the drugs had "material pricing potential," according to records obtained by the Senate.

After the acquisition, Valeant raised Isuprel's price by 720 percent, and Nitropress's by 310 percent.

As McKinsey consultants were advising Valeant in late 2014, two of MIO's funds, Compass TPM and Compass Offshore TPM, acquired an indirect stake in Valeant, through Visium Asset Management, a fund soon to implode in an insider-trading scandal.

Through another outside hedge fund, Aristeia Capital, two other MIO funds acquired shares in Valeant in early 2015, after the company agreed to buy Dendreon, a bankrupt drugmaker. The McKinsey funds were listed among the eight noteholders of Dendreon, entitled to a portion of the $495 million, in cash and Valeant shares, that Valeant paid for the company.

In a statement, Aristeia said it had learned of McKinsey's role advising Valeant only when contacted by The Times. "Aristeia never sought input from MIO on potential conflicts, because MIO had no investment discretion in respect to these assets," the company said.

McKinsey, in its statement, said its hedge fund "had no input into the investment decisions made by Visium and Aristeia," its third-party managers. Valeant, now called Bausch Health, said it hadn't been advised by McKinsey on mergers and acquisitions since May 2016.

Valeant's stock price, shown here at the New York Stock Exchange, plummeted in 2015. Lucas Jackson/Reuters

By October 2015, as Valeant's share price was falling after reports about its undisclosed relationship with a mail-order pharmacy, one research firm described the company as the "pharmaceutical Enron." Enron, an energy company and McKinsey client, collapsed in 2001. Its chief executive, Jeffrey K. Skilling, another former McKinsey partner, was sent to federal prison.

Even if the McKinsey fund's investments in Valeant were indirect, the firm's partners stood to profit from their own advice.

"You have to decide, am I a consulting firm or an investment firm?" said Charles Elson, a finance professor at the University of Delaware who focuses on corporate governance. "They're two different things."

Bridget Hickey is a reporting fellow at Columbia Journalism Investigations.

Mary Williams Walsh and Michael LaForgia contributed reporting.

A version of this article appears in print on Feb. 19, 2019, on Page A1 of the New York edition with the headline: A Double Role Puts McKinsey Under Scrutiny

READ 205 COMMENTS

