**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SRC LIQUIDATION, LLC,[1] | ) | Case No. 15-10541 (BLS) |
| | ) | |
| Debtor. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Hearing Date:  May 15, 2019 at 10:00 a.m. (ET)** |
| | ) | **Re: D.I. 257, 823, 2392, 2404, 2405, 2406, 2417** |
| | ) | |

**REPLY IN SUPPORT OF**
**MOTION OF MAR-BOW VALUE PARTNERS, LLC, A CREDITOR,**
**FOR RELIEF FROM ORDERS UNDER**
**BANKRUPTCY RULE 9024 AND  CIVIL RULE 60(d)(3)**

---

[1]     The last four digits of the Debtor's taxpayer identification number are 5540.  Inquiries regarding the Debtor should be directed to the GUC Trustee, c/o EisnerAmper LLP, 111 Wood Avenue South, Iselin, NJ 08830-2700 (Attn: Anthony R. Calascibetta).

I.    **McKinsey's Response Does Not Deny Key Facts Relating to Its Conduct in This Case and in Other Cases**

1.    McKinsey's Response to Mar-Bow's Motion for Relief never denies that in this case, it never disclosed the identity of a single connection; that it concealed its partners' and employees' *disqualifying* investment interests in DIP lenders (Bank of America and Credit Suisse) and in other creditors; that it has concealed dozens of disqualifying investments that its partners and employees held in interested parties in most of its bankruptcy cases;[2] that in this case, it concealed dozens of client connections, while reviewing their proofs of claim and fully allowing all of them.

2.    McKinsey's Response never denies that at the same time that McKinsey was actively concealing its investment and client connections in several of its cases, *including in this case*, its investment and client connections were: (1) acquiring assets from the debtors' estates; (2) conducting business and negotiating with the debtors' estates; or (3) subject to investigation by McKinsey on behalf of the debtors.

3.    McKinsey's Response never denies that in at least one case, the *Alpha Natural Resources* case, its concealed investment in an interested party subsequently resulted in an illegal profit of at least $50 million.[3]  McKinsey's illegal profits on its concealed investments in its other cases, including this case, have yet to be determined.

---

[2]    The illegal profits from the MIO-managed investments in this case and in McKinsey's other cases are as yet undetermined.
[3]    Indeed, McKinsey recently publicly admitted that it *did* make a profit on this concealed investment.  *See* Ex. 70 (Mary Williams Walsh, *One Man vs. McKinsey: A Billionaire Says the Consultancy Has Rigged the Bankruptcy System*, New York Times, Apr. 11, 2019).

**II.     MIO's Legal Status as an "Affiliate" of McKinsey and McKinsey RTS Is Irrelevant to Whether McKinsey RTS Committed a Fraud on This Court**

4.     On the merits of the charge that McKinsey RTS committed a fraud on this Court, its prime argument seems to be that because the MIO is an affiliate, RTS is not required to disclose MIO's connections.  This argument defies reality from many perspectives.

5.     *First*, McKinsey's assertion that because MIO is an affiliate, its investments are not disqualifying and need not be disclosed unsurprisingly conceals a central fact about MIO.  The investment and retirement assets that MIO manages for McKinsey's partners and employees and that McKinsey conceals in its bankruptcy cases are *not owned by MIO*.  Rather, MIO has $25 billion in assets *under management* that McKinsey's partners, employees and alumni beneficially own.  MIO holds little or no investments for itself.[4]  Therefore, the investments in interested parties that McKinsey fraudulently conceals in its bankruptcy cases, including in this case, are investment and retirement assets that McKinsey's partners and employees beneficially hold.  Under 11 U.S.C. § 327, those investments are disqualifying.  McKinsey's deliberate decision to conceal those disqualifying connections is a fraud on this Court.  MIO's legal status as an "affiliate" is irrelevant on this ground alone.

6.     *Second*, as noted, the only court that has ruled on McKinsey's argument that it is not required to disclose MIO-managed investments in interested parties—the *Alpha Natural Resources* court—*flatly rejected it nearly three years ago*.  McKinsey's calculated decision to ignore that authoritative holding and its preclusive, *res judicata* effect in the intervening three years does not diminish its legal imperative.

7.     *Third*, as a matter of logic and reason, the "connections" that McKinsey is required to disclose must include, at a minimum, a professional's investments in interested parties, if only

---

[4]     *See* Ex. 15 (Declaration of Casey Lipscomb, filed Sept. 12, 2018, *ANR* Dkt. 4152).

because such investments disqualify it under 11 U.S.C. §§ 327 and 101(14).  *In its bankruptcy cases, McKinsey has concealed 36 investment connections to the debtors and 285 investment connections to interested parties, for a total of 320 concealed investment connections.*  And these numbers of McKinsey concealed investment connections were determined from publicly available sources.  It is impossible to predict the jump in these numbers that will result from discovery of the investments of McKinsey's partners and employees.

8.      In this case, McKinsey partners and employees held equity interests in Bank of America and in several Credit Suisse entities—secured creditors and DIP lenders in this case.  Yet when the Debtor, with support from McKinsey, was negotiating that DIP loan and asking this Court for approval of it, neither the creditors, the United States Trustee, nor this Court knew that McKinsey's partners and employees held equity investments in those DIP lenders.  McKinsey had concealed those disqualifying connections.  And when McKinsey was reviewing claims in this case, no one knew that McKinsey was reviewing the claims of its own clients because McKinsey had concealed those disqualifying client connections too.

9.      *Fourth*, MIO and RTS are *not* distinct, stand-alone affiliates whose business missions are unrelated and whose only connection is vertically through common McKinsey ownership.  McKinsey partners own, manage and control both MIO and RTS.  All of the members of the MIO board were McKinsey partners.[5]  And, at all pertinent times in this case, the president of RTS—John Garcia—was on the board of MIO.[6]  In that capacity he reviewed all of the investments that MIO manages, including the investments in the secured creditors and DIP lenders

---

[5]      *See* Ex. 15 (9/12/2018 Lipscomb Dec.) at 2 ¶ 8.
[6]      *See* Ex. 15 (9/12/2018 Lipscomb Dec.) at 3 ¶ 8.

in this case.[7] RTS cannot carry out its business purpose without the support of MIO in managing the investment and retirement assets of its partners and employees. But most importantly, MIO's sole business purpose is to manage the investment and retirement funds of McKinsey partners and employees for their profit and benefit, and its success is unparalleled. Access to MIO investment expertise and to MIO's outsized investment returns is a significant component of the financial compensation that McKinsey offers to its partners and employees. As McKinsey proudly proclaims on its website, "Our firm is designed to operate as one—a single global partnership[.]"[8]

10.    *Fifth*, in this case, this Court ordered McKinsey to "disclose any and all facts that may have a bearing on whether the firm, its subsidiaries, certain of its affiliates, and/or any individuals working on the engagement hold or represent any interest adverse to the Debtor, its creditors, or other parties in interest."[9] McKinsey violated this Court's order not because it did not have access to information about MIO-managed investment connections; it plainly did have that access. McKinsey violated that order because it *chose* to violate the order knowing that if it complied, the Court would have denied its employment and it would have lost the opportunity to be paid $4,777,989 in fees in this case. Again, that is a large number of reasons for McKinsey RTS to conceal its investment connections in this case. In all of McKinsey's bankruptcy cases, its concealments of at least 320 investment connections allowed it to be paid fees totaling $140,809,985. And that is a *very* large number of reasons for McKinsey RTS to conceal its investment connections in its cases.

---

[7]    *See* Ex. 19 (Supplemental Declaration of Casey Lipscomb, filed Nov. 9, 2018, *ANR* Dkt. 4160) at 4 ¶ 6; Ex. 71 (Declaration of Jon Garcia in Respect of Questions Proffered by United States Trustee in Response Dated July 31, 2018, filed Sept. 12 2018, *ANR* Dkt. 4151) at 2 ¶ 5.
[8]    Ex. 1 (McKinsey Website – About Us – Overview).
[9]    Dkt. 257 ¶ 2(h).

11.    *Sixth*, McKinsey RTS's argument that concealing the connections of its affiliates is not fraud proves way too much.  If that argument were accepted, a professional holding disqualifying investments could simply transfer the investments to a trust and claim that it has no disqualifying investment connections.  But Section 101(14) recognizes that the integrity of a chapter 11 case can be compromised when a professional holds an interest in an interested party in the case *whether the interest is held directly or indirectly*: "The term 'disinterested person' means a person that" "does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any *direct or indirect* relationship to, connection with, or interest in, the debtor, or for any other reason."  11 U.S.C. § 101(14)(C).

12.    For these reasons, the Court should reject McKinsey's assertion that MIO's legal status as an "affiliate" of RTS shields it from the consequences of its fraud on the Court.

## III.    McKinsey's Concealment of Its Disqualifying Connections Is Not the Result of a "Good Faith" Dispute

13.    McKinsey argues that this dispute is a "good faith" dispute over the disclosure requirements of Bankruptcy Rule 2014.  It is anything but that.  Rather, this dispute is the result of McKinsey's frauds on the court in 14 bankruptcy cases, resulting from its scheme to conceal its multiple disqualifying connections, ineptly cloaked in a patently false façade of "good faith."  Bankruptcy Rule 2014 and the uniform case law state that McKinsey must disclose the identities of all of its connections.  In the *Alpha Natural Resources* case, Judge Huennekens ordered McKinsey to disclose the identities of all of its connections.  And in this case, this Court ordered McKinsey to disclose the identities of all of its connections.  Yet McKinsey has never disclosed all of its connections—not in this case, not in the *Alpha Natural Resources* case and not in any of its cases.  In every one of its cases McKinsey has violated Bankruptcy Rule 2014 and the caselaw applying Bankruptcy Rule 2014.  In *Alpha Natural Resources*, McKinsey violated Judge

5

Huennekens' order.  And in this case, McKinsey violated this Court's order.

14.    And the reason for all of McKinsey's fraud is clear.  McKinsey knew in each case that the consequence of its full disclosure would be its disqualification.  McKinsey knows that the Bankruptcy Code prohibits its employment by the estate:

a.  When its partners and employees hold equity interests in the debtors and in interested parties, as they did in this case and in *Westmoreland Coal*, *GenOn Energy*, *SunEdison*, *Alpha Natural Resources*, *Standard Register*, *Edison Mission Energy*, *AMF Bowling*, *AMR* (American Airlines), *Harry & David*, *Lyondell*, *UAL* (United Airlines), and *Hayes Lemmerz*;

b.  When it assists the estate in transferring valuable assets to its own clients, as in *Westmoreland Coal*, *GenOn Energy*, *Alpha Natural Resources*, *NII Holdings*, and *Edison Mission Energy*;

c.  When it assists the estate in investigating and asserting legal claims against its own clients, as it did in *GenOn Energy*, or when it is reviewing its own client's proofs of claim, as it did in this case and in *GenOn Energy*;

d.  When it assists the estate in maximizing its value when at the same time it assists its largest customer in reducing its supply price from the estate, as it did in *Alpha Natural Resources*; and

e.  When it failed to repay to the estate its preference payments under 11 U.S.C. § 547(b), as it did in *Westmoreland*, *GenOn* and *SunEdison*.

15.    And McKinsey knows that its fiduciary position prohibited its partners' and employees' personal gain on their investments in interested parties, as in *Alpha Natural Resources*; that its duty of candor prohibits it from concealing from the court a secret settlement with a post-

confirmation trust, later revealed to be in the amount of $17.5 million, as in *SunEdison*. And finally, McKinsey knows that it is prohibited from certifying that it is disinterested when it knows that it is not disinterested, as it did in every one of its 14 cases.

16.      But there is much more to the history of McKinsey's conduct in these cases that establishes that McKinsey's concealment of its connections is *not* related to a "good faith" dispute. This history shows that McKinsey has defied the United States Trustee Program and two United States Bankruptcy Judges.

17.      The United States Trustee Program has made at least eight attempts to enforce McKinsey's compliance with the bankruptcy code and rules.[10]  The United States Trustee's lack

---

[10]    1.      On May 3, 2016, in the *Alpha Natural Resources* case, the United States Trustee filed a motion to compel McKinsey to comply with Rule 2014.  *See* Ex. 73 (*ANR* Dkt. 2308).

2.      On May 12, 2016, in the *SunEdison* case, the United States Trustee filed objections to McKinsey's disclosure declaration.  *See* Ex. 74 (*SunEdison* Dkt. 265).

3.      On June 28, 2016, in the *Alpha Natural Resources* case, the United States Trustee stated in a hearing: "Disclosing the existence of a connection without disclosing the identity of the connection is almost always insufficient."  *See* Ex. 65 (*ANR* Dkt. 2839) at 143:23-25.

4.      On August 5, 2016, in the *Alpha Natural Resources* case, the United States Trustee filed its recommendations, stating: ". . . McKinsey RTS operated under an apparent (and inappropriate) blanket assertion of client confidentiality in its bankruptcy engagements . . . ."  Ex. 75 (*ANR* Dkt. 3222) at 5.

5.      On July 31, 2018, in the *Alpha Natural Resources* case, the United States Trustee filed a response to Mar-Bow's motion to reopen and for relief from judgments, requesting an opportunity for a further investigation.  Ex. 76 (*ANR* Dkt. 4126) at 4.

6.      On November 30, 2018, in the *Alpha Natural Resources* case, the United States Trustee filed comments stating: "McKinsey's deficient and potentially misleading representations about its relationship with MIO, and the lack of timely, voluntary, and direct candor in making disclosures warrant redress[.]"  Ex. 21 (*ANR* Dkt. 4164) at 2.

7.      On December 14, 2018, in the *Westmoreland Coal* case, the United States Trustee filed an objection to McKinsey's disclosure declaration, stating: "Here, the disclosures of [McKinsey RTS] are not transparent and by its own admission are incomplete.  The Application withholds critical details about McKinsey RTS's connections to interested parties[.]"  Ex. 77 (*WM* Dkt. 785) at 2.

8. On January 3, 2019, in the *Westmoreland Coal* case, at a hearing on McKinsey's disclosure declaration, the United States Trustee stated: "…McKinsey wants to be treated specially.  They want certain things that we think should be disclosed not to be disclosed.  And we just don't agree with that concept."  Ex. 78 (1/3/2018 *WM* Tr.) at 22:19-22.

of success demonstrates anything but "good faith" on McKinsey's part. Despite the best efforts of the United States Trustee Program, McKinsey still arrogantly and fraudulently conceals its connections.

18.    And the bankruptcy courts have also attempted on numerous occasions to compel McKinsey to disclose its disqualifying connections.[11] McKinsey defies those attempts as well.

19.    McKinsey's disputes are with the law, the United States Trustee Program and at least two United States Bankruptcy Courts (and Mar-Bow, which has unearthed seemingly countless examples of McKinsey's concealed connections without the benefit of any discovery). And those disputes are certainly not "good faith" disputes. Mar-Bow's legal positions on McKinsey's concealments of its connections have been consistently sustained by these bankruptcy courts and the United States Trustee Program. It is McKinsey's positions on these issues that have been consistently rejected. This history leaves no room for McKinsey to argue, let alone establish,

---

[11]    1.    On June 28, 2016, in the *Alpha Natural Resources* case, Judge Huennekens stated: "The Court is going to require, since we have an employee on the board of McKinsey Investments, that investments in any of the interested parties be disclosed." Ex. 65 (*ANR* Dkt. 2839) at 157:18-20.

2.    On July 1, 2016, in the *Alpha Natural Resources* case, Judge Huennekens entered an order requiring McKinsey to disclose to the Court: "a. A list containing the names of the 121 undisclosed connections . . . b. Identification of Interested Parties that manage investments for MIO Partners, Inc. . . . c. Identification of Interested Parties in which MIO owns securities . . . ." Ex. 79 (*ANR* Dkt. 2895) at 2.

3.    On January 3, 2019, in the *Westmoreland Coal* case, Judge Jones stated: "And I will tell you that Mr. Hojnacki's deposition was one of the most frustrating reads that I've had in a long time. He won't do, on the stand, what he did in that deposition. I will get candor and I will get honesty." Ex. 78 (1/3/2019 *WM* Tr.) at 30:22-31:1.

4.    On January 9, 2019, in the *Alpha Natural Resources* case, Judge Huennekens stated: "But do you think that an undisclosed equity interest in the debtor [held by McKinsey] would have been cause [to hold an evidentiary hearing]? . . . [I]t goes beyond [the adequacy of Rule 2014 disclosures]. It . . . goes to disinterestedness." Ex. 80 (1/9/2019 *ANR* Tr.) at 17:4-14.

5.    On January 15, 2019, in the *Alpha Natural Resources* case, Judge Huennekens stated: "And I've got to know, in real time, whether or not I'm invested in an entity that appears before me. And that's what Rule 2014 requires. And it's McKinsey's burden to be able to provide that information. That's what we're missing here . . . ." Ex. 81 (1/15/2019 *ANR* Tr.) at 30:21-25.

a "good faith" dispute.

## IV.    McKinsey's Reliance on the Mediator's Comment Concerning "Good Faith" Must Be Rejected

20.    Following a mediation ordered by the judges in the *Westmoreland*, *SunEdison* and *Alpha Natural Resources* cases, Bankruptcy Judge Marvin Isgur filed a "Mediator's Notice to Court" to announce a partial settlement between McKinsey and the U.S. Trustee of "the parties' good faith disputes concerning the application of Bankruptcy Rule 2014." McKinsey's Response in this case claims that the meditator (who conducted no hearings and heard no evidence) somehow made "findings" regarding McKinsey's past conduct that should guide the Court here. McKinsey (and its lawyers) know better; mediators do not *adjudicate* the merits when they mediate. They do not weigh the evidence. They do not take sides. And they certainly do not make "findings." McKinsey's suggestion to this Court—no less than three times, at pages 2, 5 and 20 of the Response—that a judge, acting as a mediator, has exonerated them is clearly meritless and, frankly, offensive.

21.    This anodyne description was a platitude; the mediator was neither expected nor authorized to make any "findings" about the merits whatsoever. That would have been both premature and impossible, since there had been no discovery or evidentiary hearings on any of the issues being mediated.[12]

22.    McKinsey claims to act in "good faith." But its bad-faith misuse and intentional mischaracterization of the mediator's statement speaks volumes. Sadly, it is part and parcel of

---

[12] *See* Local Rule of the Southern District of Texas 16.4.H (mediations are "non-binding"); 16.4.I (mediators are prohibited from "testifying about the statements made by participants or negotiations that occurred" during the mediation).

McKinsey's history of half-truths and lack of candor – not just here, but in bankruptcy courts across the country.

## V.    Mar-Bow Has Standing Under Article III

23.    McKinsey argues that Mar-Bow does not have standing to assert that it committed a fraud on this Court because (a) Article III requires a moving party to have an economic interest in the outcome of the matter, and (b) Mar-Bow has no such economic interest.  Mar-Bow agrees that if the Court concludes that McKinsey is correct on both of those arguments, then it does not have standing.  However, McKinsey is not correct in asserting that in a bankruptcy case, a creditor must have a pecuniary interest in the outcome of a contested matter to have standing to be heard on it.  And McKinsey is certainly not correct in assuming that Mar-Bow's lack of standing terminates this matter.

24.    In a chapter 11 case, there are many contested matters on which unsecured creditors are regularly heard without having to first prove a pecuniary interest in the outcome.  These include applications to approve the employment of a professional; applications for fees; motions to approve postpetition financing; motions to use cash collateral; motions to sell assets; motions to approve settlements; motions to assume (or reject) executory contracts; motions to approve a disclosure statement; plan confirmation.  And there is a very good reason that 11 U.S.C. § 1109 gives every creditor the right to be heard on every contested matter in a chapter 11 case without the need not show a pecuniary interest in the outcome.  A bankruptcy case is an *in rem* proceeding within the *in rem* jurisdiction of the district court.  In an *in rem* bankruptcy proceeding, every creditor who has a claim against the debtor or to the property of the estate is bound by every order entered in the case and has a stake in the outcome of the case.  As McKinsey itself argues, Mar-Bow is bound by the confirmation order.  And Mar-Bow is equally bound by the orders from which it now seeks relief—the order approving McKinsey's employment and the orders approving its

fees.  Three Supreme Court cases confirm this view.

25.     In *Gardner v. New Jersey*,[13] the Supreme Court stated: "*The whole process* of proof,

allowance, and distribution is, shortly speaking, an adjudication of interests claimed in a *res*."

26.     In *Tennessee Student Assistance Corp. v. Hood*, the Supreme Court stated:

> A bankruptcy court is able to provide the debtor a fresh start in this
> manner, despite the lack of participation of all of his creditors,
> because the court's jurisdiction is premised on the debtor and his
> estate, and not on the creditors.  . . . A bankruptcy court's *in rem*
> jurisdiction permits it to "determin[e] all claims that anyone,
> whether named in the action or not, has to the property or thing in
> question. The proceeding is 'one against the world.'" 16 J. Moore,
> et al., Moore's Federal Practice § 108.70[1], p. 108–106 (3d
> ed.2004)."[14]

27.     In *Central Virginia Community College v. Katz*, the Supreme Court stated:

"Bankruptcy jurisdiction, at its core, is *in rem*."[15]  The Court added: "Critical features of every

bankruptcy proceeding are the exercise of exclusive jurisdiction over all of the debtor's property,

the equitable distribution of that property among the debtor's creditors, and the ultimate discharge

that gives the debtor a 'fresh start' by releasing him, her, or it from further liability for old debts."[16]

28.     Mar-Bow's motion for relief, which asserts McKinsey's fraud on the court, is not,

therefore, a typical two-party *in personam* action in which one party sues a second for a pre-suit

wrong.  Mar-Bow's claim (which it asserts as a transferee of a creditor in this case) is that

McKinsey's fraud on the court infected and impacted the very integrity of this *in rem* bankruptcy

process that discharged its claim and reorganized the debtor.  It has the same standing to assert that

claim as its transferor had to be heard on every issue in the case, because the whole bankruptcy

process was "an adjudication of interests claimed in a *res*."  *Gardner*, 329 U.S. at 574.  Mar-Bow

---

[13]     329 U.S. 565, 574, (1947) (emphasis added).
[14]     541 U.S. 440, 447-48 (2004) (citations omitted).
[15]     546 U.S. 356, 362, (2006).
[16]     *Id*. at 363-64 (citing *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934).

has standing because, "A bankruptcy court's *in rem* jurisdiction permits it to determine all claims that anyone, whether named in the action or not, has to the property or thing in question." *Hood*, 541 U.S. at 447-48 (citation omitted). And Mar-Bow has standing because the critical features of bankruptcy are "the exercise of exclusive jurisdiction over all of the debtor's property, the equitable distribution of that property among the debtor's creditors, and the ultimate discharge[.]" *Katz*, 546 U.S. at 363-64.

29.    Once again, McKinsey's argument proves too much. In the typical chapter 11 case in which an under-secured creditor has a lien on all estate assets, McKinsey's extreme view of standing would mean that no creditor would have standing to be heard on *any* issue.

30.    11 U.S.C. § 1109 wisely grants a party like Mar-Bow the right to be heard on any issue in this case and that grant of standing is fully consistent with the restrictions of Article III in an *in rem* bankruptcy case.

## VI.    Mar-Bow Has a Pecuniary Interest in the Outcome of Its Motion for Relief

31.    The entire process of addressing a claim of fraud on the court and according relief from that fraud under Rule 60(d)(3) is an equitable process in the court's inherent power. The Supreme Court so observed in *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991): "Of particular relevance here, the inherent power also allows a federal court to vacate its own judgment upon proof that a fraud has been perpetrated upon the court." The Supreme Court then added: "Because of their very potency, inherent powers must be exercised with restraint and discretion. . . . *A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process.*" *Id*. (emphasis added) (citation omitted). At the appropriate time, therefore, Mar-Bow will assert that the disposition of any monetary sanctions that the Court imposes on McKinsey RTS for its abuses of the judicial process is entirely in the Court's discretion and that therefore, the Court is not bound by the confirmed plan, as McKinsey asserts.

32.     And there is good reason why this Court is not bound to distribute any sanction proceeds according to the plan.  McKinsey's concealment of its investment connections leaves fully open the possibility of the bizarre and unjust result that McKinsey itself may benefit, directly or indirectly, from that distribution.  And that possibility is not merely hypothetical; it is exactly what happened in *SunEdison* and *Alpha Natural Resources*.  In this case, the possibility cannot be foreclosed until the Court has a full disclosure of all MIO-managed investments in interested parties in this case, which will likely occur only through discovery.  Accordingly, now is not the time to determine that the plan controls the distribution or even to make any judgment about distribution.  In the context of this matter, Mar-Bow's claim to its fair share of any proceeds is as strong as any other party's claim.

## VII.    Under the Equitable Powers That the Supreme Court Grants to This Court to Address Mar-Bow's Claim of Fraud on the Court, This Court May Permit Mar-Bow to Proceed on its Motion

33.     In *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, the Supreme Court held that the flexibility of process necessary to determine and to remedy a fraud on the court derives from the equitable, rather than legal, nature of the proceeding:

> Equitable relief against fraudulent judgments is not of statutory creation. It is a judicially devised remedy fashioned to relieve hardships which, from time to time, arise from a hard and fast adherence to another court-made rule, the general rule that judgments should not be disturbed after the term of their entry has expired. Created to avert the evils of archaic rigidity, this equitable procedure has always been characterized by flexibility which enables it to meet new situations which demand equitable intervention, and to accord all the relief necessary to correct the particular injustices involved in these situations.[17]

34.     The Supreme Court thus held that the equitable intervention necessary to accord relief to correct the injustice resulting from a fraud on the court is a flexible process, not bound by

---

[17]     322 U.S. 238, 246 (1944).

rules of "archaic rigidity."[18]  That flexible process of equitable intervention is critical because the absolute necessity of according relief in these circumstances far outweighs the need for rigid adherence to the rules of the legal process.

35.    In *Universal Oil Products Co. v. Root Refining Co.*, the Supreme Court held: "The inherent power of a federal court to investigate whether a judgment was obtained by fraud, is beyond question.  *The power to unearth such a fraud is the power to unearth it effectively.*"[19]  The Court then made a clear statement supporting this Court's full authority to permit Mar-Bow to pursue its motion for relief under Rule 60(d)(3): "Accordingly, a federal court may bring before it by appropriate means all those who may be affected by the outcome of its investigation."  *Id*.  Mar-Bow is among those who may be affected by the outcome of this motion, if only because its motion seeks relief from orders to which it is bound.

36.    A bankruptcy case on point is *Denison v. Marina Mile Shipyard, Inc.*[20]  In that case, a creditor and a post-confirmation plan administrator filed a motion for an order requiring two brokers to disgorge a commission due to a fraud on the court resulting from a concealed conflict of interest.   The brokers responded that the moving parties lacked standing because the confirmation order released them, and the provisions of the confirmed plan bound all creditors. The *Denison* court rejected the brokers' argument that the movants lacked standing, holding: "The bankruptcy court had the authority to order disgorgement of the fees paid to the Brokers based on a finding of fraud on the court.  Under such circumstances, the means by which the fraud was brought to the court's attention is inconsequential."  *Id.* at *5.  The court concluded: "Accordingly,

---

[18]    *Id*. at 248.
[19]    328 U.S. 575, 580 (1946) (citation omitted) (emphasis added).
[20]    No. 10-CV-62522, 2012 WL 75768 (S.D. Fla. Jan. 10, 2012), *aff'd sub nom.*, *In re New River Dry Dock, Inc.*, 497 F. App'x 882 (11th Cir. 2012).

Brokers' argument regarding lack of standing is rejected." *Id*. at \*6. The standing argument was rejected not because the court found that the movants had standing, but because the court found that their standing was irrelevant.[21]

37.     Similarly here, although Mar-Bow asserts that it does have standing, in the equitable world in which this motion is to be resolved, Mar-Bow's standing does not matter. Because this Court's highest responsibility is to preserve the integrity of its process, McKinsey must be held fully accountable for its fraud on the court regardless of Mar-Bow's standing.

WHEREFORE, for the reasons set forth above, Mar-Bow's motion for relief from judgments under Rule 60(d)(3) should be granted.

---

[21]     *See also McDonald's Corp. v. Roga Enters., Inc.*, No. 10-CV-21706, 2010 WL 4281868, at \*1 (S.D. Fla. Oct. 25, 2010) ("The general rule (*with the exception of claims of fraud on the court*) is that one must either be a party or a party's legal representative in order to have standing to bring any Rule 60(b) motion.") (citation and quotation marks omitted; emphasis added); *In re La Sierra Fin. Servs., Inc.*, 290 B.R. 718, 727 (B.A.P. 9th Cir. 2002) (same).

Dated: May 8, 2019
      Wilmington, Delaware

Respectfully submitted,

Steven Rhodes, Esq.
STEVEN RHODES CONSULTING, LLC
1610 Arborview
Ann Arbor, Michigan 48103
Telephone:     (734) 646-7406
Facsimile:     (734) 665-6915
Email:          rhodessw@comcast.net

   - and -

Sheldon S. Toll, Esq.
LAW OFFICES OF SHELDON S. TOLL, PLLC
29580 Northwest Highway
Suite 1000
Southfield, Michigan 48034
Telephone:     (248) 351-5480
Facsimile:     (248) 358-2740
Email:          sst@lawtoll.com

   - and -

Sean O'Shea, Esq.
Michael Petrella, Esq.
Amanda Devereux, Esq.
CADWALADER, WICKERSHAM & TAFT LLP
200 Liberty Street
New York, New York 10281
Telephone:     (212) 504-5700
Facsimile:     (212) 504-6666
Email:          sean.oshea@cwt.com
              michael.petrella@cwt.com
              amanda.devereux@cwt.com

*Lead Counsel for Mar-Bow Value Partners, LLC*

   - and -

16

*/s/ Marc R. Abrams*

Marc R. Abrams (No. 955)
Stephen B. Gerald (No. 5857)
WHITEFORD, TAYLOR & PRESTON LLC
The Renaissance Centre
405 North King Street, Suite 500
Wilmington, Delaware 19801
Telephone:      (302) 357-3282
Facsimile:      (302) 357-3270
Email:           mabrams@wtplaw.com
                 sgerald@wtplaw.com

*Local Counsel for Mar-Bow Value Partners, LLC*