# EXHIBIT 70

5/7/2019 One Man vs. McKinsey: A Billionaire Says the Consultancy Has Rigged the Bankruptcy System - The New York Times

Case 15-10541-BLS Doc 2427-1 Filed 05/08/19 Page 2 of 12

# The New York Times

# One Man vs. McKinsey: A Billionaire Says the Consultancy Has Rigged the Bankruptcy System

By Mary Williams Walsh

April 11, 2019

You can't have divided loyalties when guiding a company through bankruptcy. If you're helping it cut debt, you can't be its lender. If you're auctioning off its assets, you can't put in a bid.

Those rules are in place because the bankruptcy system — what seems like a grim realm of destitution — is actually a place for hope and opportunity. If the game is played fairly, lenders can be predictably compensated, failing businesses can be restructured and revived, and jobs can be saved.

Jay Alix knows the regulations better than most. He has spent decades remaking companies after starting an accounting firm in his Detroit apartment. Over the years, he has been asked to untangle the DeLorean sports-car venture's books, help restructure General Motors, teach accounting to judges and propose changes to the system. Once, when the Justice Department determined that his firm had violated the rules, the government established new guidelines and even named them after him: the Jay Alix Protocol.

Mr. Alix wears that scar like a badge of honor — proof that American oversight works. To him, an incorruptible bankruptcy system is a bedrock of capitalism, one that "underpins everything we count on and believe in in our economic system."

And so it was that one day in the summer of 2014, Mr. Alix looked over a sheaf of court papers filed by one of his competitors, McKinsey & Company, with a sense of disbelief. The powerful consultancy had branched into bankruptcy advising, poached some of his firm's employees and been hired by Harry & David, the seller of pear-laden fruit baskets, to advise its restructuring in bankruptcy.

Mr. Alix had long been retired, though he still held a seat on the board of the company he started, AlixPartners. As he tried to puzzle out how McKinsey had beaten out his firm for the Harry & David job, he found something strange, the kind of thing you probably wouldn't notice unless you were a certified fraud examiner — which Mr. Alix also happened to be.

McKinsey's filings, sworn under penalty of perjury, looked complete on the outside. But they were missing their guts: a detailed list of all of McKinsey's connections to the other parties to the case. It's important paperwork, meant to prevent conflicts of interest. Advisory firms have a fiduciary duty to protect the assets of the bankrupt company, and they are required by law to submit such a list to guard against back-room dealing that might harm the business's ability to survive or reduce the payments creditors are entitled to.

Bankruptcy advisory firms like McKinsey and AlixPartners have immense power over the way a case is resolved: They influence how much creditors are paid, how salvageable parts of the business are sold, and where equipment and other tangible assets end up. If nobody knows whom else the bankruptcy adviser works with, it is impossible to know if that adviser is cutting someone a sweetheart deal.

Mr. Alix had put together hundreds of bankruptcy filings before he stepped away from his business in 2000 at age 45. His wife had died in a boating accident that year, leaving him to raise two children, ages 6 and 9. As he examined McKinsey's filings in the Harry & David case, he wondered if the law had changed while he had been busy with car pools and parent-teacher conferences. He asked some lawyers. No, he was told, the law was the same.

When he looked deeper, Mr. Alix found that McKinsey's meager disclosures appeared to go all the way back to when it began advising bankrupt companies in 2001 — the same year the Justice Department had gone after him.

"But here's McKinsey with all these violations, and has anyone ever said a word to them?" he said.

That's how it started — one man's run at the biggest, best connected and most secretive consulting firm in the world. Part personal crusade and part professional mission, it has consumed more than four years and cost Mr. Alix not only millions of dollars but a few friendships as well. In courtrooms from Texas to Virginia, Delaware and New York, Mr. Alix has appeared before bankruptcy judges to attack McKinsey.

He believes the firm has improperly earned tens of millions by concealing its own investments in bankrupt companies and their creditors, then helping decide how much the failing company must pay them. Mr. Alix also accuses McKinsey of "trafficking in the assets" of bankrupt companies: quietly selling off the viable pieces to the other companies it represents. He has even filed a civil complaint under the Racketeer Influenced and Corrupt Organizations Act — the federal law, known as RICO, under which prosecutors take on the mob. One reason: He believes McKinsey tried to offer him a bribe.

McKinsey denies wrongdoing. The firm said Mr. Alix carried a deep-seated grudge against it for competing against AlixPartners and hiring some of its employees. The firm said it had already addressed the concerns raised over its disclosure practices, and contends that Mr. Alix has invented statements by company figures to make McKinsey seem corrupt.



The Manhattan headquarters of McKinsey. The firm has said Mr. Alix holds a grudge against it for hiring some employees away from his company.
Emon Hassan for The New York Times

"For three years now, Jay Alix, the founder and largest single shareholder of our competitor, AlixPartners, has engaged in a coordinated campaign to push us out of the bankruptcy advisory market using litigation, the media and congressional lobbying," the company said in a statement. "We have and will vigorously confront him in these venues, but none of his efforts changes the essential facts here: that McKinsey is committed to its clients' success and has always delivered its work free of any conflict."

The more McKinsey says his allegations are false, the more Mr. Alix stands his ground. "When he gets something in his mind, he can be absolutely relentless about pursuing it," said Rick Wagoner, a former chairman and chief executive of General Motors, who has known Mr. Alix since G.M. hired him in 1992 to revive its failing rental-car business. (After the turnaround, G.M. sold National Car Rental for $1 billion.)

Mr. Alix, he said, is like a dog with a shoe in its mouth. "If it doesn't want to let go," Mr. Wagoner said, "you'd better say goodbye to the shoe."

Last year, Mr. Alix's campaign against McKinsey was partly vindicated when the Justice Department filed pleadings supporting his statements in three bankruptcies. The United States Trustee Program — the unit in charge of policing the bankruptcy courts — accused McKinsey of "pervasive disclosure deficiencies," and in February, McKinsey agreed to settle, returning $15

million in fees and promising to make additional disclosures in a case in Texas. The settlement, which did not require McKinsey to admit to any wrongdoing, appears to be a record for this type of enforcement action.

## 'It was happening right before my eyes'

A bearded and barrel-chested billionaire, Mr. Alix seems almost astrologically drawn to distressed enterprises, working out restructurings the way other people work out the Sunday crossword puzzle. The weekend before Thanksgiving 2008 — eight years out of the business and still a full-time parent — he called Mr. Wagoner at home to tell him how he thought G.M. could survive the financial crisis by restructuring in bankruptcy, without folding completely. Mr. Wagoner recalled arguing at first, before deciding that it was probably G.M.'s least risky option if bankruptcy was ultimately required. His board eventually agreed, and Mr. Wagoner said G.M. had followed the road map Mr. Alix provided.

Contrary to the public imagination, bankruptcy courts are not where businesses go to die. In fact, there is potential for creativity and rebirth in Chapter 11, the uniquely American law for corporate reorganizations.

"Most countries just liquidate companies," said Richard Gitlin, a bankruptcy lawyer specializing in international debt restructurings who has worked with Mr. Alix in the past. "We are the best at restructuring the resources, taking the good part of the business, adding professional management and making it profitable."

Assets and businesses worth billions are constantly changing hands in America's bankruptcy courts — more wealth than in any other court system in the world. And where there is money, there is a risk of fraud.

Congress sought to curb back-room dealing in 1978 when it enacted the current Bankruptcy Code, which replaced an outmoded law from 1898. Under the old standard, the courts in some cities were in the thrall of a "bankruptcy ring" — a clubby network of lawyers, court officials and other specialists who were more interested in entrenching and enriching one another than in helping the companies in their care.

The new law sought to break up those rings and raise the professionalism and credibility of the courts. The changes included increased compensation to reduce the temptation of cheating, and lawyers and other professionals were required to provide sworn affidavits naming all their connections.

One city with a flourishing bankruptcy ring was Detroit, where Mr. Alix moved in 1981, at age 26, following his girlfriend after graduating from business school at Rutgers University. No sooner had he formed a tiny accounting firm in his apartment than a clerk of Detroit's bankruptcy court

was indicted. The offense: using a fake name to buy a motorboat out of somebody's bankruptcy. Such assets are supposed to be under court control, and it's a crime for officials to dip in and help themselves.

Federal officials, fearing worse, took over the Detroit court, and the F.B.I. began an investigation. Soon all manner of sordid news was pouring out: bribes, kickbacks, drinking on the bench, love affairs. It was the bankrupt companies that paid for the self-dealing, meaning their creditors got less, too.

Everywhere Mr. Alix went, people were talking about the scandal. "I got very interested in the corruption of the bankruptcy system because it was happening right before my eyes," he said. He saw how easily a few people could destroy the public trust, and how hard it was to get it back.

Rick Wagoner in 2009, when he was the chairman of General Motors. He said Mr. Alix had provided the road map the company used when it went into bankruptcy.
Fabrizio Costantini for The New York Times

If fairness prevailed, on the other hand, there was a lot of high-paying work to be done. Companies began to see the strategic value of a well-executed Chapter 11 case, using reorganization to shed financial obligations, such as jury awards in product liability cases or the debt amassed in leveraged buyouts.

5/7/2019 Crain vs. McKinsey - Billionaire Says Consultancy Has Rigged the Bankruptcy System - The New York Times

Case 15-10541-BLS Doc 2427-1 Filed 05/08/19 Page 7 of 12

In 1983, Mr. Alix got his first big break: A court-appointed bankruptcy trustee hired him to untangle the books of the DeLorean Motor Company, which had collapsed in scandal the previous year. He managed to find tens of millions of dollars in the ashes, for distribution to creditors who had not expected to get much of anything.

Bigger, more challenging jobs came. When Unisys, the information technology company, seemed destined for bankruptcy in the early 1990s, Mr. Alix dug in and found $1 billion worth of savings — more than enough to satisfy its bankers.

Mr. Alix didn't just advise companies. He taught "Basic Accounting for Judges" at the Federal Judicial Center in Washington, and advised Japan's Ministry of Economy, Trade and Industry on how to foster a turnaround industry. In 1994, President Bill Clinton named him to the National Bankruptcy Review Commission, with a mandate to study and propose amendments to the bankruptcy laws.

Things were changing in Detroit, too. A new bankruptcy judge, Steven W. Rhodes, was appointed as the court tried to wash away the lingering stains of corruption. He went on to become the chief bankruptcy judge, and eventually to preside over Detroit's own historic bankruptcy before retiring in 2015.

Mr. Rhodes was one of the experts Mr. Alix called after discovering the skimpy disclosures in McKinsey's bankruptcy filings. In nearly 30 years on the bench, Mr. Rhodes said, he had never seen anything like it. It was "instantly apparent," he said, that McKinsey's filings were not compliant with the law.

"I had spent most of my professional career guarding that integrity whenever and however necessary," Mr. Rhodes said. "The very legitimacy of our bankruptcy courts, as perceived by the parties and the public, depends on the professionals and fiduciaries in the cases conducting themselves in accordance with the highest ethical standards."

McKinsey's disclosures, he said, threatened the integrity of the bankruptcy process. "I felt a moral obligation to help," Mr. Rhodes said. Today, he is Mr. Alix's lead attorney in his fight against a singularly formidable opponent.

## 'I tried to be polite'

McKinsey employs lawyers, but is a not a law firm. It employs accountants, but is not an accounting firm. It is in the business of advice. Over the decades, McKinsey has grown into one of the most influential consulting firms in the world. It advises companies, cities and countries — sometimes including authoritarian regimes.

Part of McKinsey's success has been the strict policies of confidentiality that it maintains. That secrecy adds to McKinsey's mystique and, arguably, the value of its advice.

In 2010, while Mr. Alix was home with his children, McKinsey moved to expand its share of the turnaround business. It set up a new unit, McKinsey RTS — Recovery and Transformation Services — and began hiring seasoned advisers. Some of them it poached from AlixPartners. In early 2014, AlixPartners sued two who had switched firms.

The AlixPartners board had heard about a pitch that McKinsey RTS had been making to top lawyers: If the attorneys had the bankrupt companies that hired them pick McKinsey as their adviser, McKinsey would open its confidential client list to the lawyers, who would then have the inside track on finding new customers.

At best, this sounded to Mr. Alix like the sort of clubby arrangements that pervaded bankruptcy courts decades ago. At worst, it sounded illegal.

Disputes over SunEdison, Westmoreland and Alpha Natural Resources have been rolled into a proceeding spanning three bankruptcy courts. David Paul Morris/Bloomberg

It was around this time that Mr. Alix came across McKinsey's minimalist disclosures in the Harry & David matter. In August 2014, he decided to take his concerns to Dominic Barton, then McKinsey's managing director. Both sides agree there was a series of discussions, but that's just about all they agree on.

According to Mr. Alix, Mr. Barton acknowledged that the practices violated bankruptcy law, and even sought outside legal advice that confirmed that view. Mr. Alix also told the court that Mr. Barton had initially agreed to wind down the bankruptcy advising business, but later reneged — and offered to steer some consulting business to AlixPartners instead. Mr. Alix felt insulted and foolish: The discussions, in person and over the phone, had taken 14 months and ended in what he viewed as an attempted bribe.

McKinsey recalls the discussions in a far different light. The firm said Mr. Alix had used the meetings to "hector" and "lecture" Mr. Barton, and to demand that McKinsey RTS be shut down. Mr. Barton, in response to questions from The New York Times, said, "I tried to be polite and listen to his concerns, but our discussions were unproductive as he was uninterested in any viewpoint but his own."

As for the alleged bribe, Mr. Barton said Mr. Alix had wildly misconstrued an innocuous statement.

"I was getting so fed up with his repetitive complaints that I said something like, 'Jay, there are plenty of opportunities in the transformation services sector — apart from bankrupt companies — that AlixPartners should seek out,'" Mr. Barton said.

There were any number of other firms that could benefit from AlixPartners' expertise, Mr. Barton said. He named a few potential clients.

"If Jay had even intimated that he thought I was making an improper attempt to silence him — and I am quite certain he didn't think that — I would have asked him to leave my office," Mr. Barton said.

## A database of alleged conflicts

If you want to go to war against the world's biggest consulting firm, it helps to be independently wealthy. You can't just barge into a bankruptcy court and say your piece; you have to have a stake in the case.

In the spring of 2016, Mr. Alix formed a small investment firm and used it to buy the securities of several bankrupt companies that McKinsey was advising: about $600,000 for some Westmoreland Coal bonds, $1.25 million for notes issued by Alpha Natural Resources, $150,000 for GenOn's bonds, and so on.

Even the name Mr. Alix picked for his firm was meant to be a shot at McKinsey. He called it Mar-Bow Value Partners, after the late Marvin Bower, a man of towering convictions who led McKinsey for decades and was known for prizing principle over profit. What better way for Mr. Alix to make his point than to take on the mantle of the firm's hallowed leader to accuse it of an epic fraud?

Mr. Alix also set out to build a searchable database of McKinsey's connections — the names it would be expected to disclose in court filings. Despite McKinsey's reputation for secrecy, the researchers he hired found lots of client names by mining news stories, court filings and social media. (McKinsey's younger associates, raised in the online era, seemed to have little compunction about posting details of their work.) The researchers also combed through regulatory filings and added all the names they could find of investments made by MIO Partners, McKinsey's $25 billion internal hedge fund.

Then the researchers added the names of all the parties listed as being affected in more than a dozen bankruptcies that McKinsey had worked on — thousands of banks, insurers, investors, utilities, landlords, vendors, unions, retirees and others with stakes.

With that, Mr. Alix could match McKinsey's clients and investments with the stakeholders in the bankruptcies it worked on, and see who coincided with whom over time. It was, in essence, the kind of database that every big professional-services firm keeps routinely, to watch for conflicts of interest. Mr. Alix said he had found a number of such conflicts involving McKinsey.

For example, Mr. Alix said MIO Partners had held an undisclosed stake in Alpha Natural Resources while McKinsey served as its bankruptcy adviser. McKinsey had a hand in determining how creditors like itself would be repaid — and MIO Partners walked away with a profit that Mr. Alix estimated at $50 million. McKinsey said that number was false, and the actual sum was a fraction of that amount.

The bankruptcy system "underpins everything we count on and believe in in our economic system," Mr. Alix said. Jeenah Moon for The New York Times

He also said NRG Energy, a McKinsey client, had bought power plants and other assets from bankrupt companies that were also advised by McKinsey, including the solar power provider SunEdison. A group of SunEdison creditors who were concerned about the issues raised by Mr. Alix reached a private settlement with McKinsey for $17.5 million in December, although it was not disclosed to the court until this month. That was also the first Mr. Alix had heard of it.

Mr. Alix also questioned the bankruptcy case of an NRG subsidiary, GenOn. After GenOn's creditors complained that NRG had plundered its cash and properties, GenOn hired McKinsey to investigate and settle the creditors' complaints. But it did not disclose that McKinsey already had a relationship with its parent company. Mr. Alix said that raised concerns about whether the outcome was ultimately fair.

Mr. Alix raised the GenOn issues as part of his filings in the Westmoreland bankruptcy. The judge in Houston overseeing the Westmoreland case, David R. Jones, also handled the GenOn case. He said he had stayed up to 3 a.m. reading Mr. Alix's sworn statement.

"If what Mr. Alix alleges is true, then McKinsey has a Title 18 problem," Judge Jones said during a January hearing, referring broadly to the portion of the United States code that covers criminal offenses. The judge also said that it could be a crime if Mr. Alix had lied to the court.

At a hearing in December, the judge had said, "I'll just tell everybody, I'm worried to death that I made a mistake in GenOn," he added. "If I did something wrong, I'm going to fix it."

The disputes over Westmoreland, SunEdison and Alpha Natural Resources have been rolled into a joint proceeding spanning three bankruptcy courts. They also drew the attention of the United States Trustee Program, which settled its portion of the dispute in February.

McKinsey has argued that Mr. Alix is simply a disgruntled competitor. Lawrence A. Friedman, the director of the trustee office from 2002 to 2005, agreed that the dispute could be characterized as a "turf war" — but said that didn't mean McKinsey was innocent.

"My legal eagle sense from 40 years of practice," Mr. Friedman said, "is that you don't pay $15 million where you didn't do anything wrong."

As part of the settlement, McKinsey has said it will disclose more information. "When the U.S. trustee asked that McKinsey change its approach, McKinsey did so," the company said in a statement. The judges will hold a hearing this month to decide whether to approve the settlement.

# 'I'm not on a vendetta'

Mr. Alix is undeterred. He believes McKinsey's proposed approach will fall short of the standard, and is moving ahead with his claims. He argues that the case transcends bankruptcy court, where cases move swiftly in hopes of saving companies and jobs: The longer a company languishes in bankruptcy, the less likely that it can be reorganized, and the more likely that it will have to be liquidated. Last May, he filed a complaint in Federal District Court in Manhattan under the RICO Act, usually reserved for organized crime prosecutions.

Mr. Alix said in his filing that McKinsey and seven of its officials "conducted a criminal enterprise" by intentionally submitting false statements under oath in every bankruptcy case the firm had worked on since 2001. Those statements concealed the fact that McKinsey was connected to many of the people and entities involved in the bankruptcies, Mr. Alix argued, and constituted "frauds on the courts."

McKinsey has called for that complaint to be dismissed, calling it "the latest installment in an escalating pattern of anticompetitive behavior directed toward McKinsey." It says Mr. Alix cannot prove his case and is trying to use the RICO statute to drive a competitor out of the bankruptcy market.

The case is awaiting a decision on McKinsey's motion to dismiss. If the case is tossed, Mr. Alix said, he will appeal. He's got his teeth into this shoe, and he doesn't plan on letting go.

"This is just what I do," Mr. Alix said. "I'm not on a vendetta. This is just me being true to myself."

He added: "I like solving big problems. This is a big problem."

**Correction:** *April 11, 2019*
*An earlier version of this article misstated the time frame of Jay Alix's discussions with Dominic Barton, who was the managing director of McKinsey & Company, about McKinsey's practices. The discussions took 14 months, not 11 months.*

**Correction:** *April 13, 2019*
*An earlier version of this article incompletely described a hearing before the bankruptcy court Judge David R. Jones. In addition to saying that allegations made by Jay Alix against McKinsey & Company, if true, could constitute a crime, the judge told Mr. Alix that it could be a crime if he had lied to the court about McKinsey's conduct. The article also misidentified the month of the hearing. It was in January, not December.*

A version of this article appears in print on April 14, 2019, on Page BU1 of the New York edition with the headline: One Man Versus McKinsey

