# EXHIBIT 78

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 18-35672-H2-11 |
| | § | HOUSTON, TEXAS |
| WESTMORELAND COAL COMPANY, | § | THURSDAY, |
| ET AL, | § | JANUARY 3, 2019 |
| DEBTORS. | § | 12:01 P.M. TO 2:28 P.M. |

MOTION HEARING

BEFORE THE HONORABLE DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:                          SEE NEXT PAGE

COURTROOM DEPUTY/ERO:                 VRIANA PORTILLO

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 ELDRIDGE ROAD, #144
SUGAR LAND, TEXAS 77478
(281) 277-5325 (office) ◊ (281) 277-0946 (fax)
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

<u>APPEARANCES</u>:

FOR WESTMORELAND COAL          KIRKLAND & ELLIS, LLP
COMPANY, ET AL.:               Gregory F. Pesce, Esq.
          (Via Telephone)      Steve Hessler, Esq.
                               300 N. LaSalle
                               Chicago, Illinois 60654

                               JACKSON WALKER, LLP
                               Patricia Tomasco, Esq.
                               Matthew D. Cavenaugh, Esq.
                               1401 McKinney Street, Ste. 1900
                               Houston, Texas 77002


FOR THE UNITED STATES          DEPARTMENT OF JUSTICE
TRUSTEE:                       Hector Duran, Jr., Esq.
                               Diane Livingstone, Esq.
                               515 Rusk Avenue, Suite 3516
                               Houston, Texas 77002

FOR MCKINSEY RECOVERY AND
TRANSFORMATION SERVICES,
US, LLC:                       ZACK A. CLEMENT, PLLC
                               Zach Clement, Esq.
                               3753 Drummond
                               Houston, TX  77025

                               SELENDY & GAY PLLC
                               Faith Gay, Esq.
                               Christine H. Chung, Esq.
                               1290 Avenue of the Americas
                               New York, NY  10104


FOR MAR-BOW VALUE PARTNERS,
LLC:                           DIAMOND MCCARTHY, LLP
                               Christopher R. Murray, Esq.
                               Alan Diamond, Esq.
                               Michael Fritz, Esq.
                               909 Fannin, Ste. 3700
                               Houston, TX  77010

<u>APPEARANCES (Cont'd)</u>:


ALSO FOR MAR-BOW VALUE
PARTNERS, LLC:                         BOIES SCHILLER FLEXNER, LLP
                                       Sean O'Shea, Esq.
                                       Amanda Boies, Esq.
                                       575 Lexington Ave., 7th Floor
                                       New York, NY  10022

                                       STEVEN RHODES CONSULTING, LLC
                                       Steven Rhodes, Esq.
                                       1610 Arborview Rd.
                                       Ann Arbor, MI  48103

PLUS NUMEROUS CALLERS

1          HOUSTON, TEXAS; THURSDAY, JANUARY 3, 2019; 12:01 P.M.

2              THE COURT:  Good afternoon, everyone.  Please be

3     seated.

4              COUNSEL:  Good afternoon.  Good afternoon.

5              THE COURT:  All right.  On the 12:00 o'clock docket,

6     we have the jointly administered cases under Case No.

7     18-35672, Westmoreland Coal Company.  We'll take appearances,

8     please.

9              MS. TOMASCO:  Good afternoon, Your Honor.  Patty

10    Tomasco, Jackson Walker, on behalf of the Debtors.  Joining me

11    in the courtroom is Mr. Greg Pesce, and on the phone is

12    Mr. Steve Hessler from Kirkland & Ellis.

13             THE COURT:  All right.  Thank you.  Good afternoon,

14    folks.

15             Mr. Clement, or it doesn't matter.

16             MR. RHODES:  Steve Rhodes on behalf of Mar-Bow Value

17    Partners, LLC.

18             THE COURT:  Thank you, Mr. Rhodes.

19             MR. CLEMENT:  Good afternoon, Your Honor.

20             THE COURT:  Good afternoon.

21             MR. CLEMENT:  Zach Clement for McKinsey Recovery &

22    Transformation Services, and from Selendy & Gay, Faith Gay and

23    Chris Chung.

24             THE COURT:  All right.  Thank you.  Good afternoon,

25    folks.

1          MS. GAY:  Good afternoon, Your Honor.

2          MR. O'SHEA:  Good afternoon, Your Honor.  Sean

3    O'Shea, Boies Schiller Flexner, for Mar-Bow.  Here with me are

4    my partner Amanda Devereaux, and Mike Petrella, as well.

5          THE COURT:  All right.  Thank you.  Good afternoon,

6    folks.

7          Mr. Duran?

8          MR. DURAN:  Good afternoon.  Hector Duran and Diane

9    Livingstone with the Department of Justice, on behalf of the

10   U.S. Trustee.

11         THE COURT:  All right.  Thank you.

12         Mr. Murray, good afternoon.

13         MR. MURRAY:  Good afternoon, Judge.  Chris Murray

14   from Diamond McCarthy, with my partner Allan Diamond and our

15   associate Michael Fritz, here for Mar-Bow.

16         THE COURT:  All right.  Thank you.  Good afternoon,

17   gentlemen.

18         Anyone else in the courtroom?

19      (No verbal response.)

20         THE COURT:  All right.  We have -- it's climbing.

21   We have 62 folks on the dial-in line.  Is there anyone who

22   wishes to make an appearance?

23      (No verbal response.)

24         THE COURT:  I'm living right in the new year.  All

25   right.  Terrific.

1        Mr. Pesce, do you want to get me through the --

2    because I changed your calendar yesterday just a bit.  Have we

3    thought about how we want to proceed this afternoon?

4        MR. PESCE:  Yeah, so I figured we would start with

5    what everyone is waiting to hear about on the Retiree

6    Committee.

7        THE COURT:  All right.

8        MR. PESCE:  So we've -- we -- the Debtors, the

9    parent secured creditors, the Creditors Committee, the U.S.

10   Trustee have a -- and other constituents in the case, have

11   agreed on a Form of Order, we've uploaded that to the

12   Docket --

13       THE COURT:  You have.

14       MR. PESCE:  -- maybe in the last --

15       THE COURT:  Would that have just been recent?

16       MR. PESCE:  In the last five or ten --

17       UNIDENTIFIED:  924, ECF 924.

18       MR. PESCE:  924.

19       THE COURT:  All right.

20    (Participants confer.)

21       MR. PESCE:  So the Form of Order is there.  And we

22   and the parent secured creditors have been in discussions with

23   the three members of the Committee.  I think we're very, very

24   close to agreeing on a budget to cover their work.

25       THE COURT:  Okay.

1          MR. PESCE:  And we expect to reach that agreement

2     later today.  The order doesn't require that to be finalized

3     now, so it will be -- there's a mechanism in that order for us

4     agreeing to that budget with the lenders and the Committee

5     members.  So, unless Your Honor has any questions or other

6     things for us to consider, we'd ask you to sign the order, and

7     we can --

8          THE COURT:  I don't.  I -- you know, I applaud you

9     all for sort of taking my comments and my initial thoughts and

10    putting it into a workable form.  I -- again, I respect all

11    three of the folks who are going to serve on the Committee.  I

12    have every belief that the process, wherever it goes, will be

13    transparent, it will be vigorous, and it will be honest, and

14    that's all I was ever looking for.

15         I am -- the order is short, I've seen it.  I don't

16    have any issue with it at all.  I will sign it, we'll get it

17    on the docket.  And I guess I should ask.  I assume there's

18    nothing else that I need to do, in terms of making sure that

19    the Committee is fully empowered and can now engage in the

20    process.

21         MR. PESCE:  No, we are set with the Committee.  I

22    think I will talk to Mr. Alonzo soon to find a hearing date,

23    if necessary, for the -- anything resulting from our work --

24         THE COURT:  Sure.

25         MR. PESCE:  -- but that's not for today.

1          THE COURT:  All right.  Terrific.

2          MR. PESCE:  All right.

3          THE COURT:  Thank you very much.

4          MR. PESCE:  Thank you, Your Honor.

5          THE COURT:  All right.

6          MR. PESCE:  So, with that, I'll turn it over, I

7     think to Christine Chung for --

8          MS. MAUCERI:  (Via telephone) Your Honor?

9          THE COURT:  Yes, ma'am.

10          MS. MAUCERI:  Hello?

11          THE COURT:  Yes.

12          MS. MAUCERI:  I'm sorry.  I don't if my call had

13     gone right.  It's Rachel Mauceri at Morgan Lewis.  Matthew,

14     are you on the phone?

15        (No verbal response.)

16          THE COURT:  Apparently not.  Do you need to raise an

17     issue with me or --

18          MS. MAUCERI:  I am not sure if any of my colleagues

19     are on the line, Your Honor.  If I may have just a moment, if

20     I may ask the Court to hold for just a moment.  I do apologize

21     for this.

22          THE COURT:  No, quite all right.

23          MS. MAUCERI:  We were saying that Mr. Ziegler was

24     going to be on the line this afternoon, and so I just want to

25     make sure that -- and I am at Morgan Lewis and on for the UMWA

1    Fund this afternoon, Your Honor.  So I just want to make sure

2    that they are represented at this hearing.  So, if you can

3    just give me a moment, I will be right back with you, and I do

4    apologize for holding the Court's time this way.

5              THE COURT:  It is quite all right.

6              MS. MAUCERI:  Thank you.

7         (Pause in proceedings.)

8              MR. PESCE:  I'm just checking here to see if

9    Mr. Ziegler sent me anything.

10             THE COURT:  I assume that you sent him a copy of the

11   proposed order.

12             MR. PESCE:  Yeah.  I'm reasonably sure that it was

13   signed off by everybody, but ...

14        (Pause in proceedings.)

15             THE COURT:  It's one of those horrible, sinking

16   feelings.  You think there are three people in front of you

17   that are going to talk, and all of a sudden, you're the last

18   person standing.

19        (Pause in proceedings.)

20             THE COURT:  While she's looking, were you

21   contemplating a supplemental order once you work out the

22   budget issues, or were you just going to let -- how are you

23   going to reflect that?

24             MR. PESCE:  I think it would be reflected in the DIP

25   credit facility's budget to --

1          THE COURT:  So you're just going to add a line item

2     and that will be --

3          MR. PESCE:  Correct.

4          THE COURT:  -- the memorial -- I got it.  Okay.

5      (Pause in proceedings.)

6          MR. PESCE:  Perhaps, given all the other things on

7     the docket today, do you -- would you want to maybe -- should

8     we move to the other things, and then --

9          THE COURT:  I assume --

10          MR. PESCE:  -- do this --

11          THE COURT:  -- you were going to stay, regardless,

12     is --

13          MR. PESCE:  I'll be here all day.

14          THE COURT:  Fair enough.

15      (Laughter)

16          THE COURT:  All right.  And when she comes back in,

17     then we'll -- if we need to, we'll pop back up.

18          MR. PESCE:  Okay.

19          THE COURT:  Ms. Chung, do you want to give me a

20     status report?  And I want you all to know that, quite

21     frankly, I haven't read depo transcripts all night long in

22     about eight years, so it was fun revisiting the past.  But I

23     have read both transcripts in their entirety, and had time to

24     both contemplate them, as well as to read parts that I found

25     interesting more than once.

1       MS. CHUNG:  Good afternoon, Your Honor.  Christine

2   Chung from Selendy & Gay for McKinsey RTS.

3       We're here today, Your Honor had set a status

4   conference.  And at the last conference, you had -- we had --

5   you had anticipated that, perhaps after these depositions that

6   the Court ordered -- which Your Honor made clear to both sides

7   would be very important, in terms of substantiating and coming

8   forth with a good faith basis for their respective pleadings -

9   - that one side or the other -- and actually, you were

10   addressing me at the time -- might make an application for --

11   an emergency application for some form of limiting relief.

12   And I don't think Your Honor used the word, but the idea was

13   to have a plan for getting everything done by January 28th

14   because the Court was very clear that that should be all --

15   each party's priority, and it was the Court's priority.

16       Your Honor, we have set forth the plan in a pleading

17   that we filed late last night.

18       THE COURT:  Yeah, I've read it.

19       MS. CHUNG:  And what I'd like to do, with the

20   Court's permission, is to set forth the contours of the plan,

21   and then set forth the reasoning behind our proposal.

22       So the plan that we are proposing, Your Honor, after

23   the depositions, and what we believe was Mr. Alix's failure to

24   substantiate or bring forth a good faith basis for his very

25   serious and "inflammatory" -- to use the word that the Court

1     used -- allegations of fraud and of crimes -- and he did

2     embrace in his deposition that he is alleging crimes -- that,

3     because of that, the lack of a good faith basis, that the next

4     step should be for the parties to brief legal issues -- which

5     were revealed by, not just Mr. Alix's deposition, but

6     Mr. Hojnacki's deposition -- to be the true disagreement

7     between the parties.

8           And so we have proposed the briefing on a schedule

9     before January 16th, simultaneous briefing by the parties --

10    opening briefs and reply briefs -- on two issues, which were

11    exposed by the depositions to be central to the disposition of

12    this matter:

13          One is the reach of Rule 2014.  And Your Honor

14    heard, even at the last conference, Mr. Rhodes say that the

15    view of Mar-Bow is that Rule 2014 requires all connections to

16    be disclosed.  We believe that that's an extreme and

17    idiosyncratic view of the law, as it was elaborated upon by

18    Mr. Alix at his deposition.  And he fully advocated the view

19    that no lookback period is permitted, that there may be some

20    *de minimis* exception, which, in our view, he did not

21    consistently apply to McKinsey RTS and other professionals who

22    are applying to be retained in bankruptcy.  But clearly, the

23    claim of hidden and concealed connections is, in reality, tied

24    to objective criteria that McKinsey RTS is truthfully applying

25    in its Rule 2014 declaration.  So we think that's one issue

1       that needs to be briefed.

2               The second issue has to do with affiliates.  Another

3       consequence of this view that Rule 2014 requires the

4       disclosure of all connections is that any affiliate, even if

5       it's a separate corporate entity -- even if it has a separate

6       existence, even if there's no basis for piercing the corporate

7       veil, even if, as in the case of MIO, we believe that it has

8       turned out that Mr. Alix could not substantiate his reckless,

9       really, allegations that there was -- there's no separateness

10      between MIO and RTS -- but the legal question is:  Is it the

11      case that disclosures under Rule 2014 need to make -- be made

12      of every connection of every affiliate?  And I would note that

13      Mr. Alix also reaffirmed the view that, in the case of MIO

14      connections -- and that's the pension plan and investment

15      plans of McKinsey for its consultants and employees -- that

16      every connection would be disqualifying.

17              So, again, we believe that's an extreme and

18      idiosyncratic view of the law; and that, if the Court resolves

19      those two questions that -- in our view, because there was no

20      factual issue that Mr. Alix was able to put forth a good faith

21      basis to dispute, we -- in one line, Mr. Alix basically

22      admitted that what he has is public information; that he's

23      read into that a fraud.  We think the road by which he got

24      there was to add speculation and innuendo; and that, given

25      that there's no factual issue, and that the legal issues can

1       be resolved, that the Court may have a pathway towards

2       resolving this, even on the legal issues.

3              Of course, if the Court believes, after receiving

4       the briefing and rendering a ruling on the legal questions,

5       that there is some factual issue remaining, then we remain

6       pleased to bring the witnessed that we have to court, and in

7       particular Mr. Hojnacki and whatever witnesses would address

8       whichever factual issues Your Honor believes need to be

9       addressed.

10             We are very confident that the issue here is

11      disinterestedness, not fraud, not crime because neither one of

12      those things was shown to have a shred of factual support.  It

13      has all been speculation.  It was evasiveness from Mr. Alix.

14      And the issue really boils down to:  What does Rule 2014

15      require?  And do those connections, as they're disclosed or

16      are -- have there been connections that weren't disclosed that

17      add up to McKinsey RTS not being disinterested?

18             We don't think that Mar-Bow can come close to that

19      standard, but we are proposing this pathway to keep us on a

20      track to resolve the issues that this Court needs to resolve,

21      to ensure that RTS continues doing the good work that it is

22      doing for the Debtor, and the work that is bringing value to

23      every interested party in the case.

24             THE COURT:  All right.  Thank you.

25             Mr. Rhodes.

1          MR. RHODES:  May it please the Court, we have a

2     different view of how the case should proceed from here.  The

3     difficulty with McKinsey's position is that, if we follow the

4     briefing schedule that they propose, and then Your Honor makes

5     a decision, there will leave very little time, if any, for the

6     discovery that we need, and we assume McKinsey needs from us,

7     to present to the Court all of the evidence in support of our

8     amended objection, and frankly, in support of the Debtors'

9     application to employ McKinsey here.

10         We certainly agree with the goal of trying to get

11    this resolved by January 28th, if it's at all possible.  It is

12    our view that the work that McKinsey has been doing in this

13    case is illegal work, in the sense that they are not qualified

14    to perform it.  And if it's at all possible to get that

15    resolved before confirmation, it ought to be.

16         So we propose, Your Honor, to proceed on parallel

17    tracks with discovery and with briefing, concurrently.  My

18    colleague on the case, Mr. O'Shea, will talk about the

19    specific discovery we want to obtain here and that we think we

20    need.  But we'd like to open that up now, Your Honor.  We

21    think that's important to a prompt and thorough review of the

22    issues that we have raised here.

23         It is, of course, our view that, in his lengthy and

24    detailed deposition, Mr. Alix established, at a minimum, a

25    good faith basis for all of the allegations that he has made

1    in this matter.  If Your Honor would like, in connection with

2    this hearing, I am certainly prepared to review that with you.

3           It was a long -- it was a result of a long, four-

4    and-half-year journey that Mr. Alix has had with McKinsey

5    here.  It began, not with litigation, Your Honor, but with

6    Mr. Alix's overture to the managing partner --

7           THE COURT:  Yeah, no, I read --

8           MR. RHODES:  -- of McKinsey.

9           THE COURT:  -- the history.  I got it.

10           MR. RHODES:  Yeah.  And so you know that he didn't

11    get here lightly or without thought or without consideration

12    or without help.  He has had substantial legal and expert

13    advise all along the way here.

14           And it's important to recognize that it is not a

15    feature of our legal system that, when a party files a paper,

16    that they are required by law to prove every element of it

17    when they file it.  They are required to have a good faith

18    evidentiary basis.  And the inferences that the party asks the

19    Court to draw must, of course, be reasonable inferences, and

20    we strongly believe that we have met that burden here.  But

21    that doesn't mean that the thorough consideration of these

22    issues does not require discovery.  It does.

23           If Your Honor is contemplating a short way to

24    resolve this, here is what I would suggest, Your Honor:  Ask

25    McKinsey a couple of questions, which they have not yet

1    answered.  Do the employees and partners of McKinsey, through

2    the MIO, have ownership interests in the Debtor or in any of

3    the Debtors' creditors?  We still do not have an answer to

4    that question, Your Honor.  We believe the answer is yes.  And

5    if the answer is yes, they are disqualified under Section 327,

6    which prohibits a professional from holding an interest

7    adverse to the estate.  It's incomprehensible to me that we

8    still do not have an answer to that question.

9         Now McKinsey throws up to this Court this concept

10    that there's this wall.  And we submitted, through Mr. Alix's

11    deposition, substantial reason to believe that, both legally

12    and factually, there is no wall.  There is no wall, Your

13    Honor.  Information flows freely back and forth through this

14    alleged wall.   And more than that, McKinsey is one firm.

15    And this allegation on Mr. Alix's part was fully justified by

16    the evidence that he cited.  It is -- all of the affiliates of

17    McKinsey, including RTS and including MIO, are owned and

18    managed by McKinsey.  There's no separation.

19         The issue here to be considered is:  What does

20    Section 327 required, and what does Rule 2014 require?  It may

21    well be that, for other unrelated purposes, MIO is separate

22    from McKinsey RTS and separate from McKinsey US, or even

23    separate from McKinsey & Company.  But we have a very specific

24    purpose here, and that is to ask whether the connections of

25    MIO, the connections of MIO have to be disclosed in a

1    bankruptcy case, in which McKinsey RTS --

2            THE COURT:  Let me --

3            MR. RHODES:  -- is in --

4            THE COURT:  -- ask you this.  Isn't the real issue a

5    bit different than that?  Isn't the real issue is what inquiry

6    was made, and was that inquiry reasonable?  Isn't that the

7    threshold issue --

8            MR. RHODES:  That is --

9            THE COURT:  -- for purposes of 2014?

10            MR. RHODES:  That is certainly one of the threshold

11    issues, Your Honor.  And we can talk about why the answer to

12    both of those questions is no.  That's the section -- that's

13    the Rule 2014 issue; it is not the Section 327 issue.

14            THE COURT:  That I got.

15            MR. RHODES:  Yeah.

16            THE COURT:  I got it.  But it's -- there is the

17    possibility -- and I'm not talking about anything specific --

18    is that you could have a reasonable inquiry, which could miss

19    something.  And if a reasonable inquiry was made and something

20    was missed, then that issue, what that meant, if it were

21    discovered, would be something totally different and, quite

22    frankly, falls within an awful wide range of discretion that I

23    would have to fashion a remedy, if that's what happened.  And

24    so I'm -- as opposed to the -- you know, they have to disclose

25    the connections up front.  I agree with you, that can become a

1    concern.

2            But what was -- what I was really looking for -- and

3    I probably ought to hear -- I want to hear from the U.S.

4    Trustee.  We're going to come back to this because I have some

5    comments for all of you.  And my thought is what I'm going to

6    do is I'm going to make a couple of comments, and then I'm

7    going to give you an opportunity to talk amongst yourselves,

8    and then see where we all want to go.  I thought that would

9    probably be the most fair.  And I -- you got me started, and I

10    do apologize.

11            Let me ask --

12            MR. O'SHEA:  May I, Judge?

13            THE COURT:  I want to save the discovery issue --

14            MR. O'SHEA:  Okay.

15            THE COURT:  -- if that's what you were going to

16    address.  I do want to hear from you about that --

17            MR. O'SHEA:  Well --

18            THE COURT:  -- but not quite yet.

19            MR. O'SHEA:  -- it -- I will address that, Judge.

20    But in terms of the reasonable inquiry, and in terms of why we

21    brought forward all of these allegations, which Your Honor

22    found so serious --

23            THE COURT:  Uh-huh.

24            MR. O'SHEA:  -- I think you need to look of the

25    history.  And if you look at the history of the -- this is the

1    fourteenth bankruptcy that McKinsey has been involved in.  If

2    you look at the history, you'll see, in the beginning,

3    McKinsey -- and this goes to, Your Honor, what Your Honor just

4    brought up:  Reasonable inquiry.  In the beginning, McKinsey

5    disclosed no connections, just used descriptive words.

6              THE COURT:  Yeah.

7              MR. O'SHEA:  And then --

8              THE COURT:  I promise you --

9              MR. O'SHEA:  -- if I may --

10             THE COURT:  I know you don't know me, and this is my

11   indication that you probably ought to save your comments.

12             MR. O'SHEA:  All right.  I'll save it.

13             THE COURT:  I --

14             MR. O'SHEA:  I'll save it, Your Honor.

15             THE COURT:  I've got it.

16             MR. O'SHEA:  Okay.

17             THE COURT:  I spent -- I would have -- I could have

18   had this conversation with you at 3:00 o'clock this morning.

19   I literally have read every single word.  My mind still works

20   fairly well.  I got it.

21             MR. O'SHEA:  Well, I'm going into something that

22   builds off the deposition, but I'll wait.  I'll wait for that.

23             THE COURT:  All right.

24             MR. O'SHEA:  Thank you, Judge.

25             THE COURT:  Let me hear from the U.S. Trustee, if

1   the U.S. Trustee has a position.  I don't expect you to have

2   read all, you know, 1,200 pages, or whatever it was.

3          MS. LIVINGSTONE:  I did try.

4          THE COURT:  Fair enough.  Where is the U.S. Trustee

5   on this?

6          MS. LIVINGSTONE:  Well, with regard to the

7   application to employ --

8          THE COURT:  Uh-huh.

9          MS. LIVINGSTONE:  -- McKinsey, we're still dealing

10   with the issue of the nondisclosure of Client X.

11          THE COURT:  So -- okay.  Is that the only issue?

12          MS. LIVINGSTONE:  That -- I think there may be a few

13   issues with regard to the completeness of the searches.  But

14   that, I think, is working its way through, as we continue to

15   talk to McKinsey --

16          THE COURT:  Okay.

17          MS. LIVINGSTONE:  -- about what they've done.  Our

18   bigger issue -- and I think --

19          THE COURT:  Let me ask you this.  And I'm sorry for

20   interrupting.  One of the things that has bothered me, as I

21   look at the process as a whole -- and again, I am not

22   criticizing any other court.  The only court I will ever

23   criticize is the one that I'm responsible for because I get

24   things wrong all the time.  But I have -- I am bothered by the

25   lack of transparency that has taken place in another

1    bankruptcy case.

2         There won't ever be in camera discussions in this

3    court, there won't even be in camera meetings; it will not

4    happen in this court.  The process demands transparency.  And

5    if you are working through objections -- which you certainly

6    have every right to do, and I encourage you to work through

7    that.  But at the end of the day, what is the record of how

8    those issues get resolved?

9         MS. LIVINGSTONE:  Well, Your Honor, I would say

10   that, even though we're in discussions with McKinsey, one of

11   the things that we just cannot agree to is some abrogation of

12   the process of 327 and 2014.  Again, I mean, you talked about

13   this yesterday and again today, the process.  327, 2014 lays

14   out the roadmap for professionals to show that they are

15   qualified, they are not disinterested, they are disinterested,

16   and that they -- and that all professionals are held to the

17   same standard.

18        In this case and in our objection to the motion to

19   seal, what we raised was, you know, McKinsey wants to be

20   treated specially.  They want certain things that we think

21   should be disclosed not to be disclosed.  And we just don't

22   agree with that concept.  A client who has 17 and a half

23   percent revenue is something that we think has an important

24   bearing on McKinsey's ability to fairly negotiate on behalf of

25   their own client, and then on behalf of the Debtor.

1          And regardless of who Client X is, the fact that

2     they don't want -- or are concealing that connection

3     interferes with the whole process of transparency and the

4     public's ability to know what is happening in its Bankruptcy

5     Courts.

6          THE COURT:  Let me ask you this.  Do you believe --

7     and I think, in my order, I used the term "Client X" or

8     something.  And again, I was just trying to fashion something,

9     so that this could go forward.  I didn't mean anything by it

10    or it wasn't indicative --

11         MS. LIVINGSTONE:  Right.

12         THE COURT:  -- of anything --

13         MS. LIVINGSTONE:  No, it was --

14         THE COURT:  -- other than --

15         MS. LIVINGSTONE:  -- a name.

16         THE COURT:  -- creating a placeholder.

17         MS. LIVINGSTONE:  Sure.

18         THE COURT:  Is it your belief that Client X has to

19    be openly and publicly disclosed, or does it have to be

20    disclosed to the parties in this case, with the ability of

21    anyone to come in and say, here is a reason why I need to know

22    this, and here's my application, and here's who I am,

23    therefore --

24         MS. LIVINGSTONE:  Right.

25         THE COURT:  -- I need a hearing, so you can tell me

1  whether or not I can find out who it is?

2  MS. LIVINGSTONE:  Well, I think that there's two

3  points to that, and one is that, yes, just providing a name of

4  the confidential client to the Court and to the U.S. Trustee

5  doesn't really get us very far down the line of -- in terms of

6  -- you may have more knowledge of the workings of the case or

7  the workings of Westmoreland.  But the parties who have that

8  information are not being given the name, with the exception

9  of the Debtors.

10  THE COURT:  Right.

11  MS. LIVINGSTONE:  And so there isn't that ability of

12  the parties-in-interest, a broad, general parties-in-interest

13  having the ability to know the information and to provide

14  their input.

15  THE COURT:  Well, they have the ability in what I

16  proposed; it just requires them to take the extra step.

17  MS. LIVINGSTONE:  Yes.  And -- but the -- McKinsey

18  also has to meet their burden, under 107, that this is an

19  appropriate redaction of this name, and we don't think that

20  they've met that burden.  We think that that requires --

21  THE COURT:  Well, I mean, I denied the request as it

22  was filed.  I mean, I got it.  I was trying to see where the

23  U.S. Trustee's lines are, but I got it.

24  MS. LIVINGSTONE:  We --

25  THE COURT:  Okay.

1          MS. LIVINGSTONE:  We just think that they are

2     pushing the envelope to an extent on limiting the transparency

3     of the process, without meeting their burdens.

4          THE COURT:  So let me ask you this.  And you know,

5     there are two concerns that I have.  Obviously, there is the

6     employment in the Westmoreland case.  And then there are the

7     issues in, you know, another case of mine --

8          MS. LIVINGSTONE:  Yes.

9          THE COURT:  -- which, having been raised, you know,

10    I can't just ignore them.  I can't say, well, that case is

11    done, I'm not going to go pay attention to it.  What is your

12    view of the U.S. Trustee's role in sorting through those

13    issues?

14         MS. LIVINGSTONE:  Well, I do think we should sort

15    through the issues.  I do think it's important, regardless of

16    the posture of the case.  I will say timing right now is an

17    issue, in terms of --

18         THE COURT:  Oh, that's right.  All of you are

19    furloughed, aren't you?

20         MS. LIVINGSTONE:  We're all furloughed.

21         THE COURT:  Oh, that's right.

22         MS. LIVINGSTONE:  So I can --

23         THE COURT:  I totally forgot --

24         MS. LIVINGSTONE:  I can --

25         THE COURT:  -- about that.

1          MS. LIVINGSTONE:  Which is why you're seeing me

2     here, but --

3          THE COURT:  Oh, quite honestly --

4          MS. LIVINGSTONE:  We --

5          THE COURT:  -- I totally forgot about that --

6          MS. LIVINGSTONE:  It --

7          THE COURT:  -- and I'm sorry.

8          MS. LIVINGSTONE:  It is a matter of timing, and not

9     just because of the furlough, but because there are a lot of

10    important cases that are being filed here -- and I keep

11    thinking GenOn was filed here.  We did have someone from our

12    San Antonio office review it.  But timing has been a limiting

13    factor for us, recently, and I'm not sure how long that will

14    go on.

15         But be that as it may, in answer to your question, I

16    don't think that it should be left unanswered or unreviewed.

17    But I don't have an answer to your question as to whether or

18    not -- whether or not there is something there to be found.

19         THE COURT:  Got it.  All right.  I got it.  Thank

20    you.

21         So let me -- folks, let me talk.  And I get myself

22    in trouble all the time when I do this.  When I make comments

23    from the bench, they're not made lightly, nor are they made

24    because I like to hear myself talk, I don't.  I do it because

25    I'm trying to give everyone insight into things that are

1    bothering me, and to try to give you some insight into where

2    my thought process is going.

3         I required these two depositions because I wanted

4    some insight into what this dispute really was.  I also, quite

5    honestly, was bothered by the lack of public scrutiny, if you

6    will, as to the entire process, which is why I required that

7    the depositions be filed.  So, if there is a news agency or a

8    paper that wishes to continue its investigation or to start

9    one, all of the materials that I'm seeing, that I'm

10   considering, that I'm thinking about are there.  And if

11   someone wants to expend the effort to read through it, then

12   I've provided that opportunity.

13        So I -- you know, I also believe -- it's the reason

14   -- I had a couple of requests of did I want the video of the

15   depositions.  I would love to have the video of the

16   depositions, but I am unwilling, given the nature of what this

17   is and the dispute that it is, is to receive something that

18   the rest of the public cannot see.  And so that's why I said,

19   I will read the transcripts, because anyone else can read the

20   transcripts, given what has occurred.

21        I want to -- I have also told you, and I'm going to

22   tell you more bluntly today, you know, we've got two really

23   smart organizations that have great professionals, that have a

24   lot of wisdom, a lot of knowledge.  And I am somewhat

25   befuddled at the lack of a Plan B because I want to tell you

1   what each of you have done.

2        I was racing along through the depositions, and I

3   read through Mr. Hojnacki's -- if I'm saying that correctly --

4   and I started on Mr. Alix's, and I got to Page 224 of

5   Mr. Alix's deposition.  And I want you to understand where you

6   all are.  If what Mr. Alix alleges is true, then McKinsey has

7   a Title 18 problem.  If Mr. Alix has made this up and he has

8   committed perjury, as well as slandered what would in that

9   case be a -- you know, not only individuals, but a company, as

10  well, he's got, in my view, a Title 18 problem.

11       This makes no sense to me, with what -- with how you

12  all have positioned this.  I mean, I was not the greatest

13  lawyer in the world; I also wasn't the worst,  but I never

14  went into a dispute without a Plan B.  I always had a Plan B.

15  And you all have drawn a box around yourselves.  And if you

16  all have advised your clients, respectively, of what that box

17  is, and you understand what it is, fine with me.

18       I -- you know, a lot of you don't know me.  I won't

19  shy away from this at all.  I'm not looking to shortcut the

20  process.  If we have to start turning over all of the rocks, I

21  will take as long as it takes; I will be as methodical as I

22  can possibly be.  For those of you who don't know me, I was

23  trained as an engineer.  It won't -- I will go through this

24  sequentially, and I will make this -- I will make this so

25  painful for everyone, but we will get to the truth, or at

1   least what I believe the truth to be.

2           And given what you all have done, in terms of

3   drawing a box -- you know, I said this, based on what I heard.

4   Now I'm convinced because now I've read it.  Now it is under

5   oath.  Someone doesn't survive this the way it's currently

6   postured, and I don't understand this.  There can't be two

7   views of this that are both partially correct.  There is

8   someone right, someone wrong.

9           And I mean, you know, unfortunately, given where

10  this is -- I mean, I'm going to need to hear from Mr. Barton,

11  and I'm going to need to hear from Mr. Sternfels, and they're

12  going to need to have their own counsel, and I'm going to need

13  to understand where this goes.  I'm not going to shortcut this

14  by including a -- or trying to, if you will, get rid of it,

15  based on the briefing.  I would not be doing the process

16  justice, and I wouldn't be upholding the oath that I took.

17          You all have given me the problem.  You know, I was

18  raised an old trial lawyer.  I don't like written submissions,

19  I don't like arguing on the briefing.  You get to the truth by

20  swearing people in, and you put them on the stand, and you

21  subject them to cross-examination, and we figure out what the

22  truth is.  That's -- it's the reason that I always tell folks

23  I don't like affidavits.  Affidavits are the lawyers view of

24  what has happened, and the lawyers don't testify.

25          But when you put somebody under oath, and you put

1    them on the stand, and you ask the questions -- and I'll tell

2    you all, I haven't been on the bench so long that I haven't

3    forgotten how to cross-examine.  I do it every Thursday in my

4    class, I enjoy doing it.  And if I had one talent as a lawyer,

5    it was the art of cross-examination.  And I do ask questions,

6    if I don't -- if I am not satisfied with the questions that

7    the parties ask.  I just want you all to know what you're

8    saddling up for.

9         Given what has been alleged, I want you all to take

10   some time and really contemplate where you are.  I'm not going

11   to do any threshold issues.  I will say this.  I have read

12   through -- I mean, I went back over Mr. Alix's deposition,

13   actually, a couple of times, and he's got some things wrong,

14   he knows he has some things wrong.  He reaches some

15   conclusions that I don't think I will ever reach.  But he's

16   also got a theory, and he's -- again, unless he's totally

17   making some things up, he's got a reason for thinking that

18   there's something wrong.

19        You know, one of the reasons that I wanted the

20   depositions is I wanted to give the principals -- I hear what

21   the lawyers say, and the lawyers all do a magnificent job, but

22   I wanted to hear what the principals had to say.  And I will

23   tell you that Mr. Hojnacki's deposition was one of the most

24   frustrating reads that I've had in a long time.  He won't do,

25   on the stand, what he did in that deposition.  I will get

1   candor and I will get honesty.  And we won't play the word

2   game with what is the meaning of the word "is;" we won't do

3   that here.  If there's an attempt to do it, it will be an

4   unpleasant thing.  Likewise, if I conclude that someone is

5   stretching the truth or being dishonest about it, that won't

6   be a bad day.

7           This is a career-ender for somebody.  I'm going to

8   say that again, this is the third time I've said it.  I'm not

9   going to say it again.  You are all educated people.  You

10  understand what the risks are.  I hope that that has

11  facilitated toward upper management.  This is not a problem

12  that is simply going to go away.  This is not a problem that a

13  Bankruptcy Judge is going to decide he just doesn't want to be

14  troubled with.

15          I will get to the end of this.  I am perfectly happy

16  for you all to take this away from me.  But if you don't, and

17  if you don't work together to come up with a process, then we

18  will do this the Jones way.  And if you want to understand

19  what the "Jones way" is, pick somebody in this room that has

20  tried a case with me over my twenty-year career; they will

21  tell you just how un-fun that will be.  And now, I don't even

22  have to be nice about it, I don't have to work with anybody, I

23  get to do it totally my way, so I want you to understand how

24  that goes.

25          You know, I'm hoping -- and Mr. Pesce, I will say

1    this, so that it will ease your blood pressure a bit.  This

2    doesn't, in any way, change my view about the case proceeding

3    forward.  I am totally committed to the Debtors staying on

4    track and a reorganization being at least posed to the

5    creditor constituents, and a confirmation hearing kept on

6    track.  I am not slowing the process down, I know I told you

7    that the other day.  Sometimes repeating myself makes a

8    difference.  I'm telling you this doesn't change anything with

9    respect to the Debtors' case going forward.

10          With respect to this issue -- and I assume that the

11    Debtor is evaluating -- because this is the Debtors'

12    application.  I'm assuming that the Debtor is evaluating the

13    effect that this can have on the case as a whole.  I don't

14    need an answer to that, but I assume that a responsible

15    Debtor, as a fiduciary to its constituents, guided by able

16    professionals, is always listening and thinking and adjusting,

17    and I assume that process will continue.

18          I'm going to -- I -- you know, I want you all to

19    take a couple of minutes.  And if you need to get on the phone

20    and talk to folks that aren't here or folks that are on the

21    telephone, I encourage you to do that.  If you think that

22    you've just talked long enough, and we need to talk about

23    setting this up for a trial schedule, I am more than happy to

24    do it.  I'll hear the discovery issue.

25          My guess is -- and I have in mind what this model

1    ought to look like.  My guess is it will not be as invasive as

2    Mr. Alix and his group wants it to me.  It's also my belief

3    that it will be far more invasive than McKinsey thinks it

4    should be.

5          And I will also tell you we're not going to have

6    another deposition like Mr. Hojnacki's deposition.  If we

7    continue that process, we're going to take all the depositions

8    in my conference room.  And any time that there's a problem,

9    we'll come in here and we'll visit.  And I'm not picking on --

10    I'm not picking on McKinsey.  I still haven't figured out

11    exactly who's in the right and who's in the wrong.  I'm

12    starting to have ideas.  But we're not going to have another

13    waste of time like we had with the Hojnacki deposition, I'm

14    not going to do it.  I know Rule 37 really well; I also know

15    how to implement it harshly.

16          So I think that it probably makes some sense for

17    everybody to kind of talk about a process.  We are going to

18    get to the bottom of this.

19          I don't know what to do about the issue -- that's

20    why I asked the U.S. Trustee.  I want them to read Page 224.

21    It is bothersome to me.  It is -- I'm not -- I don't even know

22    if it's a problem that can be consensually resolved at this

23    point; I don't know.  But everyone ought to be thinking about

24    this, and everyone ought to be putting all of their brain

25    cells to figuring out where this goes.  And if you don't have

1    a Plan B, I would reevaluate that position.  All right?

2         What do we think makes some sense, in terms of

3    timing?  Mr. Pesce, I'm going to start with you, since you're

4    not involved at all.  I have come to admire skills about

5    moving everyone around and having them think, so ...

6         MR. PESCE:  I am looking over my shoulder for the 62

7    people on the phone.  How much time do you think might need?

8         UNIDENTIFIED:  Maybe a half-hour.

9         THE COURT:  All fine by me.

10        MR. PESCE:  Right.

11        THE COURT:  I have -- so that you know my schedule,

12   I have a little pipe-bending Chapter 11 case that I'm -- I

13   think I'm going to get bad news on at 2:00 o'clock.  And then

14   we have a disclosure statement, which I don't think is

15   contested, in PetroQuest at 3.  And then I think Mr. Alonzo

16   and I fly at 10:00 tonight for a Corpus Docket tomorrow.  So

17   you have plenty of time, and you have my undivided attention,

18   other than those matters.

19        MR. PESCE:  Sure.  So why don't we start with

20   30 minutes for that and --

21        THE COURT:  All fine.  Ms. Portillo will be in the

22   courtroom, and if you need more time, just let her know.

23        Let me also say, if you need places to talk

24   privately, I have the conference room that's right beside --

25   and I now actually have furniture in there; you can actually

1    sit in there and have privacy.  I'm happy to open that up.

2    And obviously, there's the attorney lounge, which I'm happy to

3    commandeer, if we need to.  I think the combination -- if any

4    of the Houston lawyers -- Mr. Murray, is it like -- is it

5    still --

6              MR. MURRAY:  I think it's --

7              THE COURT:  -- one, two, three?

8              MR. MURRAY:  -- still one, two, three.

9              THE COURT:  One, two, three.  Okay.  All right.  So

10   that will get you -- that will get you in.  And if we need

11   more space, let me know.  I'm happy to -- I'm happy to try and

12   accommodate.

13             MR. PESCE:  Sure.  And if we could take one quick

14   detour back to the first matter.

15             THE COURT:  Of course.

16             MR. PESCE:  I understand that the lines were muted,

17   so I think the --

18             THE COURT:  Oh, you know what?  I think there's a

19   maximum number of people that -- I didn't mute them.

20             MR. PESCE:  Okay.

21             THE COURT:  But there's a maximum number of people

22   that can be on --

23             MR. PESCE:  Sure.

24             THE COURT:  -- that can be speaking at one time.

25             MR. PESCE:  So the Coal Act Funds counsel emailed

1     the Debtors' counsel during the intro.  As part of the

2     hearing, we had sent the order, didn't receive a response.  We

3     received a response during the hearing that they don't consent

4     to the order, and I understand they wanted to say something on

5     the --

6               THE COURT:  All right.

7               MR. PESCE:  -- on the record about it.

8               THE COURT:  So let me --

9               MR. PESCE:  So I --

10              THE COURT:  -- do this.  For folks on the telephone

11    -- because we now have 76 people on the telephone -- I'm going

12    to mute all of the lines.  And then the -- whoever is going to

13    be speaking on behalf of the Coal Act Funds, if you would hit

14    star five, I will then note who you are, and I'll activate the

15    line.

16              OPERATOR:  Conference muted.

17         (Pause in proceedings.)

18              THE COURT:  All right.  I have --

19              MR. ZIEGLER:  (Via telephone) Good afternoon, Your

20    Honor.  It's Matt Ziegler of Morgan Lewis for the Coal Act

21    Funds.

22              THE COURT:  All right.  Thank you.

23         (Participants confer.)

24              MR. ZIEGLER:  Sorry about the situation earlier,

25    Your Honor.  Thank you for accommodating us.

1          THE COURT:  No problem.

2          MR. ZIEGLER:  Your Honor, we did want to make a

3     brief remark about the proposed Retiree Committee solution.

4          THE COURT:  Okay.

5          MR. ZIEGLER:  And there's certainly no question in

6     our mind that that appointees that Your Honor has selected are

7     eminently qualified, and we really appreciate Your Honor's

8     thoughtful consideration in this matter and Your Honor's

9     efforts to achieve a creative solution here.

10         And we have reviewed this with our clients, and we

11    do not believe that Section 105(a) confers the authority to

12    alter the requirement that the U.S. Trustee appoint a

13    Committee under Section 1114(d).  We are, therefore, not in a

14    position to consent to the entry of the order.  But again,

15    Your Honor, this has nothing to do with the qualifications of

16    those that Your Honor has selected.

17         THE COURT:  Understood.  And for the record -- and I

18    said this yesterday, but I'll say it again -- I agree that

19    only the U.S. Trustee can appoint a Committee under 1114.

20    However, the U.S. Trustee has filed its notice of an ability

21    to appoint a Committee under 1114, and I'm simply using my

22    power under 105 to appoint a series of people who act -- who

23    will act as a Committee and undertake those obligations that a

24    Retiree Committee, under 1114, would assume.  And so I -- to

25    me, there's a very real difference.  I understand you may

1        disagree, but that is what I'm doing.  I've been very clear

2        about that from the start.

3              MR. ZIEGLER:  Of course, Your Honor.  We do

4        understand that, and we appreciate that.

5              And recognizing that this order is being entered

6        over our objection, we did have a couple of questions about

7        how Your Honor contemplates this Committee will act and how it

8        will interact with the Coal Act Fund, and I --

9              THE COURT:  It was my hope that having appointed

10       three really smart people, that I would have -- I would not

11       have to express opinions about anything; that they would

12       simply take it and run with it.  If they have questions, they,

13       all three, know me well enough to know that they can seek

14       emergency relief, and I'll either get everybody in the

15       courtroom or on the telephone and we'll sort all those issues

16       out.

17             I really -- I was reluctant to even start

18       identifying people, and then I just came to the conclusion

19       that, if I didn't, no one would.  And so, having, if you will,

20       crossed that bridge, I was unwilling to go any further.  I've

21       given them no instructions, I've given them no limitations.  I

22       am looking to them to tell me what it is they need and what it

23       is they think their sort of path forward is, if you will.

24       That's -- I -- that's a horrible analogy, and I apologize for

25       that, I don't have a better one.  But I'm really looking for

1      them to get engaged and tell me what they like, what they

2      don't like, what they need, what they don't have, what they

3      have too much of, whatever that is.

4              I would expect, as a vocal constituent in the case,

5      that, you know, you would have access to those folks, and you

6      would be able to talk to them.  I don't -- they may choose to

7      ignore you, and if they do, I don't know whether that's

8      appropriate or not.  But I'll hear that, if, as, and when that

9      issue arises.

10             MR. ZIEGLER:  Yeah.  Your Honor, there is one issue

11     that's on our minds right now, if I may raise it.

12             THE COURT:  No, please.

13             MR. ZIEGLER:  We do expect, based on the anticipated

14     timing, given the Debtors' milestones, that there will be some

15     objection practice, even if a deal is still being negotiated -

16     -

17             THE COURT:  All right.

18             MR. ZIEGLER:  -- in late January.  And we do believe

19     that the Coal Act Funds could have substantive objections, if

20     the Debtors file a motion to terminate their Coal Act

21     obligations.

22             THE COURT:  Right.  I --

23             MR. ZIEGLER:  Hopefully.

24             THE COURT:  I did, as well.

25             MR. ZIEGLER:  We would very much like to be

1      sufficiently educated as to the information that was

2      exchanged, in order to be able to formulate those objections

3      appropriately.  And therefore, we would request that Your

4      Honor require that we have access to the information that is

5      provided to the Committee for its evaluation and to any

6      proposals that are exchanged.

7                  THE COURT:  Let me -- and again, Mr. Pesce, I -- how

8      do you feel about that request?

9                  MR. PESCE:  I don't think we're bothered by it

10     because, given the unique posture here, I think we are

11     anticipating we'll have to meet a burden akin to not having a

12     deal with a designated representative.

13                 THE COURT:  Right.

14                 MR. PESCE:  And in that case, we would have to

15     provide the information.

16                 A housekeeping matter we can take up at the end of

17     the session is there's a protective order we've agreed to with

18     the Coal Act Funds, and I think that would help facilitate

19     that.  But I don't think there's any issue with us sharing

20     information, unless the Coal Act Funds don't -- I'm sorry --

21     unless the Committee members don't want us to.  But I think

22     the Debtor doesn't have an objection, as far as I'm aware --

23                 THE COURT:  Yeah, I would --

24                 MR. PESCE:  -- to that.

25                 THE COURT:  I would hope -- and again, I don't want

1    this to be a limitation on the Committee.  And I thought I saw

2    Ms. Byman here.

3              MR. PESCE:  She's floating around.

4              THE COURT:  She's floating around.

5              UNIDENTIFIED:  Your Honor, she had to go back to her

6    trustee panel, but I can bring her down if you want.

7              THE COURT:  No, that's all right.  I assume that

8    she'll hear about this, one way or another.

9              I would think that it would be -- since I have --

10   you know, I stood on my soapbox yesterday and said, I want

11   transparency, I want transparency.  I would hope that the

12   Committee would listen to that and would share the -- would

13   want the Coal Act Funds to have that information, but I also

14   do want them to have a voice.  And if they think that the

15   negotiation process is somehow impinged by sharing that

16   information --

17             MR. PESCE:  Uh-huh.

18             THE COURT:  -- I have a hard time sorting my way

19   through that.  But those are three very smart people.

20             MR. PESCE:  Yeah, maybe just a suggestion.  So,

21   hopefully, the order gets entered today.  The Debtor is

22   already in the process of scheduling a meeting at our office

23   here for next week --

24             THE COURT:  Okay.

25             MR. PESCE:  -- with the representatives.  My

1    understanding is that they will probably engage counsel.

2            THE COURT:  Okay.

3            MR. PESCE:  So the Debtor has no issue with sharing

4    information.

5            I would suggest, though -- especially since

6    Ms. Byman is not here, and the other two are out of the

7    country -- to let them engage counsel and figure out what

8    they're comfortable sharing with --

9            THE COURT:  Let me ask you this.  Could I -- since

10   you and Mr. Ziegler are the two lawyers who are party to this

11   conversation, could I ask you all to jointly have a

12   conversation with either the Committee members or their

13   representative as soon as we know that that -- who that person

14   is.  And if there is not going to be a person, that you would

15   then jointly engage --

16           MR. PESCE:  Yeah.

17           THE COURT:  -- with the Committee to have that

18   discussion?

19           MR. PESCE:  Absolutely.

20           THE COURT:  Mr. Ziegler, with the understanding that

21   you always have the right to file something that says, I've

22   been shut out, I need the following things, does that seem

23   like a reasonable way to proceed, given where we are today?

24           MR. ZIEGLER:  It certainly does, Your Honor.  Thank

25   you.

1          And I would just note that I believe that Your Honor

2     did, in fact, so order the protective order yesterday, to

3     which we agreed with the Debtors.

4          THE COURT:  I thought I had signed it, but I

5     wouldn't --

6          MR. PESCE:  Okay.

7          THE COURT:  -- I wasn't confident enough that I was

8     going to tell you that it was entered, so ...

9          MR. PESCE:  In that case, then we're ahead of the

10    ball.

11         THE COURT:  All right.  Terrific.

12         MR. PESCE:  Okay.  So --

13         MR. ZIEGLER:  Thank you very much, Your Honor.

14         MR. PESCE:  -- with that, I think -- I guess we'd

15    come back in 35 minutes or so or --

16         THE COURT:  Fair enough.  Why don't we just say --

17    why don't we just -- in fact, why don't we do this, just

18    because I don't want to bring 30 people back in --

19         MR. PESCE:  Uh-huh.

20         THE COURT:  -- to tell me you need more time.  Why

21    don't -- at 1:30, why don't you give Ms. Portillo a status

22    report.  And a status report would be, you know, let's just

23    get -- let's roll up our sleeves and let's start fighting,

24    let's roll up our sleeves and start fighting in a particular

25    way, we need more time to figure out if we're fighting or not.

1       And that way, if you need more time, I'm happy to give it to

2       you, and if you're ready to go, then we can get started on

3       trying to work through the issues.

4                   MR. PESCE:  We will --

5                   THE COURT:  And I haven't forgotten -- I haven't

6       forgotten the discovery issue.

7                   UNIDENTIFIED:  Thank you, Judge.

8                   MR. PESCE:  We will find her -- we'll find her and

9       do that.

10                  THE COURT:  All right.  And if you need rooms,

11      again, just buzz on chambers, and we'll get somebody out to do

12      it.

13                  MR. PESCE:  Great.

14                  THE COURT:  All right?

15                  MR. PESCE:  Thank you, sir.

16                  THE COURT:  All right.  Thank you.  We'll be

17      adjourned.

18                  THE COURT OFFICER:  All rise.

19          (Recess taken from 12:56 p.m. to 2:18 p.m.)

20                          AFTER RECESS

21                  THE COURT:  Let me return to Westmoreland, Case

22      No. 18-35672.

23                  Folks, have we made any progress?  What do we need

24      to do?

25                  MS. GAY:  Yes, Your Honor, we have a couple of

1    thoughts on ways to go forward.

2              THE COURT:  I always love constructive thoughts.

3              MS. GAY:  Okay.  Faith Gay from Selendy & Gay.

4              MR. O'SHEA:  May I join you, Faith?

5              MS. GAY:  You may.

6              So there's two things, sort of macro and micro:

7    One, what you were just talking about when we took a break;

8    and then I want to get back to the 107 for just a second, with

9    a thought on a way forward there, too, Your Honor.

10             Both sides -- I think I can speak for Mr. O'Shea --

11   take very seriously what you said, and want to think about it,

12   consider if we've missed anything; whether there's anything

13   else, some other angle that we haven't anticipated.

14             What we can tell you from the side of McKinsey RTS,

15   in a very full-throated way, Your Honor, is the accusations

16   Mr. Alix has made, we think are defamatory, we think they are

17   terribly false.  And we want to get in front of the Court,

18   have you see the witnesses you mentioned, and have you hear

19   them and look at them and understand what they're saying

20   because we think what's been said is just outright wrong.

21             THE COURT:  Okay.

22             MS. GAY:  Having said that -- and as I said, again,

23   Your Honor, we want you to hear that we are hearing you and

24   that we're taking you seriously -- Mr. O'Shea and I have

25   decided we'll talk on Monday, along with our whole team, and

1        try to regroup with a path forward.  And if the Court has some

2        time for us later next week, we --

3                    THE COURT:  I'll make the time.  What were you

4        thinking?

5                    MS. GAY:  Well, we have a hearing in Richmond on the

6        9th, which I think is Wednesday.

7                    MR. O'SHEA:  Wednesday at 2, Your Honor.

8                    THE COURT:  Okay.

9                    MS. GAY:  So, if you could see us on Thursday or

10       Friday, we'd be grateful.

11                   THE COURT:  Let me ask.  Is this -- were you

12       contemplating actually appearing or simply dialing in?  And

13       the reason that I'm asking is next week is my Laredo docket.

14       And so what I do is I go out in the morning, I start court at

15       1:00 o'clock.  If I can get done by the 4:30, or whatever is

16       the last flight out, then I come back that night; and, if not,

17       I take the 6:00 o'clock back the next morning.  If a

18       telephonic conference is what you were -- is what you were

19       thinking, then I can do it Thursday or Friday.  If what you

20       were thinking was you want to be here -- and again, I

21       understand all the reasons why -- then I can set you for

22       Friday afternoon, so it allows me to get back to Houston, and

23       then we can go from there.

24                   MR. O'SHEA:  If I may, Judge?

25                   THE COURT:  Sure.

1          MR. O'SHEA:  This is very important to my client, as

2     you can imagine.

3          THE COURT:  Sure.

4          MR. O'SHEA:  We would prefer an in-person

5     conference; Friday afternoon is fine.

6          THE COURT:  Oh, wait a minute.  That is --

7          MR. O'SHEA:  And I think, Your Honor, in talking to

8     Ms. Gay and her colleagues, that we have agreed to come

9     forward by next Friday.  I, frankly, am not optimistic on a

10    settlement, but I want to give Ms. Gay some time and -- but I

11    think, by next Friday, we should -- if we don't get there, we

12    should have a discovery schedule, which we can propose to the

13    Court.

14         THE COURT:  All I'm looking for, again -- you know,

15    I've now said everything twice, and I won't repeat it.  And I

16    didn't mean -- I hope no one took it in an insulting fashion

17    that I said it a second time.  I didn't think that you all

18    weren't listening, or I didn't think it needed to be said

19    again.  It's just, because of the seriousness of this, I

20    wanted to make sure that people were listening.

21         I am not advocating a resolution.  I know that --

22    you know, you go to baby judges school, and you know, everyone

23    says, oh, you know, if you do this, it will settle.  I don't

24    care.  I genuinely don't.  I was raised in an environment

25    where things don't settle.  I don't want settlements, if

1        settlements aren't appropriate.

2                All I want is to make sure that people understand

3        the ramifications of where we're going because, again, once it

4        starts, and once we go down this process -- and I said this

5        the other day.  I gave this stupid analogy about the big ball

6        rolling down the hill, that everybody looked at me like I was

7        crazy.  You know, I'll say it again.  Once this starts, you

8        will not be able to stop me.  And that's -- I just want to

9        make sure everybody understands that; that's all that was.

10               You see two folks came in.  I don't have the 11th.

11       There is a new Magistrate Judge in Laredo being invested, and

12       as Chief Bankruptcy Judge, as well as the Bankruptcy Judge

13       that sits in Laredo, I have an obligation to attend that

14       investiture, so I will not be back Friday afternoon; I'll be

15       back Saturday morning.

16               MS. GAY:  Judge, would you like us to come Thursday

17       to Laredo?  I think both sides feel like in-person is

18       important.

19               THE COURT:  It's a wonderful thing.  You can't get

20       there, is the problem, is --

21               MS. GAY:  Really?

22               MR. O'SHEA:  You can't get there from here.

23               THE COURT:  The way that that works, if you -- the

24       only place you can fly from is Houston.  There's a flight that

25       gets in right at like 11:00 o'clock-ish, and then the last

1   flight out is at 4:00 and I -- you know, I don't want to do

2   that to you because I've been stuck here --

3           MS. GAY:  Wait a minute.  I'm a -- listen --

4           THE COURT:  -- many times.

5           MS. GAY:  -- I am a pilot.  Maybe Mr. O'Shea can fly

6   with me.

7           THE COURT:  You know what?

8           MR. O'SHEA:  I'd love to fly with you.

9       (Participants confer.)

10          THE COURT:  Yeah, that's a way of working things

11  out, right?

12          MS. GAY:  Maybe that's right.

13          THE COURT:  I'm taking my hands off, here we go.

14          MR. O'SHEA:  Well, I don't know --

15          THE COURT:  that's --

16          MR. O'SHEA:  -- she might --

17          MS. GAY:  He won't do it.

18          MR. O'SHEA:  But she might throw me out of the

19  plane, Judge.

20          THE COURT:  Well, that's --

21          MS. GAY:  But anyway, Judge, in all seriousness, I

22  think the point is, you know, we feel very strongly about what

23  we think --

24          THE COURT:  Let me ask you this.

25          MS. GAY:  -- the falsehoods were here.

1           THE COURT:  Could we --

2           MS. GAY:  So we want to --

3           THE COURT:  What about -- I agreed -- I don't even

4       know what the case is.  I agreed to mediate on Monday.  Let me

5       just check to see what this is.

6           MS. GAY:  Monday, the 14th?

7           THE COURT:  And what I could do is perhaps -- let me

8       see what case it is, first.  Is Monday a possibility?

9           MR. O'SHEA:  Is this the 14th, Judge?

10          THE COURT:  It would be the 14th.

11      (Participants confer.)

12          MS. GAY:  I have to check with --

13          THE COURT:  Sure.

14          MS. GAY:  Just one second, Your Honor.

15      (Participants confer.)

16          THE COURT:  And I'm sorry that my calendar is

17      problematic.

18      (Participants confer.)

19          MR. O'SHEA:  We -- speaking for our side, Judge, we

20      can do the 14th.

21          MS. GAY:  And we can, as well, Your Honor, we'd be

22      happy to.

23          THE COURT:  Which would be better for you, first

24      thing in the morning, over the lunch hour, or late in the day?

25          (Participants confer.)

1              THE COURT:  And I'll move the litigation around to

2      kind of fit that.

3              MR. O'SHEA:  Lunch hour would be great, Judge.

4              THE COURT:  Lunch hour would be great.

5              MS. GAY:  And we'll try to be prepared and

6      expedient.

7              MR. O'SHEA:  Yes.

8              THE COURT:  I assume that you always do that.

9              MS. GAY:  Yes.

10             MR. O'SHEA:  Your Honor, there's one more

11     housekeeping matter from our side.

12             THE COURT:  Sure.

13             MR. O'SHEA:  As Your Honor alluded to earlier, there

14     was a motion filed last night.  Does Your Honor require a

15     response to that?

16             THE COURT:  You don't need to do anything right now.

17             MR. O'SHEA:  Thank you.

18             THE COURT:  All right.

19             MS. GAY:  Great.

20             THE COURT:  So --

21             MS. GAY:  And Judge, I had -- go ahead.  I'm sorry.

22             THE COURT:  No, I was -- I just want to make sure

23     that I got this right, so that everybody hears, both in the

24     courtroom, as well as on the telephone.  So we're going to

25     hold a continued scheduling conference on January the 14th,

1        2019, at 12:00 o'clock noon, Central Time, correct?

2                MS. GAY:  And not in Laredo.

3                THE COURT:  Not in Laredo, in Houston, Texas.  Thank

4        you.  You know things are getting bad when I start setting the

5        hearings in Laredo, that's always a sign.

6                MS. GAY:  Okay.  And I'm glad to hear that, and one

7        other thing, and I don't think Mr. O'Shea is so much a party

8        to this.  But on the 107 piece, we provided -- and had a very

9        good conversation with Ms. Livingstone this morning -- the

10       name of the confidential client to Ms. Livingstone.  But we

11       also heard very clearly that everybody wants some kind of

12       proof on the record.  And so we will -- we're going to try to

13       work that out, too, Judge, on that same kind of time table --

14               THE COURT:  Fair enough.

15               MS. GAY:  -- so that we can move that along, as

16       well.

17               THE COURT:  I will tell you -- again, and I have --

18       you know, I try to be open-minded and creative about these

19       things.  I'm perfectly happy to some -- for some process, to

20       the extent -- because, again, I don't know who Client X is, I

21       don't know -- that's not really my focus right now, so I don't

22       know how important that is.  But I am perfectly happy to come

23       up with a process that gives the required disclosure under an

24       appropriate protective order, and then sets forth a procedure

25       that, if anyone else wants to know, they can file a pleading

1    with the Court, they can establish cause, people can come in

2    and object.  I think that's a perfectly fine way of

3    proceeding.

4          I didn't -- I fully understand that there are things

5    that need to be protected, and all I ever want is for people

6    to have an avenue to come in and tell me why it is that they

7    need access to whatever the information is.  And so, so long

8    as we think about that process, I'm going to be perfectly

9    comfortable with that.

10         MS. GAY:  And Judge, we very much agree with that.

11   We think some characteristics of this client are already out

12   there that give people some notice, and maybe we can work

13   around that and suggest a process, but we'll come back to you.

14         THE COURT:  I'll let you all talk and figure out if

15   there's a way that makes sense on that or not.  And if not,

16   then we'll -- you know, we'll go through whether or not

17   McKinsey has to make a choice, and I'm not to that point yet.

18   So I'm going to let you all continue to talk.

19         MS. GAY:  I'd like to avoid another high noon

20   hearing, if I could, so.

21         All right, Judge.  Thank you.  We'll try to get on

22   that, and have a proposal on that in the same time frame.

23         THE COURT:  All right.  And so, just so that we're

24   clear, no need to respond to the pleading that just got filed.

25   We are going to continue today's scheduling conference, you're

1    going to talk.  You've now seen the monkey with the gun

2    analogy, and you're going to -- you're going to try and figure

3    out amongst yourselves if you want to take the gun out of the

4    monkey's hands.  Is that where we are?

5         MS. GAY:  I'm not sure I agree with the monkey, but

6    yes, we hear you, Your Honor.

7         THE COURT:  Got it.  All right.

8         MR. O'SHEA:  We'll see you on the 14th, Judge.

9         THE COURT:  All right.

10        MR. O'SHEA:  Thank you.

11        THE COURT:  Thank you, all.

12        MS. GAY:  Take care.

13        THE COURT:  Anything else -- before we go, anything

14   -- anyone else have anything else they need to raise today?

15      (No verbal response.)

16        THE COURT:  All right.  Terrific.  Safe travels

17   home.  We'll be adjourned until 3:00 o'clock.

18        COUNSEL:  Thank you, Your Honor.  Thank you.

19        THE COURT OFFICER:  All rise.

20      (Proceedings concluded at 2:28 p.m)

21

22

23

24

25                         *  *  *  *  *

1    *I certify that the foregoing is a correct transcript*

2 *to the best of my ability produced from the electronic sound*

3 *recording of the proceedings in the above-entitled matter.*

4  */S./ MARY D. HENRY*

5 *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

6 *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

7 *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

8 *JTT TRANSCRIPT #59773*

9 *DATE FILED: JANUARY 5, 2019*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25