```
1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
2
                                    .  Chapter 11
3   IN RE:                          .
                                    .  Case No. 15-10541 (BLS)
4   SRC LIQUIDATION, LLC,           .
                                    .  Courtroom No. 1
5                                   .  824 Market Street
                                    .  Wilmington, Delaware 19801
6                                   .
                                    .  May 15, 2019
7                       Debtor.     .  10:00 A.M.
    . . . . . . . . . . . . . . . . .
8

9                        TRANSCRIPT OF HEARING
              BEFORE HONORABLE BRENDAN L. SHANNON
10                UNITED STATES BANKRUPTCY JUDGE

11  APPEARANCES:

12  For Mar-Bow Value        Marc Adrams, Esquire
    Partners, LLC:           WHITEFORD TAYLOR PRESTON
13                           405 N. King Street
                             Wilmington, Delaware 19801
14
                             - and -
15
                             Steven Rhodes, Esquire
16                           STEVEN RHODES CONSULTING LLC
                             Ann Arbor, Michigan
17

18

19

20
    ECRO:                    LACRISHA HARDEN
21
    Transcription Service:   Reliable
22                           1007 N. Orange Street
                             Wilmington, Delaware 19801
23                           Telephone:  (302) 654-8080
                             E-Mail:  gmatthews@reliable-co.com
24
    Proceedings recorded by electronic sound recording:
25  transcript produced by transcription service.
```

APPEARANCES (Cont'd):

For McKinsey RTS:           William Bowden, Esquire
                            ASHBY & GEDDES
                            500 Delaware Avenue
                            Wilmington, Delaware 19801

                            - and -

                            Faith Gay, Esquire
                            SELENDY & GAY
                            1290 Avenue of the Americas
                            New York, New York 10104

1                              INDEX

2                                                          Page

3

4   #1) Motion of Mar-Bow Value Partners, LLC, a Creditor, for
    Relief from Orders Under Bankruptcy Rule 9024 and Civil Rule

5   60(d)(3) [Docket No. 2392; Filed: 3/6/2019].

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (Proceedings commence 10:08 a.m.)

2        (Call to order of the Court)

3              THE CLERK:  All rise.

4              THE COURT:  Please be seated.  Good morning.

5        (A Chorus of "Good morning, Your Honor")

6              MR. ABRAMS:  Good morning, Your Honor.

7              THE COURT:  Mr. Abrams, it's good to see you.

8              MR. ABRAMS:  Good to see you.  Your Honor, this is

9    the date and time fixed by the court --

10             THE COURT:  It is.

11             MR. ABRAMS:  -- in connection with the motion for

12   Mar-Bow from relief from orders consistent with Your Honor's

13   determination last Thursday, the 9th.  Today's hearing is

14   devoted exclusively per Your Honor's ruling, to the issue of

15   standing.

16             I'd like to make introductions of my colleagues on

17   the Mar-Bow side.  Mr. Bowen through his introductions, then

18   we'll proceed to the argument.

19             THE COURT:  That sounds just fine.

20             MR. ABRAMS:  To my left is Steven Rhodes, Your

21   Honor.

22             THE COURT:  Mr. Rhodes, good to see you.  Welcome.

23   Welcome to Delaware.

24             MR. ABRAMS:  Lead counsel from Mar-Bow.  To his

25   left is Sean O'Shea from the Cadwalader firm.

1          THE COURT:  Welcome, sir.

2          MR. ABRAMS:  Also representing Mar-Bow.  Behind

3 Mr. O'Shea is Mr. Jay Alix, Your Honor.

4          THE COURT:  Mr. Alix, good to see you.

5          MR. ABRAMS:  Who is not licensed to practice law

6 in the state of Delaware but who, nonetheless, is in

7 attendance today.  Steve Gerald my colleague on Mr. Alix's

8 right.  And Dan Lemisch also counsel for Mar-Bow.

9          THE COURT:  Very good.

10         MR. ABRAMS:  Thank you, Your Honor.

11         THE COURT:  All right.  Mr. Bowen, we'll take

12 appearances.

13         MR. BOWDEN:  Thank you, Your Honor.

14         THE COURT:  Good morning.

15         MR. BOWDEN:  Good morning.  And may I please the

16 court, Bill Bowden of Ashby & Geddes from McKinsey Recovery

17 and Transportation Services.

18         Your Honor, at counsel table is Ms. Faith Gay from

19 the Selendy & Gay firm --

20         THE COURT:  Welcome.

21         MR. BOWDEN:  -- who will be making the

22 presentation on behalf of McKinsey RTS, as we refer to it

23 this morning, Your Honor.

24         Seated next to Ms. Gay is Maria Ginzburg, her

25 colleague at Selendy & Gay.

1           THE COURT:  Welcome.

2           MR. BOWDEN:  Also, from the Selendy & Gay firm is

3  Mr. Nick Klenow.

4           Your Honor from the Debevoise & Plumpton firm in

5  attendance we have John Gleeson.

6           THE COURT:  Good morning, sir, welcome.

7           MR. BOWDEN:  Erica Weisberger and Elie Worenklein.

8           THE COURT:  Very good.

9           MR. BOWDEN:  Thank you, Your Honor.

10          THE COURT:  Sure.

11          Good morning, Mr. Rhodes.

12          MR. RHODES:  Good morning, Your Honor.  And may I

13  please the court, Mar-Bow claims that McKinsey committed a

14  fraud on the court when it obtained entry of this court's

15  orders approving its employment and later than approving its

16  fees.

17          Mar-Bow claims that its fraud on the court was

18  McKinsey's concealment of its partners and its employee's

19  investment interest and interested parties and its

20  concealment of its client connections with interested

21  parties, all of which were disqualifying and all of which we

22  will prove.

23          Mar-Bow has standing to seek relief from those

24  orders.  Mar-Bow is bound by those orders.  It cannot pursue

25  litigation in any court as if it is not bound.  McKinsey

1  surely does not contend otherwise; although, it might be

2  worth asking counsel that question.  McKinsey wants Mar-Bow

3  to be bound by those orders and we agree we are bound.

4        That alone is reason enough to hold that Mar-Bow

5  has standing.  It simply cannot be our jurisprudence, Your

6  Honor, that a party that is bound by law to a court order

7  cannot later come to the court that entered that order and

8  say here is proof that the order that binds us was obtained

9  by a fraud on the court and that the order was infected by a

10  fraud on the court as we will prove happened in this case.

11        THE COURT:  What's the distinction between the

12  concept of bringing to the court's attention the prospect of

13  a potential or an actual fraud upon the court versus the

14  commencement of litigation and the prosecution of a motion

15  for a specific request for relief, attendant to that, the

16  right to conduct discovery, and all the bells and whistles

17  that go with litigation.

18        I think I'd like to understand the distinction

19  between those two.

20        MR. RHODES:  Sure.  In either event, the

21  proceeding is an equitable proceeding over which the court

22  has full and complete control; full and complete control to

23  determine the scope of the investigation, to determine the

24  scope of the hearing, to determine the sanctions, if any, to

25  be imposed, and to determine the distribution of those

1 sanctions.

2           THE COURT:  I don't disagree with that.  Had you

3 not purchased a claim, had your client not acquired a claim,

4 would you have the ability to be at that podium seeking

5 redress or remedy of the significant injury you allege has

6 occurred here to the process to the court?

7           MR. RHODES:  We would only be permitted to be here

8 with the court's permission.  In other words, if we had

9 simply written a letter to the court outlining our evidence

10 and attaching binder after binder, the court would have the

11 discretion then to set a hearing and the discretion then to

12 hear from us as to how we developed that evidence, to test

13 the credibility of it and, of course, to hear every parties

14 who have a stake in the outcome of it.

15           As I indicated a moment ago, this is entirely an

16 equitable proceeding in the court's discretion.  And later

17 on, when I have concluded my argument as to why we believe we

18 do have standing, we will argue that if the court determines

19 that we do not have standing, the court, nevertheless,

20 retains the discretion to appoint an investigator. And we

21 believe that we should be considered for that position, but

22 it's entirely up to the court.

23           So, but we believe that we have standing because

24 we are bound by the orders from which we seek relief, except,

25 perhaps, in some outlier cases the peculiarity interest test

1  that McKinsey asserts for standing is not and has never been

2  the law in bankruptcy cases and is not the law in the Third

3  Circuit.  Hopefully, it will never be.

4          The practical reality of the great majority of

5  bankruptcy cases, Your Honor, is that unsecured creditors

6  have no financial stake in the outcome because there are no

7  assets for them.

8          So, for example, does McKinsey argue that in every

9  no asset Chapter 7 case, for example, Article III deprives

10  every unsecured creditor of the right to be heard?  Does

11  Article III deprive a creditor of the right to file an

12  objection to a discharge?

13          THE COURT:  Well, I think that might be trying to

14  extend that principle a little bit too far. We start with the

15  proposition that you have a no asset seven.  But an unsecured

16  creditor has, at least, a contingent right if in some

17  debtor's sock drawers found a lottery ticket or if the

18  trustee --

19          MR. RHODES:  Which happens.

20          THE COURT:  Which happens.  Not often enough, but

21  it happens.  Or if the trustee, for example, manages to

22  unwind the secured claims, the security interest of a

23  creditor, et cetera.  At the outset of a case, obviously,

24  every lender stands at that podium and says those jokers are

25  out of the money.  Stop listening to them.

1         We still listen to them.  We appoint committees.

2  I think the Code contemplates that those rights are

3  respected.  But at the conclusion or once rights are fixed,

4  at that point, then I think courts are much much less

5  inclined to say that you have the ability to seek relief from

6  the court that has no impact on you.

7         And it goes in both directions.  Often, part of

8  the argument against a creditor who is seeking relief is

9  they're paid in full.  How is it that they can object?  There

10  is no remedy that you can give.  You can't get more than

11  full.

12         And, likewise, you're not getting anything.  And

13  if you prevail, you will not get anything so, Judge, what is

14  the relief that would be accorded.

15         And I understand and I read carefully your papers.

16  The idea that the court has certainly broad discretion to

17  formulate a remedy.  But, again, that's sort of a three-stage

18  step of saying let us prosecute the case.  Let us prove our

19  case.  Let you fashion a remedy that then if you choose

20  perhaps ignores the plan.

21         And I understand the back and forth about whether

22  parties are bound by the plan at this point for purposes of

23  distribution of whatever might come in, in that context.  But

24  at the end of the day, the court could give us something so

25  that gives us standing.  That seems to me to be an attenuated

1  proposition.

2        MR. RHODES:  Okay.  But the premise of the court

3  could give us something is the conclusion legally that a

4  pecuniary interest is necessary.  And what I want to argue to

5  the court is that under applicable Third Circuit law and

6  Supreme Court law that pecuniary interest is not necessary.

7        And the reason I assert that is never in the

8  course of a Chapter 7 case or, more pertinently, here a

9  Chapter 11 case is a party required to show, as Your Honor

10  has pointed out, as a condition of standing here at the

11  podium that they have a pecuniary interest in the outcome of

12  any particular issue, whether it's cash collateral or --

13        THE COURT:  Anything --

14        MR. RHODES:  -- appointment of a creditor -- or --

15        THE COURT:  Retention or rejection of a contract,

16  et cetera, et cetera.

17        MR. RHODES:  Or exactly, or approval of a

18  disclosure statement or even plan confirmation.

19        We don't really ever ask a creditor to say what's

20  your standing, what's your pecuniary interest here.  And the

21  reason we don't ask that has been answered by the Supreme

22  Court itself.

23        McKinsey's own brief cites an en banc decision

24  from the Third Circuit called Global Industrial Technologies.

25        THE COURT:  I have it.

1          MR. RHODES:  And in that case, the court said,

2              "We have noted the contours of the injury-in-fact

3               requirement while not precisely defined, are very

4              generous."

5          And it cited its own prior decision in Bowman v.

6    Wilson.  And the court said,

7              "The standard is met as long as the party alleges

8    a specific identifiable trifle of injury," quoting a Supreme

9    Court case colorfully, "or a personal stake in the outcome of

10   the litigation," citing, again, its own prior case in Pitman

11   vs. Fisher.

12         And then it cites Congoleum for the proposition,

13   "Article III standing need not be financial and only need be

14   fairly traceable to the alleged illegal action."

15         And it goes on to talk about a Seventh Circuit

16   case.  United States Court of Appeals for the Seventh Circuit

17   described a party-in-interest as anyone who has a legally

18   protected interest that could be affected by a bankruptcy

19   proceeding.  Citing and quoting the James Wilson case.

20         And the court goes on,

21             "That party in interest test comports with our

22             definition of party-in-interest.  As well, he has

23             a sufficient stake in the proceeding as to require

24             representation."

25         Amatex that's a prior Third Circuit case as well.

1  We, thus adopt --

2         THE COURT:  So, in this case is the claim that

3  Mar-bow has in the SRC case the protectable interest or is it

4  an interest that we all have in the integrity of the process

5  and the sufficiency of the disclosures that are made.

6         What's the. . .

7         MR. RHODES:  And, of course, it's both, Your

8  Honor.

9         THE COURT:  Okay.

10         MR. RHODES:  Mar-Bow stands in the shoes of its

11  transferor.  Its transferor was a creditor in the case.  If

12  the creditor had standing, has standing because it was a

13  stakeholder in the action, then we do too.

14         But in the *in personam* action as ordinarily seen

15  in a District Court.  A sues B on a claim recognized in law

16  or in equity and as to which it is readily discernible in

17  most cases whether A has a pecuniary interest or some other

18  legally recognized interest in the outcome.

19         But in Central Virginia Community College vs.

20  Katz, the Supreme Court held that a bankruptcy case is an *in*

21  *rem* action in which the race is the debtor's property, of

22  course, and the issues are how to distribute the race.  And

23  whether and to what extent the debtor gets a discharge.

24         And in that case, of course, the court was relying

25  on its earlier decision in Gardner vs. New Jersey.  The whole

1  bankruptcy process, the court there said is an "Adjudication

2  of interest claimed in a race."

3       And, similarly, in Tennessee Assistance Corp vs. Hood,

4  the court stated,

5            "A bankruptcy court's *in rem* jurisdiction permits

6            it to determine all claims that anyone, whether

7            named in the action nor not, has to property or

8            thing in question."

9            All claims.

10            THE COURT:  I don't disagree with any of that.

11  And, again, I think that your description and discussion

12  about the distinction between classic litigation across the

13  street in the District Court, A vs. B, the bankruptcy

14  proceeding is be definition a collective process.

15            While a landlord may be angry with and litigating

16  with its counterparty who's a debtor, the court is cognizant

17  of the position of a creditors committee, an entity that does

18  not exist across the street.

19            The court will listen, for example, to the

20  debtor's secured creditor who would likely not be able to

21  intervene in a lawsuit between tenant and landlord, but would

22  clearly be considered, in this case.  So that's not

23  necessarily a proposition that's in dispute.

24            MR. RHODES:  Right.

25            THE COURT:  The question is in this case, again,

1  those parties in a bankruptcy proceeding those parties have a

2  remedy or are seeking a remedy or relief as to the race.

3          And the question I have is are you seeking a

4  remedy as to the race or relief as to the race that is the

5  matter that is -- that is the predicate for the exercise of

6  my jurisdiction?  Because here's the problem I have.

7          And I think we're making progress on it. This is

8  actually very helpful.

9          I think you're telling me -- it's not an argument

10 in the alternative.  You're telling me that you don't

11 necessarily need a pecuniary interest, an economic stake, the

12 ability to take money out of this case.

13         Though your point is, although, Judge, I have

14 that. And, again, I understand the other side disagrees.  But

15 your point is that I am by virtue, I guess, of being a

16 creditor, I am a party interested in this proceeding, even if

17 I can't get more money out of it, I'm entitled to appear and

18 be heard.

19         Do I have that right?

20         MR. RHODES:  That's exactly right because in the

21 broadest sense when we talk about do we not, a remedy that

22 relates to the race of the estate, the answer to that is

23 clearly yes because what we're talking about is a remedy that

24 relates to the administration of the race.  It is the

25 administration of the race that we contend was corrupted by

1 | the fraud of McKinsey here.  To put it in its most concise

2 | point that's exactly what is going on here.

3 | So, who in a bankruptcy case does have a legally

4 | recognizable interest in the outcome?  Who has a legally

5 | recognizable interest in the debtor's assets or in the

6 | debtor's discharge?  And, most importantly, who has a legally

7 | recognized interest in the administration of the debtor's

8 | assets and in the very integrity of the process.

9 | In Section 1109, legally recognizes that creditors

10 | and even equity security holders have that right in every

11 | Chapter 11 case.  And nothing in Article III would say no to

12 | that.  Article III contemplates *in rem* jurisdiction.  It

13 | does.

14 | THE COURT:  If your claim had been paid in full or

15 | otherwise satisfied in its entirety, would you be able to

16 | still be here?  I'll give you an easy example.

17 | Early in a case, the debtor files.  The debtor is

18 | a counterparty to a contract with your client or with the

19 | predecessor to your client.  The debtor determines to assume

20 | and sign over to somebody who's interested in taking that.

21 | And the court approves under 365 the assumption and

22 | assignment.

23 | Cure is satisfied.  Cure will be whatever it is.

24 | There's no argument about that.

25 | At the outset of the case, there's no question

1  that there is a claim.  It's contingent.  It depends upon

2  whether or not there's an assumption or a rejection, et

3  cetera.  And here we are.

4         Would that give rise to the ability to seek relief

5  in this court?  That's a creditor.  That's an entity, at

6  least, who's no longer a creditor because their claim has

7  been satisfied, but clearly would still be bound by the

8  orders that were entered while it was the subject to the

9  proceeding.  Could that party show up?

10         MR. RHODES:  The answer is I unequivocally yes,

11  Your Honor, and here's why.

12         There is in the law and in Rule 60 a clear

13  distinction between fraud on the court and fraud on a party.

14         THE COURT: Right.  Okay.  So, what's the -- all

15  right, I get that.

16         MR. RHODES:  Okay.

17         THE COURT:  So then let me ask the next question

18  which is what's the distinction, say between what you're

19  doing and a whistleblower?  And, again, I do not pretend to

20  understand what I think is some pretty complex law about

21  whistleblowers and there's statues and everything else.

22  That's not what we're talking about.

23         But you mentioned it yourself a few minutes ago

24  one of the things you could have done was send a letter to

25  the court.  Anybody can send a letter to the court.  I open

1   my mail.  And I would probably -- I would be obliged to do

2   something or give it the attention it deserved.

3           What's the distinction between the two?  Are you a

4   whistleblower in this case?

5           MR. RHODES:  Well, not in the sense that we are a

6   whistleblower without standing who's a volunteer and just a

7   good citizen.

8           THE COURT:  Right, well that's what they're

9   accusing you of is being a volunteer.  That your --

10          MR. RHODES:  Right.  They say we don't have

11  standing.  We say we do.  That's the distinction between the

12  two.

13          We say we have a right to be here.  They say we

14  don't.  And I don't know whether they would concede that Your

15  Honor has the authority to allow us to proceed if we don't

16  have standing or not, but that's not before the court right

17  now.

18          So, our position is that we do have standing.  And

19  that Article III which surely recognize that in an *in rem*

20  action like a bankruptcy case, all interested parties have

21  the right to be heard on any issue because Article III

22  contemplates not just process, but more than that, fair

23  process, due process.  And where's the fair process or due

24  process for a creditor that is denied the right to be heard

25  before its rights against the debtor and the debtor's

1   property are foreclosed?  There isn't any.

2          And where's the fair process or the due process

3   for a creditor that's denied the right to be heard after its

4   rights against the debtor and the debtor's property have been

5   foreclosed, what it can prove that that process was infected

6   by a professional's fraud on the court.

7          Again, Your Honor, there is none.  And all of that

8   is why Article III standing and standing under the Bankruptcy

9   Code are effectively coterminous and coextensive as the Third

10  Circuit has held.

11         Now logically, of course, we've all been around

12  long enough to know that it is the parties with the pecuniary

13  interest in a case that is those who's claims are in the

14  money are the parties whose claims are satisfied by

15  definition, at last in part, and they are, therefore, the

16  parties most likely to be content with the outcome, to the

17  extent creditors are ever content with a bankruptcy and most

18  likely to be concerned about fraud on the court.

19         But it's more likely that the parties whose

20  prepetition rights have been foreclosed after receiving

21  nothing that they will be the parties who are concerned about

22  fraud on the court and we hope Article III is wise enough to

23  recognize that distinction.  But it's worse than that, Your

24  Honor.

25         Hypothetically what happens under McKinsey's

1  highly restrictive view of Article III standing if the only

2  party with a pecuniary interest in the case is a McKinsey

3  client; or a McKinsey client that McKinsey has concealed from

4  the court; or the only party with a pecuniary interest is an

5  entity, again, concealed by McKinsey in which McKinsey

6  partners and employees have an interest, again concealed by

7  McKinsey.

8          What would Article III say then?  What would it

9  say to the creditors?  Too bad.  Sorry.  Only McKinsey's

10 client or only the entity in which McKinsey's partners hold

11 equity interest can object to McKinsey's employment or object

12 to its fees or a claim that McKinsey committed a fraud on the

13 court?  Would Article III really require that --

14         THE COURT:  I don't think though that they're

15 arguing that in that case, for example, you've got -- let's

16 take a typical case where equity gets wiped out.

17         I don't know that they would argue if the case was

18 run, the court confirms the plan, typical result.  Equity

19 gets wiped out, unsecureds get whatever pennies they get.

20 And then debtor's counsel shows up and says here's my fee

21 application.  And I'm not satisfied that they're arguing or

22 that the court would look at an equity holder who came in and

23 said I am objecting to their fees.

24         And we'll leave the drama aside.  I'm objecting to

25 their fees.  They're too high.  It's unreasonable under 327,

1  330, 331, ya de ya de ya.

2         I'm not certain that where somebody says you're

3  not going to get a recovery that I would say you don't have

4  standing.  It may impact the significance I attribute to the

5  claim or to the argument.  In that instance, for example,

6  where the equity holder stands up and says Smith and Jones

7  limited liability -- you know, the firm charged $2 million

8  dollars.  This should have been a million-dollar case.

9         Okay.  Then I'll order it disgorged and it goes to

10 the unsecured creditors through their trust.  And if I do

11 that, you still don't have any stake, but arguably you have

12 the right to stand up and make that argument.

13        And then if you've got that further theory that,

14 well, you know, if all that money pays all the unsecureds and

15 maybe you get something or you don't, but I think you still

16 have standing.

17        MR. RHODES:  We agree one hundred percent, Your

18 Honor.  But I don't think McKinsey is arguing that.  I think

19 McKinsey would say if that equity security holder does not

20 have a stake in that specific fee application because they're

21 not going to get money from it if the application is denied,

22 then they don't have standing.  But I don't think Article III

23 goes that far because as the Third Circuit said Section 1109

24 and Article III are coextensive.

25        But, again, it's worse than that, Your Honor,

1  because even if -- all right, just to get right to the heart

2  of it.

3         This hypothetical that I have presented to the

4  court in which we're concerned that only Article III

5  connections have standing under McKinsey's test.  It's not so

6  hypothetical.  It happened.  It happened in the A&R case.  In

7  the A&R case, that's the Alpha Natural Resources case in the

8  Eastern District of Virginia.

9         In that case, McKinsey concealed from the court

10  the U.S. Trustee and the creditors its partners indirect

11  equity interest managed by the MIO and secured creditors that

12  acquired the debtor's assets in that case, managed by the

13  MIO.  And that investment resulted in an illegal profit to

14  McKinsey's partners of $50 million dollars.

15         And yet in the A&R case, McKinsey has argued that

16  under Article III only creditors with a pecuniary interest

17  have standing to assert fraud on the court.  Only the

18  creditors that got assets in the case.

19         THE COURT:  Well that matter is under advisement

20  right now before Judge Huennekens.

21         MR. RHODES:  It is.

22         THE COURT:  And standing is likewise under

23  advisement before Judge Bernstein as well.

24         MR. RHODES:  It is.  It is.

25         And I don't mean to argue those cases here, but

1  I'm trying to point out that the argument about pecuniary

2  interest under Article III that McKinsey makes can in some

3  cases lead to the result that only McKinsey connected

4  entities have standing.  And that cannot be what Article III

5  reads.  It just can't.

6           Now, I'll turn to the argument that even if the

7  court determines that Article III requires more about a show

8  that it has a pecuniary interest.  We do, at least, for

9  standing purposes.

10          Your Honor has already indicated familiarity with

11 this.  You have seen that the parties have presented

12 different perspectives on how any sanctions against McKinsey

13 might be or should be distributed.  In fact, there are a

14 (indiscernible) number of such possible distribution

15 scenarios.

16          One of those scenarios is the one that we would

17 argue which is that under the Supreme Court's case in

18 chambers, the court has discretion.  And the court should

19 exercise that discretion in a way that doesn't benefit

20 McKinsey, either directly or indirectly.

21          We have to be careful about that.  We have to have

22 full knowledge of what McKinsey's investments and client

23 connections are before we can make that determination.  But

24 Your Honor could also well determine that the distribution

25 should go to the unsecured creditors, of which Mar-Bow is

1   one.

2           Now is that speculative?  To some extent, it is

3   but all of the scenarios are --

4           THE COURT:  Right, I have the limited submissions

5   from the reorganized debtor and from the secured creditor

6   trust, both of whom claim --

7           MR. RHODES:  Of course.  But now is not the time

8   to decide all of that.

9           And in terms of the extent to which our scenario

10  was speculative or another scenario was speculative so is it

11  speculative that there is a lottery ticket in the sock

12  drawer.

13          THE COURT:  Can I ask some context questions,

14  please.

15          MR. RHODES:  Sure.

16          THE COURT:  Obviously, this is coming to me in an

17  unusual format.  You're in front of Huennekens.  You're in

18  front of Bernstein.  You're in front of Jones.  There's a

19  complaint in the Southern District, as well that's in the

20  Southern District, District Court --

21          MR. RHODES:  Yes.

22          THE COURT:  -- that's a RICO action.

23          I have had an opportunity to review, at least

24  broadly, the proceedings in Virginia and New York.  I think,

25  as far as I can, the proceedings in Texas are procedurally

1  different.

2          MR. RHODES:  They are.

3          THE COURT:  The other cases are post-confirmation

4  and certainly longer.  Westmoreland is still, I think, it's

5  preconfirmation, right?

6          MR. RHODES:  Well, there was a confirmation of

7  some of the debtors in the case, but you are right that the

8  issue of McKinsey's employment in the case under Section 327

9  is still open.

10          THE COURT:  Is still open.  Okay.

11          So what's the significance of the settlement that

12  was approved at the three-Judge hearing with the U.S. Trustee

13  and McKinsey and how do I deal with that?  Because I think

14  one of the arguments McKinsey is going to tell me is that to

15  the extent that somebody has standing or somebody ought to be

16  policing this process, it's the U.S. Trustee.  And the U.S.

17  Trustee is onboard.  And, by the way, Judge, your case is

18  actually listed in the settlement.

19          How do I deal with that?

20          MR. RHODES:  Okay.  So, Mar-Bow as not a party to

21  that, first of all.  Second of all, the settlement papers

22  which we can provide to you if you haven't already seen.

23          THE COURT:  I have them.

24          MR. RHODES:  Okay.  So, you can see that they

25  clearly provide that all that's being settled there are the

1 U.S. Trustee's concerns about McKinsey's disclosure issues

2 under Rule 2014.

3     It explicitly states that the settlement does not

4 cover an issue of McKinsey's disqualifications or fraud.  And

5 that's where we are.

6     The U.S. Trustee's program, when it was

7 negotiating and settling with McKinsey in this matter and it

8 resulted in a $15 million dollar settlement in those, for

9 those three cases.  Did not have the benefit of the evidence

10 that we have accumulated of McKinsey's fraud on the court in

11 those cases and in this case and in other cases, as well,

12 Your Honor.

13     So, our position is that that settlement has no

14 impact whatsoever here and should have no impact whatsoever

15 here.  It's a different party with different claim that

16 decided in its own discretion to settle. Okay.

17     Before closing, Your Honor, I want to address what

18 I think, at least is the closest bankruptcy case on point and

19 that's the Denison case.  Denison vs. Marina Mile Shipyard

20 2012 W.L. 75768 --

21     THE COURT:  I have it.

22     MR. RHODES:  Okay.

23     So, in that case, --

24     THE COURT:  The brokers.  These are the brokers.

25     MR. RHODES:  Yeah, the brokers.  A creditor and a

1   post-confirmation planning. This debtor filed a motion

2   seeking disgorgement by the brokers of their commission that

3   the court had approved and they argued fraud on the court in

4   concealing an actual conflict of interest.  Something like

5   what we have here.

6           The brokers responded what these parties had no

7   standing because of the terms of the confirmed plan.  Again,

8   like what we have here.  But the court rejected the broker's

9   argument concerning the moving parties standing.

10          It held,

11          "The Bankruptcy Court had authority to order

12          disgorgement of the fees paid to the brokers based

13          on a finding of fraud on the court.  Under such

14          circumstances, the means by which the fraud was

15          brought to the court's attention is

16          inconsequential."

17          And the court explained why.  And Your Honor

18   understands this already.  It's an -- fraud on the court is

19   an unconscionable plan or scheme, the court said, designed to

20   improperly influence the court in its decision.  And the

21   court rejected the standing argument, but it's important to

22   see why.

23          The court rejected it not because it found that

24   the moving parties had standing, but because the parties'

25   standing did not matter.

1          THE COURT:  So here -- I guess, here's the next

2    step of that.

3          MR. RHODES:  Yeah.

4          THE COURT:  Again, I don't think -- and I'll hear,

5    obviously, from your friends to your right in a moment.

6          I think we started with the distinction between

7    the concept of bringing to the court's attention, the

8    prospect of a fraud on the court and the inherent obligation

9    or, at least, the opportunity that the court should take to

10   investigate and remedy.

11         MR. RHODES:  Right.

12         THE COURT:  I get that.  The question is whether

13   or not that party who brings to the court's attention that

14   issue is able to file a motion, to prosecute a motion, to

15   demand and obtain discovery and to seek a particular relief.

16         And I don't want to go in circles, but I wan to

17   circle back to either the whistleblower concept or the

18   volunteer issue because this is really where they're coming

19   after you.  And I want to make sure I understand your

20   argument.

21         Imagine that you're across the street and you're a

22   bartender.  And because this is -- you're within two blocks

23   of 8th and Market, everyone understands bankruptcy.  And the

24   fellas at the bar at congratulating each other on how they

25   blew one past Judge Shannon by authorizing this, et cetera.

1              In that instance, you are welcome to write a

2   letter or tell me when I get over there --

3        (Laughter)

4              THE COURT:  -- and, at that point, I would have, I

5   think, the responsibility that you've described in your

6   papers.

7              MR. RHODES:  Yes.

8              THE COURT:  The court has an obligation to ensure

9   and maintain the integrity of the court process and that's

10  the fraud on the court, whether it's an exception to

11  standing.  Your kind of accused of saying that you're

12  creating this exception to standing.  That's in their papers.

13             But I'm not certain that I would say file your

14  papers, or demand discovery of the lawyers that were sitting

15  in front of you.  So, I think I want you to navigate that for

16  me.

17             And if I'm not been clear then I'll try to clarify

18  it a little bit, but. . .

19             MR. RHODES:  No, you've been clear.

20             And the answer is when you get a letter like that,

21  the first thing you have to do is make a judgment about

22  whether there's something here worth pursuing.

23             THE COURT:  Right.

24             MR. RHODES:  Judges get these letters all the

25  time.

1         THE COURT:  Sure do.

2         MR. RHODES:  If you decide there is, then the next

3   question what, what do you do?  You're not going to appoint

4   the bartender to come to court and present the evidence.  But

5   you've still got to figure out what to do.

6         You might refer it to the U.S. Trustee.  You might

7   appoint an examiner or other kind of an investigator to do an

8   investigation and present findings.

9         THE COURT:  Now there was some colloquy between --

10        MR. RHODES:  Yeah.

11        THE COURT:  I had a chance to review the

12  transcript and there was some colloquy, I think, between you

13  and Judge Bernstein about what remedies are available in that

14  respect because, obviously, the examiner is a pre-

15  confirmation remedy.  But the idea is the Code, I think your

16  response was the Code can't handcuff a court if it's obliged

17  to investigate.

18        MR. RHODES:  Well, that's right.  I pointed out to

19  the Judge that the appointment of an examiner is a

20  preconfirmation thing.  And he said well we have ways of

21  getting around that.

22        THE COURT:  Yeah.

23        MR. RHODES:  And again, I would say to the court

24  that because of the importance of a fraud on the court issue,

25  the court has the discretion to appoint a person, whatever

1  you decide to call it -- examiner, investigator, expert

2  witness.  It doesn't matter what you call.

3         What matters is do they have authority?  Do they

4  have resources?  Are they qualified?  Are they disinterested?

5  And we can talk about what all of the selection criteria

6  might be.

7         The court has complete authority to do that.

8  Where it would get the resources becomes a more challenging

9  question and we can talk about that too.  But that's in the

10  case of the bartender making the request.

11         We're not bartenders, Your Honor.

12         THE COURT:  I gather that.

13         MR. RHODES:  We're creditors.  We're creditors.

14  And under the Third Circuit of the Supreme Court, we assert

15  we have standing, therefore.

16         Of course, Your Honor retains the discretion to

17  determine the scope and the timing of every investigation of

18  any discovery that might be done here.

19         And we implore the court if it determines that a

20  pecuniary interest is necessary and that we do not have a

21  pecuniary interest, contrary to our argument, to proceed to

22  appoint an investigator in this matter regardless.

23         We urge the court to hear from all interested

24  parties including us as to what the selection criteria should

25  be and who that person should be.  You might ask us for

1  nominees, for example.

2         We would certainly ask the court to consider Mar-

3  Bow as that investigator.  We have the resources.  We have

4  accumulated now three years' worth of information about

5  McKinsey's connections that it has not disclosed, both on the

6  client's side and on the investment side.

7         We would fully cooperate with any investigation,

8  of course.  But what is at stake here as Your Honor has

9  pointed out is the integrity of the court's process.

10         We recognize that today's hearing is strictly

11  about standing and we have tried to hone to that, but in

12  deciding whether a fraud on the court claim merits for the

13  review and whether Mar-Bow is the appropriate entity to

14  conduct that review, we ask the court to recognize some key

15  facts here.

16         Mar-Bow in McKinsey's response nowhere does it

17  deny owning a financial interest in Credit Suisse and Bank of

18  America, some of the DIP lenders to Standard Register.

19         Nowhere does it deny owning financial interest in

20  nine interested parties who were creditors that stood to

21  benefit from McKinsey's restructuring advice to the debtor.

22         Nowhere does it deny the substance of our

23  allegations.  It argues procedural defenses, standing,

24  separateness of affiliates, disagreements about the

25  interpretation of Rule 2014; although, this case doesn't

1  involve Rule 2014.

2          It involves Your Honor's own order requiring

3  McKinsey to disclose its connections because this was a 363

4  appointment not a Section 327 appointment.

5          THE COURT:  Can I ask a question? When you're

6  talking about the appointment issue, I'm not certain that its

7  relevant to the standing inquiry, but the parties have

8  sparred back and forth about who's a fiduciary.  Whether

9  McKinsey is a fiduciary.

10          Does that weigh into what standard is imposed upon

11  them in the context of that investigation and what would be

12  looked into or is that relevant to the standing inquiry?

13          I'm not certain what I'd do with that argument.

14          MR. RHODES:  I would say that primarily it goes to

15  the merits of McKinsey's obligations and whether it breached

16  those obligations.  Judge Huennekens told McKinsey that it is

17  a fiduciary so we don't think there can be any dispute about

18  it.  It has, nevertheless, maintained ever since then still

19  that it is not a fiduciary.  It's --

20          THE COURT:  I'm not certain that there's a heck of

21  a distinction.  I saw in the transcript that Judge -- or in

22  your submissions because it wasn't in the transcript from the

23  standing argument, I believe.

24          MR. RHODES:  Right.

25          THE COURT:  But in the submissions that Judge

1  Huennekens had made that comment.  I'm not certain of that.

2  I think that as with counsel, McKinsey is employed by a

3  fiduciary.  But I represented, you know, at that podium

4  debtors forever.  I never regarded myself as a fiduciary by

5  any stretch.

6         I'm a lawyer with a client.  If I had fiduciary

7  obligations, I'm not sure what I would do with that.  My

8  client is the fiduciary.  And my responsibilities are bounded

9  by the Code and the rules and, obviously, the Rules of

10  Professional Conduct.

11         But I don't think it -- I think I agree with you

12  that it goes to the merits question.  But I'm not certain

13  that really drives the analysis that --

14         MR. RHODES:  Well, at the appropriate time I'll

15  have an opportunity to brief it and we will argue to the

16  court many many cases that hold that professionals are

17  fiduciaries.

18         THE COURT:  Are fiduciaries.

19         MR. RHODES:  Now, there's a distinction to be made

20  here and I think it may be the one that Your Honor is

21  focusing on.

22         It is our position that McKinsey is a fiduciary to

23  the court.  It has obligations to the court.  They may not be

24  fiduciaries to the debtor and I think that's what Your Honor

25  is focusing on.

1           THE COURT:  Well that's certainly the case, for

2  example, with counsel.  Counsel are officers of the court.

3  The word fiduciary gets thrown out.  Justice Clark has his

4  comment.  He says a man is a fiduciary is simply to begin the

5  inquiry.

6           I'm not -- but that word gets thrown around all

7  the time.

8           MR. RHODES:  You're right.

9           THE COURT:  And when you think about it in some

10  ways, you could, especially if you're thinking about

11  fiduciary duties in the classic, you know, sort of Delaware

12  corporate law, you would be drastically reducing the scope of

13  responsibility of a party that you would want to call a

14  fiduciary.

15           Yes, to satisfy their duty of care they have to

16  have a pulse and an I.Q. above room temperature.  And, you

17  know, their duty of loyalty is satisfied by not being on both

18  sides of a transaction.

19           And I mean no disrespect.  But, you know, that

20  concept gets to be -- the throwing around of that term and

21  its accompanied with, you know, the comment to the quote you

22  have from Cardozo with the punctilio of --

23           MR. RHODES:  It's a good quote.  We like it.

24           THE COURT:  It is a good quote.  But my question

25  was -- I think you've answered my question though because

1  it's not really driven by that issue.

2           MR. RHODES:  No.

3           THE COURT:  And by that definition.

4           MR. RHODES:  But in the context of bankruptcy what

5  it means for a professional, whether a lawyer or a financial

6  advisor, to be a fiduciary means a duty of candor to the

7  court, a duty to comply with Rule 2014, a duty not -- a duty

8  of loyalty.  A duty of loyalty to the debtor.

9           And the reason we have Section 327 is to enforce

10 the professional's duty of loyalty.  That's why we have

11 Section 327.

12           In the end, however, because Mar-Bow is bound by

13 the orders that it seeks relief from, due to McKinsey's fraud

14 or for other reasons, we believe that Mar-Bow does have

15 standing to ask this court to find that those orders were

16 entered by a fraud on the court.

17           THE COURT:  Okay.  Let me do this.  We'll take

18 just a two-minute break and then we'll reconvene for the

19 responsive argument.  And, Mr. Rhodes, I'll hear from you in

20 reply at your convenience.  All right.

21           MR. RHODES:  Thank you.

22           THE COURT:  All right, we'll stand in recess.

23      (Recess at 10:54 a.m.)

24      (Proceedings resumed at 11:01 a.m.)

25           MS. GAY:  Your Honor, thank you.  Thank you for

1  taking so much time to listen to this important argument.

2          THE COURT:  Happy to oblige.

3          MS. GAY:  Obviously, today we're going to talk

4  about standing.  I just want to say since my colleague, Mr.

5  Rhodes, has mentioned so many times fraud on the court;

6  obviously, McKinsey and its employees, and McKinsey standing

7  behind its employees in the RTS business passionately,

8  passionately, Your Honor, dispute what has been said here,

9  they are hardworking, diligent, honest competitors in the

10 space.  They intend to stay that way.  And while we won't go

11 into the evidence now, we think we've submitted quite a bit

12 to Your Honor to show what this case is really all about

13 which is a good faith dispute as Judge Isgur said about how

14 Rule 2014 is to be followed.

15          Mr. Rhodes is right that here we also have an

16 order for Your Honor that required disclosure, and McKinsey

17 diligently made disclosures there.  Its disclosures which we

18 can respond to at the right time from inquiry from the court.

19 I am certainly not here at all to say that the court's power

20 is limited.  And if the court has questions about our

21 submissions we are happy to direct the court to narrower

22 parts, larger parts, whatever the court is interested in, but

23 that is a different thing as to whether Mar-Bow, a

24 competitor, comes into this court with standing.

25          Your Honor, you know, for quite a bit of time

1  today Mr. Rhodes has said things that I don't disagree with,

2  but they are hypothetical.  They are not about the actual

3  facts, the actual claims in this case.  And I submit to Your

4  Honor there is not a case in either party's briefs, and they

5  are voluminous, even though they're a little short on

6  standing, and anything that is cited on either side that says

7  you can proceed here, you being Mar-Bow, not you, Judge, but

8  Mar-Bow without a pecuniary concrete interest in the case.

9        Just quickly, I'm sure while the court still has

10  it on its mind, there were two cases that Mar-Bow cited in

11  its argument.  I'd just like to make clear the first one was

12  a Third Circuit case, Global Industry Technologies, where the

13  court made reference to the pecuniary interest at issue as

14  staggering.  That is on Page -- let me just make sure I have

15  the site.  It's right after Footnote 28, referring to the

16  interest of insurers in untried, and to be tried, and

17  currently tried asbestos claims.

18        It says,

19        "The plan's promise of a silica trust appears to

20        have staggeringly increased by more than twenty-

21        seven times."

22  Talking about money, Your Honor.  The prepetition

23  liability exposure here.  So, that is a concrete pecuniary

24  interest if I've ever seen one.

25        The other case that was mentioned in argument is

1  the Denison case, Your Honor.

2          THE COURT:  From Florida, right.

3          MS. GAY:  Yes, Southern District of Florida.  And

4  there's two important points there.  The issue of fraud there

5  was brought up *sua sponte* by the judge.  It wasn't because

6  some other party was going to make itself a private attorney

7  general or prosecute it.  And on top of that it's also very,

8  very important here that there is not an argument at all

9  about the major creditor being that it was not a party in

10 interest.  In other words, the issue of the standing here; if

11 you look it says standing to proceed disgorgement.  It says

12 here the brokers have not argued it's not at issue that

13 Marina Mile, a major credit of the New River Dry Dock was not

14 a party in interest.

15         So, first of all, the court inquired *sua sponte*

16 and was exercising its rights *sua sponte*.  Secondly, there's

17 no dispute about the party in interest who was advancing the

18 claim here.  So, I don't think either of those are relevant.

19 And I will go in more detail because certainly Mr. Rhodes has

20 made a detailed presentation.  But I haven't seen a case,

21 ever, that said Article III standing doesn't apply in these

22 proceedings.  I don't know how it could.  And that requires a

23 pecuniary interest on these facts.

24         THE COURT:  I think I'd like you to respond

25 directly to the argument that was made from the podium, but

1  as well extensively in the briefing, that fraud on the court

2  is different.  That everything else contemplates, at a

3  minimum, a pecuniary interest because that's, at least, in

4  bankruptcy what we deal with.  You need skin in the game in

5  order to ask or petition the court for relief.

6       Standing is an interesting thing.  You could look

7  at it as an affirmative issue, a shield or a sword when you

8  think about standing.  Either standing is you have the right

9  to come into court, stand at that podium and ask me for

10  something and that would give you standing; or I could think

11  about the reverse of the coin which is am I able with

12  whatever authority I have closed, statutorily, or equitably

13  or otherwise to fashion a remedy for you.  If not, while you

14  may desperately seek my advice, guidance and relief, there is

15  nothing that I can do for you and, therefore, because I can't

16  provide relief to you, you lack standing.  There is, sort of,

17  two sides to that argument.

18       I think what I'd like you to respond to directly

19  is this issue that I think is a theme throughout their

20  submissions that fraud on the court is just different.  It

21  imposes a responsibility on the court and the quote that

22  they've pulled from the Denison case that it doesn't matter

23  where it comes from, who raises it to the court; everywhere

24  else it matters.  In bankruptcy court we care who asks,

25  again, because you ask whose money is this.

1          While it may not necessarily go to questions

2   purely of standing, it goes to the significance you attribute

3   to someone's objection.  The out of the money shareholder

4   probably has standing, I think, to object to somebody's fees

5   in that case.  We could argue about that, but I'd be more

6   likely to say, well, what are you doing, why are we here?  If

7   there's a remedy it doesn't go to you.  That is almost that

8   flipside of the standing argument.

9          So, I would like your precise response.  You

10  briefed it, but I would like the clarity from the argument.

11  Is fraud on the court different, 60(d)(3).

12          MS. GAY:  So, Your Honor, first of all, it is not

13  different at all.  This is not the first time this has been

14  raised, this particular issue has been raised.  This court is

15  here in a different situation then Mar-Bow is, obviously.

16  The court can do what it wants and I will get to that, but in

17  terms of whether fraud on the court grants some kind of

18  standing exemption for Mar-Bow to be able to prosecute its

19  claim in this court it does not.

20          There are three circuit cases that expressly

21  reject the same exact argument.  The first is a Ninth Circuit

22  case, Herring vs. FDIC, which is 82 F.3d 282, Your Honor,

23  from 1995.  In that case shareholders of a bank in

24  receivership argued fraud on the court by the FDIC.

25          THE COURT:  Right.  You briefed that.

1          MS. GAY:  Yes, exactly.  And the court refused and

2    says,

3               "Rule 60 does not grant anyone standing to bring

4               an independent action.  It merely does not

5               restrict someone who already has it."

6          So, you've got to be able to show you have

7    pecuniary interest that is concrete here.

8          The next case as well -- which all of these are

9    brief, Your Honor, but let me just tell you the three of them

10   since you have asked.

11         THE COURT:  Sure.

12         MS. GAY:  Kim Manufacturing v. Wilder, which is

13   817 F.2d 1517 from the Eleventh Circuit.  It says the same

14   thing.  It says,

15               "In no case, presented to us, has any court

16               anywhere provided standing to a non-party unless

17               that non-party's rights were directly and

18               concretely compromised by a final judgment."

19         Finally, in terms of the three circuit cites

20   there's a Seventh Circuit cite, Parvati Corporation v. City

21   of Oak Forest, which is 630 F.3d 512, Seventh Circuit 2010.

22   The same thing, it's saying that the movant has to have

23   standing to bring the case at the outset; otherwise, you

24   can't even -- these are all three fraud on the court

25   allegations, Your Honor, which leads us to the question of

1  what interest do they have.

2         What was sort of interesting to me today was, you

3  know, a very learned and scholarly argument by Mr. Rhodes,

4  but almost no discussion of what interests Mar-Bow does have.

5         So, just sort of looking back for a moment, first

6  of all, as you've noticed or as you've mentioned, Your Honor,

7  in the Southern District there is a pending litigation that

8  the motion to dismiss has been fully briefed and we are

9  weighing decision.  And in that case, Your Honor, Jay Alix,

10 who, of course, is the owner of Mar-Bow as he's presented

11 himself here, makes, as you've noted, the exact same

12 complaints about Standard Register.  And he also says in that

13 filing, which we have marked as exhibits in this case, that

14 there is -- let me quote,

15         "There is no proof that any debtor or interested

16         party suffered a financial loss."

17         He not only says it once.  He says it twice.  So,

18 Exhibits 2 and 3 to our response to the motion; here Mar-Bow

19 says,

20         "There is no proof in these actions that any

21         debtor or interested party suffered a financial

22         loss because of the defendant's scheme."

23         Same thing in their reply brief in the Southern

24 District action.

25         THE COURT:  Hang on.  Where was that reference?

1    I'm at your brief.  I'm at the --

2              MS. GAY:  These are -- what I'm reading from right

3    now, Your Honor, are Exhibits --

4              THE COURT:  I'm at Exhibit 2.

5              MS. GAY:  -- 2 on Page 8.  Exhibit 2 is

6    plaintiff's memorandum of law in opposition to a motion to

7    dismiss.  At the very top Jay Alix says, in that brief, first

8    line,

9              "There is no proof that any debtor or interested

10             party suffered a financial loss because of

11             defendant's scheme."

12             In Exhibit 3 to our papers in this case, Your

13   Honor, which is their follow-up brief, just in case there was

14   a mistake, it says again, first paragraph, Page 4,

15             "Alix has not alleged that any debtor or

16             interested party was, in fact, injured nor have we

17             argued otherwise."

18             So, that's for starters.  In addition, the lack of

19   a financial stake here, I think, is quite clearly

20   corroborated because this claim was bought after the plan

21   confirmation here, some three years ago; bought post-

22   confirmation and then sat silent for three years because

23   there was no financial harm to timely vindicate.

24             THE COURT:  Well, I have avoided any discussion

25   about, and the parties have briefed this a little bit, any

1  discussion about latches, or delay or --

2          MS. GAY:  Right.

3          THE COURT:  Because I don't think that that goes

4  to the standing analysis.

5          MS. GAY:  I agree with that.  I think that it is a

6  very vital argument, but I think it is separate, Your Honor.

7  Just to the issue of advancing a financial stake both in the

8  RICO complaint, which actually notes that Mar-Bow was aware

9  of this concern about Standard Register for four years.  If

10 there is a financial stake to advance, they were aware of it

11 pre-plan confirmation.  They were aware of it post.  I'm not

12 arguing latches, I'm arguing standing.

13         More to your point in the reply brief in this

14 matter --

15         THE COURT:  Hang on.  Is part of that analysis

16 also a waiver analysis because -- and, again, I know it

17 doesn't necessarily address the standing question, but what

18 you're saying is that I believe Mr. Toll filed a notice of

19 appearance in my case well before confirmation, after the

20 McKinsey retention, but that no submissions were filed, no

21 objections, et cetera.  Mr. Rhodes, I think, started off his

22 discussion by saying we are bound by orders and, therefore,

23 we are obliged to seek relief in this court.

24         Is there a waiver argument that travels with that

25 as well?  You had the opportunity to object to the fee

1  application and you didn't. It's not as if they weren't here.

2          MS. GAY:  Well, certainly, in the Southern

3  District RICO complaint, and we can pull out the exact cite

4  for the court, in the allegations about Standard Register it

5  is very clear that there was four years to the day, actually,

6  four years from yesterday Mar-Bow alleges that they brought

7  the Standard Register concerns to the attention of McKinsey.

8          So, I think when the court, itself, with its own

9  inherent authority, is considering what to do about these

10 allegations of fraud, which, again, we think are a dispute

11 about a rule, but one thing that the court can certainly look

12 at is latches, it can look at waiver, it can look at the

13 damage of sitting on a concern like that.  But I agree with

14 the court that that is not specifically a standing argument,

15 but I certainly think it's within the court's authority and

16 that the court should take a look at that because this could

17 have been resolved long, long ago if Mar-Bow had actually had

18 a real interest here.

19         So, in our reply brief, once we raised standing in

20 this particular case, they don't even attempt to argue a

21 concrete financial stake.  They don't address the plans

22 prohibition on post-confirmation transfers like the one that

23 Mar-Bow attempted here.  And it is their burden to establish

24 that, but I'd like to just briefly review for the court what

25 --

1        THE COURT:  Can I ask a question about -- and I

2   saw the briefing on that.

3        MS. GAY:  Yes, Your Honor.

4        THE COURT:  And I saw the restriction on the

5   transfer of these trust interests which I'm certain I didn't

6   focus on it in the context of this.  I'm not sure that that's

7   a typical feature.

8        How significant is that plan restriction on the

9   standing argument if the original holder, which was some

10  outfit called AAA or AA or something --

11       MS. GAY:  Right.

12       THE COURT:  -- would the standing argument --

13  would your standing argument be the same if AAA showed up and

14  said we want to find precisely these.  We're not Mar-Bow,

15  we're AAA, we are the holder of the claim.

16       MS. GAY:  Well, I think at this point the GUC

17  Trust might have standing, but I don't think, under the plan,

18  that anybody had standing at this point.  As far as I know,

19  from what we could see, because the movant doesn't allege it

20  here, they just drop in a footnote that they have a claim.

21  The claim was attempted to be purchased in March 2016 well

22  after the plan became effective as far as I understand and

23  that claim, itself, was extinguished by the plan in exchange

24  for interest in the GUC Trust.

25       There is a prohibition in the plan for, actually,

1   acquiring interest in the GUC Trust.  I don't know if that is

2   unusual or not.  I am not, by any means, steeped in

3   bankruptcy law as the court is, but it is, in fact, in the

4   plan in Section 1.7 and 3.2.3.

5           As far as we can tell, despite the thousand pages

6   of exhibits there is no suggestion by Mar-Bow that they even

7   tried to acquire interest in the GUC Trust and they couldn't

8   under the plan anyway.  So, yes, Your Honor, we think it's

9   dispositive of standing.

10          THE COURT:  Right, but my question was, as a

11  hypothetical, if you didn't have that gating question would

12  you acknowledge or agree with standing if, again, it was AAA

13  showing up, not whoever they acquired the thing from because

14  I will be honest, and, again, I don't want to quibble with

15  you about it, I regard that transfer restriction of

16  relatively limited significance.

17          What it means, perhaps is that the acquirer

18  wouldn't necessarily be able to sue the trustee or be made at

19  the trustee, etc., and the trustee wouldn't necessarily be

20  obliged to continually update his or her distribution

21  schedules, but rather I have a contract with someone and when

22  they get a distribution they got to give it to me because I

23  acquired it.

24          So, that is a long way of saying I'm not sure that

25  if that transfer restriction and, therefore, a challenge to

1  the validity of the acquisition of the claim or the

2  beneficial interest in the trust is -- if that is the great

3  wall that stops this then I think we have -- I don't think

4  that's your argument, but I guess my point is that I don't

5  necessarily see that as being the end of the inquiry.

6          Let's assume that they've, at least, acquired,

7  perhaps once removed, some right associated with a

8  distribution because, otherwise, I mean that trade

9  restriction, again, is of relatively limited significance to

10  me to the questions that are really before me.  Do you know

11  what I mean?

12          MS. GAY:  I think I do, Your Honor.

13          So, our argument is multi-pronged certainly.  One

14  that they bought after, obviously, the plan was confirmed,

15  well after.  Secondly, that all those interests did go to one

16  of the two trusts under the plan.  So, the trusts have

17  standing. They filed -- you know, they filed papers here

18  saying -- and I don't think it matters because Mar-Bow has no

19  interest in either of those trusts.

20          So, with regard to that the parties with standing

21  at this point in time are the two trusts.  They filed here

22  and they disagree as to who would have an interest in the

23  claim, but it's nothing that I think they violently agree on

24  Your Honor, is that it's not Mar-Bow or anyone like Mar-Bow.

25          You asked a slightly broader question.  So, my

1  response would be if it's a general unsecured claim pre-

2  confirmation, this whole argument, that's fine.  That's what

3  1109 is all about.  I think that is pretty clear.  If it's

4  GUC Trust's or the other trust after confirmation they have a

5  stake as well, but Mar-Bow simply does not for one of several

6  reasons.

7          Both having -- you know, cause when Mr. Rhodes

8  stands up here and says they're a creditor; well, they're

9  not.  They tried to buy this claim afterwards.  They don't

10 have an interest in the trust.  The trusts are the ones with

11 standing at this point in time.

12         So, I have covered, Your Honor, I think, unless

13 the court has questions that fraud on the court allegations

14 are not a carve-out to Article III standing.  You still have

15 to have a pecuniary interest to advance those.  The three

16 circuit cases and others say that very, very clearly.

17         I think there are two other arguments that may

18 well have been covered by me as well, but just let me be sure

19 because I think they're slightly independent if I understand

20 Mr. Rhodes correctly.

21         The second argument is that there is this, sort

22 of, attenuated step on step on step that I would call

23 speculative for sure.  I think under Article III standing

24 just doesn't work here.

25         I think what Mr. Rhodes is saying -- let me just

1　be sure I wrote the notes down right -- that if it has

2　standing as opposed to the trust, if it prevails on its

3　motion, if somehow RTS is sanctioned as three steps, if --

4　and, again, I'm just looking at what Mr. Rhodes says, if --

5　　　　　THE COURT:  Actually, can I but in --

6　　　　　MS. GAY:  Yes, please.

7　　　　　THE COURT:  -- because I think you started on the

8　wrong step.  I don't mean it disparaging, but in some ways I

9　think that the argument is intentionally kind of circular and

10　that is that if Mar-Bow prosecutes its motion, and carries

11　its burden, and obtains an award the court has brought

12　discretion, unlimited discretion, I think, was their word, to

13　fashion a relief which could go to Mar-Bow, which means Mar-

14　Bow has standing.

15　　　　　MS. GAY:  Something like that.  There might be an

16　extra step or two in there because also the court would have

17　to disregard the plan, I think.

18　　　　　THE COURT:  Right.

19　　　　　MS. GAY:  Mar-Bow is very fond of calling this

20　sanctions.  I mean certainly the trustee settlement that Mar-

21　Bow referend is not a sanction.  Those are settlement

22　proceeds. So, whatever could come out of this and, again,

23　Your Honor, just to note for the record we think there is no

24　there, there.  We think it's simply an anti-competitive

25　dispute.

1          Again, all of those if's are incredible

2   hypothetical including that the court would elect to give

3   something to Mar-Bow instead of to those who would receive

4   interests, who have interests under the plan.  This circuit

5   has none of that.  It says a theory of standing that relies

6   on a highly attenuated chain of possibilities is not enough.

7   And this is Clapper v. Amnesty International.  It went up and

8   down and up and down, and it takes about that much.

9          And as now Chief Justice Roberts has said,

10              "It's not enough to have a colorable, arguable

11              remedial claim to relieve at the pleading stage."

12          You can't just say there is a possibility,

13   striated four or five different ways.  You have to say we

14   have an injury that is fairly traceable and it's a concrete

15   money interest.  That doesn't change.

16          There is a slight argument, I think, Mr. Rhodes

17   hasn't mentioned so much today, but is in his papers, doesn't

18   change if the parties seeking some kind of equitable relief.

19   For that I think the court and I think you have seen this in

20   the A&R argument.  There is a dispositive case from the

21   Supreme Court from just 2009, Summersview (indiscernible)

22   Institute [phonetic].

23          On the issue of 1109 providing standing -- again,

24   Your Honor, I think that's been pretty well covered here, but

25   the cases that are cited in Mar-Bow's brief have nothing to

1  do with standing. They deal with everything as various as

2  sovereign immunity or whether the claims of states can be

3  adjudicated by the Federal Bankruptcy Court.  But one thing

4  is clear, all three of them have nothing to do with standing.

5          Certainly, 1109, before the confirmation, let's

6  people come in and complain.  Well, Mar-Bow may have known

7  about this, but they were nowhere on the scene at that point.

8  There is, certainly, a raise, an *in rem* at that time, but at

9  this point there is not.

10          So, you know, Mar-Bow doesn't respond to the fact

11  that it's any kind of hypothetical speculative interest they

12  could have had it gone based on the plan confirmation.  At

13  that time there are these two buckets, the two trusts and

14  they are the one that has standing.

15          Under any view, again, we have two conflicting,

16  sort of, placeholder motions here as I understand them.

17  Neither of them are suggesting Mar-Bow has standing.  They're

18  suggesting we have.  That is exactly what the plan says.

19  Your Honor, there is just not a case --

20          THE COURT:  You mean the two placeholders coming

21  in from the reorganized debtor?

22          MS. GAY:  Yes, right.

23          THE COURT:  Okay.

24          MS. GAY:  Again, Your Honor, forgive me.

25          THE COURT:  That's okay.  I get you.

1          MS. GAY:  I do feel like I'm getting a little bit

2    of an LLM in bankruptcy in all this.

3          THE COURT:  You are doing fine.

4          MS. GAY:  I appreciate that.  Again, there is not

5    a case anywhere, any shape or form, at least, cited in these

6    voluminous papers and I have to think we have everything

7    because this is the fourth time around or, at least, the

8    third time around that says a party can proceed without a

9    pecuniary concrete non-speculative interest.

10         THE COURT:  How do I deal with, I think, the

11   argument that Mr. Rhodes walked through at the conclusion of

12   his comments, and I realize that it bleeds into the merits,

13   but I think I need your response on it.  The concern was, as

14   described by Mr. Rhodes, that McKinsey is in a position --

15   again, these are their allegations.

16         MS. GAY:  Understood, Your Honor.

17         THE COURT:  Having committed what it did at this

18   stage then to further gain the system because, I think, their

19   allegation is that perhaps the folks that might have the most

20   obvious standing, right, the two trusts or the two entities,

21   are populated by people that McKinsey has a relationship

22   with.  So, this kind of -- it's almost a this cannot stand

23   argument.  I'd like your response.

24         You heard his argument, perhaps I'm not

25   capsulizing it perfectly, but part of the concern that he has

1  is if McKinsey is right, McKinsey has put the rabbit in the

2  hat.  I think what he is saying is that, Judge, you shouldn't

3  stands for that.  How do I deal with that?  I recognize that

4  you denied that, but I think I'd like you to respond to his

5  argument.

6           MS. GAY:  Your Honor, we do deny it.  And I

7  appreciate you giving me the chance to respond to it.  Every

8  allegation of fraud made here, Your Honor, is absolutely

9  false.  I mean I would simply direct Your Honor, just by way

10 of example, to Exhibit 8 in their papers which lays out

11 evidence not about us --

12           THE COURT:  Well, I want to circle back.

13           MS. GAY:  Should I just stop there?

14           THE COURT:  Yeah.

15           MS. GAY:  Okay.

16           THE COURT:  I'm not being clear.  Perhaps a

17 slightly different analogy.  One of the ways, in a bankruptcy

18 case, that you shut people up is to pay them.  Sometimes you

19 pay people you don't like or that you don't want to hear

20 from.  I have had, at that podium, arguments from people that

21 have been treated in a particular way to be unimpaired

22 because we know that they object.  And what you're going to

23 do is shut them up.  That is not a perfect analogy, but I

24 think that that is, at least, part of the criticism that the

25 other side has of yours is to say -- and we're bleeding into

1  the merits.  For that I apologize, but I'm asking the

2  question.

3          MS. GAY:  No problem, Your Honor.

4          THE COURT:  You can't -- I think the argument from

5  Mr. Rhodes was you can't commit wrongdoing and then structure

6  it in a way that you're insulated from being criticized for

7  it because of the procedures.  Maybe this circles all the way

8  back to where we started; you know, if fraud on the court

9  different that we have a broader inquiry because we have a

10 responsibility to the integrity of the process rather than to

11 see whether or not this side gets 15 cents or 26 cents on the

12 dollar.

13         I realize I'm not being that clear, but I mean I

14 think that that was part of the theme of the argument at the

15 end that the standing inquiry becomes this antiseptic narrow

16 myopic, is one of the words in the pleadings that you saw.  I

17 guess that's it.  Respond to the argument that your position

18 requires a request that I be myopic, that I not look at this

19 for what they say it is.

20         MS. GAY:  Well, first of all, Your Honor, you're

21 quite clear.  I think I wasn't clear.  So, forgive me and let

22 me try again.  We are not running from these allegations,

23 Your Honor.  We're not trying to say please resolve this on a

24 technicality.  We have made fulsome filings with the court

25 and I will refrain from my passionate desire to tell you my

1 | favorite exhibits, but you do have all of our filings.

2 |         What we're saying is you can't come into court --

3 | these guys respectfully, and I am not going to devolve into

4 | name calling, but --

5 |         THE COURT:  When you start with these guys we

6 | ought to --

7 |         MS. GAY:  They're not just fellows off the street,

8 | as they say.  They are our competitor.  So, they come in here

9 | and they make rank speculation on top of rank speculation.

10 | We believe our papers, without further ado, demonstrate.  The

11 | court retains authority to read those papers, to take into

12 | account the arguments, to call us in to ask questions. We're

13 | just saying Mar-Bow cannot come in here as a competitor of

14 | ours, make false accusations, disparage our people and

15 | proceed to be some kind of private attorney general.

16 |         As the court referenced, the United States Trustee

17 | has settled the issues of what -- the good faith issues of

18 | the type and methodology of our disclosures.  As Mr. Rhodes

19 | noted for you today, Your Honor, the United States Trustee

20 | has full range to look at whatever else they want to.  That

21 | is what they are charged with doing.

22 |         The court system does not allow particularly for a

23 | competitor to become a private policeman with no interest in

24 | the game.  So, we've got -- we have people with standing

25 | under the plan, we have the trustee.  Most importantly, Your

1   Honor, we have you.  And we are always happy to answer

2   questions.  We think our briefs are pretty good on it.  We

3   think that the court can look at public things like the

4   Luskin report which deals with a lot of these issues.

5           THE COURT:  From Puerto Rico?

6           MS. GAY:  Yes.

7           THE COURT:  I have it.

8           MS. GAY:  Which Mr. Rhodes says we have never

9   answered questions about X, Y and Z.  Well, that X, Y and Z

10  is in that report.  It's filed with this court.  I won't go

11  any further except to say that no matter how important the

12  issue is, because pointing that someone else doesn't have

13  standing is not an answer to having standing here.

14          This circuit, Supreme Court requires a pecuniary

15  interest.  They don't have anything close to it, Your Honor.

16  They bought a claim after the fact.  They have no interest in

17  these trusts.  They have nothing.  You have a lot.  So, if

18  you have questions, Your Honor, we are happy to answer them

19  and we look forward to it.

20          THE COURT:  Very good.

21          MS. GAY:  Thank you, Your Honor.

22          THE COURT:  Thank you, Ms. Gay.

23          Mr. Rhodes, reply?

24          MR. RHODES:  Ms. Gay made several points that I

25  feel obligated to respond to.

1           THE COURT:  Of course.

2           MR. RHODES:  Beginning once again, Your Honor,

3   with our mediator's assertion in a court filed paper that the

4   settlement he had negotiated was a settlement of a good faith

5   dispute.  As we argued in our reply, we do not believe that

6   that statement by that mediator is entitled to any weight in

7   any court.  With all due respect to Judge Isgur, who we all

8   due respect, it was beyond his authority as a mediator to

9   make that finding.  We will argue that when and if McKinsey

10  asks this court to place any weight upon it.

11          McKinsey argues that it made disclosure pursuant

12  to this court's order.  Your Honor, it disclosed the identity

13  of none of its connections in response to that order.

14  McKinsey asserts, Ms. Gay asserts that no case says that we

15  can proceed without a pecuniary interest and yet, Your Honor,

16  that is precisely what the Global Industrial Technologies

17  case cites when it quotes from the Congoleum case.

18          I have to point out, which I don't think I quite

19  did earlier, the Global Industrial Technologies case is a

20  case that McKinsey, itself, cited.  And in that case the

21  court said,

22          "Article III standing need not be financial."

23          In the Global case the court did say that the

24  financial interests of the insurance companies whose standing

25  was at issue there was staggering and, indeed, they were.

1   They were not financial interests in the race of the

2   bankruptcy case.  They just weren't.

3           It's not a huge deal and I don't want to make too

4   much out this, but in the Denison case there was a motion for

5   relief from the order of the court.

6           THE COURT:  There was.

7           MR. RHODES:  It was a motion.  It wasn't the court

8   bringing it up *sua sponte*.

9           We do not seek a ruling from this court that says

10  that standing -- the standing requirement of Article III is

11  different in a fraud on the court motion.  We do not seek

12  that ruling at all.  We seek the court to impose the same

13  Article III standing requirement on a fraud on the court

14  claim as it would at any other point in the proceeding which

15  is that -- which the Third Circuit says is co-extensive with

16  Rule -- excuse me, Section 1109 of the Bankruptcy Code.

17          The three Circuit Court cases that McKinsey relies

18  on from the Ninth, the Eleventh and the Seventh Circuit all

19  say non-parties don't have standing to bring Rule 60(d)(3)

20  fraud on the court motions.  This is an unexceptional holding

21  and one that we take no exception to at all.  I would note

22  that, as I recall, at least, none of them are bankruptcy

23  cases, but the point is --

24          THE COURT:  That's right.

25          MR. RHODES:  -- they conclude, and rightly so,

1  that an entity bringing a fraud on the court claim has to

2  have standing.  We agree.

3         I want to address the piece in RICO, the piece

4  that was quoted from our RICO complaint, no proof of

5  financial loss.

6         THE COURT:  That was from the briefing.

7         MR. RHODES:  Yeah, the briefing on RICO, not the

8  complaint itself.  Again, Your Honor, the Supreme Court has

9  dealt with this very concern in the context of bankruptcy,

10 and the case is Woods v. City National Bank & Trust, 312 U.S.

11 262.  And in that case the court said,

12         "Where a claimant who represented members of the

13         investing public was serving more than one master

14         or was subject to conflicting interest he should

15         be denied compensation.  It is no answer to say

16         that fraud or unfairness were not shown to have

17         resulted."

18         And the court gave three reasons for that

19 conclusion, all of which apply here.  The court said,

20         "What is struck at by this ruling, in a refusal to

21         enforce contracts of this kind where there are

22         conflicting maters, is not only the actual evil

23         that results, but their tendency to evil in the

24         future and future cases.  It's a matter of

25         deterrence as much as anything else.  The sanction

1              for fraud on the court is as much about deterrence

2              as anything else."

3         And the court went on to make a very practical

4    point,

5              "The incidents of particular conflict of interest

6              can seldom be measured with any degree of

7              certainty.  The bankruptcy court need not

8              speculate as to whether the results of the

9              conflict was to delay action where speed was

10             essential or to close the record of past

11             transactions where publicity and investigation

12             were needed, or to compromise claims by

13             inattention where vigilant assertion was necessary

14             or, otherwise, to dilute the undivided loyalty

15             owed to those to whom the claimant purported to

16             represent."

17        THE COURT:  That quote is in your reply.

18        MR. RHODES:  I'm not sure that it is, Your Honor.

19        THE COURT:  I'm pretty sure it is.

20        MR. RHODES:  Okay.  Finally, the court said, and

21   it used the word fiduciary,

22             "A fiduciary represents security holders in an

23             organization may not perfect its claim to

24             compensation by insisting that, although, we have

25             conflicting interests he served his masters

1          equally well or that his primary loyalty was

2          weakened by --

3          THE COURT:  He didn't favor one over the other.

4          MR. RHODES:  Yeah.  Then we go on actually to

5  quote the famous Justice Cardozo about the trodden crowd and

6  all of that.  So, the fact that Mar-Bow disavows any

7  financial harm from McKinsey's fraud on the court is

8  irrelevant to our standing under the Woods case.

9          My preference would be not to discuss issues of

10  latches or waiver unless the court specifically asks me to at

11  this time.

12          THE COURT:  No.  I don't think that that's

13  necessary.  That is definitely not part of the inquiry of

14  this discussion.

15          MR. RHODES:  Ms. Gay goes on and on about how

16  condition one, and condition two, and condition three and

17  four if, if, if have to all be met before we get to the issue

18  of who gets the money.  Your Honor, that's true in every

19  single piece of litigation.  To establish standing a

20  plaintiff does not have to show, as a preliminary matter

21  before any discovery, the merit of the claim.  Case after

22  case says merits are separate from standing.

23          It may well be that the two trusts here have

24  standing.  This is not an issue that we have researched nor

25  are we particularly concerned about.  We're concerned about

1  whether we have standing.

2         THE COURT:  I agree with that.  Can I ask a

3  question that, I think, was the subject of some discussion in

4  one of the prior arguments?  I think it may have been Judge

5  Bernstein who said wouldn't I be better off allowing the

6  District Court litigation to proceed, there's a jury there

7  who will make all the findings, and the whole process will

8  play itself out, and I will be guided by whatever comes out

9  of that.

10         I think that that question was raised by Judge

11  Bernstein.  I confess I don't recall what the response was.

12  So, I'd like to know.

13         MR. RHODES:  Again, this is not an issue of

14  standing, but since Your Honor has raised it, we will

15  certainly answer it.

16         The issues in the RICO case --

17         THE COURT:  Which I have, but as much fun as this

18  has been, I have not read the RICO complaint.  I will be

19  honest with you.

20         MR. RHODES:  Fair enough.  So, the issues in the

21  RICO case are different.

22         THE COURT:  Okay.

23         MR. RHODES:  That's why.

24         THE COURT:  Okay.  Well, obviously, the issues

25  that are here in front of me are particular.  I think there's

1  a broader question I'm asking and maybe this circles back to

2  the back and forth we had about getting a little bit of

3  context.  What happened with the U.S. Trustee?  Where are you

4  with the A&R case versus Sun Edison, versus Westmoreland,

5  versus the District Court litigation.

6          It's not typical that -- I mean this has to be

7  ground hog day for you.  I mean this is, basically, the third

8  nearly identical, fourth --

9          MR. RHODES:  If you count Westmoreland.

10          THE COURT:  Oh, right, the fourth argument that is

11  nearly identical, but the operative facts at a merits stage

12  would be different.

13          MR. RHODES:  Yes.

14          THE COURT:  If we got to the merits stage then the

15  question would be having determined that you have standing

16  the question would be what relationships did McKinsey or its

17  affiliates have with the creditor universe of this peculiar

18  debtor.

19          MR. RHODES:  Yes.

20          THE COURT:  And you would have the same inquiry,

21  but the different universe of facts and parties in Sun

22  Edison, and Westmoreland, and A&R.

23          The question, I think, is a question judges ask

24  which is what should I be doing?  What's the most practical

25  and efficient way to proceed?  So, if there are three or four

1  courts that are answering a particular question what should I

2  be doing?

3          I will -- I think that this is in your papers.  It

4  is certainly in the argument.  I am cognizant of my own

5  responsibilities.  So, that much I get.  Again, I think Judge

6  Bernstein's question was can we get some of these questions

7  answered by somebody else and then I will be guided by that

8  and conduct a more focused hearing.  Where do I go with that?

9          MR. RHODES:  So, the issues in a RICO action are

10  different.  The elements to get a remedy are different.  The

11  result of the RICO action may well be a general verdict that

12  doesn't give any of the bankruptcy courts any guidance about

13  what the jury felt about McKinsey's conduct in any specific

14  case.  As Your Honor knows, contract litigation like a RICO

15  action, unless it's terminated on a motion to dismiss, can

16  take years to resolve.

17          THE COURT:  I don't disagree and I don't want

18  parties concerned that I'm asking about whether or not I

19  should stay this until a District Court litigation is all

20  done.  That is not going to happen.  I'm just trying to

21  figure out the interplay between the two.

22          One of the obvious concerns that comes up with any

23  kind of litigation is the prospect of inconsistent

24  adjudications on threshold issues.  If it gets to the merits,

25  I could easily see Judge Bernstein saying there's a problem,

1  this should have been disclosed because of the relationship

2  between entity A and this creditor where Judge Hennigan might

3  say that's not a material relationship or it wouldn't have

4  driven anybody's analysis.  That's a merits issue.  Again,

5  when you've got, essentially, the same parties and,

6  essentially, the same issues being raised courts are

7  cognizant of the prospect that we will head in different

8  directions.

9          MR. RHODES:  It's a perfectly fair question.

10 There is significant overlap in the facts, but what there is

11 not significant or really any overlap in is the claims.  The

12 legal issues that apply to those facts.  That is the problem.

13          THE COURT:  Okay.

14          MR. RHODES:  In bankruptcy, unlike in civil

15 litigation, we do not have the benefit of a multi-district

16 litigation panel, right?

17          THE COURT:  No, but you had that three judge

18 hearing. I haven't done one those and I'm not volunteering

19 either.

20          MR. RHODES:  Good.  So, just two more points.

21          THE COURT:  Sure.

22          MR. RHODES:  I hesitate to tread on, at least, the

23 first one.  Let me go to the second one.  The Luskin report

24 deals with Puerto Rico.  Section 327 does not apply under

25 promisa for Puerto Rico.  So, whatever the Luskin report

1  found or didn't find had nothing to do with McKinsey's

2  obligations under Section 327 or, frankly, Rule 2014 of the

3  Federal Rules of Bankruptcy Procedure.  What Ms. Gay didn't

4  tell you was that the Luskin report for all of the findings

5  that it made did recommend that McKinsey disclose its

6  investment connections.

7           Now, let me turn to the last one that I hesitate

8  to jump into, but I feel the obligation to because we have

9  twice now been accused to Your Honor of making false

10  allegations.  Now, we understand that they contest them.

11  That's fine.  But on the phone and by implication here -- on

12  the phone explicitly and by implication here today we were

13  accused of intentionally making false allegations.  Your

14  Honor, that is a very serious charge.  We object to it

15  vehemently.

16           Every single allegation in the motion before the

17  court has been checked, double checked and triple checked by

18  the evidence that we have accumulated and guess where we got

19  that evidence; mostly from McKinsey, mostly from the

20  disclosures that McKinsey has made in other cases, but not in

21  this case and mostly from the disclosures that McKinsey made

22  on the Labor Department website regarding its investment

23  connections.

24           So, we got the evidence, Your Honor.  And if Your

25  Honor has any doubt whatsoever about our good faith, and

 1  evidentiary basis for bringing this motion I would call Mr.

 2  Alix to the stand.

 3            THE COURT:  We're not doing that today, but I

 4  understand the point.

 5            MR. RHODES:  Thank you, Your Honor.  That's all I

 6  have.

 7            THE COURT:  All right.  Do we have anything

 8  further?

 9            MS. GAY:  Just very briefly, Your Honor.

10            THE COURT:  Sure.

11            MS. GAY:  I'm not going to repeat anything from

12  the cases we've already talked about because I think they are

13  in our briefs for sure.

14            THE COURT:  Okay.

15            MS. GAY:  I will say that, you know, the

16  suggestion -- and this is in our briefs, I'll be quick --

17  that you can make a, sort of, good faith claim or whatever;

18  I'm not quite sure what Mr. Rhodes said here, but you can

19  make a conjectural claim and then find discovery to find

20  understanding.  It is just not the law of this circuit.

21            One case that we didn't cite to Your Honor on that

22  is Huertas v. City of Camden, which is 245 Federal Appendix

23  168, 172.  I would also note that since Your Honor is reading

24  these cases so carefully that Woods that was cited for the

25  first time in rebuttal here is not a standing case at all,

1  which Mr. Rhodes has cited.  It's in the papers.  So, you can

2  find that there as well.

3           I would say, Your Honor, that the facts do matter.

4  This is not a situation where, yes, the RICO claims are

5  different then the bankruptcy claims, but the factual

6  assertion that there was no harm, no damage made by Mar-Bow

7  does matter.  I would say the facts do matter in terms of the

8  Puerto Rico report which finds the separation between the

9  investment affiliate and the consulting affiliates which is a

10 huge part of Mar-Bow's claim here to be solid, worthwhile,

11 diligent, ethical; all of those things.

12          So, I think the facts do matter.  The facts matter

13 that Mar-Bow has ignored issues like a look back period

14 that's used wide in the industry, has ignored separate

15 between investment affiliates and consulting affiliates; all

16 those things which I think, Your Honor, are for the court to

17 review the papers and see if there are questions.

18          To say one thing in one place and say something

19 else in another matters.  I think we've said enough today,

20 Your Honor.  We appreciate your time, but we are available if

21 there are questions that the court has about the papers we

22 filed here which we think not only firmly established that

23 Mar-Bow has no financial interest despite its thousand pages

24 of filings, but also really set out clearly what McKinsey has

25 tried to do in these disclosures and others as well.

1          So, thank you, Your Honor.

2          THE COURT:  Okay.  Mr. Rhodes, would you like the

3    last word?

4          MR. RHODES:  No.  Thank you, Your Honor.

5          THE COURT:  Thank you very much.  All right.  I

6    very much appreciate the argument and the submissions.

7    Obviously, I'm going to take the matter under advisement.  I

8    don't believe that both parties have offered to answer any

9    questions the court has.  I don't believe that I have any at

10   this time.  I am going to take the matter under advisement

11   and I expect to rule promptly.

12         Again, I very much appreciate the submissions and

13   the argument was particularly helpful.  We'll stand in

14   recess.  Have a good day.

15         ALL:  Thank you, Your Honor.

16      (Proceedings concluded at 11:55 a.m.)

17

18

19

20

21

22

23

24

25

1                                CERTIFICATE
2

3        I certify that the foregoing is a correct transcript
4   from the electronic sound recording of the proceedings in the
5   above-entitled matter.
6

7   /s/Mary Zajaczkowski_____            May 15, 2019
8   Mary Zajaczkowski, CET**D-531
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25