```
1                   UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE
2
                                    .  Chapter 11
3   IN RE:                          .
                                    .  Case No. 15-10541 (BLS)
4   SRC LIQUIDATION, LLC,           .
                                    .  Courtroom No. 1
5                                   .  824 Market Street
                                    .  Wilmington, Delaware 19801
6                                   .
                                    .  May 15, 2019
7                   Debtor.         .  10:00 A.M.
    . . . . . . . . . . . . . . . . .
8

9                       TRANSCRIPT OF HEARING
                 BEFORE HONORABLE BRENDAN L. SHANNON
10                 UNITED STATES BANKRUPTCY JUDGE

11  APPEARANCES:

12  For Mar-Bow Value         Marc Adrams, Esquire
    Partners, LLC:            WHITEFORD TAYLOR PRESTON
13                            405 N. King Street
                              Wilmington, Delaware 19801
14
                              - and -
15
                              Steven Rhodes, Esquire
16                            STEVEN RHODES CONSULTING LLC
                              Ann Arbor, Michigan
17

18

19

20
    ECRO:                     LACRISHA HARDEN
21
    Transcription Service:    Reliable
22                            1007 N. Orange Street
                              Wilmington, Delaware 19801
23                            Telephone:  (302) 654-8080
                              E-Mail:  gmatthews@reliable-co.com
24
    Proceedings recorded by electronic sound recording:
25  transcript produced by transcription service.
```

```
 1   APPEARANCES (Cont'd):

 2   For McKinsey RTS:          William Bowden, Esquire
                                ASHBY & GEDDES
 3                              500 Delaware Avenue
                                Wilmington, Delaware 19801
 4
                                - and -
 5
                                Faith Gay, Esquire
 6                              SELENDY & GAY
                                1290 Avenue of the Americas
 7                              New York, New York 10104

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

INDEX

2

Page

3

4

5

#1) Motion of Mar-Bow Value Partners, LLC, a Creditor, for Relief from Orders Under Bankruptcy Rule 9024 and Civil Rule 60(d)(3) [Docket No. 2392; Filed: 3/6/2019].

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (Proceedings commence 10:08 a.m.)

2        (Call to order of the Court)

3              THE CLERK:  All rise.

4              THE COURT:  Please be seated.  Good morning.

5        (A Chorus of "Good morning, Your Honor")

6              MR. ABRAMS:  Good morning, Your Honor.

7              THE COURT:  Mr. Abrams, it's good to see you.

8              MR. ABRAMS:  Good to see you.  Your Honor, this is

9    the date and time fixed by the court --

10             THE COURT:  It is.

11             MR. ABRAMS:  -- in connection with the motion for

12   Mar-Bow from relief from orders consistent with Your Honor's

13   determination last Thursday, the 9th.  Today's hearing is

14   devoted exclusively per Your Honor's ruling, to the issue of

15   standing.

16             I'd like to make introductions of my colleagues on

17   the Mar-Bow side.  Mr. Bowen through his introductions, then

18   we'll proceed to the argument.

19             THE COURT:  That sounds just fine.

20             MR. ABRAMS:  To my left is Steven Rhodes, Your

21   Honor.

22             THE COURT:  Mr. Rhodes, good to see you.  Welcome.

23   Welcome to Delaware.

24             MR. ABRAMS:  Lead counsel from Mar-Bow.  To his

25   left is Sean O'Shea from the Cadwalader firm.

1          THE COURT:  Welcome, sir.

2          MR. ABRAMS:  Also representing Mar-Bow.  Behind

3   Mr. O'Shea is Mr. Jay Alix, Your Honor.

4          THE COURT:  Mr. Alix, good to see you.

5          MR. ABRAMS:  Who is not licensed to practice law

6   in the state of Delaware but who, nonetheless, is in

7   attendance today.  Steve Gerald my colleague on Mr. Alix's

8   right.  And Dan Lemisch also counsel for Mar-Bow.

9          THE COURT:  Very good.

10          MR. ABRAMS:  Thank you, Your Honor.

11          THE COURT:  All right.  Mr. Bowen, we'll take

12   appearances.

13          MR. BOWDEN:  Thank you, Your Honor.

14          THE COURT:  Good morning.

15          MR. BOWDEN:  Good morning.  And may I please the

16   court, Bill Bowden of Ashby & Geddes from McKinsey Recovery

17   and Transportation Services.

18          Your Honor, at counsel table is Ms. Faith Gay from

19   the Selendy & Gay firm --

20          THE COURT:  Welcome.

21          MR. BOWDEN:  -- who will be making the

22   presentation on behalf of McKinsey RTS, as we refer to it

23   this morning, Your Honor.

24          Seated next to Ms. Gay is Maria Ginzburg, her

25   colleague at Selendy & Gay.

1           THE COURT:  Welcome.

2           MR. BOWDEN:  Also, from the Selendy & Gay firm is

3  Mr. Nick Klenow.

4           Your Honor from the Debevoise & Plumpton firm in

5  attendance we have John Gleeson.

6           THE COURT:  Good morning, sir, welcome.

7           MR. BOWDEN:  Erica Weisberger and Elie Worenklein.

8           THE COURT:  Very good.

9           MR. BOWDEN:  Thank you, Your Honor.

10          THE COURT:  Sure.

11          Good morning, Mr. Rhodes.

12          MR. RHODES:  Good morning, Your Honor.  And may I

13  please the court, Mar-Bow claims that McKinsey committed a

14  fraud on the court when it obtained entry of this court's

15  orders approving its employment and later than approving its

16  fees.

17          Mar-Bow claims that its fraud on the court was

18  McKinsey's concealment of its partners and its employee's

19  investment interest and interested parties and its

20  concealment of its client connections with interested

21  parties, all of which were disqualifying and all of which we

22  will prove.

23          Mar-Bow has standing to seek relief from those

24  orders.  Mar-Bow is bound by those orders.  It cannot pursue

25  litigation in any court as if it is not bound.  McKinsey

1  surely does not contend otherwise; although, it might be

2  worth asking counsel that question.  McKinsey wants Mar-Bow

3  to be bound by those orders and we agree we are bound.

4         That alone is reason enough to hold that Mar-Bow

5  has standing.  It simply cannot be our jurisprudence, Your

6  Honor, that a party that is bound by law to a court order

7  cannot later come to the court that entered that order and

8  say here is proof that the order that binds us was obtained

9  by a fraud on the court and that the order was infected by a

10 fraud on the court as we will prove happened in this case.

11        THE COURT:  What's the distinction between the

12 concept of bringing to the court's attention the prospect of

13 a potential or an actual fraud upon the court versus the

14 commencement of litigation and the prosecution of a motion

15 for a specific request for relief, attendant to that, the

16 right to conduct discovery, and all the bells and whistles

17 that go with litigation.

18        I think I'd like to understand the distinction

19 between those two.

20        MR. RHODES:  Sure.  In either event, the

21 proceeding is an equitable proceeding over which the court

22 has full and complete control; full and complete control to

23 determine the scope of the investigation, to determine the

24 scope of the hearing, to determine the sanctions, if any, to

25 be imposed, and to determine the distribution of those

1 sanctions.

2         THE COURT:  I don't disagree with that.  Had you

3 not purchased a claim, had your client not acquired a claim,

4 would you have the ability to be at that podium seeking

5 redress or remedy of the significant injury you allege has

6 occurred here to the process to the court?

7         MR. RHODES:  We would only be permitted to be here

8 with the court's permission.  In other words, if we had

9 simply written a letter to the court outlining our evidence

10 and attaching binder after binder, the court would have the

11 discretion then to set a hearing and the discretion then to

12 hear from us as to how we developed that evidence, to test

13 the credibility of it and, of course, to hear every parties

14 who have a stake in the outcome of it.

15         As I indicated a moment ago, this is entirely an

16 equitable proceeding in the court's discretion.  And later

17 on, when I have concluded my argument as to why we believe we

18 do have standing, we will argue that if the court determines

19 that we do not have standing, the court, nevertheless,

20 retains the discretion to appoint an investigator. And we

21 believe that we should be considered for that position, but

22 it's entirely up to the court.

23         So, but we believe that we have standing because

24 we are bound by the orders from which we seek relief, except,

25 perhaps, in some outlier cases the peculiarity interest test

1  that McKinsey asserts for standing is not and has never been

2  the law in bankruptcy cases and is not the law in the Third

3  Circuit.  Hopefully, it will never be.

4        The practical reality of the great majority of

5  bankruptcy cases, Your Honor, is that unsecured creditors

6  have no financial stake in the outcome because there are no

7  assets for them.

8        So, for example, does McKinsey argue that in every

9  no asset Chapter 7 case, for example, Article III deprives

10  every unsecured creditor of the right to be heard?  Does

11  Article III deprive a creditor of the right to file an

12  objection to a discharge?

13        THE COURT:  Well, I think that might be trying to

14  extend that principle a little bit too far. We start with the

15  proposition that you have a no asset seven.  But an unsecured

16  creditor has, at least, a contingent right if in some

17  debtor's sock drawers found a lottery ticket or if the

18  trustee --

19        MR. RHODES:  Which happens.

20        THE COURT:  Which happens.  Not often enough, but

21  it happens.  Or if the trustee, for example, manages to

22  unwind the secured claims, the security interest of a

23  creditor, et cetera.  At the outset of a case, obviously,

24  every lender stands at that podium and says those jokers are

25  out of the money.  Stop listening to them.

1          We still listen to them.  We appoint committees.

2  I think the Code contemplates that those rights are

3  respected.  But at the conclusion or once rights are fixed,

4  at that point, then I think courts are much much less

5  inclined to say that you have the ability to seek relief from

6  the court that has no impact on you.

7          And it goes in both directions.  Often, part of

8  the argument against a creditor who is seeking relief is

9  they're paid in full.  How is it that they can object?  There

10  is no remedy that you can give.  You can't get more than

11  full.

12          And, likewise, you're not getting anything.  And

13  if you prevail, you will not get anything so, Judge, what is

14  the relief that would be accorded.

15          And I understand and I read carefully your papers.

16  The idea that the court has certainly broad discretion to

17  formulate a remedy.  But, again, that's sort of a three-stage

18  step of saying let us prosecute the case.  Let us prove our

19  case.  Let you fashion a remedy that then if you choose

20  perhaps ignores the plan.

21          And I understand the back and forth about whether

22  parties are bound by the plan at this point for purposes of

23  distribution of whatever might come in, in that context.  But

24  at the end of the day, the court could give us something so

25  that gives us standing.  That seems to me to be an attenuated

1  proposition.

2          MR. RHODES:  Okay.  But the premise of the court

3  could give us something is the conclusion legally that a

4  pecuniary interest is necessary.  And what I want to argue to

5  the court is that under applicable Third Circuit law and

6  Supreme Court law that pecuniary interest is not necessary.

7          And the reason I assert that is never in the

8  course of a Chapter 7 case or, more pertinently, here a

9  Chapter 11 case is a party required to show, as Your Honor

10 has pointed out, as a condition of standing here at the

11 podium that they have a pecuniary interest in the outcome of

12 any particular issue, whether it's cash collateral or --

13          THE COURT:  Anything --

14          MR. RHODES:  -- appointment of a creditor -- or --

15          THE COURT:  Retention or rejection of a contract,

16 et cetera, et cetera.

17          MR. RHODES:  Or exactly, or approval of a

18 disclosure statement or even plan confirmation.

19          We don't really ever ask a creditor to say what's

20 your standing, what's your pecuniary interest here.  And the

21 reason we don't ask that has been answered by the Supreme

22 Court itself.

23          McKinsey's own brief cites an en banc decision

24 from the Third Circuit called Global Industrial Technologies.

25          THE COURT:  I have it.

1        MR. RHODES:  And in that case, the court said,

2            "We have noted the contours of the injury-in-fact

3             requirement while not precisely defined, are very

4            generous."

5        And it cited its own prior decision in Bowman v.

6    Wilson.  And the court said,

7            "The standard is met as long as the party alleges

8    a specific identifiable trifle of injury," quoting a Supreme

9    Court case colorfully, "or a personal stake in the outcome of

10   the litigation," citing, again, its own prior case in Pitman

11   vs. Fisher.

12       And then it cites Congoleum for the proposition,

13   "Article III standing need not be financial and only need be

14   fairly traceable to the alleged illegal action."

15       And it goes on to talk about a Seventh Circuit

16   case.  United States Court of Appeals for the Seventh Circuit

17   described a party-in-interest as anyone who has a legally

18   protected interest that could be affected by a bankruptcy

19   proceeding.  Citing and quoting the James Wilson case.

20       And the court goes on,

21            "That party in interest test comports with our

22            Own definition of party-in-interest.  As well, he

23            has a sufficient stake in the proceeding as to

24            require representation."

25       Amatex that's a prior Third Circuit case as well.

1   We, thus adopt --

2              THE COURT:  So, in this case is the claim that

3   Mar-bow has in the SRC case the protectable interest or is it

4   an interest that we all have in the integrity of the process

5   and the sufficiency of the disclosures that are made.

6              What's the. . .

7              MR. RHODES:  And, of course, it's both, Your

8   Honor.

9              THE COURT:  Okay.

10             MR. RHODES:  Mar-Bow stands in the shoes of its

11  transferor.  Its transferor was a creditor in the case.  If

12  the creditor had standing, has standing because it was a

13  stakeholder in the action, then we do too.

14             But in the Global case, the Court of Appeals went

15  onto say,

16             "In applying the teachings of James Wilson and

17  Amatex --"

18             The two prior cases --

19             --"we are guided by our previous statement that

20              Section 1109(b) must be construed broadly to

21             permit parties affected by a Chapter 11 proceeding

22             to appear and be heard."

23             That's the standing test.  Parties affected by a

24  Chapter 11 proceeding.

25             Every creditor in a Chapter 11 proceeding is

1  affected by it.  It's affected by it because, as a result of

2  the proceeding, it can no longer exercise its prepetition

3  rights against the debtor or the debtor's property.

4         So, why I ask, Your Honor, are Article III

5  standing and the standing under the Bankruptcy Code Section

6  1109, why are they effective coextensive?  That's the

7  language from the Third Circuit in Global Industrial

8  Technologies.  Why are they co-extensive, and here's the

9  reason.

10         A bankruptcy case is not an *in personam* action as

11  ordinarily seen in a District Court.  A sues B on a claim

12  recognized in law or in equity and as to which it is readily

13  discernible in most cases whether A has a pecuniary interest

14  or some other legally recognized interest in the outcome.

15         But in Central Virginia Community College vs.

16  Katz, the Supreme Court held that a bankruptcy case is an *in*

17  *rem* action in which the race is the debtor's property, of

18  course, and the issues are how to distribute the race.  And

19  whether and to what extent the debtor gets a discharge.

20         And in that case, of course, the court was relying

21  on its earlier decision in Gardner vs. New Jersey.  The whole

22  bankruptcy process, the court there said is an "Adjudication

23  of interest claimed in a race."

24      And, similarly, in Tennessee Assistance Corp vs. Hood,

25  the court stated,

1           "A bankruptcy court's *in rem* jurisdiction permits

2           it to determine all claims that anyone, whether

3           named in the action nor not, has to property or

4           thing in question."

5       All claims.

6       THE COURT:  I don't disagree with any of that.

7  And, again, I think that your description and discussion

8  about the distinction between classic litigation across the

9  street in the District Court, A vs. B, the bankruptcy

10 proceeding is be definition a collective process.

11          While a landlord may be angry with and litigating

12 with its counterparty who's a debtor, the court is cognizant

13 of the position of a creditors committee, an entity that does

14 not exist across the street.

15          The court will listen, for example, to the

16 debtor's secured creditor who would likely not be able to

17 intervene in a lawsuit between tenant and landlord, but would

18 clearly be considered, in this case.  So that's not

19 necessarily a proposition that's in dispute.

20      MR. RHODES:  Right.

21      THE COURT:  The question is in this case, again,

22 those parties in a bankruptcy proceeding those parties have a

23 remedy or are seeking a remedy or relief as to the race.

24          And the question I have is are you seeking a

25 remedy as to the race or relief as to the race that is the

1  matter that is -- that is the predicate for the exercise of

2  my jurisdiction?  Because here's the problem I have.

3          And I think we're making progress on it. This is

4  actually very helpful.

5          I think you're telling me -- it's not an argument

6  in the alternative.  You're telling me that you don't

7  necessarily need a pecuniary interest, an economic stake, the

8  ability to take money out of this case.

9          Though your point is, although, Judge, I have

10 that. And, again, I understand the other side disagrees.  But

11 your point is that I am by virtue, I guess, of being a

12 creditor, I am a party interested in this proceeding, even if

13 I can't get more money out of it, I'm entitled to appear and

14 be heard.

15         Do I have that right?

16         MR. RHODES:  That's exactly right because in the

17 broadest sense when we talk about do we not, a remedy that

18 relates to the race of the estate, the answer to that is

19 clearly yes because what we're talking about is a remedy that

20 relates to the administration of the race.  It is the

21 administration of the race that we contend was corrupted by

22 the fraud of McKinsey here.  To put it in its most concise

23 point that's exactly what is going on here.

24         So, who in a bankruptcy case does have a legally

25 recognizable interest in the outcome?  Who has a legally

1 recognizable interest in the debtor's assets or in the

2 debtor's discharge?  And, most importantly, who has a legally

3 recognized interest in the administration of the debtor's

4 assets and in the very integrity of the process.

5         In Section 1109, legally recognizes that creditors

6 and even equity security holders have that right in every

7 Chapter 11 case.  And nothing in Article III would say no to

8 that.  Article III contemplates *in rem* jurisdiction.  It

9 does.

10        THE COURT:  If your claim had been paid in full or

11 otherwise satisfied in its entirety, would you be able to

12 still be here?  I'll give you an easy example.

13        Early in a case, the debtor files.  The debtor is

14 a counterparty to a contract with your client or with the

15 predecessor to your client.  The debtor determines to assume

16 and sign over to somebody who's interested in taking that.

17 And the court approves under 365 the assumption and

18 assignment.

19        Cure is satisfied.  Cure will be whatever it is.

20 There's no argument about that.

21        At the outset of the case, there's no question

22 that there is a claim.  It's contingent.  It depends upon

23 whether or not there's an assumption or a rejection, et

24 cetera.  And here we are.

25        Would that give rise to the ability to seek relief

1 in this court?  That's a creditor.  That's an entity, at

2 least, who's no longer a creditor because their claim has

3 been satisfied, but clearly would still be bound by the

4 orders that were entered while it was the subject to the

5 proceeding.  Could that party show up?

6          MR. RHODES:  The answer is I unequivocally yes,

7 Your Honor, and here's why.

8          There is in the law and in Rule 60 a clear

9 distinction between fraud on the court and fraud on a party.

10          THE COURT:  Right.  Okay.  So, what's the -- all

11 right, I get that.

12          MR. RHODES:  Okay.

13          THE COURT:  So then let me ask the next question

14 which is what's the distinction, say between what you're

15 doing and a whistleblower?  And, again, I do not pretend to

16 understand what I think is some pretty complex law about

17 whistleblowers and there's statues and everything else.

18 That's not what we're talking about.

19          But you mentioned it yourself a few minutes ago

20 one of the things you could have done was send a letter to

21 the court.  Anybody can send a letter to the court.  I open

22 my mail.  And I would probably -- I would be obliged to do

23 something or give it the attention it deserved.

24          What's the distinction between the two?  Are you a

25 whistleblower in this case?

1           MR. RHODES:  Well, not in the sense that we are a

2   whistleblower without standing who's a volunteer and just a

3   good citizen.

4           THE COURT:  Right, well that's what they're

5   accusing you of is being a volunteer.  That your --

6           MR. RHODES:  Right.  They say we don't have

7   standing.  We say we do.  That's the distinction between the

8   two.

9           We say we have a right to be here.  They say we

10  don't.  And I don't know whether they would concede that Your

11  Honor has the authority to allow us to proceed if we don't

12  have standing or not, but that's not before the court right

13  now.

14          So, our position is that we do have standing.  And

15  that Article III which surely recognize that in an *in rem*

16  action like a bankruptcy case, all interested parties have

17  the right to be heard on any issue because Article III

18  contemplates not just process, but more than that, fair

19  process, due process.  And where's the fair process or due

20  process for a creditor that is denied the right to be heard

21  before its rights against the debtor and the debtor's

22  property are foreclosed?  There isn't any.

23          And where's the fair process or the due process

24  for a creditor that's denied the right to be heard after its

25  rights against the debtor and the debtor's property have been

1   foreclosed, what it can prove that that process was infected

2   by a professional's fraud on the court.

3          Again, Your Honor, there is none.  And all of that

4   is why Article III standing and standing under the Bankruptcy

5   Code are effectively coterminous and coextensive as the Third

6   Circuit has held.

7          Now logically, of course, we've all been around

8   long enough to know that it is the parties with the pecuniary

9   interest in a case that is those who's claims are in the

10  money are the parties whose claims are satisfied by

11  definition, at last in part, and they are, therefore, the

12  parties most likely to be content with the outcome, to the

13  extent creditors are ever content with a bankruptcy and most

14  likely to be concerned about fraud on the court.

15         But it's more likely that the parties whose

16  prepetition rights have been foreclosed after receiving

17  nothing that they will be the parties who are concerned about

18  fraud on the court and we hope Article III is wise enough to

19  recognize that distinction.  But it's worse than that, Your

20  Honor.

21         Hypothetically what happens under McKinsey's

22  highly restrictive view of Article III standing if the only

23  party with a pecuniary interest in the case is a McKinsey

24  client; or a McKinsey client that McKinsey has concealed from

25  the court; or the only party with a pecuniary interest is an

1   entity, again, concealed by McKinsey in which McKinsey

2   partners and employees have an interest, again concealed by

3   McKinsey.

4           What would Article III say then?  What would it

5   say to the creditors?  Too bad.  Sorry.  Only McKinsey's

6   client or only the entity in which McKinsey's partners hold

7   equity interest can object to McKinsey's employment or object

8   to its fees or a claim that McKinsey committed a fraud on the

9   court?  Would Article III really require that --

10          THE COURT:  I don't think though that they're

11  arguing that in that case, for example, you've got -- let's

12  take a typical case where equity gets wiped out.

13          I don't know that they would argue if the case was

14  run, the court confirms the plan, typical result.  Equity

15  gets wiped out, unsecureds get whatever pennies they get.

16  And then debtor's counsel shows up and says here's my fee

17  application.  And I'm not satisfied that they're arguing or

18  that the court would look at an equity holder who came in and

19  said I am objecting to their fees.

20          And we'll leave the drama aside.  I'm objecting to

21  their fees.  They're too high.  It's unreasonable under 327,

22  330, 331, ya de ya de ya.

23          I'm not certain that where somebody says you're

24  not going to get a recovery that I would say you don't have

25  standing.  It may impact the significance I attribute to the

1   claim or to the argument.  In that instance, for example,

2   where the equity holder stands up and says Smith and Jones

3   limited liability -- you know, the firm charged $2 million

4   dollars.  This should have been a million-dollar case.

5           Okay.  Then I'll order it disgorged and it goes to

6   the unsecured creditors through their trust.  And if I do

7   that, you still don't have any stake, but arguably you have

8   the right to stand up and make that argument.

9           And then if you've got that further theory that,

10  well, you know, if all that money pays all the unsecureds and

11  maybe you get something or you don't, but I think you still

12  have standing.

13          MR. RHODES:  We agree one hundred percent, Your

14  Honor.  But I don't think McKinsey is arguing that.  I think

15  McKinsey would say if that equity security holder does not

16  have a stake in that specific fee application because they're

17  not going to get money from it if the application is denied,

18  then they don't have standing.  But I don't think Article III

19  goes that far because as the Third Circuit said Section 1109

20  and Article III are coextensive.

21          But, again, it's worse than that, Your Honor,

22  because even if -- all right, just to get right to the heart

23  of it.

24          This hypothetical that I have presented to the

25  court in which we're concerned that only Article III

1  connections have standing under McKinsey's test.  It's not so

2  hypothetical.  It happened.  It happened in the A&R case.  In

3  the A&R case, that's the Alpha Natural Resources case in the

4  Eastern District of Virginia.

5          In that case, McKinsey concealed from the court

6  the U.S. Trustee and the creditors its partners indirect

7  equity interest managed by the MIO and secured creditors that

8  acquired the debtor's assets in that case, managed by the

9  MIO.  And that investment resulted in an illegal profit to

10 McKinsey's partners of $50 million dollars.

11         And yet in the A&R case, McKinsey has argued that

12 under Article III only creditors with a pecuniary interest

13 have standing to assert fraud on the court.  Only the

14 creditors that got assets in the case.

15         THE COURT:  Well that matter is under advisement

16 right now before Judge Huennekens.

17         MR. RHODES:  It is.

18         THE COURT:  And standing is likewise under

19 advisement before Judge Bernstein as well.

20         MR. RHODES:  It is.  It is.

21         And I don't mean to argue those cases here, but

22 I'm trying to point out that the argument about pecuniary

23 interest under Article III that McKinsey makes can in some

24 cases lead to the result that only McKinsey connected

25 entities have standing.  And that cannot be what Article III

1    reads.  It just can't.

2           Now, I'll turn to the argument that even if the

3    court determines that Article III requires more about a show

4    that it has a pecuniary interest.  We do, at least, for

5    standing purposes.

6           Your Honor has already indicated familiarity with

7    this.  You have seen that the parties have presented

8    different perspectives on how any sanctions against McKinsey

9    might be or should be distributed.  In fact, there are a

10   (indiscernible) number of such possible distribution

11   scenarios.

12          One of those scenarios is the one that we would

13   argue which is that under the Supreme Court's case in

14   chambers, the court has discretion.  And the court should

15   exercise that discretion in a way that doesn't benefit

16   McKinsey, either directly or indirectly.

17          We have to be careful about that.  We have to have

18   full knowledge of what McKinsey's investments and client

19   connections are before we can make that determination.  But

20   Your Honor could also well determine that the distribution

21   should go to the unsecured creditors, of which Mar-Bow is

22   one.

23          Now is that speculative?  To some extent, it is

24   but all of the scenarios are --

25          THE COURT:  Right, I have the limited submissions

1  from the reorganized debtor and from the secured creditor

2  trust, both of whom claim --

3          MR. RHODES:  Of course.  But now is not the time

4  to decide all of that.

5          And in terms of the extent to which our scenario

6  was speculative or another scenario was speculative so is it

7  speculative that there is a lottery ticket in the sock

8  drawer.

9          THE COURT:  Can I ask some context questions,

10  please.

11          MR. RHODES:  Sure.

12          THE COURT:  Obviously, this is coming to me in an

13  unusual format.  You're in front of Huennekens.  You're in

14  front of Bernstein.  You're in front of Jones.  There's a

15  complaint in the Southern District, as well that's in the

16  Southern District, District Court --

17          MR. RHODES:  Yes.

18          THE COURT:  -- that's a RICO action.

19          I have had an opportunity to review, at least

20  broadly, the proceedings in Virginia and New York.  I think,

21  as far as I can, the proceedings in Texas are procedurally

22  different.

23          MR. RHODES:  They are.

24          THE COURT:  The other cases are post-confirmation

25  and certainly longer.  Westmoreland is still, I think, it's

1  preconfirmation, right?

2          MR. RHODES:  Well, there was a confirmation of

3  some of the debtors in the case, but you are right that the

4  issue of McKinsey's employment in the case under Section 327

5  is still open.

6          THE COURT:  Is still open.  Okay.

7          So what's the significance of the settlement that

8  was approved at the three-Judge hearing with the U.S. Trustee

9  and McKinsey and how do I deal with that?  Because I think

10 one of the arguments McKinsey is going to tell me is that to

11 the extent that somebody has standing or somebody ought to be

12 policing this process, it's the U.S. Trustee.  And the U.S.

13 Trustee is onboard.  And, by the way, Judge, your case is

14 actually listed in the settlement.

15         How do I deal with that?

16         MR. RHODES:  Okay.  So, Mar-Bow as not a party to

17 that, first of all.  Second of all, the settlement papers

18 which we can provide to you if you haven't already seen.

19         THE COURT:  I have them.

20         MR. RHODES:  Okay.  So, you can see that they

21 clearly provide that all that's being settled there are the

22 U.S. Trustee's concerns about McKinsey's disclosure issues

23 under Rule 2014.

24         It explicitly states that the settlement does not

25 cover an issue of McKinsey's disqualifications or fraud.  And

1  that's where we are.

2         The U.S. Trustee's program, when it was

3  negotiating and settling with McKinsey in this matter and it

4  resulted in a $15 million dollar settlement in those, for

5  those three cases.  Did not have the benefit of the evidence

6  that we have accumulated of McKinsey's fraud on the court in

7  those cases and in this case and in other cases, as well,

8  Your Honor.

9         So, our position is that that settlement has no

10  impact whatsoever here and should have no impact whatsoever

11  here.  It's a different party with different claim that

12  decided in its own discretion to settle. Okay.

13         Before closing, Your Honor, I want to address what

14  I think, at least is the closest bankruptcy case on point and

15  that's the Denison case.  Denison vs. Marina Mile Shipyard

16  2012 W.L. 75768 --

17         THE COURT:  I have it.

18         MR. RHODES:  Okay.

19         So, in that case, --

20         THE COURT:  The brokers.  These are the brokers.

21         MR. RHODES:  Yeah, the brokers.  A creditor and a

22  post-confirmation planning. This debtor filed a motion

23  seeking disgorgement by the brokers of their commission that

24  the court had approved and they argued fraud on the court in

25  concealing an actual conflict of interest.  Something like

1  what we have here.

2          The brokers responded what these parties had no

3  standing because of the terms of the confirmed plan.  Again,

4  like what we have here.  But the court rejected the broker's

5  argument concerning the moving parties standing.

6          It held,

7          "The Bankruptcy Court had authority to order

8          disgorgement of the fees paid to the brokers based

9          on a finding of fraud on the court.  Under such

10         circumstances, the means by which the fraud was

11         brought to the court's attention is

12         inconsequential."

13         And the court explained why.  And Your Honor

14 understands this already.  It's an -- fraud on the court is

15 an unconscionable plan or scheme, the court said, designed to

16 improperly influence the court in its decision.  And the

17 court rejected the standing argument, but it's important to

18 see why.

19         The court rejected it not because it found that

20 the moving parties had standing, but because the parties'

21 standing did not matter.

22         THE COURT:  So here -- I guess, here's the next

23 step of that.

24         MR. RHODES:  Yeah.

25         THE COURT:  Again, I don't think -- and I'll hear,

1  obviously, from your friends to your right in a moment.

2          I think we started with the distinction between

3  the concept of bringing to the court's attention, the

4  prospect of a fraud on the court and the inherent obligation

5  or, at least, the opportunity that the court should take to

6  investigate and remedy.

7          MR. RHODES:  Right.

8          THE COURT:  I get that.  The question is whether

9  or not that party who brings to the court's attention that

10 issue is able to file a motion, to prosecute a motion, to

11 demand and obtain discovery and to seek a particular relief.

12         And I don't want to go in circles, but I wan to

13 circle back to either the whistleblower concept or the

14 volunteer issue because this is really where they're coming

15 after you.  And I want to make sure I understand your

16 argument.

17         Imagine that you're across the street and you're a

18 bartender.  And because this is -- you're within two blocks

19 of 8th and Market, everyone understands bankruptcy.  And the

20 fellas at the bar at congratulating each other on how they

21 blew one past Judge Shannon by authorizing this, et cetera.

22         In that instance, you are welcome to write a

23 letter or tell me when I get over there --

24      (Laughter)

25         THE COURT:  -- and, at that point, I would have, I

1 think, the responsibility that you've described in your

2 papers.

3          MR. RHODES:  Yes.

4          THE COURT:  The court has an obligation to ensure

5 and maintain the integrity of the court process and that's

6 the fraud on the court, whether it's an exception to

7 standing.  Your kind of accused of saying that you're

8 creating this exception to standing.  That's in their papers.

9          But I'm not certain that I would say file your

10 papers, or demand discovery of the lawyers that were sitting

11 in front of you.  So, I think I want you to navigate that for

12 me.

13          And if I'm not been clear then I'll try to clarify

14 it a little bit, but. . .

15          MR. RHODES:  No, you've been clear.

16          And the answer is when you get a letter like that,

17 the first thing you have to do is make a judgment about

18 whether there's something here worth pursuing.

19          THE COURT:  Right.

20          MR. RHODES:  Judges get these letters all the

21 time.

22          THE COURT:  Sure do.

23          MR. RHODES:  If you decide there is, then the next

24 question what, what do you do?  You're not going to appoint

25 the bartender to come to court and present the evidence.  But

1  you've still got to figure out what to do.

2          You might refer it to the U.S. Trustee.  You might

3  appoint an examiner or other kind of an investigator to do an

4  investigation and present findings.

5          THE COURT:  Now there was some colloquy between --

6          MR. RHODES:  Yeah.

7          THE COURT:  I had a chance to review the

8  transcript and there was some colloquy, I think, between you

9  and Judge Bernstein about what remedies are available in that

10 respect because, obviously, the examiner is a pre-

11 confirmation remedy.  But the idea is the Code, I think your

12 response was the Code can't handcuff a court if it's obliged

13 to investigate.

14         MR. RHODES:  Well, that's right.  I pointed out to

15 the Judge that the appointment of an examiner is a

16 preconfirmation thing.  And he said well we have ways of

17 getting around that.

18         THE COURT:  Yeah.

19         MR. RHODES:  And again, I would say to the court

20 that because of the importance of a fraud on the court issue,

21 the court has the discretion to appoint a person, whatever

22 you decide to call it -- examiner, investigator, expert

23 witness.  It doesn't matter what you call.

24         What matters is do they have authority?  Do they

25 have resources?  Are they qualified?  Are they disinterested?

1  And we can talk about what all of the selection criteria
2  might be.

3          The court has complete authority to do that.
4  Where it would get the resources becomes a more challenging
5  question and we can talk about that too.  But that's in the
6  case of the bartender making the request.

7          We're not bartenders, Your Honor.

8          THE COURT:  I gather that.

9          MR. RHODES:  We're creditors.  We're creditors.
10 And under the Third Circuit of the Supreme Court, we assert
11 we have standing, therefore.

12         Of course, Your Honor retains the discretion to
13 determine the scope and the timing of every investigation of
14 any discovery that might be done here.

15         And we implore the court if it determines that a
16 pecuniary interest is necessary and that we do not have a
17 pecuniary interest, contrary to our argument, to proceed to
18 appoint an investigator in this matter regardless.

19         We urge the court to hear from all interested
20 parties including us as to what the selection criteria should
21 be and who that person should be.  You might ask us for
22 nominees, for example.

23         We would certainly ask the court to consider Mar-
24 Bow as that investigator.  We have the resources.  We have
25 accumulated now three years' worth of information about

1 McKinsey's connections that it has not disclosed, both on the

2 client's side and on the investment side.

3       We would fully cooperate with any investigation,

4 of course.  But what is at stake here as Your Honor has

5 pointed out is the integrity of the court's process.

6       We recognize that today's hearing is strictly

7 about standing and we have tried to hone to that, but in

8 deciding whether a fraud on the court claim merits for the

9 review and whether Mar-Bow is the appropriate entity to

10 conduct that review, we ask the court to recognize some key

11 facts here.

12       Mar-Bow in McKinsey's response nowhere does it

13 deny owning a financial interest in Credit Suisse and Bank of

14 America, some of the DIP lenders to Standard Register.

15       Nowhere does it deny owning financial interest in

16 nine interested parties who were creditors that stood to

17 benefit from McKinsey's restructuring advice to the debtor.

18       Nowhere does it deny the substance of our

19 allegations.  It argues procedural defenses, standing,

20 separateness of affiliates, disagreements about the

21 interpretation of Rule 2014; although, this case doesn't

22 involve Rule 2014.

23       It involves Your Honor's own order requiring

24 McKinsey to disclose its connections because this was a 363

25 appointment not a Section 327 appointment.

1          THE COURT:  Can I ask a question? When you're

2    talking about the appointment issue, I'm not certain that its

3    relevant to the standing inquiry, but the parties have

4    sparred back and forth about who's a fiduciary.  Whether

5    McKinsey is a fiduciary.

6          Does that weigh into what standard is imposed upon

7    them in the context of that investigation and what would be

8    looked into or is that relevant to the standing inquiry?

9          I'm not certain what I'd do with that argument.

10         MR. RHODES:  I would say that primarily it goes to

11   the merits of McKinsey's obligations and whether it breached

12   those obligations.  Judge Huennekens told McKinsey that it is

13   a fiduciary so we don't think there can be any dispute about

14   it.  It has, nevertheless, maintained ever since then still

15   that it is not a fiduciary.  It's --

16         THE COURT:  I'm not certain that there's a heck of

17   a distinction.  I saw in the transcript that Judge -- or in

18   your submissions because it wasn't in the transcript from the

19   standing argument, I believe.

20         MR. RHODES:  Right.

21         THE COURT:  But in the submissions that Judge

22   Huennekens had made that comment.  I'm not certain of that.

23   I think that as with counsel, McKinsey is employed by a

24   fiduciary.  But I represented, you know, at that podium

25   debtors forever.  I never regarded myself as a fiduciary by

1  any stretch.

2       I'm a lawyer with a client.  If I had fiduciary

3  obligations, I'm not sure what I would do with that.  My

4  client is the fiduciary.  And my responsibilities are bounded

5  by the Code and the rules and, obviously, the Rules of

6  Professional Conduct.

7       But I don't think it -- I think I agree with you

8  that it goes to the merits question.  But I'm not certain

9  that really drives the analysis that --

10      MR. RHODES:  Well, at the appropriate time I'll

11 have an opportunity to brief it and we will argue to the

12 court many many cases that hold that professionals are

13 fiduciaries.

14      THE COURT:  Are fiduciaries.

15      MR. RHODES:  Now, there's a distinction to be made

16 here and I think it may be the one that Your Honor is

17 focusing on.

18      It is our position that McKinsey is a fiduciary to

19 the court.  It has obligations to the court.  They may not be

20 fiduciaries to the debtor and I think that's what Your Honor

21 is focusing on.

22      THE COURT:  Well that's certainly the case, for

23 example, with counsel.  Counsel are officers of the court.

24 The word fiduciary gets thrown out.  Justice Clark has his

25 comment.  He says a man is a fiduciary is simply to begin the

1  inquiry.

2          I'm not -- but that word gets thrown around all

3  the time.

4          MR. RHODES:  You're right.

5          THE COURT:  And when you think about it in some

6  ways, you could, especially if you're thinking about

7  fiduciary duties in the classic, you know, sort of Delaware

8  corporate law, you would be drastically reducing the scope of

9  responsibility of a party that you would want to call a

10 fiduciary.

11         Yes, to satisfy their duty of care they have to

12 have a pulse and an I.Q. above room temperature.  And, you

13 know, their duty of loyalty is satisfied by not being on both

14 sides of a transaction.

15         And I mean no disrespect.  But, you know, that

16 concept gets to be -- the throwing around of that term and

17 its accompanied with, you know, the comment to the quote you

18 have from Cardozo with the punctilio of --

19         MR. RHODES:  It's a good quote.  We like it.

20         THE COURT:  It is a good quote.  But my question

21 was -- I think you've answered my question though because

22 it's not really driven by that issue.

23         MR. RHODES:  No.

24         THE COURT:  And by that definition.

25         MR. RHODES:  But in the context of bankruptcy what

1  it means for a professional, whether a lawyer or a financial

2  advisor, to be a fiduciary means a duty of candor to the

3  court, a duty to comply with Rule 2014, a duty not -- a duty

4  of loyalty.  A duty of loyalty to the debtor.

5          And the reason we have Section 327 is to enforce

6  the professional's duty of loyalty.  That's why we have

7  Section 327.

8          In the end, however, because Mar-Bow is bound by

9  the orders that it seeks relief from, due to McKinsey's fraud

10 or for other reasons, we believe that Mar-Bow does have

11 standing to ask this court to find that those orders were

12 entered by a fraud on the court.

13         THE COURT:  Okay.  Let me do this.  We'll take

14 just a two-minute break and then we'll reconvene for the

15 responsive argument.  And, Mr. Rhodes, I'll hear from you in

16 reply at your convenience.  All right.

17         MR. RHODES:  Thank you.

18         THE COURT:  All right, we'll stand in recess.

19     (Recess at 10:54 a.m.)

20     (Proceedings resumed at 11:01 a.m.)

21         MS. GAY:  Your Honor, thank you.  Thank you for

22 taking so much time to listen to this important argument.

23         THE COURT:  Happy to oblige.

24         MS. GAY:  Obviously, today we're going to talk

25 about standing.  I just want to say since my colleague, Mr.

1  Rhodes, has mentioned so many times fraud on the court;

2  obviously, McKinsey and its employees, and McKinsey standing

3  behind its employees in the RTS business passionately,

4  passionately, Your Honor, dispute what has been said here,

5  they are hardworking, diligent, honest competitors in the

6  space.  They intend to stay that way.  And while we won't go

7  into the evidence now, we think we've submitted quite a bit

8  to Your Honor to show what this case is really all about

9  which is a good faith dispute as Judge Isgur said about how

10 Rule 2014 is to be followed.

11         Mr. Rhodes is right that here we also have an

12 order for Your Honor that required disclosure, and McKinsey

13 diligently made disclosures there.  Its disclosures which we

14 can respond to at the right time from inquiry from the court.

15 I am certainly not here at all to say that the court's power

16 is limited.  And if the court has questions about our

17 submissions, we are happy to direct the court to narrower

18 parts, larger parts, whatever the court is interested in, but

19 that is a different thing as to whether Mar-Bow, a

20 competitor, comes into this court with standing.

21         Your Honor, you know, for quite a bit of time

22 today Mr. Rhodes has said things that I don't disagree with,

23 but they are hypothetical.  They are not about the actual

24 facts, the actual claims in this case.  And I submit to Your

25 Honor there is not a case in either party's briefs, and they

1 are voluminous, even though they're a little short on

2 standing, and anything that is cited on either side that says

3 you can proceed here, you being Mar-Bow, not you, Judge, but

4 Mar-Bow without a pecuniary concrete interest in the case.

5          Just quickly, I'm sure while the court still has

6 it on its mind, there were two cases that Mar-Bow cited in

7 its argument.  I'd just like to make clear the first one was

8 a Third Circuit case, Global Industry Technologies, where the

9 court made reference to the pecuniary interest at issue as

10 staggering.  That is on Page -- let me just make sure I have

11 the site.  It's right after Footnote 28, referring to the

12 interest of insurers in untried, and to be tried, and

13 currently tried asbestos claims.

14          It says,

15          "The plan's promise of a silica trust appears to

16          have staggeringly increased by more than twenty-

17          seven times."

18          Talking about money, Your Honor.  The prepetition

19 liability exposure here.  So, that is a concrete pecuniary

20 interest if I've ever seen one.

21          The other case that was mentioned in argument is

22 the Denison case, Your Honor.

23          THE COURT:  From Florida, right.

24          MS. GAY:  Yes, Southern District of Florida.  And

25 there's two important points there.  The issue of fraud there

1   was brought up *sua sponte* by the judge.  It wasn't because

2   some other party was going to make itself a private attorney

3   general or prosecute it.  And on top of that it's also very,

4   very important here that there is not an argument at all

5   about the major creditor being that it was not a party in

6   interest.  In other words, the issue of the standing here; if

7   you look it says standing to proceed disgorgement.  It says

8   here the brokers have not argued it's not at issue that

9   Marina Mile, a major credit of the New River Dry Dock was not

10  a party in interest.

11          So, first of all, the court inquired *sua sponte*

12  and was exercising its rights *sua sponte*.  Secondly, there's

13  no dispute about the party in interest who was advancing the

14  claim here.  So, I don't think either of those are relevant.

15  And I will go in more detail because certainly Mr. Rhodes has

16  made a detailed presentation.  But I haven't seen a case,

17  ever, that said Article III standing doesn't apply in these

18  proceedings.  I don't know how it could.  And that requires a

19  pecuniary interest on these facts.

20          THE COURT:  I think I'd like you to respond

21  directly to the argument that was made from the podium, but

22  as well extensively in the briefing, that fraud on the court

23  is different.  That everything else contemplates, at a

24  minimum, a pecuniary interest because that's, at least, in

25  bankruptcy what we deal with.  You need skin in the game in

1  order to ask or petition the court for relief.

2          Standing is an interesting thing.  You could look

3  at it as an affirmative issue, a shield or a sword when you

4  think about standing.  Either standing is you have the right

5  to come into court, stand at that podium and ask me for

6  something and that would give you standing; or I could think

7  about the reverse of the coin which is am I able with

8  whatever authority I have closed, statutorily, or equitably

9  or otherwise to fashion a remedy for you.  If not, while you

10 may desperately seek my advice, guidance and relief, there is

11 nothing that I can do for you and, therefore, because I can't

12 provide relief to you, you lack standing.  There is, sort of,

13 two sides to that argument.

14          I think what I'd like you to respond to directly

15 is this issue that I think is a theme throughout their

16 submissions that fraud on the court is just different.  It

17 imposes a responsibility on the court and the quote that

18 they've pulled from the Denison case that it doesn't matter

19 where it comes from, who raises it to the court; everywhere

20 else it matters.  In bankruptcy court we care who asks,

21 again, because you ask whose money is this.

22          While it may not necessarily go to questions

23 purely of standing, it goes to the significance you attribute

24 to someone's objection.  The out of the money shareholder

25 probably has standing, I think, to object to somebody's fees

1  in that case.  We could argue about that, but I'd be more

2  likely to say, well, what are you doing, why are we here?  If

3  there's a remedy it doesn't go to you.  That is almost that

4  flipside of the standing argument.

5          So, I would like your precise response.  You

6  briefed it, but I would like the clarity from the argument.

7  Is fraud on the court different, 60(d)(3).

8          MS. GAY:  So, Your Honor, first of all, it is not

9  different at all.  This is not the first time this has been

10  raised, this particular issue has been raised.  This court is

11  here in a different situation then Mar-Bow is, obviously.

12  The court can do what it wants and I will get to that, but in

13  terms of whether fraud on the court grants some kind of

14  standing exemption for Mar-Bow to be able to prosecute its

15  claim in this court it does not.

16          There are three circuit cases that expressly

17  reject the same exact argument.  The first is a Ninth Circuit

18  case, <u>Herring vs. FDIC</u>, which is 82 F.3d 282, Your Honor,

19  from 1995.  In that case shareholders of a bank in

20  receivership argued fraud on the court by the FDIC.

21          THE COURT:  Right.  You briefed that.

22          MS. GAY:  Yes, exactly.  And the court refused and

23  says,

24              "Rule 60 does not grant anyone standing to bring

25              an independent action.  It merely does not

1          restrict someone who already has it."

2          So, you've got to be able to show you have

3 pecuniary interest that is concrete here.

4          The next case as well -- which all of these are

5 brief, Your Honor, but let me just tell you the three of them

6 since you have asked.

7          THE COURT:  Sure.

8          MS. GAY:  Kim Manufacturing v. Wilder, which is

9 817 F.2d 1517 from the Eleventh Circuit.  It says the same

10 thing.  It says,

11          "In no case, presented to us, has any court

12          anywhere provided standing to a non-party unless

13          that non-party's rights were directly and

14          concretely compromised by a final judgment."

15          Finally, in terms of the three circuit cites

16 there's a Seventh Circuit cite, Parvati Corporation v. City

17 of Oak Forest, which is 630 F.3d 512, Seventh Circuit 2010.

18 The same thing, it's saying that the movant has to have

19 standing to bring the case at the outset; otherwise, you

20 can't even -- these are all three fraud on the court

21 allegations, Your Honor, which leads us to the question of

22 what interest do they have.

23          What was sort of interesting to me today was, you

24 know, a very learned and scholarly argument by Mr. Rhodes,

25 but almost no discussion of what interests Mar-Bow does have.

1          So, just sort of looking back for a moment, first

2    of all, as you've noticed or as you've mentioned, Your Honor,

3    in the Southern District there is a pending litigation that

4    the motion to dismiss has been fully briefed and we are

5    weighing decision.  And in that case, Your Honor, Jay Alix,

6    who, of course, is the owner of Mar-Bow as he's presented

7    himself here, makes, as you've noted, the exact same

8    complaints about Standard Register.  And he also says in that

9    filing, which we have marked as exhibits in this case, that

10   there is -- let me quote,

11          "There is no proof that any debtor or interested

12          party suffered a financial loss."

13          He not only says it once.  He says it twice.  So,

14   Exhibits 2 and 3 to our response to the motion; here Mar-Bow

15   says,

16          "There is no proof in these actions that any

17          debtor or interested party suffered a financial

18          loss because of the defendant's scheme."

19          Same thing in their reply brief in the Southern

20   District action.

21          THE COURT:  Hang on.  Where was that reference?

22   I'm at your brief.  I'm at the --

23          MS. GAY:  These are -- what I'm reading from right

24   now, Your Honor, are Exhibits --

25          THE COURT:  I'm at Exhibit 2.

1    MS. GAY:  -- 2 on Page 8.  Exhibit 2 is

2  plaintiff's memorandum of law in opposition to a motion to

3  dismiss.  At the very top Jay Alix says, in that brief, first

4  line,

5         "There is no proof that any debtor or interested

6         party suffered a financial loss because of

7         defendant's scheme."

8         In Exhibit 3 to our papers in this case, Your

9  Honor, which is their follow-up brief, just in case there was

10  a mistake, it says again, first paragraph, Page 4,

11         "Alix has not alleged that any debtor or

12         interested party was, in fact, injured nor have we

13         argued otherwise."

14         So, that's for starters.  In addition, the lack of

15  a financial stake here, I think, is quite clearly

16  corroborated because this claim was bought after the plan

17  confirmation here, some three years ago; bought post-

18  confirmation and then sat silent for three years because

19  there was no financial harm to timely vindicate.

20         THE COURT:  Well, I have avoided any discussion

21  about, and the parties have briefed this a little bit, any

22  discussion about latches, or delay or --

23         MS. GAY:  Right.

24         THE COURT:  Because I don't think that that goes

25  to the standing analysis.

1          MS. GAY:  I agree with that.  I think that it is a

2    very vital argument, but I think it is separate, Your Honor.

3    Just to the issue of advancing a financial stake both in the

4    RICO complaint, which actually notes that Mar-Bow was aware

5    of this concern about Standard Register for four years.  If

6    there is a financial stake to advance, they were aware of it

7    pre-plan confirmation.  They were aware of it post.  I'm not

8    arguing latches, I'm arguing standing.

9          More to your point in the reply brief in this

10   matter --

11          THE COURT:  Hang on.  Is part of that analysis

12   also a waiver analysis because -- and, again, I know it

13   doesn't necessarily address the standing question, but what

14   you're saying is that I believe Mr. Toll filed a notice of

15   appearance in my case well before confirmation, after the

16   McKinsey retention, but that no submissions were filed, no

17   objections, et cetera.  Mr. Rhodes, I think, started off his

18   discussion by saying we are bound by orders and, therefore,

19   we are obliged to seek relief in this court.

20          Is there a waiver argument that travels with that

21   as well?  You had the opportunity to object to the fee

22   application and you didn't. It's not as if they weren't here.

23          MS. GAY:  Well, certainly, in the Southern

24   District RICO complaint, and we can pull out the exact cite

25   for the court, in the allegations about Standard Register it

1  is very clear that there was four years to the day, actually,

2  four years from yesterday Mar-Bow alleges that they brought

3  the Standard Register concerns to the attention of McKinsey.

4        So, I think when the court, itself, with its own

5  inherent authority, is considering what to do about these

6  allegations of fraud, which, again, we think are a dispute

7  about a rule, but one thing that the court can certainly look

8  at is latches, it can look at waiver, it can look at the

9  damage of sitting on a concern like that.  But I agree with

10 the court that that is not specifically a standing argument,

11 but I certainly think it's within the court's authority and

12 that the court should take a look at that because this could

13 have been resolved long, long ago if Mar-Bow had actually had

14 a real interest here.

15       So, in our reply brief, once we raised standing in

16 this particular case, they don't even attempt to argue a

17 concrete financial stake.  They don't address the plans

18 prohibition on post-confirmation transfers like the one that

19 Mar-Bow attempted here.  And it is their burden to establish

20 that, but I'd like to just briefly review for the court what

21 --

22       THE COURT:  Can I ask a question about -- and I

23 saw the briefing on that.

24       MS. GAY:  Yes, Your Honor.

25       THE COURT:  And I saw the restriction on the

1  transfer of these trust interests which I'm certain I didn't

2  focus on it in the context of this.  I'm not sure that that's

3  a typical feature.

4        How significant is that plan restriction on the

5  standing argument if the original holder, which was some

6  outfit called AAA or AA or something --

7        MS. GAY:  Right.

8        THE COURT:  -- would the standing argument --

9  would your standing argument be the same if AAA showed up and

10 said we want to find precisely these.  We're not Mar-Bow,

11 we're AAA, we are the holder of the claim.

12       MS. GAY:  Well, I think at this point the GUC

13 Trust might have standing, but I don't think, under the plan,

14 that anybody had standing at this point.  As far as I know,

15 from what we could see, because the movant doesn't allege it

16 here, they just drop in a footnote that they have a claim.

17 The claim was attempted to be purchased in March 2016 well

18 after the plan became effective as far as I understand and

19 that claim, itself, was extinguished by the plan in exchange

20 for interest in the GUC Trust.

21       There is a prohibition in the plan for, actually,

22 acquiring interest in the GUC Trust.  I don't know if that is

23 unusual or not.  I am not, by any means, steeped in

24 bankruptcy law as the court is, but it is, in fact, in the

25 plan in Section 1.7 and 3.2.3.

1          As far as we can tell, despite the thousand pages

2     of exhibits there is no suggestion by Mar-Bow that they even

3     tried to acquire interest in the GUC Trust and they couldn't

4     under the plan anyway.  So, yes, Your Honor, we think it's

5     dispositive of standing.

6          THE COURT:  Right, but my question was, as a

7     hypothetical, if you didn't have that gating question would

8     you acknowledge or agree with standing if, again, it was AAA

9     showing up, not whoever they acquired the thing from because

10    I will be honest, and, again, I don't want to quibble with

11    you about it, I regard that transfer restriction of

12    relatively limited significance.

13         What it means, perhaps is that the acquirer

14    wouldn't necessarily be able to sue the trustee or be made at

15    the trustee, etc., and the trustee wouldn't necessarily be

16    obliged to continually update his or her distribution

17    schedules, but rather I have a contract with someone and when

18    they get a distribution they got to give it to me because I

19    acquired it.

20         So, that is a long way of saying I'm not sure that

21    if that transfer restriction and, therefore, a challenge to

22    the validity of the acquisition of the claim or the

23    beneficial interest in the trust is -- if that is the great

24    wall that stops this then I think we have -- I don't think

25    that's your argument, but I guess my point is that I don't

1 necessarily see that as being the end of the inquiry.

2          Let's assume that they've, at least, acquired,

3 perhaps once removed, some right associated with a

4 distribution because, otherwise, I mean that trade

5 restriction, again, is of relatively limited significance to

6 me to the questions that are really before me.  Do you know

7 what I mean?

8          MS. GAY:  I think I do, Your Honor.

9          So, our argument is multi-pronged certainly.  One

10 that they bought after, obviously, the plan was confirmed,

11 well after.  Secondly, that all those interests did go to one

12 of the two trusts under the plan.  So, the trusts have

13 standing. They filed -- you know, they filed papers here

14 saying -- and I don't think it matters because Mar-Bow has no

15 interest in either of those trusts.

16          So, with regard to that the parties with standing

17 at this point in time are the two trusts.  They filed here

18 and they disagree as to who would have an interest in the

19 claim, but it's nothing that I think they violently agree on

20 Your Honor, is that it's not Mar-Bow or anyone like Mar-Bow.

21          You asked a slightly broader question.  So, my

22 response would be if it's a general unsecured claim pre-

23 confirmation, this whole argument, that's fine.  That's what

24 1109 is all about.  I think that is pretty clear.  If it's

25 GUC Trust's or the other trust after confirmation they have a

1  stake as well, but Mar-Bow simply does not for one of several

2  reasons.

3        Both having -- you know, cause when Mr. Rhodes

4  stands up here and says they're a creditor; well, they're

5  not.  They tried to buy this claim afterwards.  They don't

6  have an interest in the trust.  The trusts are the ones with

7  standing at this point in time.

8        So, I have covered, Your Honor, I think, unless

9  the court has questions that fraud on the court allegations

10  are not a carve-out to Article III standing.  You still have

11  to have a pecuniary interest to advance those.  The three

12  circuit cases and others say that very, very clearly.

13        I think there are two other arguments that may

14  well have been covered by me as well, but just let me be sure

15  because I think they're slightly independent if I understand

16  Mr. Rhodes correctly.

17        The second argument is that there is this, sort

18  of, attenuated step on step on step that I would call

19  speculative for sure.  I think under Article III standing

20  just doesn't work here.

21        I think what Mr. Rhodes is saying -- let me just

22  be sure I wrote the notes down right -- that if it has

23  standing as opposed to the trust, if it prevails on its

24  motion, if somehow RTS is sanctioned as three steps, if --

25  and, again, I'm just looking at what Mr. Rhodes says, if --

1          THE COURT:  Actually, can I but in --

2          MS. GAY:  Yes, please.

3          THE COURT:  -- because I think you started on the

4  wrong step.  I don't mean it disparaging, but in some ways I

5  think that the argument is intentionally kind of circular and

6  that is that if Mar-Bow prosecutes its motion, and carries

7  its burden, and obtains an award the court has brought

8  discretion, unlimited discretion, I think, was their word, to

9  fashion a relief which could go to Mar-Bow, which means Mar-

10 Bow has standing.

11         MS. GAY:  Something like that.  There might be an

12 extra step or two in there because also the court would have

13 to disregard the plan, I think.

14         THE COURT:  Right.

15         MS. GAY:  Mar-Bow is very fond of calling this

16 sanctions.  I mean certainly the trustee settlement that Mar-

17 Bow referend is not a sanction.  Those are settlement

18 proceeds. So, whatever could come out of this and, again,

19 Your Honor, just to note for the record we think there is no

20 there, there.  We think it's simply an anti-competitive

21 dispute.

22         Again, all of those if's are incredible

23 hypothetical including that the court would elect to give

24 something to Mar-Bow instead of to those who would receive

25 interests, who have interests under the plan.  This circuit

1   has none of that.  It says a theory of standing that relies

2   on a highly attenuated chain of possibilities is not enough.

3   And this is <u>Clapper v. Amnesty International</u>.  It went up and

4   down and up and down, and it takes about that much.

5           And as now Chief Justice Roberts has said,

6           "It's not enough to have a colorable, arguable

7           remedial claim to relieve at the pleading stage."

8           You can't just say there is a possibility,

9   striated four or five different ways.  You have to say we

10  have an injury that is fairly traceable and it's a concrete

11  money interest.  That doesn't change.

12          There is a slight argument, I think, Mr. Rhodes

13  hasn't mentioned so much today, but is in his papers, doesn't

14  change if the parties seeking some kind of equitable relief.

15  For that I think the court and I think you have seen this in

16  the <u>A&R</u> argument.  There is a dispositive case from the

17  Supreme Court from just 2009, Summersview (indiscernible)

18  Institute [phonetic].

19          On the issue of 1109 providing standing -- again,

20  Your Honor, I think that's been pretty well covered here, but

21  the cases that are cited in Mar-Bow's brief have nothing to

22  do with standing. They deal with everything as various as

23  sovereign immunity or whether the claims of states can be

24  adjudicated by the Federal Bankruptcy Court.  But one thing

25  is clear, all three of them have nothing to do with standing.

1          Certainly, 1109, before the confirmation, let's

2    people come in and complain.  Well, Mar-Bow may have known

3    about this, but they were nowhere on the scene at that point.

4    There is, certainly, a raise, an *in rem* at that time, but at

5    this point there is not.

6          So, you know, Mar-Bow doesn't respond to the fact

7    that it's any kind of hypothetical speculative interest they

8    could have had it gone based on the plan confirmation.  At

9    that time there are these two buckets, the two trusts and

10   they are the one that has standing.

11         Under any view, again, we have two conflicting,

12   sort of, placeholder motions here as I understand them.

13   Neither of them are suggesting Mar-Bow has standing.  They're

14   suggesting we have.  That is exactly what the plan says.

15   Your Honor, there is just not a case --

16         THE COURT:  You mean the two placeholders coming

17   in from the reorganized debtor?

18         MS. GAY:  Yes, right.

19         THE COURT:  Okay.

20         MS. GAY:  Again, Your Honor, forgive me.

21         THE COURT:  That's okay.  I get you.

22         MS. GAY:  I do feel like I'm getting a little bit

23   of an LLM in bankruptcy in all this.

24         THE COURT:  You are doing fine.

25         MS. GAY:  I appreciate that.  Again, there is not

1  a case anywhere, any shape or form, at least, cited in these

2  voluminous papers and I have to think we have everything

3  because this is the fourth time around or, at least, the

4  third time around that says a party can proceed without a

5  pecuniary concrete non-speculative interest.

6          THE COURT:  How do I deal with, I think, the

7  argument that Mr. Rhodes walked through at the conclusion of

8  his comments, and I realize that it bleeds into the merits,

9  but I think I need your response on it.  The concern was, as

10  described by Mr. Rhodes, that McKinsey is in a position --

11  again, these are their allegations.

12          MS. GAY:  Understood, Your Honor.

13          THE COURT:  Having committed what it did at this

14  stage then to further gain the system because, I think, their

15  allegation is that perhaps the folks that might have the most

16  obvious standing, right, the two trusts or the two entities,

17  are populated by people that McKinsey has a relationship

18  with.  So, this kind of -- it's almost a this cannot stand

19  argument.  I'd like your response.

20          You heard his argument, perhaps I'm not

21  capsulizing it perfectly, but part of the concern that he has

22  is if McKinsey is right, McKinsey has put the rabbit in the

23  hat.  I think what he is saying is that, Judge, you shouldn't

24  stands for that.  How do I deal with that?  I recognize that

25  you denied that, but I think I'd like you to respond to his

1  argument.

2          MS. GAY:  Your Honor, we do deny it.  And I

3  appreciate you giving me the chance to respond to it.  Every

4  allegation of fraud made here, Your Honor, is absolutely

5  false.  I mean I would simply direct Your Honor, just by way

6  of example, to Exhibit 8 in their papers which lays out

7  evidence not about us --

8          THE COURT:  Well, I want to circle back.

9          MS. GAY:  Should I just stop there?

10         THE COURT:  Yeah.

11         MS. GAY:  Okay.

12         THE COURT:  I'm not being clear.  Perhaps a

13 slightly different analogy.  One of the ways, in a bankruptcy

14 case, that you shut people up is to pay them.  Sometimes you

15 pay people you don't like or that you don't want to hear

16 from.  I have had, at that podium, arguments from people that

17 have been treated in a particular way to be unimpaired

18 because we know that they object.  And what you're going to

19 do is shut them up.  That is not a perfect analogy, but I

20 think that that is, at least, part of the criticism that the

21 other side has of yours is to say -- and we're bleeding into

22 the merits.  For that I apologize, but I'm asking the

23 question.

24         MS. GAY:  No problem, Your Honor.

25         THE COURT:  You can't -- I think the argument from

1  Mr. Rhodes was you can't commit wrongdoing and then structure

2  it in a way that you're insulated from being criticized for

3  it because of the procedures.  Maybe this circles all the way

4  back to where we started; you know, if fraud on the court

5  different that we have a broader inquiry because we have a

6  responsibility to the integrity of the process rather than to

7  see whether or not this side gets 15 cents or 26 cents on the

8  dollar.

9         I realize I'm not being that clear, but I mean I

10 think that that was part of the theme of the argument at the

11 end that the standing inquiry becomes this antiseptic narrow

12 myopic, is one of the words in the pleadings that you saw.  I

13 guess that's it.  Respond to the argument that your position

14 requires a request that I be myopic, that I not look at this

15 for what they say it is.

16        MS. GAY:  Well, first of all, Your Honor, you're

17 quite clear.  I think I wasn't clear.  So, forgive me and let

18 me try again.  We are not running from these allegations,

19 Your Honor.  We're not trying to say please resolve this on a

20 technicality.  We have made fulsome filings with the court

21 and I will refrain from my passionate desire to tell you my

22 favorite exhibits, but you do have all of our filings.

23        What we're saying is you can't come into court --

24 these guys respectfully, and I am not going to devolve into

25 name calling, but --

1          THE COURT:  When you start with these guys we

2  ought to --

3          MS. GAY:  They're not just fellows off the street,

4  as they say.  They are our competitor.  So, they come in here

5  and they make rank speculation on top of rank speculation.

6  We believe our papers, without further ado, demonstrate.  The

7  court retains authority to read those papers, to take into

8  account the arguments, to call us in to ask questions. We're

9  just saying Mar-Bow cannot come in here as a competitor of

10  ours, make false accusations, disparage our people and

11  proceed to be some kind of private attorney general.

12          As the court referenced, the United States Trustee

13  has settled the issues of what -- the good faith issues of

14  the type and methodology of our disclosures.  As Mr. Rhodes

15  noted for you today, Your Honor, the United States Trustee

16  has full range to look at whatever else they want to.  That

17  is what they are charged with doing.

18          The court system does not allow particularly for a

19  competitor to become a private policeman with no interest in

20  the game.  So, we've got -- we have people with standing

21  under the plan, we have the trustee.  Most importantly, Your

22  Honor, we have you.  And we are always happy to answer

23  questions.  We think our briefs are pretty good on it.  We

24  think that the court can look at public things like the

25  Luskin report which deals with a lot of these issues.

1          THE COURT:  From Puerto Rico?

2          MS. GAY:  Yes.

3          THE COURT:  I have it.

4          MS. GAY:  Which Mr. Rhodes says we have never

5    answered questions about X, Y and Z.  Well, that X, Y and Z

6    is in that report.  It's filed with this court.  I won't go

7    any further except to say that no matter how important the

8    issue is, because pointing that someone else doesn't have

9    standing is not an answer to having standing here.

10          This circuit, Supreme Court requires a pecuniary

11   interest.  They don't have anything close to it, Your Honor.

12   They bought a claim after the fact.  They have no interest in

13   these trusts.  They have nothing.  You have a lot.  So, if

14   you have questions, Your Honor, we are happy to answer them

15   and we look forward to it.

16          THE COURT:  Very good.

17          MS. GAY:  Thank you, Your Honor.

18          THE COURT:  Thank you, Ms. Gay.

19          Mr. Rhodes, reply?

20          MR. RHODES:  Ms. Gay made several points that I

21   feel obligated to respond to.

22          THE COURT:  Of course.

23          MR. RHODES:  Beginning once again, Your Honor,

24   with our mediator's assertion in a court filed paper that the

25   settlement he had negotiated was a settlement of a good faith

1  dispute.  As we argued in our reply, we do not believe that

2  that statement by that mediator is entitled to any weight in

3  any court.  With all due respect to Judge Isgur, who we all

4  due respect, it was beyond his authority as a mediator to

5  make that finding.  We will argue that when and if McKinsey

6  asks this court to place any weight upon it.

7         McKinsey argues that it made disclosure pursuant

8  to this court's order.  Your Honor, it disclosed the identity

9  of none of its connections in response to that order.

10 McKinsey asserts, Ms. Gay asserts that no case says that we

11 can proceed without a pecuniary interest and yet, Your Honor,

12 that is precisely what the Global Industrial Technologies

13 case cites when it quotes from the Congoleum case.

14         I have to point out, which I don't think I quite

15 did earlier, the Global Industrial Technologies case is a

16 case that McKinsey, itself, cited.  And in that case the

17 court said,

18         "Article III standing need not be financial."

19         In the Global case the court did say that the

20 financial interests of the insurance companies whose standing

21 was at issue there was staggering and, indeed, they were.

22 They were not financial interests in the race of the

23 bankruptcy case.  They just weren't.

24         It's not a huge deal and I don't want to make too

25 much out this, but in the Denison case there was a motion for

1  relief from the order of the court.

2          THE COURT:  There was.

3          MR. RHODES:  It was a motion.  It wasn't the court

4  bringing it up *sua sponte*.

5          We do not seek a ruling from this court that says

6  that standing -- the standing requirement of Article III is

7  different in a fraud on the court motion.  We do not seek

8  that ruling at all.  We seek the court to impose the same

9  Article III standing requirement on a fraud on the court

10 claim as it would at any other point in the proceeding which

11 is that -- which the Third Circuit says is co-extensive with

12 Rule -- excuse me, Section 1109 of the Bankruptcy Code.

13         The three Circuit Court cases that McKinsey relies

14 on from the Ninth, the Eleventh and the Seventh Circuit all

15 say non-parties don't have standing to bring Rule 60(d)(3)

16 fraud on the court motions.  This is an unexceptional holding

17 and one that we take no exception to at all.  I would note

18 that, as I recall, at least, none of them are bankruptcy

19 cases, but the point is --

20         THE COURT:  That's right.

21         MR. RHODES:  -- they conclude, and rightly so,

22 that an entity bringing a fraud on the court claim has to

23 have standing.  We agree.

24         I want to address the piece in RICO, the piece

25 that was quoted from our RICO complaint, no proof of

1 financial loss.

2          THE COURT:  That was from the briefing.

3          MR. RHODES:  Yeah, the briefing on RICO, not the

4 complaint itself.  Again, Your Honor, the Supreme Court has

5 dealt with this very concern in the context of bankruptcy,

6 and the case is Woods v. City National Bank & Trust, 312 U.S.

7 262.  And in that case the court said,

8               "Where a claimant who represented members of the

9               investing public was serving more than one master

10              or was subject to conflicting interest he should

11              be denied compensation.  It is no answer to say

12              that fraud or unfairness were not shown to have

13              resulted."

14         And the court gave three reasons for that

15 conclusion, all of which apply here.  The court said,

16              "What is struck at by this ruling, in a refusal to

17              enforce contracts of this kind where there are

18              conflicting maters, is not only the actual evil

19              that results, but their tendency to evil in the

20              future and future cases.  It's a matter of

21              deterrence as much as anything else.  The sanction

22              for fraud on the court is as much about deterrence

23              as anything else."

24         And the court went on to make a very practical

25 point,

1        "The incidents of particular conflict of interest

2        can seldom be measured with any degree of

3        certainty.  The bankruptcy court need not

4        speculate as to whether the results of the

5        conflict was to delay action where speed was

6        essential or to close the record of past

7        transactions where publicity and investigation

8        were needed, or to compromise claims by

9        inattention where vigilant assertion was necessary

10        or, otherwise, to dilute the undivided loyalty

11        owed to those to whom the claimant purported to

12        represent."

13        THE COURT:  That quote is in your reply.

14        MR. RHODES:  I'm not sure that it is, Your Honor.

15        THE COURT:  I'm pretty sure it is.

16        MR. RHODES:  Okay.  Finally, the court said, and

17   it used the word fiduciary,

18        "A fiduciary represents security holders in an

19        organization may not perfect its claim to

20        compensation by insisting that, although, we have

21        conflicting interests he served his masters

22        equally well or that his primary loyalty was

23        weakened by --

24        THE COURT:  He didn't favor one over the other.

25        MR. RHODES:  Yeah.  Then we go on actually to

1  quote the famous Justice Cardozo about the trodden crowd and

2  all of that.  So, the fact that Mar-Bow disavows any

3  financial harm from McKinsey's fraud on the court is

4  irrelevant to our standing under the Woods case.

5         My preference would be not to discuss issues of

6  latches or waiver unless the court specifically asks me to at

7  this time.

8         THE COURT:  No.  I don't think that that's

9  necessary.  That is definitely not part of the inquiry of

10  this discussion.

11         MR. RHODES:  Ms. Gay goes on and on about how

12  condition one, and condition two, and condition three and

13  four if, if, if have to all be met before we get to the issue

14  of who gets the money.  Your Honor, that's true in every

15  single piece of litigation.  To establish standing a

16  plaintiff does not have to show, as a preliminary matter

17  before any discovery, the merit of the claim.  Case after

18  case says merits are separate from standing.

19         It may well be that the two trusts here have

20  standing.  This is not an issue that we have researched nor

21  are we particularly concerned about.  We're concerned about

22  whether we have standing.

23         THE COURT:  I agree with that.  Can I ask a

24  question that, I think, was the subject of some discussion in

25  one of the prior arguments?  I think it may have been Judge

1  Bernstein who said wouldn't I be better off allowing the

2  District Court litigation to proceed, there's a jury there

3  who will make all the findings, and the whole process will

4  play itself out, and I will be guided by whatever comes out

5  of that.

6       I think that that question was raised by Judge

7  Bernstein.  I confess I don't recall what the response was.

8  So, I'd like to know.

9       MR. RHODES:  Again, this is not an issue of

10  standing, but since Your Honor has raised it, we will

11  certainly answer it.

12       The issues in the RICO case --

13       THE COURT:  Which I have, but as much fun as this

14  has been, I have not read the RICO complaint.  I will be

15  honest with you.

16       MR. RHODES:  Fair enough.  So, the issues in the

17  RICO case are different.

18       THE COURT:  Okay.

19       MR. RHODES:  That's why.

20       THE COURT:  Okay.  Well, obviously, the issues

21  that are here in front of me are particular.  I think there's

22  a broader question I'm asking and maybe this circles back to

23  the back and forth we had about getting a little bit of

24  context.  What happened with the U.S. Trustee?  Where are you

25  with the A&R case versus Sun Edison, versus Westmoreland,

1  versus the District Court litigation.

2        It's not typical that -- I mean this has to be

3  ground hog day for you.  I mean this is, basically, the third

4  nearly identical, fourth --

5        MR. RHODES:  If you count Westmoreland.

6        THE COURT:  Oh, right, the fourth argument that is

7  nearly identical, but the operative facts at a merits stage

8  would be different.

9        MR. RHODES:  Yes.

10        THE COURT:  If we got to the merits stage then the

11  question would be having determined that you have standing

12  the question would be what relationships did McKinsey or its

13  affiliates have with the creditor universe of this peculiar

14  debtor.

15        MR. RHODES:  Yes.

16        THE COURT:  And you would have the same inquiry,

17  but the different universe of facts and parties in Sun

18  Edison, and Westmoreland, and A&R.

19        The question, I think, is a question judges ask

20  which is what should I be doing?  What's the most practical

21  and efficient way to proceed? So, if there are three or four

22  courts that are answering a particular question what should I

23  be doing?

24        I will -- I think that this is in your papers.  It

25  is certainly in the argument.  I am cognizant of my own

1  responsibilities.  So, that much I get.  Again, I think Judge

2  Bernstein's question was can we get some of these questions

3  answered by somebody else and then I will be guided by that

4  and conduct a more focused hearing.  Where do I go with that?

5         MR. RHODES:  So, the issues in a RICO action are

6  different.  The elements to get a remedy are different.  The

7  result of the RICO action may well be a general verdict that

8  doesn't give any of the bankruptcy courts any guidance about

9  what the jury felt about McKinsey's conduct in any specific

10 case.  As Your Honor knows, contract litigation like a RICO

11 action, unless it's terminated on a motion to dismiss, can

12 take years to resolve.

13        THE COURT:  I don't disagree and I don't want

14 parties concerned that I'm asking about whether or not I

15 should stay this until a District Court litigation is all

16 done.  That is not going to happen.  I'm just trying to

17 figure out the interplay between the two.

18        One of the obvious concerns that comes up with any

19 kind of litigation is the prospect of inconsistent

20 adjudications on threshold issues.  If it gets to the merits,

21 I could easily see Judge Bernstein saying there's a problem,

22 this should have been disclosed because of the relationship

23 between entity A and this creditor where Judge Hennigan might

24 say that's not a material relationship or it wouldn't have

25 driven anybody's analysis.  That's a merits issue.  Again,

1 | when you've got, essentially, the same parties and,

2 | essentially, the same issues being raised courts are

3 | cognizant of the prospect that we will head in different

4 | directions.

5 |      MR. RHODES:  It's a perfectly fair question.

6 | There is significant overlap in the facts, but what there is

7 | not significant or really any overlap in is the claims.  The

8 | legal issues that apply to those facts.  That is the problem.

9 |      THE COURT:  Okay.

10 |      MR. RHODES:  In bankruptcy, unlike in civil

11 | litigation, we do not have the benefit of a multi-district

12 | litigation panel, right?

13 |      THE COURT:  No, but you had that three judge

14 | hearing. I haven't done one those and I'm not volunteering

15 | either.

16 |      MR. RHODES:  Good.  So, just two more points.

17 |      THE COURT:  Sure.

18 |      MR. RHODES:  I hesitate to tread on, at least, the

19 | first one.  Let me go to the second one.  The Luskin report

20 | deals with Puerto Rico.  Section 327 does not apply under

21 | promisa for Puerto Rico.  So, whatever the Luskin report

22 | found or didn't find had nothing to do with McKinsey's

23 | obligations under Section 327 or, frankly, Rule 2014 of the

24 | Federal Rules of Bankruptcy Procedure.  What Ms. Gay didn't

25 | tell you was that the Luskin report for all of the findings

1  that it made did recommend that McKinsey disclose its

2  investment connections.

3          Now, let me turn to the last one that I hesitate

4  to jump into, but I feel the obligation to because we have

5  twice now been accused to Your Honor of making false

6  allegations.  Now, we understand that they contest them.

7  That's fine.  But on the phone and by implication here -- on

8  the phone explicitly and by implication here today we were

9  accused of intentionally making false allegations.  Your

10 Honor, that is a very serious charge.  We object to it

11 vehemently.

12         Every single allegation in the motion before the

13 court has been checked, double checked and triple checked by

14 the evidence that we have accumulated and guess where we got

15 that evidence; mostly from McKinsey, mostly from the

16 disclosures that McKinsey has made in other cases, but not in

17 this case and mostly from the disclosures that McKinsey made

18 on the Labor Department website regarding its investment

19 connections.

20         So, we got the evidence, Your Honor.  And if Your

21 Honor has any doubt whatsoever about our good faith, and

22 evidentiary basis for bringing this motion I would call Mr.

23 Alix to the stand.

24         THE COURT:  We're not doing that today, but I

25 understand the point.

1    MR. RHODES:  Thank you, Your Honor.  That's all I

2  have.

3    THE COURT:  All right.  Do we have anything

4  further?

5    MS. GAY:  Just very briefly, Your Honor.

6    THE COURT:  Sure.

7    MS. GAY:  I'm not going to repeat anything from

8  the cases we've already talked about because I think they are

9  in our briefs for sure.

10    THE COURT:  Okay.

11    MS. GAY:  I will say that, you know, the

12  suggestion -- and this is in our briefs, I'll be quick --

13  that you can make a, sort of, good faith claim or whatever;

14  I'm not quite sure what Mr. Rhodes said here, but you can

15  make a conjectural claim and then find discovery to find

16  understanding.  It is just not the law of this circuit.

17    One case that we didn't cite to Your Honor on that

18  is Huertas v. City of Camden, which is 245 Federal Appendix

19  168, 172.  I would also note that since Your Honor is reading

20  these cases so carefully that Woods that was cited for the

21  first time in rebuttal here is not a standing case at all,

22  which Mr. Rhodes has cited.  It's in the papers.  So, you can

23  find that there as well.

24    I would say, Your Honor, that the facts do matter.

25  This is not a situation where, yes, the RICO claims are

1  different then the bankruptcy claims, but the factual

2  assertion that there was no harm, no damage made by Mar-Bow

3  does matter.  I would say the facts do matter in terms of the

4  Puerto Rico report which finds the separation between the

5  investment affiliate and the consulting affiliates which is a

6  huge part of Mar-Bow's claim here to be solid, worthwhile,

7  diligent, ethical; all of those things.

8          So, I think the facts do matter.  The facts matter

9  that Mar-Bow has ignored issues like a look back period

10 that's used wide in the industry, has ignored separate

11 between investment affiliates and consulting affiliates; all

12 those things which I think, Your Honor, are for the court to

13 review the papers and see if there are questions.

14         To say one thing in one place and say something

15 else in another matters.  I think we've said enough today,

16 Your Honor.  We appreciate your time, but we are available if

17 there are questions that the court has about the papers we

18 filed here which we think not only firmly established that

19 Mar-Bow has no financial interest despite its thousand pages

20 of filings, but also really set out clearly what McKinsey has

21 tried to do in these disclosures and others as well.

22         So, thank you, Your Honor.

23         THE COURT:  Okay.  Mr. Rhodes, would you like the

24 last word?

25         MR. RHODES:  No.  Thank you, Your Honor.

1       THE COURT:  Thank you very much.  All right.  I

2   very much appreciate the argument and the submissions.

3   Obviously, I'm going to take the matter under advisement.  I

4   don't believe that both parties have offered to answer any

5   questions the court has.  I don't believe that I have any at

6   this time.  I am going to take the matter under advisement

7   and I expect to rule promptly.

8       Again, I very much appreciate the submissions and

9   the argument was particularly helpful.  We'll stand in

10  recess.  Have a good day.

11      ALL:  Thank you, Your Honor.

12      (Proceedings concluded at 11:55 a.m.)

13

14

15                          CERTIFICATE

16

17      I certify that the foregoing is a correct transcript

18  from the electronic sound recording of the proceedings in the

19  above-entitled matter.

20

21  /s/Mary Zajaczkowski_____           May 17, 2019

22  Mary Zajaczkowski, CET**D-531

23

24

25